TONY LOPRESTI, SBN 289269
County Counsel
KAVITA NARAYAN, SBN 264191
Chief Assistant County Counsel
MEREDITH A. JOHNSON, SBN 291018
Lead Deputy County Counsel
RAPHAEL N. RAJENDRA, SBN 255096
HANNAH M. GODBEY, SBN 334475
Deputy County Counsels
70 West Hedding Street, East Wing, Ninth Floor
San José, California 95110-1770
Telephone: (408) 299-5900
E-Mail: Raphael.Rajendra@cco.sccgov.org
         Hannah.Godbey@cco.sccgov.org

DAVID CHIU, SBN 189542
City Attorney
YVONNE R. MERÉ, SBN 175394
Chief Deputy City Attorney
MOLLIE M. LEE, SBN 251404
Chief of Strategic Advocacy
SARA J. EISENBERG, SBN 269303
Chief of Complex and Affirmative Litigation
DAVID S. LOUK, SBN 304654
STEVEN A. MILLS, SBN 328016
Deputy City Attorneys
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, CA 94102-5408
Telephone: (415) 355-3308
E-Mail: David.Louk@sfcityatty.org
         Steven.Mills@sfcityatty.org

*Attorneys for Plaintiff*
*County of Santa Clara*

*Attorneys for Plaintiff*
*City and County of San Francisco*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COUNTY OF SANTA CLARA; CITY AND COUNTY OF SAN FRANCISCO, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security, *et al.*,<br><br>Defendants. | Case No. 5:25-cv-08330-EJD<br><br>**[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date: November 20, 2025<br>Time: 9:00 a.m.<br>Before: Hon. Edward J. Davila<br>Place: U.S. District Court<br>San Jose Courthouse<br>280 South 1st Street<br>Courtroom 4—5th Floor<br>San Jose, CA 95113<br><br>Trial Date: None set |

[PROPOSED] ORDER GRANTING PLTFS' MTN FOR PI, CASE NO. 5:25-cv-08330-EJD

1

\\ctyatt06svr\lit_support\stradv\images\trump 2025\260235_dhs grant conditions\2025-10-02 pi filing\2025-10-01 proposed order - final draft.docx

This matter came before the Court on Plaintiffs' Motion for a Preliminary Injunction (the "Motion").[1] Having considered the briefs and declarations submitted in support of and in opposition to the Motion, and the other pleadings and papers filed in this action, and the arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law.

**FINDINGS OF FACT**

1. For decades, Congress has appropriated billions of dollars to support state and local disaster preparedness and emergency response to prevent and mitigate the harms caused by unpredictable disasters, emergencies, and security threats. *See Illinois v. FEMA*, No. 25-206 WES, 2025 WL 2716277, at *1 (D.R.I. Sept. 24, 2025). "Over time, this support has been expanded through various statutes such as the Stafford Act, the USA PATRIOT Act, the Maritime Transportation and Security Act, and the Post-Katrina Emergency Management Reform Act, among others." *Id.* These congressionally authorized programs vary in scope and purpose, yet collectively include funding to respond to, prevent, and prepare for wildfires, floods, acts of terrorism, and more. Despite the nuance and particularity enshrined in each authorization, they are united by a common theme of providing local governments with critical financial support to prepare for and respond to emergencies, threats, and similar safety needs.

2. The Department of Homeland Security ("DHS"), Secretary of Homeland Security Kristi Noem, the Federal Emergency Management Agency ("FEMA"), and David Richardson, the

---

[1] Plaintiffs consist of the County of Santa Clara, City and County of San Francisco, City of Alameda, City of Bellingham, City of Berkeley, City of Culver City, City of Los Angeles, County of Los Angeles, Los Angeles Consolidated Fire Protection District, Martin Luther King, Jr. County, County of Marin, City of Oakland, City of Palo Alto, City of Pasadena, City of Petaluma, Pierce County, City of Sacramento, City of San Diego, County of San Diego, City of San José, County of San Mateo, City of Santa Monica, City of Santa Rosa, Snohomish County, County of Sonoma, Sonoma County Community Development Commission, Sonoma County Water Agency, Sonoma Valley County Sanitation District, and the City of Tucson (collectively, "Plaintiffs").

Senior Official Performing the Duties of FEMA Administrator (collectively "Defendants") have primary responsibility for administering these programs and issuing appropriated funds.

3. Plaintiffs have consistently relied on these funds to protect and serve their communities through a range of initiatives, ranging from increasing staffing of and programs for first responders, securing equipment to promote health, safety, and security, developing and protecting critical infrastructures, preparing for disasters like fires, floods, and earthquakes, updating technological capabilities, and building robust regional partnerships.

4. Each of the Plaintiffs has applied for or received, or will imminently apply to or anticipate receiving, funding under one of more of the following DHS grant programs: Port Security Grant Program ("PSGP"), 46 U.S.C. § 70107; Transit Security Grant Program ("TSGP"), 6 U.S.C. § 1135; Assistance to Firefighters ("AFG"), 15 U.S.C. § 2229; Staffing for Adequate Fire and Emergency Response ("SAFER"), 15 U.S.C.§ 2229a; Homeland Security Grant Programs ("HSGP"), including Urban Areas Security Initiative ("UASI") and State Homeland Security Program ("SHSP"), 6 U.S.C. § 603 *et seq.*; Emergency Management Grants Program ("EMPG"), 6 U.S.C. § 762; Urban Search & Rescue ("US&R"), 42 U.S.C § 5165f; Hazard Mitigation Grant Program ("HMGP"), 42 U.S.C. § 5170c(a); and Securing the Cities ("STC"), 6 U.S.C. § 596b(a).

5. In the final days of the 2025 federal fiscal year, Defendants began issuing awards for these grants and presenting Plaintiffs, or the States through which Plaintiffs receive funding as subrecipients, with grant agreements incorporating terms from DHS's FY 2025 DHS Standard Terms and Conditions Version 3 Dated April 18, 2025 ("Standard DHS Terms"), of which the Court has taken judicial notice. (Request for Judicial Notice ["RJN"], Ex. 1). The Standard DHS Terms "apply to all new federal awards of federal financial assistance (federal awards) for which the federal award date occurs in FY 2025 and flow down to subrecipients unless a term or condition specifically indicates otherwise." Standard DHS Terms at p. 1. And in practice, Defendants have incorporated many of these terms directly into Plaintiffs' grant awards.

6. Plaintiffs' awards contain two categories of unlawful conditions addressed in Plaintiffs' Motion that Defendants have never previously imposed on Plaintiffs: (1) a Discrimination Condition

and requirements implementing that Condition; and (2) an Executive Order Condition ("EO Condition") requiring compliance with all present and future executive orders related to grants.

7. With respect to the new Discrimination Condition contained in the Standard DHS Terms:

    a. Plaintiffs must certify that "[t]hey do not, and will not . . . operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws" and that "[t]hey do not engage in and will not during the term of this award engage in, a discriminatory prohibited boycott." Standard DHS Terms §§ C.XVII.2.a.i-ii.[2]

    b. DEI is defined to mean "diversity, equity, and inclusion." Standard DHS Terms § C.XVII.1.a. DEIA is defined to mean "diversity, equity, inclusion, and accessibility." *Id.* § C.XVII.1.b. The Court uses DEIA to refer to both DEI and DEIA. "Discriminatory equity ideology has the meaning set forth in Section 2(b) of Executive Order 14190 of January 29, 2025." *Id.* § C.XVII.1.c. There are no definitions or examples of the phrases "diversity," "equity," "inclusion," "accessibility," "operate," "advance," "promote," "engage," or "discriminatory prohibited boycott" in the Standard DHS Terms.

    c. The Discrimination Condition also requires that "[r]ecipients must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of 31 U.S.C. § 372(b)(4)." Standard DHS Terms § C.XVII. Within the Standard DHS Terms, "Federal anti-discrimination laws mean Federal civil rights law that protect *individual Americans* from discrimination on the basis of race, color, sex, religion, and national origin." *Id.* § C.XVII.1.d (emphasis added). On its

---

[2] Another term requires recipients to certify that "[t]hey do not, and will not . . . operate any program that benefits illegal immigrants or incentivizes illegal immigration." Standard DHS Terms § C.XVII.2.a.iii. This term was vacated in *Illinois* and has been expressly excluded from Plaintiffs' awards on that basis. Accordingly, Plaintiffs do not move for relief on this provision at this time.

face, this definition seemingly excludes non-citizens by indicating that these laws "protect individual *Americans* from discrimination"—even though civil rights laws facially protect individuals *and* classes of persons from discrimination based on national origin, in addition to protections based on race, sex, religion, and disability.

8. In addition, the Standard DHS Terms broadly require recipients to comply with various civil rights laws. For instance, recipients must "comply with the requirements of Title VI of the Civil Rights Act of 1964," "Title VIII of the Civil Rights Act of 1968," and "Title IX of the Education Amendments of 1972," to name a few. Standard DHS Terms §§ C.VII-VIII, XIV (together with the provisions cited in the footnote, the "Civil Rights Conditions").[3] As discussed below, the current President and his Administration have taken actions that call into question the meaning of these federal anti-discrimination laws.

9. In furtherance of the Discrimination Condition's restrictions on DEIA, Defendants are also requiring recipients of certain awards to agree to comply with derivative conditions in FEMA's August 2025 Preparedness Grants Manual. *See* RJN, Ex. 3 ("Grants Manual"). The Grants Manual dictates that "[a]ll non-disaster grant program reimbursement requests must be reviewed and approved by FEMA prior to drawdowns." Grants Manual § 6.11.3. To the extent "funding is provided directly or indirectly to a subrecipient," the reimbursement request must indicate "[w]hether the subrecipient has *any* diversity, equity, and inclusion practices." *Id.* (emphasis added). The Court refers to this as the "DEI Disclosure Requirement." The DEI Disclosure Requirement does not define "diversity," "equity," or "inclusion practices," and facially is not limited to violations of federal anti-discrimination laws.

10. As to the EO Condition identified by Plaintiffs:

---

[3] *See* Standard DHS Terms § C.III [Age Discrimination Act of 1975]; *Id.* § C.IV [Americans with Disabilities Act of 1990]; *Id.* § C.VII [Civil Rights Act of 1964]; *Id.* § C.VIII [Civil Rights Act of 1968]; *Id.* § C.XIV [Title IX]; *Id.* § C.XVI [Equal Treatment of Faith-Based Organizations]; *Id.* § C.XXIV [Civil Rights Act of 1964, Title VI]; *Id.* § C.XXXIII [Rehabilitation Act of 1973].

      a. The Standard DHS Terms state "[r]ecipients must comply with the requirements of Presidential Executive Orders related to grants (also known as federal assistance and financial assistance), the full text of which are incorporated by reference." Standard DHS Terms § C.XXXI.

      b. Defendants have provided little detail on what "compliance" with the EO Condition would require, including how an executive order is "related to grants." Standard DHS Terms § C.XXXI. The provision is capable of any number of readings and is extraordinarily ambiguous, especially given that the current Administration has issued over 200 executive orders to date in President Trump's second term alone. Moreover, executive orders do not by their terms apply to federal grant recipients. Underscoring the ambiguous nature of the EO Condition here, the Standard DHS Terms do enumerate *specific* executive orders in other parts that must be complied with, raising serious question about the full scope of Plaintiffs' obligations. *E.g.*, *id.* §§ C.XI, C.XLI.

11. Collectively, the Court refers to the Discrimination Condition, DEI Disclosure Requirement, and EO Condition as the Unlawful DHS Conditions throughout this order.

12. Against the backdrop of the Unlawful DHS Conditions, the current President and his Administration have taken actions that call into question the meaning of federal anti-discrimination laws by purporting to interpret them far differently than previously understood by Congress, the executive, and the courts—leaving it unclear to Plaintiffs what is now expected.

      a. Immediately following his inauguration, President Trump began issuing a series of executive orders promoting his anti-equity political agenda. For example, he issued orders directing all federal agencies to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology,"[4] "terminate . . . 'equity-

---

[4] Executive Order No. 14168, *Defending Women From Gender Ideology Extremism And Restoring Biological Truth To The Federal Government*, 90 Fed. Reg. 8,615 (Jan. 20, 2025).

related grants'"—without defining "equity-related" or even "equity,"[5] and require grant recipients to certify that they do not operate any programs "promoting" DEIA "that violate any applicable Federal anti-discrimination laws" in all grant terms.[6] Going further, President Trump recently ordered that discretionary grant awards must "demonstrably advance the President's policy priorities" "and "shall not be used to fund, promote, encourage, subsidize, or facilitate" what the Executive deems to be "racial preferences or other forms of racial discrimination by the grant recipient," "denial by the grant recipient of the sex binary in humans or the notion that sex is a chosen or mutable characteristic," or other "anti-American values."[7]

    b. Following the President's direction, Attorney General Pam Bondi released a memo titled *Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination* on July 29, 2025. *See* RJN, Ex. 4 ("Discrimination Guidance Memo"). The Discrimination Guidance Memo purports to "clarif[y] the application of federal antidiscrimination laws to programs or initiatives that may involve discriminatory practices, including those labeled as Diversity, Equity, and Inclusion ('DEI') programs." *Id*. at 1. Among other "clarifications," Attorney General Bondi states that the use of "[f]acially neutral criteria (e.g., 'cultural competence,' 'lived experience,' geographic targeting) that function as proxies for protected characteristics violate federal law if designed or applied with the intention of advantaging or disadvantaging individuals based on protected characteristics." *Id*. at 2. This "clarification," however, is inconsistent with Supreme Court precedent that has "consistently declined to find

---

[5] Executive Order No. 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8,339 (Jan. 20, 2025).

[6] Executive Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8,633 (Jan. 21, 2025).

[7] Executive Order No. 14332, *Improving Oversight of Federal Grantmaking*, 90 Fed. Reg. 38929 (Aug. 7, 2025).

constitutionally suspect" the adoption of race-neutral criteria—even where the decision-maker was "well aware" the race-neutral criteria "correlated with race." *Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 885–86 (4th Cir. 2023) (cleaned up) (citing, inter alia, *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 545 (2015)). Similarly, the Administration's insistence on "the sex binary" and its refusal to recognize the reality of gender identity is out of step with governing law extending critical sex-based protection to trans people. *See, e.g.., Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 662, 670 (2020) (recognizing "Title VII prohibits all forms of discrimination because of sex, however they may manifest themselves or whatever other labels might attach to them").

    c. Nevertheless, in early September—a few weeks before issuing new grant awards—FEMA sent copies of the Discrimination Guidance Memo to all grant recipients, with the admonition to "review and adhere to the Attorney General's [guidance]." Louk Decl., Ex. 1 (FEMA Notice to Recipients). These awards with the Unlawful DHS Conditions now seek to hold Plaintiffs to the President's political agenda that misconstrues and distorts the contours of anti-discrimination law.

13. Defendants' new misinterpretation and distortion of federal law raises serious questions about what meaning and scope Defendants intend the Unlawful DHS Conditions to carry. And Plaintiffs reasonably fear significant consequences if they accept the award conditions subject to Defendants' vague and unsupported distortion of federal anti-discrimination laws.

    a. The False Claims Act (FCA) imposes liability on "any person" who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). Each violation of the FCA is punishable by mandatory treble damages plus civil penalties. 31 U.S.C. § 3729(a); 28 C.F.R. § 85.5(a). The Discrimination Condition expressly references the FCA and purports to achieve an end run around the federal government's demanding burden to prove that a representation is "material to the Government's payment decisions" before these

significant penalties will attach. Standard DHS Terms § C.XVII; *see Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192, 194 (2016).

    b. Moreover, the Department of Justice has formed a nationwide task force specifically to target grantees that sign these certifications, has described potential liability under the FCA as a "weapon" it will deploy, and has "strongly encourag[ed]" private parties to bring civil suits against grant recipients. *See* RJN Ex. 12 (Civil Rights Fraud Initiative Memo), at pp. 1, 2.

14. Defendants have not identified any statutory authority to justify the imposition of the Unlawful DHS Conditions on Plaintiffs' awards. In establishing the grant programs at issue in this action and appropriating funds, Congress has not authorized Defendants to impose grant conditions even *remotely* similar to the Unlawful DHS Conditions, which effectively prohibit any activity that the Administration would consider to be "DEIA," purport to rewrite anti-discrimination law as it has long been understood, and force compliance with all executive orders.

15. Nor do the Unlawful DHS Conditions have any nexus to any of the grant programs' purposes, which address a broad range of disaster, emergency management, and security capabilities by: providing port security services and training to public safety personnel, 46 U.S.C. § 70107, allowing security improvements to public transportation, 6 U.S.C. § 1135, protecting the health and safety of first responders and the public in connection with fire hazards, 15 U.S.C. § 2229(c), assisting with fire prevention and the promotion of research and development, *id.* § 2229(d)(1), ensuring minimum staffing standards for safety personnel, and preventing acts of terrorism, 6 U.S.C. §§ 604-605, providing an orderly means of disaster assistance and management, 42 U.S.C. § 5121(b), and mitigating the risks of hazards, 42 U.S.C. § 5170c(a). If anything, the new conditions Defendants seek to impose on Plaintiffs' awards are antithetical to Congress's express purpose to guarantee public safety, community preparedness, and security of critical infrastructure. There is no question that Plaintiffs' requests qualified for funding: otherwise, Defendants would not have issued awards and in some cases even predetermined targeted allocations for Plaintiffs in the first place. Rather than work in partnership with Plaintiffs to fulfill Congress's express intent to guarantee public safety and security for all community members, Defendants' unprecedented conditioning of funds now forces local

governments to choose between resisting arbitrary, unlawful, and ideological mandates, and funding for the exact safety measures Congress sought to incentivize in the first place to prevent harm.

16. Plaintiffs face immediate and irreparable harms from the imposition of the Unlawful DHS Conditions during the pendency of this litigation absent a preliminary injunction. Some plaintiffs must decide as early as October 24, 2025, to either accept unlawful conditions that violate their rights or risk losing federal funding earmarked for vital community preparedness, public safety and security services. Harm to the remaining Plaintiffs is sufficiently imminent based off their respective award deadlines or demonstrated entitlement to forthcoming awards.

17. The loss of the funds would also result in immediate, irreparable, and reverberating harms to Plaintiffs—including by upending budgets, forcing the sacrifice of critical public safety upgrades intended to protect the community and first responders, and risking diminished community trust due to hampered public safety efforts. Plaintiffs are already grappling with the uncertainty over federal funding, including by discussing anticipated layoffs or program caps. Even a temporary interruption in funding would disrupt procurement and management of programs that help prevent the loss of life and property during natural disasters and man-made threats. The uncertainty that Defendants are creating undermines Plaintiffs' ability to conduct long-term planning: without reliable and stable funding, they cannot responsibly commit to multi-year projects, leaving them ultimately less prepared to address both current and emerging threats. The threats to public safety and emergency management are particularly significant since Plaintiffs' diverse, urban, and metropolitan areas include streets, railways, advanced telecommunications and power systems, and other critical infrastructure that will support large-scale events vulnerable to public safety threats, including but not limited to the 2026 FIFA World Cup and Super Bowl LX, in addition to the hundreds of events that already occur annually.

**CONCLUSIONS OF LAW**

1. The Court has jurisdiction over Defendants and the subject matter of this action. Plaintiffs' claims are not subject to the Tucker Act because the sources of their asserted rights are the U.S. Constitution and statutes, including the Separation of Powers doctrine, the Spending Clause, and the Administrative Procedure Act (APA). Moreover, the Tucker Act does not bar Plaintiffs' APA

claims because "Plaintiffs challenge the Defendant agencies' *policies* and *guidance* to condition funding on the [g]rant [c]onditions on *statutory*, namely APA, and *constitutional* grounds, and they seek injunctive relief barring Defendants' imposition of the conditions and setting aside related internal agency directives." *City of Fresno v. Turner*, No. 25-cv-07070-RS, 2025 WL 2721390, at *6 (N.D. Cal. Sept. 23, 2025); *see also Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2661 (2025) (Barrett, J., concurring in part).

      2.     As a threshold issue, Defendants' policy decision to adopt the Unlawful DHS Conditions and apply them to grant recipients like Plaintiffs is a "final agency action" subject to review under the APA. The same is true for Defendants' attachment of those conditions to Plaintiffs' awards from DHS. *See* 5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted).

      3.     Plaintiffs have standing to bring this suit. "A loss of funds promised under federal law satisfies Article III's standing requirement." *City & Cnty. of San Francisco v. Trump* ("*San Francisco*"), 897 F.3d 1225, 1235 (9th Cir. 2018) (cleaned up); *Arizona v. Yellen*, 34 F.4th 841, 852 (9th Cir. 2022). Here, Plaintiffs have been awarded millions of dollars in DHS funds, and anticipate receiving millions more in DHS funds via pass-through awards from their states based on long-standing practice, statutory entitlement, or predetermined allocations in notices of funding opportunities. Plaintiffs could lose these awards unless they accept unlawful conditions that would dictate how they govern on matters of public concern. This imminent loss of funds through infringement of Plaintiffs' constitutional and statutory rights is traceable to the Unlawful DHS Conditions and redressable by an order restraining their enforcement. "An injunction enjoining Defendants from enforcing the [Unlawful DHS Conditions] would [also] redress Plaintiffs' alleged injury of having to either modify their conduct or risk making a false certification." *San Francisco A.I.D.S. Found. v. Trump*, No. 25-CV-01824-JST, 2025 WL 1621636, at *10 (N.D. Cal. June 9, 2025).

      4.     To obtain a preliminary injunction, Plaintiffs must establish (1) they are likely to succeed on the merits; (2) irreparable harm is likely in the absence of preliminary relief; (3) the balance of equities tips in Plaintiffs' favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

5.    There is a strong likelihood that Plaintiffs will succeed on the merits of their claims that the Unlawful DHS Conditions violate (1) the Constitution's separation of powers doctrine, *see San Francisco*, 897 F.3d at 1234; (2) the spending power, *see S. Dakota v. Dole*, 483 U.S. 203, 207–08 (1987); and (3) the APA, 5 U.S.C. § 706(2).

6.    Plaintiffs have also shown that they are likely to suffer irreparable harm during the pendency of this litigation in the absence of a preliminary injunction.

7.    The balance of equities strongly tips towards Plaintiffs and the public interest strongly weighs in favor of entering a preliminary injunction. Defendants have not posited any non-monetary harm they will experience if an injunction were to issue, and they have no legitimate interest in ensuring that funds are spent pursuant to conditions that were likely imposed in violation of the Constitution and the APA. *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (defendants "cannot suffer harm from an injunction that merely ends an unlawful practice"). An injunction also further protects the public interest because it avoids the patchwork of emergency management and security problems that would persist if funds are not appropriated consistent with Congressional leaders' determinations that those very problems needed to be addressed for a safer and more resilient nation.

8.    The Court deems no security bond is required under Federal Rule of Civil Procedure 65(c).

**ORDER**

It is now, therefore, ORDERED as follows:

1.    Plaintiffs' Motion for a Preliminary Injunction is GRANTED;

2.    Defendants and their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them (collectively "Enjoined DHS Parties"), are enjoined during the pendency of this lawsuit from:

    a)    imposing or enforcing the Discrimination Condition, DEI Disclosure Requirement, and EO Condition, as defined above and in the Appendix to this Order, or any materially similar terms or conditions in connection with federal funding, at any stage of the grantmaking process, including but not limited to in new grant applications,

        applications for continuation funding, notices of funding availability or opportunity, certifications, grant agreements, post-award submissions, or reimbursement requests, with respect to any DHS/FEMA funds awarded to Plaintiffs or their subrecipients;

    b) attaching, incorporating, imposing, or enforcing any interpretation of the Civil Rights Conditions as requiring anything other than compliance with the statutes cited in the Civil Rights Conditions as they have been enacted by Congress and interpreted by the judiciary;

    c) as to Plaintiffs or their subrecipients, rescinding, withholding, cancelling, or otherwise not processing any DHS/FEMA grant agreements, or pausing, freezing, impeding, blocking, cancelling, terminating, delaying, withholding, or conditioning DHS/FEMA funds, based on such terms or conditions, including without limitation failing or refusing to process and otherwise implement grants signed with changes or other objections to conditions enjoined by this preliminary injunction;

    d) requiring Plaintiffs or their subrecipients to make any "certification" or other representation or assurance related to compliance with such terms or conditions; or

    e) retaliating against any Plaintiff for participating in this lawsuit or taking any adverse action based on any Plaintiff's participation in this lawsuit, including but not limited to reducing the amount of a grant award to that Plaintiff or to any state agency through which Plaintiff may receive grant funding; refusing to issue, process, sign, or approve grant applications, grant agreements, or subgrant agreements; and refusing to issue, process, sign, or approve any invoice or request for payment, or reducing the amount of such approval or payment.

    3. The Enjoined DHS Parties shall immediately treat any actions taken to implement or enforce the Unlawful DHS Conditions or any materially similar terms or conditions as to the Plaintiffs or their subrecipients, including but not limited to any delays or withholding of funds based on such conditions, as null, void, and rescinded; while this preliminary injunction is in effect, shall treat as null and void any such conditions included in any grant agreement executed by any of the Plaintiffs or their subrecipients; and may not retroactively apply such conditions to grant agreements during the effective

period of this preliminary injunction. The Enjoined DHS Parties shall immediately take every step necessary to effectuate this order, including without limitation clearing any administrative, operational, or technical hurdles to implementation;

4. Defendants' counsel shall provide written notice of this Order to all Defendants and their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them by the end of the second day after issuance of this Order;

5. By the end of the second day after issuance of this Order, the Defendants SHALL FILE on the Court's electronic docket and serve upon Plaintiffs a Status Report documenting the actions that they have taken to comply with this Order, including a copy of the notice and an explanation as to whom the notice was sent; and

6. This order remains in effect pending further orders from this Court.

Dated this ___ day of _____, 2025

_____
THE HON. EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE

# APPENDIX

The "**Discrimination Conditions**" enjoined by this Order are the following terms and conditions:

<u>C.XVII Anti-Discrimination</u>
Recipients must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of 31 U.S.C. § 372(b)(4).
  (1) Definitions. As used in this clause –
    (a) DEI means "diversity, equity, and inclusion."
    (b) DEIA means "diversity, equity, inclusion, and accessibility."
    (c) Discriminatory equity ideology has the meaning set forth in Section 2(b) of Executive Order 14190 of January 29, 2025.
    (d) Federal anti-discrimination laws mean Federal civil rights law that protect individual Americans from discrimination on the basis of race, color, sex, religion, and national origin.
    (e) Illegal immigrant means any alien, as defined in 8 U.S.C. § 1101(a)(3), who has no lawful immigration status in the United States.
  (2) Grant award certification.
    (a) By accepting the grant award, recipients are certifying that:
      (i) They do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws; and
      (ii) They do not engage in and will not during the term of this award engage in, a discriminatory prohibited boycott.
      (iii) [*provision omitted here and included within Immigration Conditions described in paragraph*]
  (3) DHS reserves the right to suspend payments in whole or in part and/or terminate financial assistance awards if the Secretary of Homeland Security or her designee determines that the recipient has violated any provision of subsection (2).
  (4) Upon suspension or termination under subsection (3), all funds received by the recipient shall be deemed to be in excess of the amount that the recipient is determined to be entitled to under the Federal award for purposes of 2 C.F.R. § 200.346. As such, all amounts received will constitute a debt to the Federal Government that may be pursued to the maximum extent permitted by law.

The "**Civil Rights Conditions**" covered by this Order are the following terms and conditions:

<u>C.III *Age Discrimination Act of 1975*</u>
Recipients must comply with the requirements of the *Age Discrimination Act of 1975*, Pub. L. No. 94-135 (codified as amended at Title 42, U.S. Code § 6101 *et seq*.), which prohibits discrimination on the basis of age in any program or activity receiving federal financial assistance.

<u>C.IV Americans with Disabilities Act of 1990</u>
Recipients must comply with the requirements of Titles I, II, and III of the *Americans with Disabilities Act*, Pub. L. No. 101-336 (1990) (codified as amended at 42 U.S.C.
§§ 12101– 12213), which prohibits recipients from discriminating on the basis of disability in the operation of public entities, public and private transportation systems, places of public accommodation, and certain testing entities.

<u>C.VII Civil Rights Act of 1964 – Title VI</u>
Recipients must comply with the requirements of Title VI of the *Civil Rights Act of 1964*, Pub. L. No. 88-352 (codified as amended at 42 U.S.C. § 2000d *et seq*.), which provides that no person in the United States will, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. DHS implementing regulations for the Act are found at 6 C.F.R. Part 21. Recipients of a federal award from the Federal Emergency Management Agency (FEMA) must also comply with FEMA's implementing regulations at 44 C.F.R. Part 7.

<u>C.VIII Civil Rights Act of 1968</u>
Recipients must comply with Title VIII of the *Civil Rights Act of 1968*, Pub. L. No. 90284 (codified as amended at 42 U.S.C. § 3601 *et seq*.) which prohibits recipients from discriminating in the sale, rental, financing, and advertising of dwellings, or in the provision of services in connection. therewith, on the basis of race, color, national origin, religion, disability, familial status, and sex, as implemented by the U.S. Department of Housing and Urban Development at 24 C.F.R. Part 100. The prohibition on disability discrimination includes the requirement that new multifamily housing with four or more dwelling units— i.e., the public and common use areas and individual apartment units (all units in buildings with elevators and ground-floor units in buildings without elevators)—be designed and constructed with certain accessible features. (See 24 C.F.R. Part 100, Subpart D.)

<u>C.XIV Education Amendments of 1972 (*Equal Opportunity in Education Act*) – Title IX</u>
Recipients must comply with the requirements of Title IX of the Education Amendments of 1972, Pub. L. No. 92-318 (codified as amended at 20 U.S.C. § 1681 *et seq*.), which provide that no person in the United States will, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving federal financial assistance. DHS implementing regulations are codified at 6 C.F.R. Part 17. Recipients of a federal award from the Federal Emergency Management Agency (FEMA) must also comply with FEMA's implementing regulations at 44 C.F.R. Part 19.

<u>C.XVI Equal Treatment of Faith-Based Organizations</u>
It is DHS policy to ensure the equal treatment of faith-based organizations in social service programs administered or supported by DHS or its component agencies, enabling those organizations to participate in providing important social services to beneficiaries.
Recipients must comply with the equal treatment policies and requirements

contained in 6 C.F.R. Part 19 and other applicable statutes, regulations, and guidance governing the participations of faith-based organizations in individual DHS programs.

<u>C.XXIV Limited English Proficiency (*Civil Rights Act of 1964, Title VI*)</u>
Recipients must comply with Title VI of the *Civil Rights Act of 1964* (42 U.S.C. § 2000d *et seq*.) prohibition against discrimination on the basis of national origin, which requires that recipients of federal financial assistance take reasonable steps to provide meaningful access to persons with limited English proficiency (LEP) to their programs and services. For additional assistance and information regarding language access obligations, please refer to the DHS Recipient Guidance: https://www.dhs.gov/guidance-published-help- department-supported-organizationsprovide-meaningful-access-people-limited and additional resources on http://www.lep.gov.

<u>C. XXXIII *Rehabilitation Act of 1973*</u>
Recipients must comply with the requirements of Section 504 of the *Rehabilitation Act of 1973*, Pub. L. No. 93-112 (codified as amended at 29 U.S.C. § 794), which provides that no otherwise qualified handicapped individuals in the United States will, solely by reason of the handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.

<u>C.XVIII *False Claims Act* and Program Fraud Civil Remedies</u>
Recipients must comply with the requirements of the *False Claims Act*, 31 U.S.C. §§ 3729- 3733, which prohibit the submission of false or fraudulent claims for payment to the Federal Government. (See 31 U.S.C. §§ 3801-3812, which details the administrative remedies for false claims and statements made.)

The "**DEI Disclosure Requirement**" enjoined by this Order is the following:

<u>Grants Manual § 6.11.3 Submission Process</u>

For all non-disaster reimbursement requests (regardless of system), please ensure submittal of the following information:

\*\*\*

4. Subrecipient Funding Details (if applicable)

\*\*\*

If yes, provide the following details:

\*\*\*

Whether the subrecipient has any diversity, equity, and inclusion practices.

The "**EO Condition**" enjoined by this Order is the following:

<u>C.XXXI Presidential Executive Orders</u>
Recipients must comply with the requirements of Presidential Executive Orders related to grants (also known as federal assistance and financial assistance), the full text of which are incorporated by reference.