# EXHIBIT A

TONY LOPRESTI, SBN 289269
County Counsel
KAVITA NARAYAN, SBN 264191
Chief Assistant County Counsel
MEREDITH A. JOHNSON, SBN 291018
Lead Deputy County Counsel
RAPHAEL N. RAJENDRA, SBN 255096
HANNAH M. GODBEY, SBN 334475
Deputy County Counsels
70 W. Hedding Street, East Wing, Ninth Floor
San José, California 95110-1770
Telephone: (408) 299-5900
E-Mail:    Raphael.Rajendra@cco.sccgov.org
           Hannah.Godbey@cco.sccgov.org

DAVID CHIU, SBN 189542
City Attorney
YVONNE R. MERÉ, SBN 175394
Chief Deputy City Attorney
MOLLIE M. LEE, SBN 251404
Chief of Strategic Advocacy
SARA J. EISENBERG, SBN 269303
Chief of Complex and Affirmative Litigation
DAVID S. LOUK, SBN 304654
STEVEN A. MILLS, SBN 328016
Deputy City Attorneys
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, CA 94102-5408
Telephone: (415) 355-3308
E-Mail:    David.Louk@sfcityatty.org
           Steven.Mills@sfcityatty.org

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

Attorneys for Plaintiff
CITY AND COUNTY OF SAN
FRANCISCO

[*additional counsel on signature page*]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, COUNTY OF SANTA CLARA, CITY OF PORTLAND, MARTIN LUTHER KING, JR. COUNTY, CITY OF NEW HAVEN, CITY OF OAKLAND, CITY OF EMERYVILLE, CITY OF SAN DIEGO, CITY OF SAN JOSÉ, CITY OF SACRAMENTO, CITY OF SANTA CRUZ, COUNTY OF MONTEREY, CITY OF SEATTLE, CITY OF MINNEAPOLIS, CITY OF ST. PAUL, CITY OF SANTA FE, COUNTY OF ALAMEDA, CITY OF ALBANY, CITY OF ALBUQUERQUE, COUNTY OF ALLEGHENY, CITY OF BALTIMORE, CITY OF BEND, CITY OF BENICIA, CITY OF BERKELEY, CITY OF BOSTON, CITY OF CAMBRIDGE, CITY OF CATHEDRAL CITY, CITY OF CHICAGO, CITY OF COLUMBUS, CITY OF CULVER CITY, COUNTY OF DANE, CITY AND COUNTY OF DENVER, CITY OF HEALDSBURG, COUNTY OF HENNEPIN, CITY OF LOS ANGELES, COUNTY OF MARIN, CITY OF MENLO PARK, MULTNOMAH COUNTY, CITY OF PACIFICA, CITY OF PALO ALTO, CITY OF PETALUMA, PIERCE COUNTY, CITY OF | Case No. 3:25-cv-01350-WHO

**ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED** |

RICHMOND, CITY OF ROCHESTER, CITY
OF ROHNERT PARK, COUNTY OF SAN
MATEO, CITY OF SANTA ROSA, COUNTY
OF SONOMA, CITY OF WATSONVILLE,
CITY OF WILSONVILLE,

     Plaintiffs,

v.

DONALD J. TRUMP, President of the United
States, UNITED STATES OF AMERICA,
PAMELA BONDI, Attorney General of the
United States, EMIL BOVE, Acting Deputy
Attorney General, UNITED STATES
DEPARTMENT OF JUSTICE, KRISTI NOEM,
Secretary of United States Department of
Homeland Security, UNITED STATES
DEPARTMENT OF HOMELAND SECURITY,
RUSSELL VOUGHT, Director of United States
Office of Management and Budget, UNITED
STATES OFFICE OF MANAGEMENT AND
BUDGET, DOES 1-100,

     Defendants.

Under Northern District of California Civil Local Rules 3-12 and 7-11, Plaintiffs to the action *County of Santa Clara, et al. v. Noem, et al.*, No. 3:25-cv-08330 (N.D. Cal.) (the "Action"), respectfully request that this Court consider whether the Action should be related to the above-captioned case, *City and County of San Francisco, et al. v. Trump, et al.*, No. 3:25-cv-01350-WHO (N.D. Cal.) ("*San Francisco*"), a case currently pending before this Court.

This Court's Local Rules provide that "[a]n action is related to another when: (1) [t]he actions concern substantially the same parties, property, transaction, or event; and (2) [i]t appears likely that there will be an unduly burdensome duplication of labor and expense or conflicting results if the cases are conducted before different Judges." N.D. Cal. Civ. L.R. 3-12(a). This standard is satisfied here.

***First***, the Action concerns "substantially the same parties, property, transaction[s], or event[s]" as *San Francisco*. Many of the Plaintiffs in the Action are also plaintiffs in *San Francisco*, including the County of Santa Clara, City and County of San Francisco, City of Berkeley, City of Culver City, City of Los Angeles, Martin Luther King, Jr. County, County of Marin, City of Oakland, City of Palo Alto, City of Petaluma, Pierce County, City of Sacramento, City of San Diego, City of San José,

County of San Mateo, City of Santa Rosa, and County of Sonoma.[1]  Moreover, in *San Francisco*, the Court issued a preliminary injunction enjoining the defendants—including the Department of Homeland Security (DHS) and Kristi Noem in her official capacity as Secretary of DHS, who are also defendants in the Action—from taking any steps to withhold, freeze, or place conditions on the receipt of federal funds because the plaintiff cities and counties have policies that could be described as "sanctuary" policies.  *City & Cnty. of San Francisco v. Trump*, No. 25-CV-01350-WHO, 2025 WL 2426858, at *1 (N.D. Cal. Aug. 22, 2025); *City & Cnty. of San Francisco v. Trump*, 783 F. Supp. 3d 1148, 1161 (N.D. Cal. 2025); *City & Cnty. of San Francisco v. Trump*, 779 F. Supp. 3d 1077 (N.D. Cal.), *opinion clarified*, 782 F. Supp. 3d 830 (N.D. Cal. 2025).  The preliminary injunction specifically blocked implementation of certain provisions of Executive Orders 14159 and 14218 and a memo issued by the Attorney General, but the Court clarified that other Executive Orders and actions could not be used as an end run around the preliminary injunction.

In addition, the Court in *San Francisco* expressly ruled upon, at the request of the parties, whether the preliminary injunction extended to DHS's "Standard Terms and Conditions" for federal grant agreements, insofar as those terms and conditions implement the enjoined sections of the Executive Orders challenged in that case.  *See City & Cnty. of San Francisco v. Trump*, No. 25-CV-01350-WHO, 2025 WL 1738675, at *1 (N.D. Cal. June 23, 2025) (noting that the DHS Standard Terms and Conditions "include numerous immigration conditions that reflect the enjoined language" of the relevant Executive Orders).  The Court concluded that the DHS Standard Terms and Conditions, which on their face apply to "all new federal awards," are covered by the preliminary injunction; and that application of the DHS Standard Terms and Conditions to grants "used for emergency preparedness, which has no nexus to immigration enforcement," violated the preliminary injunction. *Id.* at *2-*3.

---

[1] There are 12 Plaintiffs in the Action who are not parties to *San Francisco*: the City of Alameda, the City of Bellingham, Los Angeles County, Los Angeles County Consolidated Fire Protection District, the City of Pasadena, San Diego County, the City of Santa Monica, Snohomish County, Sonoma County Community Development Commission, Sonoma County Water Agency, Sonoma Valley County Sanitation District, and the City of Tucson.

The defendants in *San Francisco* have opposed the plaintiffs' facial challenge to the Executive Orders by arguing, in essence, that such actions may only be brought on an as applied, grant-by-grant basis. *See, e.g.*, *City & Cnty. of San Francisco v. Trump*, 783 F. Supp. 3d at 1180, 1193, 1197, 1202. And the Court has acknowledged that, despite the injunction, Defendants are permitted to impose terms "on individual grants with a meaningful nexus to sanctuary jurisdiction policies," and that "[l]itigation may be necessary to determine whether the challenged immigration conditions are appropriate to that grant program." *City & Cnty. of San Francisco*, 2025 WL 1738675, at *3; *see also id.* at *1 n.4 (citing "law enforcement grant programs" as an example where such conditions may be appropriate). The Plaintiffs in the Action have now brought suit against DHS and the Federal Emergency Management Agency (FEMA) challenging multiple unlawful conditions across a suite of federal emergency management grants.

Plaintiffs to the Action are cities, counties, and other local government entities that have received or anticipate shortly receiving grant agreements from DHS—and in particular, FEMA—that reflect and incorporate the DHS Standard Terms and Conditions. All Plaintiffs receive funding from DHS, either directly or indirectly. Grant agreements that Plaintiffs have received include the immigration-related conditions the Court addressed in *San Francisco*, despite none of the grants having any "meaningful nexus" to so-called sanctuary jurisdiction policies. In addition, all of the grant agreements include terms requiring the recipients to certify that they do not operate any programs that "advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws," among other discrimination-related provisions, and a term purporting to incorporate and require compliance with "the requirements of Presidential Executive Orders related to grants." Plaintiffs challenge those grant conditions on many of the grounds asserted in *San Francisco*, including as violative of the separation of powers, spending power, and Administrative Procedure Act. Because many of the Plaintiffs in this case are also plaintiffs in *San Francisco*, two of the defendants in this case are also defendants in *San Francisco*, and the actions concerns substantially the same event (namely, the issuance and application of the DHS Standard

Terms and Conditions), the Action therefore concerns "substantially the same parties, property, transaction, or event" as *San Francisco*. N.D. Cal. Civ. L.R. 3-12(a)(1).[2]

**Second**, it is "likely that there will be an unduly burdensome duplication of labor and expense or conflicting results if the cases are conducted before different Judges." N.D. Cal. Civ. L.R. 3-12(a)(2). As set forth above, this Court in *San Francisco* has already analyzed and preliminarily ruled on the legality of the immigration-related provisions in the DHS Standard Terms and Conditions as an implementation of the Executive Orders at issue in that case. *City & Cnty. of San Francisco*, 2025 WL 1738675, at *2-3. Now that grant agreements have issued, the Action raises grant-specific challenges to those same provisions. The Court's prior analysis of those terms will undoubtedly inform its analysis of those terms as applied to particular grants. And many of the challenges raised regarding the immigration-related provisions in *San Francisco* apply in parallel to the discrimination-related and EO-related provisions, including the separation of powers, spending power, and Administrative Procedure Act challenges. There is no benefit to requiring that another court take on from scratch an analysis this Court has already conducted and develop the expertise this Court has already amassed.

As explained in the accompanying Declaration of Hannah M. Godbey, Plaintiffs have not obtained a stipulation from counsel in *San Francisco* because the defendants in that matter did not so stipulate. Declaration of Hannah M. Godbey ¶¶ 4-5.

For the foregoing reasons, Plaintiffs to the Action respectfully request that this Court order the Action related to *San Francisco*.[3]

---

[2] The Plaintiffs in the Action intend to seek preliminary relief, but do not intend to move for such relief as to the immigration conditions at this time because those conditions were already vacated as arbitrary and capricious in *Illinois v. FEMA*, No. 25-206 WES, 2025 WL 2716277, at *15 (D.R.I. Sept. 24, 2025), and because of the injunction in *San Francisco*. In addition, while the grant agreements received by the Plaintiffs to date have contained the immigration provisions, they have, by and large, also contained provisions stating that the immigration conditions would not apply.

[3] *San Francisco* is itself related to eight prior cases that—like *San Francisco* and the Action—involved constitutional challenges to the federal government's conditioning of federal funding on compliance and cooperation with federal civil immigration enforcement priorities, and, in some instances, were brought against the Secretary of DHS. *See City and County of San Francisco v. Trump*, No. 3:25-cv-01350-WHO (N.D. Cal), ECF No. 15 (Order Relating Cases); *see also City and County of San Francisco v. Trump*, No. 3:17-cv-00485-WHO (N.D. Cal.), ECF No. 238 (Motion to Relate Case). Those eight cases are *City and County of San Francisco v. Trump*, No. 3:17-cv-00485-WHO (N.D. Cal.); *County of Santa Clara v. Trump*, No. 3:17-cv-00574-WHO (N.D. Cal.); *City of Richmond Police Department v. Trump*, No. 3:17-cv-01535-WHO (N.D. Cal.); *City and County of San*

1

2                                    Respectfully submitted,

3

4    Dated: October 1, 2025              TONY LOPRESTI
                                         County Counsel
5                                        KAVITA NARAYAN
                                         Chief Assistant County Counsel
6                                        MEREDITH A. JOHNSON
                                         Lead Deputy County Counsel
7                                        RAPHAEL N. RAJENDRA
                                         HANNAH M. GODBEY
8                                        Deputy County Counsels

9                                    By:  /s/ Tony LoPresti
10                                       TONY LOPRESTI
                                         County Counsel
11
                                         Attorneys for Plaintiff
12                                       COUNTY OF SANTA CLARA

13

14

15

16

17

18

19

20

21

22

23

24   _____
     *Francisco v. Sessions*, No. 3:17-cv-04642-WHO (N.D. Cal.); *State of California v. Sessions*, No. 3:17-
25   cv-04701-WHO (N.D. Cal.); *City and County of San Francisco v. Sessions*, No. 3:18-cv-05146-WHO
     (N.D. Cal.); *State of California v. Sessions*, No. 3:18-cv-05169-WHO (N.D. Cal.); *State of California
26   v. Barr*, No. 3:19-cv-06189-WHO (N.D. Cal.).  Because the primary basis for this motion is the
     Action's connection to the ongoing litigation in *San Francisco*, Plaintiffs are filing this motion in the
27   docket for that case.  *See* N.D. Cal. Civ. L.R. 3-12(b).  If the Court is of the view that the Action
     should also be related to these eight other previously related cases, Plaintiffs would not oppose such
28   relation.

     _____
     ADMINISTRATIVE MOTION TO CONSIDER            6            CASE NO. 3:25-cv-01350-WHO
     WHETHER CASES SHOULD BE RELATED

DAVID CHIU
City Attorney
YVONNE R. MERÉ
Chief Deputy City Attorney
MOLLIE M. LEE
Chief of Strategic Advocacy
SARA J. EISENBERG
Chief of Complex and Affirmative Litigation
DAVID S. LOUK
STEVEN A. MILLS
Deputy City Attorneys

/s/ David Chiu
By: DAVID CHIU
City Attorney

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

By: /s/ Sharanya Mohan
SHARANYA (SAI) MOHAN (SBN 350675)
ERIN MONJU*
NAOMI TSU*
TOBY MERRILL*
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
Tel: (510) 738-6788
sai@publicrightsproject.org
erin@publicrightsproject.org
naomi@publicrightsproject.org
toby@publicrightsproject.org

Attorneys for Plaintiffs
CITY OF ALAMEDA, CITY OF BELLINGHAM,
CITY OF BERKELEY, CITY OF CULVER, KING
COUNTY, COUNTY OF LOS ANGELES, COUNTY
OF MARIN, CITY OF OAKLAND, CITY OF PALO
ALTO, CITY OF PASADENA, CITY OF
PETALUMA, PIERCE COUNTY, CITY OF
SACRAMENTO, CITY OF SAN DIEGO, SAN DIEGO
COUNTY, CITY OF SAN JOSE, COUNTY OF SAN
MATEO, CITY OF SANTA MONICA, CITY OF
SANTA ROSA, COUNTY OF SONOMA, SONOMA
COUNTY WATER AGENCY, SONOMA VALLEY
COUNTY SANITATION DISTRICT, SONOMA

COUNTY COMMUNITY DEVELOPMENT
COMMISSION, SNOHOMISH COUNTY, CITY OF
TUCSON

YIBIN SHEN
Alameda City Attorney

By:  /s/ Yibin Shen
YIBIN SHEN (SBN 233545)
CARA SILVER (SBN 136992), Special Counsel
DANIEL J. TURNER (SBN 336499), Deputy City
Attorney
2263 Santa Clara Avenue, Rm 280
Alameda, CA 94501
Tel: (510) 747-4750
yshen@alamedaca.gov
csilver@alamedaca.gov
dturner@alamedaca.gov

Attorneys for Plaintiff
CITY OF ALAMEDA

FARIMAH F. BROWN
Berkeley City Attorney

/s/ Farimah F. Brown
By:  FARIMAH F. BROWN (SBN 201227), City Attorney
KATRINA L. EILAND (SBN 275701), Deputy City
Attorney
STEPHEN A. HYLAS (SBN 319833), Deputy City
Attorney
2180 Milvia Street, Fourth Floor
Berkeley, CA 94704
Tel: (510) 981-6998
Fax: (510) 981-6960
fbrown@berkeleyca.gov
keiland@berkeleyca.gov
shylas@berkeleyca.gov

Attorneys for Plaintiff
CITY OF BERKELEY

KING COUNTY PROSECUTING ATTORNEY
LEESA MANION

By: /s/ David J. Hackett
DAVID J. HACKETT*
Executive General Counsel
ALISON HOLCOMB*
Deputy Executive General Counsel
Special Deputy Prosecuting Attorneys
Chinook Building
401 5th Avenue, Suite 800
Seattle, WA 98104
Tel: (206) 477-2720
David.Hackett@kingcounty.gov
aholcomb@kingcounty.gov

Attorneys for Plaintiff
MARTIN LUTHER KING, JR. COUNTY

HYDEE FELDSTEIN SOTO
City Attorney of the City of Los Angeles

By: /s/ Michael J. Dundas
MICHAEL J. DUNDAS (SBN 226930), Chief Assistant
City Attorney
JOSHUA M. TEMPLET (SBN 267098), Deputy City
Attorney
Office of the Los Angeles City Attorney
200 North Main Street, Room 800
Los Angeles, California 90012
Tel: (213) 978-8100
mike.dundas@lacity.org
joshua.templet@lacity.org

Attorneys for Plaintiff
CITY OF LOS ANGELES

By: /s/ Thomas J. Faughnan
THOMAS J. FAUGHNAN (SBN 155238), Senior
Assistant County Counsel
BRIGIT GREESON ALVAREZ (SBN 237301), Deputy
County Counsel
Office of the County Counsel
648 Kenneth Hahn Hall of Administration
500 West Temple Street Los Angeles,
California 90012-2713
Tfaughnan@counsel.lacounty.gov
Bgreesonalvarez@counsel.lacounty.gov

Tel: (213) 681-0408

Counsel for Plaintiffs
COUNTY OF LOS ANGELES and
LOS ANGELES COUNTY CONSOLIDATED FIRE
PROTECTION DISTRICT

BRIAN E. WASHINGTON
County Counsel

By: /s/ Kate K. Stanford
KATE K. STANFORD (SBN 302825), Deputy County
Counsel
EDWARD F. SEARS (SBN 297775), Deputy County
Counsel
3501 Civic Center Drive, Suite 275
San Rafael, CA 94903
Tel: (415) 473-6117
kate.stanford@marincounty.gov

Attorneys for Plaintiff
COUNTY OF MARIN

RYAN RICHARDSON
City Attorney

By: /s/ Ryan Richardson
RYAN RICHARDSON (SBN 223548), City Attorney
MARIA BEE (SBN 167716), Chief Assistant City
Attorney
JAIME HULING DELAYE (SBN 270784), Supervising
City Attorney
H. LUKE EDWARDS (SBN 313756), Deputy City
Attorney
DIVYA MUSINIPALLY (SBN 316114), Deputy City
Attorney
One Frank H. Ogawa Plaza, 6th Floor
Oakland, California 94612
Tel: (510) 238-3836
Fax: (510) 238-6500
ledwards@oaklandcityattorney.org

Attorneys for Plaintiff
CITY OF OAKLAND

MOLLY S. STUMP
City Attorney

By: /s/ Mark Vanni
MOLLY S. STUMP (SBN 177165), City Attorney
CAIO A. ARELLANO (SBN 262168), Chief Assistant
City Attorney
MARK J. VANNI (SBN 267892), Assistant City
Attorney
CITY OF PALO ALTO
250 Hamilton Ave., 8th Floor
Palo Alto, CA 94301
Tel: (650) 329-2171
Fax: (650) 320-2646
Molly.Stump@PaloAlto.gov
Caio.Arellano@PaloAlto.gov
Mark.Vanni@PaloAlto.gov

Attorneys for Plaintiff
CITY OF PALO ALTO

ERIC DANLY
City Attorney

By: /s/ Eric Danly
ERIC DANLY (SBN 201621), City Attorney
11 English Street
Petaluma, CA 94952
Tel: (707) 778-4362
EDanly@cityofpetaluma.org

Attorney for Plaintiff
CITY OF PETALUMA

MARY E. ROBNETT
Pierce County Prosecuting Attorney

By: /s/ Jonathan R. Salamas
JONATHAN R. SALAMAS (WSBA # 39781), Deputy
Prosecuting Attorney / Civil*
930 Tacoma Avenue South, Suite 946
Tacoma, WA  98402-2102
Tel: 253-798-4862
Fax: 253-798-6713
jonathan.salamas@piercecountywa.gov

Attorney for Plaintiff
PIERCE COUNTY

SUSANA ALCALA WOOD
City Attorney

By: /s/ Andrea Velasquez
ANDREA VELASQUEZ (SBN 249210), Supervising
Deputy City Attorney
KATHERINE UNDERWOOD (SBN 249308), Senior
Deputy City Attorney
915 I St Fl 4, Sacramento, CA 95814-2621
Tel: 916-808-5346
Fax: 916-808-7455
AVelasquez@cityofsacramento.org
KUnderwood@cityofsacramento.org

Attorneys for Plaintiff
CITY OF SACRAMENTO

HEATHER FERBERT
City Attorney

By: /s/ Mark Ankcorn
MARK ANKCORN (SBN 166871), Senior Chief
Deputy City Attorney
JULIE RAU (SBN 317658), Deputy City Attorney
1200 Third Avenue, Suite 1100
San Diego, California 92101-4100
Tel: (619) 533-5800

Attorneys for Plaintiff
CITY OF SAN DIEGO

NORA FRIMANN
City Attorney

By: /s/ Nora Frimann
NORA FRIMANN (SBN 93249), City Attorney
ELISA TOLENTINO (SBN 245962), Chief Deputy City
Attorney
200 E Santa Clara St., 16th Floor
San José, CA 95113-1905
Tel: 408-535-1900
Fax: 408-998-3131
cao.main@sanjoseca.gov

Attorneys for Plaintiff
CITY OF SAN JOSÉ

JOHN D. NIBBELIN
County Counsel

By: /s/ John D. Nibbelin
    John D. Nibbelin (SBN 184603), County Counsel
    Rebecca M. Archer (SBN 202743), Chief Deputy
    Lauren F. Carroll (SBN 333446), Deputy
    Savannah Eldridge (SBN 357723), Deputy
    500 County Center, 4th Floor
    Redwood City, CA 94063
    Tel: (650) 363-4250
    jnibbelin@smcgov.org
    rmarcher@smcgov.org
    lcarroll@smcgov.org
    seldridge@smcgov.org

    Attorneys for Plaintiff
    COUNTY OF SAN MATEO

TERESA L. STRICKER
City Attorney

By: /s/ Teresa L. Stricker
    TERESA L. STRICKER (SBN 160601), City Attorney
    AUTUMN LUNA (SBN 288506), Chief Assistant City
    Attorney HANNAH E. FORD-STILLE (SBN 335113),
    Deputy City Attorney
    100 Santa Rosa Ave, Room 8
    Santa Rosa, CA 95404
    Tel: (707) 543-3040
    tstricker@srcity.org
    aluna@srcity.org
    hfordstille@srcity.org

    Attorneys for Plaintiff
    CITY OF SANTA ROSA

JASON J. CUMMINGS
Snohomish County Prosecuting Attorney

By: /s/ Bridget E. Casey
    BRIDGET E. CASEY*
    REBECCA J. GUADAMUD*
    REBECCA E. WENDLING*
    Snohomish County Prosecuting Attorney's Office
    3000 Rockefeller Avenue, M/S 504
    Everett, WA 98201-4046
    (425) 388-6392

bcasey@snoco.org
rebecca.guadamud@co.snohomish.wa.us
rwendling@snoco.org

Attorneys for Plaintiff
SNOHOMISH COUNTY

ROBERT H. PITTMAN
County Counsel

By: /s/ Joshua A. Myers
JOSHUA A. MYERS (SBN 250988), Chief Deputy
County Counsel
County of Sonoma
575 Administration Drive, Room 105A
Santa Rosa, California 95403
Telephone: (707) 565-2421
Facsimile: (707) 565-2624
joshua.myers@sonomacounty.gov

Attorney for Plaintiff
COUNTY OF SONOMA

ROBERT H. PITTMAN
County Counsel

By: /s/ Joshua A. Myers
JOSHUA A. MYERS (SBN 250988), Chief Deputy
County Counsel
County of Sonoma
575 Administration Drive, Room 105A
Santa Rosa, California 95403
Telephone: (707) 565-2421
Facsimile: (707) 565-2624
joshua.myers@sonomacounty.gov

Attorney for Plaintiffs
SONOMA COUNTY WATER AGENCY, SONOMA
VALLEY COUNTY SANITATION DISTRICT,
SONOMA COUNTY COMMUNITY
DEVELOPMENT COMMISSION

*Application for Admission Pro Hac Vice Forthcoming*

**FILER'S ATTESTATION**

I, KAVITA NARAYAN, am the ECF user whose identification and password are being used to file this Administrative Motion to Consider Whether Cases Should Be Related.  Pursuant to Northern District of California Civil Local Rule 5-1(i)(3), I hereby attest that the other above-named signatories concur in this filing.

TONY LOPRESTI, SBN 289269
County Counsel
KAVITA NARAYAN, SBN 264191
Chief Assistant County Counsel
MEREDITH A. JOHNSON, SBN 291018
Lead Deputy County Counsel
RAPHAEL N. RAJENDRA, SBN 255096
HANNAH M. GODBEY, SBN 334475
Deputy County Counsels
70 W. Hedding Street, East Wing, Ninth Floor
San José, California 95110-1770
Telephone: (408) 299-5900
E-Mail:      Raphael.Rajendra@cco.sccgov.org
             Hannah.Godbey@cco.sccgov.org

DAVID CHIU, SBN 189542
City Attorney
YVONNE R. MERÉ, SBN 175394
Chief Deputy City Attorney
MOLLIE M. LEE, SBN 251404
Chief of Strategic Advocacy
SARA J. EISENBERG, SBN 269303
Chief of Complex and Affirmative Litigation
DAVID S. LOUK, SBN 304654
STEVEN A. MILLS, SBN 328016
Deputy City Attorneys
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, California 94102-5408
Telephone: (415) 355-3308
E-Mail:      David.Louk@sfcityatty.org
             Steven.Mills@sfcityatty.org

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

Attorneys for Plaintiff
CITY AND COUNTY OF SAN
FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CITY AND COUNTY OF SAN FRANCISCO, COUNTY OF SANTA CLARA, CITY OF PORTLAND, MARTIN LUTHER KING, JR. COUNTY, CITY OF NEW HAVEN, CITY OF OAKLAND, CITY OF EMERYVILLE, CITY OF SAN JOSÉ, CITY OF SAN DIEGO, CITY OF SACRAMENTO, CITY OF SANTA CRUZ, COUNTY OF MONTEREY, CITY OF SEATTLE, CITY OF MINNEAPOLIS, CITY OF ST. PAUL, CITY OF SANTA FE, COUNTY OF ALAMEDA, CITY OF ALBANY, CITY OF ALBUQUERQUE, COUNTY OF ALLEGHENY, CITY OF BALTIMORE, CITY OF BEND, CITY OF BENICIA, CITY OF BERKELEY, CITY OF BOSTON, CITY OF CAMBRIDGE, CITY OF CATHEDRAL CITY, CITY OF CHICAGO, CITY OF COLUMBUS, CITY OF CULVER CITY, COUNTY OF DANE, CITY AND COUNTY OF DENVER, CITY OF HEALDSBURG, COUNTY OF HENNEPIN, CITY OF LOS ANGELES, COUNTY OF MARIN, CITY OF MENLO PARK, MULTNOMAH COUNTY, CITY OF PACIFICA, CITY OF PALO ALTO, CITY OF PETALUMA, PIERCE COUNTY, CITY OF RICHMOND, CITY OF ROCHESTER, CITY OF ROHNERT PARK, COUNTY OF SAN

Case No. 3:25-cv-01350-WHO

**DECLARATION OF HANNAH M. GODBEY IN SUPPORT OF ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED**

MATEO, CITY OF SANTA ROSA, COUNTY
OF SONOMA, CITY OF WATSONVILLE,
CITY OF WILSONVILLE,

      Plaintiffs,

v.

DONALD J. TRUMP, President of the United
States, UNITED STATES OF AMERICA,
PAMELA BONDI, Attorney General of the
United States, EMIL BOVE, Acting Deputy
Attorney General, UNITED STATES
DEPARTMENT OF JUSTICE, KRISTI NOEM,
Secretary of United States Department of
Homeland Security, UNITED STATES
DEPARTMENT OF HOMELAND SECURITY,
RUSSELL VOUGHT, Director of United States
Office of Management and Budget, UNITED
STATES OFFICE OF MANAGEMENT AND
BUDGET, DOES 1-100,

      Defendants.

I, Hannah M. Godbey, declare and state the following:

    1.     I am an attorney and a member of the Bar of this Court. I am a Deputy County Counsel with the Office of the County Counsel for the County of Santa Clara, and an attorney of record for Plaintiff the County of Santa Clara in the action *County of Santa Clara, et al. v. Noem, et al.*, No. 3:25-cv-08330 (N.D. Cal.) ("*Santa Clara v. Noem*"), filed in this District on September 30, 2025. I make this declaration of my own personal knowledge. If called on to do so, I could and would testify competently to the matters stated herein.

    2.     The County of Santa Clara and its co-Plaintiffs filed their Complaint in *Santa Clara v. Noem* one day before filing their Administrative Motion to Consider Whether Cases Should Be Related ("Motion to Relate") in the above-captioned case, *City and County of San Francisco, et al. v. Trump, et al.*, No. 3:25-cv-01350-WHO (N.D. Cal.) ("*San Francisco*").

    3.     I understand that under Northern District of California Civil Local Rules 3-12, 7-11, and 7-12, an administrative motion to consider whether cases should be related must be accompanied by either a written stipulation "signed by all affected parties or their counsel" consenting to the motion

1    to relate, or a declaration "that explains why a stipulation could not be obtained." Here, a stipulation

2    could not be obtained.

3         4.      On September 30, 2025, after my Office filed the Complaint in *Santa Clara v. Noem*,

4    I emailed counsel for the defendants in *San Francisco* asking whether defendants would consent to

5    relation. On October 1, 2025, I received a response from United States Department of Justice attorney

6    Lauren Fascett stating that "[d]ue to the Government lapse in funding . . . we are unable to review your

7    request and/or provide our position on your motion to relate the new case to the *SF v. Trump* case at

8    this time."

9         5.      Of the 50 plaintiff jurisdictions in *San Francisco*, all 49 that responded to outreach

10    related to the Motion to Relate consented to relation.

11         6.      Attached as **Exhibit 1** is a true and correct copy of the Complaint filed by Plaintiffs in

12    *Santa Clara v. Noem.*

13         7.      Attached as **Exhibit 2** is a true and correct copy of the operative Complaint in *San*

14    *Francisco.*

15

16        I declare under penalty of perjury under the laws of the United States of America that the

17    foregoing is true and correct to the best of my knowledge, and that this declaration was executed in

18    San José, California, on October 1, 2025.

19

20                     HANNAH M. GODBEY

21

22

23

24

25

26

27

28

# EXHIBIT 1

TONY LOPRESTI, SBN 289269
County Counsel
KAVITA NARAYAN, SBN 264191
Chief Assistant County Counsel
MEREDITH A. JOHNSON, SBN 291018
Lead Deputy County Counsel
RAPHAEL N. RAJENDRA, SBN 255096
HANNAH M. GODBEY, SBN 334475
Deputy County Counsels
70 West Hedding Street, East Wing, Ninth Floor
San José, California 95110-1770
Telephone: (408) 299-5900
E-Mail: Raphael.Rajendra@cco.sccgov.org
Hannah.Godbey@cco.sccgov.org

DAVID CHIU, SBN 189542
City Attorney
YVONNE R. MERÉ, SBN 175394
Chief Deputy City Attorney
MOLLIE M. LEE, SBN 251404
Chief of Strategic Advocacy
SARA J. EISENBERG, SBN 269303
Chief of Complex and Affirmative Litigation
DAVID S. LOUK, SBN 304654
STEVEN A. MILLS, SBN 328016
Deputy City Attorneys
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, CA 94102-5408
Telephone: (415) 355-3308
E-Mail: David.Louk@sfcityatty.org
Steven.Mills@sfcityatty.org

*Attorneys for Plaintiff*
*County of Santa Clara*

*Attorneys for Plaintiff*
*City and County of San Francisco*

*[additional counsel on signature page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COUNTY OF SANTA CLARA; CITY AND COUNTY OF SAN FRANCISCO; CITY OF ALAMEDA; CITY OF BELLINGHAM; CITY OF BERKELEY; CITY OF CULVER CITY; CITY OF LOS ANGELES; COUNTY OF LOS ANGELES; LOS ANGELES COUNTY CONSOLIDATED FIRE PROTECTION DISTRICT; MARTIN LUTHER KING, JR. COUNTY; COUNTY OF MARIN; CITY OF OAKLAND; CITY OF PALO ALTO; CITY OF PASADENA; CITY OF PETALUMA; PIERCE COUNTY; CITY OF SACRAMENTO; CITY OF SAN DIEGO; COUNTY OF SAN DIEGO; CITY OF SAN JOSÉ; COUNTY OF SAN MATEO; CITY OF SANTA MONICA; CITY OF SANTA ROSA; SNOHOMISH COUNTY; COUNTY OF SONOMA; SONOMA COUNTY COMMUNITY DEVELOPMENT COMMISSION; SONOMA COUNTY WATER AGENCY; SONOMA VALLEY COUNTY SANITATION DISTRICT; and CITY OF TUCSON, | No. 25-8330 **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Plaintiffs, | |
| v. | |
| KRISTI NOEM, in her official capacity as Secretary of Homeland Security; UNITED | |

STATES DEPARTMENT OF HOMELAND
SECURITY; DAVID RICHARDSON, in his
official capacity as Senior Official Performing the
Duties of FEMA Administrator; and FEDERAL
EMERGENCY MANAGEMENT AGENCY,

          Defendants.

## INTRODUCTION

1.     For three quarters of a century, it has been "the intent of the Congress . . . to provide an orderly and continuing means of assistance by the Federal Government to State and local governments in carrying out their responsibilities to alleviate the suffering and damage" resulting from disasters. 42 U.S.C. § 5121(b); Federal Disaster Relief Act of 1950, Pub. L. No. 81-875, § 1, 64 Stat. 1109. As a result, Congress has long directed the federal government to provide funding to help States and local governments prepare for, reduce the risk of, and recover from "loss of life, human suffering, loss of income, and property loss and damage" from disasters, as well as the "disrupt[ion] [of] the normal functioning of governments and communities" and severe adverse effects on "individuals and families" disasters cause. 42 U.S.C. § 5121(a); *see generally* Robert T. Stafford Disaster Relief and Emergency Assistance Act, as amended, 42 U.S.C. ch. 68.

2.     Pursuant to these and related authorities, Congress has established the framework for a complex, multi-layered emergency-management infrastructure to prepare for, mitigate, and recover from the harms caused by unpredictable disasters and emergencies; encouraged States and local governments to co-create that infrastructure with the federal government; and directed the federal government to collaborate with willing States and local governments in that undertaking.

3.     In support of that system, Congress appropriates billions of dollars each year to grant programs that financially support state and local governments in preparing for, responding to, and recovering from disasters. State and local governments rely heavily on this grant funding to perform a wide array of functions essential to the safety of the residents and communities they serve—from supporting first responders' salaries and training, purchasing hazmat equipment, and preparing for and mitigating the risks of earthquakes, floods, and fires, to training public employees on how to serve the public during natural disasters, funding search and rescue efforts, and strengthening

computer systems with cybersecurity tools. In short, Congress has made federal funding of state and local governments' emergency-management operations an essential linchpin in the systems that secure the Nation. Without that funding, people across the country will face greater risk of suffering and death from disasters; homes and businesses will face greater risk of destruction; and state and local governments will suffer significant economic consequences to their budgets and workforces, as well as their ability to best address their communities' unique needs.

4.     Congress has largely assigned the duty to distribute these federal funds to the Department of Homeland Security (DHS) and the Federal Emergency Management Agency (FEMA), a component agency of DHS. While DHS and FEMA retain limited discretion over the allocation of some of that funding, much of the funding is allocated to state and local governments by formulas Congress has set out by statute.

5.     Plaintiffs in this case are local government entities that are collectively responsible for the safety and well-being of tens of millions of residents. To carry out that responsibility, Plaintiffs must prepare for and respond to potential disasters and emergencies, from wildfires, earthquakes, floods, severe weather events, infectious diseases, and invasive agricultural pests, to mass shootings, acts of terrorism, or threats of physical attacks. Plaintiffs use the congressionally appropriated funds from DHS to support a wide range of activities to prevent and respond to these threats, including providing emergency management training, enhancing the technology on which emergency operation centers operate, building out public-alert communications systems, and purchasing equipment on which first-responders and other emergency response operations rely.

6.     For the first time in the 75-year history of Congress's financial support for state and local governments' disaster preparedness, mitigation, and recovery, the Executive Branch has now determined to use this critical federal funding as a cudgel, threatening to hamstring state and local governments' emergency-management functions unless they acquiesce to unrelated Executive domestic policy goals. Specifically, DHS has adopted unlawful new conditions in its "Standard Terms and Conditions" that require adherence to the Executive Branch's domestic political agenda and imposed those new conditions as barriers to Plaintiffs' acceptance of a range of grants administered by DHS and FEMA.

Complaint for Declaratory and Injunctive Relief                                                    25-8330

7.     As relevant here, the new conditions require grant recipients and subrecipients to agree to and certify compliance with an interpretation of antidiscrimination law that is contrary to statutory and decisional law (the "Discrimination Condition," described in paragraph 171 below); agree to use their limited resources to cooperate with Immigration and Customs Enforcement (ICE) and other federal immigration enforcement activities and certify that use (the "Immigration Conditions," described in paragraph 172 below); and agree in advance to comply with all executive orders the President has issued *and* might in the future issue to advance and impose his domestic political agenda on them (the "EO Condition," described in paragraph 173 below) (together, the "Challenged DHS Conditions").

8.     Conditioning funding on new, unrelated, policy-driven conditions corrupts the purposes for which Congress established and appropriates funding to these grant programs in the first place: strengthening community resiliency and alleviating the suffering and damage caused by natural and human-made disasters.  Indeed, the Executive's imposition of the Challenged DHS Conditions will diminish emergency-management capacity across the country, threatening to exacerbate rather than alleviate the suffering and damage that result from disasters.  What is more, the Challenged DHS Conditions are inscrutably vague, subjective, and overbroad, and the Executive's imposition of the conditions on Plaintiffs' grants upsets the separation of powers, exceeds the federal government's authority to place conditions on federal funding, and flouts bedrock limits on how federal agencies must consider, reach, and implement their decisions.  Neither the Constitution nor Congress empowers the Executive to hold federal emergency-management funding hostage to the Administration's political agenda by adopting and imposing the Challenged DHS Conditions on the grants at issue in this action.

9.     The result is that local governments in line to receive federal funding from DHS for emergency-management activities now face a choice that is not only untenable and unlawful, but also urgent: either accept conditions that are unconstitutional and contrary to law, or lose millions of dollars in federal grant funding used to keep their residents safe and ensure continuity of government.  That quandary is itself unconstitutional, and it inflicts substantial budget uncertainty on Plaintiffs in this action, which must now choose between acceding to these unlawful and

1 unconstitutional conditions and losing hundreds of millions of dollars in critical federal disaster

2 funding.

3        10.     Plaintiffs bring this suit to challenge the imposition of the Challenged DHS

4 Conditions on their DHS- and FEMA-administered grants.  Plaintiffs seek and are entitled to a

5 declaratory judgment that Defendants' adoption and application of the Challenged DHS Conditions

6 are unlawful, as well as injunctive relief barring Defendants from applying or enforcing the

7 Challenged DHS Conditions or any materially similar conditions in connection with Plaintiffs' DHS

8 grants.

9 **JURISDICTION AND VENUE**

10        11.     This Court has jurisdiction under 28 U.S.C. § 1331 because this is a civil action

11 arising under the Constitution and other laws of the United States.

12        12.     In addition to its other remedial authorities, this Court has authority to issue

13 declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

14        13.     Venue properly lies within the Northern District of California under 28 U.S.C.

15 §§ 1391(b)(2) and 1391(e)(1) because Plaintiffs County of Santa Clara, City and County of San

16 Francisco, City of Alameda, City of Berkeley, County of Marin, City of Oakland, City of Palo Alto,

17 City of Petaluma, City of San José, County of San Mateo, City of Santa Rosa, County of Sonoma,

18 Sonoma County Community Development Commission, Sonoma County Water Agency, and

19 Sonoma Valley County Sanitation District are in this judicial district; no real property is involved in

20 this action; and a substantial part of the events or omissions giving rise to this action occurred in this

21 District.

22 **DIVISIONAL ASSIGNMENT**

23        14.     Assignment to the San Francisco Division of this District is proper under Civil

24 L.R. 3-2(c)-(d) because the San Francisco Division is the Division serving San Francisco, which is

25 where a substantial part of the events or omissions giving rise to the claims asserted below occurred,

26 and is therefore where this action arises.

27 / / /

28 / / /

Complaint for Declaratory and Injunctive Relief                                         25-8330

**PARTIES**

**A.      Plaintiffs**

15.     Plaintiff County of Santa Clara ("Santa Clara") is a charter county and political subdivision of the State of California.

16.     Plaintiff City and County of San Francisco ("San Francisco") is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city and county.

17.     Plaintiff City of Alameda ("Alameda") is a chartered municipal corporation organized and existing under the laws of the State of California.

18.     Plaintiff City of Bellingham ("Bellingham") is a municipal corporation organized and existing under the laws of the State of Washington.

19.     Plaintiff the City of Berkeley ("Berkeley") is a municipal corporation and charter city organized and existing under the laws of the State of California.

20.     Plaintiff City of Culver City ("Culver City") is a municipal corporation and charter city organized and existing under the laws of the State of California.

21.     Plaintiff the City of Los Angeles ("LA City") is a municipal corporation and charter city organized and existing under the laws of the State of California and the Los Angeles City Charter.

22.     Plaintiff the County of Los Angeles ("LA County") is a subdivision of the State of California.

23.     Plaintiff Los Angeles County Consolidated Fire Protection District ("LA County Fire") is a special district organized and existing under the laws of the State of California.

24.     Plaintiff Martin Luther King, Jr. County ("King County") is a home rule charter county organized and existing under and by virtue of the constitution and laws of the State of Washington.

25.     Plaintiff the County of Marin ("Marin County") is a general law county and political subdivision of the State of California.

/ / /

26.     Plaintiff the City of Oakland ("Oakland") is a charter city organized and existing under and by virtue of the laws of the State of California.

27.     Plaintiff City of Palo Alto ("Palo Alto") is a chartered municipal corporation existing under the laws of the State of California.

28.     Plaintiff City of Pasadena ("Pasadena") is a home rule charter city organized and existing under the laws of the State of California.

29.     Plaintiff City of Petaluma ("Petaluma") is a municipal corporation and charter city organized and existing under the constitution and laws of the State of California.

30.     Plaintiff Pierce County is a home rule charter county organized and existing under and by virtue of the constitution and laws of the State of Washington.

31.     Plaintiff City of Sacramento ("Sacramento") is a municipal corporation organized and existing under and by virtue of the laws of the State of California and is a charter city.

32.     Plaintiff City of San Diego ("San Diego City") is a municipal corporation and charter city organized and existing under and by virtue of the laws of the State of California

33.     Plaintiff County of San Diego ("San Diego County") is a subdivision of the State of California.

34.     Plaintiff City of San José ("San José") is a municipal corporation organized and existing under and by virtue of the laws of the State of California and is a charter city.

35.     Plaintiff County of San Mateo ("San Mateo County") is a charter county and political subdivision of the State of California.

36.     Plaintiff City of Santa Monica ("Santa Monica") is a municipal corporation organized and existing under the laws of the State of California.

37.     Plaintiff the City of Santa Rosa ("Santa Rosa") is a municipal corporation organized and existing under and by virtue of the laws of the State of California and is a charter city.

38.     Plaintiff Snohomish County ("Snohomish County") is a political subdivision of the State of Washington.

39.     Plaintiff the County of Sonoma ("Sonoma County") is a political subdivision of the State of California.

40. Plaintiff Sonoma County Community Development Commission (SCCDC) is a public entity, formed pursuant to California Health and Safety Code section 34110, *et seq*., which provides affordable housing and community infrastructure projects and supports nonprofit organizations that serve low-income populations in Sonoma County.

41. Plaintiff Sonoma County Water Agency ("Sonoma Water") was created as a special district in 1949 by the California Legislature to provide flood protection and water supply services to over 600,000 residents throughout Sonoma and northern Marin Counties.

42. Plaintiff Sonoma Valley County Sanitation District (SVCSD) is a sanitation district, existing under California state law, that provides public wastewater collection and treatment for the City of Sonoma and numerous unincorporated communities within the Sonoma Valley.

43. Plaintiff Sonoma County Water Agency ("Sonoma Water") was created as a special district in 1949 by the California Legislature to provide flood protection and water supply services to over 600,000 residents throughout Sonoma and northern Marin Counties. Sonoma Water has held responsibility for managing SVCD since 1995.

44. Plaintiff City of Tucson ("Tucson") is a municipal corporation organized and existing under the laws of the State of Arizona.

45. Plaintiffs are aggrieved and have standing to bring this action because Defendants' adoption and imposition of the Challenged DHS Conditions has injured, is injuring, and will continue to injure Plaintiffs unless and until application and enforcement of the Challenged DHS Conditions is permanently enjoined.

**B. Defendants**

46. Defendant Kristi Noem is the Secretary of Homeland Security. She is sued in her official capacity, in which capacity she is responsible for overseeing and administering all duties and programs of DHS, and in which capacity she executed a document purporting to delegate to Defendant David Richardson all functions and duties of the FEMA Administrator except to the extent such functions and duties are nondelegable by law. Congress has prohibited the Secretary of Homeland Security from changing FEMA's mission, including by "substantially or significantly reduc[ing] . . . the authorities, responsibilities, or functions of [FEMA] or the capability of [FEMA]

1  to perform those missions, authorities, [or] responsibilities," except to the extent Congress expressly
2  authorizes the Secretary to do so.  6 U.S.C. § 316(c)(1).

3      47.    Defendant United States Department of Homeland Security (DHS) is an agency and
4  executive department of the United States government.  DHS has responsibility for implementing the
5  federal grant programs at issue in this action, including through FEMA.  DHS is an "agency" within
6  the meaning of the Administrative Procedure Act (APA), 5 U.S.C. § 701(b)(1).

7      48.     Defendant David Richardson is the Senior Official Performing the Duties of the
8  FEMA Administrator.  He is sued in his official capacity, in which capacity he claims to be
9  responsible for overseeing and administering all duties and programs of FEMA, except to the extent
10  the functions and duties of the FEMA Administrator are nondelegable by law.

11     49.    Defendant Federal Emergency Management Agency (FEMA) is an agency of the
12  federal government within DHS.  FEMA coordinates operational and logistical disaster relief and
13  oversees the administration of most of the federal grant programs at issue in this action.  Congress
14  has directed that FEMA is and must "be maintained as a distinct entity within" DHS.  6 U.S.C.
15  § 316(a).  FEMA is an "agency" within the meaning of the APA, 5 U.S.C. § 701(b)(1).

16                                    **ALLEGATIONS**

17  **A.    Federal Funding for Disaster Preparedness, Mitigation, and Recovery**

18     50.    Plaintiffs are the sites of major population centers and are collectively responsible for
19  the safety and well-being of tens of millions of residents.  Plaintiffs meet that responsibility in part
20  by preparing for potential disasters and responding to emergencies in an almost untold number of
21  scenarios, from wildfires, floods, earthquakes, severe weather events, infectious diseases, and
22  invasive agricultural pests, to mass shootings, acts of terrorism, or threats of physical attacks at busy
23  international airports, mass-transit systems, large-scale special events like the Super Bowl, ports
24  where large ships load and unload goods critical to the national economy, and myriad other
25  situations.

26     51.    Each year Congress appropriates billions of dollars for DHS, and primarily FEMA, to
27  distribute as grants to state and local governments to support such disaster preparedness, mitigation,
28  and recovery efforts throughout the Nation.

Complaint for Declaratory and Injunctive Relief                              25-8330

52.     Plaintiffs, like virtually every state and local government across the country, rely on these federal grants to support their emergency-management functions.  Plaintiffs variously receive this grant funding directly, by executing grant agreements with FEMA or other components of DHS, and indirectly, as subgrantees of funding from the States.

53.     Specifically, while FEMA makes some of its emergency-management grant funding available directly to local governments, it disburses most of the funding to the States, which are then authorized or required to execute subgrants to distribute the funding to local governments.  This is known as "pass-through" grant funding.  When it distributes such funding to States, FEMA typically disburses funds to the agencies within each State that FEMA refers to as the State Administrative Agency, or "SAA," or the State Emergency Management Agency, or "EMA."  FEMA grants contemplate this multi-layered, pass-through structure.

54.     The SAA and EMA for California is the California Governor's Office of Emergency Services (referred to herein as "CalOES").  The SAA and EMA for Washington State is the Emergency Management Division of the Washington State Military Department (referred to herein as "WashEMD").  The SAA for Arizona is the Arizona Department of Homeland Security (referred to herein as "AZDOHS"), and the EMA for Arizona is the Arizona Department of Emergency and Military Affairs (referred to herein as "AZ-DEMA").

55.     Once this federal funding is distributed to Plaintiffs, whether directly or indirectly, Plaintiffs use the funding for a wide range of activities that directly advance the purposes for which Congress established the grant programs at issue in this action, from emergency management training and enhancing the technology on which emergency operation centers operate, and building out public-alert communications systems and supporting community preparedness, to purchasing equipment—like portable generators and medical technology, satellite phones, bomb squad hazmat suits and bomb-defusing equipment, thermal binoculars, and temporary barriers—on which first responders and other emergency response operations rely.

56.     Moreover, the programs are far more valuable to Plaintiffs and their communities than just the dollar value of their grants.  Under longstanding multi-jurisdictional agreements and by daily practice, Plaintiffs realize the benefits, savings, and force multiplication of mutual aid and

Complaint for Declaratory and Injunctive Relief                                                                25-8330

1  protection. For instance, when Santa Clara uses federal funding to maintain and enhance the

2  capabilities of its Sheriff's Office's bomb squad, other nearby jurisdictions also benefit because the

3  Sheriff's Office can and does deploy that squad to address bomb threats in those other jurisdictions.

4  This cooperative arrangement permits other jurisdictions to use their funding for other purposes,

5  avoiding unnecessary duplication of effort and allowing all jurisdictions to use federal funding for

6  personnel, activities, and equipment that benefit the entire region, and not only an individual grantee

7  or subgrantee. This is particularly so for regional, large-scale events like the Super Bowl, where

8  visitors attending those events will travel and stay across multiple jurisdictions.

9       57. Indeed, Plaintiffs within California have been parties to a Disaster and Civil Defense

10  Master Mutual Aid Agreement since 1950,[1] and the State now has a robust and multilayered mutual-

11  aid arrangement. *See generally* Cal. Gov't Code §§ 8615-8619.5. Plaintiffs within Washington

12  State are likewise part of the Washington Intrastate Mutual Aid System. *See generally* Wash. Rev.

13  Code Ann. ch. 38.56; *id.* § 38.52.091.[2] Plaintiff Tucson is part of the Arizona Mutual Aid Compact

14  between and among the State of Arizona and numerous localities within Arizona.[3] And Plaintiffs'

15  respective States are themselves members of the Emergency Management Assistance Compact

16  (EMAC), which is an interstate compact ratified by Congress that provides for mutual assistance

17  between and among the States and mutual cooperation in emergency-related exercises, testing, and

18  training activities.[4]

19       58. Funding from the federal government has gone lengths in supporting the critical work

20

21  [1] *See* CalOES, California Disaster and Civil Defense Master Mutual Aid Agreement (Nov. 15,
22  1950), https://www.caloes.ca.gov/wp-content/uploads/Preparedness/Documents/CAMasterMutAidAgreement.pdf [archived at
23  https://perma.cc/W8V7-75ZV].

24  [2] *See also* WashEMD, Washington Mutual Aid System (WAMAS) (last accessed Sept. 30, 2025),
https://mil.wa.gov/washington-mutual-aid-system-wamas [archived at https://perma.cc/YU2Z-D2PP].

25  [3] *See* Arizona Mutual Aid Compact, https://dema.az.gov/sites/default/files/2023-
26  10/2024_AZMAC.pdf.

27  [4] *See* Emergency Management Assistance Compact, https://www.emacweb.org (last accessed
Sept. 30, 2025); *see also* H.R. J. Res. 193, 104th Cong. (1996), Pub. L. No. 104-321, 110 Stat. 3877
(consenting to compact); Cal. Gov't Code §§ 179-179.9 (ratifying and approving EMAC); Wash.
28  Rev. Code Ann. § 38.10.010 (enacting and entering EMAC); Ariz. Rev. Stats. § 26-402 (authorizing
governor to enter into EMAC on behalf of the State).

Complaint for Declaratory and Injunctive Relief          25-8330

1  accomplished through this inter-connected system.  Plaintiffs have collectively received hundreds of

2  millions of dollars from the DHS grant programs at issue in this action in recent years, and have

3  applied for and expect to receive hundreds of millions of dollars under Fiscal Year 2025 DHS grant

4  programs, both directly from DHS and also indirectly as subgrantees of their States.

5  **B.**     **Plaintiffs Have Received and Expect to Receive Federal Funding from Many DHS**
       **Grant Programs**

6

7       59.     Within California, CalOES is the SAA and EMA designated by FEMA and is the

8  agency primarily responsible for receiving, using, and distributing FEMA grant funding.  Emergency

9  management in California is organized into geographic units called operational areas, and state law

10  designates each county and all political subdivisions within it as an operational area.  Each

11  operational area has a designated lead agency, which holds primary responsibility and authority

12  within the area for communication and coordination related to emergency management, including

13  with local, state, and federal officials, community organizations, and individuals.  Cal. Gov't Code

14  §§ 8559(b), 8605.

15       60.     Santa Clara is the lead agency for the Santa Clara County Operational Area, which

16  also includes Plaintiffs Palo Alto and San José.  San Francisco is the lead agency for the San

17  Francisco Operational Area.  LA County is the lead agency for the County of Los Angeles

18  Operational Area, which also includes Plaintiffs LA City, Culver City, Pasadena, and Santa Monica.

19  San Diego County is the lead agency for the San Diego County Operational Area, which also

20  includes San Diego City.  Sonoma County is the lead agency for the Sonoma County Operational

21  Area, which also includes Plaintiffs Santa Rosa and Petaluma.  Non-party County of Alameda is the

22  lead agency for the Alameda County Operational Area, which includes Plaintiffs Alameda City,

23  Berkeley, and Oakland.  Non-party County of Sacramento is the lead agency for the Sacramento

24  County Operational Area, which includes Plaintiff Sacramento City.  San Mateo County is the lead

25  agency for the San Mateo Operational Area.  Marin County is the lead agency for the Marin County

26  Operational Area.

27       61.     Within Washington State, WashEMD is the SAA and EMA designated by FEMA and

28  is the agency that leads and coordinates mitigation, preparedness, response, and recovery in

Complaint for Declaratory and Injunctive Relief                                                    25-8330

Washington State to minimize the impact of disasters and emergencies on the people, property, environment, and economy.  Emergency management in Washington State is organized into local emergency management organizations, which are responsible for developing and keeping updated a comprehensive emergency management plan that sets out plans and policies to mitigate, prepare for, respond to, and recover from emergencies and disasters.  All political subdivisions of the State must establish or join a local emergency management organization.  Wash. Rev. Code Ann. chs. 38.52, 118-30; *id.* § 38.52.070.

62.     King County, Pierce County, and Snohomish County have each established a local emergency management organization and adopted a comprehensive emergency management plan under state law.

63.     Within Arizona, AZDOHS is the SAA and AZ-DEMA is the EMA.  AZ-DEMA leads and coordinates emergency preparedness, response, recovery, and mitigation efforts to reduce the impact of emergencies and disasters on people and property.  AZDOHS administers and manages federal homeland security grants related to prevention of terrorism and other critical hazards that affect the safety and well-being of its residents.  Counties and incorporated cities and towns within Arizona must establish and provide for emergency management within their jurisdictions, and may enter into mutual aid agreements among themselves to provide aid during an emergency.  Ariz. Rev. Stat. §§ 26-308, 26-309.

64.     Tucson handles planning and response for local emergencies and disasters in coordination with Pima County, which has promulgated an Emergency Operations Plan and established an Emergency Management Organization impacting multiple jurisdictions within the County.

65.     Plaintiffs have received or been awarded, or anticipate receiving or being awarded, grants or subgrants under one or more of the following grant programs administered by FEMA:

    a.     Emergency Management Performance Grant Program (EMPG)

    b.     Homeland Security Grant Program (HSGP), including the following two components of that program: State Homeland Security Program (SHSP) and Urban Areas Security Initiative (UASI)

c.      Assistance to Firefighters Grant Program (AFG)

d.      Hazard Mitigation Grant Program (HMGP)

e.      Port Security Grant Program (PSGP)

f.      Staffing for Adequate Fire and Emergency Response (SAFER)

g.      Fire Prevention and Safety Grants (FP&S)

h.      Transit Security Grant Program (TSGP)

i.      National Urban Search and Rescue (US&R)

66.      Plaintiff LA City has received, and anticipates receiving, grants under the Securing the Cities Grant Program (STC), which is administered by an office within DHS called the Countering Weapons of Mass Destruction Office.  All of the grant programs described in paragraph 65 and the STC are referred to collectively herein as the "Subject Grant Programs."

**i.      Emergency Management Performance Grant Program (EMPG)**

67.      The Emergency Management Performance Grant Program (EMPG) provides federal funding, passed through the States, to assist state, local, tribal, and territorial emergency management agencies in implementing FEMA's National Preparedness System (a systematic process for developing national preparedness), including by building continuity-of-government capabilities to ensure essential functions in a catastrophic disaster and otherwise working toward the National Preparedness Goal (which FEMA has articulated as "[a] secure and resilient nation with the capabilities required across the whole community to prevent, protect against, mitigate, respond to, and recover from the threats and hazards that pose the greatest risk").

68.      EMPG funding supports States and local governments in developing or enhancing emergency management planning activities, emergency operations plans, public alerts and warning systems, emergency response coordination among agencies, mutual aid systems, shelter and evacuation preparedness, and disaster recovery.  EMPG funding also supports the purchase of certain forms of equipment, as well as day-to-day activities in support of emergency management.

69.      EMPG funds have been made available to States since an initial appropriation for the program in 2003.  *See* Pub. L. No. 108-7, 117 Stat. 11, 516.  Congress has since made the program permanent and codified it at 6 U.S.C. § 762.

70.     FEMA's allocation of EMPG funds among the States is set by statutory formula.  For each year's apportioned amount of EMPG funding, FEMA must allocate to certain territories a baseline amount of 0.25 percent of the appropriated funds and to the States a baseline amount of 0.75 percent of the appropriated funds.  6 U.S.C. § 762(d)(1).  FEMA must apportion the remaining amount among the States on a population-share basis.  *Id.* § 762(d)(2).

71.     The EMPG permits States to allow subrecipients to apply for a share of the EMPG funding that they receive from FEMA.  Plaintiffs Santa Clara, San Francisco, Bellingham, King County, Marin County, LA City, LA County, San Diego County, Pierce County, and Snohomish County (the "EMPG Plaintiffs") have received or been awarded, or anticipate receiving or being awarded, FY 2025 EMPG pass-through funding.  Numerous Plaintiffs also anticipate applying for future EMPG pass-through funding.

72.     Local governments use EMPG funding for a wide range of emergency response programming.  For instance, EMPG dollars fund the salaries of EMPG Plaintiffs' employees, including emergency managers, who lead coordination efforts to prepare for and respond to natural disasters or mass casualty events.

73.     The EMPG program also funds communications and facilities for EMPG Plaintiffs' emergency response; training programs for staff members playing central roles in disaster response; and costs for software that is critical to the proper functioning of Plaintiffs' emergency operations centers, which are physical and electronic locations from which Plaintiffs often conduct their responsibilities as lead agencies for their operational areas in the event of a disaster or public health emergency.

74.     EMPG funds allow the EMPG Plaintiffs to advance their emergency management preparedness in ways they otherwise could not.  The EMPG Plaintiffs would otherwise not be able to employ or train the emergency management staff funded by EMPG funds, severely diminishing the EMPG Plaintiffs' ability to coordinate emergency response and disaster relief and recovery.

75.     For example, Santa Clara uses EMPG funding to support County and city staff throughout the Santa Clara County Operational Area in receiving training to build their expertise in emergency management and homeland security protection work, including specialized training in

1    crisis communications and emergency planning for schools; to purchase computers and other vital

2    equipment for local Emergency Operations Centers; and to support connecting local community- and

3    faith-based organizations to regional emergency response activities to keep the community better

4    informed and connected.

5          76.    EMPG grant performance periods also often remain open for two or more years,

6    meaning that an award in one fiscal year usually allows receiving Plaintiffs to continue to support

7    program activities beyond the fiscal year in which the funding is awarded.

8          77.    In its FY 2025 EMPG Notice of Funding Opportunity (NOFO) published on July 28,

9    2025, FEMA announced that it allocated California $24,392,241, Washington State $6,835,572, and

10   Arizona $6,625,941; directed applicants to apply for funding by August 11, 2025; and stated that the

11   award date would be no later than September 30, 2025.[5]  The NOFO states that recipients of EMPG

12   funding "must comply with the DHS Standard Terms and Conditions in effect as of the date of the

13   federal award," which include the Challenged DHS Conditions.

14         78.    CalOES and WashEMD timely applied to FEMA for FY 2025 EMPG funding.  The

15   EMPG Plaintiffs have timely applied or expect to timely apply to CalOES and WashEMD,

16   respectively, for a share of their State's EMPG funding, or have applied or will timely apply for

17   pass-through funding from a state subrecipient.

18         79.    On August 8, 2025, CalOES issued Grants Management Memorandum (GMM) 2025-

19   07, which states that, of California's FY 2025 EMPG funding, CalOES will allocate $451,385 to the

20   Santa Clara County Operational Area; $267,970 to the San Francisco Operational Area; $1,802,009

21   to the County of Los Angeles Operational Area; $690,432 to the San Diego County Operational

22   Area; $252,062 to the San Mateo Operational Area; $206,984 to the Sonoma County Operational

23   / / /

24   / / /

25   / / /

26

27   [5] FEMA, NOFO: FY 2025 Emergency Management Performance Grant Program (Jul. 28, 2025),

28   https://www.fema.gov/grants/preparedness/emergency-management-performance/fy-25-nofo
     [archived at https://perma.cc/L2ZD-C7GD].

1    Area; $168,221 to the Marin County Operational Area, and $407,277 to the Alameda County

2    Operational Area.[6]

3        80.    By September 30, 2025, FEMA had awarded FY 2025 EMPG funding to California

4    and Washington.

5        **ii.    Homeland Security Grant Program (HSGP)**

6        81.    FEMA's Homeland Security Grant Program (HSGP) comprises several discrete

7    subprograms, including two through which Plaintiffs have historically received grant funding and

8    expect to apply for and receive grant funding in the current fiscal year: the State Homeland Security

9    Program (HSGP-SHSP) and the Urban Area Security Initiative (HSGP-UASI) grant program.

10       82.    FEMA issues a single consolidated NOFO for all of the programs that comprise the

11   Homeland Security Grant Program.

12       83.    In its FY 2025 HSGP NOFO published on July 28, 2025 and updated on August 1,

13   2025, FEMA announced that it allocated a total of $1.008 billion in HSGP funding, including

14   $373.5 million in HSGP-SHSP funding and $553.5 million in HSGP-UASI funding; and that of

15   those amounts, FEMA allocated to California $55,863,486 in SHSP funding and a total of

16   $109,325,268 in HSGP-UASI funding, of which FEMA allocated $32,451,685 to the San Francisco-

17   San José-Oakland Urban Area, $38,664,255 to the Los Angeles/Long Beach Urban Area, $4,516,008

18   to the Sacramento-Roseville-Folsom Urban Area, $17,716,678 to the San Diego-Chula Vista-

19   Carlsbad, CA Urban Area, and $12,713,580 to the Seattle-Tacoma-Bellevue Urban Area.  The

20   FEMA NOFO directed applicants to apply for funding by August 15, 2025.[7]

21       84.    The NOFO states that recipients of Homeland Security Grant Program funding,

22   including under the HSGP-SHSP and HSGP-UASI programs, "must comply with the DHS Standard

23   / / /

24

25

---

26   [6] CalOES, GMM 2025-07, *Fiscal Year (FY) 2025 EMPG Allocations* (Aug. 8, 2025),
     https://www.caloes.ca.gov/wp-content/uploads/Grants/Documents/GMM-2025-07-FY-2025-EMPG-

27   Allocations.pdf [archived at https://perma.cc/P6T8-98TT].

     [7] FEMA, NOFO: FY 2025 Homeland Security Grant Program (Jul. 28, 2025, rev. Aug. 1, 2025),
28   https://www.fema.gov/grants/preparedness/homeland-security/fy-25-nofo [archived at
     https://perma.cc/9793-JHYE].

Terms and Conditions in effect as of the date of the federal award," which include the Challenged DHS Conditions.

85.    CalOES timely applied to FEMA for FY 2025 HSGP funding.  On August 26, 2025, CalOES issued Grants Management Memorandum (GMM) 2025-08, which describes how CalOES will allocate among local governments within California, including Plaintiffs, the HSGP funding that FEMA's HSGP NOFO stated would be allocated to California.[8] WashEMD and AZDOHS similarly timely applied to FEMA for FY 2025 HSGP funding.

86.    By September 30, 2025, FEMA had issued grant awards for HSGP funding to California, Washington, and Arizona.[9]

a.    *State Homeland Security Program (SHSP) Grant Program*

87.    Within the Homeland Security Grant Program, State Homeland Security Program (HSGP-SHSP) grants exist to provide federal funding to States—and, through them, to local governments—to build the necessary capacity to prevent, prepare for, protect against, and respond to acts of terrorism.

88.    HSGP-SHSP funds have been available to States—and, through them, to local governments—since the first version of the program was created by the USA PATRIOT Act in 2001.  Congress codified the program at 6 U.S.C. §§ 603, 605-09.

89.    Congress has directed FEMA to allocate HSGP-SHSP funds pursuant to a risk assessment, which determines the relative threat, vulnerability, and consequences to each State from acts of terrorism, considering factors such as population density and history of threats.  *Id.* § 608(a)(1).  Recipients may then use HSGP-SHSP funds for uses permitted by statute, such as enhancing homeland security, conducting training exercises, upgrading equipment, or paying salaries.  *Id.* § 609(a).

---

[8] CalOES, GMM 2025-08, *Fiscal Year (FY) 2025 HSGP Application Updates, Guidance, and Allocations* (Aug. 26, 2025), https://www.caloes.ca.gov/wp-content/uploads/Grants/Documents/GMM-2025-08-FY25-HSGP-Application-Updates-and-Allocations.pdf [archived at https://perma.cc/4CMX-WTBT].

[9] *See* Pls.' Emergency Mot for TRO, at 8, *Illinois v. Noem*, No. 1:25-cv-495 (D.R.I. filed Sept. 29, 2025) (ECF No. 3); Compl. at ¶ 111, *Illinois v. Noem*, No. 1:25-cv-495 (D.R.I. filed Sept. 29, 2025) (ECF No. 1).

90. Because HSGP-SHSP grants are formula grants based on a statutory risk formula, not competitive grants, each State is entitled to a minimum and specific allocation based on the risk assessment whenever a notice of funding opportunity is posted.

91. Congress has directed that the FEMA Administrator "shall ensure" that each State receives no less than an amount equal to 0.35 percent of the total funds Congress appropriated for HSGP-SHSP grants. *Id.* § 605(e)(1)(A)(v).

92. Congress appropriates, and FEMA distributes, hundreds of millions of dollars per year in HSGP-SHSP grants to the States. In each of the three fiscal years prior to FY 2025, FEMA awarded well over $50 million to California, over $5 million to Washington, and over $4 million to Arizona. These States then subgrant substantial HSGP-SHSP grant funding to local governments, including Plaintiffs.

93. Plaintiffs Santa Clara, San Francisco, Culver City, King County, San Mateo County, Marin County, Oakland, LA City, LA County, LA Fire, Pasadena, Pierce County, Petaluma, San Diego County, San José, Santa Monica, Sonoma County, Snohomish County, and Tucson (the "HSGP-SHSP Plaintiffs") have received or been awarded, or anticipate receiving or being awarded, FY 2025 HSGP-SHSP pass-through funding. Numerous Plaintiffs also anticipate applying for future HSGP-SHSP pass-through funding.

94. The HSGP-SHSP Plaintiffs use these funds for myriad counterterrorism and emergency response purposes, including, but not limited to, funding special operations command teams as well as mutual aid networks of police departments, fire departments, emergency services, and public works departments, in order to mobilize first responders from outside an immediate jurisdiction in the event of a disaster.

95. HSGP-SHSP funds allow the HSGP-SHSP Plaintiffs to advance counterterrorism and emergency management purposes in ways they otherwise could not.

96. For example, Santa Clara uses its HSGP-SHSP grants to fund positions throughout the Santa Clara County Operational Area that focus on counterterrorism and emergency planning—including a full-time All-Hazards Coordinator position dedicated to ensuring that fire departments throughout the Operational Area are adequately equipped and trained to respond to terrorist or all-

1    hazards events; a Domestic Violent Extremism Liaison to coordinate across all law enforcement

2    agencies in the Operational Area; and a contracted Community Resilience Coordinator to engage the

3    local community in the emergency planning process.  In addition, Santa Clara's HSGP-SHSP

4    funding goes toward the purchase of critical equipment such as security systems for County election

5    sites, law enforcement information-sharing systems, rapid DNA technology for terrorist interdiction

6    and criminal investigations, and mobile equipment such as portable ventilators to deploy in mass

7    casualty events.  Finally, Santa Clara's HSGP-SHSP funding also supports services such as

8    conducting a comprehensive cybersecurity assessment of County information technology

9    infrastructure.

10          97.    San Diego County's HSGP-SHSP funding is used for salaries and training for

11   emergency response personnel, including staff to operate its Emergency Operations Center and

12   regional alert and warning systems; operation of emergency communication systems that deliver

13   critical information to the public during times of emergency; procurement of response equipment for

14   fire, law enforcement, emergency medical services, and hazardous materials teams; joint trainings

15   and exercises to strengthen regional coordination and response capabilities; cybersecurity personnel,

16   equipment and resources; the development of regional emergency response plans to ensure

17   operational readiness; and other capabilities necessary to safeguard life, property, and the region's

18   resilience against evolving threats.

19          98.    Because each HSGP-SHSP grant typically remains open for three years, an award in

20   one fiscal year usually allows grantees and subgrantees to continue to support program activities in

21   subsequent years.  For instance, several HSGP-SHSP Plaintiffs are currently relying on funding from

22   the HSGP-SHSP awards for Federal Fiscal Years 2021 through 2024.

23          99.    Of the amount of HSGP-SHSP funding that FEMA's HSGP NOFO states would be

24   allocated to California CalOES GMM 2025-08 states the amount that CalOES anticipates allocating

25   to each Operational Are, including, as relevant here, $1,852,295 to the Santa Clara County

26   Operational Area, $853,526 to the San Francisco Operational Area, $9,206,964 to the County of Los

27   Angeles Operational Area, $3,154,001 to the San Diego County Operational Area, $766,903 to the

28   San Mateo Operational Area, $521,435 to the Sonoma County Operational Area, $310,353 to the

Complaint for Declaratory and Injunctive Relief                                          25-8330

1  Marin County Operational Area, and $1,612,108 to the Alameda County Operational Area.[10]

2          **b.**       *Urban Areas Security Initiative (UASI)*

3        100.    Within the Homeland Security Grant Program, Urban Areas Security Initiative

4  (HSGP-UASI) grants serve a similar purpose to HSGP-SHSP grants.  They are used to ensure

5  States—and, through them, local government entities serving high-risk urban areas—build and

6  maintain the capacity to prevent, prepare for, protect against, and respond to acts of terrorism.

7        101.    HSGP-UASI funds have been available to States—and, through them, local

8  government entities serving high-risk urban areas—since an initial version of the program was

9  created by appropriations statute in 2003.  *See* Pub. L. No. 108-90, 117 Stats. 1137, 1146.  The

10  program is codified at 6 U.S.C. §§ 603-04, 606-09.

11        102.    Each year, FEMA must conduct a risk assessment based on a list of factors specified

12  by statute to determine the relative threat, vulnerability, and consequences "eligible metropolitan

13  areas"—meaning the top one hundred most populous metropolitan statistical areas in the United

14  States—would face from an act of terrorism.  *Id.* §§ 601(5), 604(b)(2)(A)(i), 608(a)(1).  Based on

15  that risk assessment, FEMA must designate a list of high-risk urban areas that may submit

16  applications for HSGP-UASI grants.  *Id.* § 604(b)(3).  FEMA must also rely on the same set of

17  factors—including but not limited to population density and whether the given metropolitan area

18  was targeted by a past act of terrorism—to allocate funding to the States and high-risk urban areas

19  that apply for grants.  *Id.* § 608(a).

20        103.    Put another way, HSGP-UASI grants are grants based on a risk assessment formula

21  that Congress has directed FEMA to refine, establish, and use to allocate HSGP-UASI funding.

22  Each State is entitled to a specific allocation—based on FEMA's risk assessment and tied to the

23  FEMA-designated high-risk urban area or areas in that State—whenever a notice of funding

24  opportunity is posted.

25

26  ─────────────────────

27  [10] CalOES, GMM 2025-08, *Fiscal Year (FY) 2025 HSGP Application Updates, Guidance, and Allocations* (Aug. 26, 2025), https://www.caloes.ca.gov/wp-
28  content/uploads/Grants/Documents/GMM-2025-08-FY25-HSGP-Application-Updates-and-Allocations.pdf [archived at https://perma.cc/4CMX-WTBT].

104.    Recipients of HSGP-UASI grant funding must use the funds for permitted purposes, including enhancing homeland security, conducting training exercises, upgrading equipment, or paying salaries.  *Id.* § 609(a).

105.    States that receive HSGP-UASI funds must provide the eligible urban area or areas in that State with at least 80% of the grant funds.  *Id.* § 604(d)(2)(A).  Any funds retained by the State must be expended on items, services, or activities that benefit the high-risk urban area or areas.  *Id.*

106.    States collectively receive hundreds of millions of dollars per year in HSGP-UASI grants, passing most of these funds along to the high-risk urban areas.  States and the local government entities they pass these funds to use HSGP-UASI funds for myriad counterterrorism and emergency response purposes, including support for urban fusion centers (hubs for sharing threat-related information across government and private sector partners), SWAT teams, canine units, and bomb squads.

107.    HSGP-UASI funds allow States and local government entities to advance counterterrorism and emergency response purposes in ways they otherwise could not.

108.    For example, Santa Clara used its most recent HSGP-UASI grant award to support the purchase of an armored vehicle for its Office of the Sheriff's Emergency Response Team, enhancing its capabilities in hostage and barricade situations; and to purchase equipment for its Sheriff's Tactical Command Vehicle, which is used as a mobile hub for communications, intelligence, and logistics at major crime and attack scenes.

109.    FEMA distributes HSGP-UASI funding to the States and also determines what portion of each State's UASI funding must be allocated to particular urban areas within that State.

110.    For example, FEMA's FY 2025 HSGP NOFO allocated a portion of California's HSGP-UASI funding to the San Francisco-San José-Oakland Urban Area, which is covered by the Bay Area Urban Area Security Initiative (BAUASI).  BAUASI's area extends to over 100 incorporated cities with a combined total population exceeding 8.2 million people.  It is one of the most culturally and geographically diverse areas in the nation, and is home to critical infrastructure, a concentration of banking, Fortune 500 and technology companies, light and heavy industry, and iconic sites and destinations.  Because of these and other factors, DHS ranks the Bay Area the fifth

1    highest urban area in terms of risk and threat in the country.

2        111.    San Francisco acts as the fiscal agent for BAUASI.  As fiscal agent, San Francisco

3    applies to CalOES for HSGP-UASI funding for BAUASI.  San Francisco is authorized and

4    responsible for issuing HSGP-UASI subgrants to other entities that participate in the BAUASI and

5    for which the BAUASI approval authority has approved grant funding.  Plaintiffs Santa Clara,

6    Oakland, San José, Marin County, San Mateo County, and Sonoma County participate in BAUASI.

7        112.    Similarly, a portion of California's HSGP-UASI funds are allocated to the LA-Long

8    Beach-Glendale Urban Area, which includes Plaintiffs LA City and LA County. Through its

9    Mayor's Office of Public Safety, LA City serves as the administrative and fiscal agent, and submits

10   all grant applications and related documents on behalf of the LA-Long Beach-Glendale Urban Area

11   jurisdictions.

12       113.    Plaintiff Sacramento is the fiscal agent for the Sacramento-Roseville-Folsome Urban

13   Area.  A portion of California's HSGP-UASI funding is allocated to this Urban Area as well.

14       114.    Plaintiff San Diego City is the fiscal agent for the San Diego-Chula Vista-Carlsbad

15   Urban Area.  A portion of California's HSGP-UASI funding is allocated to this Urban Area as well.

16       115.    CalOES GMM 2025-08 states that, of the amount of UASI funding that FEMA's

17   HSGP NOFO stated was allocated to California, CalOES would allocate $26,837,543 to BAUASI,

18   $31,975,339 for the Los Angeles/Long Beach Urban Area, $3,734,739 for the Sacramento Urban

19   Area, and $14,651,693 for the San Diego Urban Area.[11]

20       116.    San Francisco has timely applied, or will timely apply, to CalOES for BAUASI's

21   allocation of FY 2025 HSGP-UASI funding, and has timely submitted or will timely submit all other

22   documents, if any, necessary to complete its application.

23       117.    In Washington, King County,  Pierce County, and Snohomish County are among the

24   core members of the applicable HSGP-UASI Urban Area Working Group. Each of these counties is

25

26   _____

27   [11] CalOES, GMM 2025-08, *Fiscal Year (FY) 2025 HSGP Application Updates, Guidance, and Allocations* (Aug. 26, 2025), https://www.caloes.ca.gov/wp-

28   content/uploads/Grants/Documents/GMM-2025-08-FY25-HSGP-Application-Updates-and-Allocations.pdf [archived at https://perma.cc/4CMX-WTBT].

the subrecipient of HSGP-UASI grant funding for projects to benefit the entire HSGP-UASI region, including one another.  Each of these counties also receives their own jurisdiction-specific UASI funding.

118.    Plaintiffs Santa Clara, San Francisco, Culver City, Oakland, San José, San Mateo County, Marin County, LA City, LA County, LA Fire, Pasadena, Sacramento, San Diego County, Santa Monica, Sonoma County, King County, Pierce County, and Snohomish County (the "HSGP-UASI Plaintiffs") have timely applied or intend to apply to their respective urban area working groups for FY 2025 allocations of the HSGP-UASI funding dedicated to their respective urban area.

**iii.    Hazard Mitigation Grant Program (HMGP)**

119.    The Stafford Act provides that the federal government may contribute "up to 75 percent of the cost of hazard mitigation measures" that "substantially reduce the risk of, or increase resilience to, future damage, hardship, loss, or suffering in any area affected by a major disaster." 42 U.S.C. § 5170c(a).

120.    The Hazard Mitigation Grant Program (HMGP) provides federal funding to state, local, tribal, and territorial governments to develop hazard mitigation plans and rebuild their communities after a Presidential major disaster declaration in ways that reduce or mitigate future disaster losses.

121.    Eligible risk reduction projects include, but are not limited to, retrofitting facilities to make them more resistant to floods, earthquakes, wind, wildfires, and other natural disasters; installing permanent barriers to prevent floodwater from entering homes or businesses; building safe rooms for communities in hurricane- or tornado-prone areas; stabilizing slopes to prevent structural losses; and developing or improving warning systems.

122.    For instance, Santa Clara has applied for $750,000 in HMGP funding for wildfire detection equipment that would provide verified, real-time alerts across Santa Clara County's highest-risk "wildland-urban interface" areas—that is, areas where human development meets undeveloped wildlands.  These fire sensors would close critical fire detection gaps—especially overnight when direct observation and public reporting are limited—in areas where conditions can quickly drive explosive fire behavior, and minutes lost in detection can mean the difference between

1   containment and catastrophe.

2        123.    HMGP funding and funding applications do not necessarily operate neatly on a

3   predicable, fiscal-year basis.  Instead, HMGP funding often follows the occurrence of disasters,

4   emergencies, and other events and Presidential declarations.  States can apply for HMGP funding

5   from FEMA after the President declares a major disaster.  The amount of HMGP funds available to a

6   State in connection with a declared disaster is a function of the level of disaster assistance provided.

7   The State also administers a process to identify and select local project plans for FEMA approval

8   and funding.  In this process, local jurisdictions submit their applications to the State, which selects

9   projects to then submit to FEMA for approval within 15 months of the date of disaster declaration.

10   *See generally* 44 C.F.R. §§ 206.430-440.  Some approved mitigation projects can span several years,

11   since many contain structural renovation components.

12        124.    Plaintiffs Santa Clara, San Francisco, Alameda, Berkeley, Marin County, Pasadena,

13   San José, Santa Monica, Santa Rosa, Sonoma County, Sonoma Water, SVCSD, Palo Alto, and

14   Pierce County (the "HMGP Plaintiffs") have applied for, and anticipate receiving or being awarded,

15   HMGP pass-through funding for FY2025 or later to support various hazard mitigation projects.

16   SCCDC has a pending project application for flood mitigation funding to support an approved

17   HMGP project.  Numerous Plaintiffs anticipate applying for HMGP pass-through funding in the

18   coming year.

19        **iv.**    **Transit Security Grant Program (TSGP)**

20        125.    The Transit Security Grant Program (TSGP) provides funding to transit agencies "for

21   security improvements," 6 U.S.C. § 1135(a)(1), and more specifically to protect critical

22   transportation infrastructure and the travelling public from terrorism, and to increase infrastructure

23   resilience in our nation's public transportation systems.

24        126.    Eligible public transportation agencies—including those operating ferries, intra-city

25   bus systems, and all forms of passenger rail—may apply for TSGP funds, *id.* § 1135(a)(2), and DHS

26   must "select the recipients of grants based solely on risk," *id.* § 1135(c)(2).

27        127.    In its FY 2025 TSGP NOFO, FEMA announced that it had targeted allocation of

28   $1,486,472 in TSGP funding to the San Francisco Municipal Railway (MUNI), which is operated by

Complaint for Declaratory and Injunctive Relief            25-8330

1    the San Francisco Municipal Transportation Agency (SFMTA), a component of San Francisco.  The

2    TSGP NOFO directed applicants to apply for funding by August 15, 2025, and stated that the award

3    date would be no later than September 30, 2025.[12]

4          128.    FEMA determined its target allocations, including for San Francisco, based on daily

5    unlinked passenger trips for transit systems in high-risk urban areas historically eligible for UASI

6    funding.[13]

7          129.    San Francisco timely applied to FEMA for funding under the TSGP.  In its

8    application, San Francisco stated it would use the funds to support personnel costs for 14 employees

9    (a lieutenant, two sergeants, and 11 sworn officers with K-9 specialty) to be deployed from the San

10   Francisco Police Department's Special Operations Unit for large-scale events, including the 2026

11   Super Bowl.

12         130.    On September 26, 2025, FEMA awarded San Francisco $3,066,376 in TSGP funding.

13         131.    San Francisco and other Plaintiffs also expect to apply for TSGP funds in the next

14   Fiscal Year.

15         **v.    Staffing for Adequate Fire and Emergency Response (SAFER) Program**

16         132.    Congress established the Staffing for Adequate Fire and Emergency Response

17   (SAFER) Program to provide funding directly to local fire departments (among other entities) to

18   help them increase or maintain the number of trained, front-line firefighters available to serve their

19   communities.

20         133.    The goal of SAFER grants is to enhance local fire departments' abilities to comply

21   with staffing, response, and operational standards established by the National Fire Protection

22   Association, including assisting fire departments with "attain[ing] 24-hour staffing to provide

23   adequate protection from fire and fire-related hazards."  15 U.S.C. § 2229a(a)(1)(A).  SAFER grants

24   are "awarded on a competitive basis through a neutral peer review process."  *Id.* § 2229a(a)(1)(G).

25

26

_____

27   [12] FEMA Transit Security Grant Program FY 2025 NOFO,
     https://www.fema.gov/grants/preparedness/transit-security/fy-25-nofo [archived at
28   https://perma.cc/G3LA-2369].
     [13] *Id.* at § 2(A)(2).

134.    The current NOFO for the SAFER Program, which is from FY 2024 but which governs awards that FEMA will make through September 30, 2025 based on applications received by July 3, 2025, states that "[g]rant funds are obligated upon [FEMA's issuance of] the offer of grant award in the FEMA GO system," and that recipients of SAFER funds must "comply with DHS Standard Terms and Conditions in effect at the time the award is issued."[14]

135.    Plaintiffs San Francisco, LA City, Palo Alto, Alameda, Oakland, and Tucson (the "SAFER Plaintiffs") have received or been awarded, or anticipate receiving or being awarded, SAFER funding pursuant to the FY2024 NOFO.  Numerous Plaintiffs expect to apply for SAFER funding in the next Fiscal Year.

136.    For instance, San Francisco timely applied for $18,126,288 in SAFER grant funding to fund 36 entry-level firefighters over the three-year grant period. Oakland timely applied for nearly $19 million in SAFER grant funding to fund hiring 20 additional firefighters.

137.    During federal Fiscal Year 2025, FEMA awarded SAFER grant funding pursuant to the FY 2024 NOFO in the amount of $4,204,414.04 to LA City.

**vi.    Assistance to Firefighters Grant (AFG)**

138.    Congress's primary goal in creating the Assistance to Firefighters Grant (AFG) was to ensure that firefighters and other first responders can obtain critical equipment, training, and other resources necessary to protect the public and emergency personnel from fire and fire-related hazards. Eligible fire departments can apply for AFG funding, 15 U.S.C. § 2229(b)(1)(A), (c), (e), which is awarded on a competitive basis, in consultation with the chief executives of the States in which the recipients are located, with the amount of grant funding capped based on statutory standards related to population size, *id.* § 2229(c)(1), (2).

139.    FEMA awards AFG grants on a rolling basis.  The current NOFO for the AFG program, which is from FY 2024 but which governs awards that FEMA will make through

---

[14] FEMA, Notice of Funding Opportunity (NOFO): FY 24 Staffing for Adequate Fire and Emergency Response (SAFER) Grant Program, https://www.fema.gov/sites/default/files/documents/fema_gpd_safer-nofo_fy24.pdf [archived at https://perma.cc/K9HR-5TYM].

1    September 30, 2025, states that recipients of AFG funds must "comply with the DHS Standard

2    Terms and Conditions in effect as of the date of the federal award.".[15]

3         140.    Plaintiffs San Francisco, Alameda, Berkeley, San Diego City, San José,  LA Fire,

4    Pasadena, Sacramento, Santa Monica, Palo Alto, Tucson, and Bellingham (the "AFG Plaintiffs")

5    have received or been awarded, or anticipate receiving or being awarded, AFG funding pursuant to

6    the FY 2024 NOFO. Numerous Plaintiffs anticipate applying for AFG funding in the next Fiscal

7    Year.

8         141.    For example, San Francisco timely applied for a total of $2,998,700 in AFG grant

9    funding to fund $1,500,000 to procure a new heavy rescue vehicle that will allow San Francisco to

10   increase its emergency response capabilities, as well as $1,488,700 to replace Automated External

11   Defibrillators that no longer comply with federal safety standards, and to procure new cardiac

12   monitors, defibrillators, video laryngoscopes, power gurneys, and stair chairs, all of which increase

13   safety to first responders and the public.

14        142.    To take another example, Santa Monica timely applied for $205,962 in AFG grant

15   funding to fund a firefighter wellness and fitness program.

16        143.    By September 30, 2025, FEMA had awarded AFG grant funding pursuant to the

17   FY 2024 NOFO in the amounts of $119,056.36 to Santa Monica and $1,147,348.14 to Tucson.

18        144.    The deadline for Santa Monica to execute the grant agreement to accept the award is

19   October 24, 2025.

20        **vii.    Fire Prevention and Safety (FP&S) Grants**

21        145.    Congress created Fire Prevention and Safety (FP&S) Grants to "assist[] fire

22   prevention programs and support[] firefighter health and safety research and development."

23   15 U.S.C. § 2229(d)(1).  Eligible fire departments can apply for funding, which is awarded on a

24   competitive basis.  *Id.* § 2229(d)(1)(A), (e).  Funding may be used to, among other things, support

25

26

27   [15] FEMA, Notice of Funding Opportunity (NOFO): FY 24 Assistance to Firefighters Grant Program,
     https://files.simpler.grants.gov/opportunities/ab253b7e-83d1-40b5-9d92-
28   f550ee51ba74/attachments/d04af45f-2c82-492c-a791-cf3fce90ab1d/FY_2024_AFG_NOFO.pdf
     [archived at https://perma.cc/A2KE-3D4M].

1   public education campaigns, enforce fire codes, and promote compliance with fire safety standards.

2   *Id.* § 2229(d)(3).

3          146.    FEMA awards FP&S grants on a rolling basis.  The current NOFO for the FP&S

4   program, which is from FY 2024 but which governs awards that FEMA will make through

5   September 30, 2025, states that recipients of AFG funds must "comply with the DHS Standard

6   Terms and Conditions in effect as of the date of the federal award."[16]

7          147.    San Francisco has received or been awarded, or anticipates receiving or being

8   awarded, FY 2025 FP&S funding.

9          148.    San Francisco timely applied for $671,808 in FP&S grant funding to fund residential

10  sprinkler code enforcement and awareness that mitigates the risk and spread of residential fires in

11  San Francisco's dense urban environment.

12         **viii.    Port Security Grant Program (PSGP)**

13         149.    The Port Security Grant Program (PSGP) provides federal funding to state, local,

14  territorial, and private-sector partners to help protect critical port infrastructure from terrorism and

15  other emergencies, enhance maritime domain awareness, improve port-wide maritime security risk

16  management, and maintain or reestablish maritime security mitigation protocols that enhance port

17  recovery and resiliency capabilities.

18         150.    PSGP funds have been available to eligible entities since the program was created by

19  the Maritime Transportation Security Act of 2002.  The program is codified at 46 U.S.C. § 70107.

20         151.    Eligible entities such as port authorities and local government agencies may apply for

21  funding, which is awarded on a competitive basis.  *Id.* § 70107(g).  Funding can be used for

22  planning, operational activities, equipment and capital projects, training and awareness campaigns,

23  and maintenance and sustainment.

24         152.    Plaintiffs San Francisco, Oakland, San Diego City, LA City, and LA County (the

25  / / /

26

27  ───────────────────────
[16] FEMA, Notice of Funding Opportunity (NOFO): FY 24 Fire Prevention and Safety (FP&S) Grant

28  Program, https://www.fema.gov/sites/default/files/documents/fema_gpd_fps-nofo_fy24.pdf
    [archived at https://perma.cc/JK8K-S656].

1  "PSGP Plaintiffs") have received or been awarded, or anticipate receiving or being awarded,

2  FY 2025 PSGP funding.

3      153.    LA County anticipates using PSGP funding to help maintain its watercraft fleet and to

4  fund personnel who conduct specialized trainings for chemical, biological, radiological, nuclear, and

5  explosive ship screening and enforcement.

6      154.    FEMA's FY 2025 PSGP NOFO directed applicants to apply for funding by

7  August 15, 2025, and stated that the award date would be no later than September 30, 2025.[17]  The

8  NOFO states that recipients of PSGP funding "must comply with the DHS Standard Terms and

9  Conditions in effect as of the date of the federal award."

10     155.    By September 30, 2025, FEMA had awarded FY 2025 PSGP grant funding in the

11 amount of $277,500 to LA City, $18,000 to Oakland, and $259,813 to San Francisco.

12     **ix.    Securing the Cities (STC)**[18]

13     156.    Congress established the Securing the Cities (STC) program to "enhance the ability of

14 the United States to detect and prevent terrorist attacks and other high-consequence events utilizing

15 nuclear or other radiological materials that pose a high risk to homeland security in high-risk urban

16 areas." 6 U.S.C. § 596b(a).

17     157.    The STC program supports "State, local, Tribal, and territorial governments in

18 designing and implementing, or enhancing existing, architectures for coordinated and integrated

19 detection and interdiction of nuclear or other radiological materials that are out of regulatory

20 control." *Id.* § 596b(b)(1).

21 / / /

22 / / /

23 / / /

24 _____

25 [17] FEMA, FY 2025 PSGP NOFO (Aug. 13, 2025),.

26 https://files.simpler.grants.gov/opportunities/b90b5e63-27e6-497c-9872-
   0e2a89a4dac7/attachments/69c6d261-1758-4906-924d-

27 fabbddf77b30/FY_2025_PSGP_NOFO_08_06_25_508-ed.pdf [archived at https://perma.cc/RY5R-
   8TP5]

28 [18] San Francisco does not challenge or seek relief with respect to the FY 2025 Securing the Cities
   grant program or any funding thereunder.

158. Originally launched as a pilot program, the STC program was codified by Congress as part of the Countering Weapons of Mass Destruction Act of 2018.  6 U.S.C. § 596b.[19]

159. On September 12, 2025, FEMA awarded FY 2025 STC grant funding of over $6 million to LA City, which LA City will not be able to access if LA City does not accept conditions of the award.

**x.    National Urban Search and Rescue (US&R)**

160. The National Urban Search and Rescue (US&R) Response System provides funding to ensure adequate management, training, exercise, procurement (vehicle and equipment), and storage and maintenance for the 28 national task forces staffed and equipped to assist States and local governments, tribes, and territories to conduct around-the-clock search-and-rescue operations following a Presidentially declared major disaster or emergency under the Stafford Act.

161. FEMA issued a NOFO for the FY 2025 US&R grant program on or about July 28, 2025.[20]

162. Plaintiffs Alameda, Oakland, San Diego City, LA City, LA County, LA Fire, Sacramento, and Pierce County (the "US&R Plaintiffs") have received or been awarded, or anticipate receiving or being awarded, FY 2025 US&R direct or pass-through funding.

163. In September 2025, FEMA awarded FY 2025 US&R grant funding in the amount of $1,393,311.00 to LA City, $1,488,311.00 to LA County, $1,378,311.00 to Oakland, $1,497,311.00 to Sacramento, $1,378,311.00 to San Diego City, and $1,378,311.00 to Pierce County.

/ / /

/ / /

---

[19] STC recipients enter into "cooperative agreements" with DHS. Unlike grant agreements, cooperative agreements are used when the federal agency will be "substantial[ly] involve[d]" in "carrying out the activity contemplated in the agreement." 31 U.S.C. § 6305. For ease of reference, Plaintiffs describe LA City's STC agreement as a grant agreement herein.

[20] FEMA, US&R FY25 NOFO, https://files.simpler.grants.gov/opportunities/6464682c-05eb-450e-8c69-ce3a3aa38125/attachments/e8f483d4-2e67-4e9a-87f1-e7702ba2bc1a/FY2025-USR-NOFO-Final.pdf [archived at https://perma.cc/7C7H-NTNV].

Complaint for Declaratory and Injunctive Relief                                                                25-8330

**C.** **DHS Introduces and Imposes New Terms and Conditions for Federal Funding That Are Unrelated to Emergency Management but Advance the Administration's Political Agenda**

    **i.** **The Executive Branch's Efforts to Impose Its Political Agenda Through Federal Grant Funding**

164. Since his first day in office, President Trump has issued executive orders that have initiated, and directed federal agencies to participate in, a coordinated effort to impose his political agenda on state and local governments and other grantees across the country. That effort has included actions to recast American civil rights laws as prohibiting policies that the President and federal agencies have generally and non-specifically described as "promot[ing]" or "advanc[ing]" what his orders have described as "diversity, equity, and inclusion" (DEI), "diversity, equity, inclusion, and accessibility" (DEIA), and "gender ideology,"[21] even though many such policies are lawful under existing federal laws and regulations.

165. Administration officials have taken up the President's instructions. For example, in a July 29, 2025 memorandum titled "Guidance for Recipients of Federal Funding Regarding Unlawful

---

[21] *See, e.g.*, Exec. Order No. 14332 of August 7, 2025, § 4(b), 90 Fed. Reg. 38,929, 38,931 ("Improving Oversight of Federal Grantmaking") (requiring federal officials to ensure discretionary grants "demonstrably advance the President's policy priorities" and prohibiting them from awarding discretionary grants that "fund, promote, encourage, subsidize, or facilitate . . . denial by the grant recipient of the sex binary in humans or the notion that sex is a chosen or mutable characteristic" or "promote anti-American values"); Exec. Order No. 14190 of Jan. 29, 2025, §§ 1-3, 90 Fed. Reg. 8,853, 8,853-55 ("Ending Radical Indoctrination in K-12 Schooling") (asserting that "schools indoctrinate their children in radical, anti-American ideologies" but should instead "instill a patriotic admiration for our incredible Nation and the values for which we stand," and requiring development of an "Ending Indoctrination Strategy" to eradicate federal support for "the instruction, advancement, or promotion of gender ideology or discriminatory equity ideology," as defined); Exec. Order No. 14173 of Jan. 21, 2025, § 1, 90 Fed. Reg. 8,633 ("Ending Illegal Discrimination and Restoring Merit-Based Opportunity") (criticizing, without substantively defining, DEI and DEIA policies as "undermin[ing] national unity" and embodying "dangerous, demeaning, and immoral race- and sex-based preferences"); Exec. Order No. 14151 of Jan. 20, 2025, § 2(b), 90 Fed. Reg. 8,339, 8,340 ("Ending Radical and Wasteful Government DEI Programs and Preferencing") (directing all federal agency heads to terminate "all . . . 'equity-related' grants or contracts[] and all DEI or DEIA performance requirements for employees, contractors, or grantees," without substantively defining DEI or DEIA); Exec. Order No. 14168 of Jan. 20, 2025, § 3, 90 Fed. Reg. 8,615, 8,616 ("Defending Women From Gender Ideology Extremism And Restoring Biological Truth To The Federal Government") (directing that "Federal funds shall not be used to promote gender ideology," as defined to include the recognition of "self-assessed gender identity" and the distinction between sex and gender); Exec. Order No. 14148 of Jan. 20, 2025, 90 Fed. Reg. 8,237 ("Initial Rescission of Harmful Executive Orders and Actions") (revoking President Biden executive orders relating to, among other topics, diversity, equity, gender identity, and sexual orientation).

Discrimination" (the "Discrimination Guidance Memo"), Attorney General Pamela Bondi promoted

the Administration's skewed view of DEI and DEIA programs by purporting to provide "guidance"

concerning various practices that would be viewed as constituting unlawful discrimination.  Despite

court decisions holding exactly to the contrary, that so-called "guidance" states that "allow[ing]

males, including those self-identifying as 'women,' to access single-sex spaces designed for females

. . . undermine[s] the privacy, safety, and equal opportunity of women and girls," and directs federal

funding recipients to "affirm sex-based boundaries rooted in biological differences" in order to

"ensure compliance with federal law."[22]  Thereafter, in a notice that FEMA distributed widely by

email on September 3, 2025, FEMA stated that it "advises recipients and subrecipients to review and

adhere to the Attorney General's" Discrimination Guidance Memo.

166.     President Trump and the current federal Administration have also undertaken several

executive actions constituting a coordinated effort to force state and local governments to assist

Immigration and Customs Enforcement (ICE) in carrying out federal civil immigration enforcement

efforts,[23] notwithstanding laws and policies through which these state and local governments have

exercised their rights under the Tenth Amendment to dedicate their law enforcement efforts

elsewhere.  Administration officials across agencies, including within DHS, have taken up the

President's instructions.[24]

---

[22] Att'y Gen'l, Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination (Jul. 29, 2025), https://www.justice.gov/ag/media/1409486/dl [archived at https://perma.cc/UG5N-TJ25]; *see also* Deputy Att'y Gen'l, Civil Rights Fraud Initiative (May 19, 2025), https://www.justice.gov/dag/media/1400826/dl [archived at https://perma.cc/MFC5-YDGU]; Att'y Gen'l, Endling Illegal DEI and DEIA Discrimination and Preferences (Feb. 5, 2025), https://www.justice.gov/ag/media/1388501/dl [archived at https://perma.cc/B4JZ-PQXZ].

[23] *See, e.g.*, Exec. Order No. 14287 of April 28, 2025, 90 Fed. Reg. 18,761 ("Protecting American Communities From Criminal Aliens"); Exec. Order No. 14218 of February 19, 2025, 90 Fed. Reg. 10,581 ("Ending Taxpayer Subsidization of Open Borders"); Exec. Order No. 14159 of January 20, 2025, 90 Fed. Reg. 8,443 ("Protecting the American People Against Invasion"); *see generally City & Cnty. of San Francisco v. Trump*, No. 25-CV-01350-WHO, 2025 WL 1282637 (N.D. Cal. May 3, 2025) (preliminarily enjoining enforcement of executive orders and Attorney General directive mandating withholding of federal funding based on plaintiffs' policies limiting or prohibiting cooperation with ICE), *appeal pending*, No. 25-3889 (9th Cir. filed June 23, 2025).

[24] E.g., Att'y Gen'l, Sanctuary Jurisdiction Directives (Feb. 5, 2025), https://www.justice.gov/ag/media/1388531/dl [archived at https://perma.cc/Q2F6-YYEB]; Acting Deputy Att'y Gen'l, Interim Policy Changes Regarding Charging, Sentencing And Immigration Enforcement (Jan. 21, 2025), https://www.fd.org/sites/default/files/public/News/memorandum-from-

167.     More broadly, the President has used executive orders as a forum to direct

Administration officials to take steps to embed his political agenda into the federal government's

grant agreements, service agreements, and other contracts across subject-matter areas and around the

country.  In the first eight months of his current Term, President Trump has already issued more than

200 executive orders, many of them purporting to leverage federal contracts to achieve political

ends, including related to the subject matters of the Discrimination Condition and Immigration

Conditions in the Challenged DHS Conditions.[25]  There is no way to know whether, how frequently,

and when the President will issue additional executive orders, the subject matters of those executive

orders, or the extent to which they would purport to direct Executive Branch officials to take actions

related to federal grants and contracts.  Based on the President's practice to date, however, it appears

exceedingly likely that he will continue to issue executive orders that could be described as "related

to grants."

---

the-acting-deputy-attorney-general-01-21-2025.pdf [archived at https://perma.cc/S3UT-PDXE];
Sec'y of Homeland Security, Restricting Grant Funding for Sanctuary Jurisdictions (Feb. 19, 2025),
Att. C to Parties' Letter Brief, *City & Cnty. of San Francisco v. Trump*, No. 25-CV-01350-WHO
(N.D. Cal. filed June 13, 2025) (ECF No. 143), *available at*
https://storage.courtlistener.com/recap/gov.uscourts.cand.444175/gov.uscourts.cand.444175.143.0.p
df#page=35 [archived at https://perma.cc/2A3U-WUA3].

[25] See the executive orders cited in footnotes 21 and 23 above.  In one additional and notable set of
examples, the President issued a series of executive orders (and other directives) this Spring that
direct agency heads to require federal government contractors "to disclose any business they do
with" law firms the President himself opposes and then terminate those contracts.  Exec. Order
No. 14263 of April 15, 2025, at § 3, 90 Fed. Reg. 15,615, 15,615-16 ("Addressing Risks from
Susman Godfrey"); Exec. Order No. 14250 of March 27, 2025, at § 3, 90 Fed. Reg. 14,549, 14,550
("Addressing Risks from WilmerHale"); Exec. Order No. 14246 of March 25, 2025, at § 3, 90 Fed.
Reg. 13,997, 13,997-98 ("Addressing Risks From Jenner & Block"); Exec. Order No. 14237 of
March 20, 2025, at § 3, 90 Fed. Reg. 13,039, 13,040 ("Addressing Risks From Paul Weiss"),
*rescinded*, Exec. Order No. 14244 of March 21, 2025 ("Addressing Remedial Action by Paul
Weiss") (rescinding executive order threatening Paul Weiss based on law firm's "remarkable change
of course"); Exec. Order No. 14230 of March 6, 2025, at § 3, 90 Fed. Reg. 11,781, 11,781-82
("Addressing Risks From Perkins Coie LLP").

Courts assessing challenges to those executive orders have ruled uniformly that they are
unconstitutional.  *Susman Godfrey LLP v. Exec. Off. of President*, --- F.Supp.3d. ----, 2025 WL
1779830 (D.D.C. June 27, 2025), *appeal pending*, No. 25-5310 (D.C. Cir. filed Aug. 26, 2025);
*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F.Supp.3d 127 (D.D.C.
2025), *amended*, No. CV 25-917 (RJL), 2025 WL 2105262 (D.D.C. June 26, 2025), *appeal pending*,
No. 25-5277 (D.C. Cir. filed Jul. 28, 2025); *Jenner & Block LLP v. U.S. Dep't of Just.*,
784 F.Supp.3d 76 (D.D.C. 2025), *appeal pending*, No. 25-5265 (D.C. Cir. filed Jul. 21, 2025);
*Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F.Supp.3d 105 (D.D.C. 2025), *appeal pending*, No. 25-
5241 (D.C. Cir. filed Jul. 2, 2025).

Complaint for Declaratory and Injunctive Relief                                              25-8330

1  **ii.  Defendants Adopt and Incorporate the Challenged DHS Conditions Into the Agency's Standard Terms and Conditions for Fiscal Year 2025**

2

3  168.  Consistent with the agenda and directions laid out in the President's executive orders

4  thus far, DHS revised the standard terms and conditions applicable to Fiscal Year 2025 grants,

5  cooperative agreements, fixed amount awards, and other types of federal financial assistance.  These

6  revisions have attempted to implement the current federal Administration's efforts to compel

7  grantees to abandon policies and programs that encourage diversity, equity, inclusion, and

8  accessibility despite clear statutory and decisional law that many such programs are lawful; policies

9  that, consistent with the Tenth Amendment, limit cooperation with federal civil immigration

10  enforcement; and other activities that do not match the federal Administration's views or political

11  agenda.

12  169.  Specifically, DHS had adopted and issued a document it called "FY 2025 DHS Terms

13  and Conditions Version 3 Dated April 18, 2025,"[26] which is referred to herein as the "Standard DHS

14  Terms" and is attached hereto as Exhibit A.[27]

15  170.  The Standard DHS Terms contain three sets of conditions that did not exist in any

16  version of the DHS Terms and Conditions issued before January 20, 2025: the Discrimination

17  Condition described in paragraph 171, the Immigration Conditions described in paragraph 172, and

18  the EO Condition described in paragraph 173 (together, the "Challenged DHS Conditions").

19

20  _____

21  [26] DHS, FY 2025 DHS Terms and Conditions Version 3 Dated April 18, 2025, https://www.dhs.gov/sites/default/files/2025-

22  08/2025_0418_fy2025_dhs_terms_and_conditions_version_3.pdf [archived at https://perma.cc/NTU7-D6ES].

23  [27] In early August 2025, DHS modified the Discrimination Condition in its Terms and Conditions to remove a definition of the term "discriminatory prohibited boycott" that had referred specifically,

24  only, and narrowly to "commercial relations specifically with Israeli companies or with companies doing business in or with Israel or authorized by, licensed by, or organized under the laws of Israel

25  to do business." *Compare* ¶ 171 *with* https://web.archive.org/web/20250708201331/https://www.dhs.gov/sites/default/files/2025-

26  04/2025_0418_fy2025_dhs_terms_and_conditions_version_3.pdf [archived at https://perma.cc/F4KL-LXLA], at Section C.XVII(1)(d) (Version 3 as DHS had uploaded it in April

27  2025); A. Rubin, *DHS denies tying FEMA funds to Israel stance*, Axios (Aug. 4, 2025), https://www.axios.com/2025/08/04/trump-dhs-fema-relief-israel-boycotts [archived at

28  https://perma.cc/2RGQ-7NY3].  DHS did not document this change and withdrew from public access the version of the Terms and Conditions that had contained the definition.

171.   *The Discrimination Condition*.  The terms referred to herein as the "Discrimination Condition" is all of Section C.XVII of the Standard DHS Terms, entitled "Anti-Discrimination," except for Subsection C.XVII(2)(a)(iii) of that Section, which is instead one of the Immigration Conditions described in paragraph 172.  *See* Ex. A at 6-7.  Specifically, the following conditions are collectively referred to herein as the "Discrimination Condition":

> Recipients must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of 31 U.S.C. § 372(b)(4).[28]
>
> (1)   Definitions. As used in this clause –
>
>> (a)   DEI means "diversity, equity, and inclusion."
>>
>> (b)   DEIA means "diversity, equity, inclusion, and accessibility."
>>
>> (c)   Discriminatory equity ideology has the meaning set forth in Section 2(b) of Executive Order 14190 of January 29, 2025.
>>
>> (d)   Federal anti-discrimination laws mean Federal civil rights law that protect individual Americans from discrimination on the basis of race, color, sex, religion, and national origin.
>>
>> (e)   Illegal immigrant means any alien, as defined in 8 U.S.C. § 1101(a)(3), who has no lawful immigration status in the United States.
>
> (2)   Grant award certification.
>
>> (a)   By accepting the grant award, recipients are certifying that:
>>
>>> (i)   They do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws; and
>>>
>>> (ii)   They do not engage in and will not during the term of this award engage in, a discriminatory prohibited boycott.

---

[28] There is no section 372 in title 31 of the United States Code.  Plaintiffs understand DHS to intend this provision to refer to 31 U.S.C. § 3729(b)(4), which defines the term "material" for purposes of the False Claims Act.  Notably, this exact typographical error recurs in very similar, sometimes identical, grant conditions newly added after January 20, 2025 by several other federal agencies, including the Department of Housing and Urban Development.  *See Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-CV-814, 2025 WL 2322763 (W.D. Wash. Aug. 12, 2025) (granting plaintiffs' third motion for preliminary injunction barring enforcement of HUD, HHS, and DOT grant conditions, including conditions materially similar to the Immigration Conditions and Discrimination Condition at issue in this action).

(iii) [*provision omitted here and included within Immigration Conditions described in paragraph 172*]

(3) DHS reserves the right to suspend payments in whole or in part and/or terminate financial assistance awards if the Secretary of Homeland Security or her designee determines that the recipient has violated any provision of subsection (2).

(4) Upon suspension or termination under subsection (3), all funds received by the recipient shall be deemed to be in excess of the amount that the recipient is determined to be entitled to under the Federal award for purposes of 2 C.F.R. § 200.346. As such, all amounts received will constitute a debt to the Federal Government that may be pursued to the maximum extent permitted by law.

172. *The Immigration Conditions.* The terms referred to herein as the "Immigration Conditions" include the entirety of Section C.IX of the Standard DHS Terms, entitled "Communication and Cooperation with the Department of Homeland Security and Immigration Officials," as well as Subsection C.XVII(2)(a)(iii) of the Standard DHS Terms. *See* Ex. A at 4-5, 6. Specifically, the following conditions are collectively referred to herein as the "Immigration Conditions":

a. *The Information Sharing Condition* (§ C.IX.1.a): Grant recipients and subrecipients "must comply with the requirements of 8 U.S.C. §§ 1373 and 1644," which "prohibit restrictions on information sharing by state and local government entities with DHS regarding the citizenship or immigration status, lawful or unlawful, of any individual."

b. *The Compliance Condition* (§ C.IX.1.b): Grant recipients and subrecipients "must comply with other relevant laws related to immigration, including prohibitions on encouraging or inducing an alien to come to, enter, or reside in the United States in violation of law, 8 U.S.C. § 1324(a)(1)(A)(iv), prohibitions on transporting or moving illegal aliens, 8 U.S.C. § 1324(a)(1)(A)(ii), prohibitions on harboring, concealing, or shielding from detection illegal aliens, 8 U.S.C. § 1324(a)(1)(A)(iii), and any applicable conspiracy, aiding or abetting, or attempt liability regarding these statutes."

Complaint for Declaratory and Injunctive Relief                    25-8330

1    c.    *The Cooperation Condition* (§ C.IX.1.c): Grant recipients and subrecipients

2         must "honor requests for cooperation, such as participation in joint operations,

3         sharing of information, or requests for short term detention of an alien

4         pursuant to a valid detainer."

5    d.    *The Access Condition* (§ C.IX.1.d): Grant recipients and subrecipients must

6         "provide access to detainees, such as when an immigration officer seeks to

7         interview a person who might be a removable alien."

8    e.    *The Publicization Condition* (§ C.IX.1.e): Grant recipients and subrecipients

9         must "not leak or otherwise publicize the existence of an immigration

10        enforcement operation."

11   f.    *The Certification Condition* (§ C.IX.2): Grant recipients "must certify under

12        penalty of perjury pursuant to 28 U.S.C. § 1746 and using a form that is

13        acceptable to DHS, that [they] will comply with the requirements of this

14        term," meaning all of Section C.IX, and must also "require any subrecipients

15        or contractors to certify in the same manner that they will comply with this

16        term prior to providing them with any funding under this award."

17   g.    *The Materiality Condition* (§ C.IX.3): Grant recipients must "agree[] that

18        compliance with this term is material to the Government's decision to make or

19        continue with this award and that the Department of [H]omeland Security may

20        terminate this grant, or take any other allowable enforcement action, if the

21        recipient fails to comply with this term."

22   h.    *The Non-Incentivizing Condition* (§ C.XVII(2)(a)(iii)): "By accepting the

23        grant award, recipients are certifying that: . . . They do not, and will not during

24        the term of this award, operate any program that benefits illegal immigrants or

25        incentivizes illegal immigration,"[29] and agree that DHS has "the right to

26

27   _____

28   [29] The Non-Incentivizing Condition relies on the Discrimination Condition's definition of the term "illegal immigrant" to "mean[] any alien, as defined in 8 U.S.C. § 1101(a)(3), who has no lawful immigration status in the United States."

suspend payments in whole or in part and/or terminate financial assistance awards if the Secretary of Homeland Security or her designee determines that the recipient has violated" this certification.

173.  *The EO Condition*.  Section C.XXXI of the Standard DHS Terms, entitled "Presidential Executive Orders" and referred to herein as the "EO Condition," provides as follows: "Recipients must comply with the requirements of Presidential Executive Orders related to grants (also known as federal assistance and financial assistance), the full text of which are incorporated by reference." *See* Ex. A at 9.

174.  Separate and apart from the Challenged DHS Conditions, DHS's standard terms and conditions have long contained several provisions that require recipients of grant funding to comply with certain specified civil rights and antidiscrimination laws and cite the specific law at issue. These provisions appear in the Standard DHS Terms, just as they have appeared in prior years' terms and conditions.  These provisions are referred to collectively herein as the "Civil Rights Conditions" and are as follows:

   a. Section C.III, entitled "Age Discrimination Act of 1975," requires recipients to "comply with the requirements of the Age Discrimination Act of 1975, Pub. L. No. 94-135 (codified as amended at Title 42, U.S. Code § 6101 *et seq*.)."

   b. Section C.IV, entitled "Americans with Disabilities Act of 1990," states that "Recipients must comply with the requirements of Titles I, II, and III of the Americans with Disabilities Act, Pub. L. No. 101-336 (1990) (codified as amended at 42 U.S.C. §§ 12101– 12213)."

   c. Section C.VII, entitled "Civil Rights Act of 1964 – Title VI," requires recipients to "comply with the requirements of Title VI of the Civil Rights Act of 1964, Pub. L. No. 88-352 (codified as amended at 42 U.S.C. § 2000d *et seq*.)," including "DHS implementing regulations for the Act [that] are found at 6 C.F.R. Part 21" and, as applicable, "FEMA's implementing regulations at 44 C.F.R. Part 7."

Complaint for Declaratory and Injunctive Relief               25-8330

d.    Section C.VIII, entitled "Civil Rights Act of 1968," requires recipients to "comply with Title VIII of the Civil Rights Act of 1968, Pub. L. No. 90284 (codified as amended at 42 U.S.C. § 3601 *et seq.*), . . . as implemented by the U.S. Department of Housing and Urban Development at 24 C.F.R. Part 100," including with respect to "new multifamily housing with four or more dwelling units" as described in "24 C.F.R. Part 100, Subpart D."

e.    Section C.XIV, entitled "Education Amendments of 1972 (Equal Opportunity in Education Act) – Title IX," requires recipients to "comply with the requirements of Title IX of the Education Amendments of 1972, Pub. L. No. 92-318 (codified as amended at 20 U.S.C. § 1681 *et seq.*)," including "DHS implementing regulations [that] are codified at 6 C.F.R. Part 17" and, as applicable, "FEMA's implementing regulations at 44 C.F.R. Part 19."

f.    Section C.XVI, entitled "Equal Treatment of Faith-Based Organizations," states: "It is DHS policy to ensure the equal treatment of faith-based organizations in social service programs administered or supported by DHS or its component agencies, enabling those organizations to participate in providing important social services to beneficiaries. Recipients must comply with the equal treatment policies and requirements contained in 6 C.F.R. Part 19 and other applicable statutes, regulations, and guidance governing the participations of faith-based organizations in individual DHS programs."

g.    Section C.XXIV, entitled "Limited English Proficiency (Civil Rights Act of 1964, Title VI)," states: "Recipients must comply with Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq.*) prohibition against discrimination on the basis of national origin, which requires that recipients of federal financial assistance take reasonable steps to provide meaningful access to persons with limited English proficiency (LEP) to their programs and services.  For additional assistance and information regarding language access obligations, please refer to the DHS Recipient Guidance:

Complaint for Declaratory and Injunctive Relief                                                    25-8330

https://www.dhs.gov/guidance-published-help-department-supported-organizations-provide-meaningful-access-people-limited and additional resources on http://www.lep.gov."

    h.    Section C.XXXIII, entitled "Rehabilitation Act of 1973," states: "Recipients must comply with the requirements of Section 504 of the Rehabilitation Act of 1973, Pub. L. No. 93-112 (codified as amended at 29 U.S.C. § 794)."

**iii.**    **Defendants Adopt, Attach, and Impose Additional Requirements That Repeat or Implement the Challenged DHS Conditions**

175.    Plaintiffs' challenge to the Challenged DHS Conditions is intended to reach all documents or other requirements of any kind that Defendants have adopted, attached, or otherwise imposed, whatever their location, to the extent they purport to impose the same or materially similar obligations as the Challenged DHS Conditions and also to the extent that Defendants would leverage them to repeat, advance, or implement the Challenged DHS Conditions with respect to DHS funding.  This includes, but is not limited to, the Challenged Grants Manual Requirements described in paragraph 179 below and the FEMA Hazard Mitigation Assistance Program and Policy Guide described in paragraph 180 below.

176.    On or about August 20, 2025, Defendants adopted and published the FEMA Preparedness Grants Manual, FM-207-23-001 (the "Grants Manual").  The Grants Manual includes a variety of requirements that are made binding on grantees, including subrecipients, of FEMA's preparedness grant programs by the plain terms of the Grants Manual itself, and also by the NOFOs for each grant program, which FEMA incorporates by reference into grant awards and which in turn state that grantees must comply with the Grants Manual.

177.    The Grants Manual states that several of its sections "received new or refreshed content for Fiscal Year (FY) 2025, mainly to align with updated standard language included across FEMA's FY 2025 NOFOs."

178.    The Grants Manual states that grant recipients "must comply with the DHS Standard Terms and Conditions in effect as of the date of the federal award" (Section 4) and reiterates the EO Condition verbatim (Section 4.1).

41

179.     In another section, referred to herein as the "Challenged Grants Manual Disclosure Requirements," the Grants Manual requires grantees to disclose certain information about subrecipients with every reimbursement request the grantee submits.  FEMA may withhold requested payments if the grantee fails to disclose the required information.  The Challenged Grants Manual Disclosure Requirements purport to be binding on grantees in and of themselves, and they also appear to implement the Challenged DHS Conditions and facilitate FEMA's enforcement of those Conditions.  Specifically, the Challenged Grants Manual Disclosure Requirements, located at paragraph 4 of Subsection 6.11.3 of the Grants Manual, require disclosure of the following information about each subgrantee:

a.     *The Mission Disclosure Requirement*: "The name, mission statement, and purpose of each subrecipient receiving funds, along with the amount allocated and the specific role or activity being reimbursed."

b.     *The Global Support Disclosure Requirement*: "Whether the subrecipient's work or mission involves supporting aliens, regardless of whether FEMA funds support such activities."

c.     *The Funded Support Disclosure Requirement*: "Whether the payment request includes an activity involving support to aliens."

d.     *The DEI Disclosure Requirement*: "Whether the subrecipient has any diversity, equity, and inclusion practices."

180.     Other DHS documents likewise contain provisions that could be construed to advance or implement one or more of the Challenged DHS Conditions.  For example, the FEMA Hazard Mitigation Assistance Program and Policy Guide states that it "outline[s] the policy and procedure requirements" related to HMGP and other hazard mitigation grant programs, and states, among other things, that "[h]azard mitigation activities must adhere to all relevant statutes, regulations and requirements," including, expressly, all "applicable federal . . . laws[,] implementing regulations[,]

Complaint for Declaratory and Injunctive Relief                                                    25-8330

1   and executive orders."[30]  In addition, Defendants have inserted new terms that purport to impose

2   requirements materially similar to the Immigration Conditions, as described in paragraphs 186-189

3   below.

4       **iv.    Defendants Unlawfully Impose the Challenged DHS Conditions and Other Requirements that Adopt, Attach, Impose, and/or Implement those Conditions**

5

6           **a.    Defendants Attach the Challenged DHS Conditions**

7       181.    Defendants have attached the Discrimination Condition and the EO Condition to all

8   of their grant awards, thereby conditioning disbursement of grant funding to all direct grantees and

9   subgrantees on their agreement to those conditions.  Defendants' application of the Discrimination

10  Condition and the EO Condition across the board, to all grants, is consistent with the plain language

11  of the Standard DHS Terms themselves, which state that they apply to all federal awards issued

12  during Fiscal Year 2025 unless a specific provision says otherwise.

13      182.    Defendants have subjected all costs charged to all of FEMA's Preparedness Grants,

14  including HSGP-SHSP, HSGP-UASI, TSGP, PSGP, and EMPG, to the Challenged Grants Manual

15  Disclosure Requirements.

16      183.    Defendants have represented that they will not apply the Immigration Conditions in

17  the Standard DHS Terms to every grant award, but those representations have proven unreliable.  On

18  March 25, 2025, Defendant Noem endorsed the recommendation of Cameron Hamilton, the former

19  Senior Official Performing the Duties of FEMA Administrator, to attach the Immigration Conditions

20  related to cooperation with ICE to all open and future awards under 12 grant programs, including but

21  not limited to EMPG, HSGP-SHSP, HSGP-UASI, PSGP, and TSGP; not to attach those conditions

22  to awards under several other grant programs; and to reserve the possibility of attaching those

23  conditions to yet more other grant programs.  Defendant Noem endorsed the recommendation even

24  though Mr. Hamilton's memorandum had identified no authority to support its categorization.  Yet

25

26  _____

27  [30] FEMA, *FEMA Hazard Mitigation Assistance Program and Policy Guide*, Version 2.1, FEA No. FP-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, at v, 555-557 (Jan. 20, 2025), available at

28  https://www.fema.gov/sites/default/files/documents/fema_hma-guide-v2.1_2025.pdf (last accessed Sept. 30, 2025).

1  when DHS adopted the Standard DHS Terms (including the Immigration Conditions related to

2  cooperation with ICE) several weeks later, they stated that they would apply to "all new federal

3  awards," without excluding the programs identified in the memorandum.

4      184.   Then, on June 9, 2025, during litigation brought by several States related to FEMA's

5  and DHS's imposition of the Immigration Conditions, Defendant Richardson—who in May had

6  replaced Mr. Hamilton as the Senior Official Performing the Duties of FEMA Administrator—

7  attested in a sworn declaration that, notwithstanding the plain language of the Standard DHS Terms,

8  DHS "will not apply immigration enforcement provisions across the board to all its programs" and

9  confirmed that DHS and FEMA had made final determinations that immigration restrictions related

10  to cooperation with ICE would not apply to a significant number of grants administered by FEMA.[31]

11  If it had been implemented, this representation would have removed many disaster preparedness,

12  relief, and mitigation grants from the cross-hairs of the immigration restrictions President Trump has

13  directed agencies to impose, including SAFER, AFG, FP&S, and US&R grants.  Defendant

14  Richardson also represented that DHS was still considering the application of the Immigration

15  Conditions to EMPG, HSGP-SHSP, HSGP-UASI, PSGP, and TSGP grants.[32]

16      185.   Subsequently, on June 23, 2025, one court preliminarily enjoined DHS from

17  imposing the Immigration Conditions on emergency preparedness grants, and on September 24,

18  2025, another court vacated and permanently enjoined imposition of the Immigration Conditions.[33]

19

---

20  [31] Decl. of David Richardson, at ¶¶ 6, 14, *Illinois v. FEMA*, No. 1:25-cv-206-WES-PAS (D.R.I. filed June 6, 2025) (ECF No. 50-1); *id.* at ¶ 6 (affirming accuracy of memorandum attached as exhibit to

21  complaint); DHS, Approval of FEMA-Administered Grant Disbursements (Mar. 20, 2025), Exhibit B to Complaint at 6-9, *Illinois v. FEMA*, No. 1:25-cv-206-WES-PAS (D.R.I. filed May 13, 2025)

22  (ECF No. 1-2) (listing grant programs as to which FEMA recommended not to apply the Immigration Conditions).

23  [32] *Id.* at ¶ 6 (affirming accuracy of memorandum attached as exhibit to complaint); DHS, Approval

24  of FEMA-Administered Grant Disbursements (Mar. 20, 2025), Exhibit B to Complaint at 6-9, *Illinois v. FEMA*, No. 1:25-cv-206-WES-PAS (D.R.I. filed May 13, 2025) (ECF No. 1-2) (listing

25  grant programs as to which FEMA recommended not to apply the Immigration Conditions).

26  [33] The district court in *Illinois v. FEMA*, --- F.Supp.3d ----, 2025 WL 2716277, No. 1:25-cv-00206 (D.R.I. Sept. 24, 2025) vacated the Immigration Conditions and enjoined their application.  The district court in *City and County of San Francisco v. Trump* held that application of the Immigration

27  Conditions to DHS grants "used for emergency preparedness, which has no nexus to immigration enforcement," violated the preliminary injunction in that case, which prohibited the government

28  from "taking any action to withhold, freeze, or condition federal funds" from the plaintiffs based on

---

Complaint for Declaratory and Injunctive Relief        25-8330

1

***b.*** **The Sanctuary Certification Condition and Temporary, Limited Carveouts**

2

3      186.    Despite Defendant Richardson's representations and the injunctions and vacatur,

4  Defendants have nonetheless purported to include and impose the Immigration Conditions on

5  Plaintiffs' receipt of almost *all* DHS funding (whether directly or indirectly, through subgrants).  For

6  a subset of those awards, Defendants have also included an additional condition, referred to herein as

7  the "Sanctuary Certification Condition" and described in paragraph 187 below, that reiterates and re-

8  imposes terms materially similar to the Immigration Conditions. Defendants have also included

9  language that purports to *temporarily* excuse the plaintiffs in *San Francisco v. Trump* (which

10  includes some but not all Plaintiffs in this action) and the plaintiffs in *Illinois v. FEMA* (which does

11  not include any Plaintiffs in this action) from compliance with the Immigration Conditions and

12  Sanctuary Certification Condition while the injunctions are in effect, and further states that the

13  Sanctuary Certification Condition will immediately become effective as to those parties upon their

14  respective injunction ceasing to be in effect.

15      187.    Specifically, on many grant awards Defendants have issued to Plaintiffs and to the

16  States through which Plaintiffs obtain subgrants, Defendants have adopted, attached, and imposed an

17  additional term that reiterates the Immigration Conditions related to cooperation with ICE,

18  affirmatively prohibits any grantee that Defendants or the Department of Justice unilaterally

19  designate as a "Sanctuary Jurisdiction" from making financial obligations under grants or subgrants,

20  and affirmatively prohibits grantees from issuing subgrants or payments under subgrants to any other

21  unilaterally designated "Sanctuary Jurisdiction."  That term, referred to herein as the "Sanctuary

22  Certification Condition," reads as follows:

23          **Compliance with Federal Immigration Law**

24          1.  Prohibition

25

26  _____

27  executive orders mandating the defunding of jurisdictions that limit or prohibit cooperation with ICE.  2025 WL 1738675, No. 3:25-cv-01350-WHO (N.D. Cal. June 23, 2025).  Plaintiffs Santa Clara, San Francisco, Berkeley, Culver City, LA City, King County, Marin County, Oakland, Palo

28  Alto, Petaluma, Pierce County, Sacramento, San Diego City, San José, San Mateo County, Santa Rosa, and Sonoma County are plaintiffs in that action.

Complaint for Declaratory and Injunctive Relief                                               25-8330

a.   The state, territorial, or local government recipient is prohibited from being designated by the Department of Homeland Security or Department of Justice as a sanctuary jurisdiction. If the Department of Homeland Security or Department of Justice designates the state, territory, or local government as a sanctuary jurisdiction after the Department of Homeland Security has made the grant award, the state, territorial, or local government recipient is prohibited from making any financial obligations under the grant award on or after the date of designation until the Department of Homeland Security or Department of Justice removes that designation. The Department of Homeland Security will suspend the grant award and not make payments to the state, local, or territorial recipient on or after the date of designation until the Department of Homeland Security or Department of Justice removes that designation.

b.   The state, local, or territorial recipient is prohibited from making subawards to a state, local, or territorial government that the Department of Homeland Security or Department of Justice has designated as sanctuary jurisdiction. If the Department of Homeland Security or Department of Justice designates a state, local, or territorial government as a sanctuary jurisdiction after the recipient makes a subaward, the recipient must suspend the subaward, the recipient must not make any additional payments to the subrecipient, and the subrecipient is prohibited from making any financial obligations under the subaward on and after the date of designation until the Department of Homeland Security or Department of Justice removes that designation. c. The Department of Homeland Security designates a state, local, or territorial government as a sanctuary jurisdiction if it fails to comply with the requirements set forth in paragraphs 2.a.i to v of this term and condition.

2.   Certification

a.   The state, territorial, or local government recipient and all state, territorial, and local government subrecipients must certify under penalty of perjury pursuant to 28 U.S.C. § 1746, and using a form that is acceptable to the Department of Homeland Security, that they will comply with the following requirements related to coordination and cooperation with the Department of Homeland Security and immigration officials:

i.   They will comply with the requirements of 8 U.S.C. §§ 1373 and 1644. These statutes prohibit restrictions on information sharing by state and local government entities with the Department of Homeland Security regarding the citizenship or immigration status, lawful or unlawful, of any individual. Additionally, 8 U.S.C. § 1373 prohibits any person or agency from prohibiting, or in any way restricting, a Federal, state, or local government entity from doing any of the following with respect to information regarding

46

the immigration status of any individual:

(1) sending such information to, or requesting or receiving such information from, Federal immigration officials;

(2) maintaining such information; or

(3) exchanging such information with any other federal, state, or local government entity.

ii. They will comply with other relevant laws related to immigration, including prohibitions on encouraging or inducing an alien to come to, enter, or reside in the United States in violation of law, 8 U.S.C. § 1324(a)(1)(A)(iv), prohibitions on transporting or moving illegal aliens, 8 U.S.C. § 1324(a)(1)(A)(ii), prohibitions on harboring, concealing, or shielding from detection illegal aliens, 8 U.S.C. § 1324(a)(1)(A)(iii), and any applicable conspiracy, aiding or abetting, or attempt liability regarding these statutes.

iii. They will honor requests for cooperation, such as participating in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer. A jurisdiction does not fail to comply with this requirement merely because it lacks the necessary resources to assist in a particular instance.

iv. They will provide access to detainees, such as when an immigration officer seeks to interview a person who might be a removable alien.

v. They will not leak or otherwise publicize the existence of an immigration enforcement operation.

b. The state, local, or territorial recipient must require a state, local, or territorial subrecipient to make the certification above before providing them with any funding under the subaward.

3. Materiality and Remedies for Noncompliance

This term and condition is material to the Department of Homeland Security's decision to make this grant award and the Department of Homeland Security may take any remedy for noncompliance, including termination, if the state, territorial, or local government recipient or any state, territorial, or local government subrecipient fails to comply with this term and condition.[34]

188. Similarly, on many grant awards Defendants have issued to Plaintiffs and to the

---

[34] Although the Sanctuary Certification Condition includes all the subsection numbering in text, Defendants have inserted it into grant awards as a single unbroken string of text. Plaintiffs have inserted paragraph breaks for ease of readability.

States through which Plaintiffs obtain subgrants, Defendants have adopted, attached, and imposed two additional terms, referred to herein individually as the "*SF v. Trump* Carveout" and "*Illinois v. FEMA* Carveout" and collectively as the "Temporary, Limited Injunction Carveouts," that acknowledge and purport to comply with the injunctions issued in *City and County of San Francisco v. Trump* and *Illinois v. FEMA* and described in paragraph 185 above.  The Temporary, Limited Injunction Carveouts read as follows:

> **Impact of San Francisco v. Trump Preliminary Injunction**
>
> Pursuant to the preliminary injunction order issued on August 22, 2025, in City and County of San Francisco, et al. v. Trump, et al., No. 3:25-cv-01350 (N.D. Cal.), the following terms and conditions do not apply to awards or subawards issued to any of the plaintiffs subject to the preliminary injunction order while the order remains in effect: [the Immigration Conditions, as described in paragraph 172 above, and the Sanctuary Certification Condition, as described in paragraph 187 above]. If the preliminary injunction is stayed, vacated, or extinguished, the [Sanctuary Certification Condition] will immediately become effective.
>
> **Impact of State of Illinois v. FEMA Injunction**
>
> Pursuant to the memorandum and order issued on September 24, 2025, in State of Illinois, et al. v. Federal Emergency Management Agency, et. al, No.25-206 (D. R.I.), the following terms and conditions do not apply to awards or subawards issued to any of the plaintiffs subject to the injunction order while the order remains in effect: [the Immigration Conditions, as described in paragraph 172 above, and the Sanctuary Certification Condition, as described in paragraph 187 above]. If the injunction is stayed, vacated, or extinguished, the [Sanctuary Certification Condition] will immediately become effective.

189.    To date, the Immigration Conditions are included within the Standard DHS Terms that have been imposed on all of the grant agreements Defendants have issued to date to Plaintiffs as direct grantees, which include the AFG, SAFER, PSGP, TSGP, US&R, and STC grant programs. Defendants' US&R, AFG, and SAFER awards issued to Plaintiffs include the Immigration Conditions but state that the Immigration Conditions do not apply to those grant awards.  With respect to LA City's STC award, Defendants have required that LA City agree to the Immigration Condition with a statement that that Condition does not apply "to the extent their application is

1  limited by the injunction in San Francisco v. Trump, No. 3:25-cv-01350 (N.D. Cal.), or any other

2  litigation, so long as that injunction is in force." With respect to TSGP and PSGP, Defendants have

3  imposed both the Sanctuary Certification Condition and the Temporary, Limited Injunction

4  Carveout.  Plaintiffs have not yet received grant agreements for EMPG, SHSP, UASI, or HMPG

5  awards, and expect that the Immigration Conditions and/or the Sanctuary Certification Condition

6  will likely be included in at least several of these programs in light of Defendant Richardson's

7  affidavit in *Illinois v. FEMA*, as described in paragraph 184 above.

8           c.       **Defendants Lack Authority to Impose the Challenged DHS Conditions or
                     Sanctuary Certification Condition**

9

10          190.    Defendants' adoption of an across-the-board policy to impose the Discrimination

11  Condition and EO Condition is *ultra vires*, arbitrary and capricious, contrary to law and the

12  Constitution, and in excess of even Congress's legislative power to impose conditions on federal

13  funding.  The same is true for Defendants' attachment of the Discrimination Condition, the EO

14  Condition, and the Immigration Conditions to particular award packages for the DHS funding

15  Plaintiffs receive through direct grants or indirectly via pass-through subgrants.

16          191.    No statute confers upon any of the Defendants the power to require grantees and

17  subgrantees to agree to any of the Challenged DHS Conditions or Sanctuary Certification Condition

18  in order to obtain the federal funds at issue.  Indeed, many of the authorizing statutes expressly

19  forbid the Executive Branch from withholding the grant funding at issue.  *See, e.g.*, 6 U.S.C.

20  § 605(e)(1)(A)(v) (FEMA administrator "shall ensure" that each State receive a minimum allocation

21  of SHSP funds); *id.* § 762(d) (FEMA administrator "shall first apportion" a baseline amount of each

22  year's apportionment of EMPG funds to States and "shall apportion" the remainder of such amounts

23  on a population-share basis).  The Challenged DHS Conditions and Sanctuary Certification

24  Condition thus disregard Congress's carefully designed statutory schemes for each grant program.

25  Nor does Article II of the Constitution grant the Executive Branch any power of its own to impose

26  spending conditions unilaterally, because that is a legislative power reserved to Congress under

27  Article I.

28          192.    In short, Defendants have no authority whatsoever to adopt the Challenged DHS

1   Conditions or Sanctuary Certification Condition or attach those conditions to Plaintiffs' grant and

2   subgrant funding.  Yet that is precisely what they have done.

3   **v.      The Challenged DHS Conditions Express Incorrect Views of the Law, Are**
        **Ambiguous and Unascertainable, and Require Grantees to Violate the**
4       **Constitution**

5           **a.      Defendants Express Incorrect Views of the Law**

6           193.    In the President's executive orders, agency memoranda issued in light of those

7   executive orders, and in the Discrimination Condition and the EO Condition themselves, the

8   Administration is attempting to rewrite federal antidiscrimination law rather than apply the law as it

9   has long been understood and interpreted by the courts.  For example, the Attorney General's

10  guidance states that organizations must "affirm sex-based boundaries rooted in biological

11  differences," even though the Administration's insistence on "the sex binary" and its refusal to

12  recognize the reality of gender identity is inconsistent with governing law.  *Bostock v. Clayton Cnty.,*

13  *Georgia*, 590 U.S. 644, 662, 669 (2020) ("For an employer to discriminate against employees for

14  being homosexual or transgender, the employer must intentionally discriminate against individual

15  men and women in part because of sex.  That has always been prohibited by Title VII's plain

16  terms[.] . . . [D]iscrimination based on homosexuality or transgender status necessarily entails

17  discrimination based on sex.").

18          194.    Moreover, neither the text of Title VI, nor any other federal antidiscrimination statute

19  or other condition enacted by Congress, supports the Trump Administration's insistence that it is

20  unlawful to accord concern and attention to issues of diversity, equity, or inclusion, let alone that the

21  federal government can bar recipients of federal funding from doing so.  The Supreme Court has

22  never interpreted Title VI to prohibit diversity, equity, and inclusion programs.  Indeed, existing case

23  law firmly rejects the Trump Administration's unmoored assertions regarding antidiscrimination law

24  with respect to DEI, and instead holds that neither the Constitution nor federal antidiscrimination

25  laws prohibit affinity groups and DEI trainings and initiatives, whether by governmental or

26  nongovernmental entities.  *E.g.*, *Diemert v. City of Seattle*, 776 F.Supp.3d 922, 939-40 (W.D. Wash.

27  2025) (although "D.E.I. initiatives" and conversations about race, sex, and other matters "may

28  prompt discomfort or spark debate, they do not necessarily violate anti-discrimination laws.

1    Multiple courts in recent years have reached the same conclusion. . . . Quite the opposite, many

2    courts have held that anti-discrimination trainings play a vital role in preventing workplace

3    discrimination. . . . D.E.I. and anti-discrimination trainings are not per se unlawful.") (collecting

4    cases); *see also City of Fresno v. Turner*, No. 25-CV-07070-RS, 2025 WL 2721390, at *16-18 (N.D.

5    Cal. Sept. 23, 2025) (preliminarily enjoining application or enforcement of grant condition

6    materially similar to Discrimination Condition); *Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-

7    CV-814, 2025 WL 2322763, at *12-13, *22-23 (W.D. Wash. Aug. 12, 2025) (same).

8          195.    The Trump Administration's assertions about immigration laws are just as flawed and

9    inconsistent with authoritative judicial analysis.  Indeed, the Administration's assertions about so-

10   called "sanctuary" cities and the reach of federal immigration law—including Defendant Noem's

11   February 19, 2025 memorandum purporting to define such jurisdictions[35]—are contradicted by

12   judicial analysis.  *United States v. Illinois*, --- F.Supp.3d. ---, No. 25 CV 1285, 2025 WL 2098688, at

13   *13 (N.D. Ill. July 25, 2025) (holding that state and local governments have the right under the

14   Tenth Amendment to adopt policies of noncooperation with ICE, and dismissing for failing to state a

15   claim United States' lawsuit alleging that such policies violate the Immigration and Nationality Act).

16   The current federal Administration's views about the legality of noncooperation policies fly directly

17   in the face of "settled constitutional law."  *Galarza v. Szalczyk*, 745 F.3d 634, 643 (3d Cir. 2014);

18   *United States v. California*, 921 F.3d 865, 886-93 (9th Cir. 2019); *McHenry Cnty. v. Raoul*, 44 F.4th

19   581 (7th Cir. 2022); *Cnty. of Santa Clara v. Trump*, 250 F.Supp.3d 497, 533 (N.D. Cal. 2017).

20         196.    The EO Condition is similarly misguided because executive orders express general

21   policy and/or are addressed to the Executive Branch; they do not by their terms apply to, or impose

22   any requirements on, federal grant recipients.  Nonetheless, several executive orders that could be

23   described as "related to grants" have broad and ambiguous language that could be read to impose

24   conditions materially similar to the Immigration Conditions and Discrimination Condition.  Those

25   include the executive orders cited in paragraphs 164 and 166 above.  One could be read as

26

27   _____

28   [35] *See* Sec'y of Homeland Security, Restricting Grant Funding for Sanctuary Jurisdictions (Feb. 19, 2025), *supra* note 24.

1  purporting to require grantees' and subgrantees' agreement that compliance with requirements

2  similar to or even broader than the Discrimination Condition is material for purposes of the False

3  Claims Act.  Exec. Order No. 14173 of Jan. 21, 2025, § 3(b)(iv)(A), 90 Fed. Reg. 8,633, 8,634.

4  Another could be read as purporting to force grantees and subgrantees to accede to the legal

5  interpretations of President Trump and the Attorney General, even when those interpretations

6  contravene settled law.  Exec. Order No. 14215 of Feb. 18, 2025, § 7, 90 Fed. Reg. 10,447, 10,448

7  ("Ensuring Accountability for All Agencies") ("The President and the Attorney General, subject to

8  the President's supervision and control, shall provide authoritative interpretations of law for the

9  executive branch.  The President and the Attorney General's opinions on questions of law are

10  controlling on all employees in the conduct of their official duties.").  There is also no limiting

11  principle to this condition: it could be read to require compliance with executive orders even after

12  they have been enjoined as unlawful, as well as acquiescence *in advance* to policy positions,

13  requirements, and legal interpretations that the President has not yet announced, even though there is

14  no way to know whether or when the President may issue additional executive orders and what those

15  orders might say or purport to require.

16                     *b.*      **The Challenged DHS Conditions are Ambiguous**

17       197.  A corollary of the Challenged DHS Conditions' and Sanctuary Certification

18  Condition's incompatibility with existing law—as made by Congress and interpreted by the

19  judiciary—is that the Conditions are so ambiguous as to have no fixed or fixable meaning.

20       198.  The Immigration Conditions and Sanctuary Certification Condition are vague and

21  ambiguous because they fail to define or provide meaningful contours on the scope of terms

22  including "cooperation," "requests for cooperation," "joint operations," "sharing of information,"

23  "valid detainer," "access to detainees," and "immigration enforcement operation," or the terms

24  "benefit" with respect to "illegal immigrants" or "incentivize" with respect to "illegal immigration."

25       199.  The Discrimination Condition is vague and ambiguous because it fails to make clear

26  to a reasonable person in the position of a grantee what conduct is prohibited and also fails to specify

27  clear standards for enforcement or for determination by the Secretary of Homeland Security or her

28  designee that grantees' activities violate the Discrimination Condition's prohibitions, which

1  determination the Discrimination Condition treats as conclusive.  The Discrimination Condition is

2  also vague and ambiguous because it does not define the terms "DEI" and "DEIA" (other than by

3  listing the words that each letter in each acronym represents); the term "operate" with respect to

4  "program"; the terms "advance" and "promote" with respect to DEI, DEIA, and discriminatory

5  equity ideology; the term "discriminatory prohibited boycott"; or the term "engage" with respect to

6  "discriminatory prohibited boycott."

7    200.    Worse, the terms DEI and DEIA are capacious and reasonably understood to include

8  conduct and speech that are lawful under the First Amendment and settled and longstanding

9  understandings of civil rights law.  Likewise, the Discrimination Condition's definition of

10  "discriminatory equity ideology"—that is, "an ideology that treats individuals as members of

11  preferred or disfavored groups, rather than as individuals, and minimizes agency, merit, and

12  capability in favor of immoral generalizations"[36]—establishes a false dichotomy between group and

13  individual characteristics that is itself at odds with settled and longstanding understandings of civil

14  rights law.  And the term "prohibited discriminatory boycott" is *entirely* undefined.  Indeed, DHS

15  actually *increased* the uncertainty, ambiguity, and potential breadth of the term when it revised the

16  Discrimination Condition in early August 2025 to remove a provision that had specifically and

17  narrowly defined that term by reference to the State of Israel.  *See* paragraph 169.

18    201.    That the Discrimination Condition purports to prohibit "programs that advance or

19  promote DEI, DEIA, or discriminatory equity ideology *in violation of Federal anti-discrimination*

20  *laws*" only exacerbates its ambiguity and uncertain reach.  It is reasonable to read the Condition as

21  positing that *all* such programs violate Federal antidiscrimination laws.  Yet the Supreme Court has

22  made clear that not all discussions of how race affects a person's life, "be it through discrimination,

23  inspiration, or otherwise," are unlawful.  *Students for Fair Admissions, Inc. v. President & Fellows*

24  *of Harvard Coll.*, 600 U.S. 181, 230-31 (2023).

25

26  _____

27  [36] The Discrimination Condition adopts the definition of the term "discriminatory equity ideology"
from Executive Order 14190, entitled "Ending Radical Indoctrination in K-12 Schooling," which is
quoted in text and is itself capacious, vague, and ambiguous.  *See* Executive Order 14190, at § 2(b),

28  90 Fed. Reg. 8853 (Jan. 29, 2025) (providing definition quoted in text and providing non-exhaustive
list of examples of "immoral generalizations").

202.    Even otherwise, this savings clause is purely theoretical, offers no method or standard for invoking it, and leaves the Administration with unfettered discretion to decide for itself what is or is not unlawful.  Indeed, the clause underscores rather than limits the Discrimination Condition's uncertainty and ambiguity because Administration attorneys have been unable or unwilling in closely related contexts to articulate clearly or unambiguously what forms or aspects of DEI, DEIA, or "discriminatory equity ideology," could be said to "violat[e] Federal anti-discrimination laws," and in other contexts have asserted views squarely at odds with governing law.  *See, e.g.*, *San Francisco Unified Sch. Dist. v. AmeriCorps*, --- F.Supp.3d ----, No. 25-CV-02425-EMC, 2025 WL 1713360, at *18-22 (N.D. Cal. June 18, 2025) (inability to define or describe terms in AmeriCorps grant condition); *Nat'l Educ. Ass'n v. United States Dep't of Educ.*, 779 F. Supp. 3d 149, 187 (D.N.H. 2025) (similar for Department of Education "Dear Colleague Letter"); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 258, 282 (D. Md. 2025) [hereinafter "*NADOHE I*"] ("Indeed, when the Court asked the government during the hearing a series of questions regarding hypothetical implementation of DEI by federal contractors and grantees, the government refused to even attempt to clarify what the Certification Provision means, or whether these hypothetical scenarios are legal."), *op. clarified*, 769 F. Supp. 3d 465 (D. Md. 2025) [hereinafter "*NADOHE II*"]; *Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-CV-814, 2025 WL 2322763, at *12-13 (W.D. Wash. Aug. 12, 2025) (Attorney General's view that grantees cannot use facially neutral criteria correlated with protected characteristics "is inconsistent with Supreme Court precedent," Deputy Attorney General's assertion about transgender persons' access to bathrooms "contradicts the decisions of multiple appellate courts that have held that federal law forbids discrimination based on transgender status," and Secretary of Transportation's assertion about DEIA "is inconsistent with well-established federal precedent" regarding reasonable accommodations for disabled persons).

203.    In any event, the structure of the Discrimination Condition exacerbates the ambiguity of its terms because it affords unfettered discretion to the Secretary of Homeland Security or designee to determine, based on their subjective interpretation, whether (a) "any programs" the grantee operates—not just the activities supported by grant funding—"advance or promote DEI,

1    DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws" or (b) any

2    activity the grantee undertakes—whether or not supported by grant funding—constitutes "a

3    discriminatory prohibited boycott." *Compare NADOHE I*, 767 F.Supp.3d at 278, 281 ("the express

4    language of the Certification Provision demands that federal contractors and grantees essentially

5    certify that there is no 'DEI' (whatever the executive branch decides that means) in any aspect of

6    their functioning, regardless of whether the DEI-related activities occur outside the scope of the

7    federal funding," and the lack of clarity on meaning of DEI, DEIA, and equity "makes unavoidable

8    that agency decisionmakers will 'shap[e] a vague [order's] contours though their enforcement

9    decisions'" (quoting *Sessions v. Dimaya*, 584 U.S. 148, 182 (2018) (Gorsuch, J., concurring)));

10   *Tennessee Educ. Ass'n*, 732 F.Supp.3d at 808-09 ("The government cannot simply tell people to 'be

11   good' and leave it up to the enforcers to decide what 'good' is. . . . By vesting interpretive authority

12   regarding such open-ended terms in the Commissioner, the Act does not so much forbid teachers

13   from suggesting that, for example, Americans are not created equal, so much as it forbids teachers

14   from suggesting that Americans are not created equal *as the Commissioner understands that*

15   *concept*—an understanding that the Commissioner does not have to share with the public until after"

16   initiating an enforcement action.).

17        204.    In addition, the Discrimination Condition and EO Condition are ambiguous insofar as

18   they reflect an attempt by the Executive Branch to wield the judicial power to say what the law is.

19   The Discrimination Condition demands that grantees agree to comply with *the Secretary's view* of

20   what the law should be, and to be bound by the Secretary's view of whether grantees comply with it,

21   regardless of whether the Secretary's views comport with authoritative judicial pronouncements.

22   And the EO Condition seemingly purports to bind grantees to an executive order asserting the

23   authoritativeness of the President's and the Attorney General's pronouncements on questions of law,

24   Exec. Order No. 14215 of Feb. 18, 2025, § 7, 90 Fed. Reg. 10,447, 10,448 ("Ensuring

25   Accountability for All Agencies").  That Executive Order, in turn, could be read to include the

26   Attorney General's Discrimination Guidance Memo, even though that memo is in some important

27   ways at odds with judicial interpretation.

28        205.    The Executive Branch's seeming arrogation of the judicial power to say what the law

1    is generates uncertainty and ambiguity as to what it means for grant recipients to agree to comply

2    with civil rights laws, and as a result, suffuses ambiguity into many other provisions of the Standard

3    DHS Terms that might otherwise seem clear—including the Civil Rights Conditions described in

4    paragraph 174 above.  What on its face may seem clear and unobjectionable, like a requirement to

5    comply with Title VI of the Civil Rights Act of 1964, becomes entirely unascertainable when the

6    President and Attorney General have put forth interpretations of that statute untethered to judicial

7    interpretations, and announced that their pronouncements on questions of law will be authoritative.

8    This is true for all of the Civil Rights Conditions.

9        206.    Thus, the arrogation underlying the Discrimination and EO Conditions casts doubt on

10   Plaintiffs' understanding of the Civil Rights Conditions themselves, and suggests, contrary to the

11   text of those provisions, that the Conditions imply grantees' acquiescence to the Executive Branch's

12   interpretation of the law.  To remedy that particular harm, any relief related to the Discrimination

13   and EO Conditions must also clarify that the references to statutes in the Civil Rights Conditions

14   mean those statutes *as enacted by Congress and interpreted by the judiciary*, such that it would not

15   be a breach of those conditions for a grantee to take actions that comply with the law as interpreted

16   by the courts, even if those actions run counter to the Executive's view of those laws.

17       207.    The EO Condition is vague and ambiguous because it fails to define or provide

18   meaningful contours on the scope of the term "related to grants."  The condition is also vague and

19   ambiguous in purporting to incorporate and require grantees and subgrantees to "comply" with all

20   "Presidential Executive Orders related to grants," because executive orders are the President's

21   directives to federal agencies or expressions of general policy and do not by their terms apply to

22   federal grant recipients or other entities outside the Executive Branch.

23       208.    Even if executive orders could be said to "apply" directly to grantees and directly

24   regulate grantee behavior, the EO Condition compounds ambiguities atop ambiguities because

25   many, if not virtually all, executive orders that might be said to "relate[] to grants" are themselves

26   replete with broad, ambiguous, and unascertainable terms whose meanings exist nowhere other than

27   in the eye of the beholder—such as what it means to "demonstrably advance the President's policy

28   priorities" or to "promote," "encourage," or "facilitate" "racial preferences," "denial . . . of the sex

56

binary . . . or the notion that sex is a chosen or mutable characteristic," "illegal immigration," or "initiatives that compromise public safety or promote anti-American values";[37] to "instill a patriotic admiration for our incredible Nation and the values for which we stand" or to engage in "the instruction, advancement, or promotion of gender ideology or discriminatory equity ideology";[38] to advocate or advance "immoral race- and sex-based preferences";[39] to conduct activities that are "equity-related" or contain "DEI or DEIA performance requirements";[40] or "to promote gender ideology."[41]

209.    The scope and meaning of the EO Condition is also incapable of being ascertained because it purports to obtain grantees' acquiescence in advance to conditions that may come into existence in the future, if and to the extent the President subsequently issues or amends executive orders related to grants.  Those future conditions would also violate the spending power for the additional, independent reason that they would be a surprise and would be imposed post-acceptance.  This is an exceedingly likely scenario, inasmuch as President Trump has already signed well over twice as many executive orders in the first eight months of the current presidential Term than any President in the last seventy years has issued in any one full calendar year.  Indeed, the President issued an expansive executive order on August 7, 2025—well after DHS published terms and conditions containing the EO Condition—that appears to be "related to grants" and purports to require federal officials to ensure that discretionary grants "demonstrably advance the President's policy priorities" and do not "fund, promote, encourage, subsidize, or facilitate . . . denial by the grant recipient of the sex binary in humans or the notion that sex is a chosen or mutable

---

[37] Exec. Order No. 14332 of August 7, 2025, § 4(b), 90 Fed. Reg. 38,929, 38,931 ("Improving Oversight of Federal Grantmaking").

[38] Exec. Order No. 14190 of Jan. 29, 2025, §§ 1-3, 90 Fed. Reg. 8,853, 8,853-55 ("Ending Radical Indoctrination in K-12 Schooling").

[39] Exec. Order No. 14173 of Jan. 21, 2025, § 1, 90 Fed. Reg. 8,633 ("Ending Illegal Discrimination and Restoring Merit-Based Opportunity").

[40] Exec. Order No. 14151 of Jan. 20, 2025, § 2(b), 90 Fed. Reg. 8,339, 8,340 ("Ending Radical and Wasteful Government DEI Programs and Preferencing").

[41] Exec. Order No. 14168 dated Jan. 20, 2025, § 3, 90 Fed. Reg. 8,615, 8,616 ("Defending Women From Gender Ideology Extremism And Restoring Biological Truth To The Federal Government").

characteristic" or "promote anti-American values."  Exec. Order No. 14332 of August 7, 2025, § 4(b), 90 Fed. Reg. 38,929, 38,931 ("Improving Oversight of Federal Grantmaking").  This executive order would dramatically revise the rules and considerations agency officials should use when issuing discretionary awards; might itself violate the separation of powers, the First Amendment, or other constitutional principles; and purports to establish criteria that are broad, vague, subjective, and value-laden and reserve to the President the ultimate prerogative to determine compliance by defining, redefining, or refining his own "policy priorities."

> ### c.   The Challenged DHS Conditions Require Grantees to Violate the Constitution

210.   The Challenged DHS Conditions' and Sanctuary Certification Condition's inconsistency with existing law and ambiguity also give rise to yet another problem: reasonably read, they require grantees to violate the Constitution in at least three different ways.

211.   By conditioning federal funds on grantees' advance and categorical agreement to honor ICE civil detainers, the Immigration Conditions and Sanctuary Certification Condition—including, at a minimum, the Cooperation Condition—require grantees and subgrantees to violate the Fourth Amendment.

212.   ICE detainers are requests from ICE to officials of a state or local jurisdiction to continue to detain a person after they would otherwise be released from that jurisdiction's custody. When a person's detention is continued based on the ICE detainer, they have been subjected to a new arrest, which the Fourth Amendment requires be independently supported by new probable cause.

213.   ICE civil detainer requests are administratively issued documents that are not reviewed by a neutral judicial officer to determine if they present or are supported by probable cause.

214.   ICE civil detainer requests are not judicial warrants and are not accompanied by judicial warrants or otherwise judicially authorized or ordered.

215.   In most, if not virtually all, instances, ICE's civil detainers are not supported by probable cause, or, at a minimum, are not accompanied by evidence that would allow the recipient to

1  independently verify whether the detainer request is supported by probable cause.

2  216. Because the Immigration Conditions and Sanctuary Certification Condition require

3  grantees to honor ICE detainers even when they are not accompanied by a judicial warrant

4  demonstrating that a neutral magistrate has determined that there is probable cause to detain the

5  subject of the detainer, they necessarily require grantees and subgrantees to violate the Fourth

6  Amendment rights of the subjects of those detainers.

7  217. To the extent the EO Condition does or could in the future impose a requirement

8  materially similar to the Immigration Conditions or Sanctuary Certification Condition, the EO

9  Condition is unlawful for the same reasons as those described in paragraphs 211-216.

10  218. The Discrimination Condition and the EO Condition require grantees and subgrantees

11  to violate the First Amendment.

12  219. As used in the Discrimination Condition and many executive orders the EO Condition

13  imposes on grantees, the terms DEI, DEIA, discriminatory equity ideology, and prohibited

14  discriminatory boycott embody and advance a specific set of viewpoints of the current federal

15  Administration. The same is true of several executive orders related to grants that are made binding

16  on grantees under the EO Condition. *See* paragraphs 164 and 207-209 above.

17  220. Plaintiffs take no position on the extent to which the federal Administration has a

18  right to focus its *own* statements on any particular viewpoint. *See, e.g.*, *Am. Council of Learned*

19  *Societies v. McDonald*, No. 25 CIV. 3657 (CM) (BCM), 2025 WL 2097738, at *32 (S.D.N.Y.

20  July 25, 2025) ("Far be it from this Court to deny the right of the Administration to focus NEH

21  priorities on American history and exceptionalism as the year of our semiquincentennial approaches.

22  Such refocusing is ordinarily a matter of agency discretion.").

23  221. But the Challenged DHS Conditions and Sanctuary Certification Condition do

24  something more: they impose the Administration's preferred phrases, concepts, and viewpoints on

25  grantees and subgrantees through funding conditions—for example, conditions that purport to bar

26  grantees and subgrantees from operating programs that "promote" DEIA concepts, and conditions

27  that require grantees and subgrantees to comply with an Executive Order purporting to refuse to

28  allow them to "promote" or recognize individual gender identity. In other words, the Discrimination

1  Condition and EO Condition require grantees broadly not to operate any programs that advance a

2  viewpoint different from the viewpoints of the current federal Administration.  In so doing, the

3  Discrimination Condition and EO Condition not only seek to regulate grantees' speech outside the

4  contours of the federally funded program, *see* paragraph 264 below, but also require grantees and

5  subgrantees to engage in unconstitutional content-based and viewpoint discrimination with respect to

6  private actors' speech.

7       222.   First, when providing financial support or entering into service agreements with third

8  parties, the Discrimination Condition and EO Condition could be read to require grantees and

9  subgrantees to select among potential contractual partners based on those third parties' viewpoints

10  and speech on political matters and other matters of public concern, and to then police those third

11  parties' viewpoints and speech on matters of public concern.  Such activities squarely violate the

12  First Amendment.  *E.g.*, *Velazquez v. Legal Servs. Corp.*, 164 F.3d 757, 747-71 (2d Cir. 1999), *aff'd*,

13  531 U.S. 533.

14       223.   Second, when policing the content of speech permitted in otherwise public spaces that

15  grantees own, operate, or manage, the Discrimination Condition and EO Condition could be read to

16  require grantees and subgrantees to review and prohibit and remove postings on property owned or

17  managed by grantees that is otherwise open to the public, and prohibit entry or forcibly remove

18  individuals or groups from such property, based on the viewpoints expressed by the postings,

19  individuals and groups, lest the federal Administration believe that a grantee's failure to prohibit and

20  remove postings, and prohibit, remove, and suppress individuals or groups, is or could constitute the

21  grantee's "operation" of a "program" that "advance[s] or promote[s]" prohibited viewpoints.  Such

22  activities squarely violate the First Amendment.  *E.g.*, *Rosenberger v. Rector & Visitors of Univ. of*

23  *Virginia*, 515 U.S. 819, 829-832 (1995).

24       224.   The likelihood of the Administration insisting on an overbroad, unconstitutional view

25  that the Discrimination Condition and EO Condition require grantees to engage in viewpoint

26  discrimination continues to increase.  Indeed, in the week of September 23, 2025, FEMA widely

27  distributed an email announcement bulletin that federal funding recipients will be prohibited from

28  / / /

Complaint for Declaratory and Injunctive Relief                                                      25-8330

1  "empower[ing] radical organizations with unseemly ties that don't serve the interest of the

2  American people," no phrase of which is further defined.[42]

3      225.  The Discrimination Condition and EO Condition also require funding recipients to

4  violate fundamental separation of powers principles.  As noted in paragraphs 204-205 above, each of

5  these two conditions arrogate to the Executive Branch the judicial power to say what the law is, and

6  in so doing, suffuse otherwise apparently clear terms with ambiguity and uncertainty.  Each

7  Condition requires grantees to acquiesce to the Executive Branch's views of antidiscrimination law,

8  and thus to displace authoritative judicial interpretation with the views of the President and Attorney

9  General themselves, expressed by fiat.  In the name of antidiscrimination laws, the Discrimination

10  and EO Conditions would prohibit what the judiciary has said those laws permit, and could require

11  what the judiciary has said those laws forbid.

12      226.  Constitutional principles prohibit grantees from disregarding judicial interpretation in

13  favor of the Executive Branch's views.  "Article III of the Constitution assigns to the Federal

14  Judiciary the responsibility and power to adjudicate 'Cases' and 'Controversies'—concrete disputes

15  with consequences for the parties involved." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 384

16  (2024).  Indeed, "Chief Justice Marshall famously declared that '[i]t is emphatically the province and

17  duty of the judicial department to say what the law is.'" *Id.* at 385 (quoting *Marbury v. Madison*, 1

18  Cranch 137, 177 (1803)).  As a corollary, "[t]he views of the Executive Branch could inform the

19  judgment of the Judiciary, but [can] not supersede it," *id.*, and courts "'certainly would not be bound

20  to adopt the construction given by the head of a department.'" *Id.* (quoting *Decatur v. Paulding*, 14

21  Pet. 497, 515 (1840)).

22      227.  The rule that the Discrimination and EO Conditions would impose on grantees—to

23  acquiesce to executive rather than judicial interpretation of antidiscrimination laws, including those

24  cited in the Civil Rights Conditions—is incompatible with the "basic constitutional propositions" of

25  the separation of powers and the governmental structure it establishes, including Congress's

26

27  ────────────────

[42] FEMA Bulletin for Week of September 23, 2025,

28  https://content.govdelivery.com/accounts/USDHSFEMA/bulletins/3f4027a [archived at
https://perma.cc/4T29-FYEE].

Complaint for Declaratory and Injunctive Relief                                             25-8330

1  monopoly on the power to make law and the supremacy of judicial interpretation of that law.

2  *Cooper v. Aaron*, 358 U.S. 1, 17 (1958); *see also Youngstown Sheet & Tube Co.*, 343 U.S. at 654

3  (Jackson, J., concurring) ( "The essence of our free Government is 'leave to live by no man's leave,

4  underneath the law'—to be governed by those impersonal forces which we call law.").

5      228.    Thus, the arrogation underlying the Discrimination and EO Conditions casts doubt on

6  Plaintiffs' understanding of the Civil Rights Conditions themselves, and suggests, contrary to the

7  text of those provisions, that the Conditions imply grantees' acquiescence to the Executive Branch's

8  interpretation of the law.  To remedy this constitutional harm, and prevent further violation of the

9  independent constitutional bar, any relief related to the Discrimination and EO Conditions must also

10  clarify that the references to statutes in the Civil Rights Conditions mean those statutes *as enacted by*

11  *Congress and interpreted by the judiciary*, such that it would not be a breach of those conditions for

12  a grantee to take actions that comply with the law as interpreted by the courts, even if those actions

13  run counter to the Executive's view of those laws.

14  **D.**    **Plaintiffs Face the Impossible Choice of Accepting Unlawful Conditions or Forgoing**
       **Federal Grant Funding for Critical Programs and Services**

15

16      229.    Defendants now insist for the first time that Plaintiffs are not entitled to these funds

17  unless they acquiesce to the federal Administration's domestic political agenda.  There is no legal

18  basis for Defendants' adoption and imposition of the Discrimination Condition and EO Condition

19  across the board as a policy matter, or to attach those conditions to all of Plaintiffs' grant funding.

20  Nor is there any lawful basis for Defendants' attachment of the Immigration Conditions on

21  Plaintiffs' grant agreements.

22      230.    Nonetheless, the sweeping imposition of the Challenged DHS Conditions and

23  Sanctuary Certification Condition on the receipt of federal funds now imperils hundreds of millions

24  of dollars in DHS and FEMA grant funding to Plaintiffs—and billions to local governments across

25  the country.  Plaintiffs have received these grants and subgrants for many years—and often

26  annually—and rely on such funding for critical disaster preparedness, mitigation, and relief efforts.

27  Further, Congress has intended and directed that the funds Defendants are now holding hostage be

28  / / /

       

1    spent to fund disaster preparedness, mitigation, and recovery—including emergency response,

2    antiterrorism, and more.

3         231.    The grant conditions that Defendants seek to impose leave Plaintiffs with the

4    Hobson's choice of accepting illegal conditions that are without authority, contrary to the

5    Constitution, and accompanied by heightened risk of False Claims Act claims, or forgoing the

6    benefit of hundreds of millions of dollars in grant funds that fund crucial local planning, preparation,

7    mitigation, deployment, and recovery activities essential to keeping their residents safe and saving

8    lives.

9         232.    The uncertainty caused by these illegal conditions has impeded Plaintiffs' ability to

10   budget and plan for services anticipated to be covered by the grants.  Indeed, because of the lag

11   between the start of many Plaintiffs' fiscal years in July and the Federal fiscal year in October, and

12   due to the annual and routine granting of these awards to Plaintiffs, Plaintiffs have often built their

13   current fiscal year budgets anticipating receiving funding from federal grants administered by DHS,

14   including FEMA.

15        233.    Ongoing budgetary uncertainty will require many Plaintiffs to reconsider their

16   staffing, including by considering layoffs of employees across departments.  Such losses would drain

17   Plaintiffs of employees with decades of accumulated knowledge and experience crucial to

18   effectively and efficiently serving their residents.  The losses would also substantially reduce the

19   ability of Plaintiffs to provide critical basic public services due to their depleted workforces.  Should

20   Plaintiffs' communities experience a new disaster (like a wildfire, earthquake, or flood), Plaintiffs

21   will be in an untenable position of needing to provide immediate, costly emergency response and

22   disaster relief with uncertainty about whether any FEMA reimbursement will ever come.

23        234.    Even if Plaintiffs ultimately obtain funding, the interim uncertainty and resulting loss

24   of employees would impose irreparable harms: these Plaintiffs would struggle to rebuild their

25   workforces, since employees lost in the interim may well obtain new jobs to pay their rent,

26   mortgages, utility bills, and grocery bills, and otherwise support their families.  *Compare AFGE v.*

27   *Trump*, 784 F.Supp.3d 1316, 1356 (N.D. Cal.) ("widespread termination of salaries and benefits for

28   individuals, families, and communities" would cause "irreparable harm" because "agencies will not

1   easily return to their prior level of operations," even if ordered by a court to rehire), *stayed on other*

2   *grounds sub nom.*, *Trump v. AFGE*, 606 U.S. ___, 145 S. Ct. 2635 (2025).

3       235.   The impact of this uncertainty has a domino effect on public safety and community

4   preparedness across Plaintiffs' entire regions because of the deeply interconnected framework within

5   which emergency management is carried out.  For example, in the Santa Clara County Operational

6   Area, Plaintiff Santa Clara subgrants EMPG and HSGP-SHSP funds to cities and special districts.

7   Earlier this year, Santa Clara notified these other public entities that because of the great degree of

8   uncertainty in FEMA funding streams and the heightened risk that EMPG and/or HSGP-SHSP

9   funding could be withheld or terminated, Santa Clara could not guarantee reimbursement for its

10  subgrantees' planned grant-funded projects, and so the cost for any services or equipment purchases

11  may need to be borne by the subgrantees—some of which are small public agencies with

12  correspondingly small budgets—themselves, if the projects could be carried out at all.

13      236.   The Hobson's choice currently facing Plaintiffs is especially and particularly acute in

14  present circumstances because Defendants have intentionally crafted the conditions to expose

15  grantees to liability under the False Claims Act based on actions that are lawful under the judiciary's

16  authoritative interpretation of federal antidiscrimination law.  It is invariably harmful for *any* entity

17  to face unwarranted threats of criminal investigation or prosecution or lawsuits that could have such

18  significant economic consequences.  That is all the more true here, where the threat is tangible,

19  concrete, and imminent, and where the federal Administration itself is proactively moving to

20  substantially increase the risks and stakes.

21      237.   DOJ has formed a nationwide task force specifically to target grantees that sign these

22  certifications, has described potential liability under the False Claims Act as a "weapon" it will

23  deploy, and has "strongly encouraged" private parties to bring civil suits.  Todd Blanche, the Deputy

24  Attorney General, called the False Claims Act the DOJ's "primary weapon" in this fight.  He

25  announced on May 19, 2025 that the Department of Justice (DOJ) would set up a "Civil Rights

26  Fraud Initiative"—co-led by DOJ's Civil Fraud Section and Civil Rights Division—that will "utilize

27  the False Claims Act to investigate and, as appropriate, pursue claims against any recipient of federal

28  funds that knowingly violates civil rights laws"—or, more accurately, the Administration's

1    reimagining thereof.  The announcement asserts that the False Claims Act "is implicated whenever

2    federal-funding recipients or contractors certify compliance with civil rights laws while knowingly

3    engaging in racist preferences, mandates, policies, programs, and activities, including through

4    diversity, equity, and inclusion (DEI) programs that assign benefits or burdens on race, ethnicity, or

5    national origin."  It further states that "[t]he Civil Fraud Section and the Civil Rights Division will

6    also engage with the Criminal Division, as well as with other federal agencies that enforce civil

7    rights requirements for federal funding recipients" and that DOJ "strongly encourages" private

8    lawsuits under the Federal Claims Act.[43]  The DOJ reaffirmed this threat on June 11, when Assistant

9    Attorney General Brett Shumate announced his intent to dedicate "all available resources" of the

10   DOJ Civil Division "to pursue affirmative litigation combatting unlawful discriminatory practices"

11   and to "aggressively investigate and, as appropriate, pursue False Claims Act violations against

12   recipients of federal funds that knowingly violate civil rights laws."[44]

13        238.    The False Claims Act imposes substantial civil liability on "any person who . . .

14   knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

15   31 U.S.C. § 3729(a).  As noted, both the federal government and any private citizen may sue a

16   recipient of federal funds for False Claims Act violations.  *Id.* § 3730.  If found liable, a funding

17   recipient faces potential treble damages, which could easily result in a judgment far exceeding the

18   amount of federal funds the recipient had received from the federal government in the first place.

19   What is more, the same conduct—presentation of a false or fraudulent claim material to the federal

20   government's issuance of payment—may also give rise to *criminal* liability, including up to five

21   years imprisonment.  18 U.S.C. § 287.

22        239.    The materiality requirements in the Challenged DHS Conditions magnify the risk

23   those Conditions pose.  *First*, when a grant recipient cannot even understand what the conditions

24   require of them, they cannot possibly have "actual knowledge," "act in deliberate ignorance," or

---

[43] Deputy Att'y Gen'l, Civil Rights Fraud Initiative, *supra* note 22.

[44] Asst. Att'y Gen'l, Civil Division Enforcement Priorities (June 11, 2025),
https://www.justice.gov/civil/media/1404046/dl [archived at https://perma.cc/QL7T-33TH].

Complaint for Declaratory and Injunctive Relief                                    25-8330

1    "act[] in reckless disregard" of their certification of compliance, a necessary element of the False

2    Claims Act.  *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 191-92 (2016).  The

3    hopeless ambiguity and breadth of the conditions make a laughingstock of the notion that the

4    materiality standard is "demanding," because their wildly open-ended obligations leave no way of

5    discerning "garden-variety breaches" from substantial ones.  *Id.* at 194.

6        240.    *Second*, the requirement that grantees acquiescence to materiality elevates the federal

7    Administration's evolving view of what the conditions require and what the law should be above

8    settled and authoritative pronouncements of what the law is—including a unanimous Supreme

9    Court's recognition that contract language alone *cannot* definitively establish that any given

10   condition is material for purposes of the False Claims Act, and that the False Claims Act's

11   materiality requirement is "rigorous" and "demanding."  *Id.* at 192-95.  But that is precisely what the

12   Immigration Conditions seek to accomplish: they purport to extract every grantee's advance waiver

13   of any argument against the materiality of its supposed noncompliance with the Administration's

14   ever-evolving, contra-indicated, and ill-defined views of  the underlying law.  "The False Claims Act

15   does not adopt such an extraordinarily expansive view."  *Id.* at 196.

16       241.    *Third*, treating a grantee's representations about its compliance with *any* of the

17   Challenged DHS Conditions or Sanctuary Certification Condition as "material" under the False

18   Claims Act would unmoor the Act's reach from any limitations whatsoever.  The Challenged DHS

19   Conditions and Sanctuary Certification Condition have nothing to do with these emergency

20   management grant programs, and their subject matters are mentioned nowhere in any of the

21   governing statutes for the Subject Grant Programs, so representations about those conditions simply

22   *cannot* go "to the very essence of the bargain," as the Supreme Court requires.  *Id.* at 194 n.5

23   (internal quotation omitted).  And they seek to shift the burden in any False Claims Act lawsuit—

24   from the government or relator, which must prove materiality, onto the defendant, which under the

25   Challenged DHS Conditions would need to disprove it.  *Compare, e.g.*, *United States ex rel. Purcell*

26   *v. MWI Corp.*, 807 F.3d 281, 287 (D.C. Cir. 2015) ("Of course, the government as plaintiff has the

27   burden of proving each element of the FCA").

28       242.    Nonetheless, and more perverse still, the purported waiver of materiality provides

1    ammunition with which the Administration could promptly arm the "weapon" it has already

2    announced is pointed back at recipients of federal funding.  And it would do so not only for the False

3    Claims Act itself, but also for purposes of *criminal* liability for false and fraudulent claims, for

4    which "[t]he 'demanding' materiality requirement" likewise "substantially narrows the universe of

5    actionable misrepresentations.'" *Kousisis v. United States*, 145 S. Ct. 1382, 1398 (2025) (quoting

6    *Universal Health Servs.*, 579 U.S. at 194).

## FIRST CAUSE OF ACTION

**The Challenged DHS Conditions, Sanctuary Certification Condition, and Challenged Grants**

**Manual Disclosure Requirements Violate the Separation of Powers**

***Against All Defendants***

11    243.    Plaintiffs reallege and incorporate by reference the allegations of the preceding

12   paragraphs.

13    244.    The Constitution vests Congress—not the Executive—with "[a]ll" of the federal

14   government's "legislative Powers," which includes the power to spend and appropriate federal

15   funds.  U.S. Const. art. 1, § 1; *id.* § 8, cl. 1 (spending power); *id.* § 9, cl. 7 (Appropriations Clause).

16    245.    The Constitution "exclusively grants the power of the purse to Congress, not the

17   President." *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).  "Congress's power

18   to spend is directly linked to its power to legislate.  Incident to the spending power, Congress may

19   attach conditions on the receipt of federal funds." *Id.* at 1232.

20    246.    The "executive Power" vested in the President does not include the power to attach

21   conditions on the receipt of federal funds.  To the contrary, "[t]here is no provision in the

22   Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Id.* (alteration in

23   original) (quoting *Clinton v. City of New York*, 524 U.S. 417, 438 (1998)).

24    247.    The Executive Branch may not "claim[] for itself Congress's exclusive spending

25   power, . . . [or] coopt Congress's power to legislate." *Id.* at 1234.

26    248.    Accordingly, absent an express delegation, only Congress, not the Executive Branch,

27   is entitled to attach conditions to federal funds.

28    249.    The separation of the legislative, executive, and judicial powers among the three

Complaint for Declaratory and Injunctive Relief                                          25-8330

1    branches is a central and core tenet of our Constitution.  *See, e.g.*, *Trump v. United States*, 603 U.S.

2    593, 637-38 (2024) (the separation of powers "doctrine is undoubtedly carved into the Constitution's

3    text by its three articles separating powers"); *West Virginia v. EPA*, 597 U.S. 697, 737 (2022)

4    (Gorsuch, J., concurring) ("the Constitution's rule vesting federal legislative power in Congress is

5    'vital to the integrity and maintenance of the system of government ordained by the Constitution.'"

6    (quoting *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892))).

7        250.    Consistent with these principles, the Executive Branch acts at the "lowest ebb" of its

8    constitutional power when it "takes measures incompatible with the express or implied will of

9    Congress." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J.,

10   concurring).

11       251.    In leveraging its spending power under the Constitution, Congress has not

12   conditioned the provision of funding for DHS and FEMA grant programs on compliance with a

13   prohibition on all forms of DEI policies and initiatives, participation in the federal Administration's

14   aggressive civil immigration enforcement agenda, refusal to recognize transgender people, or any of

15   the other terms, provisions, or principles set forth in the Challenged DHS Conditions (i.e., the

16   Immigration Conditions, the Discrimination Condition, and the EO Condition) or the Sanctuary

17   Certification Condition.  Nor has Congress delegated to Defendants the authority to attach any of the

18   Challenged DHS Conditions or Sanctuary Certification Condition unilaterally.

19       252.    By imposing the Challenged DHS Conditions and Sanctuary Certification Condition

20   on grant recipients, Defendants are unilaterally attaching new conditions to federal funding without

21   constitutional authorization from Congress and in the absence of statutory authority to do so.

22       253.    For these reasons, Defendants' conditioning of Plaintiffs' DHS grants on compliance

23   with the Challenged DHS Conditions and/or Sanctuary Certification Condition violates the

24   constitutional separation of powers.

25       254.    Defendants' violations have caused harm and will continue to cause harm to Plaintiffs

26   for which no remedy other than an injunction is adequate.

27   / / /

28   / / /

**SECOND CAUSE OF ACTION**

**The Challenged DHS Conditions, Sanctuary Certification Condition, and Challenged Grants**

**Manual Disclosure Requirements Violate the Spending Power**

*Against All Defendants*

255.    Plaintiffs reallege and incorporate by reference the allegations of the preceding paragraphs.

256.    Congress's power to attach conditions to federal funding "is of course not unlimited, but is instead subject to several general restrictions." *S. Dakota v. Dole*, 483 U.S. 203, 207 (1987). The Challenged DHS Conditions violate at least three of the Constitution's "general restrictions" on the spending power.

257.    First, the spending power requires recipients to have fair and advance notice of conditions that apply to federal funds so that recipients can "voluntarily and knowingly" decide whether to accept the funds. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981). The grant conditions must be set forth "unambiguously," because recipients "cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst*, 451 U.S. at 17). As a corollary, the spending power prohibits the federal government from "surprising" grantees "with post acceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 25.

258.    Second, the government may only impose conditions on federal funding that are reasonably related to the federal interest in the project and the project's objectives. *Dole*, 483 U.S. at 207, 208; *Massachusetts v. United States*, 435 U.S. 444, 461 (1978); *accord New York v. United States*, 505 U.S. 144, 167 (1992).

259.    Third, under the "independent constitutional bar," the spending power "may not be used to induce [grantees] to engage in activities that would themselves be unconstitutional." *Dole*, 483 U.S. at 210.

260.    Even if Congress had delegated authority to Defendants or the Executive to condition DHS grant funding on recipients' agreement to terms prohibiting all forms of DEI policies and initiatives as conceived by the Administration, requiring participation in enforcement of federal

1   immigration laws, or mandating compliance with current and future executive orders, the Challenged

2   DHS Conditions and Sanctuary Certification Condition would nonetheless be unlawful and

3   unenforceable because, in contravention of the spending power, they are ambiguous, purport to bind

4   grantees to post-acceptance and retroactive conditions, are not germane to the purposes of the

5   statutes that authorize DHS's and FEMA's grant programs, and would require recipients to engage

6   in actions that are themselves unconstitutional.  Each of these flaws applies to each of the

7   Challenged DHS Conditions and Sanctuary Certification Condition.

8                         *a.*     ***Ambiguity***

9          261.    The Challenged DHS Conditions and Sanctuary Certification Condition are

10   ambiguous and unascertainable, and preclude any reasonable grantee, including Plaintiffs, from

11   understanding their the scope and meaning and, therefore, from knowingly accepting the conditions.

12   The Challenged Grants Manual Disclosure Requirements are ambiguous and unascertainable for

13   many of the same reasons, and Plaintiffs therefore cannot ascertain their meaning or knowingly

14   accept those conditions either.  *See* paragraphs 197-209 above.

15                         *b.*     ***Germaneness***

16          262.    None of the Challenged DHS Conditions, Sanctuary Certification Condition, or

17   Challenged Grants Manual Disclosure Requirements are germane to the purposes of the grant

18   programs at issue here, the statutes that authorize those grant programs, or the federal interest in the

19   projects funded by the grant programs, which pertain to disaster preparedness, mitigation, and

20   recovery at the regional and local level.

21          263.    The lack of any reasonable relationship between the grants at issue and the

22   Challenged DHS Conditions, Sanctuary Certification Condition, and Challenged Grants Manual

23   Disclosure Requirements is further underscored by the facially unlimited reach of the conditions,

24   most which apply to *all* activities and actions of each grantee and subgrantee and are not limited to

25   the programs funded by the grants.

26          264.    That the Challenged DHS Conditions and Sanctuary Certification Condition apply

27   well beyond the activities funded by the grant programs also demonstrates that the Challenged DHS

28   Conditions and Sanctuary Certification Condition independently exceed the government's spending

Complaint for Declaratory and Injunctive Relief                                              25-8330

1  power because, on their face, the "conditions . . . seek to leverage funding to regulate speech outside

2  the contours of the program itself" and "outside the scope of the federally funded program." *Agency*

3  *for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 215-16 (2013).

4              *c.      Independent Constitutional Bar*

5        265.    The Challenged DHS Conditions and Sanctuary Certification Condition require

6  Plaintiffs and other recipients of DHS federal funding to violate the Constitution in at least three

7  ways: they require Plaintiffs and other governmental recipients to violate the Fourth Amendment

8  rights of the subjects of ICE detainer requests; to violate the First Amendment by selecting parties to

9  contract with and policing speech by members of the public based on their viewpoints; and to violate

10  the separation of powers by acceding to the primacy of the Executive Branch's view of the law to the

11  exclusion and derogation of the judiciary's authoritative interpretations. *See* paragraphs 210-228

12  above.

13        266.    Defendants' violations have caused harm and will continue to cause harm to Plaintiffs

14  for which no remedy other than an injunction is adequate.

15                    **THIRD CAUSE OF ACTION**

16  **The Challenged DHS Conditions, Sanctuary Certification Condition, and Challenged Grants**

17       **Manual Disclosure Requirements Are Arbitrary and Capricious in Violation of the**

18                   **Administrative Procedure Act**

19                    *Against DHS and FEMA*

20        267.    Plaintiffs reallege and incorporate by reference the allegations of the preceding

21  paragraphs.

22        268.    Under the APA, a "court shall . . . hold unlawful and set aside agency action,

23  findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise

24  not in accordance with law." 5 U.S.C. § 706(2)(A).

25        269.    "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and

26  reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio*

27  *Project*, 592 U.S. 414, 423 (2021)). A court must therefore "ensure, among other things, that the

28  agency has offered 'a satisfactory explanation for its action[,] including a rational connection

1   between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Assn. of United*

2   *States, Inc. v. State Farm Mut. Automobile Ins. Co.,* 463 U.S. 29, 43 (1983)).  "[A]n agency cannot

3   simply ignore 'an important aspect of the problem'" addressed by its action.  *Id.* at 293.

4          270.   Defendants' adoption of the Discrimination Condition in the Standard DHS Terms is

5   a final agency action.  Defendants' adoption of the EO Condition in the Standard DHS Terms is a

6   final agency action.  Defendants' adoption of the Grants Manual is a final agency action.  Separately,

7   and in addition, Defendants' incorporation of each of the three Challenged DHS Conditions in the

8   Standard DHS Terms, the Sanctuary Certification Condition, and the Challenged Grants Manual

9   Disclosure Requirements, into each grant program, grant award, and grant agreement is a final

10  agency action.

11         271.   Under the APA, a "court shall . . . hold unlawful and set aside agency actions,

12  findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise

13  not in accordance with law."  5 U.S.C. § 706(2)(A).

14         272.   Defendants have provided no reasoned explanation or basis for their decision to

15  impose the Challenged DHS Conditions and Sanctuary Certification Condition on funds that

16  Congress has appropriated for grant programs that have no reasonable connection to or nexus with

17  those issues.

18         273.   Defendants have provided no reasoned explanation or basis for withholding funds

19  Congress appropriated for disbursement.

20         274.   Defendants have ignored essential aspects of the "problem" they purport to address

21  by taking the final agency actions described in paragraph 270, including by failing to (a) assess the

22  extent to which the Challenged DHS Conditions and Sanctuary Certification Condition are lawful

23  and consistent with statutes and the Constitution, (b) consider Plaintiffs' reasonable and inevitable

24  reliance on now at-risk funds, and (c) consider the potential impacts on safety and emergency

25  management of withholding the funding appropriated by Congress.

26         275.   Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C.

27  § 2201 that each and all of the final agency actions described in paragraph 270 violate the APA

28  because they are arbitrary and capricious; to provide preliminary relief under 5 U.S.C. § 705; and to

1    temporarily restrain, and preliminarily and permanently enjoin, Defendants from imposing the

2    Challenged DHS Conditions, Sanctuary Certification Condition, and Grants Manual Disclosure

3    Requirements without complying with the APA.

4         276.    Defendants' violations have caused harm and will continue to cause harm to Plaintiffs

5    for which no remedy other than an injunction is adequate.

6    <center>**FOURTH CAUSE OF ACTION**</center>

7    <center>**The Challenged DHS Conditions, Sanctuary Certification Condition, and Challenged Grants**</center>

8    <center>**Manual Disclosure Requirements Are Contrary to the Constitution in Violation of the**</center>

9    <center>**Administrative Procedure Act**</center>

10   <center>***Against DHS and FEMA***</center>

11        277.    Plaintiffs reallege and incorporate by reference the allegations of the preceding

12   paragraphs.

13        278.    Under the APA, a "court shall . . . hold unlawful and set aside agency action,

14   findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or

15   immunity." 5 U.S.C. § 706(2)(B).

16        279.    As described above, the Challenged DHS Conditions, Sanctuary Certification

17   Condition, and Challenged Grants Manual Disclosure Requirements violate bedrock constitutional

18   provisions and principles including both the spending power and the separation of constitutional

19   powers between and among the President, Congress, and judiciary.

20        280.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C.

21   § 2201 that each and all of the final agency actions described in paragraph 270 violate the APA

22   because they are contrary to constitutional rights, powers, privileges, or immunities; provide

23   preliminary relief under 5 U.S.C. § 705; and temporarily restrain, and preliminarily and permanently

24   enjoin, Defendants from imposing the Challenged DHS Conditions, Sanctuary Certification

25   Condition, and Grants Manual Disclosure Requirements without complying with the APA.

26        281.    Defendants' violations have caused harm and will continue to cause harm to Plaintiffs

27   for which no remedy other than an injunction is adequate.

28   / / /

<center>73</center>

**FIFTH CAUSE OF ACTION**

**The Challenged DHS Conditions, Sanctuary Certification Condition, and Challenged Grants Manual Disclosure Requirements Are Not In Accordance with Law and Are In Excess of Statutory Authority in Violation of the Administrative Procedure Act**

*Against DHS and FEMA*

282.   Plaintiffs reallege and incorporate by reference the allegations of the preceding paragraphs.

283.   Under the APA, a "court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law … [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).

284.   Defendants may exercise only authority granted to them by statute or the Constitution.

285.   No law or provision of the Constitution authorizes Defendants to impose extra-statutory conditions not authorized by Congress on congressionally appropriated funds.  The Challenged DHS Conditions are not authorized by any statute under which any of the grant programs at issue exist, nor under any other statute.

286.   Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that that each and all of the final agency actions described in paragraph 270 violate the APA because they are in excess of Defendants' statutory jurisdiction, authority, or limitations, or short of statutory right; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from imposing the Challenged DHS Conditions and the Grants Manual Disclosure Requirements without complying with the APA.

287.   Defendants' violations have caused harm and will continue to cause harm to Plaintiffs for which no remedy other than an injunction is adequate.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court grant the following relief:

1.   A declaration that the Discrimination Condition and the EO Condition are unconstitutional, are not authorized by statute, violate the APA, and are otherwise unlawful;

2.      A declaration that Defendants' attachment or incorporation of the Discrimination Condition, the EO Condition, and the Challenged Grant Manual Disclosure Requirements to Plaintiffs' grant funding is unconstitutional, is not authorized by statute, violates the APA, and is otherwise unlawful;

3.      A declaration that Defendants' attachment or incorporation of the Immigration Conditions and Sanctuary Certification Condition to Plaintiffs' grant funding under the Subject Grant Programs is unconstitutional, is not authorized by statute, violates the APA, and is otherwise unlawful;

4.      An order temporarily restraining, and preliminarily and permanently enjoining, Defendants from attaching, incorporating, imposing, or enforcing:

a.      the Discrimination Condition, the EO Condition, the Challenged Grant Manual Disclosure Requirements, or any materially similar terms or conditions, with respect to any applications submitted by Plaintiffs, and any funds awarded to or received by Plaintiffs, whether directly or indirectly;

b.      the Immigration Conditions and Sanctuary Certification Condition, or any materially similar terms or conditions, with respect to any applications submitted by Plaintiffs, and any funds awarded to or received by Plaintiffs, whether directly or indirectly, under the Subject Grant Programs;

c.      any interpretation of the Civil Rights Conditions as requiring anything other than compliance with the statutes cited in the Civil Rights Conditions as they have been enacted by Congress and interpreted by the judiciary.

5.      An order pursuant to 5 U.S.C. § 705 that postpones the effective date of any action by any Defendants to adopt, issue, or enforce the Discrimination Condition, EO Condition, and Challenged Grants Manual Disclosure Requirements pending conclusion of this litigation; declares the Challenged DHS Conditions, Sanctuary Certification Condition, and Challenged Grants Manual Disclosure Requirements void and unenforceable with respect to any application, award, agreement, or other document executed by Plaintiffs that is related to the Subject Grant Programs; and declares that the Civil Rights Conditions require compliance with the statutes cited therein as those statutes

1  have been enacted by Congress and interpreted by the judiciary;

2      6.      An order under 5 U.S.C. § 706 holding unlawful, setting aside, and vacating all

3  actions taken by Defendants to:

4              a.      adopt, issue, or implement the Discrimination Condition, the EO Condition, or

5                      the Challenged Grant Manual Disclosure Requirements;

6              b.      require, attach, incorporate, implement, or enforce the Discrimination

7                      Condition, EO Condition, or Challenged Grant Manual Disclosure

8                      Requirements with respect to any grant application, agreement or

9                      subagreement, or other document, transaction, or activity, executed by

10                     Plaintiffs, or funding received by Plaintiffs;

11             c.      require, attach, incorporate, implement, or enforce the Immigration Conditions

12                     or the Sanctuary Certification Condition with respect to any grant application,

13                     agreement or subagreement, or other document, transaction, or activity,

14                     executed by Plaintiffs, or funding received by Plaintiffs, under the Subject

15                     Grant Programs;

16             d.      construe the Civil Rights Conditions to require anything other than

17                     compliance with the statutes cited in the Civil Rights Conditions as they have

18                     been enacted by Congress and interpreted by the judiciary.

19     7.      Orders preliminarily and permanently enjoining Defendants from retaliating against

20 any Plaintiff for participating in this lawsuit or taking any adverse action based on any Plaintiff's

21 participation in this lawsuit, including but not limited to reducing the amount of a grant award to that

22 Plaintiff or to any state agency through which Plaintiff may receive grant funding; refusing to issue,

23 process, sign, or approve grant applications, grant agreements, or subgrant agreements; and refusing

24 to issue, process, sign, or approve any invoice or request for payment, or reducing the amount of

25 such approval or payment;

26     8.      An award to Plaintiffs of their reasonable attorneys' fees, costs, and other expenses;

27 and;

28     9.      Any other and further relief that this Court may deem just and proper.

Dated: September 30, 2025

TONY LOPRESTI
County Counsel
KAVITA NARAYAN
Chief Assistant County Counsel
MEREDITH A. JOHNSON
Lead Deputy County Counsel
RAPHAEL N. RAJENDRA
HANNAH M. GODBEY
Deputy County Counsels

By: */s/* Tony LoPresti
TONY LOPRESTI
County Counsel

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

DAVID CHIU
City Attorney
YVONNE R. MERÉ
Chief Deputy City Attorney
MOLLIE M. LEE
Chief of Strategic Advocacy
SARA J. EISENBERG
Chief of Complex and Affirmative Litigation
DAVID S. LOUK
STEVEN A. MILLS
Deputy City Attorneys

*/s/* David Chiu
By: DAVID CHIU
City Attorney

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

Complaint for Declaratory and Injunctive Relief 25-8330

1                                 By: /s/ Sharanya Mohan

SHARANYA (SAI) MOHAN (SBN 350675)

2                                     ERIN MONJU*

NAOMI TSU*

3                                     TOBY MERRILL*

PUBLIC RIGHTS PROJECT

4                                     490 43rd Street, Unit #115

5                                     Oakland, CA 94609

Tel: (510) 738-6788

6                                     sai@publicrightsproject.org

erin@publicrightsproject.org

7                                   naomi@publicrightsproject.org

8                                   toby@publicrightsproject.org

9                                   Attorneys for Plaintiffs

10                                 CITY OF ALAMEDA, CITY OF BELLINGHAM, CITY OF BERKELEY, CITY OF CULVER, KING

11                               COUNTY, COUNTY OF LOS ANGELES, COUNTY OF MARIN, CITY OF OAKLAND, CITY OF PALO

12                               ALTO, CITY OF PASADENA, CITY OF PETALUMA, PIERCE COUNTY, CITY OF

13                               SACRAMENTO, CITY OF SAN DIEGO, SAN DIEGO COUNTY, CITY OF SAN JOSE, COUNTY OF SAN

14                               MATEO, CITY OF SANTA MONICA, CITY OF

15                               SANTA ROSA, COUNTY OF SONOMA, SONOMA COUNTY WATER AGENCY, SONOMA VALLEY

16                               COUNTY SANITATION DISTRICT, SONOMA COUNTY COMMUNITY DEVELOPMENT

17                               COMMISSION, SNOHOMISH COUNTY, CITY OF TUCSON

18

19                                 YIBIN SHEN

Alameda City Attorney

20

21                           By: /s/ Yibin Shen

YIBIN SHEN (SBN 233545)

22                               CARA SILVER (SBN 136992), Special Counsel DANIEL J. TURNER (SBN 336499), Deputy City

23                               Attorney

2263 Santa Clara Avenue, Rm 280

24                               Alameda, CA 94501

Tel: (510) 747-4750

25                               yshen@alamedaca.gov

csilver@alamedaca.gov

26                               dturner@alamedaca.gov

27

28                               Attorneys for Plaintiff

CITY OF ALAMEDA

FARIMAH F. BROWN
Berkeley City Attorney


By: /s/ Farimah F. Brown
FARIMAH F. BROWN (SBN 201227), City Attorney
KATRINA L. EILAND (SBN 275701), Deputy City Attorney
STEPHEN A. HYLAS (SBN 319833), Deputy City Attorney
2180 Milvia Street, Fourth Floor
Berkeley, CA 94704
Tel: (510) 981-6998
Fax: (510) 981-6960
fbrown@berkeleyca.gov
keiland@berkeleyca.gov
shylas@berkeleyca.gov

Attorneys for Plaintiff
CITY OF BERKELEY


KING COUNTY PROSECUTING ATTORNEY
LEESA MANION

By: /s/ David J. Hackett
DAVID J. HACKETT*
Executive General Counsel
ALISON HOLCOMB*
Deputy Executive General Counsel
Special Deputy Prosecuting Attorneys
Chinook Building
401 5th Avenue, Suite 800
Seattle, WA 98104
Tel: (206) 477-2720
David.Hackett@kingcounty.gov
aholcomb@kingcounty.gov

Attorneys for Plaintiff
MARTIN LUTHER KING, JR. COUNTY

HYDEE FELDSTEIN SOTO
City Attorney of the City of Los Angeles

By: /s/ Michael J. Dundas
MICHAEL J. DUNDAS (SBN 226930), Chief Assistant City Attorney

Complaint for Declaratory and Injunctive Relief                                    25-8330

1  JOSHUA M. TEMPLET (SBN 267098), Deputy City
   Attorney
2  Office of the Los Angeles City Attorney
   200 North Main Street, Room 800
3  Los Angeles, California 90012
   Tel: (213) 978-8100
4  mike.dundas@lacity.org
5  joshua.templet@lacity.org

6  Attorneys for Plaintiff
7  CITY OF LOS ANGELES

8  By: /s/ Thomas J. Faughnan
   THOMAS J. FAUGHNAN (SBN 155238), Senior
9  Assistant County Counsel
   BRIGIT GREESON ALVAREZ (SBN 237301), Deputy
10 County Counsel
   Office of the County Counsel
11 648 Kenneth Hahn Hall of Administration
   500 West Temple Street Los Angeles,
12 California 90012-2713
13 Tfaughnan@counsel.lacounty.gov
   Bgreesonalvarez@counsel.lacounty.gov
14 Tel: (213) 681-0408

15 Counsel for Plaintiffs
16 COUNTY OF LOS ANGELES and
   LOS ANGELES COUNTY CONSOLIDATED FIRE
17 PROTECTION DISTRICT

18 BRIAN E. WASHINGTON
19 County Counsel

20 By: /s/ Kate K. Stanford
   KATE K. STANFORD (SBN 302825), Deputy County
21 Counsel
   EDWARD F. SEARS (SBN 297775), Deputy County
22 Counsel
   3501 Civic Center Drive, Suite 275
23 San Rafael, CA 94903
   Tel: (415) 473-6117
24 kate.stanford@marincounty.gov
25
   Attorneys for Plaintiff
26 COUNTY OF MARIN
27
28

Complaint for Declaratory and Injunctive Relief                    25-8330

1    RYAN RICHARDSON
     City Attorney
2

3    By:  /s/ Ryan Richardson
     RYAN RICHARDSON (SBN 223548), City Attorney
4    MARIA BEE (SBN 167716), Chief Assistant City
     Attorney
5    JAIME HULING DELAYE (SBN 270784), Supervising
     City Attorney
6    H. LUKE EDWARDS (SBN 313756), Deputy City
     Attorney
7    DIVYA MUSINIPALLY (SBN 316114), Deputy City
     Attorney
8    One Frank H. Ogawa Plaza, 6th Floor
9    Oakland, California 94612
     Tel: (510) 238-3836
10   Fax: (510) 238-6500
11   ledwards@oaklandcityattorney.org

12   Attorneys for Plaintiff
     CITY OF OAKLAND
13

14   MOLLY S. STUMP
     City Attorney
15

16   By:  /s/ Mark Vanni
     MOLLY S. STUMP (SBN 177165), City Attorney
     CAIO A. ARELLANO (SBN 262168), Chief Assistant
17   City Attorney
     MARK J. VANNI (SBN 267892), Assistant City
18   Attorney
19   CITY OF PALO ALTO
     250 Hamilton Ave., 8th Floor
20   Palo Alto, CA 94301
     Tel: (650) 329-2171
21   Fax: (650) 320-2646
22   Molly.Stump@PaloAlto.gov
     Caio.Arellano@PaloAlto.gov
23   Mark.Vanni@PaloAlto.gov

24   Attorneys for Plaintiff
     CITY OF PALO ALTO
25

26

27

28

ERIC DANLY
City Attorney

By: /s/ Eric Danly
ERIC DANLY (SBN 201621), City Attorney
11 English Street
Petaluma, CA 94952
Tel: (707) 778-4362
EDanly@cityofpetaluma.org

Attorney for Plaintiff
CITY OF PETALUMA

MARY E. ROBNETT
Pierce County Prosecuting Attorney

By: /s/ Jonathan R. Salamas
JONATHAN R. SALAMAS (WSBA # 39781), Deputy
Prosecuting Attorney / Civil*
930 Tacoma Avenue South, Suite 946
Tacoma, WA  98402-2102
Tel: 253-798-4862
Fax: 253-798-6713
jonathan.salamas@piercecountywa.gov

Attorney for Plaintiff
PIERCE COUNTY

SUSANA ALCALA WOOD
City Attorney

By: /s/ Andrea Velasquez
ANDREA VELASQUEZ (SBN 249210), Supervising
Deputy City Attorney
KATHERINE UNDERWOOD (SBN 249308), Senior
Deputy City Attorney
915 I St Fl 4, Sacramento, CA 95814-2621
Tel: 916-808-5346
Fax: 916-808-7455
AVelasquez@cityofsacramento.org
KUnderwood@cityofsacramento.org

Attorneys for Plaintiff
CITY OF SACRAMENTO

HEATHER FERBERT
City Attorney

82

By:  /s/ Mark Ankcorn
     MARK ANKCORN (SBN 166871), Senior Chief
     Deputy City Attorney
     JULIE RAU (SBN 317658), Deputy City Attorney
     1200 Third Avenue, Suite 1100
     San Diego, California 92101-4100
     Tel: (619) 533-5800

     Attorneys for Plaintiff
     CITY OF SAN DIEGO

     HEATHER FERBERT
     City Attorney

By:  /s/ Nora Frimann
     NORA FRIMANN (SBN 93249), City Attorney
     ELISA TOLENTINO (SBN 245962), Chief Deputy City
     Attorney
     200 E Santa Clara St., 16th Floor
     San José, CA 95113-1905
     Tel: 408-535-1900
     Fax: 408-998-3131
     cao.main@sanjoseca.gov

     Attorneys for Plaintiff
     CITY OF SAN JOSÉ

     JOHN D. NIBBELIN
     County Counsel

By:  /s/ John D. Nibbelin
     John D. Nibbelin (SBN 184603), County Counsel
     Rebecca M. Archer (SBN 202743), Chief Deputy
     Lauren F. Carroll (SBN 333446), Deputy
     Savannah Eldridge (SBN 357723), Deputy
     500 County Center, 4th Floor
     Redwood City, CA  94063
     Tel: (650) 363-4250
     jnibbelin@smcgov.org
     rmarcher@smcgov.org
     lcarroll@smcgov.org
     seldridge@smcgov.org

     Attorneys for Plaintiff
     COUNTY OF SAN MATEO

Complaint for Declaratory and Injunctive Relief                                    25-8330

1

TERESA L. STRICKER
City Attorney

2

3

By:  /s/ Teresa L. Stricker
TERESA L. STRICKER (SBN 160601), City Attorney
AUTUMN LUNA (SBN 288506), Chief Assistant City
Attorney HANNAH E. FORD-STILLE (SBN 335113),
Deputy City Attorney
100 Santa Rosa Ave, Room 8
Santa Rosa, CA 95404
Tel: (707) 543-3040
tstricker@srcity.org
aluna@srcity.org
hfordstille@srcity.org

4

5

6

7

8

9

Attorneys for Plaintiff
CITY OF SANTA ROSA

10

11

JASON J. CUMMINGS
Snohomish County Prosecuting Attorney

12

13

By:  /s/ Bridget E. Casey
BRIDGET E. CASEY*
REBECCA J. GUADAMUD*
REBECCA E. WENDLING*
Snohomish County Prosecuting Attorney's Office
3000 Rockefeller Avenue, M/S 504
Everett, WA 98201-4046
(425) 388-6392
bcasey@snoco.org
rebecca.guadamud@co.snohomish.wa.us
rwendling@snoco.org

14

15

16

17

18

19

20

Attorneys for Plaintiff
SNOHOMISH COUNTY

21

22

ROBERT H. PITTMAN
County Counsel

23

24

By:  /s/ Joshua A. Myers
JOSHUA A. MYERS (SBN 250988), Chief Deputy
County Counsel
County of Sonoma
575 Administration Drive, Room 105A
Santa Rosa, California 95403
Telephone: (707) 565-2421
Facsimile: (707) 565-2624
joshua.myers@sonomacounty.gov

25

26

27

28

Complaint for Declaratory and Injunctive Relief                                           25-8330

1

2    Attorney for Plaintiff
     COUNTY OF SONOMA

3
     ROBERT H. PITTMAN
4    County Counsel

5    By:  /s/ Joshua A. Myers
          JOSHUA A. MYERS (SBN 250988), Chief Deputy
6         County Counsel
          County of Sonoma
7         575 Administration Drive, Room 105A
          Santa Rosa, California 95403
8         Telephone: (707) 565-2421
          Facsimile: (707) 565-2624
9         joshua.myers@sonomacounty.gov

10
     Attorney for Plaintiffs
11   SONOMA COUNTY WATER AGENCY, SONOMA
     VALLEY COUNTY SANITATION DISTRICT,
12   SONOMA COUNTY COMMUNITY
     DEVELOPMENT COMMISSION
13

14   *Application for Admission Pro Hac Vice Forthcoming

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint for Declaratory and Injunctive Relief                                    25-8330

**FILER'S ATTESTATION**

I, Tony LoPresti, am the ECF user whose identification and password are being used to file this Complaint for Declaratory and Injunctive Relief. Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that the other above-named signatories concur in this filing.

Complaint for Declaratory and Injunctive Relief                                    25-8330

# EXHIBIT A

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

The Fiscal Year (FY) 2025 Department of Homeland Security (DHS) Standard Terms and Conditions apply to all new federal awards of federal financial assistance (federal awards) for which the federal award date occurs in FY 2025 and flow down to subrecipients unless a term or condition specifically indicates otherwise. For federal continuation awards made in subsequent FYs, the FY 2025 DHS Standard Terms and Conditions apply unless otherwise specified in the terms and conditions of the continuation awards. The United States has the right to seek judicial enforcement of these terms and conditions.

All legislation and digital resources are referenced with no digital links. These FY 2025 DHS Standard Terms and Conditions are maintained on the DHS website at https://www.dhs.gov/publication/dhs-standard-terms-and-conditions.

## A. Assurance, Administrative Requirements, Cost Principles, Representations, and Certifications

    I.    Recipients must complete either the Office of Management and Budget (OMB) Standard Form 424B Assurances – Non- Construction Programs, or OMB Standard Form 424D Assurances – Construction Programs, as applicable. Certain assurances in these documents may not be applicable to your program and the DHS financial assistance office (DHS FAO) may require applicants to certify additional assurances. Applicants are required to fill out the assurances, as instructed.

## B. General Acknowledgements and Assurances Recipients are required to follow the applicable provisions of the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards in effect as of the federal award date and located in Title 2, Code of Federal Regulations, Part 200 and adopted by DHS at 2 C.F.R. § 3002.10.

All recipients and subrecipients must acknowledge and agree to provide DHS access to records, accounts, documents, information, facilities, and staff pursuant to 2 C.F.R. § 200.337.

    I.    Recipients must cooperate with any DHS compliance reviews or compliance investigations.

    II.    Recipients must give DHS access to examine and copy records, accounts, and other documents and sources of information related to the federal award and permit access to facilities and personnel.

    III.    Recipients must submit timely, complete, and accurate reports to the appropriate DHS officials and maintain appropriate backup documentation to support the reports.

    IV.    Recipients must comply with all other special reporting, data collection, and evaluation requirements required by law, federal regulation, Notice of Funding Opportunity, federal award specific terms and conditions, and/or DHS Component program guidance. Organization costs related to data and evaluation are allowable. The definition of data and evaluation costs is in 2 C.F.R. § 200.455(c), the full text of which is incorporated by reference.

    V.    Recipients must complete DHS Form 3095 within 60 days of receipt of the Notice of Award for the first award under which this term applies. For further instructions and to access the form, please visit: https://www.dhs.gov/civil-rightsresources-recipients-dhs-financial-assistance.

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

C. **Standard Terms & Conditions**

    I. <u>Acknowledgement of Federal Funding from DHS</u>

    Recipients must acknowledge their use of federal award funding when issuing statements, press releases, requests for proposal, bid invitations, and other documents describing projects or programs funded in whole or in part with federal award funds.

    II. <u>Activities Conducted Abroad</u>

    Recipients must coordinate with appropriate government authorities when performing project activities outside the United States obtain all appropriate licenses, permits, or approvals.

    III. <u>*Age Discrimination Act of 1975*</u>

    Recipients must comply with the requirements of the *Age Discrimination Act of 1975*, Pub. L. No. 94-135 (codified as amended at Title 42, U.S. Code § 6101 *et seq.*), which prohibits discrimination on the basis of age in any program or activity receiving federal financial assistance.

    IV. <u>*Americans with Disabilities Act of 1990*</u>

    Recipients must comply with the requirements of Titles I, II, and III of the *Americans with Disabilities Act*, Pub. L. No. 101-336 (1990) (codified as amended at 42 U.S.C. §§ 12101– 12213), which prohibits recipients from discriminating on the basis of disability in the operation of public entities, public and private transportation systems, places of public accommodation, and certain testing entities.

    V. <u>Best Practices for Collection and Use of Personally Identifiable Information</u>

    (1) Recipients who collect personally identifiable information (PII) as part of carrying out the scope of work under a federal award are required to have a publicly available privacy policy that describes standards on the usage and maintenance of the PII they collect.

    (2) Definition. DHS defines "PII" as any information that permits the identity of an individual to be directly or indirectly inferred, including any information that is linked or linkable to that individual. Recipients may also find the DHS Privacy Impact Assessments: Privacy Guidance and Privacy Template as useful resources respectively.

    VI. <u>*CHIPS and Science Act of 2022*, Public Law 117-167 CHIPS</u>

    (1) Recipients of DHS research and development (R&D) awards must report to the DHS Component research program office any finding or determination of sex based and sexual harassment and/or an administrative or disciplinary action taken against principal investigators or co-investigators to be completed by an authorized organizational representative (AOR) at the recipient institution.

    (2) Notification. An AOR must disclose the following information to agencies within 10 days of the date/the finding is made, or 10 days from when a recipient imposes an administrative action on the reported individual, whichever is sooner. Reports should include:

    (a) Award number,

    (b) Name of PI or Co-PI being reported,

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

    (c)  Awardee name,

    (d)  Awardee address,

    (e)  AOR name, title, phone, and email address,

    (f)  Indication of the report type:

      (i)    Finding or determination has been made that the reported individual violated awardee policies or codes of conduct, statutes, or regulations related to sexual harassment, sexual assault, or other forms of harassment, including the date that the finding was made.

      (ii)   Imposition of an administrative or disciplinary action by the recipient on the reporting individual related to a finding/determination or an investigation of an alleged violation of recipient policy or codes of conduct, statutes, or regulations, or other forms of harassment.

      (iii)  The date and nature of the administrative/disciplinary action, including a basic explanation or description of the event, which should not disclose personally identifiable information regarding any complaints or individuals involved. Any description provided must be consistent with the *Family Educational Rights in Privacy Act*.

(3) Definitions.

    (a)  An "authorized organizational representative (AOR)" is an administrative official who, on behalf of the proposing institution, is empowered to make certifications and representations and can commit the institution to the conduct of a project that an agency is being asked to support as well as adhere to various agency policies and award requirements.

    (b)  "Principal investigators and co-principal investigators" are award personnel supported by a grant, cooperative agreement, or contract under Federal law.

    (c)  A "reported individual" refers to recipient personnel who have been reported to a federal agency for potential sexual harassment violations.

    (d)  "Sex based harassment" means a form of sex discrimination and includes harassment based on sex, sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity.

    (e)  "Sexual harassment" means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when this conduct explicitly or implicitly affects an individual's employment, unreasonably interferes with an individual's work performance, or creates an intimidating, hostile, or offensive work environment, whether such activity is carried out by a supervisor or by a co-worker, volunteer, or contractor.

VII.   *Civil Rights Act of 1964 – Title VI*

Recipients must comply with the requirements of Title VI of the *Civil Rights Act of 1964*, Pub. L. No. 88-352 (codified as amended at 42 U.S.C. § 2000d *et seq.*), which provides that no person in the United States will, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. DHS

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

implementing regulations for the Act are found at 6 C.F.R. Part 21. Recipients of a federal award from the Federal Emergency Management Agency (FEMA) must also comply with FEMA's implementing regulations at 44 C.F.R. Part 7.

VIII. <u>*Civil Rights Act of 1968*</u>

Recipients must comply with Title VIII of the *Civil Rights Act of 1968*, Pub. L. No. 90284 (codified as amended at 42 U.S.C. § 3601 *et seq.*) which prohibits recipients from discriminating in the sale, rental, financing, and advertising of dwellings, or in the provision of services in connection. therewith, on the basis of race, color, national origin, religion, disability, familial status, and sex, as implemented by the U.S. Department of Housing and Urban Development at 24 C.F.R. Part 100. The prohibition on disability discrimination includes the requirement that new multifamily housing with four or more dwelling units— i.e., the public and common use areas and individual apartment units (all units in buildings with elevators and ground-floor units in buildings without elevators)—be designed and constructed with certain accessible features. (See 24 C.F.R. Part 100, Subpart D.)

IX. <u>Communication and Cooperation with the Department of Homeland Security and Immigration Officials</u>

(1) All recipients and other recipients of funds under this award must agree that they will comply with the following requirements related to coordination and cooperation with the Department of Homeland Security and immigration officials:

(a) They must comply with the requirements of 8 U.S.C. §§ 1373 and 1644. These statutes prohibit restrictions on information sharing by state and local government entities with DHS regarding the citizenship or immigration status, lawful or unlawful, of any individual. Additionally, 8 U.S.C. § 1373 prohibits any person or agency from prohibiting, or in any way restricting, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status of any individual: 1) sending such information to, or requesting or receiving such information from, Federal immigration officials; 2) maintaining such information; or 3) exchanging such information with any other Federal, State, or local government entity;

(b) They must comply with other relevant laws related to immigration, including prohibitions on encouraging or inducing an alien to come to, enter, or reside in the United States in violation of law, 8 U.S.C. § 1324(a)(1)(A)(iv), prohibitions on transporting or moving illegal aliens, 8 U.S.C. § 1324(a)(1)(A)(ii), prohibitions on harboring, concealing, or shielding from detection illegal aliens, 8 U.S.C. § 1324(a)(1)(A)(iii), and any applicable conspiracy, aiding or abetting, or attempt liability regarding these statutes;

(c) That they will honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer. A jurisdiction does not fail to comply with this requirement merely because it lacks the necessary resources to assist in a particular instance;

(d) That they will provide access to detainees, such as when an immigration officer seeks to interview a person who might be a removable alien; and

(e) That they will not leak or otherwise publicize the existence of an immigration enforcement operation.

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

(2) The recipient must certify under penalty of perjury pursuant to 28 U.S.C. § 1746 and using a form that is acceptable to DHS, that it will comply with the requirements of this term. Additionally, the recipient agrees that it will require any subrecipients or contractors to certify in the same manner that they will comply with this term prior to providing them with any funding under this award.

(3) The recipient agrees that compliance with this term is material to the Government's decision to make or continue with this award and that the Department of homeland Security may terminate this grant, or take any other allowable enforcement action, if the recipient fails to comply with this term.

X. <u>Copyright</u>

Recipients must affix the applicable copyright notices of 17 U.S.C. §§ 401 or 402 to any work first produced under federal awards and also include an acknowledgement that the work was produced under a federal award (including the federal award number and federal awarding agency). As detailed in 2 C.F.R. § 200.315, a federal awarding agency reserves a royalty-free, nonexclusive, and irrevocable right to reproduce, publish, or otherwise use the work for federal purposes and to authorize others to do so.

XI. <u>Debarment and Suspension</u>

Recipients must comply with the non-procurement debarment and suspension regulations implementing Executive Orders 12549 and 12689 set forth at 2 C.F.R. Part 180 as implemented by DHS at 2 C.F.R. Part 3000. These regulations prohibit recipients from entering into covered transactions (such as subawards and contracts) with certain parties that are debarred, suspended, or otherwise excluded from or ineligible for participation in federal assistance programs or activities.

XII. <u>Drug-Free Workplace Regulations</u>

Recipients must comply with drug-free workplace requirements in Subpart B (or Subpart C, if the recipient is an individual) of 2 C.F.R. Part 3001, which adopts the Government- wide implementation (2 C.F.R. Part 182) of the *Drug-Free Workplace Act of 1988* (41 U.S.C. §§ 8101-8106).

XIII. <u>Duplicative Costs</u>

Recipients are prohibited from charging any cost to this federal award that will be included as a cost or used to meet cost sharing requirements of any other federal award in either the current or a prior budget period. See 2 C.F.R. § 200.403(f). However, recipients may shift costs that are allowable under two or more federal awards where otherwise permitted by federal statutes, regulations, or the federal award terms and conditions.

XIV. <u>Education Amendments of 1972 (*Equal Opportunity in Education Act*) – Title IX</u>

Recipients must comply with the requirements of Title IX of the Education Amendments of 1972, Pub. L. No. 92-318 (codified as amended at 20 U.S.C. § 1681 *et seq.*), which provide that no person in the United States will, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving federal financial assistance. DHS implementing regulations are codified at 6 C.F.R. Part 17. Recipients of a federal award from the Federal Emergency Management Agency (FEMA) must also comply with FEMA's implementing regulations at 44 C.F.R. Part 19.

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

XV. *Energy Policy and Conservation Act*

Recipients must comply with the requirements of the *Energy Policy and Conservation Act*, Pub. L. No. 94-163 (1975) (codified as amended at 42 U.S.C. § 6201 *et seq.*), which contain policies relating to energy efficiency that are defined in the state energy conservation plan issued in compliance with this Act.

XVI. Equal Treatment of Faith-Based Organizations

It is DHS policy to ensure the equal treatment of faith-based organizations in social service programs administered or supported by DHS or its component agencies, enabling those organizations to participate in providing important social services to beneficiaries.

Recipients must comply with the equal treatment policies and requirements contained in 6 C.F.R. Part 19 and other applicable statutes, regulations, and guidance governing the participations of faith-based organizations in individual DHS programs.

XVII. Anti-Discrimination

Recipients must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of 31 U.S.C. § 372(b)(4).

(1) Definitions. As used in this clause –

(a) DEI means "diversity, equity, and inclusion."

(b) DEIA means "diversity, equity, inclusion, and accessibility."

(c) Discriminatory equity ideology has the meaning set forth in Section 2(b) of Executive Order 14190 of January 29, 2025.

(d) Federal anti-discrimination laws mean Federal civil rights law that protect individual Americans from discrimination on the basis of race, color, sex, religion, and national origin.

(e) Illegal immigrant means any alien, as defined in 8 U.S.C. § 1101(a)(3), who has no lawful immigration status in the United States.

(2) Grant award certification.

(a) By accepting the grant award, recipients are certifying that:

(i) They do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws; and

(ii) They do not engage in and will not during the term of this award engage in, a discriminatory prohibited boycott.

(iii) They do not, and will not during the term of this award, operate any program that benefits illegal immigrants or incentivizes illegal immigration.

(3) DHS reserves the right to suspend payments in whole or in part and/or terminate financial assistance awards if the Secretary of Homeland Security or her designee determines that the recipient has violated any provision of subsection (2)..

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

    (4) Upon suspension or termination under subsection (3), all funds received by the recipient shall be deemed to be in excess of the amount that the recipient is determined to be entitled to under the Federal award for purposes of 2 C.F.R. § 200.346. As such, all amounts received will constitute a debt to the Federal Government that may be pursued to the maximum extent permitted by law.

XVIII.    _False Claims Act_ and Program Fraud Civil Remedies

Recipients must comply with the requirements of the _False Claims Act_, 31 U.S.C. §§ 3729- 3733, which prohibit the submission of false or fraudulent claims for payment to the Federal Government. (See 31 U.S.C. §§ 3801-3812, which details the administrative remedies for false claims and statements made.)

XIX.    Federal Debt Status

All recipients are required to be non-delinquent in their repayment of any federal debt. Examples of relevant debt include delinquent payroll and other taxes, audit disallowances, and benefit overpayments. See OMB Circular A-129.

XX.    Federal Leadership on Reducing Text Messaging While Driving

Recipients are encouraged to adopt and enforce policies that ban text messaging while driving recipient-owned, recipient-rented, or privately owned vehicles when on official government business or when performing any work for or on behalf of the Federal Government. Recipients are also encouraged to conduct the initiatives of the type described in Section 3(a) of Executive Order 13513.

XXI.    _Fly America Act of 1974_

Recipients must comply with Preference for U.S. Flag Air Carriers (a list of certified air carriers can be found at: Certificated Air Carriers List | US Department of Transportation, https://www.transportation.gov/policy/aviation-policy/certificated-aircarriers-list)for international air transportation of people and property to the extent that such service is available, in accordance with the _International Air Transportation Fair Competitive Practices Act of 1974_, 49 U.S.C. § 40118, and the interpretative guidelines issued by the Comptroller General of the United States in the March 31, 1981, amendment to Comptroller General Decision B-138942.

XXII.    _Hotel and Motel Fire Safety Act of 1990_

Recipients must ensure that all conference, meeting, convention, or training space funded entirely or in part by federal award funds complies with the fire prevention and control guidelines of Section 6 of the _Hotel and Motel Fire Safety Act of 1990_, 15 U.S.C. § 2225a.

XXIII.    _John S. McCain National Defense Authorization Act of Fiscal Year 2019_

Recipients, subrecipients, and their contractors and subcontractors are subject to the prohibitions described in section 889 of the _John S. McCain National Defense Authorization Act for Fiscal Year 2019_, Pub. L. No. 115-232 (2018) and 2 C.F.R. §§ 200.216, 200.327, 200.471, and Appendix II to 2 C.F.R. Part 200. The statute – as it applies to DHS recipients, subrecipients, and their contractors and subcontractors – prohibits obligating or expending federal award funds on certain telecommunications and video surveillance products and contracting with certain entities for national security reasons.

XXIV.    Limited English Proficiency (_Civil Rights Act of 1964, Title VI_)

Recipients must comply with Title VI of the _Civil Rights Act of 1964_ (42 U.S.C. § 2000d _et seq._) prohibition against discrimination on the basis of national origin, which requires that recipients of federal financial assistance take reasonable steps

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

to provide meaningful access to persons with limited English proficiency (LEP) to their programs and services. For additional assistance and information regarding language access obligations, please refer to the DHS Recipient Guidance: https://www.dhs.gov/guidance-published-help- department-supported-organizationsprovide-meaningful-access-people-limited and additional resources on http://www.lep.gov.

XXV. <u>Lobbying Prohibitions</u>

Recipients must comply with 31 U.S.C. § 1352 and 6 C.F.R. Part 9, which provide that none of the funds provided under a federal award may be expended by the recipient to pay any person to influence, or attempt to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with any federal action related to a federal award or contract, including any extension, continuation, renewal, amendment, or modification. Per 6 C.F.R. Part 9, recipients must file a lobbying certification form as described in Appendix A to 6 C.F.R. Part 9 or available on Grants.gov as the Grants.gov Lobbying Form and file a lobbying disclosure form as described in Appendix B to 6 C.F.R. Part 9 or available on Grants.gov as the Disclosure of Lobbying Activities (SF-LLL).

XXVI. *National Environmental Policy Act*

Recipients must comply with the requirements of the *National Environmental Policy Act of 1969*,  Pub. L. No. 91-190 (1970) (codified as amended at 42 U.S.C. § 4321 *et seq.*) (NEPA) and the Council on Environmental Quality (CEQ) Regulations for Implementing the Procedural Provisions of NEPA, which require recipients to use all practicable means within their authority, and consistent with other essential considerations of national policy, to create and maintain conditions under which people and nature can exist in productive harmony and fulfill the social, economic, and other needs of present and future generations of Americans.

XXVII. <u>National Security Presidential Memorandum-33 (NSPM-33) and provisions of the CHIPS and Science Act of 2022, Pub. L. 117-167, Section 10254</u>

(1) Recipient research institutions ("covered institutions") must comply with the requirements in NSPM-33 and provisions of Pub. L.117-167, Section 10254 (codified at 42 U.S.C. § 18951) certifying that the institution has established and operates a research security program that includes elements relating to:

    (a) cybersecurity;

    (b) foreign travel security;

    (c) research security training; and

    (d) export control training, as appropriate.

(2) Definition. "Covered institutions" means recipient research institutions receiving federal Research and Development (R&D) science and engineering support "in excess of $50 million per year."

XXVIII. <u>Non-Supplanting Requirement</u>

Recipients of federal awards under programs that prohibit supplanting by law must ensure that federal funds supplement but do not supplant non-federal funds that, in the absence of such federal funds, would otherwise have been made available for the same purpose.

XXIX. <u>Notice of Funding Opportunity Requirements</u>

All the instructions, guidance, limitations, scope of work, and other conditions set forth in the Notice of Funding Opportunity (NOFO) for this federal award are incorporated

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

by reference. All recipients must comply with any such requirements set forth in the NOFO. If a condition of the NOFO is inconsistent with these terms and conditions and any such terms of the federal award, the condition in the NOFO shall be invalid to the extent of the inconsistency. The remainder of that condition and all other conditions set forth in the NOFO shall remain in effect.

XXX.  Patents and Intellectual Property Rights

Recipients are subject to the *Bayh-Dole Act*, 35 U.S.C. § 200 *et seq.* and applicable regulations governing inventions and patents, including the regulations issued by the Department of Commerce at 37 C.F.R. Part 401 (Rights to Inventions Made by Nonprofit Organizations and Small Business Firms under Government Awards, Contracts, and Cooperative Agreements) and the standard patent rights clause set forth at 37 C.F.R. § 401.14.

XXXI.  Presidential Executive Orders

Recipients must comply with the requirements of Presidential Executive Orders related to grants (also known as federal assistance and financial assistance), the full text of which are incorporated by reference.

XXXII.  Procurement of Recovered Materials

States, political subdivisions of states, and their contractors must comply with Section 6002 of the *Solid Waste Disposal Act*, Pub. L. No. 89-272 (1965) (codified as amended by the *Resource Conservation and Recovery Act* at 42 U.S.C. § 6962) and 2 C.F.R. § 200.323. The requirements of Section 6002 include procuring only items designated in guidelines of the Environmental Protection Agency (EPA) at 40 C.F.R. Part 247 that contain the highest percentage of recovered materials practicable, consistent with maintaining a satisfactory level of competition.

*XXXIII.*  *Rehabilitation Act of 1973*

Recipients must comply with the requirements of Section 504 of the *Rehabilitation Act of 1973*, Pub. L. No. 93-112 (codified as amended at 29 U.S.C. § 794), which provides that no otherwise qualified handicapped individuals in the United States will, solely by reason of the handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.

XXXIV.  Reporting Recipient Integrity and Performance Matters

If the total value of any currently active grants, cooperative agreements, and procurement contracts from all federal awarding agencies exceeds $10,000,000 for any period of time during the period of performance of the federal award, then the recipient must comply with the requirements set forth in the government-wide federal award term and condition for Recipient Integrity and Performance Matters is in 2 C.F.R. Part 200, Appendix XII, the full text of which is incorporated by reference.

XXXV.  Reporting Subawards and Executive Compensation

For federal awards that total or exceed $30,000, recipients are required to comply with the requirements set forth in the government-wide federal award term and condition on Reporting Subawards and Executive Compensation set forth at 2 C.F.R. Part 170, Appendix A, the full text of which is incorporated by reference.

XXXVI.  Required Use of American Iron, Steel, Manufactured Products, and Construction Materials

(1) Recipients of a federal award from a financial assistance program that provides funding for infrastructure are hereby notified that none of the funds provided under this federal award may be used for a project for infrastructure unless:

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

(a) all iron and steel used in the project are produced in the United States—this means all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States;

(b) all manufactured products used in the project are produced in the United States—this means the manufactured product was manufactured in the United States; and the cost of the components of the manufactured product that are mined, produced, or manufactured in the United States is greater than 55 percent of the total cost of all components of the manufactured product, unless another standard for determining the minimum amount of domestic content of the manufactured product has been established under applicable law or regulation; and

(c) all construction materials are manufactured in the United States—this means that all manufacturing processes for the construction material occurred in the United States.

(2) The Buy America preference only applies to articles, materials, and supplies that are consumed in, incorporated into, or affixed to an infrastructure project. As such, it does not apply to tools, equipment, and supplies, such as temporary scaffolding, brought to the construction site and removed at or before the completion of the infrastructure project. Nor does a Buy America preference apply to equipment and furnishings, such as movable chairs, desks, and portable computer equipment, that are used at or within the finished infrastructure project but are not an integral part of the structure or permanently affixed to the infrastructure project.

(3) *Waivers*

When necessary, recipients may apply for, and the agency may grant, a waiver from these requirements. The agency should notify the recipient for information on the process for requesting a waiver from these requirements.

(a) When the Federal agency has determined that one of the following exceptions applies, the federal awarding official may waive the application of the domestic content procurement preference in any case in which the agency determines that:

(i) applying the domestic content procurement preference would be inconsistent with the public interest;

(ii) the types of iron, steel, manufactured products, or construction materials are not produced in the United States in sufficient and reasonably available quantities or of a satisfactory quality; or

(iii) the inclusion of iron, steel, manufactured products, or construction materials produced in the United States will increase the cost of the overall project by more than 25 percent.

(b) A request to waive the application of the domestic content procurement preference must be in writing. The agency will provide instructions on the format, contents, and supporting materials required for any waiver request. Waiver requests are subject to public comment periods of no less than 15 days and must be reviewed by the Made in America Office.

(c) There may be instances where a federal award qualifies, in whole or in part, for an existing waiver described at "Buy America" Preference in FEMA Financial Assistance Programs for Infrastructure | FEMA.gov.

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

(4) *Definitions*. The definitions applicable to this term are set forth at 2 C.F.R. § 184.3, the full text of which is incorporated by reference.

XXXVII.  SAFECOM

Recipients receiving federal awards made under programs that provide emergency communication equipment and its related activities must comply with the SAFECOM Guidance for Emergency Communication Grants, including provisions on technical standards that ensure and enhance interoperable communications. The SAFECOM Guidance is updated annually and can be found at Funding and Sustainment | CISA.

XXXVIII.  Subrecipient Monitoring and Management

Pass-through entities must comply with the requirements for subrecipient monitoring and management as set forth in 2 C.F.R. §§ 200.331-333.

XXXIX.  System for Award Management and Unique Entity Identifier Requirements

Recipients are required to comply with the requirements set forth in the governmentwide federal award term and condition regarding the System for Award Management and Unique Entity Identifier Requirements in 2 C.F.R. Part 25, Appendix A, the full text of which is incorporated reference.

XL.  Termination of a Federal Award

(1) By DHS. DHS may terminate a federal award, in whole or in part, for the following reasons:

    (a) If the recipient fails to comply with the terms and conditions of the federal award;

    (b) With the consent of the recipient, in which case the parties must agree upon the termination conditions, including the effective date, and in the case of partial termination, the portion to be terminated; or

    (c) Pursuant to the terms and conditions of the federal award, including, to the extent authorized by law, if the federal award no longer effectuates the program goals or agency priorities.

(3) By the Recipient. The recipient may terminate the federal award, in whole or in part, by sending written notification to DHS stating the reasons for such termination, the effective date, and in the case of partial termination, the portion to be terminated. However, if DHS determines that the remaining portion of the federal award will not accomplish the purposes for which the federal award was made, DHS may terminate the federal award in its entirety.

(4) Notice. Either party will provide written notice of intent to terminate for any reason to the other party no less than 30 calendar days prior to the effective date of the termination.

(5) Compliance with Closeout Requirements for Terminated Awards. The recipient must continue to comply with closeout requirements in 2 C.F.R. §§ 200.344200.345 after an award is terminated.

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

XLI.   Terrorist Financing

Recipients must comply with Executive Order 13224 and applicable statutory prohibitions on transactions with, and the provisions of resources and support to, individuals and organizations associated with terrorism. Recipients are legally responsible for ensuring compliance with the Executive Order and laws.

XLII.   Trafficking Victims Protection Act of 2000(TVPA)

Recipients must comply with the requirements of the government-wide federal award term and condition which implements Trafficking Victims Protection Act of 2000, Pub. L. No. 106-386, § 106 (codified as amended at 22 U.S.C. § 7104). The federal award term and condition is in 2 C.F.R. § 175.105, the full text of which is incorporated by reference.

XLIII.   *Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001*, Pub. L. 107-56

Recipients must comply with the requirements of Pub. L. 107-56, Section 817 of the USA PATRIOT Act, which amends 18 U.S.C. §§ 175–175c.

XLIV.   Use of DHS Seal, Logo and Flags

Recipients must obtain written permission from DHS prior to using the DHS seals, logos, crests, or reproductions of flags, or likenesses of DHS agency officials. This includes use of DHS component (e.g., FEMA, CISA, etc.) seals, logos, crests, or reproductions of flags, or likenesses of component officials.

XLV.   *Whistleblower Protection Act*

Recipients must comply with the statutory requirements for whistleblower protections in 10 U.S.C § 470141 U.S.C. § 4712.

# EXHIBIT 2

DAVID CHIU, SBN 189542
City Attorney
YVONNE R. MERÉ, SBN 175394
Chief Deputy City Attorney
MOLLIE M. LEE, SBN 251404
Chief of Strategic Advocacy
SARA J. EISENBERG, SBN 269303
Chief of Complex and Affirmative Litigation
NANCY E. HARRIS, SBN 197042
KARUN A. TILAK, SBN 323939
Deputy City Attorneys
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, CA  94102-5408
Telephone:     (415) 355-3308
Facsimile:      (415) 437-4644
E-Mail:          karun.tilak@sfcityatty.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

TONY LOPRESTI, SBN 289269
County Counsel
KAVITA NARAYAN, SBN 264191
Chief Assistant County Counsel
MEREDITH A. JOHNSON, SBN 291018
Lead Deputy County Counsel
STEFANIE L. WILSON, SBN 314899
RAJIV NARAYAN, SBN 334511
Deputy County Counsels
BILL NGUYEN, SBN 333671
Litigation Fellow
70 W. Hedding Street, East Wing, 9th Floor
San José, CA 95110
Telephone:     (408) 299-5900
Facsimile:      (408) 292-7240
E-Mail:          bill.nguyen@cco.sccgov.org

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

*[additional counsel on signature page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, COUNTY OF SANTA CLARA, CITY OF PORTLAND, MARTIN LUTHER KING, JR. COUNTY, CITY OF NEW HAVEN, CITY OF OAKLAND, CITY OF EMERYVILLE, CITY OF SAN JOSÉ, CITY OF SAN DIEGO, CITY OF SACRAMENTO, CITY OF SANTA CRUZ, COUNTY OF MONTEREY, CITY OF SEATTLE, CITY OF MINNEAPOLIS, CITY OF ST. PAUL, CITY OF SANTA FE, COUNTY OF ALAMEDA, CITY OF ALBANY, CITY OF ALBUQUERQUE, COUNTY OF ALLEGHENY, CITY OF BALTIMORE, CITY OF BEND, CITY OF BENICIA, CITY OF BERKELEY, CITY OF BOSTON, CITY OF CAMBRIDGE, CITY OF CATHEDRAL CITY, CITY OF CHICAGO, CITY OF COLUMBUS, CITY OF CULVER CITY, COUNTY OF DANE, CITY AND COUNTY OF DENVER, CITY OF HEALDSBURG, COUNTY OF HENNEPIN, CITY OF LOS ANGELES, COUNTY OF MARIN, CITY OF MENLO PARK, MULTNOMAH COUNTY, CITY OF PACIFICA, CITY OF PALO ALTO, CITY OF PETALUMA, PIERCE COUNTY, CITY OF RICHMOND, CITY OF ROCHESTER, CITY OF ROHNERT PARK, COUNTY OF SAN | Case No. 25-CV-01350-WHO  **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

MATEO, CITY OF SANTA ROSA, COUNTY
OF SONOMA, CITY OF WATSONVILLE,
CITY OF WILSONVILLE,

      Plaintiffs,

      vs.

DONALD J. TRUMP, President of the United
States, UNITED STATES OF AMERICA,
PAMELA BONDI, Attorney General of the
United States, EMIL BOVE, Acting Deputy
Attorney General, UNITED STATES
DEPARTMENT OF JUSTICE, KRISTI NOEM,
Secretary of United States Department of
Homeland Security, UNITED STATES
DEPARTMENT OF HOMELAND SECURITY,
RUSSELL VOUGHT, Director of United States
Office of Management and Budget, UNITED
STATES OFFICE OF MANAGEMENT AND
BUDGET, DOES 1-100,

      Defendants.

## INTRODUCTION

1. Defendant President Donald J. Trump is intent on ignoring the rule of law and punishing all who would disagree with him. In his new Administration, the President is again trampling established law limiting the extent of federal power over state and local governments. He appears emboldened to do what the courts thwarted him from doing before and penalize "sanctuary jurisdictions" that do not bend to his will. This action seeks to check this abuse of power.

2. During his first term in office, President Trump sought to force local authorities to carry out federal civil immigration efforts. In January 2017, he issued Executive Order 13,768, which directed his Administration to withhold funds from and pursue enforcement actions against so-called "sanctuary jurisdictions" that limit local entanglement with federal immigration authorities. Federal courts, including this Court and the Ninth Circuit, roundly rejected these efforts as a blatantly unconstitutional usurpation of legislative authority. *See, e.g.*, *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. Apr. 25, 2017); *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225 (9th Cir. 2018). President Trump's Department of Justice ("DOJ") also tried to condition various DOJ funds on local jurisdictions' agreement to enforce federal immigration law. Again, federal courts, including this Court and the Ninth Circuit, struck down these funding restrictions. *See City & Cnty. of S.F. v.*

*Sessions*, 349 F. Supp. 3d 924 (N.D. Cal. 2018); *City & Cnty. of S.F. v. Barr*, 965 F.3d 753 (9th Cir. 2020).

3. Undaunted by court rulings holding these efforts blatantly illegal, President Trump renewed his assault on these jurisdictions immediately upon taking office for a second term. On the same day he was inaugurated, he issued an Executive Order that purports to reinstate Executive Order 13,768. He then underscored his intent to punish jurisdictions that do not enforce his immigration policy priorities by issuing a second Executive Order, No. 14,159. That order returns to his 2017 playbook by directing Defendant Attorney General Pam Bondi and Defendant Department of Homeland Security ("DHS") Secretary Kristi Noem to withhold all federal funds from jurisdictions that refuse to use their local resources to carry out his immigration agenda. Even since the filing of this lawsuit, President Trump has issued two more punitive Executive Orders: No. 14,218, which targets such jurisdictions by directing all executive departments and agencies to ensure that "Federal payments to States and localities do not . . . abet so-called 'sanctuary' policies," and No. 14,287, which directs all executive departments and agencies "in coordination with the Director of the Office of Management and Budget" to "identify appropriate Federal funds to sanctuary jurisdictions, including grants and contracts, for suspension or termination."

4. His administration has doubled down on these tactics, with Defendant Bondi issuing a memo on February 5, 2025 ("Bondi Directive"), stating DOJ's position that "State and local jurisdictions must comply with applicable immigration-related federal laws" and "state and local actors may not . . . fail to comply with lawful immigration-related directives." The Bondi Directive threatens not only termination of funding but also civil and criminal prosecution of any jurisdiction that refuses to comply.

5. Bondi and DOJ have made good on these threats, filing lawsuits against states and localities with policies limiting local cooperation with federal immigration enforcement and asserting an unprecedented and unlawful interpretation of the federal government's authority to commandeer local government resources.

6. Defendant Noem has followed suit, issuing a memo on February 19, 2025 ("Noem Directive"), directing components of DHS to "cease providing federal funding to sanctuary

jurisdictions" and to make criminal referrals to DOJ. The Federal Emergency Management Agency ("FEMA"), a component of DHS, subsequently recommended that "conditions or restrictions" related to "sanctuary" jurisdictions be placed on "all <u>open</u> and <u>future</u> awards" for several grant programs that fund critical emergency-preparedness activities. Secretary Noem approved that recommendation on March 25, 2025.

7.      DHS has further affirmed this Administration's commitment to ending "sanctuary" jurisdictions by issuing terms and conditions that target them ("DHS Standard Terms"). The DHS Standard Terms, issued on March 27, 2025, and then most recently updated on April 18, 2025, and applicable to "all new federal awards" for Fiscal Year 2025, mandate that award recipients agree to almost a full page of immigration enforcement–related conditions, including that they will "honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer" and will "provide access to detainees" in local custody.

8.      In flagrant disregard of the law, President Trump seeks once again to punish those who disagree with him, coerce local authorities, and commandeer them into carrying out his agenda. President Trump is aided in these efforts by Defendants DOJ, DHS, Bondi, Bove, and Noem.

9.      His actions fly in the face of foundational constitutional principles. They violate plain statutory language and numerous court orders. And they force local governments that have made deliberate decisions about how to make their communities safer and where to spend their own resources into an impossible choice—to relinquish their autonomy and independence and abandon their valid laws and policies, or face the sudden and devastating loss of federal funding and civil and criminal enforcement actions.

10.     By this action, Plaintiffs challenge each of these related Executive actions. President Trump's Executive Orders 14,159, 14,218, and 14,287; the Bondi Directive; and the Noem Directive violate the Tenth Amendment, Separation of Powers, the Spending Clause, and the Due Process Clause. The Bondi Directive and the Noem Directive are additionally unlawful because they are arbitrary and capricious, contrary to constitutional rights, and issued in excess of DOJ's and DHS's statutory jurisdiction.

11.     Plaintiffs are cities and counties spread across the country that are collectively home to close to 29 million residents. Plaintiffs have diverse populations and vibrant immigrant communities. Plaintiffs have each made the choice, protected by the Tenth Amendment to the United States Constitution, to ensure that their local resources are dedicated to serving all residents of their communities, and that these services can be accessed by all residents without fear of immigration consequences. To achieve these goals, Plaintiffs have enacted laws and policies that limit the use of local resources to enforce or administer federal civil immigration law.

12.     Plaintiffs are not going to stand in the way of lawful federal immigration enforcement. But neither are they going to be bullied into abandoning their laws that have made their communities safer or doing what the federal government cannot compel them to do—actively assist the federal government in enforcing federal immigration laws.

13.     For all of these reasons, as detailed below, Plaintiffs respectfully request the court to declare that these Executive actions are unlawful and to enjoin Defendants from enforcing the challenged provisions of the Executive Orders, the Bondi Directive, the Noem Directive, and actions taken to implement those provisions and memos.

## JURISDICTION AND VENUE

14.     The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202 *et seq.*

15.     Venue properly lies within the Northern District of California because Plaintiffs City & County of San Francisco and County of Santa Clara reside in this judicial district and a substantial part of the events or omissions giving rise to this action occurred in this district. 28 U.S.C. §1391(e)(1).

## INTRA-DISTRICT ASSIGNMENT

16.     Assignment to the San Francisco Division of this District is proper pursuant to Civil Local Rule 3-2(c)-(d) because a substantial part of the acts or omissions that give rise to this action occurred in the City and County of San Francisco.

## PARTIES

17.     Plaintiff the City and County of San Francisco ("San Francisco") is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city and county.

18.     Plaintiff the County of Santa Clara ("Santa Clara") is a charter county and political subdivision of the State of California.

19.     Plaintiff the City of Portland ("Portland") is a municipal corporation of the State of Oregon duly organized and existing under the laws of the State of Oregon.

20.     Plaintiff Martin Luther King, Jr. County ("King County") is a home rule charter county organized and existing under and by virtue of the constitution and laws of the State of Washington.

21.     Plaintiff the City of New Haven ("New Haven") is a municipal corporation organized and existing under the laws of the State of Connecticut.

22.     Plaintiff the City of Oakland ("Oakland") is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city.

23.     Plaintiff the City of Emeryville ("Emeryville") is a municipal corporation organized and existing under and by virtue of the laws of the State of California. It is a general law city except for municipal revenue purposes, including taxation and assessment, for which it has charter city authority.

24.     Plaintiff the City of San José ("San José") is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city.

25.     Plaintiff the City of San Diego ("San Diego") is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city.

26.     Plaintiff the City of Sacramento ("Sacramento") is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city.

27.     Plaintiff the City of Santa Cruz ("Santa Cruz") is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city.

28.     Plaintiff the County of Monterey ("Monterey") is a general law county and political subdivision of the State of California.

29.     Plaintiff the City of Seattle ("Seattle") is a municipal corporation and first-class charter city organized and existing under the laws of the State of Washington.

30.     Plaintiff the City of Minneapolis ("Minneapolis") is a municipal corporation organized and existing under and by virtue of the laws of the State of Minnesota. It is a home rule charter city.

31.     Plaintiff the City of Saint Paul ("Saint Paul") is a municipal corporation organized and existing under and by virtue of the laws of the State of Minnesota. It is a charter city.

32.     Plaintiff the City of Santa Fe ("Santa Fe") is a municipal corporation and charter city organized under the laws of the State of New Mexico.

33.     Plaintiff the County of Alameda ("Alameda County") is a charter county and political subdivision of the State of California.

34.     Plaintiff the City of Albany ("Albany") is a municipal corporation incorporated and acting according to the laws of the State of New York.

35.     Plaintiff the City of Albuquerque ("Albuquerque") is a municipal corporation and charter city organized under the laws of the State of New Mexico.

36.     Plaintiff the County of Allegheny ("Allegheny County") is a home rule charter county organized under the laws of the Commonwealth of Pennsylvania.

37.     Plaintiff the City of Baltimore ("Baltimore") is a home rule jurisdiction created under the laws of the State of Maryland.

38.     Plaintiff the City of Benicia ("Benicia") is a municipal corporation, general law city, organized under the laws of the State of California.

39.     Plaintiff the City of Bend ("Bend") is a municipal corporation with a home-rule all-powers charter under the laws of the State of Oregon.

40.     Plaintiff the City of Berkeley ("Berkeley") is a municipal corporation and charter city organized and existing under the laws of the State of California.

41.     Plaintiff the City of Boston ("Boston") is a municipal corporation organized under the laws of the Commonwealth of Massachusetts.

42.     Plaintiff the City of Cambridge ("Cambridge") is a municipal corporation organized and existing under the laws of the Commonwealth of Massachusetts.

43.     Plaintiff the City of Cathedral City ("Cathedral City") is a municipal corporation and home rule charter city organized and existing under the laws of the State of California.

44.     Plaintiff the City of Chicago ("Chicago") is a municipal corporation and home rule unit organized and existing under the constitution and laws of the State of Illinois.

45.     Plaintiff the City of Columbus ("Columbus") is a municipal corporation and home rule charter city organized under the laws of the State of Ohio.

46.     Plaintiff Culver City is a charter city and a municipal corporation organized and existing under the Constitution and laws of the State of California.

47.     Plaintiff the County of Dane ("Dane County") is a quasi-municipal corporation organized and operating under the laws of the State of Wisconsin.

48.     Plaintiff the City and County of Denver ("Denver") is a home rule city and county organized pursuant to the laws of the State of Colorado.

49.     Plaintiff the City of Healdsburg ("Healdsburg") is a municipal corporation and general law city organized under the laws of the State of California.

50.     Plaintiff the County of Hennepin ("Hennepin County") is a political subdivision of the State of Minnesota.

51.     Plaintiff the City of Los Angeles is a municipal corporation and charter city organized and existing under the Constitution and laws of the State of California.

52.     Plaintiff the County of Marin ("Marin County") is a general law county and political subdivision of the State of California organized under the laws of the State of California.

53.     Plaintiff the City of Menlo Park ("Menlo Park") is a municipal corporation and general law city organized under the laws of the State of California.

54.     Plaintiff Multnomah County is a political subdivision of the State of Oregon and a home rule county organized under the laws of the State of Oregon.

55.     Plaintiff the City of Pacifica ("Pacifica") is a municipal corporation and general law city organized under the laws of the State of California.

56.     Plaintiff the City of Palo Alto ("Palo Alto") is a municipal corporation and charter city organized under the laws of the State of California.

57.     Plaintiff the City of Petaluma ("Petaluma") is a municipal corporation and charter city existing under the laws of the State of California.

58.     Plaintiff Pierce County ("Pierce County") is a home rule charter county organized and existing under and by virtue of the constitution and laws of the State of Washington.

59.     Plaintiff the City of Richmond ("Richmond") is a charter city and municipal corporation organized and existing under and by virtue of the laws of the State of California.

60.     Plaintiff the City of Rochester ("Rochester") is a municipal entity organized and existing under and by virtue of the laws of the State of New York.

61.     Plaintiff the City of Rohnert Park ("Rohnert Park") is a municipal corporation and general law city organized and existing under and by virtue of the laws of the State of California.

62.     Plaintiff the County of San Mateo ("San Mateo County") is a charter county and a political subdivision of the State of California.

63.     Plaintiff the City of Santa Rosa ("Santa Rosa") is a municipal corporation and charter city organized under the laws of the State of California.

64.     Plaintiff the County of Sonoma ("Sonoma County") is a general law county and a political subdivision of the State of California, organized under the laws of the State of California.

65.     Plaintiff the City of Watsonville ("Watsonville") is a municipal corporation and general law city organized under and by virtue of the laws of the State of California.

66.     Plaintiff the City of Wilsonville ("Wilsonville") is a municipal corporation of the State of Oregon organized under the laws of the State of Oregon.

67.     Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity.

68.     Defendant United States of America is sued under 28 U.S.C. § 1346.

69.     Defendant United States Department of Justice ("DOJ") is an executive department of the United States federal government. 28 U.S.C. § 501. DOJ is responsible for the governmental actions at issue in this lawsuit.

70.     Defendant Pamela Bondi is the Attorney General of the United States, the highest-ranking official in DOJ, and is responsible for the decisions of DOJ. She is sued in her official capacity.

71.     Defendant Emil Bove is the Acting Deputy Attorney General, the second-ranking official within DOJ, and is therefore responsible for the decisions of DOJ. He is sued in his official capacity.

72.     Defendant United States Department of Homeland Security ("DHS") is an executive department of the United States federal government. 6 U.S.C. § 111. DHS is responsible for enacting some of the governmental actions at issue in this lawsuit.

73.     Defendant Kristi Noem is the Secretary of Homeland Security, the highest-ranking official in DHS, and is responsible for the decisions of DHS. She is sued in her official capacity.

74.     Defendant United States Office of Management and Budget ("OMB") is an executive office of the United States federal government. 31 U.S.C. § 501. OMB is responsible for enacting some of the governmental actions at issue in this lawsuit.

75.     Defendant Russell Vought is the Director of OMB, the highest-ranking official in OMB, and is responsible for the decisions of OMB. He is sued in his official capacity.

76.     Doe 1 through Doe 100 are sued under fictitious names. Plaintiffs do not now know the true names or capacities of said Defendants, who were responsible for the alleged violations, but pray that the same may be alleged in this complaint when ascertained.

## FACTUAL ALLEGATIONS

### I.     Plaintiffs' Laws and Policies

77.     Plaintiffs have each made the lawful decision to limit the use of their local resources to assist with federal civil immigration enforcement. In general, these laws and policies limit cooperation with U.S. Immigration & Customs Enforcement ("ICE") and other immigration enforcement authorities with respect to civil immigration detainer requests and administrative warrants, the sharing of confidential personal information (such as contact information) of individuals served by local officials, the sharing with ICE of release dates of individuals in local custody, and the collection of immigration or citizenship information about communities served by local officials.

78.     These local policy choices are not designed to, and do not, interfere with federal law enforcement, but instead ensure that all residents of Plaintiffs' communities—regardless of immigration status—feel safe reporting crimes, going to schools, seeking medical care, and accessing critical public services.

79.     These local policies also preserve scarce local resources. For example, a civil immigration detainer request is distinct from a criminal warrant, which Plaintiffs honor. A detainer request is not issued by a judge based on a finding of probable cause. It is simply a request by ICE that a state or local law enforcement agency hold individuals after their release date to provide ICE agents extra time to decide whether to take those individuals into federal custody and then deport them. Complying with detainer requests requires municipalities to commit scarce law enforcement personnel and resources to track and respond to requests, detain individuals in holding cells, and supervise and feed individuals during the prolonged detention. And the federal government has made clear that the local agency bears the financial burden of the detention, providing that "[n]o detainer issued as a result of a determination made under this chapter . . . shall incur any fiscal obligation on the part of the Department." 8 C.F.R. § 287.7(e).

80.     Further, courts have held that complying with civil immigration detainer requests, in the absence of a probable cause determination, violates the Fourth Amendment to the United States Constitution and could subject Plaintiffs to civil liability. *See Hernandez v. United States*, 939 F.3d 191, 200–01 (2nd Cir. 2019); *Morales v. Chadbourne*, 793 F.3d 208, 217 (1st Cir. 2015); *Miranda-Olivares v. Clackamas Cnty.*, No. 12-cv-02317-ST, 2014 WL 1414305, at *9 (D. Or. Apr. 11, 2014); *see also Melendres v. Arpaio*, 695 F.3d 990, 1000–01 (9th Cir. 2012) (applying the Fourth Amendment to immigration arrests).

81.     While "sanctuary" is not a legally defined term—and several Plaintiffs do not use the term "sanctuary" to describe their policies or consider themselves to be "sanctuary jurisdictions"—Defendants have characterized all jurisdictions with policies like those adopted by Plaintiffs to be so-called "sanctuary jurisdictions."

**A.    San Francisco**

82.    San Francisco has designated itself a Sanctuary City since 1989. In the 1980s, thousands of Central American refugees fled their countries in the midst of violent civil wars to seek legal protection in the United States. Against the backdrop of this humanitarian crisis, San Francisco began enacting the ordinances that, as later amended, make up San Francisco's Sanctuary City laws.

83.    Today, San Francisco's body of Sanctuary City law is contained in two chapters of San Francisco's Administrative Code: Chapters 12H and 12I. Importantly, these chapters do not shield criminals or prevent individuals from being prosecuted for illegal acts. Instead, they protect children by ensuring that their parents feel safe taking them to playgrounds, to schools, and to hospitals. They support family stability and community engagement. And they protect the safety and health of all residents of San Francisco by helping to ensure that everyone, including undocumented immigrants, feels safe reporting crimes, cooperating with police investigations, and seeking medical care.

84.    San Francisco Administrative Code Chapter 12H prohibits San Francisco departments, agencies, commissions, officers, and employees from using San Francisco funds or resources to assist in the enforcement of Federal immigration law or to gather or disseminate information regarding the release status, or other confidential identifying information, of an individual unless such assistance is required by Federal or state law.

85.    San Francisco Administrative Code Chapter 12I prohibits San Francisco law enforcement officials from detaining an individual who is otherwise eligible for release from custody on the basis of a civil immigration detainer request issued by the Federal government.

86.    Chapter 12I also prohibits San Francisco law enforcement officials from responding to a federal immigration officer's request for advance notification of the date and time an individual in San Francisco's custody is being released, unless the individual in question meets certain criteria. *See* S.F. Admin. Code § 12I.3(c), (d).

87.    Finally, as relevant here, Chapter 12I provides that "[l]aw enforcement officials shall not arrest or detain an individual, or provide any individual's personal information to a federal immigration officer, on the basis of an administrative warrant, prior deportation order, or other civil immigration document based solely on alleged violations of the civil provisions of immigration laws."

*See* Section 12I.3(e). "Personal information" is defined as "any confidential, identifying information about an individual, including, but not limited to, home or work contact information, and family or emergency contact information." *See* Section 12I.2.

88.     San Francisco's Sanctuary City laws arise from San Francisco's commitment and responsibility to ensure public safety and welfare. The Board of Supervisors, as San Francisco's legislative body, found that public safety is "founded on trust and cooperation of community residents and local law enforcement." Section 12I.1. Citing a study by the University of Illinois, which found that at least 40% of Latinos surveyed were less likely to provide information to police because they feared exposing themselves, family, or friends to a risk of deportation, the Board stated that "civil immigration detainers and notifications regarding release undermine community trust of law enforcement by instilling fear in immigrant communities of coming forward to report crimes and cooperate with local law enforcement agencies." *Id*.; *see also id*. ("The City has enacted numerous laws and policies to strengthen communities and to build trust between communities and local law enforcement. Local cooperation and assistance with civil immigration enforcement undermines community policing strategies.").

89.     The legislative findings set forth in Chapter 12I evidence the legitimate local purpose of San Francisco's Sanctuary City laws. For example, the Board declared:

> Fostering a relationship of trust, respect, and open communication between City employees and City residents is essential to the City's core mission of ensuring public health, safety, and welfare, and serving the needs of everyone in the community, including immigrants. The purpose of this Chapter 12I, as well as of Administrative Code Chapter 12H, is to foster respect and trust between law enforcement and residents, to protect limited local resources, to encourage cooperation between residents and City officials, including especially law enforcement and public health officers and employees, and to ensure community security, and due process for all. (*See* Section 12I.2.)

90.     The Board of Supervisors also had a public health purpose for its decision to restrict disclosure of confidential information: "To carry out public health programs, the City must be able to reliably collect confidential information from all residents . . . . Information gathering and cooperation may be jeopardized if release of personal information results in a person being taken into immigration custody." Section 12I.1.

---

13     n:\exlit\li2025\250739\01860447.docx

91.     Finally, the Board of Supervisors determined that enforcing immigration detainer requests would require San Francisco to redirect scarce local law enforcement personnel and resources—noting that the costs of "responding to a civil immigration detainer can include, but [are] not limited to, extended detention time, the administrative costs of tracking and responding to detainers, and the legal liability for erroneously holding an individual who is not subject to a civil immigration detainer." Section 12I.1. In short, the Board of Supervisors concluded that "[c]ompliance with civil immigration detainers and involvement in civil immigration enforcement diverts limited local resources from programs that are beneficial to the City." *Id*.

92.     San Francisco departments have adopted and implemented policies consistent with Chapters 12H and 12I.

**B.     Santa Clara**

93.     Plaintiff Santa Clara is home to one of the largest and most diverse populations in the United States. With nearly two million residents, Santa Clara is the sixth largest county in California and more populous than twelve states. More than 40 percent—numbering upwards of 750,000—of Santa Clara's residents are foreign-born. This is the highest percentage of any county in California and one of the highest of any county nationally. Santa Clara's foreign-born population includes naturalized citizens; lawful permanent residents; refugees, asylees, student- and work-visa holders; victims of human trafficking or other crimes who have assisted law enforcement and hold T or U visas; and residents who lack lawful immigration status.

94.     Santa Clara is governed by an elected Board of Supervisors, which has repeatedly expressed its position that fostering a relationship of trust, respect, and open communication between and among Santa Clara officials and community members is critical to successfully achieving Santa Clara's mission of protecting community health and wellbeing and ensuring public safety.

95.     Santa Clara's elected Sheriff and District Attorney echo the same sentiment in their roles as Santa Clara's top law enforcement officials, expressing and instructing their employees that to encourage the reporting of crime and cooperation in criminal investigations, *all* community members, regardless of their immigration status, must feel safe and secure when contacting members of local public safety agencies; and must not fear that making contact will lead to an immigration inquiry or

proceeding against them or a loved one. Their leaders have stated publicly many times not only that their crime prevention, prosecution, and investigation services are available to all, but that the full participation of the community as victims and witnesses—buoyed by Santa Clara's policies of separation from federal civil immigration enforcement and the confidence and trust they engender—has been critical to solving specific crimes.

96.     Santa Clara employees do not impede or prevent ICE officials from carrying out their own enforcement activities relating to federal civil immigration laws. However, under Santa Clara's longstanding policies, employees do not use Santa Clara's *own* facilities, resources, or staff time to assist.

97.     Santa Clara's policy of not expending local law enforcement resources to assist with federal civil immigration enforcement is set forth in Board of Supervisors Policy 3.54 ("Board Policy 3.54"). Board Policy 3.54 prohibits jail administration from honoring ICE civil detainer requests; provides that the Sheriff may, in their discretion, facilitate transfers of incarcerated individuals to ICE custody *only* under the auspices of a signed judicial warrant or court order; and prohibits Santa Clara staff from using local resources or local facilities to support civil immigration enforcement activities, including by "communicating with ICE regarding individuals' incarceration status or release dates." Board Policy 3.54, by its express terms, does not in any way hamper local law enforcement officers' cooperation with other agencies in any *criminal* law enforcement activities. In full, Board Policy 3.54 states:

> It is the policy of the County of Santa Clara that County officials and employees may cooperate with United States Immigration and Customs Enforcement (ICE) only as follows:
>
> (A)     Consistent with longstanding County policy, the California Values Act (Gov. Code, §§ 7284-7284.12)[1], and the Fourth Amendment to the United States Constitution, the County does not, under any circumstances, honor civil detainer requests from ICE by holding inmates on ICE's behalf for additional time after they would otherwise be released from County custody.

---

[1] The California Values Act ("SB 54") defines narrow circumstances in which California state and local law enforcement agencies may take specific actions related to immigration enforcement. However, SB 54 does not restrict local jurisdictions from adopting their own policies further narrowing the scope of actions permitted within those local jurisdictions, and many California localities have enacted local laws and policies that govern their own employees' conduct.

(B)      It is the policy of the County that the Sheriff may exercise discretion to facilitate the transfer of an adult inmate to ICE custody if an ICE agent presents a valid arrest warrant signed by a federal or state judicial officer, or other signed writ or order from a federal or state judicial officer authorizing ICE's arrest of the inmate. An administrative warrant signed by an agent or official of ICE or of the Department of Homeland Security (such as a Form I-200) is not a judicial warrant and will not be honored. The Sheriff and Chief of Correction shall jointly develop transfer procedures to implement this paragraph.

(C)      Except as permitted by this Policy, the County shall not provide assistance or cooperation to ICE in its civil immigration enforcement efforts, including by giving ICE agents access to individuals or allowing them to use County facilities for investigative interviews or other purposes, expending County time or resources responding to ICE inquiries or communicating with ICE regarding individuals' incarceration status or release dates, or otherwise participating in any civil immigration enforcement activities. This Policy does not limit or prohibit giving assistance with the investigative activities of any local, state, or federal law enforcement agency relating to suspected violations of criminal laws.

98.      The requirements of subsections (A) and (C) of Board Policy 3.54 have been in place since 2011, and subsection (B) was added when the Board of Supervisors amended the policy in 2019.

**C.      Portland**

99.      In 1987, the Oregon State Legislature passed legislation prohibiting the use of state and local law enforcement resources to detect or apprehend persons whose only violation was being in the country without documentation. The bipartisan bill passed nearly unanimously and was codified in ORS 181A.820. In the years since, the state has added to the policy, and, in 2017, Portland adopted a resolution affirming its commitment to those state laws. These laws are instrumental in promoting a relationship of trust between law enforcement and immigrant communities, ensuring that victims report crimes to law enforcement so that perpetrators are apprehended before harming others.

100.      The current iteration of the Oregon Law is codified in ORS 180.805 and ORS 181A.820-829. ORS 180.805 provides, in relevant part, that:

a.   Except as required by state or federal law, a public body may not disclose, for the purpose of enforcement of federal immigration laws," a person's address, workplace or hours of work, school or school hours, contact information, known associates or relatives, or the date and time of a person's hearings or other proceedings with a public body.
b.   Except as required by state or federal law, or as necessary to determine eligibility for a benefit a person is seeking, a public body may not

inquire about or request information concerning a person's citizenship or immigration status.

c. If a public body collects information concerning a person's citizenship or immigration status, the public body shall decline to disclose the information unless disclosure is required by" State or federal law, a court order, or a warrant authorized by a court.

d. The above may be enforced through a civil action.

101. ORS 181A.820-829 provide, in relevant part, that:

a. Law enforcement agencies may not use agency money, equipment or personnel to enforce federal immigration law and may not enter into immigration-related detention agreements with federal immigration authorities.

b. Public facilities, property, moneys, equipment, technology or personnel may not be used for the purpose of investigating, detecting, apprehending, arresting, detaining or holding individuals for immigration enforcement.

c. Violations of these provisions may be reported through a formal reporting process and may be enforced through civil action.

102. Portland's Resolution No. 37277 expresses the city's commitment to adhering to federal and state law. As such, in relevant part, it prohibits the city from using city resources to enforce federal immigration law except where required to do so by state or federal law, prohibits the Portland Police Bureau from cooperating with ICE except as expressly required by federal law, and resolves to take other action that support the city's immigrant community.

103. In 2017 and 2018, the first Trump Administration attempted to require Oregon and Portland to cooperate with federal authorities on enforcement of federal immigration law as a condition of receiving funds awarded under the Byrne JAG formula grant program. A federal district court held that the Attorney General lacked the authority to impose these conditions and issued a permanent injunction, *Oregon v. Trump*, 406 F. Supp. 3d 940, 963 (D. Or. 2019). The Ninth Circuit affirmed this ruling. *City & Cnty. of S.F. v. Garland*, 42 F.4th 1078, 1084 (9th Cir. 2022).

**D.    King County**

104. King County is the largest county in Washington and the twelfth most populous county in the nation. More than 25% of King County residents are foreign-born and contribute to making it a vibrant center for aerospace manufacturing, technological innovation, cutting-edge medical research, education, agriculture, and other industries.

105.     King County is subject to state and local laws that make the county a welcoming place for immigrants. Washington law prohibits discriminatory treatment by state and local government based on immigration or citizenship status unless specifically authorized by federal or state law, regulation, or government contract. Wash. Rev. Code §§ 49.60.010, .030, .215. The Washington State Legislature has determined that it is neither state nor local law enforcement's primary purpose to enforce civil federal immigration law, and that a person's immigration status, presence in the country, or employment alone "is not a matter for police action." *See* Wash. Rev. Code § 10.93.160. The Keep Washington Working Act (KWW) prohibits components of local governments in the state from voluntarily assisting or participating in federal civil immigration enforcement efforts. *Id.* KWW therefore furthers Washington's "compelling interest in ensuring the state of Washington remains a place where the rights and dignity of all residents are maintained and protected in order to keep Washington working." 2019 Wash. Sess. Laws, ch. 440, § 1(3).

106.     Under KWW, state and local law enforcement officers may not "[i]nquire into or collect information about an individual's immigration or citizenship status, or place of birth unless there is a connection between such information and an investigation into a violation of state or local criminal law," or take or hold individuals in custody solely for the purpose of determining immigration status or based solely on civil immigration warrants or detainers, unless accompanied by a judicial warrant. Wash. Rev. Code § 10.93.160(4)(a), (8). KWW also prohibits local law enforcement from providing "information pursuant to notification requests from federal immigration authorities for the purposes of civil immigration enforcement, except as required by law." RCW 10.93.160(4)(b). To that end, KWW expressly provides that such limitations do not apply to information requests for citizenship or immigration status made pursuant to 8 U.S.C. § 1373, and does not prevent state or local officials from "[c]omplying with any other state of federal law." 2019 Wash. Sess. Laws, ch. 440, § 8(1)-(2).

107.     Under King County Code (KCC) 2.15.010, county officials are generally precluded from inquiring about immigration status or using county resources to assist with enforcement of federal immigration laws. In particular, "[a]n agent of King County or a county employee shall not expend any time, moneys or other resources on facilitating the civil enforcement of federal

immigration law or participating in civil immigration enforcement operations, except where state or federal law, regulation, or court order shall so require." KCC 2.15.010.

108. King County has remained steadfast in its compliance with KWW and KCC 2.15. The King County Executive, Dow Constantine, directed King County's 16,000+ work force on February 4, 2024 that "[w]e remain committed to enforcing state law and local ordinances protecting the rights of immigrants." Policies in effect from various King County Departments, including the King County Sheriff and the Department of Adult and Juvenile Detention, reflect the county's determination to follow state and local law.

### E.    New Haven

109. New Haven is a racially and ethnically diverse city. This diversity contributes to New Haven's economy and cultural richness.

110. New Haven's Administration is committed to promoting the health and safety of all its residents, without regard to their immigration status.

111. The Mayor of the City of New Haven issued a Welcoming City Executive Order on July 23, 2020. That Order limits the City's entanglement with federal civil immigration enforcement as part of New Haven's "commitment to promoting the safety of all who live here and in recognition of the fact that all persons need to feel comfortable in their interactions with City officials."

112. Pursuant to the Order:

   a.   New Haven City employees and local law enforcement may not ask about a person's immigration status unless required to do so by state or federal law;

   b.   New Haven officers and City employees may not use public resources to assist in the enforcement of any federal program requiring registration of individuals on the basis of race, gender, sexual orientation, religion, or national or ethnic origin;

   c.   New Haven officers and City employees may not disclose confidential information absent written consent or unless required by law, or if necessary to apprehend an individual suspected of terrorism or criminal activity. Confidential information is defined as a social security number and information relating to sexual orientation;

1   status as a victim of domestic violence, crime witness, or recipient of public

2   assistance; or immigration status; and

3      d. Local law enforcement may not detain a person solely on the belief that they have

4         committed a civil immigration violation nor detain or arrest a person based solely

5         on a civil detainer request or administrative warrant issued by ICE.

6   113.   The policies set out in the Order aim to build strong community relations and enhance

7   public safety by facilitating trust between local law enforcement and the immigrant community.

8      **F.   Oakland**

9   114.   The City of Oakland is a multicultural city of more than 400,000 people. Roughly a

10  quarter of Oakland's population was born outside of the United States. Over the years, Oakland has

11  repeatedly reaffirmed its commitment to respecting the civil and human rights of all its residents,

12  regardless of their immigration status.

13  115.   In 1986, in the face of thousands of individuals fleeing their countries of origin to avoid

14  persecution, the Oakland City Council first declared Oakland to be a "City of Refuge" for immigrants.

15  116.   In January 2019, the City Council enacted Ordinance No. 13515, strengthening

16  Oakland's longstanding commitment to remaining a sanctuary jurisdiction. Under that ordinance,

17  Oakland Police Department employees are prohibited from providing "enforcement assistance,

18  including traffic support, to ICE, including any subdivision of ICE, in any capacity except to respond

19  to a public safety emergency related to an ICE action or where assistance is required by Federal or

20  State statute, regulation or court decision."

21  117.   Ordinance No. 13515 remains in effect and governs the Oakland Police Department's

22  relationship with ICE.

23     **G.   Emeryville**

24  118.   In 2017, the Emeryville City Council adopted Resolution No. 17-08, "Resolution of the

25  City Council of the City of Emeryville Declaring the City of Emeryville a Welcoming and Sanctuary

26  City" (the "Welcoming and Sanctuary Resolution"). The Welcoming and Sanctuary Resolution

27  contains the following relevant provisions:

28      a. Emeryville is a Welcoming and Sanctuary City;

     b.   Emeryville employees serve all residents, and city services are accessible to all residents regardless of immigration status;

     c.   Emeryville employees do not inquire about a person's immigration status in either the provision of municipal services or in the course of law enforcement;

     d.   Emeryville refuses any requests that are an extension of any federal immigration policy enforcement actions;

     e.   Emeryville does not enter into any agreements to carry out such federal enforcement actions; and

     f.   Emeryville does not dedicate any City time or resources to such enforcement, but leaves such actions to federal authorities.

119. The Welcoming and Sanctuary Resolution does not shield anyone from criminal prosecution, nor does the Resolution interfere with the federal government's immigration enforcement role.

120. The Resolution protects all Emeryville residents by fostering an environment of inclusion and ensuring local resources are reserved for local government functions. It also promotes public safety by reducing barriers to reporting crimes, cooperating with police investigations, and seeking medical care.

**H.    San José**

121. San José is the third most populous city in California, and the largest city in Silicon Valley, a region in the Southern San Francisco Bay Area of Northern California. It is the oldest city in California, developing from a Spanish pueblo established in 1777.

122. Silicon Valley is a global center of high technology, innovation, and social media; and home to many of the world's largest technology companies. Commercial, retail, professional, high-tech manufacturing, electronic assembly, and service businesses all have a presence in San José.

123. San José is centrally located in a region that has attracted significant foreign investments from all over the world, and is a gateway for many immigrants who come to the United States to work and study here.

124. San José is one of the most diverse cities in the United States, with nearly 410,000

residents who are foreign-born. Sixty percent of children residing in San José have at least one immigrant parent. San José's foreign-born population includes naturalized citizens; lawful permanent residents; refugees, asylees, student- and work-visa holders; victims of human trafficking or other crimes who hold T or U visas; and residents who lack lawful immigration status.

125.    In 2007, the City Council adopted Resolution No. 73677 to support public safety and immigrants by creating an environment where immigrants are not afraid to report crimes and interact with the police, fire department, or other City departments to obtain critical services.

126.    In September 2015, the City Council adopted Resolution No. 77517 identifying the City of San José as a "Welcoming City", and affirming its commitment to build a community that recognized the contributions of all residents to enhance its economic growth, global competitiveness and overall prosperity. San José was certified as a welcoming city by the nonprofit Welcoming America, a formal designation for local governments that have created policies and programs that demonstrate a commitment to immigrant inclusion in all areas of civic, social, and economic life.

127.    In February 2025, the City Council adopted Resolution No. 2025-19 and affirmed its commitment from 2007 to preserve the safety and integrity of all its residents, regardless of national origin or legal status.

128.    In 2018, San José updated the San José Police Duty Manual (L7911) to comply with state and federal law. The San José Police Duty Manual contains the policies, rules, and procedures for the Police Department and all its members, sets forth the Police Department structure, and how to conduct its various law enforcement duties. The manual acknowledged "the responsibility of enforcement of civil immigration law rests with the U.S. Immigration and Customs Enforcement."

129.    The San José Police Department can cooperate with the U.S. Immigration and Customs Enforcement in matters involving serious crimes, the protection of public safety, and as required by statute, federal regulations, or court decisions.

130.    Based on city policy and state law, San José does not detain or question people based solely on a person's citizenship or status under civil immigration laws, nor for the purpose of discovering that status or citizenship.

131.    It is the official policy of San José to ensure that residents do not fear arrest or

1    deportation for coming forward to report a crime as a victim or a witness.

2        132.    Consistent with state law, San José determined that it can best protect the public safety

3    of the entire community by not eroding the trust of its residents, and thereby discouraging the

4    reporting of crimes or cooperation in prosecution of these crimes.

5        133.    For this reason, San José's limited resources are directed to serve the local public safety

6    priorities including the investigation and prosecution of state and local crimes.

7    **I.    San Diego**

8        134.    San Diego is home to roughly 1.4 million residents.

9        135.    The City's boundary in the south is the international border with Mexico, and as a

10   result San Diego has a significant immigrant population. Approximately one in four San Diego

11   residents is foreign-born, having arrived from one of at least 115 countries. And approximately 41% of

12   the San Diego population speaks a language other than English. Immigration has been and continues

13   to be a major contributor to San Diego's ethnic and cultural diversity. Being a multicultural melting

14   pot positions San Diego's labor force for success in the global economy.

15       136.    San Diego adheres to federal and state law, including SB 54.

16       137.    San Diego has no provision in its Charter relating to immigration or citizenship status

17   and City employees, including its police force, have no additional restrictions under its Charter or

18   Municipal Code beyond that of state law.

19       138.    Resolution No. 313834, adopted December 17, 2017, declares that San Diego is a

20   "welcoming city that respects the dignity of all people and promotes programs and policies to foster

21   inclusion for all." It does not describe itself as a "sanctuary city" nor does it place any obstacles on

22   federal officials seeking to enforce federal immigration laws within its boundaries.

23       139.    This resolution affirmed that it welcomes all persons, regardless of immigration status,

24   race, ethnicity, place of origin, English language proficiency, religion, income, gender, sexual

25   orientation, differing abilities, age, and other factors—to enhance San Diego's health, economic

26   prosperity, and well-being for current and future generations.

27

28

---

### J.    Sacramento

140.    Sacramento has a long history of welcoming individuals of diverse racial, ethnic, and religious backgrounds, making it one of the most integrated and diverse cities in the United States, a reputation it embraces.

141.    As one of the nation's most integrated and diverse cities, Sacramento prioritizes community trust in the delivery of government services as well as its use of law enforcement authority.

142.    Sacramento has long prioritized the inclusion and cooperation of all residents, including its immigration population, in every aspect of providing government services.

143.    The city encourages residents of all backgrounds to contact the city on all variety of matters, including code enforcement, building and fire safety concerns, and transportation and housing needs, and to participate in city-offered programs such as vocational training, internships and workforce development, and assistance for residents experiencing homelessness.

144.    In some of these situations, maintaining confidentiality or offering the option are essential to the delivery of services. For example, confidentiality protects code enforcement complainants from unwarranted retaliation that might otherwise be borne upon them by the subject code violator; it reduces the spread of stigma for people experiencing homelessness; and it reduces the risks associated with survivors of domestic violence being found by their aggressor. Similarly, assurance of confidentiality increases the likelihood that an immigrant contacts code enforcement, participates in housing programs that reduce homelessness, and otherwise engages with City services for problems that might otherwise persist in their neighborhoods.

145.    Elected by the residents of Sacramento, the City Council is authorized by law to make decisions and set policy regarding the deployment of city resources to try and meet all community needs.

146.    In full exercise of their authority, the Sacramento City Council passed Resolution 2017-0158 to clarify how and why the city declines to be entangled in federal civil immigration enforcement.

147.    As Resolution 2017-0158 states, "to carry out public housing programs, the City must be able to reliably collect confidential information from applicants" for temporary and permanent

housing. Release of such confidential information for "unintended purposes …. could hinder collection of information vital to those significant city programs. To solve code enforcement violations that can detrimentally impact families and neighborhoods, residents and community members must be encouraged to contact the City's Code Enforcement divisions." Resolution 2017-0158 further states that "to protect the public from crime and violence" requires "encouraging all persons who are victims of or witnesses to crimes, or who otherwise can give evidence in a criminal investigation, to cooperate with the criminal justice system" knowing that the City's employees are disentangled from immigration enforcement.

148. To achieve these goals, Resolution 2017-058 provides in relevant part that city resources shall not be used to:

    a. Ask about or investigate immigration status, except as necessary to comply with 18 USC § 922(d)(5), to certify an individual who has been identified as a potential crime or trafficking victim, with consent, or as required by federal or state laws;

    b. Absent a judicial warrant, arrest or detain an individual solely on the basis of alleged violation of civil immigration law;

    c. Detain someone solely on the belief that they may be violating civil immigration law or on the basis of a detainer or administrative warrant based in civil immigration law;

    d. Notify the federal government about the release date of a person alleged to have violated civil immigration law;

    e. Absent consent, provide confidential information about an individual on the basis of alleged violation of civil immigration law, where "confidential information" is defined as "including, but not limited to, information about the individual's home address; work address; person's status as a victim of domestic abuse or sexual assault; sexual orientation; or disability.

149. An express exemption for Sections 1373 and 1644 provides that city officials and employees may send to, or receive from, federal immigration authorities, information regarding the citizenship or immigration status, lawful or unlawful, of a person.

150.     Sacramento has a number of policies and systems aimed at promoting cooperation between local law enforcement and the diverse immigrant communities that have long flourished in Sacramento.

151.     One such policy is the Sacramento Police Department's General Order 523.07, which establishes procedures for contacts with foreign nationals, including as victims or suspects of crimes or infractions, witnesses in investigations, or subjects involved in accidents. The policy provides that SPD will provide equal enforcement of the law and equal service to all members of the public regardless of an individual's immigration status and will not initiate police action based solely on an individual's immigration status.

152.     Developing this trust is essential to ensuring that crimes are reported and that victims and witnesses participate in the process. This helps local police enforce the laws against serious offenders who threaten public safety.

153.     Consuming scarce city resources to assist federal civil immigration activities does not advance the interests or needs of the city, and could actually work to thwart other important work performed by law enforcement. This includes a recently formed cooperative partnership between the Sacramento Police Department and the Sacramento County District Attorney to address human trafficking.

154.     Sacramento officials and employees do not interfere with federal immigration enforcement officers carrying out their duties in Sacramento.

155.     The Sanctuary City Resolution is instead intended to direct and prevent Sacramento officials and employees from expending scarce local resources on federal civil immigration enforcement efforts to the detriment of Sacramento's core mission of ensuring public health, safety, and welfare for all those that live, work, and visit Sacramento.

### K.     Santa Cruz

156.     The residents of Santa Cruz have a long history of and deep commitment to welcoming immigrants, refugees, and those in exile.

157.     In 1986, Santa Cruz established its first "Sanctuary City" policy, declaring itself a "refuge for Salvadoran and Guatemalan refugees until these refugees can safely return to their

homelands or until they are granted federally recognized residency status, temporary or permanent."
*See* City Council Resolution No. 16,876.

158.    Since then, the Santa Cruz City Council has taken legislative actions to expand its sanctuary policies in an effort to create a safe haven for all immigrants who live and work in the city.

159.    Pursuant to City Council Resolution No. NS-30,438, Santa Cruz restricts city agencies, departments, officers, employees, and agents from taking the following actions:

    a.  … enforc[ing] Federal civil immigration laws, request[ing] or maintain[ing] information concerning a person's immigration status, or us[ing] City monies, resources, or personnel to investigate, question, detect, apprehend, or question a person on the basis of his or her immigration status …;

    b.  … disclos[ing] information about a person's immigration status …; and

    c.  … us[ing] City funds, resources, facilities, property, equipment, or personnel … to assist in the enforcement of federal immigration law …

*See also* City Council Ordinance No. 2017-06; City Council Resolutions Nos. 27,504, 29,187.

160.    However, Santa Cruz provides exceptions to its restrictions on supporting federal immigration authorities when necessary to comply with and respond to a lawfully issued judicial warrant or subpoena; when information is provided consensually; when necessary to provide a city service or prevent an imminent threat to public health or safety; or as otherwise required by state or federal law or judicial decision. *See* City Council Resolution No. NS-30,438; *see also* City Council Ordinance No. 2017-06.

161.    In setting forth its restrictions on supporting federal immigration authorities, Santa Cruz declared its intent to abide by state and federal law. *See* City Council Resolution No. NS-30,438.

162.    Santa Cruz City Council created these policies after finding that, in the interest of promoting public safety, it is important to create an environment in which people feel comfortable interacting with law enforcement, and not erode that trust by permitting local police officers to assist federal immigration enforcement.

163.    Santa Cruz City Council also has found that these policies are supported by studies proving that jurisdictions that provide protections for immigrants are safer and economically more prosperous compared to other jurisdictions – including a 2017 report by the Center for American Progress, which shows that, on average, there are 35.5 fewer crimes committed per 10,000 people

1    annually in these jurisdictions, the average annual income is $4,353 higher, the poverty rate is 2.3%

2    lower, and unemployment is 1.1% lower. *See* City Council Resolution No. NS-30,438.

3    **L.    Monterey**

4    164.    Monterey was built largely by immigrants. Like many other political subdivisions of

5    California, Monterey boasts rich demographic and cultural diversity that reflects its tradition of

6    attracting people from all over the world who come to the county in search of employment

7    opportunities and a better life. An estimated 29% of Monterey County residents were born in a

8    different country.

9    165.    The County's democratically elected officials necessarily serve the interests of these

10   and all other residents, who share a common interest in maintaining a community built on

11   quintessentially American ideals of diversity, tolerance, and inclusion.

12   166.    In both 2017 and 2025, the Monterey Board of Supervisors acted swiftly to establish

13   and re-establish the locality as a "Welcoming County for Immigrants and Refugees" and to declare the

14   "County a Place of Trust and Safety for Immigrants." Board of Supervisors Res. No. 17-042, 25-004.

15   Among other things, the Board's legislative actions recognized that:

   a.    A relationship of trust between California's immigrant residents and our
16         local agencies, including law enforcement, schools and hospitals, is
17         essential to carrying out basic local functions; and that trust is threatened
         when local agencies are involved in immigration enforcement; and
18   b.    [N]o County resources shall be used to assist in the enforcement of
19         federal immigration law, participate in any immigration enforcement
         operation or joint operation involving any federal immigration agent for
20         the purpose of enforcing federal immigration law, unless such
         assistance is required by federal or state statute, regulation or court
21         decision.

22   167.    Monterey County recently issued guidance regarding county employees' legal

23   obligations when responding to federal immigration enforcement activity. The guidance dutifully

24   balanced local directives, state law, and federal law. It advises that "county employees may not in the

25   course of their employment give their consent to federal immigration enforcement activities," subject

26   to the requirements of 8 U.S.C. § 1373 and the Fourth Amendment of the U.S. Constitution.

27   168.    The Monterey County Sheriff's Office likewise maintains policies limiting inquiry into

28   immigration status and limiting immigration detainers in a manner that explicitly honors federal legal

1   requirements while adhering to state law.

2       169.    Monterey's policies reflect local prerogatives, and afford every measure of respect and

3   deference to federal immigration prerogatives that is required by long-established principles of

4   federalism.

5       **M.    Seattle**

6       170.    Seattle's laws, policies, and programs make it a Welcoming City that serves all

7   residents.

8       171.    In 2003, the Seattle City Council unanimously adopted Ordinance 121063, which

9   provides that, unless otherwise required by law or by court order, "no Seattle City officer or employee

10  shall inquire into the immigration status of any person, or engage in activities designed to ascertain the

11  immigration status of any person." Seattle Mun. Code § 4.08.015(A).

12      172.    Ordinance 121063 includes one exemption for police officers where officers have a

13  reason to believe that a person: (1) has previously been deported from the United States; (2) is again

14  present in the United States; and (3) is committing or has committed a felony criminal-law violation.

15  Seattle Mun. Code § 4.18.015(B).

16      173.    Ordinance 121063 recognized that Seattle is home to immigrants from around the

17  world who contribute to the city's cultural richness and economic vitality. Seattle enacted Ordinance

18  121063 with the intent to "guide city officials and employees to adhere to federal law while helping to

19  protect the safety and health of all members of [the] community."

20      174.    Alongside its commitment to protect all members of the community, Seattle complies

21  with 8 U.S.C. § 1373 and other federal laws. Ordinance 121063 directs that it shall not "be construed

22  to prohibit any Seattle City officer or employee from cooperating with federal immigration authorities

23  as required by law." Seattle Mun. Code § 4.18.035. Another longstanding provision of the Municipal

24  Code, which has been in effect since 1986, provides that "[c]ity officers and employees are directed to

25  cooperate with, and not hinder, enforcement of federal immigration laws." Seattle Mun. Code

26  § 4.18.010.

27      175.    Consistent with the Municipal Code, the Seattle Police Department Manual provides:

28

> It is the Seattle Police Department's intent to foster trust and cooperation with all people served by the Department, including immigrant and refugee residents. The Department encourages any person who wishes to communicate with Seattle Police officers to do so without fear of inquiry regarding their immigration status. . . .
>
> The Department recognizes that local law enforcement has no role in immigration enforcement. "Unlawful presence" in the country is a civil matter and not within the department's jurisdiction.
>
> Employees Will Not Inquire About Any Person's Citizenship or Immigration Status. . . . Employees Will Not Request Specific Documents for the Sole Purpose of Determining a Person's Immigration Status . . . Employees Will Not Initiate, Maintain, or Participate in any Police Action Based on an Individual's Immigration Status.

Seattle Police Department Manual, Sect. 6.020, https://public.powerdms.com/Sea4550/tree/documents/2042882.

176. Seattle's Resolution 31730 reaffirms its commitment to being a Welcoming City. It states that the City will not withhold services based on ancestry, race, ethnicity, national origin, color, age, sex, sexual orientation, gender identity, marital status, physical or mental disability, religion, or immigration status. *See also* Seattle Resolution 30672 (2004), Seattle Resolution 31775 (2017).

177. Seattle coordinates programs and services for immigrants and refugees through the Office of Immigrant and Refugee Affairs ("OIRA"). *See* Seattle Mun. Code § 3.14.505. The mission of OIRA is to improve the lives of Seattle's immigrant and refugee communities through policies, programs, services, and community engagement. Examples of OIRA programs include: assistance with the naturalization process (including workshops, clinics, legal support, and outreach to people with disabilities); public safety interventions for children of immigrants and young immigrants; victim and family support services; job training and English language skills; and translating City services into more languages to broaden access.

178. In 2017 Seattle and Portland filed a joint lawsuit against the first Trump Administration challenging Executive Order 13,768. A federal district court determined that the Administration would likely consider Seattle to be a "sanctuary city" and issued declaratory relief, holding that it would be unconstitutional for Executive Branch agencies to withhold funds that Congress had not tied to compliance with 8 U.S.C. § 1373 from Seattle and Portland. *City of Seattle v. Trump, et al.*, Civil Case

No. C17-497-RAJ (W.D. Wash. Oct. 24, 2018); *City of Seattle v. Trump*, No. 17-497-RAJ, 2017 WL 4700144, at *8 (W.D. Wash. Oct. 19, 2017).

### N.    Minneapolis

179.    Minneapolis is the largest city in Minnesota and one of its most diverse. Minneapolis is home to immigrants and refugee residents with varying immigration statuses, from naturalized citizens to those without lawful immigration status.

180.    Minneapolis's immigrant community is a valued and important part of the City's social milieu.

181.    Minneapolis's immigrant community is also a critical piece of the City's crime prevention efforts. The Minneapolis Chief of Police, Brian O'Hara, has stated that "[t]he police department can only be effective when community tells us what's going on, when community is willing to tell us when they've been victimized, when they need help…."

182.    For over two decades, Minneapolis has formally prioritized using its finite resources to advance the health and safety of all of the Minneapolis community.

183.    In 2003, the City of Minneapolis enacted an ordinance in Chapter 19 of its Code of Ordinances, entitled "Employee Authority in Immigration Matters." This ordinance, commonly referred to as the "Separation Ordinance," "clarifies the communication and enforcement relationship between the city and the United States Department of Homeland Security and other federal agencies with respect to the enforcement of civil immigration laws." Minneapolis Municipal Code of Ordinances ("M.C.O.") § 19.10.

184.    Section 19.10 further provides that "[t]he city works cooperatively with the Homeland Security [Department], as it does with all state and federal agencies, but the city does not operate its programs for the purpose of enforcing federal immigration laws. The Homeland Security [Department] has the legal authority to enforce immigration laws in the United States, in Minnesota and in the city."

185.    If Minneapolis personnel were to enforce federal immigration laws for the federal government, it would squander limited municipal resources, have deleterious effects on public safety, and have a chilling effect on immigrant populations' willingness to report crime and cooperate with the City's public safety efforts.

186.     Minneapolis's Separation Ordinance states that to the extent permitted by law, public safety officials may "not undertake any law enforcement action for the purpose of detecting the presence of undocumented persons, or to verify immigration status." M.C.O. § 19.30(1).

187.     In addition, Minneapolis public safety officials may not "question, arrest or detain any person for violations of federal civil immigration laws except when immigration status is an element of a crime." M.C.O. § 19.30(3).

188.     Nothing in the Separation Ordinance, however, "prohibits public safety personnel from assisting federal law enforcement officers in the investigation of criminal activity involving individuals present in the United States who may also be in violation of federal civil immigration laws." M.C.O. § 19.30(4).

189.     The Minneapolis Separation Ordinance makes an exemption to the prohibition on the use of City resources for immigration-related investigation and enforcement when City personnel are complying with "lawful subpoenas" or "any properly issued subpoena." M.C.O. §§ 19.20 & 19.50.

190.     Under the Separation Ordinance, City employees generally may "only solicit immigration information or inquire about immigration status when specifically required to do so by law or program guidelines as a condition of eligibility for the service sought." M.C.O. § 19.20(a)(2).

191.     City of Minneapolis departments and staff do not operate for the purpose of enforcing federal immigration law, but rather to provide municipal services to the Minneapolis community, regardless of immigration status.

**O.     St. Paul**

192.     Saint Paul is the county seat of Ramsey County, and the second most populous city in Minnesota. The City is highly racially diverse, with a population which is only about 51% White (non-Hispanic). 18.6% of the residents of Saint Paul are foreign-born, a much higher percentage than the State of Minnesota (8.4%) or United States (13.6%) as a whole. Non-U.S. citizens represent 8.1% of the population of the City, again a larger percentage than the state (6.5%) or the nation (6.5%) as a whole.

193.     Saint Paul has the largest Hmong population of any city in the United States.

194.     Given the diversity of its population, the City has a longstanding commitment to serving and welcoming immigrants in the community. Among other things, the City offers immigrants access to a host of public and private assistance programs, many of which are operated by the City itself, on its website at https://www.stpaul.gov/immigration-resources. The Saint Paul City Attorney's office employs a full-time attorney dedicated to assisting with immigration-related issues, and operates an Immigrant and Refugee Program which assists immigrants within the City.

195.     In 2004, Saint Paul enacted a separation ordinance at Chapter 44 of its Administrative Code, entitled "Employee Authority in Immigration Matters." The ordinance was intended to allow all residents full access to city services, regardless of their immigration status.

196.     The ordinance provides, among other things, that:

    a.   City employees cannot ask residents about their immigration status, except when required by law;

    b.   the City does not use its programs to enforce federal immigration laws; and

    c.   City public safety officials cannot use law enforcement authority solely to find undocumented persons or check immigration status.

197.     Chapter 44 is not intended as a sanctuary policy, but is likely to be interpreted by the Trump Administration as rendering Saint Paul a "sanctuary" jurisdiction within the meaning of the Executive Orders, the Bondi Directive, and the Noem Directive.

**P.     Santa Fe**

198.     Santa Fe is an over 400-year-old-city and is the capital city of New Mexico. It is home to approximately 90,000 residents and annually hosts approximately 4,000,000 tourists. The city has long been renowned for its rich cultures, traditions, arts, and history. UNESCO designated Santa Fe as the United States' first "Creative City" twenty years ago. Approximately fifteen percent of the City's population are foreign-born and over thirty percent of the population speaks a language other than English at home.

199.     Santa Fe adopted Welcoming Community resolutions in 1999 and 2017.

200.     In 1999, Santa Fe adopted Resolution 1999-6, which declared a policy of non-discrimination based on a person's national origin and equal treatment for all persons, with respect and

dignity, regardless of immigration status. It prohibited use of municipal resources to identify or apprehend non-citizen residents on the sole basis of immigration status, unless otherwise lawfully required to do so.

     201.    In 2017, Santa Fe adopted Resolution 2017-19, reaffirming its immigrant-friendly status and commitment to the established rule of law. The resolution:

       a.   Prohibits employees of the City of Santa Fe from making or initiating any inquiry regarding the immigration status of any person, except as required by law, including, without limitation, to determine eligibility for City employment or for a federal benefit or program administered by the City.

       b.   Generally prohibits employees of the City of Santa Fe from disclosing to any person or agency outside city government any sensitive information about any person that comes into the employee's possession during the course and scope of that employee's work for the City of Santa Fe, subject to certain exceptions. Sensitive information includes confidential identifying information such as social security numbers or individual tax identification numbers, a person's place and date of birth, a person's status as a recipient of public assistance or as a crime victim, and a person's sexual orientation, physical or mental disability, immigration status or national origin.

       c.   Requires City elected and appointed officials and employees to refuse access to all non-public areas of City property by federal immigration agents for the purposes of enforcing federal immigration laws unless they present a warrant issued by a federal court specifically requiring such access.

       d.   Requires City departments and employees to accept driving authorization cards and non Real-ID compliant identification cards issued by the New Mexico Motor Vehicle Division (MVD) for all of the purposes for which they would accept Real-ID-compliant drivers' licenses and identification cards issued by the MVD.

       e.   Prohibits City departments' use of the voluntary federal e-verify system to investigate or determine the work eligibility of applicants for city employment

unless required by law for the purposes of administering a federal benefit or program.

202.   Santa Fe departments and employees operate to deliver city services to Sante Fe residents. Diverting limited municipal resources to enforce federal immigration law would limit the City's ability to deliver public safety resources, including but not limited to traffic safety, response to emergency calls, services to the unhoused population, criminal investigations, criminal prosecutions, animal services, and code enforcement.

**Q.   Alameda County**

203.   With more than 1.6 million residents, Alameda County is the seventh most populous county in California and is characterized by its rich diversity and culture. Approximately one third of Alameda County's residents—over 560,000 people—were born outside of the United States.

204.   Alameda County's Board of Supervisors has long held and repeatedly expressed the position that achieving the County's core missions to ensure public safety and serve residents' needs requires respect, trust, and open communication among all members of the community. To that end, in 2013, the Board adopted Resolution 2013-142, titled "Resolution Regarding Civil Immigration Detainer Requests." In that Resolution, the Board discouraged Alameda County's Sheriff from honoring ICE holds or other detention requests for suspected violations of civil federal immigration law. The Resolution further discouraged the use of County resources for "responding to ICE inquiries or communicating with ICE regarding individuals' incarceration status or release dates," absent a criminal warrant or a "legitimate law enforcement purpose that is not related to the enforcement of immigration laws."

205.   The Board reiterated those positions in 2016, when it first adopted Resolution 2016-274, titled "Resolution Regarding Upholding Due Process and Protecting Civil Rights of Immigrant Residents." In Resolution 2016-274, the Board of Supervisors again stated its opposition to using County resources to assist in enforcing federal civil immigration law, including by honoring ICE civil detainer requests; giving ICE access to individuals or County facilities without a judicial warrant; arresting individuals for actual or suspected civil violations of federal immigration law; and communicating with ICE regarding individuals' release dates, among other information. About a week

later, the Board also adopted Resolution 2016-303, titled "A Resolution Designating Alameda County a Welcoming County for Immigrants and Refugees," which reiterated the County's commitment to building a welcoming community for all County residents.

206.     Consistent with the Board's longstanding positions, and California law, including SB 54 and the TRUST and TRUTH Acts, several County departments have taken steps to keep local resources separate from federal civil immigration enforcement. For example, Alameda County Sheriff's Office policy precludes officers from (1) detaining, arresting or contacting individuals based solely on their actual or suspected immigration status; (2) entering into agreements with federal immigration authorities to enforce federal immigration laws; (3) using County resources to assist or facilitate federal immigration enforcement operations, except in cases of critical or emergency requests from other law enforcement agencies; (4) honoring civil immigration detainers, absent a "criminal warrant signed by a judge"; (5) inquiring about an individual's immigration status, unless the information is necessary to a criminal investigation of a violation of California law; (6) using immigration authorities as interpreters; (7) initiating contact with ICE to provide information about individuals in the Sheriff's Office's custody who are suspected of violating federal immigration laws; or (8) participating in "sweeps to locate and detain undocumented residents." *See* Alameda County Sheriff's Office General Order 1.24.

**R.     Albany**

207.     The City of Albany was established in 1614 by foreign-born residents. Incorporated in 1686, it is the oldest continuously chartered municipality in the United States. For more than four centuries, the City of Albany has benefited from the social and economic contributions of foreign-born residents and visitors.

208.     Albany is home to just over 100,000 people, at least 15,000 of whom were born outside of the United States. Ensuring public safety in Albany requires that City of Albany officials and law enforcement maintain open lines of communication with foreign-born city residents and visitors. This cooperation is possible only when foreign-born residents can interact with law enforcement without fear of deportation or the deportation of friends and family members.

209.    As a result, in 2017, Albany's Mayor issued Executive Order 1-17, "City of Albany Policy Regarding Community Policing and Protecting Immigrants." Pursuant to Executive Order 1-17, Albany Police Department officers are not permitted (1) to inquire into an individual's immigration status "unless necessary to investigate criminal activity by that individual"; (2) to stop individuals based on suspected citizenship status, ICE detainers, or administrative warrants; (3) to respond to ICE requests for non-public information other than as required to comply with 8 U.S.C. § 1373; or (4) to otherwise enforce federal immigration law. In addition, the order (5) bars City employees from asking about immigration status unless required to do so by the applicable program or by law, and (6) affirms all residents' access to city services for which they are eligible by law.

**S.      Albuquerque**

210.    Albuquerque, the largest municipality in the State of New Mexico, is a vibrant and diverse city, serving more than 560,000 residents. Albuquerque values immigrants as an important part of its community, workforce, and culture.

211.    Albuquerque has been a welcoming city since 2000, when the Albuquerque City Council passed its first immigrant-friendly city resolution and memorialized it as Section 3-1-11 of the Albuquerque Code of Resolutions. Section 3-1-11, among other directives, states that municipal resources cannot be used to apprehend individuals solely on the basis of their immigration status, unless required by law.

212.    In 2018, in an effort to promote public safety; safeguard the civil rights, safety, and dignity of Albuquerque's residents; and facilitate victims' reporting of violent crime, the Council reaffirmed its commitment to Section 3-1-11 and strengthened Albuquerque's status as an immigrant-friendly city by enacting Resolution 18-7. Among other provisions, Resolution 18-7 prohibits the use of City resources to assist in the enforcement of federal immigration law, including by arresting or detaining a person based solely on his or her immigration status or a suspected violation of federal immigration law; arresting or detaining a person due to a federal administrative warrant or an immigration detainer based solely on a violation of federal immigration law; permitting access to non-public areas of City facilities for federal immigration law enforcement, absent a judicial warrant; or

gathering or disclosing confidential identifying information of an individual unless such assistance is required by law.

### T.   Allegheny County

213.   Allegheny County is the second most populous County in Pennsylvania, containing the City of Pittsburgh and numerous other municipalities. Allegheny County is home to many businesses, including legacy manufacturing industries such as steel and aluminum, as well information technology, robotics, and biotechnology. Allegheny County is also home to a number of universities, including the University of Pittsburgh and Carnegie Mellon, as well as two well-regarded health systems that provide advanced medical treatment.

214.   Allegheny County has a diverse population and is home to immigrants drawn to the County's opportunities in higher education and employment. Allegheny County also has historically appealed to immigrants from around the world who have joined their families and communities here, including refugees. Allegheny County's immigrant community is a valued and important part of the County's economic success and rich culture.

215.   The County and its staff do not operate for the purpose of enforcing federal immigration law, but rather to provide municipal services to the residents of the County, irrespective of immigration status. To that end, Allegheny County has taken steps to safeguard its municipal resources, protect public safety, and encourage immigrant populations' willingness to report crime and cooperate with the County's public safety efforts by adopting a policy at the Allegheny County Jail that the facility will not detain an individual, or delay their release, solely based on an immigration detainer request or administrative warrant received from ICE. *See* Allegheny County Bureau of Corrections Policy No. 220.

### U.   Baltimore

216.   Baltimore City is the 30th most populous city in the country, with a population exceeding 568,000 people. Approximately 10% of the population is foreign-born.

217.   Baltimore City considers its diversity to be one of its greatest strengths and is a welcoming city that strives to protect the rights, dignity, and wellbeing of all of its residents, including immigrants.

218.    To that end, and to encourage crime reporting and cooperation with law enforcement by individuals who might otherwise fear an immigration inquiry, Baltimore Police Department ("BPD") policy generally prohibits officers from inquiring into the immigration status of an individual and limits BPD support to federal immigration enforcement efforts except as legally required. Baltimore Police Department Policy 1021. Under Baltimore Police Department Policy 1021, members of the department shall not (1) take law enforcement action, including initiating an investigation or conducting an arrest, based on actual or perceived immigration status; (2) make inquiries into immigration status except as otherwise authorized by BPD policy; or (3) engage in, assist, or support immigration enforcement, with limited exceptions such as those required by 8 U.S.C. § 1373, among other restrictions.

### V.    Bend

219.    The City of Bend recognizes that fostering a welcoming environment and treating all individuals with compassion and respect, regardless of citizenship status, enhances Bend's cultural fabric, economic growth, global competitiveness, and overall prosperity. In order to foster such a welcoming environment, and to promote trust between local law enforcement and members of the community, Bend adheres to Oregon state law, which prohibits Bend from cooperating with federal immigration enforcement beyond what federal law requires. *See* ORS 180.805–810, 181A.820–829.

220.    Under these state laws, the City and/or its law enforcement agency may not (1) share numerous categories of sensitive personal information with federal immigration authorities beyond what is required by law; (2) collect information about an individual's immigration or citizenship status, except as required by law; (3) use funds, equipment, or personnel "for the purpose of detecting or apprehending persons" or "for the purpose of enforcing [civil] federal immigration laws," absent a judicial warrant; (4) "enter into a formal or informal agreement with a federal immigration authority relating to the detention of [such] a person"; or (5) use public resources to investigate, arrest, or detain individuals for immigrant enforcement, including by granting federal immigration agents access to nonpublic areas or otherwise supporting or assisting federal agencies in immigration enforcement in specified situations. *Id.*

221.     These state laws have been found to be not in conflict with federal law. *See City & Cnty. of San Francisco v. Garland*, 42 F.4th 1078, 1085–86 (9th Cir. 2022) (addressing ORS 180.805 and 181A.820).

222.     In addition to being bound by these laws as a city in Oregon, Bend has affirmed its commitment to following the laws and has developed policies and procedures to comply with them. For example, in 2017, the Bend City Council unanimously adopted a resolution titled "A Resolution to Declare Bend a *Welcoming City* and Affirm Membership in the National Welcoming America Initiative." Resolution No. 3068. That resolution states, in part, that, "in alignment with Oregon State laws, the City will continue to refrain from the use of City funds, personnel and equipment from enforcing federal immigration laws and detaining people solely on their immigration status." *Id.* The Bend Police Department ("BPD") also has policies governing its compliance with these state laws, including by specifying that the BPD "does not participate in routine immigration investigation and enforcement activities." *See* BPD Policy 413.

**W.     Benicia**

223.     Benicia is an ethnically, racially, and religiously diverse city located in Solano County, California, and has a population of almost 28,000 residents. The City has long derived its strength and prosperity from its diverse community. The City recognizes that cooperation among all members of that diverse community is essential to creating a safe and welcoming community, and advances the City's mission of delivering efficient public services in partnership with the community, which ensures public safety, a prosperous economic environment, opportunities for the City's youth, and a high quality of life for all residents.

224.     To realize that mission, and to further compliance with state laws like SB 54, protect limited local resources, encourage cooperation between residents and law enforcement, and ensure public safety for all, in 2017, Benicia's City Council adopted Resolution 17-13, a "Resolution Declaring the City of Benicia's Commitment of Being a Welcoming, Inclusive, Tolerant and Safe Community for Everyone." Resolution 17-13 recognized that California law limits cooperating with federal immigration enforcement; clarified that use of the City's limited resources should be aligned

with state law; and prohibited contacting, detaining, or arresting an individual based solely on their immigration status.

### X.    Berkeley

225.    Berkeley is a multicultural city of more than 125,000 people, with roughly a quarter of that population born outside of the United States. Berkeley has been the home of the modern sanctuary movement since the 1980s, when the City Council declared Berkeley to be a "City of Refuge" for immigrants. Berkeley has repeatedly reaffirmed its commitment to protecting the civil and human rights of all its residents, regardless of their immigration status.

226.    Berkeley's current sanctuary policy, which is consistent with state law such as SB 54, is contained in City Council Resolution No. 71,658-N.S., entitled "Reaffirming Berkeley as a Sanctuary City." Under the resolution, City employees are prohibited from, among other things, "us[ing] any City funds or resources to assist in the enforcement of Federal immigration law or to gather or disseminate information on the status of individuals in the City of Berkeley unless required by federal law."

### Y.    Boston

227.    Boston is the largest city in Massachusetts and one of its most diverse. Boston is home to immigrants and refugee residents with varying immigration statuses, from naturalized citizens to those without lawful immigration status. Boston's immigrant community is a valued and important part of the City's cultural landscape, and the City's departments and law enforcement personnel focus on providing municipal services to the entire Boston community, regardless of immigration status.

228.    In 2014, the City of Boston passed the Boston Trust Act, which outlines the Boston Police Department's role in interacting with federal immigration enforcement agencies. Boston City Code Section 11-1.9.

229.    Section 11-1.9 prohibits Boston law enforcement officers from (1) detaining an individual solely on the basis of a civil immigration detainer request or an ICE administrative warrant, in the absence of a criminal judicial warrant, and (2) using local resources to interrogate, detain, or arrest persons for immigration enforcement purposes that are otherwise the responsibility of ICE. *See* City of Boston Code, Section 11-1.9(D)(1).

230.     Section 11-1.9 works to protect limited municipal resources and promote public safety, and supports immigrant populations' willingness to report crimes and to cooperate with the City's public safety efforts. It is also consistent with state law, as articulated by the Massachusetts Supreme Judicial Court, the Commonwealth's highest court: "Massachusetts Law provides no authority for Massachusetts court officers to arrest and hold an individual solely on the basis of a Federal civil immigration detainer, beyond the time that the individual would otherwise be entitled to be released from State custody." *See Lunn v. Commonwealth*, 477 Mass. 517, 537 (2017).

**Z.     Cambridge**

231.     Cambridge is one of the most populous and ethnically diverse cities in Massachusetts. As of 2023, Cambridge's population totaled just over 118,000 people, 28% of whom were foreign born.

232.     Cambridge initially designated itself a sanctuary city in 1985. The Cambridge City Council reaffirmed this designation as recently as 2024, by declaring in a resolution that "Cambridge is a city proud of its diversity, immigrant population, and its role as a welcoming community to people from around the world," and "[n]on-Citizen residents of Cambridge are integral members of our community, contributing as workers, taxpayers, caregivers, students, and law-abiding neighbors." The 2024 resolution further stated that "Cambridge has a deep and unwavering commitment to diversity and inclusivity, ensuring that all individuals, regardless of immigration status, can live in peace, safety, and dignity, while and being protected from physical and emotional abuse, intimidation and discrimination," and "[t]hat the Cambridge City Council go[es] on record reaffirming its commitment to being a Sanctuary City and a welcoming community to immigrants from around the world, and encouraging residents of Cambridge, as well as people across the United States, to treat one another with kindness and respect, and to value the diversity that strengthens both Cambridge and the nation."

233.     The animating goals of Cambridge's sanctuary policies are to declare that all are welcome in the City and to increase public confidence in the City's government by establishing limits on the City's voluntary involvement with federal immigration enforcement. *See* Cambridge Mun. Code, Sec. 2.129.010. Specifically, under its Welcoming Community Ordinance, passed in 2020, Cambridge municipal code provides that "[i]t is not within the purview nor mandate of the City of

Cambridge to enforce federal immigration law or seek the detention, transfer or deportation of Cambridge residents for civil immigration purposes, nor should the City's resources be expended toward that end." *Id.* Under the ordinance, City staff and/or law enforcement officers may not, among other limits, (1) inquire about immigration status except as required by 8 U.S.C. § 1373; (2) take law enforcement action, including arrest, on the sole basis of actual or perceived immigration status; (3) perform the functions of an immigration officer except as required by law; (4) arrest or detain an individual solely on the basis of an ICE detainer or ICE administrative warrant; or (5) provide ICE agents access to individuals in custody except in response to a judicial warrant or other court order. *Id.*

### AA.    Cathedral City

234.    Cathedral City is a diverse city in eastern Riverside County, in the heart of the Coachella Valley. With a diverse population of almost 52,000, based on the 2020 Census, Cathedral City is the second-largest city in the Coachella Valley with residents and families of varying immigration statuses, from naturalized citizens to those without lawful immigration status.

235.    Cathedral City has declared that fostering a relationship of trust, respect, and open communication between City officials and residents is essential to the City's mission of delivering efficient public services, which in turn ensures public safety, a prosperous economic environment, increased opportunities for Cathedral City's youth, and a high quality of life for residents.

236.    Cathedral City is committed to ensuring that all persons, regardless of immigration status, feel free to contact law enforcement if they witness a reportable crime being committed or a have a medical emergency without the fear of being detained solely due to their immigration status. The City is also committed to preserving its limited municipal resources.

237.    As such, in 2017, Cathedral City declared itself as a place where all families can live without the fear of local law enforcement seeking their immigration or citizenship status by enacting City Resolution No. 2017-19, which declares that the City is a sanctuary city and prohibits City employees and officials from using City funds or resources to enforce federal civil immigration laws. The sanctuary resolution is consistent with California law, which also binds Cathedral City, and which limits the use of state and local resources in civil federal immigration enforcement. *See* Cal. Gov. Code Title 1, Div 7, Chapters 17.2, 17.25.

**BB.    Chicago**

238.    Chicago is the third largest city in the country and has more than 560,000 foreign-born residents living and working within its communities. Chicago prizes this vibrant and diverse population, which contributes to Chicago's social and cultural fabric, as well as to its economy.

239.    For decades, Chicago has adhered to a "Welcoming City" policy that prioritizes local crimefighting and community engagement rather than federal civil immigration enforcement. That policy promotes cooperation between local law enforcement and the diverse immigrant communities that have long flourished in Chicago.

240.    Chicago passed a Welcoming City Ordinance, codified at Chapter 2-173 of the Municipal Code, which limits Chicago's cooperation with federal immigration enforcement efforts. Specifically, Chicago's ordinance requires that "agent[s]" and "agenc[ies]" do not (1) detain individuals based on ICE detainers, (2) permit ICE agents to interrogate individuals in Chicago's custody, and (3) use city resources to communicate with ICE about custody release dates.

**CC.    Columbus**

241.    Columbus is the capital of Ohio, the state's largest city, and the fifteenth largest city in the country, with a population of over 905,000 people, according to the 2020 Census, over 155,000 of whom were born in other countries, including scores of refugees. Columbus's immigrant community consists of hundreds of business owners and thousands of students, and more than 100 languages are spoken in the City.

242.    In early 2017, Columbus's Mayor issued Executive Order 2017-01, titled "Reinforcing and Expanding City Immigration Policy for All Columbus Residents." The Order was issued with the purpose of instituting policies that respect the rights of all individuals, regardless of national origin or immigration status, preserving limited public resources, and promoting strong police-community relations. Pursuant to the Order, and among other directives, (1) no City department or employee is permitted to use city resources for the sole purpose of detecting or apprehending an individual based on suspected immigration status, unless in response to a court order; (2) City offices and employees are limited in their ability to inquire into immigration status for the purpose of providing city services;

and (3) the City announced a policy to "vigorously oppose any effort to require the use of local

taxpayer resources for the enforcement of federal immigration policy."

243.    Several months later, the Columbus City Council passed Ordinance 1304-2017, which

enacted Columbus Code Section 161.10. Section 161.10 in large part codified Executive Order 2017-

01 and imposed additional limits on City employees' and officials' ability to inquire into or investigate

a person's immigration status, in the absence of a warrant, a reported criminal violation, or an arrest.

Columbus has never declared itself to be a sanctuary city.

**DD.    Culver City**

244.    Culver City is a diverse city of approximately 40,000 residents (as of the 2020 Census)

located in Los Angeles County and mostly surrounded by the City of Los Angeles.

245.    Culver City is bound by the requirements of the California Values Act, also known as

SB 54, which limits California state and local law enforcement agencies from using their resources to

support federal immigration enforcement.

246.    In addition, in 2017, Culver City's City Council adopted Resolution No. 2017-R025,

declaring Culver City to be a sanctuary city for all of its residents regardless of immigration status. By

passing the Resolution, the City Council intended to demonstrate its commitment to fostering trust

between City officials and the public; to protect the safety, well-being, and constitutional rights of its

residents; and to direct the City's limited resources to matters of greatest concern to the City.

247.    Under the Resolution, City officials will, among other directives, (1) require a judicial

warrant before detaining an individual or prolonging a detention at the request of federal immigration

authorities, or before arresting, detaining, or transporting an individual solely on the basis of an

immigration detainer or other administrative document; (2) generally not allow access to persons in

City custody for enforcing civil immigration law; (3) generally not inquire into immigration status

unless required to do so by law or for a law enforcement purpose other than enforcing civil

immigration law; (4) not release personally identifiable information to federal immigration authorities

unless for a law enforcement purpose other than enforcing civil immigration law; and (5) not use City

resources to assist in the enforcement of federal immigration law unless otherwise required.

**EE.    Dane County**

248.    Dane County is the second largest county in Wisconsin with a population of almost 600,000, which includes the state capital of Madison and the University of Wisconsin. Dane County has a diverse population and is home to immigrants and refugee residents with varying immigration statuses, from naturalized citizens to those without lawful immigration status.

249.    The Dane County Sheriff's Office adheres to the protections guaranteed by the Fourth Amendment to the United States Constitution, which prohibits unreasonable searches and seizures. In accordance with that constitutional mandate, it is the policy of the Dane County Sheriff's Office, per the Sheriff's Office Booking Manual, not to detain individuals solely on the basis of an ICE detainer or administrative warrant.

**FF.    Denver**

250.    Denver is the capital city of Colorado and the state's largest city and county, with a population of 715,522 people, per the 2020 Census. Denver is a welcoming, diverse city that is home to nearly 100,000 immigrants and refugees.

251.    In 2017, Denver's Mayor issued Executive Order 142, titled "Standing with Immigrants and Refugees: A Safe and Welcoming City for All of Denver's People," in order to establish the City's priorities for interacting with Denver's immigrant communities. Under the Order, Denver made explicit that it would foster respect and trust between community members and all City officials, including law enforcement, and enhance communication and collaboration between community members and City officials, by ensuring that all community members enjoyed the rights and liberties guaranteed to them by the Constitutions of the United States and the State of Colorado.

252.    Also in 2017, Denver's City Council passed the "Public Safety Enforcement Priorities Act," which limits the use of city funds and resources in furtherance of federal civil immigration enforcement—by, for example, assisting with investigations, detentions, or arrests related to federal civil immigration enforcement, or inquiring into immigration or citizenship status—except as required by law or where necessary for public safety. *See* Denver Revised Municipal Code, Art. VIII, Sec. 28-250, *et. seq.* The Act, for example, also (1) limits federal immigration authorities' access to secure areas of City-owned law enforcement facilities for the purpose of federal immigration enforcement, in

the absence of a judicial warrant, and (2) prohibits City law enforcement officers from detaining an inmate who is otherwise eligible for release from custody on a civil detainer request by federal immigration authorities, absent a judicial warrant. *Id.*

253.    While Denver permits some coordination with federal law enforcement authorities, including by permitting law enforcement officers to notify federal law enforcement authorities of detainees' release dates, Denver's welcoming city policies and balanced approach to immigration enforcement allow Denver city employees to dedicate their time and resources to providing city services to all residents of Denver.

**GG.    Healdsburg**

254.    Healdsburg is an ethnically, racially, and culturally diverse city located in Sonoma County, California, with a population of approximately 11,340 residents, per the 2020 Census.

255.    Healdsburg adheres to California state law, including SB 54, which limits use of local resources for federal immigration enforcement. *See* Cal. Gov. Code Title 1, Div. 7, Chapters 17.2, 17.25.

256.    In 2017, Healdsburg's City Council also adopted Resolution No. 15-2017, "acknowledging and embracing the community's diversity, and expressing the City's commitment to non-discrimination and inclusivity and enhancing and protecting the quality of life of our residents." Among other things, Resolution 15-2017 states that the City strives to welcome all members of its community, regardless of immigration status. Resolution 15-2017 also states that the Healdsburg Police Department's mission is to protect all community members, regardless of immigration status, and as such, officers do not affirmatively request immigration status.

**HH.    Hennepin County**

257.    Hennepin County is home to over 1.2 million people, making it the most populous county in the state of Minnesota and its most diverse.

258.    Hennepin County is governed by a Board of Commissioners, which has consistently emphasized the County's priority of ensuring that all County residents thrive. Hennepin County's Sheriff has reiterated this shared goal.

259.     Hennepin County does not describe, and has not described, itself as a "Sanctuary County," and does not interfere with federal officials enforcing federal immigration law. It has no ordinances relating to immigration or citizenship status, and County employees—including its Sheriff Office staff—are instructed and expected to comply with all federal, state, and local law.

260.     Since 2021, the Hennepin County Sheriff's Office has implemented its Administrative Directive 21-02, a policy under which the Sheriff's Office will not hold individuals in custody based solely on an administrative warrant, including a DHS or ICE detainer. In addition, under the policy, the Sheriff's Office does not notify ICE of the admittance or release of any individual based on such detainers. This policy is consistent with 8 U.S.C. § 1373, the Fourth Amendment of the U.S. Constitution, all other applicable federal immigration law, and the Minnesota Government Data Practices Act.

**II.     Los Angeles**

261.     Since its founding, Los Angeles has always been a city of immigrants. The very first Angelenos—Los Pobladores—arrived here 236 years ago, a small band of settlers who traced their ancestry from all over the world, including to the native people of this region, and saw opportunity where the mountains meet the sea. In the centuries since, Los Angeles has grown into the most diverse city on the face of the earth—a city that champions inclusiveness and tolerance, and welcomes everyone who seeks to realize their dreams and build their families there.

262.     Today, more than 1.5 million residents of the City are foreign-born, and nearly two of every three Angelenos are either immigrants or children of immigrants. The City's immigrants are the engine of the Los Angeles economy, representing 47% of the employed workforce in the City and more than half of the self-employed workforce—entrepreneurship that generated $3.5 billion in income in 2014 alone. More than that, the City's immigrants have woven the social, cultural, and civic fabric of Los Angeles, from its educational institutions to artistic stages, from the halls of government to community activism, from the City's vibrant culinary scene to its fields of play.

263.     Because of the City's immigrant history, for nearly half a century, the Los Angeles Police Department ("LAPD") has implemented policies and practices designed to promote the public safety of the residents of Los Angeles by engendering cooperation and trust between its law

enforcement agencies and officers on the one hand, and members of the City's many immigrant communities on the other. The fundamental goal of these local policies and practices has been to encourage crime victims and witnesses of criminal conduct to cooperate with LAPD, irrespective of their immigration status.

264. For example, in 1979, LAPD began a policy known as "Special Order 40," which (1) restricted an LAPD officer from initiating a police action with the objective of discovering a person's immigration status, and (2) prohibited arrests based solely on that status.

265. In 2024, the Los Angeles City Council formally codified these immigration policies into the City's Municipal Code and expanded the local prohibition on the use of City resources for federal immigration enforcement, with which the City already adhered due to California state law, from the LAPD to all City personnel. *See* Los Angeles Municipal Code Sec. 19.190 *et seq*.

### JJ. Marin County

266. Marin County is home to approximately 260,000 people of diverse racial, ethnic, and national backgrounds, including a large immigrant population from countries around the world. The County of Marin celebrates the rich tapestry of diversity that makes its communities strong and vibrant, and recognizes that the County's strength comes from the contributions of individuals from all walks of life whose experiences, talents, and resilience enrich the County.

267. In 2020, to celebrate its immigrant community and to further foster trust between residents and law enforcement, the Marin County Board of Supervisors adopted Resolution 2020-97, which, among other directives, reaffirmed the County's support for California's SB 54, which limits the use of local resources for federal immigration enforcement. As a community bound by California law, Marin County continues to comply with SB 54.

268. Further, the Marin County Sheriff's Office maintains policies limiting inquiry into immigration status and limiting immigration detainers in a manner consistent with federal and state law. The Sheriff's Office's Immigration Violations Policy ("Policy 414") establishes clear limits on local involvement in federal immigration enforcement: (1) Deputies are prohibited from inquiring into an individual's immigration status for enforcement purposes and may not detain or arrest anyone solely based on immigration status or a civil immigration warrant. (2) They are also barred from

accessing or using Department of Motor Vehicles records for immigration enforcement. (3) Individuals cannot be held solely based on an immigration detainer. (4) Transfers to immigration authorities are permitted only in specific circumstances, such as when the individual has a qualifying felony conviction or is subject to a judicial warrant or outstanding federal felony warrant. (5) And, in the event ICE is notified of a release, the individual and their attorney or designated contact must also be notified.

### KK.    Menlo Park

269.    Menlo Park is a diverse city located in San Mateo County with a population of almost 33,780 residents, based on the 2020 Census, a significant number of whom were born outside of the United States. The City has long derived its strength and prosperity from its diverse community.

270.    In 2017, the City adopted City of Menlo Park Municipal Code Chapter 2.60, in part to create a community free from fear, in which individuals are assured that they can access the full range of City services, including law enforcement services, without risking that City officials would collect "sensitive information" like immigration or citizenship status, among other categories. Chapter 2.60, among other requirements, prohibits the use of City resources to gather such "sensitive information" in certain circumstances, or to "detain, relocate or intern" a person on the basis of such information, consistent with state and federal law.

271.    Menlo Park also limits the use of local resources for civil federal immigration enforcement consistent with California law. *See* Cal. Gov. Code Title 1, Div 7, Chapters 17.2, 17.25.

### LL.    Multnomah County

272.    Multnomah County is the largest county in the state of Oregon; includes Portland, Oregon's largest city; and boasts one of Oregon's most diverse communities, including a significant immigrant population made up of immigrants and refugee residents with varying immigration statuses.

273.    Since 1987, Oregon has prohibited any law enforcement agency of any political subdivision from using its resources for the purpose of detecting or apprehending persons whose only violation of law is being a person of foreign citizenship residing in the United States. *See, e.g.*, ORS 181.820. Multnomah County's Sheriff's Office is a law enforcement agency under the State of Oregon and is bound by that state law.

274.     More recently, Oregon has enacted additional laws that govern political subdivisions like Multnomah County that limit or prohibit assistance to federal immigration authorities. For example, law enforcement agencies in Oregon may neither expend resources for detecting or apprehending persons for the purpose of enforcing federal immigration laws, nor may they enter into agreements with federal immigration authorities to do so. *See* ORS 181A.820(2). Oregon law also prohibits law enforcement agencies from inquiring into or collecting information, in most cases, about an individual's immigration or citizenship status or country of birth. *See* ORS 181A.823. Oregon law also prohibits any use of public resources for the purpose of investigating, detecting, apprehending, arresting, detaining, or holding individuals for immigration enforcement, *see* ORS 181A.826(1), and directs public bodies like Multnomah County to decline federal requests relating to immigration enforcement, in the absence of judicial process. *See* ORS 181A.826(3). Oregon law prohibits civil arrests of any individual without a judicial warrant or order within a court facility, and prohibits civil arrests of any party or witness who is going to, attending, or leaving a court proceeding at the facility; in Multnomah County, Sheriff's Office deputies and other county officers ensure compliance with this law in courts. *See* ORS 181A.828(1); ORS 181.828(2). Multnomah County is bound by these and other similar state laws.

275.     Consistent with these laws, in 2016, Multnomah County's Board of County Commissioners issued Resolution 2016-132, which declares that Multnomah County is a sanctuary jurisdiction. The resolution affirms the County's commitment to ensuring that all community members have access to County resources and services for which they are eligible, irrespective of immigration status.

**MM.  Pacifica**

276.     Pacifica is a diverse city located in San Mateo County with a population of almost 38,640 residents, per the 2020 Census. Pacifica values its immigrant residents as essential members of the community, who contribute to the City's vibrant culture and power its economic engine. Pacifica is committed to providing the public with equal access to City services, regardless of immigration status.

277.     Pacifica has determined that fostering a relationship of trust, respect, and open communication between City officials and residents is essential to its goal of delivering efficient

public services. For example, Pacifica is committed to ensuring that all persons, regardless of immigration status, feel free to contact law enforcement if they are a victim of a crime, witness a reportable crime being committed, or have a medical emergency, without the fear of being detained solely due to their immigration status.

278. To foster that trust, and to prioritize use of its limited resources for local public services, in 2017, the City adopted City of Pacifica Municipal Code Title 4, Chapter 17, which, among other things, declares that the City is a sanctuary city and prohibits the use of City resources and personnel for immigration enforcement, including by prohibiting the Pacifica Police Department from participating with federal immigration law enforcement. Specifically, under Title 4, local law enforcement may not use local resources to (1) inquire into an individual's immigration status; (2) detain an individual on the basis of an ICE detainer; (3) make arrests based on civil administrative warrants except in limited circumstances; (4) give federal immigration agents access to interview persons in local custody for immigration enforcement purposes; or (5) otherwise perform the functions of a federal immigration officer. *See* Pacifica Municipal Code Section 4-17.03. City employees also may not condition access to City services on immigration status unless required by law, *id.* § 4-17.04, and generally are prohibited from releasing sensitive personal information, including release dates, and home and work addresses, absent a judicial warrant or court order or circumstances relevant to public safety, *id.* § 4-17.05. Pacifica also complies with state law, including SB 54.

**NN. Palo Alto**

279. Palo Alto is one of the principal cities of Silicon Valley. It has served as the headquarters or founding location of many of the world's largest and most influential tech companies. It is also home to Stanford University, a private research university that attracts students and academics from across the globe. The City also attracts many other foreign-born residents with varying immigration statuses. Palo Alto's immigrant community is a valued and important part of the City's social and cultural environment, and fostering cooperation and trust with Palo Alto's immigrant community plays a critical role in the City's crime-prevention efforts.

280. While Palo Alto does not have a municipal provision related to immigration or citizenship status, the City adheres to California state law, including SB 54, which limits the use of

local resources for federal immigration enforcement. *See* Cal. Gov. Code Title 1, Div 7, Chapters 17.2, 17.25. Consistent with state law, Palo Alto departments and staff do not operate for the purpose of enforcing federal immigration law, but rather to provide municipal services to the Palo Alto community, regardless of immigration status.

### OO.   Petaluma

281.    Petaluma is the second largest city in Sonoma County, California, with approximately 60,000 residents. Based on the most recent census, 15.1% of Petaluma's population is made up of foreign-born residents with varying immigration statuses, from naturalized citizens to those without lawful immigration status. Since Petaluma's incorporation in 1858, the City's immigrant community has been an essential part of Petaluma's culture, from the Chinese immigrants who labored to straighten the Petaluma River, to the immigrant families who built Petaluma's reputation as a leading producer of agricultural products in the nineteenth century, a sector that remains crucial in Petaluma today. The City's immigrant community continues to play a key role in that sector, as well as in all sectors of the local economy and community life.

282.    On February 23, 2025, the Petaluma City Council adopted Resolution no. 2025-019 N.C.S., "A Resolution of the City Council of the City of Petaluma Reaffirming the City's Commitment to Immigrants, Inclusivity, and Compliance with California Law, Including Senate Bill 54." The Resolution declared that Petaluma's immigrant residents are valued members of the Petaluma community who contribute to the City's strength and vibrancy, reaffirmed the City's right to limit the use of local resources for immigration enforcement consistent with SB 54 and other laws, and condemned threats by the federal government to coerce or intimidate local jurisdictions into acting inconsistently with their legal obligations and values with respect to immigration enforcement. The Resolution provided that the City would continue to support policies and practices that strengthen trust and cooperation between local government, law enforcement, and immigrant communities, including compliance with SB 54, which "ensure[s] local resources are used to promote community trust and safety while protecting immigrant communities," so as to promote public safety and wellbeing, and the overall strength of the Petaluma community.

**PP.    Pierce County**

283.    Pierce County, home of Tacoma, is the second largest county in Washington and the fifty-ninth most populous county in the United States. Pierce County strives to be an inclusive community with policies and programs that serve all of its residents.

284.    Pierce County is subject to state and local laws that make the county a welcoming place for immigrants. Under the "Keep Washington Working Act" ("KWW"), Laws of 2019 ch. 440, E2SB 5497 (May 21, 2019), all local governments in the state are precluded from using local resources to assist in federal immigration enforcement efforts. *See id.* Sec. 1. Under KWW, state and local law enforcement officers may not (1) "[i]nquire into or collect information about an individual's immigration or citizenship status, or place of birth unless there is a connection between such information and an investigation into a violation of state or local criminal law" or (2) "[p]rovide information pursuant to notification requests from federal immigration authorities for the purposes of civil immigration enforcement, except as required by law." RCW 10.93.160. KWW similarly prevents local jurisdictions from honoring immigration detainers unless accompanied by a judicial warrant. *Id.*

285.    Pierce County has remained steadfast in its compliance with KWW. On April 29, 2025, the Pierce County Council passed Resolution R2025-139s, which affirmed the County's commitment to "public safety, equity, and inclusive access to county services for immigrants, refugees and all residents." Resolution R2025-139s also affirmed the County's commitment to complying with KWW and ensuring that all residents can fully participate in economic and civic life without fear or discrimination.

**QQ.    Richmond**

286.    Richmond is located in the nine-county San Francisco Bay Area in West Contra Costa County. It is known for its unique history and its role in the World War II home front effort. During World War II, tens of thousands of workers from all over the country came to Richmond to support the wartime industries. Richmond was home to four Kaiser shipyards that housed the most productive wartime shipbuilding operations of World War II. It was also home to approximately five war-related industries, more than any other city of its size in the country. It is currently home to the Rosie the Riveter/World War II Home Front National Historical Park.

287.   Richmond has a population of approximately 115,000 people and is home to people of diverse racial, ethnic, and national backgrounds, including a large immigrant population—34.5% of Richmond's residents are foreign-born. Richmond recognizes that immigrants are valuable and essential members of the Richmond community, and has found that a relationship of trust between Richmond's immigrant community and Richmond, its departments, programs, and personnel is central to the public safety of Richmond residents. As such, Richmond has a history of fostering an atmosphere of trust and cooperation with its residents, including immigrant communities.

288.   As far back as 1990, Richmond has limited local cooperation with federal immigration enforcement, due to considerations such as "the possible disruption and inconvenience that may be experienced by the immigrant and refugee community in the City of Richmond." *See* Ordinance 29-90 N.S. More recently, in March 2025, Richmond adopted Ordinance 08-25 N.S., which added Chapter 2.30 to Article II of the Richmond Municipal Code ("RMC"). Richmond adopted RMC 2.30 to maintain the relationship of trust between Richmond and its residents, including its immigrant communities; protect the safety, well-being, and constitutional rights of Richmond residents; ensure effective policing; and direct Richmond's limited resources to matters of greatest concern. To achieve those goals, RMC 2.30 builds upon Richmond's prior legislation by providing clear limits on the use of City resources to assist with federal immigration efforts. Under Chapter 2.30, (1) no city resources can be utilized to assist in the enforcement of federal immigration law; (2) city resources shall not be used to gather or disseminate release dates or personal information unless required by law; in addition, consistent with California's SB 54—with which Richmond complies—Richmond Police Department officials (3) shall not detain an individual based on an ICE detainer request; (4) shall not arrest based on civil immigration warrants; (5) shall not perform the functions of an immigration officer; (6) generally shall not transfer an individual to civil immigration custody; and (7) generally shall not provide facilities for civil immigration enforcement purposes. *See* Richmond Municipal Code Section 2.30.030 – .060.

**RR.   Rochester**

289.   Rochester is New York's third largest city and it is home to a diverse population, including many immigrants and refugees. Rochester's support for immigrants and refugees—for all

those who flee violence and persecution—stretches back over 200 years. An integral component of the underground railroad and the adopted home of Frederick Douglass, Rochester first codified its support for the vulnerable and dispossessed on May 15, 1986, when the Rochester City Council established Rochester as a "City of Sanctuaries." *See* Council Resolution 86-29 ("the 1986 Resolution").

290.     The 1986 Resolution recognized that the regulation of immigration is a matter of federal jurisdiction, and it is the responsibility of federal officials to implement federal immigration and refugee policy. *Id.* With the proviso that City personnel will not violate any federal laws or interfere with law enforcement efforts, City personnel were directed to "exclude refugee status as a consideration in their daily activities and routine dealings with the public." *Id.* The 1986 Resolution recognized that many faith-based groups in the City provided services to refugees and others fleeing persecution. The 1986 Resolution reassured those faith communities, and those in their care, that they could freely access City services without concern for refugee status.

291.     Similarly, the City of Rochester Code ("Code"), Chapter 63, enshrines Rochester's "long tradition of tolerance and openness as a community." Ch. 63 Transmittal. Code Chapter 63 prohibits human rights violations, including discrimination on the basis of national origin. Code § 63-1. In enacting Code Chapter 63, the Council determined that Rochester was responsible for ensuring that

> "every individual within this City is afforded an equal opportunity to enjoy a full and productive life and that failure to provide such equal opportunity, whether because of discrimination, prejudice or intolerance in . . . public accommodations . . . based upon [*inter alia*] national origin . . . not only threatens the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety, and general welfare of the City and its inhabitants." *Id.*

292.     Code Chapter 63 defines national origin protections to include "persons not citizens." Code § 63-2. Moreover, pursuant to Code Chapter 63, the City is bound "not to discriminate" in the provision of any City programs or services. Code § 63-7. That Code prohibition against discrimination includes the provision of public safety and law enforcement services by the Rochester Police Department ("RPD").

293.     In the wake of the 2016 Presidential election and President Trump's January 25, 2017 executive order directing the Attorney General of the United States to scrutinize the actions of cities with sanctuary policies, the Council determined to enact a policy which would further assure immigrants and refugees that they are free to contact RPD or any other Rochester agency without fear of adverse immigration consequences. *See* Council Resolution 2017-5 ("the 2017 Resolution"). The 2017 Resolution enhanced public safety and neighborhood conditions for all Rochester residents, not just immigrants and refugees. *Id.*

294.     Subject to federal law and the Constitution of the United States of America, the 2017 Resolution requires that: (1) RPD "shall not engage in certain activities solely for the purpose of enforcing federal immigration laws, including not inquiring about the immigration status of an individual," except where necessary to investigate criminal activity; (2) "[Rochester] personnel shall not inquire about or request proof of immigration status or citizenship when providing services or benefits," except where required by law; and (3) Rochester funds and personnel shall not be used to "enforce or to assist in the enforcement of Federal immigration policies," except as required by law or in limited circumstances implicating public safety. *Id.* But the 2017 Resolution explicitly notes that it does not preclude Rochester personnel from communicating with immigration authorities. Likewise, RPD officials are authorized to assist federal immigration officials to execute judicial warrants or to investigate criminal activity.

295.     Thus, for nearly 40 years, Rochester has formally prioritized the use of its finite resources to ensure public safety while ensuring equal access to Rochester's services, including by immigrants and refugees. And these policies represent a proud tradition dating back centuries.

296.     Were federal immigration authorities to conscript Rochester officials into their immigration enforcement efforts—as they have done as recently as March 24, 2025, and continue to try to do as demonstrated in the allegations made by the U.S. government in the pending matter of *United States v. City of Rochester, et al.*, 25-cv-6226 (W.D.N.Y.)—it would pose a direct threat to the safety of Rochester's residents and guests because it would chill the willingness of Rochester's residents to report crime to RPD. It would also eat away at precious Rochester resources.

297.     Rochester is focused on upholding its core sovereign duty, to ensure the health and safety of Rochestarians—no matter where they come from. Immigration enforcement is the federal government's prerogative with which Rochester does not involve itself.

**SS.     Rohnert Park**

298.     Rohnert Park is a diverse city located in Sonoma County with a population of almost 44,390 residents, per the 2020 Census.

299.     Rohnert Park complies with state law, specifically SB 54, which limits the use of state and local resources in civil federal immigration enforcement. *See* Cal. Gov. Code Title 1, Div 7, Chapters 17.2, 17.25. The City's compliance with SB 54 does not obstruct federal law enforcement operation.

300.     Rohnert Park has limited resources and prioritizes those resources for local public services. Entangling local law enforcement with federal immigration enforcement diverts already limited resources and blurs lines of accountability between local and federal government.

**TT.     San Mateo County**

301.     San Mateo County is one of the nine counties that comprise the San Francisco Bay Area and is the fifteenth most populous county in California. The County occupies 455 square miles and contains 20 diverse cities that are home to immigrants and refugee residents with varying immigration statuses. San Mateo County's immigrant community is a valued and important part of the County's fabric and economic engine.

302.     San Mateo County's immigrant community is also a critical component of the County's crime prevention and public health and safety efforts. To effectively ensure the health and safety of the community, it is important that the community be willing to come forward when they are victims of crime or need health or other services that affect the community, without fear of being detained by immigration authorities.

303.     San Mateo County has formally prioritized using its finite resources to advance the health and safety of all members of the San Mateo County community by, among other things, certifying as a "Welcoming" place with Welcoming America, an organization that supports the proposition that our communities are stronger, safer, and more prosperous when immigrant neighbors

are included, valued, and listened to, and by enshrining principles of equity and inclusion into its ordinance code.

304.    For example, in addition to being bound by California law SB 54, in 2023, San Mateo County enacted an ordinance codified at Chapter 2.4 of its Ordinance Code entitled "Non-Cooperation with Immigration Authorities." This ordinance clarifies how County resources may be used in interacting with federal immigration agents. Specifically, the Ordinance restricts County personnel's ability to use County resources to assist federal authorities with civil immigration enforcement, limits certain information sharing, and restricts access to non-public areas of County facilities. *See* San Mateo County Ordinance Code § 2.48.010(a).

305.    In addition, the San Mateo County Sheriff's Office has adopted a policy of not aiding ICE in detaining and transferring residents without a valid judicial warrant.

306.    These policies further San Mateo County personnel's ability to focus on service provision to the San Mateo County community, regardless of immigration status, and not on immigration enforcement, which is within the province of the federal government.

**UU.    Santa Rosa**

307.    The City of Santa Rosa has a diverse population of approximately 178,000 residents, both native born and immigrants, whose collective cultures, religions, backgrounds, orientations, abilities, and viewpoints join to form a highly pluralistic community that prides itself on being a place that welcomes persons and families of all walks of life.

308.    Since 2013, the Santa Rosa Police Department has had a policy prohibiting members of the Department from (a) assisting federal agencies with the investigation, detention, or arrest of individuals solely for violation of federal immigration laws; (b) contacting, questioning, detaining, or arresting individuals based solely on their undocumented immigration status; or (c) seeking to discover the immigration status of any individual except as needed to protect public safety such as apprehending violent crime offenders. *See* Santa Rosa Police Department Policy 420.4.

309.    In 2017, the Santa Rosa City Council adopted Resolution RES-2017-017 declaring itself an "Indivisible City." The resolution prohibits all City employees, including members of the Santa Rosa Police Department, from "enforc[ing] Federal civil immigration laws" or "us[ing] city

monies, resources or personnel to investigate, question, detect, detain or apprehend persons solely on the basis of a possible violation of immigration law."

310.    In adopting the resolution, the Council declared that "Santa Rosa is a safe place for everyone, including, but not limited to, immigrants from all countries." The Council also found that local civil immigration enforcement would undermine "trust and cooperation with immigrant communities, increasing the risk of civil liability . . . and detracting from the core mission of the Santa Rosa Police Department to create safe communities." The Council further expressed the City's desire to "foster trust and cooperation as between the City, its police department, and its immigrant communities," and to "encourage immigrants to report crime and speak to the police without fear of being arrested or detained by, or reported to," federal immigration authorities.

311.    Thus, under established City policies, and consistent with SB 54, Santa Rosa does not use its own resources or staff to assist the federal government with enforcement of federal civil immigration laws. Instead, the City reserves its limited resources for critical local services. By doing so, Santa Rosa promotes public health and safety for its community by encouraging residents and visitors of all backgrounds to contact the City on a variety of safety issues, including reporting crimes, code enforcement and building and safety concerns, and seeking lifesaving first responder medical care, transportation, housing and homeless service needs.

## VV.    Sonoma County

312.    Sonoma County has a population of approximately 500,000 people, and is home to persons of diverse racial, ethnic, and national backgrounds, including a large immigrant population. All Sonoma County immigrant residents, whether they are U.S. citizens, permanent residents, undocumented residents, refugees, or residents with any other immigration status, are valued and integral members of the County's social, cultural, and economic fabric. Sonoma County endeavors to safeguard the public health and safety of all of its residents, a goal that depends on an environment of trust and cooperation between all residents and local law enforcement.

313.    Sonoma County complies with California law—the TRUST Act, the TRUTH Act, and SB 54, the California Values Act—that limits the circumstances under which local law enforcement, including the Sonoma County Sheriff's Office, may use funds or personnel to support immigration

enforcement or to detain individuals on behalf of federal immigration authorities. *See, e.g.*, Cal. Gov. Code Title 1, Div. 7, Chapters 17.2, 17.25.

314.    On January 10, 2025, the Sonoma County Board of Supervisors also adopted a "Resolution of the Board of Supervisors to Uphold the Civil Rights, Dignity, Health and Safety of Our Immigrant Population and All Sonoma County Residents." In doing so, the Board stated that it wanted the Sonoma County community to know that interacting with local government should not put any resident at risk, regardless of immigration status. *See* Resolution No. 25-0015.

315.    Through the Resolution, the Board declared that the County "decline[d] to participate in federal efforts to enforce" immigration law, and directed that, except as required by law, all County personnel are prohibited from using County resources to (1) investigate, interrogate, detain, detect, or arrest persons only for immigration enforcement purposes, or (2) communicate with ICE regarding an individual's immigration status, except as required by 8 U.S.C. § 1373 or other federal law. *Id.*

**WW.  Watsonville**

316.    Watsonville is a diverse city located in Santa Cruz County with a population of almost 52,590 residents, based on the 2020 Census. Watsonville has for 150 years welcomed individuals of diverse racial, ethnic, religious, and cultural backgrounds, including a large immigrant population. The City embraces, honors, and respects the contributions of all of its residents, regardless of their immigration status. Immigrants and their families in Watsonville contribute to the economic and social fabric of the City by establishing and patronizing businesses, working for both growers and food processors in the Pájaro Valley, participating in the arts and culture, and achieving significant educational accomplishments.

317.    Watsonville has declared that fostering a relationship of trust, respect, and open communication between City officials and residents is essential to the City's mission of delivering efficient public services in partnership with the community, which ensures improved public safety, a prosperous economic environment, opportunities for the City's youth, and a high quality of life for residents. Furthermore, Watsonville has limited resources and prioritizes those resources for local public service.

318.   In 2007, the City adopted Resolution No. 98-07 designating the City as a Sanctuary City. That same year, the City also affirmed its commitment to equity and inclusion by adopting Ordinance No. 1353-17 ("Sanctuary Ordinance"). The Sanctuary Ordinance reaffirms Watsonville's status as a Sanctuary City and establishes the City's procedures regarding immigration status and enforcement of federal civil immigration laws. The Sanctuary Ordinance is consistent with California law, SB 54, which limits the use of State and local resources in civil federal immigration enforcement. *See* Cal. Gov. Code Title 1, Div. 7, Chapters 17.2, 17.25; Watsonville Ordinance No. 1353-17.

319.   Notably, Section 3 of the Sanctuary Ordinance prohibits City officials and employees from enforcing federal civil immigration laws or using City resources to investigate, question, detect, or apprehend a person on the basis of their immigration status, except as allowed by the Ordinance. And Section 5 of the Sanctuary Ordinance, among other directives, limits using City resources to investigate or detain a person solely on the basis of their immigration status, or an immigration detainer or administrative warrant based solely on a violation of immigration law, or to disclose release dates for immigration enforcement purposes, except as required by law or otherwise permitted by the Ordinance. *See* Watsonville Ordinance No. 1353-17.

320.   In January 2025, the City reaffirmed its commitment to the protections of the Sanctuary Ordinance, and enacted other provisions protecting its immigrant community, by adopting Resolution 21-25 ("Sanctuary Resolution"), which provides that the City is a welcoming and inclusive community for all.

**XX.   Wilsonville**

321.   Wilsonville is a City in Clackamas and Washington counties, Oregon, with a population of approximately 26,000 people, as of the 2020 Census. Wilsonville declares itself a welcoming and inclusive city, which prohibits the use of local funds, personnel, or equipment for the enforcement of federal immigration laws, consistent with federal and state law. *See* Resolution No. 2626.

322.   Specifically, Oregon state law precludes the use of local law enforcement resources to detect or apprehend persons whose only violation was being in the country without documentation, and Wilsonville complies with that law. *See* ORS 181A.820 - .829.

323.     In addition, in 2017, the Wilsonville City Council adopted Resolution No. 2626 declaring the City of Wilsonville to be a welcoming and inclusive city. Resolution No. 2626 states, "The City will continue, in a manner consistent with the laws of the United States of America, the State of Oregon, and the City of Wilsonville, to prohibit the use of City funds, personnel, and/or equipment for the enforcement of federal immigration laws. This Resolution shall be interpreted and executed in a manner consistent with ORS 181A.820 and with 8 U.S.C. §§ 1373 and 1644." The Resolution further states, in relevant part, "The City of Wilsonville will ensure all City services are provided regardless of immigration status. Further, City staff will not ask for or otherwise seek out an individual's immigration status as a condition of providing City services, unless the provision of such services has a legal requirement to obtain such information." Wilsonville Resolution No. 2626.

## II.     Defendants' Efforts to Defund and Threaten "Sanctuary" Jurisdictions

### A.     President Trump's Executive Orders

#### 1.     The First Trump Administration's Unsuccessful Efforts to Defund "Sanctuary" Jurisdictions

324.     President Trump's efforts to threaten and coerce municipalities like Plaintiffs that limit cooperation with federal civil immigration enforcement is not new. Days into his first term in January 2017, he issued Executive Order 13,768. 82 Fed. Reg. 8799 (Jan. 25, 2017). That Executive Order declared that "sanctuary" jurisdictions were jurisdictions that "willfully violate Federal law in an attempt to shield aliens from removal from the United States," and declared it the policy of the executive branch to ensure that "sanctuary" jurisdictions "that fail to comply with applicable Federal law do not receive Federal funds, except as mandated by law." *Id.*

325.     To effectuate this policy, the Executive Order directed the Attorney General and Secretary of Homeland Security that any jurisdictions "that willfully refuse to comply with 8 U.S.C. § 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary." 82 Fed. Reg. at 8801.

326.     The Attorney General was further directed to "take appropriate enforcement action against any entity that violates 8 U.S.C. § 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law." *Id.*

327.    With Executive Order 13,768, President Trump and his administration sought to coerce states, counties, and cities to go against their considered judgments about how best to use their own law enforcement resources to serve their communities, and abandon their policies of non-cooperation with federal civil immigration enforcement. In some cases, the threat had its desired effect, with local governments like Miami-Dade County quickly announcing they were letting go of their policies in order to keep their federally funded programs and services.

328.    Plaintiffs City and County of San Francisco and County of Santa Clara challenged Executive Order 13,768 as unconstitutional. This Court granted San Francisco and Santa Clara's motion for preliminary injunction, *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017), and later granted their motion for summary judgment, issuing a permanent injunction enjoining enforcement of Executive Order 13,768, *Cnty. of Santa Clara v. Trump*, 267 F. Supp. 3d 1201 (N.D. Cal. 2017). The Ninth Circuit affirmed this Court's ruling that the Executive Order was unconstitutional. *City & Cnty. of S.F.,* 897 F.3d at 1235. This Court then entered a final judgment and order enjoining the Trump Administration from enforcing the relevant section of Executive Order No. 13,768 within the State of California. *See* Stipulation and Final Judgment and Order, ECF No. 235, *City & Cnty. of S.F. v. Trump*, No. 17-cv-00485 (N.D. Cal. Aug. 15, 2019).

329.    The first Trump Administration then tried another approach to cut funds to jurisdictions that the administration considered "sanctuary jurisdictions." DOJ tried to condition funding under the Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG") on local cooperation with federal civil immigration enforcement priorities. Those conditions too were swiftly and successfully challenged, including before this Court and the Ninth Circuit. *See, e.g.*, *City & Cnty. of S.F. v. Sessions*, 349 F. Supp. 3d 924 (N.D. Cal. 2018); *City & Cnty. of S.F. v. Sessions*, 372 F. Supp. 3d 928 (N.D. Cal. 2019); *Oregon v. Trump*, 406 F. Supp. 3d 940, 963 (D. Or. 2019); *City and Cnty. of S.F. v. Barr*, 965 F.3d 753, 757 (9th Cir. 2020); *City & Cnty. of S.F. v. Garland*, 42 F.4th 1078, 1084 (9th Cir. 2022). Those lawsuits resulted in injunctions here and elsewhere prohibiting DOJ from withholding Byrne JAG funds based on the challenged immigration-related conditions. Notably, the United States District Court for the Northern District of Illinois issued an order that "applie[d] to the Attorney General's imposition of the Challenged Conditions *and any materially identical conditions on the*

*Byrne JAG grant program in FY 2018 and all future grant years*." Am. Final Judgment & Order at 3, ECF No. 183, *City of Chicago v. Garland*, No. 18-cv-06859 (N.D. Ill. Mar. 8, 2022) (emphasis added). The court also specified that the order's "effects run to the benefit of all Byrne JAG applicants and recipients and are not limited to the City of Chicago and its sub-grantees." *Id.*

330.     Ultimately, when President Joseph R. Biden took office, he issued Executive Order 13,993, which rescinded President Trump's Executive Order 13,768. *See* 86 Fed. Reg. 7051 (Jan. 20, 2021).

### 2.     President Trump Renews Efforts to Unlawfully Target "Sanctuary" Jurisdictions by Issuing Executive Orders 14,159, 14,218, and 14,287

331.     Immediately upon taking office for his second term on January 20, 2025, President Trump issued a slew of Executive Orders vilifying immigrants and renewing his efforts to target "sanctuary" jurisdictions.

332.     First, the President issued Executive Order 14,148, entitled "Initial Rescissions of Harmful Executive Orders and Actions." 90 Fed. Reg. 8237 (Jan. 20, 2025). In relevant part, Executive Order 14,148 revoked Executive Order 13,993—and purported to reverse the revocation of President Trump's Executive Order 13,768. 90 Fed. Reg. at 8237.

333.     Second, the President doubled down on his efforts to compel sanctuary jurisdictions to do his bidding by issuing Executive Order 14,159, entitled "Protecting the American People Against Invasion." 90 Fed. Reg. 8443 (Jan. 20, 2025) (Exhibit A). Executive Order 14,159 repeats the xenophobic rhetoric common to this Administration, asserting without factual basis that "[m]any . . . aliens unlawfully within the United States present significant threats to national security and public safety, committing vile and heinous acts against innocent Americans," are "engaged in hostile activities, including espionage, economic espionage, and preparations for terror-related activities," and "have abused the generosity of the American people." 90 Fed. Reg. at 8443.

334.     Section 17 of Executive Order 14,159 provides as follows:

> *Sanctuary Jurisdictions*. The Attorney General and the Secretary of Homeland Security shall, to the maximum extent possible under law, evaluate and undertake any lawful actions to ensure that so-called "sanctuary" jurisdictions, which seek to interfere with the lawful exercise

of Federal law enforcement operations, do not receive access to Federal funds. Further, the Attorney General and the Secretary of Homeland Security shall evaluate and undertake any other lawful actions, criminal or civil, that they deem warranted based on any such jurisdiction's practices that interfere with the enforcement of Federal law. 90 Fed. Reg. at 8446.

335.    Like Executive Order 13,768 before it, Executive Order 14,159 contains both a restriction on funding (contained in sentence one) and an enforcement directive (contained in sentence two) against jurisdictions they deem "sanctuary jurisdictions."

336.    The funding restriction in the Order requires the Attorney General and DHS Secretary to withhold all "Federal funds" from "sanctuary" jurisdictions "to the maximum extent permissible by law." 90 Fed. Reg. at 8446.

337.    The enforcement directive in the Executive Order directs the Attorney General and DHS Secretary to evaluate and pursue "criminal or civil" legal action against any sanctuary jurisdiction based on any practices deemed to "interfere with the enforcement of Federal law." *Id.*

338.    Notably, the Administration's definition of "sanctuary jurisdictions" is even broader than under Executive Order 13,768. Where Executive Order 13,768 defined sanctuary jurisdictions by reference to compliance with 8 U.S.C. § 1373, Executive Order 14,159 simply defines sanctuary jurisdictions as those "seek[ing] to interfere with the lawful exercise of Federal law enforcement operations" in the Administration's view. *Id.*

339.    Executive Order 14,159 is an attempt to circumvent this Court's permanent injunction entered against Section 9 of Executive Order 13,768. In substance, both orders are the same—each directs the Attorney General or the Secretary of Homeland Security to withhold federal funds from sanctuary jurisdictions. Executive Order 14,159 fails to cabin its reach to any subset of federal funds, and so, on its face, it is as expansive as Executive Order 13,768. Neither order attempts to advance a clear definition of what constitutes a "sanctuary" jurisdiction, nor is there any semblance of congressional authority to support either order.

340.    In an interview on January 22, 2025—two days after issuing Executive Order 14,159— President Trump publicly expressed his intent to "get rid of" and "end" sanctuary jurisdictions, and confirmed that withholding federal funds is one of the ways the Administration aims to achieve this

goal.[2]

341.     In a further effort to weaponize federal funding to coerce local jurisdictions, on February 19, 2025, President Trump issued Executive Order 14,218, entitled "Ending Taxpayer Subsidization of Open Borders." 90 Fed. Reg. 10581 (Exhibit B). Section 2(a)(ii) of that Executive Order directs every federal agency to "ensure, consistent with applicable law, that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation." 90 Fed. Reg. at 10581. The asserted purpose of this directive is to "prevent taxpayer resources from acting as a magnet and fueling illegal immigration to the United States" and to ensure that "no taxpayer-funded benefits go to unqualified aliens." *Id.*

342.     Executive Order 14,218 does not define "sanctuary" policies or "Federal payments," or clarify what it means for federal payments to "abet" sanctuary policies. Nor does the Executive Order provide an explanation for why funding to localities with "sanctuary" policies "fuel[s] illegal immigration" or results in taxpayer-benefits to "unqualified aliens."

343.     Tripling down on his threat to defund "sanctuary" jurisdictions, on April 28, 2025, President Trump issued Executive Order 14,287, entitled "Protecting American Communities from Criminal Aliens." 90 Fed. Reg. 18761 (Exhibit E). Section 2 of Executive Order 14,287 instructs the Attorney General and the Secretary of Homeland Security to "publish a list of States and local jurisdictions that obstruct the enforcement of Federal immigration laws (sanctuary jurisdictions)" and to notify each "sanctuary jurisdiction regarding its defiance of Federal immigration law enforcement and any potential violations of Federal criminal law." *Id.* Like Executive Orders 14,159 and 14,218, Executive Order 14,287 does not define what criteria the Attorney General and the Secretary of Homeland Security must use in classifying a locality as a "sanctuary jurisdiction."

344.     Section 3(a) of Executive Order 14,287 further directs "each executive department or agency . . . in coordination with the Director of the Office of Management and Budget and as

[2] Tr. of Interview Between President Donald J. Trump and Sean Hannity (Fox News broadcast Jan. 22, 2025), available at https://rollcall.com/factbase/trump/transcript/donald-trump-interview-sean-hannity-fox-news-january-22-2025/.

permitted by law" to "identify appropriate Federal funds to sanctuary jurisdictions, including grants and contracts, for suspension or termination, as appropriate." *Id.* Section 3(b) of EO 14,287 directs that the Attorney General and the Secretary of Homeland Security "shall pursue all necessary legal remedies and enforcement measures" against "sanctuary" jurisdictions. *Id.* Finally, Section 4 of EO 14,287 threatens additional mechanisms "to ensure appropriate eligibility verification is conducted for individuals receiving Federal public benefits" in "sanctuary" jurisdictions. *Id.*

345.    The White House also issued a "Fact Sheet" accompanying Executive Order 14,287. The "Fact Sheet" makes clear that the Executive Order "follow[s] through on [President Trump's] promise to rid the United States of sanctuary cities." It also includes the following quote from President Trump: "No more Sanctuary Cities! They protect the Criminals, not the Victims. They are disgracing our Country, and are being mocked all over the World. Working on papers to withhold all Federal Funding for any City or State that allows these Death Traps to exist!!!"

346.    Other Trump administration officials have also publicly confirmed the Administration's intent to go after localities they deem to be "sanctuary" jurisdictions. For example:

        a.   On January 22, 2025, Stephen Miller, President Trump's Deputy Chief of Staff for Policy claimed that the Administration would pursue "civil and, if necessary, criminal charges against anybody who shelters or harbors criminal aliens," including individuals in sanctuary cities who he claimed were "harboring violent and dangerous criminals from federal law enforcement."[3]

        b.   On January 31, 2025, Defendant Noem appeared for an interview on Fox News during which she was asked whether the Administration would take action against sanctuary city officials. She confirmed that "of course we will," and stated that she would follow President Trump's direction on "how we are going

---

[3] Adam Shaw, *Trump's ICE racks up hundreds of arrests, including illegal immigrants arrested for horror crimes*, Fox News (Jan. 22, 2025), https://www.foxnews.com/politics/trumps-ice-racks-up-hundreds-arrests-including-illegal-immigrants-arrested-horror-crimes

to go after these individuals."[4]

    c.    On February 3, 2025, Tom Homan, the acting director of ICE, told Fox News that President Trump "will end sanctuary cities" and that "we're going to sue 'em."[5]

    d.    On February 6, 2025, Homan confirmed to reporters at the White House that the Administration plans to "hold [sanctuary cities] accountable and take them to court."[6]

    e.    On March 14, 2025, Defendant Bondi went on national TV and made clear that the Trump administration is targeting "sanctuary" jurisdictions, stating that "we will continue to pull their federal funding until they comply" with Defendants' sweeping and improper assertion of federal control over local affairs.[7]

    f.    On March 19, 2025, DOJ told the media that "[t]he Department of Justice has made it crystal clear" that so-called "sanctuary" jurisdictions "will be sued and stripped of federal funding."[8]

    g.    On March 27, 2025, the President declared that he would "end sanctuary cities" through potential further Executive action.[9]

    h.    On May 29, 2025, DHS issued a press release that "Exposes Sanctuary Jurisdictions" for "protect[ing] dangerous criminal illegal aliens from facing

---

[4] "Trump is 'restoring law and sovereignty' with mass deportations, Stephen Miller says," Fox News (Jan. 22, 2025), available at https://www.foxnews.com/video/6368025256112.

[5] "Trump 'border czar' Tom Homan: We have a great team and 'will not fail this president,'" Fox News (Feb. 3, 2025), available at https://www.foxnews.com/video/6368227422112.

[6] Bernd Debusmann Jr., *Trump administration sues Chicago over 'sanctuary city' laws*, BBC News (Feb. 6, 2025), https://www.bbc.com/news/articles/c8r585ndey4o.

[7] Interview between Attorney General Pam Bondi and Maria Bartiromo, at 3:30–4:30, "AG Pam Bondi says 'America will be transparent again' on politics, justice," Fox Business (Mar. 14, 2025), https://www.foxbusiness.com/video/6370020686112.

[8] Wisdom Howell, *'Sanctuary' jurisdictions seek injunction against Trump administration's funding freeze*, Daily Journal (Mar. 19, 2025), https://perma.cc/44YQ-FD8P.

[9] Michael Lee, *Trump anti-sanctuary city executive order could target federal funding, says expert*, Fox News (Mar. 27, 2025), https://perma.cc/3UXA-VV72.

consequences and put[ting] law enforcement in grave danger" and includes this quote from Defendant Noem: "*Sanctuary politicians are on notice: comply with federal law.*"[10]

## B.    DOJ Implements President Trump's Executive Orders

### 1.    DOJ Implements Executive Order 14,159

347.    On January 21, 2025, a day after Executive Order 14,159 was issued, Defendant Acting Deputy Attorney General Bove issued a memorandum to all DOJ employees entitled "Interim Policy Changes Regarding Charging, Sentencing, And Immigration Enforcement" ("Bove Directive") (Exhibit C).

348.    The Bove Directive implements Executive Order 14,159, including the enforcement directive related to sanctuary jurisdictions. Ex. C at p.3. The memo states the position of DOJ that "[t]he Supremacy Clause and other authorities require state and local actors to comply with the Executive Branch's immigration enforcement initiatives." *Id.* Immigration enforcement initiatives are not defined. On information and belief, Defendants seek to unlawfully compel localities across the country, including Plaintiffs, and in contravention of court orders and precedent, to participate and assist with aggressive immigration enforcement measures announced by the Trump Administration.

349.    The Bove Directive further states DOJ's view that state and local actors violate federal law if they "fail[] to comply with lawful immigration-related commands and requests" pursuant to a non-exhaustive and vague list of authorities, including the President's "extensive Article II authority with respect to foreign affairs and national security, the Immigration and Nationality Act, and the Alien Enemies Act." *Id.*

350.    The Bove Directive also concludes that jurisdictions with laws that "prohibit[] disclosures of information to federal authorities engaged in immigration-enforcement activities" "threaten to impede Executive Branch immigration initiatives" and "threaten public safety and national security." *Id.*

---

[10] "DHS Exposes Sanctuary Jurisdictions Defying Federal Immigration Law," U.S. Department of Homeland Security (May 29, 2025), https://www.dhs.gov/news/2025/05/29/dhs-exposes-sanctuary-jurisdictions-defying-federal-immigration-law.

351.    The scope of immigration-related "commands" and "requests" is not defined, nor does the Bove Directive describe what information must be disclosed to immigration authorities. In fact, Defendants appear to interpret federal law to require that local jurisdictions comply with civil detainer requests, notification requests, civil administrative warrants, and request for personal information (including contact information and release dates) about undocumented residents in Plaintiffs' jurisdictions, despite court orders and precedent foreclosing Defendants' understanding of federal law. See Part II.C, infra.

352.    The Bove Directive directs U.S. Attorney's Offices to investigate incidents of local actors failing to comply with immigration enforcement initiatives, commands, or requests for prosecution under 18 U.S.C. § 371, 8 U.S.C. § 1324, and 8 U.S.C. § 1373.

353.    Plaintiffs' decision to decline to participate in federal immigration enforcement efforts is not a crime under any of the cited statutes. 8 U.S.C. § 1324 makes it a felony to, *inter alia*, knowingly or recklessly conceal, harbor, or shield an undocumented immigrant from detection or encourage or induce an undocumented immigrant to come to, enter, or reside in the United States. *See* 8 U.S.C. § 1324(a)(1)(A)(iii), (iv). A violation of these provisions, without any aggravating circumstances, is subject to fines and a sentence of up to five years in prison for each person involved. *Id.* § 1324(a)(1)(B).

354.    Declining to provide local resources to assist with all federal immigration initiatives, commands, and requests does not constitute a violation of § 1324. As discussed above, and consistent with Ninth Circuit precedent, Plaintiffs' laws do not and are not intended to interfere with federal law enforcement or shield or conceal undocumented immigrants from federal immigration authorities, but are instead a lawful exercise of authority to preserve scarce local resources to address matters of local concern and to build trust between government and the local community.

355.    8 U.S.C. § 1373 makes it unlawful for any jurisdiction to "prohibit, or in any way restrict," any government entity or official from sending "citizenship or immigration status" information about an individual to federal immigration authorities, or receiving such information from immigration authorities.

356.     This Court and the Ninth Circuit have held that § 1373 does not require jurisdictions to share non-immigration-status information (such as custody status, release date, and contact information) with immigration authorities. *See City & Cnty. of S.F. v. Sessions*, 349 F. Supp. 3d 924, 969 (N.D. Cal. 2018); *United States v. California*, 921 F.3d 865, 891–93 (9th Cir. 2019); *City & Cnty. of S.F. v. Barr*, 965 F.3d 753 (9th Cir. 2020). Any interpretation of § 1373 that would require assistance more broadly squarely conflicts with this precedent.

357.     18 U.S.C. § 371 makes it a crime to conspire to commit an offense against or defraud the United States. If the underlying offense is a felony, a violation of this provision is subject to financial penalties and/or a sentence of up to five years in prison. For the reasons stated above, Plaintiffs do not believe that their policies violate federal law or constitute an offense against the United States.

358.     In addition to threatening prosecution under these statutes, the Bove Directive announces that a newly established "Sanctuary Cities Enforcement Working Group" will "identify state and local laws, policies, and activities that are inconsistent with Executive Branch immigration initiatives" and take legal action to challenge these laws. Ex. C at p.3.

359.     In the context of other contemporaneous actions taken by the Administration, Defendants' directive that local actors must "comply" with immigration-related "initiatives" and "requests" under threat of prosecution is extraordinarily vague and could effectively require local jurisdictions in every state to administer federal immigration laws, in contravention of the text of federal statutes, constitutional principles, and precedent foreclosing such a view.

360.     For example, on January 23, 2025, the then-acting DHS Secretary issued an order entitled "Finding of Mass Influx of Aliens" ("DHS Order"). In that Order, the acting Secretary invoked his authority under the INA and 28 C.F.R. § 65.83 to "request assistance from a State or local government in the administration of the immigration laws of the United States," *inter alia*, when "there exist circumstances involving the administration of the immigration laws of the United States that endanger the lives, property, safety, or welfare of the residents of a State or locality," including an "actual or imminent mass influx of aliens" arriving at the border. 28 C.F.R. § 65.83(b), (d)(1).

361.    Citing various statistics about the number of undocumented immigrants crossing the southern border, the acting DHS Secretary concluded there was "an actual or imminent mass influx of aliens" at the southern border and that this "influx" threatens all 50 states.

362.    On this account, the acting DHS Secretary formally invoked his authority under the INA and implementing regulations to "request the assistance of State and local governments in all 50 States" to administer federal immigration law.

363.    While the DHS Order is phrased as a "request," the Bove Directive provides that states and local jurisdictions are *required* to comply with the Executive Branch's "initiatives" and "requests."

### 2.    DOJ Announces Pause of Federal Funding for "Sanctuary" Jurisdictions and Orders Investigations and Prosecutions of These Jurisdictions

364.    On January 27, 2025, the Office of Management and Budget ("OMB") issued Memo 25-13 ("OMB Memo") announcing a pause on "all Federal financial assistance" in order to review and implement the funding conditions in several of President Trump's Executive Orders, including the Funding Restriction in Executive Order 14,159.

365.    The OMB Memo was immediately challenged in at least two cases. *See Nat'l Council of Nonprofits v. Office of Mgmt. & Budget*, No. 25-239 (D.D.C. filed Jan. 28, 2025); *New York v. Trump*, No. 25-CV-39 (D.R.I. filed Jan. 28, 2025). DOJ and the then Acting Attorney General were named in the *New York* lawsuit. The federal court in that case issued a Temporary Restraining Order directing that the defendants (including DOJ) may not "pause, freeze, impede, block, cancel, or terminate" federal financial assistance to the States as directed by the OMB Memo "except on the basis of the applicable authorizing statutes, regulations, and terms." TRO at 11, ECF No. 50, *New York* (Jan. 31, 2025). Defendants were further enjoined from "giving effect to the OMB Directive under any other name or title or through any other Defendants." *Id.* at 12.

366.    On February 5, 2025, Defendant Attorney General Bondi issued the Bondi Directive to all DOJ employees entitled "Sanctuary Jurisdiction Directives" (Exhibit D).

367.    Consistent with the direction of Executive Order 14,159, the Bondi Directive states that DOJ announced its own funding restriction to "ensure that, consistent with law, 'sanctuary

1    jurisdictions' do not receive access to Federal funds from the Department." Ex. D at p.1.

2        368.    The Attorney General also proscribes that "[s]anctuary jurisdictions should not receive

3    access to federal grants administered by the Department of Justice." Ex. D at p.1. Rather than relying

4    on the (enjoined) Funding Restriction in Executive Order 14,159, the Attorney General purports to

5    invoke DOJ's "own authority to impose any conditions of funding that do not violate applicable

6    constitutional or statutory limitations." *Id.* The memo further states that certain DOJ grants will be

7    conditioned on compliance with 8 U.S.C. § 1373, and that future grants may be tailored "to promote a

8    lawful system of immigration" and to "reduce efforts by state or local jurisdictions to undermine a

9    lawful system of immigration." *Id.* at 2.

10       369.    To effectuate this unlawful order, the Attorney General directs that the Department of

11   Justice "shall pause the distribution of all funds until a review has been completed, terminate any

12   agreements that are in violation of law or are the source of waste, fraud, or abuse, and initiate

13   clawback or recoupment procedures, where appropriate." Ex. D at p.1. The Attorney General purports

14   to justify this measure as "[c]onsistent with applicable statutes, regulations, court orders, and terms."

15   *Id.*

16       370.    The Bondi Directive defines a "sanctuary jurisdiction" as "includ[ing]" any jurisdiction

17   that refuses to comply with 8 U.S.C. § 1373 or "willfully fail[s] to comply with other applicable

18   federal immigration laws." *Id.* at p.2.

19       371.    Contrary to law and express precedent, Defendants interpret § 1373 to preclude local

20   jurisdictions from preventing their employees from asking individuals about citizenship or

21   immigration status information or limiting sharing of non-immigration status information (such as

22   custody status, release date, and contact information) with immigration authorities.

23       372.    Consistent with the enforcement directive in Executive Order 14,159 and the Bove

24   Directive, the Bondi Directive provides that state and local actors "may not" "fail to comply with

25   lawful immigration-related directives." Ex. D at p.3. It also states that jurisdictions with policies that

26   "impede lawful federal immigration operations" will be challenged. efforts to enforce immigration

27   law." *Id.*

28

---

373.    The Memo then repeats the instruction to DOJ staff to investigate and prosecute such conduct under 18 U.S.C. § 371 and 8 U.S.C. §§ 1324 and 1373, and for the Sanctuary Cities Enforcement Working Group to bring legal actions challenging sanctuary policies. *Id.*

### 3.    DOJ Takes Enforcement Action Against Sanctuary Jurisdictions

374.    The enforcement directive in Executive Order 14,159, and the Bove and Bondi Directives, are not idle threats.

375.    On February 6, 2025, the United States filed a lawsuit against the State of Illinois, Plaintiff Chicago, Cook County, and various local officials alleging that these jurisdictions' laws violated federal law. Compl., *United States v. State of Illinois*, ECF No. 1, No. 25-cv-01285 (N.D. Ill.) (*Illinois* Compl.). The lawsuit explicitly invokes Executive Order 14,159. *Illinois* Compl. ¶ 1.

376.    The lawsuit reveals the sheer breadth of power that Defendants claim they can assert over state and local policies, despite court orders and precedent to the contrary.

377.    The federal government's complaint challenges provisions of the Illinois jurisdictions' laws that prohibit state and local officials from (1) detaining an individual on the basis of a detainer or civil administrative warrant, *Illinois* Compl. ¶ 42, 48, 54; (2) assisting with federal civil immigration enforcement or detaining individual for federal civil immigration violations, *id.* ¶ 43; (3) inquiring about the citizenship or immigration status of any individual, *id.* ¶ 44; (4) providing immigration authorities access to individuals in local custody for investigative interviews, *id.* ¶ 48; and (5) providing immigration authorities with information regarding an individual's release date, *id.* ¶ 48; *see generally id.* ¶¶ 8–10.

378.    The federal government asserts that such provisions violate 8 U.S.C. § 1373 because, *inter alia*, they (1) prevent state and local actors from expending resources to respond to immigration enforcement inquiries about "custody status, release date, or contact information," and (2) preclude local officials from requesting or maintaining the immigration status of any individual. *Id.* ¶ 66.

379.    The government further asserts that provisions of these jurisdictions' laws violate federal law, including the Supremacy Clause, by limiting compliance with immigration detainers or civil administrative warrants, limiting access to individuals in local custody, and limiting the sharing of personal and release date information with immigration authorities. *Id.* ¶¶ 68–70.

380.    Less than a week after filing the *Illinois* lawsuit, DOJ then filed a second lawsuit against the State of New York and New York state officials. *See* Compl., ECF No. 1, *United States v. New York et al.*, No. 1:25-cv-00205 (N.D.N.Y, filed Feb. 12, 2025) ("*New York* Compl.").

381.    In the *New York* lawsuit, DOJ doubled down on its unprecedented and illegal interpretation of federal law, asserting that the Supremacy Clause and 8 U.S.C. § 1373 prevent the State of New York from*, inter alia*, limiting the sharing of records—including home and work addresses—with immigration authorities simply because the federal government deems this information "relevant" to immigration-related determinations. *See, e.g.*, *New York* Compl. ¶¶ 37–38, 44–45.

382.    In announcing the *New York* lawsuit, Defendant Bondi reiterated DOJ's intent to pursue enforcement actions against any jurisdiction that fails to fall in line with Defendants' sweeping assertion of power over local authorities, stating: "If you don't comply with federal law, we will hold you accountable . . . We did it to Illinois, strike one. Strike two is New York. And if you are a state not complying with federal law, you're next. Get ready."[11]

383.    Defendant Bondi followed through on this threat, and has pursued litigation against other so-called "sanctuary" jurisdictions, including Plaintiffs Rochester, Denver, and Los Angeles, for their policies limiting cooperation with federal immigration officials. *See United States v. City of Rochester*, 25-cv-06226 (W.D.N.Y. filed Apr. 24, 2025); *United States v. State of Colorado*, 25-cv-01391 (D. Colo. filed May 2, 2025); *United States v. City of Los Angeles*, 25-cv-05917 (C.D. Cal. filed June 30, 2025); *see also, e.g.*, *United States v. Newark*, 25-cv-05081 (D.N.J. filed May 22, 2025); *United States v. State of New York*, 25-cv-00744 (N.D.N.Y. filed June 12, 2025).

384.    As discussed above, Plaintiffs have many of the same policies that the federal government claims to be illegal or unconstitutional. *See* Part I, *supra*.

---

[11] Andrew Goudsward and Sarah N. Lynch, *US sues New York officials over immigration enforcement*, Reuters (Feb. 12, 2025), https://www.reuters.com/world/us/us-sues-new-york-state-officials-over-immigration-enforcement-attorney-general-2025-02-12/.

### C. DHS and Other Agencies Continue Implementing the Executive Orders Against "Sanctuary" Jurisdictions

#### 1. Secretary Noem Directs DHS Components, Including FEMA, to Cease Providing Federal Funding to "Sanctuary" Jurisdictions

385. On February 19, 2025, Defendant Noem issued the Noem Directive, a memorandum entitled "Restricting Grant Funding for Sanctuary Jurisdictions" (Exhibit F).

386. The Noem Directive implements Executive Order 14,159 by directing components of DHS not just to review federal assistance awards but to "cease providing federal funding to sanctuary jurisdictions" and to "make appropriate criminal referrals to the Department of Justice." Ex. F at p. 2.

387. Like Executive Order 14,159, the Noem Directive fails to meaningfully define "sanctuary jurisdiction," instead broadly asserting that the term "include[s]" localities, like many Plaintiffs, that may decline to "honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of alien pursuant to a valid detainer," or that do not "provide access to detainees" in local custody. *Id.* at pp. 1–2.

388. On March 25, 2025, Defendant Noem approved recommendations to restrict FEMA funding ("FEMA Memo") (Exhibit G), "[i]n compliance with" the Noem Directive. Ex. G at p. 1.

389. The FEMA Memo proposes the following methodology for restricting FEMA funding: Grant programs that "go to a sanctuary jurisdiction as designated by" ICE and "where the purpose of the grant has a nexus to immigration activities, law enforcement, or national security; or, where statute does not limit how FEMA implements the program" should be subject to "conditions or restrictions." *Id.* at p. 2.

390. On this basis, the FEMA Memo recommends that "conditions or restrictions" related to "sanctuary" jurisdictions be placed on "all open and future awards" for twelve grant programs that fund critical emergency-preparedness activities: the Case Management Pilot Program, the Emergency Management Performance Grant, Operation Stonegarden, the State Homeland Security Program, the Urban Area Security Initiative, the Homeland Security National Training Program – Continuing Training Grants, the Port Security Grant Program, the Presidential Residence Protection Assistance Program, the Regional Catastrophic Preparedness Grant Program, the Shelter and Services Program, the Targeted Violence and Terrorism Prevention Grant Program, and the Transit Security Grant

Program. *Id.* at pp. 2–3. A FEMA official has since indicated that FEMA may still apply "sanctuary"
conditions on five of these grants—the Emergency Management Performance Grant, the State
Homeland Security Program, the Urban Area Security Initiative, the Port Security Grant Program, and
the Presidential Residence Protection Assistance Program—but that FEMA has determined not to
apply "sanctuary" conditions to the remaining grants identified in the FEMA Memo.

391.    These grants have nothing to do with civil immigration enforcement, as the language of
the FEMA Memo itself makes clear. *See id.* at pp. 21–23 (describing the purpose of each grant,
including preparing for "all phases of emergency management," "responding to acts of terrorism," and
"encouraging innovative regional solutions to issues related to catastrophic incidents"). Many
Plaintiffs rely on these grant programs to prepare for and respond to natural disasters, terrorist attacks,
and other emergencies. For example:

    a.  Santa Clara uses (1) the State Homeland Security Grant Program to fund
community-wide exercises to test responses to catastrophic events, train first
responders on terrorism response, create plans to ensure it can meet the needs of
residents with disabilities during disasters, and purchase critical equipment for
hazard response; (2) the Emergency Management Grant Program to distribute
emergency planning materials, stock emergency supply points, provide
specialized earthquake-response training, and support volunteer Community
Emergency Response Teams; and (3) the Urban Areas Security Initiative Grant
Program to purchase software that allows police agencies to combine and
analyze data from multiple sources, generate leads, and share investigatory data
securely.

    b.  King County uses (1) the Urban Areas Security Initiative Grant Program to fund
aircrew aviation training, joint agency drills, small unmanned aerial systems
that detect activity where there is no ambient light, and portable X-ray machines
that allow law enforcement in mass-transit locations to X-ray and see suspicious
items, and (2) the State Homeland Security Grant Program to fund planning
efforts, training, equipment acquisition, and exercise programs.

c. Monterey uses the Homeland Security Grant Program to fund explosive ordnance bomb-squad and Special Weapons and Tactics training and equipment.

d. San José uses (1) the Urban Areas Security Initiative Grant Program to fund items that are shared by regional agencies for police work, such as APX NEXT radios, Medvac Bearcat, Mobile Barricades, and Long Range Acoustic Devices, and (2) the State Homeland Security Grant Program to fund equipment and training to protect against, prevent, respond to, and recover from terrorist acts and other emergencies or disasters.

392.    A district court has concluded that the Noem Directive—and FEMA's implementation thereof—effectuates Executive Order 14,159. Mem. & Order, *New York v. Trump*, No. 1:25-cv-00039-JJM-PAS (D.R.I. Apr. 4, 2025), at 12–13.

### 2. DHS and Other Agencies Issue Standard Terms and Conditions That Target "Sanctuary" Jurisdictions

393.    DHS issued the DHS Standard Terms on March 27, 2025 (Exhibit H), and most recently updated them on April 18, 2025 (Exhibit I). The DHS Standard Terms are applicable to "all new federal awards" for Fiscal Year 2025. These terms specifically target "sanctuary" jurisdictions by mandating, *inter alia*, that award recipients certify under penalty of perjury, and require any subgrantees to likewise certify under penalty of perjury, their compliance with five different immigration conditions in Section IX, including that they will "honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer"; will "provide access to detainees" in custody; and will broadly "comply with other relevant laws related to immigration." Ex. I § IX(1). These conditions closely mirror language in the Noem Directive. Section XVII of the DHS Standard Terms also broadly requires grant recipients to certify that they do not "operate any program that benefits illegal immigrants or incentivizes illegal immigration." The DHS Standard Terms do not define what it means to "benefit" illegal immigrants or "incentivize" illegal immigration, but appear to mirror Executive Order 14,218's language identifying "sanctuary" jurisdictions as "fueling illegal immigration to the United States" and

"facilitat[ing] the subsidization or promotion of illegal immigration." The terms further state that grantees must "comply with the requirements of Presidential Executive Orders related to grants (also known as federal assistance and financial assistance), the full text of which are [*sic*] incorporated by reference." *Id.* § XXXI.

394.   On May 29, 2025, pursuant to Section 2 of Executive Order 14,287, DHS published a list of over 500 states, cities, and counties that it claimed "are deliberately … obstructing the enforcement of federal immigration laws endangering American citizens." The press release accompanying the list stated that "[e]ach jurisdiction listed will receive formal notification of its non-compliance and all potential violations of federal criminal statutes. DHS demands that these jurisdictions immediately review and revise their policies to align with federal immigration laws and renew their obligation to protect American citizens, not dangerous illegal aliens." DHS removed the list from its website on June 1, 2025, without explanation.[12] The import of the removal is unclear. In an interview with Fox News on June 1, 2025, Defendant Noem stated that the "list is absolutely continuing to be used and it is going to be identifying those cities and those jurisdictions that aren't honoring law and justice."

395.   Other agencies, too, have implemented the Executive Orders. For example, far from just "evaluating" federal funding, the U.S. Department of Housing and Urban Development ("HUD") has issued immigration-related grant conditions for its Continuum of Care program (Exhibit J), which funds services to end homelessness for individuals and families, including persons fleeing domestic violence and sexual assault. These conditions mandate compliance with Executive Order 14,218 and its amorphous directive that federal payments not "abet[] so-called 'sanctuary' policies" "by design or effect." Ex. J at p. 5.

396.   HUD has also emailed notices "questioning the accuracy" of localities' certification that Community Development Block Grant funds "will be administered in conformity with applicable laws, including Executive Orders." Like the HUD Continuum of Care conditions, these notices require

---

[12] An archived version of the list is available at https://web.archive.org/web/20250529215954/https://www.dhs.gov/sanctuary-jurisdictions.

grantees to "provide assurance" that they will comply with Executive Order 14,218 and its amorphous directive that federal payments not "abet[] so-called 'sanctuary' policies" "by design or effect."

397.    Similarly, DOT has implemented the challenged Executive Orders to condition funds to "sanctuary" jurisdictions. On April 24, 2025, Secretary of Transportation Sean Duffy issued a letter labeled "Follow the Law Letter to Applicants" ("Duffy Letter") (Exhibit K) announcing the department's policy of providing federal funding only to recipients that cooperate with Federal officials "in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." A press release accompanying the letter specifically referenced and linked to Executive Order 14,159.[13]

398.    Pursuant to this policy, DOT has included the precise language from the Duffy Letter in standard terms and template grant agreements for the Federal Transit Administration ("FTA") Master Agreement (Apr. 25, 2025) § 12(m) (Exhibit L), the Federal Railroad Administration ("FRA") General Terms and Conditions (Apr. 16, 2025) § 20.2 (Exhibit M), the Federal Aviation Administration ("FAA") FY25 Grant Agreement Template § 32 (Exhibit N), and the Federal Highway Administration ("FHWA") Competitive Grant Program General Terms and Conditions (Apr. 22, 2025) § 18.2 (Exhibit O) (collectively "DOT Standard Terms").

399.    These standard terms—including immigration-specific terms—have in turn been incorporated into specific grant programs and grant agreements that some Plaintiffs have received, including grants that support transportation infrastructure and accessibility, like the FHWA Safe Streets for All Grant and the Better Utilizing Infrastructure to Leverage Development Grant.[14]

400.    On June 3, 2025, Judge Barbara J. Rothstein of the United States District Court for the Western District of Washington preliminarily enjoined the federal government, in relevant part, from "imposing or enforcing the CoC Grant Conditions"—including the condition reciting Executive Order

---

[13] Trump's Transportation Secretary Sean P. Duffy: Follow the Law, U.S. Department of Transportation (Apr. 24, 2025), https://www.transportation.gov/briefing-room/trumpstransportation-secretary-sean-p-duffy-follow-law.

[14] Some of the plaintiffs in this litigation are also plaintiffs in *King County v. Turner*, Case No. 2:25-cv-00814 (W.D. Wash.), a case challenging the legality of HUD and DOT grant conditions.

14,218's directive that federal payments not "abet[] so-called 'sanctuary' policies" "by design or effect"—"with respect to any CoC funds awarded to the HUD Plaintiffs or members of their Continuums." Order Granting Plaintiffs' First and Second Motions for Preliminary Injunction, *King County v. Turner*, No. 2:25-cv-00814 (W.D. Wash. June 3, 2025), at 46, 12. The court also preliminarily enjoined the federal government, in relevant part, from "imposing or enforcing the DOT Grant Conditions"—including the condition in the FTA Master Agreement reciting the Duffy Letter's directive that grant recipients "cooperate with Federal officials in the enforcement of Federal law, including . . . the enforcement of Federal immigration law"—"to any DOT funds awarded, directly or indirectly, to the DOT Plaintiffs or their subrecipients." *Id.* at 47, 13. The court held that both the challenged HUD conditions and the challenged DOT conditions likely "violat[e] the Separation of Powers principle" and so are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" under the Administrative Procedure Act, and that those conditions are likely "arbitrary and capricious" under the Administrative Procedure Act. *Id.* at 33, 38.

## III.    Defendants' Actions are Blatantly Unconstitutional and Violate Federal Law

### A.    Tenth Amendment

401.    The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

402.    This provision prohibits the federal government from "commandeering" state and local officials to help enforce federal law. *See Printz v. United States*, 521 U.S. 898 (1997); *New York v. United States*, 505 U.S. 144 (1992). This doctrine recognizes that the federal government has limited enumerated powers, and does not have "the power to issue direct orders to the governments of the States." *N.J. Thoroughbred Horsemen's Ass'n v. NCAA*, 584 U.S. 453, 471 (2018).

403.    Under the anti-commandeering doctrine, "the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz*, 521 U.S. at 925. Otherwise, the federal government could invade the sovereign power reserved to the states and simply "shift[] the costs of regulation to the States." *N.J. Thoroughbred Horsemen's Ass'n*, 584 U.S. at 474.

404.     Executive Orders 14,159, 14,218, and 14,287 and the Bondi and Noem Directives' restrictions on federal funding and threats of civil and criminal enforcement violate the anti-commandeering principle inherent in the Tenth Amendment by effectively coercing state and local governments to administer and enforce federal law.

405.     First, as discussed further below, Executive Orders 14,159, 14,218, and 14,287 and the Bondi and Noem Directives commandeer state and local governments by attempting to use the Spending Power to coerce them into acting as arms of the federal government.

406.     Second, Executive Order 14,159, Executive Order 14,287, and the Bondi and Noem Directives compel state and local jurisdictions to administer federal immigration law, on penalty of civil and criminal enforcement.

407.     Executive Order 14,159 directs the Attorney General and DHS to undertake civil and criminal enforcement actions against any jurisdiction for practices that they deem, in their discretion, to "interfere with the enforcement of Federal law."

408.      The Bove Directive, which implements Executive Order 14,159, states that "prohibiting disclosures of information to federal authorities engaged in immigration-enforcement activities" "impede[s] Executive Branch immigration initiatives" and directs the Sanctuary Cities Enforcement Working Group to take legal action to challenge "state and local laws, policies, and activities that are inconsistent with Executive Branch immigration initiatives." It also states that local officials who fail to comply with "lawful immigration related commands and requests" violate federal law. The memo directs that DOJ employees investigate "incidents involving such misconduct" for criminal prosecution under 8 U.S.C. § 371 and 18 U.S.C. §§ 1324 and 1373.

409.  Executive Order 14,287 similarly directs the Attorney General and DHS to take all necessary legal remedies and enforcement measures against any jurisdiction they determine in their discretion to be a "sanctuary" jurisdiction.

410.     The Bondi and Noem Directives further affirm Defendants' view that local jurisdictions that fail to respond to immigration-related "directives" or "requests for cooperation" violate federal law and impede federal immigration operations and reiterates Defendants' commitment to seek criminal and civil legal sanction against such jurisdictions.

411.    As the federal government's *Illinois*, *New York*, *Rochester*, *Colorado*, and *Los Angeles* lawsuits demonstrate, Defendants seek to compel localities, including Plaintiffs, to enforce federal immigration laws—including using local resources to hold individuals pursuant to civil immigration detainers and administrative warrants and to share confidential personal information, such as contact information and release dates for individuals in custody, with immigration authorities.

412.    By limiting the use of local resources in aiding the execution of federal civil immigration enforcement, Plaintiffs have exercised lawful authority reserved to them under the Tenth Amendment. Defendants' actions—compelling state and local governments to enforce and administer federal immigration law at the behest of the federal government under threat of civil and criminal punishment and the withholding of critical funding—violates the Tenth Amendment.

413.    The Ninth Circuit has held that nothing in the Supremacy Clause or in any federal statute imposes an obligation on state or local governments to enforce federal immigration laws, and that to hold otherwise would violate the Tenth Amendment. *See United States v. California*, 921 F.3d at 890–91 (involving a challenge to SB 54, a California law that limits cooperation with immigration enforcement). In direct response to Defendants' assertions that limiting local cooperation with immigration enforcement may frustrate the federal government's immigration enforcement, the Ninth Circuit held:

> SB 54 may well frustrate the federal government's immigration enforcement efforts. However, whatever the wisdom of the underlying policy adopted by California, that frustration is permissible, because California has the right, pursuant to the anticommandeering rule, to refrain from assisting with federal efforts. The United States stresses that, in crafting the INA, Congress expected cooperation between states and federal immigration authorities. That is likely the case. But when questions of federalism are involved, we must distinguish between expectations and requirements. In this context, the federal government was free to expect as much as it wanted, but it could not *require* California's cooperation without running afoul of the Tenth Amendment. *Id.*

**B.      Separation of Powers**

414.    By purporting to restrict funds to sanctuary jurisdictions, Executive Orders 14,159, 14,218, and 14,287 and the Bondi and Noem Directives seek to exercise spending power that Article I, Section 8 of the Constitution grants exclusively to Congress.

415.    The Executive Orders violate the separation of powers by creating a penalty for limiting cooperation with immigration enforcement that Congress did not authorize, without regard to statutory rules on grant programs put in place by Congress.

416.    The Bondi Directive violates the separation of powers by conditioning federal funding administered by DOJ on compliance with "applicable federal immigration law," without regard to statutory rules on DOJ grant programs enacted by Congress.

417.    The Noem Directive similarly violates the separation of powers by conditioning federal funding administered by DHS on compliance with a variety of immigration-related conditions, including requiring that jurisdictions "honor requests for cooperation, such as participating in joint operations, sharing of information, or requests for short term detention of alien[s] pursuant to a valid detainer," and "provide access to detainees" in local custody. FEMA has recommended, and Defendant Noem has approved, the inclusion of these conditions on FEMA grants that support critical emergency preparedness functions and lack statutory authorization for immigration-related conditions.

418.    Through the Executive Orders and the Bondi and Noem Directives, Defendants also effectively legislate a new sanction for failing to comply with the Executive Branch's immigration enforcement priorities. The unilateral imposition of this new sanction and condition on spending is not supported by the INA, or any other act of Congress, or by the Constitution.

419.    Defendants may not unilaterally impose new restrictions on jurisdictions' eligibility for federal funding. Any restriction on eligibility for federal funds must be imposed—clearly, unambiguously, and in advance—by Congress. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). When Congress has not imposed such a restriction by statute, the President may not do so by fiat. The President does not have "unilateral power to change the text of duly enacted statutes." *Clinton v. City of New York*, 524 U.S. 417, 447 (1998).

420.    Congress has consistently and repeatedly rejected the imposition of funding restrictions

for sanctuary jurisdictions that limit cooperation with federal civil immigration enforcement. *See City & Cnty. of S.F.*, 897 F.3d at 1234 n.4 (listing numerous failed Congressional bills to withhold funds from sanctuary jurisdictions); *see also* No Bailout for Sanctuary Cities Act, H.R. 5717, 118th Cong. (2024); Stop Dangerous Sanctuary Cities Act, S. 3452, 117th Cong. (2021); Mobilizing Against Sanctuary Cities Act, H.R. 94, 117th Cong. (2021); No Tax Breaks for Sanctuary Cities Act, H.R. 894, 117th Cong. (2021); Ending Sanctuary Cities Act of 2021, H.R. 3195, 117th Cong. (2021). Where the President "takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

421. By imposing conditions or limitations on federal spending without express statutory authority, the Executive Orders and the Bondi and Noem Directives also unlawfully exceed the President's powers under other provisions of the Constitution that establish the separation of powers among the branches of our government, including: (i) the President's obligation to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, cl. 5 (Take Care Clause), (ii) the limitation that Congressional enactments must "be presented to the President of the United States," who then may sign that enactment or veto it, but has no power to merely revise it, either upon presentment or after enactment, U.S. Const. art. I, § 7, cls. 2-3 (Presentment Clause); and (iii) Congress's authority to levy taxes, to finance government operations through appropriations, and to set the terms and conditions on the use of those appropriations. U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause).

422. The Ninth Circuit has held that the President violates the constitutional separation of powers by attempting to withhold federal funds from jurisdictions that limit cooperation with ICE where Congress has not tied such funding to compliance with immigration enforcement or delegated authority to the Executive to impose such conditions. *See City & Cnty. of S.F.*, 897 F.3d at 1234–35 (upholding injunction against Executive Order 13,768 on separation-of-powers grounds).

**C. Spending Clause**

423. Further, Executive Orders 14,159, 14,218, and 14,287 and the Bondi and Noem Directives purport to exercise spending power in ways that even Congress could not.

424. First, Defendants' actions violate the Spending Clause by imposing vague new funding

conditions on existing appropriations of federal funds. "[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously," in advance. *Pennhurst*, 451 U.S. at 17. "The legitimacy of Congress' power to legislate under the spending power . . . rests on whether the State voluntarily and knowingly accepts" Congress's conditions. *Id.* "There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it." *Id*. Once a State has accepted funds pursuant to a federal spending program, the Federal government cannot alter the conditions attached to those funds so significantly as to "accomplish[ ] a shift in kind, not merely degree." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 584 (2012).

425.    Defendants' actions also violate the Spending Clause by imposing funding conditions that are not germane to the purpose of the funds. "[T]he imposition of conditions under the spending power" must be "germane" or "related" to the purpose of federal funding. *South Dakota v. Dole*, 483 U.S. 203, 208-09 & n.3 (1987); *see also Massachusetts v. United States*, 435 U.S. 444, 461 (1978). Here, Defendants have conditioned eligibility for federal funding on compliance with Defendants' immigration enforcement priorities and efforts, without regard to whether that purpose is germane to any federal funds at issue.

426.    In addition, Defendants' actions impose conditions so severe that they "cross[] the line distinguishing encouragement from coercion." *Sebelius*, 567 U.S. at 579 (opinion of Roberts, C.J.); *New York*, 505 U.S. at 175. Executive Order 14,159's conditioning of all funding on compliance with the federal government's demands regarding cooperation with its civil immigration enforcement efforts "is much more than 'relatively mild encouragement'—it is a gun to the head." *Sebelius*, 567 U.S. at 581 (opinion of Roberts, C.J.). *See* Part IV.B, *infra.* Executive Order 14,218 does not define "Federal payments," creating the potential risk that the Executive Branch will interpret the provision broadly to encompass large swathes of federal funds. President Trump made clear in statements accompanying Executive Order 14,287 that he intends to "withhold all Federal Funding" from "sanctuary jurisdictions." Through the Bondi Directive and Noem Directive, DOJ and DHS likewise seek to withhold essential funds from Plaintiffs in order to coerce them into immigration enforcement. Threats of this magnitude, and to such critical programs, constitute "economic dragooning that leaves the States with no real option but to acquiesce" to federal dictates. *Id*. at 582.

427.    Finally, by compelling state and local jurisdictions to enforce immigration laws, Defendants seek to impose conditions that would require Plaintiffs to act unconstitutionally. Under the Fourth Amendment, generally, detention of an individual must be supported by a determination of probable cause. *See Morales*, 793 F.3d at 215–17; *Miranda-Olivares*, 2014 WL 1414305. Requiring state and local governments to establish blanket policies of compliance with immigration detainers could thus cause them to violate the Fourth Amendment. But Congress's spending power "may not be used to induce the States to engage in activities that would themselves be unconstitutional." *Dole*, 483 U.S. at 210. And state and local governments generally lack authority to make warrantless arrests under the Federal government's civil immigration laws. *See Arizona v. United States*, 567 U.S. 387, 408 (2012).

**D.    Due Process**

428.    The Fifth Amendment protects against federal laws that are so vague they fail to provide fair notice of what is prohibited or so standardless that they permit discriminatory enforcement. *United States v. Williams*, 553 U.S. 285, 304 (2008).

429.    Under the Fifth Amendment, the federal government may not work a deprivation of money or property without due process of law.

430.    Executive Orders 14,159, 14,218, and 14,287 and the Bondi and Noem Directives fail to meaningfully define key terms underlying their enforcement, including "sanctuary jurisdictions," "'sanctuary' policies," "joint requests for cooperation," "benefit[ing] illegal immigrants," "incentiviz[ing] illegal immigration," "Federal funds," "Federal payments," "practices that interfere with the lawful exercise of Federal law," or "abet[ting] sanctuary policies." Having such a "practice" subjects a jurisdiction to "criminal or civil" enforcement action, yet what such a practice might be is left undefined, and therefore subject to executive whim.

431.    Similarly, Executive Orders 14,159, 14,218, and 14,287 and the Bondi and Noem Directives deny procedural due process because they grant the Executive Branch unfettered, undefined, and standardless discretion to withhold funds from "sanctuary jurisdictions" in which those jurisdictions have a cognizable property interest.

432.    The lack of definition, notice, or procedures associated with designation as a "sanctuary jurisdiction" and the withholding of funding pose obvious constitutional infirmities, especially in an environment in which DOJ is now prosecuting jurisdictions for their non-cooperation ordinances and policies.

**E.    Administrative Procedure Act**

433.    The Administrative Procedure Act ("APA") governs the process of federal agency decision-making. Defendants DOJ and DHS are "agencies" as defined in the APA, 5 U.S.C. § 551(1), and the Bondi and Noem Directives are therefore agency actions subject to review under the APA. Defendant DOJ's action in promulgating the Bondi Directive and Defendant DHS's actions in promulgating the Noem Directive violate the APA in numerous respects.

434.    As discussed above, Defendant DOJ's and Defendant DHS's actions are in excess of statutory authority and contrary to fundamental constitutional principles. *See* 5 U.S.C. § 706(2)(B), (C). Further, Defendants DOJ's and DHS's actions are also in excess of statutory authority because they violate the well-established constitutional and statutory appropriations laws discussed below.

435.    In addition, the APA prohibits agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Bondi and Noem Directives are an abuse of discretion and are not in accordance with law because they are unsupported by constitutional or statutory authority.

436.    In addition, the Bondi and Noem Directives are arbitrary and capricious because they fail entirely to offer a reasonable explanation for the breadth of funding withheld or conditioned to "sanctuary" jurisdictions. For example, the Bondi and Noem Directives fail to consider the lack of statutory authority or basis for withholding already appropriated funds, and fail entirely to address the reasonable and inevitable reliance by Plaintiffs on DOJ and DHS funds for critical public safety and emergency preparedness activities, and the need for clarity by local governments about funding streams to provide day-to-day services relied on by their residents.

**F.    Appropriations Law**

437.    A framework of statutes structures how Congress utilizes its appropriation power to authorize federal funding. To start, Congress acts through legislation to make funds available for

financial obligations that will result in immediate or future disbursements of federal funds from the United States Treasury. *See* 2 U.S.C. § 622(2)(A)(i). An "obligation" is a "definite commitment that creates a legal liability of the government for the payment of goods and services ordered or received, or a legal duty on the part of the United States that could mature into" such a liability; an "expenditure," also known as a "disbursement," is the actual spending of federal funds. U.S. Gov't Accountability Off., *A Glossary of Terms Used in the Federal Budget Process*, GAO-05-734SP, at 45, 48, 70 (Sept. 2005), https://www.gao.gov/assets/gao-05-734sp.pdf ("Budget Glossary").

438.    Further, "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law," 31 U.S.C. § 1301(a)—in other words, appropriations may only be used for those purposes which *Congress* has designated. Federal officers and employees cannot obligate or spend funds absent congressional appropriation. 31 U.S.C. § 1341(a)(1)(A).

439.    Because the Constitution limits the authority of the Executive Branch to impound funds on its own initiative absent congressional authorization, the President must seek approval from Congress before deferring or rescinding federal funds.

440.    The Impoundment Control Act of 1974, 2 U.S.C. §§ 681 *et seq*. ("ICA"), requires the President to transmit to both houses of Congress a message indicating his request to rescind budget authority (i.e., cancel a federal payment) or defer budget authority (i.e., pause a federal payment). The President can request to defer budget authority in only three circumstances: "(1) to provide for contingencies; (2) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (3) as specifically provided by law." 2 U.S.C. § 684(b). Beyond these three reasons, "[n]o officer or employee of the United States may defer any budget authority for any other purpose." *Id*.

441.    Among other requirements, the President's message to Congress must indicate the amount of the budget authority, the likely impact of the rescission or deferral, and the justification for the rescission or deferral. 2 U.S.C. §§ 683, 684. This message must be delivered to both houses of Congress, to the Comptroller General, and to the Federal Register. 2. U.S.C. §§ 685. Upon receipt, both houses of Congress are given an opportunity to act on the proposed rescission or deferral. 2

U.S.C. § 688. If both houses of Congress do not approve a rescission proposal within 45 days, the withheld funds must be made available for obligation. 2 U.S.C. § 683(b).

442. Executive Orders 14,159, 14,218, and 14,287 and the Bondi and Noem Directives violate these well-established appropriations laws by purporting to unilaterally withhold already-appropriated federal funding to Plaintiffs.

## IV. Plaintiffs Face Serious Harm from Defendants' Unconstitutional and Unlawful Actions

### A. Plaintiffs Each Have Laws and Policies That Defendants Consider "Sanctuary" Policies

443. Executive Order 14,159 defines a "sanctuary" jurisdiction as any jurisdiction that "seek[s] to interfere with the lawful exercise of Federal law enforcement operations."

444. The Bove Directive concludes that limiting compliance with federal "immigration enforcement initiatives" and "requests," and "prohibiting disclosures of information" to immigration authorities, impedes federal civil immigration enforcement and violates federal law.

445. The Bondi Directive defines "sanctuary" jurisdictions as any jurisdictions that "refuse to comply with 8 U.S.C. § 1373" or other "applicable federal immigration laws." It concludes that jurisdictions must comply with applicable "immigration-related directives."

446. The Noem Directive defines "sanctuary" jurisdictions as "includ[ing]" localities that may decline to "honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of alien pursuant to a valid detainer," or that fail to "provide access to detainees" in local custody.

447. The *Illinois* lawsuit makes clear that for purposes of Executive Order 14,159, and consistent with the Bove and Bondi Directives, Defendants have concluded that jurisdictions violate federal law, including 8 U.S.C. § 1373, and interfere with federal immigration enforcement operations, if they limit or prohibit officials from: (1) detaining an individual on the basis of a detainer or civil administrative warrant, *Illinois* Compl. ¶¶ 42, 48, 54; (2) assisting with federal civil immigration enforcement or detaining an individual for federal civil immigration violations, *id.* ¶ 43; (3) inquiring about the citizenship or immigration status of any individual, *id.* ¶ 44; (4) providing immigration authorities access to individuals in local custody for investigative interviews, *id.* ¶ 48; and (5)

providing immigration authorities with information, including contact information or an individual's release date, *id.* ¶ 48; *see generally id.* ¶¶ 8-10.

448.    The *New York* lawsuit likewise suggests that Defendants take the position, contrary to existing precedent, that the Supremacy Clause and 8 U.S.C. § 1373 require that local jurisdictions share broad, undefined categories of sensitive information—including home and work addresses—as long as the federal government deems this information "relevant" to immigration-related determinations. *New York* Compl. ¶ 37; *see also id.* ¶¶ 38, 44–45.

449.    The *Rochester*, *Colorado*, and *Los Angeles* complaints further underscore Defendants' position that policies limiting immigration cooperation are unlawful "sanctuary" policies.

450.    Executive Order 14,218 refers to "sanctuary policies" "that seek to shield illegal aliens from deportation." Based on Defendants' public statements, the Bove and Bondi Directives, and DOJ's position in the *Illinois* and *New York* lawsuit, it appears that Defendants view jurisdictions that limit cooperation with civil immigration efforts as somehow shielding undocumented immigrants from deportation—even where these policies are actually aimed at improving public safety and public services for all residents and are not intended to shield or harbor undocumented immigrants.

451.    Executive Order 14,287 instructs the Attorney General and the Secretary of Homeland Security to "publish a list of States and local jurisdictions that obstruct the enforcement of Federal immigration laws (sanctuary jurisdictions)" and to notify each "sanctuary jurisdiction regarding its defiance of Federal immigration law enforcement and any potential violations of Federal criminal law." Like Executive Orders 14,159 and 14,218, Executive Order 14,287 does not define what criteria the Attorney General and the Secretary of Homeland Security must use in classifying a locality as a "sanctuary jurisdiction." However, almost all Plaintiffs were named on DHS's May 29 list of "sanctuary" jurisdictions.[15] DHS removed that list on June 1, 2025, without explanation. The import of that removal and the status of the list remain unclear.

---

[15] All Plaintiffs but Bend, Marin County, Palo Alto, and Wilsonville appeared on the May 29 list, an archived version of which is available at https://web.archive.org/web/20250529215954/https://www.dhs.gov/sanctuary-jurisdictions. However, the States of Oregon and California are included on that list, and as alleged above, Bend and Wilsonville follow Oregon state law—and Marin County and Palo Alto follow California state law—limiting the use of local resources for federal civil immigration enforcement.

452.    Plaintiffs have the kinds of laws and policies that Defendants have deemed unlawful "sanctuary" policies.

453.    For example, Plaintiffs generally prohibit the use of their localities' resources to assist in federal civil immigration enforcement and limit the ability of local law enforcement to inquire about immigration status or detain individuals for purely civil immigration violations. Many of Plaintiffs laws and policies also limit compliance with civil immigration detainer requests or administrative warrants, restrict the disclosure to immigration authorities of personal information (including contact information) about any individual, and/or limit compliance with a notification request for the release date of someone in custody, subject to certain exceptions—such as for judicial warrants, lawful subpoenas, or as otherwise required by federal law.

### B.    Plaintiffs Face Devastating Budgetary Injury

454.    The Bondi Directive expressly threatens Plaintiffs with the loss of federal funds that they use to provide essential services for supporting children and families, law enforcement activities and agencies, and victims of violent crimes in their communities. The Noem Directive further threatens Plaintiffs with the loss of federal funds that they use to prevent, respond to, and recover from acts of terrorism, disasters, and other emergency events. The threatened cuts are unrelated to immigration enforcement and run counter to the goals of public safety sought to be advanced by the Administration and would have far reaching consequences. Plaintiffs face immediate injury from DOJ's and DHS's freezing of federal funds and their withholding and conditioning of federal funding on local cooperation with federal immigration policies.

455.    Executive Order 14,159's threatened withholding of all federal funding—and Executive Orders 14,218 and 14,287's threats with respect to undefined categories of federal payments and funds—would have far-reaching impacts on Plaintiffs, which rely on federal funding as a significant portion of their budgets, and would cripple Plaintiffs' ability to deliver critical services to their communities.

1.      **San Francisco**

456.     In Fiscal Year 2024-25, San Francisco received at least $8.7 million in funds administered by DOJ, either directly or through state pass-through funding. These funds support a myriad of critical public safety and other services, including:

a.   San Francisco's District Attorney's Office Victim Witness Program from the Department of Justice, Office for Victims of Crimes pursuant to the Victims of Crime Act of 1984, 34 U.S.C. § 20103(a) and (b), that supports San Francisco in providing comprehensive services to victims and survivors of all types of violent crime;

b.   The San Francisco Police Department Regional Vehicle Interdiction Desk Project, a multijurisdictional project to combat carjacking. The law enforcement activities funded by this grant include tactical casework in support of carjacking investigations and prosecutions and use of carjacking vehicles in organized crime;

c.   Law Enforcement Assisted Diversion, an innovative approach that seeks to accomplish the goals of reduced criminal behavior and improved public safety by connecting appropriate low-level drug offenders with services;

d.   Focused Drug Deterrence, short-and-long term proactive activities including targeted investigations and enforcement and social network analysis to increase the identification of individuals involved in high-level drug markets;

e.   Drug Court Prosecution, which seeks to connect criminal defendants who suffer from a substantial substance abuse problem to treatment services in the community in order to enhance public safety, reduce recidivism, and to find appropriate dispositions to the criminal charges;

f.   Targeted Drug Treatment for Underserved Populations, a treatment intervention conducted by the Sheriff's Department for individuals in custody;

g.   Intensive Probation Supervision, a targeted caseload of probationers with substance abuse and/or mental health issues;

h. Reentry Social Work through the Public Defender's Office, which provides legal and wraparound support to help indigent clients charged with felony drug cases and other felony offenses successfully exit the criminal justice system;

i. Citywide Justice-Involved Youth Planning, which examines current criminal justice trends impacting youth and young adults and strengthens partnerships and collaboration at various levels to create a continuum of support for youth and young adults.

457.   These programs are funded by grants that are statutorily authorized by Congress, which did not impose immigration-related conditions upon the award or use of the funds. See e.g., 42 U.S.C. § 3752(a)(5)(D) (Byrne JAG provisions directing that recipients simply must use funds for a program or activity that falls within one of the several statutory purposes, and certify that they will "comply with all provisions of this [statutory] part and all other applicable Federal laws." ); see also Victims of Crime Act authorizing Victim Witness Program grants 34 U.S.C. § 20103 ("Subject to the availability of money in the Fund, the Director shall make an annual grant from any portion of the Fund made available...")

458.   San Francisco currently faces a significant budget deficit for FY 2026 and 2027 and the Mayor has directed City departments to propose ongoing cuts of 15% from their general fund budgets. The federal funds frozen by the Bondi Directive and subject to unlawful immigration-related conditions are funds that are currently anticipated and relied upon by San Francisco. The expectation for these funds is part of San Francisco's currently approved budget and even if it were to immediately cease all activities by laying off staff and notifying contractors to stop work, San Francisco would still be obligated to pay for work done, adding to its current budget shortfall. If San Francisco were deprived of its DOJ funding, it would be forced to make difficult choices on sustaining the DOJ-funded programs that serve children, crime victims, and critical law enforcement services through local funding sources or cutting these or other critical services.

459.   The Executive Orders threaten an even greater impact on San Francisco's fiscal situation. San Francisco's current budget includes nearly $3.1 billion in federal funds for a myriad of critical services such as health care reimbursement, housing, capital projects, emergency services, and

public infrastructure. Losing all, or even a fraction, of that amount would trigger a fiscal crisis that would require drastic reductions in critical municipal services.

### 2.    Santa Clara

460.    Upon information or belief, Santa Clara estimates that it receives $6 to $7 million in grants that originate with DOJ, either directly or passed through the State of California. This DOJ funding supports a range of important programs and services provided by Santa Clara's Office of the Sheriff, Office of the District Attorney, Probation Department, and other departments and agencies to crime victims, child abuse survivors, justice-involved youth, and the entire Santa Clara County community. These programs and services include, but are not limited to:

    a.  Direct services to trafficking survivors and other victims of crime;

    b.  The Psychiatric Emergency Response Team, which is a joint effort among Santa Clara's Behavioral Health Services Department and law enforcement agencies in which multidisciplinary law enforcement and clinician teams respond to 911 calls that involve both a mental health crisis and a law enforcement issue;

    c.  Data analysts for the Office of the District Attorney's Gun Related Intelligence Program, which uses ballistic evidence to link shootings and solve gun crimes, through DOJ's Crime Gun Intelligence Center grant;

    d.  Services of Santa Clara's Crime Laboratory, an internationally accredited forensic laboratory that handles controlled substance analysis, firearms examination, latent fingerprint processing, digital evidence, fire debris and explosives analysis, DNA and toxicology analysis, and more, through DOJ's Paul Coverdell Forensic Science Improvement Grants Program, which supports improvements in forensic science; and DOJ's DNA Capacity Enhancement for Backlog Reduction Program, which aims to increase the capacity of government-run forensic laboratories to process DNA samples and reduce backlogs that delay justice;

    e.  Through DOJ's Improving the Investigation and Prosecution of Child Abuse and the Regional and Local Children's Advocacy Centers Program, efforts to improve techniques for investigating and prosecuting child abuse; to enhance coordination

among community-based providers and law enforcement, child welfare, and

medical and mental health professionals involved in investigation, prosecution,

intervention, and prevention work; and to serve child abuse victims and their non-

offending family members through Santa Clara's Children's Advocacy Center; and

f.   Services to improve public safety and reach youth involved in serious violent or

weapons-related crimes, as well as youth at risk of justice involvement—including

a collaboration with the University of Cincinnati Corrections Institute to implement

a phased process of youth-centered design and programming enhancements at the

Probation Department's a rehabilitative youth facility, with associated training and

coaching for Probation staff.

461.   Not a single one of these programs relates to immigration enforcement or any community member's immigration status. Instead, they relate more broadly to protecting the entire Santa Clara County community—including vulnerable children, trafficking victims, and sexual assault survivors—from harm; and enhancing the ability of local police agencies and prosecutors to do their core work of preventing and addressing crime.

462.   Santa Clara, like entities across California and the nation, is facing a budget deficit. To meet Santa Clara's obligation to deliver a balanced budget, Santa Clara's departments, agencies, and executive leadership made very difficult choices in the most recent fiscal year to close a $250 million budget deficit while maintaining critical services for the community. If Santa Clara were deprived of its DOJ funding, it would struggle to sustain its DOJ-funded programs that serve children, crime victims, and vitally important forensic and law enforcement services through local funding sources. It would be forced to make impossible choices about cutting either these programs, or the other safety-net programs that Santa Clara provides.

463.   Beyond the millions of dollars of funding immediately threatened by the Bondi Directive, the Executive Orders, which are not expressly limited to DOJ grant dollars, threaten the approximately $3.5 billion in total federal funding that Santa Clara received or will receive in the current fiscal year. In total, federal funding comprises 31 percent of Santa Clara's revenue.

464.    These funds support healthcare, safety-net programs and social services for children and families, and other essential government functions, such as public health, infrastructure, emergency response and public safety. Many of the programs supported by federal funds require Santa Clara to advance the cost of services before seeking reimbursement from the federal government. Without these federal funds, Santa Clara would be forced to make extraordinary cuts to critical services—and in some cases totally eliminate key services and functions. The elimination, or even reduction, of federal funding would require Santa Clara to fundamentally and globally reallocate funds and services.

465.    Because Santa Clara is continuing to operate federally funded programs on a daily basis, it needs to know whether to (1) continue incurring hundreds of millions of dollars in costs that may never be reimbursed by the federal government, (2) discontinue basic safety-net services delivered to its most vulnerable residents, or (3) in an attempt to avoid either of these outcomes, be effectively conscripted into using local law enforcement and other resources to assist the federal government in its immigration enforcement efforts.

### 3.    Portland

466.    Today, the City of Portland has over $10 million in 12 active grants from different Department of Justice grant programs. This funding has already been awarded to Portland, but most of it has not yet been disbursed. Among these threatened grants are funding for essential services under the Byrne JAG program and the National Sexual Assault Kit Initiative (SAKI) – which is supporting Portland's effort to tackle its backlog of rape kits for victims of sexual assault. This funding is critical to maintaining public safety.

467.    In total, Portland currently has over $340 million in awarded federal grants which may be implicated by the Executive Orders' broad sweeping scope.

468.    In addition, Portland faces a potential $100 million budget shortfall for fiscal year 2025-2026. The Mayor and City Council are actively working to budget during these very difficult financial times. As city leaders and employees work to ensure essential services continue for its residents, even a temporary pause could cause untold harm. The federal government's threats to not

only limit future funding, but to stop funding or renegotiate hundreds of millions of dollars in grants that the city has already been awarded only exacerbates the already serious budget crisis.

### 4.     King County

469.     The 2025 King County operating budget includes roughly $200 million in federal funding for operations. An additional $500 million is allocated to multi-year capital projects. Federal grants and appropriations fund numerous critical public safety projects and include ear-marked funds designated by congress for anti-terrorism counter measures related to the 2026 World Cup. The loss of this funding based on King County's decision to limit cooperation with federal civil immigration enforcement would have a devastating impact on public safety and emergency preparedness.

470.     Defendant Bondi's purported freeze on DOJ funds directly impacts King County. Currently, the county has approximately $20 million in direct and indirect funding from DOJ and DHS, including over $9 million in funding for local law enforcement initiatives and approximately $9.5 million in disaster planning and wildfire prevention funding. King County also has plans to seek future DOJ and DHS grants to enhance both public safety and officer safety. DOJ's actions in freezing existing grant funds and precluding King County from future grants are especially impactful in the current budget cycle, where King County is facing a substantial short fall in its general fund. DOJ's actions, if allowed to proceed, will directly and negatively impact public safety by decreasing resources precisely when they are needed the most.

### 5.     New Haven

471.     New Haven relies heavily on federal funding to deliver public services.

472.     Over the last few years, New Haven has received approximately $104,222,265 in direct federal grants.

473.     New Haven is scheduled to receive approximately $30,000,000 in federal funds in the fiscal year starting July 1, 2025. Loss of some or all of this funding would have a significant adverse impact on the finances of the City.

474.     New Haven currently has 85 employees in positions doing critical work, whose salaries are paid for by $6.5 million in federal grants.

475.    A $2.1 million federal grant provides services for overdose prevention and harm reduction.

476.    The city and 20 partner organizations use $20 million in federal funding designed to mitigate climate change, build resiliency, and reduce pollution in New Haven.

477.    New Haven also relies specifically on funding from DOJ, with $6,409,071 in DOJ federal grants awarded over the last few years. These funds support critical public safety needs, cover the costs of mental health professionals to work with police officers in crisis response, pay for the purchase and installation of public safety technology and safety gear for police protection, and financially support other public-safety related initiatives.

478.    New Haven's Office of Violence Prevention is funded with a $2 million DOJ grant.

479.    Another $2 million DOJ grant funds the Elm City C.O.M.P.A.S.S. program providing crisis intervention for individuals with mental illness or substance addiction problems.

480.    The freezing and withholding of these funds based on New Haven's decision to limit local involvement in federal civil immigration enforcement would have a significant impact on New Haven's ability to keep its residents safe.

481.    Should New Haven lose these federal funds, the City would be forced to choose between ending the programs or backfilling the lost funds through a combination of increased taxes and position eliminations.

482.    Given that 56.8% of property within New Haven is tax exempt, New Haven's property tax rates are already well over state and national averages. Therefore, the loss of federal funding would very likely require cutting some of these programs.

483.    New Haven's budget planning process for FY25-FY26, beginning July 1, 2025, is underway. On March 1, 2025, New Haven's Mayor submitted a recommended budget and tax rate to the Board of Alders, New Haven's legislative body.

484.    The Board of Alders holds public hearings and department workshops on the proposed budget and was required to approve a balanced budget by June 30, 2025.

485.    The federal government's threat of loss of federal funding creates uncertainty for New Haven's budgeting process, making it extremely difficult to plan a budget that allows for continuing

staffing levels, programs, and services that are dependent on federal grant funding. If these grant funds are cut after the budget is passed, the stability of the City's finances would be threatened by the need to deviate from the approved budget to either reallocate funds or terminate programs and staff positions. If the Federal Directives to freeze, deny or eliminate federal grants are put into effect after March 1, when the Mayor needs to submit the proposed budget to the legislative body, the City would likely need to consider cutting back services, or increasing the taxation rate, which would stress City residents who are already financially strapped by inflation and rising prices. Given that 56.8% of property within New Haven is tax exempt, homeowners would bear a significant burden in making up for lost grants by increased property taxes. Further, increased taxes also would adversely impact the rental housing market.

486.    In addition to significantly impacting existing grants, the loss of federal funds would have a grave impact on future public safety efforts. New Haven has relied heavily on federal funding over many years to implement important programs that keep the community safe. DOJ funds alone have been vital to the City's ability to provide critical support to a police department that already faces significant challenges. For example, over the last few years, New Haven has been awarded over $6,000,000 in DOJ federal grants. These funds support critical public safety needs, including various violence prevention programs, improved training and equipment for police officers, mental health professionals to work with police officers in crisis response, purchase and installation of public safety technology and safety gear for police protection, and other public-safety related initiatives. Should New Haven lose the ability to apply for and receive federal grants such as these in the future, the City would be severely limited in its ability to support its police department with the many technological, staffing and other related public safety needs with the result being that the community would be less safe.

### 6.    Oakland

487.    As part of funding cycles including the 2025 calendar year, the City of Oakland was awarded approximately $8 million in grants from DOJ. That funding allows for critical public safety services including:

a.    The hiring of 15 additional police officers;

b.  Decreasing the backlog of biological evidence;

c.  Expanding Oakland Ceasefire Strategy efforts intended to address and reduce gun violence in Oakland;

d.  Funding training equipment and helicopter maintenance for the police department;

e.  Funding laboratory firearms work and training;

f.  Funding workshops to repair and strengthen the Oakland Police Department's relationship with the Oakland Community; and

g.  Enhancing school violence intervention and prevention teams for the Oakland Unified School District.

488.    The City of Oakland is facing budget shortfalls. Already the City has had to initiate layoffs of several dozen employees in addition to cutting spending across the city. Oakland is continuing to work to ensure the long-term financial viability of its budget. Maintaining DOJ funding is thus essential for the Oakland Police Department. Without these funds, the Oakland Police Department would have to scale back critical initiatives and/or reduce staffing, thus undermining the city's public safety objectives.

489.    Including the DOJ funding immediately under threat, Oakland received approximately $170 million in federal funds and awards for 2024. These federal funds go to support emergency services, housing within the city, outreach to homeless persons, early childhood development services, violence prevention, and ecological projects among other things.

490.    The threatened withdrawal of federal funding only makes the budgeting process for Oakland more daunting and puts Oakland at risk of having to guess as to whether it can afford to count on those funds or if it needs to cut programs, spending, and potentially staff to be able to withstand that loss of funding.

### 7.    Emeryville

491.    Federal grants have often supported the City's community services. For example, Emeryville has previously received Community Development Block Grant funds from HUD through Alameda County, as part of the Urban County program supporting Meals on Wheels and minor home repairs.

492.    Emeryville has also been granted two Community Project Funding grants, which it is scheduled to receive pending the execution of an agreement with HUD. Those grants total $500,000 and $2 million, respectively, and will support an intergenerational affordable housing project and the design of a new Corporation Yard.

493.    Emeryville has received a draft agreement from HUD for $850,000 in funding for construction of the 40th Street Multimodal Project to improve transportation safety, reduce congestion, and enhance multimodal access on 40th Street in Emeryville.

494.    Emeryville relies on federal funding from DOJ to support its police department. The Emeryville Police Department ("EPD") receives approximately $10,000 to $12,000 annually in DOJ funding through the Edward Byrne Memorial Justice Assistance Grant Program.

495.    EPD uses this funding to pay for police equipment, including body-worn cameras, computer monitors used for trainings, tasers, radio upgrades, and early intervention software. This equipment makes EPD more effective, responsive, and transparent. Radio upgrades, for example, have improved officers' ability to communicate with officers across the Bay Area during a crisis, and early intervention software enables EPD to remedy gaps in training causing officer errors.

496.    EPD receives, on average, approximately $10,000 annually in DOJ funding through the Patrick Leahy Bulletproof Vest Partnership Program. This funding allows for the regular replacement of outdated body armor. Newer body armor is lighter and stronger; it also distributes the weight of officers' equipment more evenly around their bodies to reduce injury and increase longevity in the field.

497.    EPD also relies on federal funding passed through the California state government. For example, it receives approximately $50,000 to $100,000 annually through the Highway Safety Grants Program. EPD uses these funds to increase traffic enforcement and offer safe driving education to the community. EPD also uses California's state-run 911 service, which is partially funded through federal grants.

498.    The loss of federal funding would require Emeryville to either cut back on essential equipment and services, which would put officers at risk and compromise public safety, or cover these costs from its general fund.

499.    Emeryville currently faces an $11 million budget deficit following a downturn in economic activity during the COVID pandemic and reduced development due to high interest rates.

500.    Emeryville will budget the anticipated federal funds as it does in the ordinary course of preparing its annual budget. If these funds are not allocated by the federal government, the city's budget would become out of balance and the city would then have to decide whether to backfill the loss in revenue with General Fund money or not move forward with the project(s) the federal funds were intended to support.

### 8.    San José

501.    The Fiscal Year 2024-2025 San José budget included nearly $187 million in federal funding ($98.1 million for operations, and $88.6 million for capital projects).

502.    An additional $162 million is anticipated for the 2025-2029 adopted capital improvement program. The City has budgeted and has or will expend in reliance on the funding awarded. Most of these funds are disbursed on a reimbursement basis.

503.    The Executive Orders could impact funding that supports many critical programs ranging from essential programs such as workforce development, low-income and interim housing, law enforcement, the airport, and public safety services.

504.    In many instances, San José receives federal funding through formula grants (grants that are noncompetitive and allocated to grantees based on distribution formulas) and has built programs around the continuing nature of these funds.

505.    From DOJ, San José has been awarded $8.6 million, of which $6.4 million are claimed on reimbursement. The City relies on the DOJ funds to:

      a.    Cover the costs of inventorying, DNA testing, tracking and reporting DNA analysis of sexual assault kits inclusive of training, investigation and victim engagement and support activities (National Sexual Assault Kit Initiative);

      b.    Pay for addition and upgrading of police department equipment, police training, and community outreach (Edward Byrne Memorial Justice Assistance Grant); and

      c.    Support the investigation of hate incidents and community education to prevent hate crimes.

506.    None of the programs or services funded by DOJ focuses on immigration or include any element of immigration enforcement. These funds are used for local law enforcement, criminal investigation, and harm reduction.

507.    As of December 2024, San José's preliminary ongoing budget shortfall is estimated at approximately $60 million for 2025-2026, followed by an additional $30 million shortfall in 2026-2027. These shortfalls do not reflect the full budget challenges including services currently funded on a one-time basis of approximately $8.5 million.

508.    The City is facing difficult decisions to cut costs and still maintain essential services to our residents. The loss of federal funds, even on a temporary basis, could lead to the elimination of programs that serve our most vulnerable residents.

509.    The City begins its budgeting process in February to identify priorities, followed by public study sessions and hearings in April and May, with the final adoption of the budget in June for the next fiscal year. Uncertainty about the loss of federal funds, including from DOJ, impacts how the City should plan and what services can reliably be funded in the coming year.

### 9.    San Diego

510.    San Diego has over $8 million in fifteen active grants from at least four different programs administered by DOJ, either directly or passed through the State of California. This federal funding was awarded to the City over the span of several years and generally funds critical law enforcement services to protect the health, safety, and welfare of the entire San Diego community.

511.    The grants at stake are the following:

    a.    the Edward Byrne Justice Assistance Program, which funds the City's initiatives to control crime and strengthen the criminal justice system with respect to law enforcement and crime prevention programs;

    b.    the DNA Capacity Enhancement for Backlog Reduction Program, which increases San Diego Police Department's (SDPD) capacity to process, record, and analyze forensic DNA at its crime labs;

    c.    the Internet Crimes Against Children Task Force Program, which funds forensic and investigative components as well as training to develop an effective response to

internet crimes targeting children and technology-facilitated child sexual

exploitation; and

d.  the Paul Coverdell Forensic Science Improvement Grants Program, which provides

funding to acquire and maintain accreditation for SDPD's crime labs, reduce

backlogs, and improve the quality and timeliness of forensic science.

512.    These grants are critical for local law enforcement to maintain public safety in San

Diego. And none of these grants relate to immigration enforcement or any community member's

immigration status.

513.    All of the above-mentioned DOJ grant programs are set up to reimburse San Diego for

eligible costs. In short, these grants require the expenditure of San Diego's own funds first with the

expectation of federal reimbursement later. Already, San Diego has expended significant expenditures

in eligible costs that have not yet been reimbursed.

514.    In total, San Diego has approximately $530 million in awarded federal grants. This

includes approximately $104 million from DHS, $229 million from HUD, $135 million from DOT,

and $8 million from DOJ. These federal grants and appropriations fund many essential services for

San Diego's residents, including housing, emergency relief, infrastructure, public safety, and much

more.

515.    Currently, San Diego faces a massive budget deficit of $258 million for fiscal year

2026 and a projected deficit of approximately $1 billion for the next five years.

516.    The Mayor has ordered a hiring freeze, along with restrictions on non-essential funding,

a reassessment of San Diego's leases and contracts, and other potential cuts. With limited staff, money

and resources, the threat of prosecution further hinders the City's ability to provide essential services

to its San Diego residents

517.    San Diego is making difficult decisions on cutting back essential services, projects and

programs impacting the region. Losing federal funds now will cause irreparable harm, taking an

enormous toll on a city that is already struggling to balance its budget sheet.

518.    The loss of federal funding would also have a detrimental impact on San Diego's

ability to keep its residents safe, negatively impacting public safety and emergency preparedness.

Thus, the federal government's directives to stop funding or pause millions of dollars in federal grants that the City has already been awarded harms public safety, public health, and local law enforcement's ability to protect all San Diego residents.

519.    Recent actions by the Trump Administration are impacting the budget outlook for San Diego.

520.    Due to the uncertainty involving a pause and/or termination of federal grants, San Diego has no choice but to use its own general fund, diverting money as well as resources from vital services and programs that residents depend upon. It also makes it nearly impossible for the City to maintain an accurate outlook in planning its future budgets.

**10.    Sacramento**

521.    Sacramento currently is expecting approximately $175 million in outstanding federal reimbursements that support public works, public safety, and medical services. For comparison, the City's annual budget is approximately $1.6 billion.

522.    Sacramento has more than $1.6 million in grants from DOJ grant programs. Active DOJ grant programs include the COPS hiring program, Byrne JAG, and National Public Safety Partnership Capacity Building. Sacramento uses these DOJ grants to fund:

a.    Additional police officer positions;

b.    An acoustic gunfire detection system for gun violence prevention and investigation efforts;

c.    SPD's Digital Forensics Unit; and

d.    Improving crime mapping.

523.    In addition, the Sacramento Police Department is also the grantee of the Urban Area Security Initiative (UASI) grant, a federal Department of Homeland Security grant program focused on preventing terrorism and improving the public safety infrastructure throughout the Sacramento region.

524.    Sacramento also receives approximately $450 million in total federal funding annually. This includes $26.7 million from HUD, $50 million from FHWA, and $7 million from DHS.

525.     Sacramento would suffer substantial harm if deprived of the funding it receives from the federal government or from DOJ.

526.     Sacramento would suffer significant harm if forced to alter its Sanctuary policy that preserves local resources for building "community safety and security, support for youth and education, economic development, and financial stability." Resolution 2017-0158, Sec. 1.

### 11.     Santa Cruz

527.     To build its current fiscal year budget, the City of Santa Cruz anticipated receiving approximately $107.5 million from federal grants, including $26,813 from DOJ for its Bulletproof Vest Partnership Grant. Of the approximately $107.5 million in federal funds awarded, Santa Cruz has only received approximately $27.9 million. This leaves approximately $79.6 million in federal funds that have been awarded to Santa Cruz and yet remain uncollected.

528.     The remaining uncollected funds are intended to support programs across seven Santa Cruz departments: the Department of Economic Development and Housing; the City Manager's Office; the Police Department; the Fire Department; the Parks and Recreation Department; the Public Works Department; and the Water Department.

529.     If the federal government withholds Santa Cruz's nearly $80 million of awarded but uncollected federal funds, Santa Cruz faces a dire financial situation.

530.     Santa Cruz will struggle to provide essential public services, including emergency assistance, food, and shelter, which its residents rely on, and which Santa Cruz has already promised to deliver. In addition, Santa Cruz's ongoing projects, including critical water infrastructure, critical affordable housing development, and hazard mitigation construction, all risk significant delays or outright incompletion.

531.     The federal government's threats to withhold federal funds expose Santa Cruz to unprecedented budgetary uncertainty, making it nearly impossible to plan for and commit to future projects and expenditures.

532.     The federal government's threats put Santa Cruz in a position where it may need to pause or cancel ongoing contracts, exposing the city to potential litigation from partners, contractors, and developers. Furthermore, the ongoing budgetary uncertainty may require Santa Cruz to reconsider

its staffing, including by considering layoffs of employees across all departments. Losing these employees will drain Santa Cruz of a workforce full of faithful community members who have accumulated decades of crucial knowledge and experience as to how to serve and operate the city most effectively. Should Santa Cruz lose federal funding and later regain it, the city will struggle to rebuild this faithful, dedicated workforce because any employees let go will need to obtain new jobs to pay their rent, mortgages, utility bills, grocery bills, and support their families.

### 12. Monterey

533. Monterey County also depends on the ongoing and proper provision of federal funding. The County incorporates significant federal allocations and grants into its service provision efforts, including for the provision of basic public goods such as healthcare, disaster relief, and public safety. The County estimates that it has budgeted for some $480 million in direct federal funding over the last two years, representing roughly 13% of all money budgeted.

534. Federal funding to Monterey County includes several million dollars in funding specifically from DOJ. Grants originating from DOJ supply funding to the Monterey County District Attorney and Sheriff's Offices. JustGrants and Edward Byrne Memorial Justice Assistance Grants are used by the County to reduce and solve violent crime; they provide for the prosecution of cold cases, the purchase of body worn cameras, and other tools to ensure that law enforcement officers, local officials, and the community can work together to keep Monterey safe.

535. Monterey County is currently working through its annual budgeting process and operates federally funded programs on a daily basis. Threats from the federal executive to arbitrarily cut funding to localities such as Monterey cast doubt over the County's ongoing ability to provide basic services to its residents without significant disruption.

### 13. Seattle

536. Seattle relies heavily on federal funding. During the year beginning January 1, 2025, Seattle has legal and appropriations authority to spend up to $370 million in federal grant funds. Among other priorities, these federal dollars provide services for vulnerable residents needing access to food, medical care, shelter, and other housing assistance. If that funding were eliminated, harms would be felt immediately.

537.     Seattle's federal funding also supports survivors of domestic violence and sexual assault in Seattle; without it, they would not receive important services.

538.     These grants will allow Seattle to make critical seismic upgrades in a high-risk earthquake-impact area. If that funding were lost, it would leave Seattle less protected from a potential earthquake.

539.     The Seattle Police Department is responsible for preventing crime, enforcing the law, and supporting quality public safety by delivering respectful, professional and dependable police services. In the coming year, the Police Department anticipates spending approximately $4 million in DOJ grant funds. The Seattle Police Department will use these funds to:

     a.  Employ a full-time investigator for domestic violence prosecutions;

     b.  Fund three Crime Prevention Coordinator police officer positions for 80% of each year;

     c.  Lead the Northwest Regional Internet Crimes Against Children Task Force;

     d.  Participate in a regional Human Trafficking Task Force through which the Seattle Police Department can seek justice and connect trafficking survivors to services; and

     e.  Fund investigative tools such as advanced DNA analysis to pursue unsolved sexual assault cases.

540.     Loss of DOJ funds would negatively impact not just Seattle, but the surrounding communities. For example, Seattle submits a joint application, on behalf of Seattle and more than 10 surrounding jurisdictions, for the DOJ Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG"). These DOJ Byrne JAG grant funds allow participating jurisdictions to preserve and support a variety of law enforcement programs aimed at preventing and reducing crime, providing services to victims, purchasing much needed law enforcement and investigative equipment, enhancing law enforcement training and officer safety, implementing community-based programs, providing law enforcement overtime, and improving technology systems.

541.     The Seattle Police Department also receives substantial federal funding from DHS that supports essential public safety initiatives and programs. These funds allow the Department to buy

emergency response equipment and conduct preparedness activities that help it plan for, protect against, and respond to terrorist attacks and other hazards. The Seattle Police Department's 2025 Budget reflects $8 million in funds from the Department of Homeland Security, almost $4 million of which will likely be spent in 2025.

### 14.  Minneapolis

542.  Federal grants play an important role in funding the City's public safety and other operations. In 2024, direct and pass-through DOJ funds financed almost $1,800,000 of Minneapolis's expenditures. The City used DOJ funds to:

    a.  Fund recruitment of community members and college-aged candidates to pursue careers in the Minneapolis Police Department (Police Recruitment Through Pathways Encouraging Active Community Engagement);

    b.  Fund the inventorying, DNA testing, tracking and reporting DNA analysis of sexual assault kits inclusive of training, investigation and victim engagement and support activities (National Sexual Assault Kit Initiative);

    c.  Pay the salary and fringe benefits of an attorney who serves as a direct legal advisor to Minneapolis Police Department officers in police precincts, fund the addition and upgrading of police department equipment, and pay overtime costs for officers to address emerging or special enforcement (Edward Byrne Memorial Justice Assistance Grant); and

    d.  Fund an opioid addiction treatment program including medication, clinical care, and wrap-around services (Comprehensive Opioid, Stimulant, and Substance Abuse Program).

543.  None of the programs or services funded by DOJ dollars focus on immigration or include any element of immigration enforcement. These funds are used for local law enforcement, criminal investigation, harm reduction, and prosecution costs.

544.  The impact of the Executive Orders, which purports to impact not just DOJ funding but all federal funding, is even more significant.

545.     Annually, federal funding from federal agencies finances approximately $60 million in 2024 dollars Minneapolis's programs and services, including essential programs like critical infrastructure improvements, creation and preservation of low-income housing, emergency shelter assistance for unhoused individuals, household radon, mold, lead, and pest mitigation, developing public health infrastructure and workforce, and provision of public safety services.

546.     In some cases, Minneapolis receives federal funding through formula grants (grants that are noncompetitive and allocated to grantees based on distribution formulas) and has built programs around the continuing nature of these funds. Minneapolis has largely obligated federal funding awarded to it in previous years. The City is relying on the federal government satisfying its contractual funding commitments to meet these obligations.

547.     Minneapolis is already facing difficult budgetary decisions and large projected tax levy increases because of decreasing commercial property values and the rising costs of providing municipal services. The loss of its anticipated federal grant funding would force the City to choose between cuts to municipal services or imposition of a historically large tax levy on its residents.

548.     The threat of loss of federal funds also creates confusion and uncertainty in the budget planning for Minneapolis.

549.     The City is currently planning its budget for 2026. Departments are now determining whether grant supported positions will be supported by grants in 2026. The Mayor must deliver a proposed budget to the City Council by August 2025. Without knowing whether certain federal funds will be available for those positions will create significant uncertainty about those positions and the work those positions perform for the communities the City serves.

### 15.     St. Paul

550.     The Executive Orders and the Bondi Directive threaten the City with the loss of federal funds. The threatened cuts are unrelated to immigration enforcement, and would have dramatic, far-reaching consequences for Saint Paul.

551.     Saint Paul has $192.2 million in federal funds currently under contract. The majority of these funds, roughly $139.4 million, is tied to one-time projects, largely capital investments. The

remainder, approximately $52.7 million, consists of operational funding supporting ongoing programs and departments. Saint Paul receives significant funding from EPA, HUD, and DOT.

552.    In addition to the foregoing amounts, Saint Paul has been awarded $66.8 million in federal funds, and in the post-award phase of establishing work plans and executing contracts. The City has applied for additional amounts of federal grants totaling approximately $66.1 million.

553.    Last year, Saint Paul received $5,250,996 in funds from DHS and $7,108,957 in funds from DOJ. These DOJ funds were used for, among other things, the partial funding of 15 full-time peace officer positions, a dedicated domestic violence investigator, overtime for community engagement and the investigation of serious crimes, and the Familiar Faces program, which engages frequent users of emergency and shelter services.

554.    If Saint Paul lost federal funding pursuant to the Executive Orders and/or the Bondi Directive, the impact would be substantial, put the full burden of infrastructure investments on local and state resources, and cause delays to pending projects. The ripple effect associated with this impact would last for decades.

555.    Examples of these effects include the following:

      a.    Loss of 15 police officers the City plans to hire through the COPS Hiring Program.

      b.    Loss of police academy training program and other pathways programs.

      c.    Cuts to public safety programs supporting victims of violence and sexual assault, reduction in domestic violence, DWI enforcement, drug trafficking unit, traffic enforcement, and equipment for gathering evidence at crime scenes.

      a.    An indefinite interruption in the ten-year plan to replace the 26,000 lead service lines to households in the City, including, most immediately, low-income households in Saint Paul's East and North Side neighborhoods

556.    The foregoing examples are not exclusive. Because Saint Paul relies on federal funds for its ongoing operations across many subject matter areas, and for many different purposes, it is not possible to identify each and every area in which the City would suffer significantly, were it to lose out on federal funds by operation of the Executive Orders. The effect of a complete loss of federal funds would be devastating for Saint Paul, its employees, and its residents.

### 16.  Santa Fe

557.  Santa Fe's budget relies on federal funding; in fiscal year 2024, it included over $14.5 million in federal funds. The federal funds included $5.9 million to support transit programs, $1.8 million for an airport capital improvement project, and $1.5 million to support affordable housing programming.

558.  Federal grant revenue is the main funding source or a significant supplemental funding source for some city programs.

559.  Santa Fe's budget for the current fiscal year includes $15.5 million in budgeted federal grant revenue. The impact of federal grants varies by program, with programs such as Transit, Seniors, and Affordable Housing particularly dependent on federal funding. In these programs, federal funding enables important projects that would not otherwise be possible. Interruptions in federal funding may cause disruptions to planned timelines and the delivery of essential services to the public.

560.  Santa Fe is highly concerned about the implications of the federal funding directives. Santa Fe, and many of its nonprofit partners, relies on federal grants to support critical services and infrastructure projects. Any delays could disrupt operations and adversely impact the community.

561.  In January 2025, Santa Fe entered into an agreement for $300,000 in DOJ funding from the Byrne Discretionary Grants Program. With this funding, Santa Fe will purchase needed equipment and training for the Fire Department's Mobile Integrated Health Team, a specialized unit that identifies, connects with, and provides case management to individuals in the community who frequently require emergency services. The program allows Santa Fe to connect these individuals with resources to address their underlying needs and achieve healthier, more stable living situations.

562.  Without DOJ funding, the Mobile Integrated Health Team would not be able to replace and improve the technology and vehicles it uses to serve the community. The team currently relies on laptop computers that are worn from several years of heavy use. Likewise, the vehicles the team currently uses are older models not conducive to the needs of the team. Without the funding, the team would have limited and delayed capacity to provide services, and it would serve fewer persons per day.

### 17.    Alameda County

563.    In Fiscal Year 2024-2025, Alameda County received approximately $590 million in direct federal funding, totaling nearly 13% of the County's budget. Alameda County also received about that same amount in indirect federal funding, including funds that passed through the State of California, bringing the County's total federal funding for the Fiscal Year to approximately $1.1 billion. Those numbers are estimated to grow in Fiscal Year 2025-2026. The County relies on these funds to support vital safety net programs, social services, public health functions, infrastructure maintenance and development, and other essential government services that are unrelated to immigration enforcement.

564.    Breaking these figures down, Alameda County received approximately $517 million from DHS, $345 million from HHS, $70 million from the U.S. Department of the Treasury ("Treasury"), and $45 million from the U.S. Department of Agriculture ("USDA"). In addition, the County received approximately $8.5 million in grants that originated with DOJ. The County distributes approximately $1.5 million of those DOJ funds to other local agencies in Alameda County. This DOJ funding supports critical public safety efforts and other important services provided by the Sheriff's Office, the District Attorney's Office, the Probation Department, and other departments and agencies, including to victims of abuse and other crimes, young people in the justice system, and the broader community. For example, DOJ grants help fund (1) efforts in Alameda County's crime laboratory to process DNA evidence crucial to exonerating wrongfully accused or convicted individuals and to identifying true perpetrators; (2) reentry and job training programs aimed at reducing recidivism rates; and (3) efforts to prevent and prosecute hate crimes. The County also administers federal grants that fund programs and services provided by other local law enforcement agencies in Alameda County.

565.    In developing the proposed budget for Fiscal Year 2025-26, Alameda County struggled to close a $105 million budget deficit. Closing this gap while maintaining funding for vital community services required difficult decisions that have left the County financially vulnerable if circumstances were to change—including if the federal government withholds or seeks to rescind federal funds. Without federal funds, Alameda County will have to make drastic cuts, potentially eliminating crucial

lifelines for children, families, and the homeless, among other of the County's most vulnerable residents.

566.    The impacts would not be limited to programs directly funded by federal aid. Losing federal funding would require the County to shift non-federal funds to other programs in an effort to fill some of the gaps—creating a ripple effect that would severely limit the County's ability to provide essential government services. Those cuts will be particularly severe if they happen mid-year, as threatened by the Executive Orders and other federal agency directives, given that the County would have to rush to develop new budget proposals in an effort to backfill federal funding where possible, resulting in yet more drastic reductions to County services.

### 18.    Albany

567.    Federal grant funding plays an important role in Albany's efforts to maintain public safety and protect public health and welfare. In 2023, Albany received roughly $12 million in federal funding, including $216,871 from the Department of Justice, nearly $1.4 million from DHS, and funding from HUD, DOT, and the Department of Labor ("DOL"). This federal funding is used to support the Albany Police Department's organized drug crime task force, Port of Albany security, and K9 explosives detection programs. It is also used to support youth employment, home ownership support, and street improvement programs. None of the programs or services funded with this money are related to immigration enforcement; all are threatened by the challenged Executive Orders and agency directives.

568.    Losing this funding would result in a significant budgetary deficit that would have to be borne by Albany taxpayers in the form of reduced services or an increased tax levy. As a result, Albany now faces the threat of having to change its laws or to present a budget for 2026 with an enormous degree of uncertainty as to what federal funds will be available. And Albany has already felt the pain of that choice, as Albany residents who previously felt protected by Albany's municipal code withdraw from civil society, and Albany personnel fear retaliation by the federal government simply for doing their jobs.

### 19.    Albuquerque

569.    Albuquerque's budget relies heavily on federal funding. Albuquerque's budget for

Fiscal Year 2026, beginning July 1, 2025, includes over $21 million in current year federal funds, covering federal awards for police equipment and special police programs, Early Head Start, the AmeriCorps Senior Programs, HUD grants, and funds for transit equipment and facilities, among other programs.

570. In addition to the federal funds allocated in the annual operating budget, Albuquerque expects to receive an additional $75.4 million in federal multi-year grants budgeted in prior years, largely for public infrastructure projects such as affordable housing, transitional housing, rapid rehousing, social service contracts, park development, HUD grants, FEMA grants, and investments in programs to address homelessness and affordable housing. This funding also accounts for a large fraction of the Albuquerque Police Department's budget—upwards of $17 million—which includes paying dozens of officers' salaries, providing needed equipment, processing sexual assault and other evidence kit backlogs, and more. Albuquerque's 2026 budget also includes $563,500 in DHS funding.

### 20. Allegheny County

571. Allegheny County received $53 million in federal funding in Fiscal Year 2025, amounting to nearly 5% of the County's budget. This funding included nearly $850,000 in DOJ funds that the County uses to fund its Police Department, sexual assault kit processing, violence prosecution and prevention, and opioid addiction treatment.

572. The bulk of the County's funding comes from HUD, HHS, DOL, and DOT. These moneys fund essential programs for hazardous materials training, training and support of the County's medical examiner's office, critical infrastructure improvements, developing public health infrastructure and workforce for the County, and the provision of public safety services, all of which are unrelated to immigration enforcement. Allegheny County has established programs, contracted with vendors, and staffed jobs in reliance on this previously stable federal funding.

573. In its 2025 budget, the County increased its tax levy to address revenue decreases due in part to its county seat, the City of Pittsburgh, suffering decreasing commercial property values. As a result of this already difficult budget process, a loss of federal funding would force the County to make deep cuts to governmental services, and risk further tax increases on its residents who are already struggling.

574.    The County is currently planning its budget for 2026. Departments are now determining whether grant supported positions will be supported by federal grants in 2026. The County Executive's Office must deliver a proposed budget to the County Council in October 2025 and is now at work on developing that budget. The threatened of loss of federal funds in the Executive Orders and other federal government directives has created significant uncertainty in that budget planning process as to whether federal funds will be available and what services the County can realistically plan to provide for its residents.

### 21.    Baltimore

575.    As an economically disadvantaged city with a higher than average poverty rate, Baltimore relies on federal money to improve the health, safety, and welfare of its citizens. For Fiscal Year 2026, Baltimore expects to receive approximately $216 million in operating dollars and $65 million in capital dollars from the federal government, accounting for about 6.1% of Baltimore's annual budget. Baltimore currently also has $32.9 million in open DOJ grants, and open grants from the Environmental Protection Agency totaling $690 million, $514 million from HUD, $399.7 million from HHS, and $184 million from DOT.

576.    Some of the important programs that are funded by federal dollars include: serving over 11,000 people in Baltimore living with HIV/AIDS with case management and care services, including health treatment, transportation, and housing assistance; programs dedicated to improving maternal health and reducing infant mortality; assisting 4,500 households with housing needs, including the creation of new homes, rehabilitation of existing buildings, critical repairs, and lead paint remediation; aiding the unhoused population of approximately 2,000 with outreach, services, and rental assistance, along with providing assistance to thousands more vulnerable citizens during times of extreme heat and cold; preparing and training emergency management teams, firefighters, and police in handling wide scale emergencies, disasters, and terrorist attacks; community violence reduction initiatives and aiding victims of violence, including those who have experienced intimate partner violence; providing assistance for economically challenged households with water, electric and gas utilities, and rent; and serving 759 children and families through the Head Start program, providing early childhood education and development.

577.     In addition to the above programs, the Baltimore Police Department also relies on federal funds to support officers' effective enforcement of criminal laws and to provide important services to crime victims. For example, a number of positions in the Baltimore Police Department are funded by federal grants, including four forensic scientists, thirteen victim coordinators (who assist with victims of domestic violence and sexual assault, families of homicide victims, and translation services), a fiscal technician, two crime analysts, court staff, housing code enforcement officers, and a violence prevention program educator.

578.     A loss of funding for these programs would have a devastating effect on the population of Baltimore by cutting off important avenues to necessary services for the City's most vulnerable populations. For example, the Baltimore Police Department is already significantly understaffed, with a current shortage of approximately 500 officers, and is currently grossly overbudget. A loss of federal funding would significantly hamper the Baltimore Police Department's crime reduction efforts and create a risk to public safety, including by requiring the elimination of the above federal-funded positions as well as more than a dozen other federal-funded positions at various Baltimore public safety agencies. While Baltimore has recently seen a historic reduction in violent crimes and homicides, a loss of federal funds would tax the City's already overburdened resources and threaten the progress Baltimore has made.

579.     Baltimore is currently in the process of finalizing its budget for the next fiscal year, and the legal confusion around the federal government's funding elimination threats—which imperil *every* federal dollar Baltimore receives—has created difficulty in knowing what funds will actually be available, making for an incredibly uncertain budgeting process.

### 22.     Bend

580.     Bend relies on federal grants, direct funding, and indirect funding to support City services. Bend has been awarded more than $90 million in active federal grants for current and future years.

581.     For example, Bend has been awarded more than $1 million in federal funds administered by DOJ, DHS, and the Executive Office of the President, for law enforcement programs such as those covered by the Byrne JAG and High Intensity Drug Trafficking Area programs; traffic

safety services and equipment purchases; emergency management staffing and equipment purchases under the State Homeland Security grant program; and cybersecurity programs. Bend has also been awarded more than $47 million in federal funds from DOT, $14.5 million from EPA, and almost $5 million from HUD for critical services related to housing development, airport safety and infrastructure, pedestrian and vehicular safety, clean water infrastructure, emergency services, and roadway infrastructure. While this funding has already been awarded to Bend, most of it has not yet been disbursed, leaving the funds under threat from the recent Executive Orders, despite the fact that the grants do not implicate immigration enforcement.

582.    Losing all, or even a fraction, of these federal funds would likely require drastic reductions in critical municipal services. That is particularly true now, given the difficult budget climate Bend faces: Property tax rates in Oregon are constrained by the state constitution, and Bend cannot raise property taxes to pay for infrastructure improvements. Further, Bend's annual operating revenues are projected to increase by 12% ($63 million), while expenses are forecast to rise by 19% ($181 million), creating a $118 million gap. Reserves and one-time revenues, such as grants and asset sales, will close most of this gap. But Bend does not have additional reserves or one-time revenues to fill gaps that would be created by the loss of federal funding.

583.    Thus, if federal agencies prevent Bend from accessing some or all of the federal funding described above, Bend would likely be forced to eliminate or curtail important programs that serve all of Bend's residents, including critical law enforcement services; and public infrastructure programs for maintenance and construction of Bend's roads, bridges, railroads, sewer systems, and Bend's airport. Bend would also be required to evaluate alternatives for paying those employee salaries that are currently funded, at least in part, by federal grants.

584.    In addition, all or most of these federally funded programs operate on a reimbursement basis, meaning Bend has had to expend its own resources to pay costs and then is reimbursed by the federal government—if the federal government releases the promised funding. Also, Bend has agreed to complete projects in reliance on its anticipated receipt of federal funding, but will have to complete the projects whether or not that funding materializes. For example, Bend has agreed to complete work on its airport's taxiways and runway with the expectation of receiving millions in FAA funding for the

1    project, and Bend will now have to complete that project regardless of whether those grant monies are

2    paid—jeopardizing the City's ability to pay for other critical services

3        585.    The federal government has presented the City of Bend with an untenable choice:

4    violate state law and the City's policies, or lose access to $90 million or more in funding that is critical

5    to the public health, safety, and welfare of the community of Bend. It is challenging to engage in a

6    complete and thorough budget process with uncertainty over millions of dollars in already-awarded

7    federal grant money. Given the active federal grants and the timing of the City's fiscal year, the

8    uncertainty created by the Executive Orders threatening funding, as well as the administration's actions

9    advancing these orders, presents a major risk to Bend's budget and creates uncertainty for the delivery

10   of critical city services. Thus, while the City adopted its 2025-2027 budget on June 18, 2025, that

11   uncertainty played a significant role—the budget is more financially constrained, omitting new

12   positions requested to meet department needs, as a precaution in this uncertain climate. If funding

13   recissions were to materialize, yet more drastic cuts would be required, jeopardizing public safety and

14   the community's wellbeing.

15       **23.    Benicia**

16       586.    Federal grants play an important role in funding Benicia's public safety and other

17   operations. This fiscal year, Benicia has been pledged more than $5.7 million in funding from federal

18   agencies, including FEMA, the National Oceanic and Atmospheric Administration ("NOAA"),

19   FHWA, the Institute of Museum and Library Services, and DOJ. These federal dollars support the

20   City's programs and services, including de-escalation training for police officers, water transmission

21   infrastructure, transportation infrastructure, and library services. None of these grants are for

22   immigration enforcement. While Benicia does not currently receive DOJ grants, Benicia is applying

23   for a maximum grant of $450,000.00.

24       587.    Benicia has also acted in reliance on receipt of these federal funds. For example, the

25   City is programmed to receive over $4 million in federal funding from FEMA, as reimbursements for

26   the City's recovery from damage caused by storms in 2023 that resulted in a rupture of the City's sole

27   raw water sewer line. Because the City can only receive these funds after it submits documentation

28   showing it has completed qualifying projects, the City has funded this recovery with the expectation

that it would be repaid by FEMA—an expectation imperiled by the challenged Executive Orders.

588.    Following significant disruption to fiscal planning caused by the challenged Executive Orders, on June 17, 2025, the City Council approved a budget for Fiscal Year 2025-2026 based on the assumption that the City would receive federal funding. Yet budgetary uncertainty remains: The loss of these federal funds would impair core public services in the areas of delivering reliable clean water, public safety, transportation, and community enrichment. Without federal funding, Benicia may have to cancel contracts that ensure public safety, create jobs, and improve roads and other necessary infrastructure, causing lasting operational damage and a breakdown in the trust between the City and its community.

### 24.    Berkeley

589.    Berkeley's budget relies on significant federal funds administered by agencies including DOJ, FEMA, HUD, USDA, HSS, and FTA. The City currently has open federal funding contracts totaling more than $60 million. These critical funds support a variety of programs, including infrastructure projects, health and housing services like nutrition programs, and emergency and permanent supportive housing services.

590.    A relatively large portion of the budget for Berkeley's Health, Housing & Community Services Department ("HHCS") comes from the federal government. Approximately half of Berkeley's contracted federal funds go to HHCS's critical health and housing programs. For example, the City has a $3.5 million formula contract to provide special mental health services to vulnerable populations. It also receives about $14 million from HUD for supportive housing for people experiencing chronic homelessness. In addition, every year, HHCS provides about 90,000 delivered meals to home-bound seniors and 20,000 meals to low-income seniors at its senior centers, leveraging hundreds of thousands of federal dollars. If the City were to lose even a portion of this funding, services provided to underserved residents with severe mental health conditions would have to be reduced or eliminated, hundreds of formerly homeless families could be displaced, and hundreds of low-income seniors could lose critical nutrition services.

591.    Other City departments that receive substantial federal funds include the Fire Department, the Public Works Department, the Parks Recreation & Waterfront Department, the

Planning Department, and the Police Department. For example, Berkeley's Police Department has been awarded more than $600,000 in key public safety grants, including by DOJ, and FEMA awarded the City $7.5 million dollars for critical fire and emergency response services. If FEMA were to cut off these funds, the Fire Department could lose nine firefighters it hired to staff up three of its busiest engine companies.

592. In addition, across its departments, the City currently has approximately 95 employees carrying out critical work whose salaries are funded by federal dollars, and whose positions could be in jeopardy if the challenged Executive Orders were implemented.

593. As these examples illustrate, if the federal government were to withhold any substantial funds, the City would face a dire situation, particularly now when it already faces a budget deficit of approximately $27 million. Berkeley would struggle to provide essential city services, and crucial services likely would have to be reduced or eliminated, severely undermining public health and safety in Berkeley.

594. Indeed, Berkeley is already feeling the impact of these threatened cuts: Due to the uncertainty around federal funding availability, as well as the existing budget deficit, the City Manager instituted a hiring freeze on April 18, 2025. Loss of substantial federal funds may force Berkeley to reduce staffing levels or consider layoffs of employees. Also, departments' budget processes have been complicated by the uncertainty as they complete the budget-appropriations process for Fiscal Year 2026 without a clear idea of what funding will be available to them.

### 25. Boston

595. In city Fiscal Year 2024, Boston received $238 million in federal funding. Funding from the U.S. Department of Education ("DOE"), USDA, HUD, and HHS supported essential programs such as services for students with disabilities and English language learners, and providing school meals at Boston Public Schools; affordable housing development, homeownership programs, and services for people experiencing homelessness; and supports for older adults. Boston received $89.8 million from DOE, $74.4 million from HUD, and $34.6 million from USDA. Boston also received $1.7 million in DOJ funding and $27 million in DHS funding, which supported police, fire, emergency management, and other critical work.

596.     This federal funding played an important role in funding the City's public safety programs and operations. For example, the City used DOJ funds to, among other things: fund a full-time domestic violence advocate as well as overtime pay for civilian domestic violence advocates; fund the purchase of essential equipment for Boston Police Department officers; pay the salary and fringe benefits for three full-time employees; and supplement Boston Police Department DNA testing capacity by funding contracts with external labs. Similarly, the City used DHS funding to, among other things: support the salaries of Boston Fire Department firefighters; fund personnel, equipment, and training costs for radiation detection; support equipment, planning, training, and operational needs of the Metro Boston Homeland Security Region; and fund planning and design activities for hazard mitigation and climate resilience along the waterfront of the Dorchester and South Boston neighborhoods. None of these programs or services focus on immigration or include any element of immigration enforcement in Boston. Instead, the funds are used for local law enforcement, criminal investigation, harm reduction, prosecution, counterterrorism, public safety, and emergency preparedness costs.

597.     The threatened of loss of federal funds has created confusion and uncertainty in the budget planning process for Boston. The City has adopted a Fiscal Year 2026 budget. Departments are now determining whether grant supported programs and services will be supported by grants in Fiscal Year 2026, which began July 1, 2025. The Mayor has delivered a proposed budget to the City Council, and the City Council has made decisions regarding the budget. Not knowing whether certain federal funds will be available for those programs and services will create significant uncertainty about the continued viability of all of those programs and services.

598.     More than that, the federal government's threats have generated significant fear and uncertainty in Boston, affecting the City's ability to deliver critical information, resources, and services to immigrant communities. Despite consistent City efforts to communicate City policies, including that BPD does not enforce federal immigration law, members of the Boston community have expressed confusion, uncertainty, and fear given federal actions.

### 26.     Cambridge

599.     In Fiscal Year 2025, Cambridge expects to receive $23.4 million in federal grants,

directly and indirectly through the Commonwealth of Massachusetts, including $12.4 million from HUD, $5.3 million from DOE, $1.9 million from HHS, $2.95 million from USDA, $64,535 from DOJ, and $61,600 from DHS. These federal funds support critical City programs, such as community development, housing opportunities, public safety programs, substance addiction care, and the provision of school meals in the City, as well as the salaries of a number of City employees.

600.    If Cambridge were to be deprived of some or all of the funding from the federal grants it regularly receives, it would face a potential fiscal and public services crisis. Numerous City departments would be forced to eliminate the programs, services, and positions funded by federal grants or reallocate City funds to fund them, risking the reduction or elimination of City-funded programs, services, and positions, inflicting harm on all Cambridge residents, but li particular, its most vulnerable populations.

601.    For example, the Cambridge Department of Human Service Programs ("DHSP") relies on HUD grants to supplement Cambridge's efforts to support low-income households, including those who are experiencing homelessness, housing instability, domestic violence, food insecurity, and other challenges. As a result of the challenged Executive Orders, DHSP is currently experiencing budgetary uncertainty due to new terms and conditions that have, in effect, been added to the Continuum of Care ("CoC") Program grant agreements, and due to the anticipation that similar terms and conditions will be added to other HUD grants, such as Community Development Block Grants (which support food pantries, homeless services, services for teen residents of public housing, and legal services for domestic violence victims) and Emergency Solutions Grants (which support homeless shelters, homeless street outreach programs, homelessness prevention, and rapid rehousing services), on which the City relies. Given this uncertainty, DHSP plans to expend its own resources to ensure continuation of these services during the first quarter of Fiscal Year 2026. But Cambridge will not be able to afford to use its funds as a long-term solution to provide these services. In the absence of the approximately $7 million of annual HUD funding used for these programs, the programs likely will be forced to shut down or significantly reduced, positions likely will be eliminated, and the populations who rely on these services will suffer.

602.    These budgetary uncertainties afflict departments across Cambridge government, in

1  addition to DHSP, creating significant administrative burdens as the departments work to navigate the

2  frequently changing landscape related to affected federal grants and the budgetary, administrative, and

3  programmatic changes that may result from the threatened funding elimination.

4         **27.  Cathedral City**

5       603.  Federal grants play a substantial role in funding Cathedral City's public safety efforts

6  and other operations. This fiscal year, direct and pass-through federal funding amounts to $14 million

7  of Cathedral City's total budget for public safety initiatives, infrastructure improvements, disaster

8  relief, planning, and violence prevention initiatives, of which approximately $7 million came from

9  HUD, DHS, and DOT, and another $32,000 came from DOJ. In addition, FEMA has authorized

10  reimbursements of nearly $9 million in qualifying expenses for the City's recovery efforts during

11  Tropical Storm Hillary, an unprecedented storm system that caused millions of dollars in damages to

12  public property. None of these programs or services funded by federal dollars focus on immigration

13  enforcement.

14       604.  Cathedral City is already facing difficult budgetary decisions following Tropical Storm

15  Hillary and the rising costs of providing municipal services. While the City has spent over $7 million

16  on recovery efforts, with the understanding that these funds would be reimbursed by FEMA after the

17  City submitted the appropriate paperwork, the City has only received $135,507.92 in reimbursement

18  from FEMA, despite expensing $5,395,661.86. Cathedral City is relying on the federal government to

19  satisfy its funding commitments in order for the City to recover from the unprecedented storm system.

20  Deprivation of funds for unrelated issues concerning immigration enforcement would be devastating,

21  forcing the City to choose between cuts to municipal services or recovery efforts following an

22  unprecedented storm system.

23       605.  The threatened loss of federal funds also creates confusion and uncertainty in the

24  budget planning process for Cathedral City. Because the City has adopted its biennial budget for Fiscal

25  Years 2025–2026 and 2026–2027 based on the assumption that the City would receive federal

26  funding, significant uncertainty remains. This uncertainty forces Cathedral City to divert limited

27  resources to contingency planning and emergency measures and threatens significant disruption to the

28  City's ability to provide services if anticipated federal funds were withheld.

### 28.    Chicago

606.    Federal grants make up a significant portion of Chicago's overall budget. For Fiscal Year 2025, federal grant revenues are estimated to be approximately $3.5 billion, or 20% of the City's total budget, including $2.4 billion in carryover balances from current federal grants and $1.1 billion in new federal grants. These funds include $116.5 million in federal funds from DOJ and $157.4 million from DHS, $1.8 billion from DOT, $668.9 million from HHS, and $329.8 million from HUD. These grants support critical public safety initiatives, such as law enforcement, fire suppression and prevention, emergency medical services, anti-terrorism, emergency management, and cyber security programs, among others.

607.    For example, for Fiscal Year 2025, Chicago has been awarded over $17 million under the Byrne JAG program, over $13 million under the Office of Community Oriented Policing Services ("COPS") Hiring Program, and $75 million associated with hosting the Democratic National Convention in 2024. This funding is essential to sustaining Chicago's law enforcement services and maintaining public safety. Chicago uses Byrne JAG funds to support projects ranging from purchasing critical law enforcement equipment—including the purchase of nearly 1,000 police vehicles over the past two decades—and overtime, to community policing outreach and engagement. Another Byrne JAG project, the Force for Good program, has since 2011, supported services such as emergency shelter and clothing; youth mentoring and safe, structured activities; and job training and placement. The Chicago Police Department ("CPD") further uses Byrne JAG funds to purchase technology upgrades, fund officer safety and resiliency programming, conduct post homicide canvassing and home visit pilot programs, and for certification and capability building training for different CPD units. Without Byrne JAG funds, Chicago would have to restrict or shut down some or all of these programs, or else divert funds from other policing objectives to sustain them. Crucially, these DOJ grants are reimbursement grants, which means that Chicago has already spent many of the federal dollars awarded, based on the federal government's promise to reimburse Chicago for appropriately used dollars.

608.    As mentioned above, for Fiscal Year 2025, Chicago estimates receipt of over $150 million in DHS grants, including direct grants and pass-through funding from the State of Illinois.

Chicago currently has $127,282,000 in active grants from the Urban Area Security Initiative ("UASI"), which supports training and equipment purchases needed to build, sustain, and deliver capabilities necessary to prevent, prepare for, protect against, respond to, and recover from terrorism threats in high-threat, high-density urban areas like Chicago. The Chicago Fire Department ("CFD") has also received UASI awards through Fiscal Year 2024 totaling $27.8 million. These funds have been critical to the development, sustainment, and improvement of CFD's anti-terrorism response, mitigation, and recovery capabilities, by supporting the equipment and training needs of CFD Special Operations personnel.

609.    Chicago would suffer serious negative impacts if it were to lose its DOJ and DHS funding as a result of the challenged Executive Orders. Chicago has already spent or taken steps in reliance on much of the funding allocated in Fiscal Years 2024 and 2025, including entering into agreements with subcontractors to purchase equipment and perform work. Chicago would have to lay off staff, notify its subcontractors to immediately stop work, and likely end many of the crucial safety programs listed above. Even with these actions, Chicago would still suffer budgetary deficits for costs already incurred that would no longer be reimbursed.

610.    The Executive Orders threaten not just DOJ and DHS funding, however, but all federal funding the City receives—including the $3.5 billion to which the City anticipates having access in Fiscal Year 2025. These federal funds support essential infrastructure projects, transportation, and public health, housing, and emergency services, to name just a few crucial services. Given that Chicago is already facing a budget deficit of $1.1 million for Fiscal Year 2026 and a projected deficit of approximately $1.3 billion by Fiscal Year 2027, the loss of even some of these federal funds could result in fiscal upheaval and require drastic reductions in municipal services as well as layoffs.

611.    The threatened loss of federal funds has thus created significant confusion and uncertainty in Chicago's budget planning for Fiscal Year 2026, which is already underway. Departments must determine whether ongoing positions and programs will be supported by federal grants. The Mayor must deliver a proposed budget to the City Council by October 2025. Thus, Chicago is put in an impossible position of trying to plan and pay for essential services for the communities it serves while not knowing whether the funds it relies on for these services will be

available.

### 29. Columbus

612. In Fiscal Year 2025, Columbus will receive $163.8 million in federal funding, to support the provision of essential programs and services, such as critical infrastructure improvements; creation and preservation of low-income housing; emergency shelter assistance for unhoused individuals; household radon, mold, lead, and pest mitigation; developing Columbus's public health infrastructure and workforce; and providing public safety services.

613. Of those funds, Columbus has been awarded approximately $4.1 million in grants from DOJ to, among other things, fund crime-reduction initiatives; support domestic violence survivors, investigator trainings, and prosecutions; pay for DNA testing to address Columbus's testing backlog and support for other testing services, and fund programs assisting those struggling with addiction.

614. Columbus also has been awarded approximately $7 million in federal grants, both directly and as pass-through grants, from DHS, to support the City's counterterrorism response and for the City's BioWatch air monitoring program, which tests for biological agents, among other programs.

615. None of these programs or services focus on immigration or include any element of immigration enforcement. These funds are used for local law enforcement, criminal investigation, harm reduction, prosecution costs, and counterterror responses, among other public safety programs.

616. The impact of the Executive Orders, which purport to impact all federal funding, has injected significant uncertainty into Columbus's planning and budget process, which is underway for Fiscal Year 2026. Columbus is already facing difficult budgetary decisions, and the loss of anticipated federal grant funding would force the city to choose between cuts to municipal services and imposition of a historically large tax levy on its residents.

617. Columbus has also built programs around federal grant funding it has received for years, and spent money in reliance on the federal government reimbursing the City for the expenses it has incurred under its awarded grants. Whether Columbus will be punished for that reliance is now an open question.

### 30. Culver City

618. Culver City has been awarded approximately $5.5 million in federal grant funds for

Fiscal Year 2025-2026, including approximately $231,970 from DOJ; $78,332 from DHS; $2.8 million from DOT (with additional funds appropriated through 2028); $1.4 million from HUD; and nearly $1 million from EPA. Looking beyond just the Fiscal Year 2025-2026, the City also has approximately $47.5 million in selected, allocated, or awarded grant funding from federal grant sources.

619.    These funds support critical City services and operational needs, including, but not limited to, transportation infrastructure projects and bus purchases, the purchase of public safety equipment like bullet proof vests, police officer wellness programs, tactical emergency medical services, purchasing community emergency response team supplies, housing assistance payments, curb ramp improvements in compliance with Americans with Disabilities Act, and stormwater filtration projects.

620.    Culver City is in a structural deficit and requires certainty as to whether it can continue to rely on federal funds already awarded. In most cases, there are no alternative funding sources available to the City to replace this threatened loss of significant grant funding; therefore, loss of funding would result in a detrimental impact to services and programs.

### 31.    Dane County

621.    The 2024 Dane County operating budget included roughly $60 million in federal funding for operations, not including Medicaid administration and eligibility. That Fiscal Year, Dane County received funds from DOJ, through the Edward Byrne Memorial JAG Program, to support critical law enforcement and public safety services. It also received FEMA grants from DHS, HUD funding for affordable and low-income housing projects, and public health and Medicaid funding from HHS. In addition to that funding, in 2024, the Dane County Regional Airport received $15 million in federal funding, primarily from DOT. None of the programs or services supported by these funds involves immigration or include any element of immigration enforcement.

622.    To date, in 2025, the County has relied on federal funding from many federal agencies, including DOJ, DHS, HUD, HHS, and DOT, to finance essential county programs and services, including law enforcement and criminal justice programs; emergency management programs; critical infrastructure improvements; creation and preservation of low-income housing; emergency shelter

assistance for unhoused individuals; household radon, mold, lead, and pest mitigation; and developing Dane County's public health infrastructure and workforce.

623.    The threatened loss of federal funds by the Executive Orders has created confusion and uncertainty in the budget planning process for Dane County, which has just started for Fiscal year 2025. For example, Dane County has entered into numerous contracts to provide needed services to county residents that are funded with federal grants. If the federal funding is terminated mid-year, many of those contracts will be terminated. Dane County is also already facing difficult budgetary decisions because of decreasing revenue and the rising costs of providing government services. The County Executive has recently issued budget guidance to all county departments requiring a 4% cut in department budget requests. The loss of anticipated federal grant funding would force even more significant reductions in the County's budget, potentially requiring the County to cut essential government services, lay off county employees, and terminate contracts for services.

### 32.    Denver

624.    Denver anticipates expending approximately $250 million in federal grant funding in 2025, both through direct grants and as a subrecipient of the State of Colorado. This includes $1,543,595 in DOJ pass-through funds. These combined funds support approximately 200 full-time equivalent positions and numerous contracts across multiple core departments and functions, including public health and environment, economic development, transportation, aviation, and other essential City functions.

625.    Because Denver is already facing a budget shortfall due to decreasing tax revenues, local funds are insufficient to maintain current programs and cover the threatened loss in federal funding. Indeed, Denver has already instituted a hiring freeze and ordered employees to take furlough days as a result of the unstable budget situation. Given that, loss of federal funding would negatively impact programs and reduce or even potentially eliminate services, including essential healthcare services, workforce development and training, and construction of major infrastructure projects.

626.    The uncertainty over whether Denver will actually receive its anticipated federal funding may require the City to cut back on essential services, end grant-funded projects, and otherwise reduce spending, including terminating grant-funded positions in the City workforce. This,

in turn, would impact public health and safety, and cause additional economic instability in Denver and the greater metropolitan area. And, such short-term cuts in services or delays in projects would likely result in long-term effects that reduce the efficacy of services and increase the total cost of any delayed projects, even if the funding were later replaced.

### 33. Healdsburg

627.    This fiscal year, Healdsburg has received approximately $861,820 in DOT funds for projects improving City streets. These projects contribute to the safety and well-being of drivers and pedestrians who live in and visit the City.

628.    The city also anticipates receiving approximately $14 million in DOT funds to help fund two large projects upgrading streets throughout the City. These projects contribute to the infrastructure and character of the City's community, in addition to improving the safety and public health of its community members; and without these funds, the City will not be able to complete these projects. Design is actively underway for its Grove Street streetscape project. The project includes numerous safety improvements, including a complex, multi-agency plan to underground utilities to address wildfire risks. Elimination of this funding would cause all work to stop and threaten several years of work by Healdsburg and local utility providers.

629.    Healdsburg is in the process of applying for a DHS FEMA Hazard Mitigation grant to fund an aquifer storage and recovery project that would help ensure adequate water supplies for the community. Healdsburg has another pending FEMA grant application for replacement of breathing apparatuses for first responders.

630.    Federal grants also play a particularly important role at the Healdsburg Municipal Airport. The City regularly receives grant funding for maintenance and improvements at the airport, which is used for private aviation, as well as for staging, landing, and take off by firefighters and other emergency personnel for emergency events in all of Sonoma County. In 2017, the airport played a critical role in allowing CalFire to fight the Tubbs Fire, which burned through Sonoma County and necessitated the full evacuation of Healdsburg. The City has submitted grant applications for nearly $600,000 for projects at the airport, funding the City needs to support critical improvements and rehabilitation of the airport's runways.

631.    The challenged Executive Orders pose a significant threat to Healdsburg's ability to maintain critical services for its community, including ensuring the safety and wellbeing of its residents and visitors. For example, Healdsburg has largely obligated the federal funding awarded to it in previous years, and the City is relying on the federal government to satisfy those funding commitments. In addition, on June 3, 2024, the City Council approved a budget for Fiscal Year 2025-2026 based on the assumption that the City will receive federal funding. The threatened loss of federal funds creates significant uncertainty. That uncertainty, by turn, undermines the accuracy of the City's budget, disrupts the City's fiscal planning, and jeopardizes the City's ability to protect jobs and vital programs.

### 34.    Hennepin County

632.    Hennepin County's 2025 budget anticipates $271 million in federal funding received directly from the federal government. This figure does not include additional federal funding received through grants administered by the State of Minnesota and its political subdivisions.

633.    The 2025 budget includes $1.5 million from DHS, $3.3 million from DOJ, $24.5 million from the Department of Agriculture, $205.7 million from HHS, $16.8 million from HUD, and $15.8 million from DOT.

634.    Hennepin County's budgeting process for 2026 is well underway, with a statutory deadline of September 30, 2025 to determine the amount of revenue the County must raise through property taxes in 2026. Uncertainty surrounding the availability of federal funding makes this budgeting process extremely challenging.

635.    If Hennepin County's federal funding is delayed or reduced, the County will be forced to make difficult decisions regarding its ability to support the current level of public services provided to Hennepin County residents.

### 35.    Los Angeles

636.    Federal grants play a critical role in funding Los Angeles's core services.  Over the course of the next fiscal year, the City expects to receive over $704 million in federal dollars, over $277 million of which come in the form of formula grants.  These dollars are written into the Fiscal Year 2025-2026 budget, which was adopted by the Los Angeles City Council and Mayor just a few

weeks ago.

637.  The federal funds support emergency response programs; police officer hiring; crime prevention and victim assistance programs, including supportive services for domestic violence victims and gang reduction and youth development programs; rape kit processing; homeless services, including provision of emergency shelter; development and management of affordable housing and permanent supporting housing; water recycling programs; brownfield cleanups; infrastructure support, such as sewer connection and maintenance throughout the City and local transit assistance; security upgrades for the Port of Los Angeles; services for senior residents in the City, including nutrition programs, senior centers, and transportation assistance; arts and cultural programs for residents and visitors to the City; and disaster recovery money related to recent wildfires and winter storms. None of these federally funded programs involve immigration or include any element of immigration enforcement.

638.  Any loss in funding would have a devastating impact on the City's adopted budget and overall finances.  In June, the Los Angeles City Council declared a fiscal emergency, due to the continued risk of elevated tariffs and their impact on global trade and tourism and revenue in the City, volatile market conditions, economic uncertainty, the cost of recovering from the January 2025 wildfires, and the threatened loss of federal funding by targeted action resulting from the Executive Orders.

639.  The loss of federal funding would lead to drastic service cuts that directly impact the residents of Los Angeles.  Public safety cuts would result from the loss of nearly $1 million earmarked for the Fire Department and over $6 million for the Police Department, $3 million of which is for hiring police officers. The public safety of those who live, work, and visit the Los Angeles area would also suffer from the withholding of over $2 million for criminal victim witness services and hundreds of thousands of dollars budgeted for police investigation of child sex crimes. In the wake of the devastating economic consequences of the January 2025 wildfires, the City depends more than ever on federal funding for economic development and job creation; those efforts would be crippled by the withholding of over $63 million expected for that purpose this year. The City is also counting on over $9 million in federal disaster relief grants to fund its ongoing relief efforts. Housing and services for

the City's most vulnerable residents would also be impacted, including by the loss of $84 million in expected federal housing and community development grants. The City would suffer similarly devastating cuts to programs supporting transit infrastructure maintenance (over $28 million in potential losses that would directly impact residents' ability to transit the City), airport modernization and maintenance ($162 million in potential losses), and rail and Port improvements (over $9 million in potential losses). Simply put, federal funds have been awarded to the City in support of a wide variety of core public functions that the City will not be able to provide as expected should the funding be withheld.

640.    FEMA disaster assistance is on a reimbursement basis. For example, the $9,709,007 in the FEMA reimbursements the City expects in 2025-2026 are reimbursements from prior disasters. The City has not started submitting reimbursements for the January Wildfires.  The City has only submitted the FEMA public assistance need, which is estimated at $310 million.

641.    The funding uncertainty has prompted the City to devote CAO staff time to tracking all federal actions to assess their impact to City grant funding. To address anticipated changes in City funding, City staff will need to update quarterly financial status reports, and all such changes will need to be reflected in the Fiscal Year 2026-2027 budget development process.

### 36.    Marin County

642.    For Fiscal Year 2023–2024, federal funding accounted for 13% of Marin County's $783 million budget.

643.    These funds were used for a range of purposes, including emergency assistance, healthcare access, and supporting housing access. Specifically, the County's Department of Health and Human Services received approximately $45 million from HHS to support the delivery of essential governmental services aimed at promoting the health, well-being, self-sufficiency, and safety of all Marin County residents. The County's Community Development Agency relied on approximately $20 million in HUD funding to advance the agency's mission of promoting sustainable development, increasing affordable housing, and enhancing the quality of life for all Marin residents. The County's Office of Emergency Management received tens of thousands of dollars from FEMA to reimburse County expenses for purchases such as hazard response equipment and cybersecurity technology. And

the County's Department of Public Works relied on approximately $4 million in funding from DOT to support highway maintenance, roadwork, and traffic safety measures. The County received $1.75 million in federal funds from DOJ to support the County's District Attorney and Sheriff's Offices.

644.    The County's budget for Fiscal Year 2025–2026 was recently approved by the Board of Supervisors. Given the fact that the County relied on the availability of federal funds when crafting the budget, a disruption in federal funding would severely impact the County's operations and service delivery throughout the upcoming fiscal year. The loss of federal funding for health and safety programs, in particular, would place residents at immediate risk and lead to serious disruptions in critical services.

### 37.    Menlo Park

645.    This fiscal year, Menlo Park anticipates receiving $21 million in direct and pass-through federal funding. That amount includes $5 million from DHS in FEMA funds, to replace outdated infrastructure with three new pumps to protect the City against a 100-year flood event and future sea level rise. Notably, flooding in Menlo Park is one of the greatest disaster risks to the City, and chronic lowland flooding in the area has caused millions of dollars in damage to public and private property. Menlo Park also receives significant funding from DOT, HHS, and the Department of the Interior, which combined make up $12 million of the City's funding, to support City infrastructure improvements and other essential services, such as bicycle and pedestrian safety improvements, charging stations for electric vehicles, and support for childhood development. None of the programs or services funded by federal dollars focus on immigration or include any element of immigration enforcement.

646.    On June 24, 2025, the City Council approved a budget for Fiscal Year 2025–2026 based on the assumption that the City would receive federal funding. The threatened loss of federal funds creates significant uncertainty that disrupts the City's fiscal planning and jeopardizes jobs and vital programs. In addition, Menlo Park has largely obligated the federal funding awarded to it in previous years, and is thus relying on the federal government to satisfy its funding commitments. The anticipated loss of federal funding for Menlo Park's large infrastructure projects, that span multiple years from design to construction completion, may require the City to cover contracted or incurred

expenses, depending on the stage of the project, or cancel the project entirely if alternate funding sources are not available. Similarly, a loss of federal funding for services, such as programming offered at the Belle Haven Child Development Center, will require Menlo Park to identify alternate funding sources and consider the use of reserves to cover funding loss during the fiscal year. Delaying or cancelling projects due to loss of federal funding will lead to the work being more expensive as more time goes on and costs increase. Further, delaying or deferring the construction of Menlo Park's infrastructure projects will put critical systems for flood control and other utilities at further risk of deterioration.

### 38.     Multnomah County

647.    In Fiscal Year 2025, Multnomah County's budget included more than $100 million in direct and pass-through federal grant funding.

648.    That amount includes approximately $9 million from DOJ to support the County's Department of Community Justice, Health, Local Public Safety Coordinating Counsel, Sheriff's Office, as well as funding to the Multnomah County District Attorney; approximately $1 million from DHS; and approximately $42.5 million from HHS to support the County Health Department's public health programming, including primary care and specialized services such as HIV/AIDS services, school-based and early childhood mental health, addiction medicine and outreach, public health and epidemiology, and healthy family initiatives. The amount also includes $38.8 million from HUD, the Department of Energy, the Department of Education, HHS, the Department of Veterans Affairs, and Treasury to support critical community programs through the County's Department of Human Services, such as community school programs and youth advocacy, housing programs and homelessness prevention services, nutrition and health programs, case management, and outreach. The amount also includes $18.9 million in HUD and Treasury/American Rescue Plan funding for the County's Department of Homeless Services programs and $12.4 million in DOT funding for infrastructure improvements.

649.    Multnomah County's Fiscal Year 2026 began July 1, 2025. The loss of federal funding, both in Fiscal Year 2026 and in future years, would have a tremendous impact on Multnomah County's ability to provide these services to the community, and to staff departments with any degree

of certainty with regard to ongoing grant funding.

### 39. Pacifica

650.    In this fiscal year, direct and pass-through federal funding amounts to over $12 million of Pacifica's total budget. This includes more than $2 million from DHS and DOT, to support infrastructure improvements, traffic safety, and storm recovery efforts. Pacifica has also received over $500,000 from HHS to support services such as senior transportation, Meals on Wheels, and childcare support. And Pacifica has received $110,000 in DOT funding to support City programs and services related to traffic control and public safety. None of these programs or services focus on immigration or include any element of immigration enforcement.

651.    These funds operate on a reimbursement model, and the City is relying on the federal government to satisfy its funding commitments to repay these costs. Pacifica is also currently applying for a $3.5 million grant from DOT to support key planning and infrastructure to prevent death and serious injury on roads and streets. The Executive Orders threaten the City's ability to apply for and receive these and other future federal funding for critical public safety and infrastructure projects.

652.    Pacifica is already facing difficult budgetary decisions in the Fiscal Year 2025-2026 budget, with the $53 million budget projected to run $3.2 million deficit. The loss of anticipated federal grant funding would cause significant additional financial harm, and the mere threat of the loss has created confusion and uncertainty in Pacifica's budget planning, which is now in its final stages. Pacifica is currently considering how to navigate the threat of lost funds. If there is a reduction in revenue, Pacifica will need to suspend childcare and senior services and abandon critical infrastructure and disaster recovery projects. It will also need to reduce staffing that supports those services.

### 40. Palo Alto

653.    Palo Alto receives or plans to receive over $87 million in grants from the federal government over the next three years, including approximately $1.7 million from DHS and $185,000 from DOJ. These grants include funds for the construction of infrastructure; support of critical infrastructure such as aviation, water, and natural gas distribution; funds to house the unhoused; the purchase of public safety equipment; and aid for disaster relief. Palo Alto also receives $16.5 million from Department of Transportation, $12.8 million from the Department of the Interior, $1.2 million

from the Environmental Protection Agency, and $1.2 million from HUD.

654.    On June 16, 2025, Palo Alto adopted a Fiscal Year 2026 budget that reasonably relies on receipt of expected federal grants. Sudden and unanticipated cuts, such as the withdrawal of already budgeted and accounted-for federal funds, could lead to immediate service cuts, layoffs, and cancellation of contracts and associated penalties. The threat of losing federal funds under the Executive Orders and other federal directives creates significant uncertainty in Palo Alto's budget process, making it unclear whether federal funds will be available and what services and infrastructure the City can realistically plan to provide for its residents.

### 41.    Petaluma

655.    Federal grants play a critical role in funding Petaluma programs for: disaster mitigation and resiliency; energy efficiency and conservation; emergency operations; public safety equipment replacement, accreditation, and mobile crisis response; traffic safety and DUI operations; bulletproof vest replacement, and purchase of mobile vehicle barriers; storm drain trash capture, flood reduction, and recycled water expansion; water main replacement; wetlands restoration and other environmental protections; climate change response; airport improvements; road safety improvements; transit facility improvements; paratransit vehicles and operations; fixed route vehicles; community development services; and planning services. Outstanding Petaluma grant funding from the DOJ currently equals or exceeds $743,594, and supports public safety equipment replacement, accreditation, mobile crisis response, and bulletproof vest replacement. Outstanding grant funding from DHS totals $47,018. The total outstanding grant awards from a variety of federal agencies to Petaluma in all of these categories currently equals or exceeds $29 million, or nearly 10% of the city's budget.

656.    The threatened loss of nearly 10% of the city's budget would present the City Council with very difficult choices regarding how to maintain such critical programs as providing adequate safety equipment for law enforcement officials, maintaining essential disaster preparedness, protections for the environment and response to climate change, transit services for community members, including disabled community members, safety improvements on city rights of way, safety improvements at the municipal airport, housing services and critical non-profit service support, and other essential services and programs. The resulting program and service gaps would impact basic

services essential for Petaluma's most vulnerable community members.

## 42. Pierce County

657.    The Fiscal Year 2024–2025 Pierce County biennial budget includes roughly $187 million in federal direct and pass-through funding, or about 6% of Pierce County's operating budget. About $15.5 million of this funding is from DHS, and about $2.5 million is from DOJ. Pierce County uses federal funding to support many of the County's core functions, including aging and disability resources, homeless services, public safety, emergency management, home weatherization programs, urban search and rescue task force readiness and deployment, and infrastructure and capital improvement projects.

658.    Pierce County is already facing considerable economic uncertainty due to inflation, elevated interest rates which will likely lead to slower growth in local revenues, and the uncertainty that tariffs have wrought. The threat of the loss of federal funding has compounded the county's already daunting financial situation, and losing federal grant funds could lead to the loss of critical services.

659.    Similarly, Defendants' threats to prosecute employees of so-called sanctuary jurisdictions have caused considerable distress and consternation within the Pierce County work force. Pierce County has limited resources to create and adopt new protocols to mitigate the federal threat to frontline workers while continuing to comply with state law that precludes localities from assisting federal immigration enforcement efforts.

## 43. Richmond

660.    Richmond relies on federal funding to deliver public services. During Fiscal Year 2024–2025, Richmond received or was awarded approximately $37.8 million in direct and pass-through federal grants. Most of its funding came from HUD, DOT, and DOL. It also received $150,000 in Edward Byrne Memorial JAG Grants administered through DOJ.

661.    Federal grants fund many essential services and programs for Richmond's residents, including police services and safety; housing through the Richmond Housing Authority; housing for unsheltered and low-income residents; infrastructure improvements to the port, housing, community centers, libraries, parks, and streets, including bicycle, pedestrian, and traffic safety; and job training

and educational services for youths and adults.

662.    Richmond has already started its budgeting process for Fiscal Year 2025–2026. The uncertainty involving a pause and/or termination of federal grants makes it impossible for Richmond to maintain an accurate outlook in planning its future budgets. Losing federal funds will have a detrimental impact on Richmond's ability to continue to provide services to its residents.

### 44.    Rochester

663.    A significant portion of Rochester's budget is derived from federal funds, which Rochester uses to deliver critical resources to some of its most at-risk community members. Those federal dollars deliver critical resources to some of the most at-risk members of our community.

664.    For example, in Fiscal Year 2023-2024, Rochester's total expenditure of federal funds was $81,024,661. These funds pay for crucial City services such as housing assistance and services to low-income persons with AIDS, the development of rental housing and housing rehabilitation to assist first-time homebuyers, personal protective equipment and hazmat equipment for firefighters, as well as funding for community development activities and public safety initiatives. Over $4 million of this amount also goes to directly support City employee salary and benefits, affecting the employment of approximately 50 City employees.

665.    Rochester is already facing tough budget decisions and the loss of such a significant— and acutely important—set of funds would force Rochester to implement cuts to municipal services and staff. Indeed, the profound uncertainty that the mere threat of that funding loss has already created damaging confusion and uncertainty. Rochester officials are unsure what the future holds, and city residents are likewise extremely concerned, as they have frequently communicated to municipal leaders.

### 45.    Rohnert Park

666.    Federal grants play an important role in funding the Rohnert Park's public safety efforts, infrastructure improvements, and other essential operations. This fiscal year, more than $4 million of the City's total budget consists of direct and pass-through federal funding. A significant portion of that funding—nearly $3.5 million—comes from FHWA grants for public safety and infrastructure improvements related to pedestrian and cyclist safety. For example, the grants fund the

City's Highway 101 Bicycle and Pedestrian Overcrossing Project. Notably, the U.S. 101 freeway is a major barrier to east-west travel in Rohnert Park, particularly for cyclists and pedestrians, and creates gaps in the City's active transportation network. Although it is possible to travel between the east and west sides of the City using the underpass at Rohnert Park Expressway, these crossings present safety concerns by requiring cyclists and pedestrians to navigate freeway on and off ramps, large intersections, and heavy traffic. Federal funding is helping the City address this critical safety issue.

667.    Another large portion of the City's federal funding—$880,725—is from FEMA for mitigation activities to reduce risk to life and property from natural hazards, including earthquakes and wildfires, such as funding for the Autonomous Firewatch Camera Systems to combat wildfires; a project to seismically retrofit seven water tanks and six water well sites within the City; the construction of an off-channel stormwater detention basin to protect against a 10-year storm event; and other associated maintenance for sediment removal near the City's Copeland Creek. Rohnert Park also received $75,714 from DOJ this fiscal year. None of these projects are related to immigration enforcement.

668.    On June 10, 2025, the City Council approved an annual budget for Fiscal Year 2025-2026 based on the assumption that the City will receive federal funding. The threatened loss of federal funds creates significant uncertainty. For example, the City is relying on FHWA to fulfill its commitment to provide $3.35 million in already-awarded funds for the Highway 101 Bicycle and Pedestrian Overcrossing Project. This funding is essential to complete environmental clearance and design. Without the funding, the project, already years in the making, would be delayed indefinitely, and residents, particularly ones in vulnerable and underserved communities, would face prolonged exposure to hazardous road conditions.

### 46.    San Mateo County

669.    In Fiscal Year 2025–2026, direct and pass-through federal funds are anticipated to account for approximately $1 billion—or 20%—of the County's $4.9 billion in revenue.

670.    These funds are used to support essential County operations. For example, the County's health system relies on over $500 million in annual federal funding, and the County's Human Services Agency—which provides safety net and protective services to children, families, and adults in need of

assistance—is anticipated to receive approximately $90 million in federal funding for Fiscal Year 2025–2026, or almost one-quarter of its $363 million budget.

671.    San Mateo County has received or will receive at least $2.6 million from DOJ and $14.2 million from DHS that it expects to draw down from in Fiscal Year 2025-2026. Federal funding from HUD, HHS, DOL, and DOT annually finances over $650 million of San Mateo County's programs and services, including essential programs like critical infrastructure improvements, creation and preservation of low-income housing, and emergency shelter assistance for unhoused individuals. Similarly, San Mateo County has received or will receive tens of millions in funding from DOJ and DHS, to support such critical law enforcement services as first responder crisis intervention training; County Crime Laboratory staff training; salary costs for the officers addressing drug trafficking; costs for the victim services division of the District Attorney's Office and the County child advocacy center, which serves child crime victims and aids in the prosecution of sex crimes and other crimes against children.

672.    San Mateo County is already facing difficult budgetary decisions because of decreased state funding and the rising costs of providing public safety and safety net services. Particularly given the already difficult budget situation, critically important services would be jeopardized by a loss of federal funding emanating from the Executive Orders. Moreover, the mere threat of loss of federal funds has created confusion and uncertainty in the budget planning for San Mateo County and as to the County's continued ability to provide essential services.

### 47.    Santa Rosa

673.    The Fiscal Year 2025-2026 budget adopted by the Santa Rosa City Council on June 17, 2025 totals approximately $518 million, for all City operations. The budget is based on the assumption that Santa Rosa will receive approximately $218 million in awarded or anticipated federal grant funding.

674.    Of these funds, Santa Rosa receives approximately $47 million in grants from DHS, with the majority of those grants coming from FEMA. This funding includes, for example, $2.93 million annually from a FEMA Staffing for Adequate Fire and Emergency Response ("SAFER") grant, which pays for 12 firefighter paramedics. Losing these funds would significantly reduce the

City's ability to respond to wildfire risks and other emergency incidents. Santa Rosa also has also been awarded approximately $14.2 million in FEMA Hazard Mitigation Grant Program funds for the City's Laguna Treatment Plant Flood protection project, which is intended to decrease the risk of flooding during a 100-year event and improve resiliency of this critical regional sewage treatment plant. Without these funds, the project could not be completed and there is a significant risk that flooding at the site could lead to regional public health and water quality issues.

675.    Santa Rosa also receives approximately $44.5 million in DOT grants, including direct FTA and FHWA grants used to maintain City streets, replace the City's aging buses, and fund transit employee positions. Without these funds, Santa Rosa would experience increased maintenance costs due to the prolonged use of outdated vehicles, infrastructure challenges, and reductions in transit staffing that would increase disruptions and reduce transit services.

676.    Santa Rosa also intends to request new federal grants for use in Fiscal Year 2025-2026. These federal grant requests include, but are not limited to, DOJ's COPS Hiring program and Edward Byrne Memorial JAG grants. Santa Rosa has been awarded these DOJ grants in the past and the Santa Rosa Police Department used the funds for critical updated law enforcement technology, such as automated license plate readers, unmanned aerial devices, forensic and surveillance technology, body worn cameras, gunshot detection software, and updated records management systems. Without this funding, the City's ability to provide safe and effective public safety services to the community will substantially diminish.

677.    Based on declining revenue projections, with expenditures exceeding revenues, Santa Rosa projected a nearly $20 million deficit when developing its Fiscal Year 2025-2026 budget.  To reduce the deficit, the budget the City Council adopted in June 2025 includes roughly $12 million in expenditure reductions citywide, including but not limited to, elimination of 30 employee positions and cuts to service delivery citywide. Loss of the above and future federal grant funds would result in a further dramatic decline in projected revenue and the City would be required to further deplete emergency reserves set aside for future disasters (such as the devasting wildfires Santa Rosa has experienced since 2017), leaving Santa Rosa with greater exposure to disaster. If federal funds were cut suddenly, outside normal funding cycles, the City likely would also be required to make drastic

additional expenditure reductions including potentially further layoffs and cuts to critical basic
municipal services. Losing these grant funds would cause irreparable harm to the City and the
community it serves.

### 48. Sonoma County

678.     In Fiscal Year 2023-2024, Sonoma County received $289 million in federal funds,
including $134 million from HHS, $65 million from HUD, $2.4 million from DOJ, and almost $11
million from DHS. Sonoma County's Department of Health Services, Department of Public
Infrastructure, Human Services Department, and Department of Emergency Management, among
others, rely on this funding to support essential programs like critical infrastructure improvements,
creation and preservation of low-income housing, emergency shelter assistance for unhoused
individuals, developing public health infrastructure and workforce, disaster preparedness and response,
and provision of public safety services.

679.     The threatened loss of federal funds creates confusion and uncertainty in the budget
planning for Sonoma County. Lack of certainty regarding federal funds has created significant
uncertainty about the future viability or continuity of programs and services.

680.     The County is already facing difficult budgetary decisions. If federal grant funding is
lost or reduced, the County will be forced to dramatically cut County services. The threatened loss of
federal funds also creates confusion and uncertainty in Sonoma County's budget planning process:
The County recently adopted its budget for Fiscal Year 2025-2026. Without knowing whether certain
federal funds will be available for County programs and services, described above, the County is
unable to plan with any certainty whether it will be able to maintain the viability and continuity of
programs and services otherwise planned for in that budget.

### 49. Watsonville

681.     In Fiscal Year 2025-2026, Watsonville anticipates receiving over $19 million in direct
and pass-through federal funding, providing critical support for public safety, infrastructure, planning,
and transportation projects.

682.     In Fiscal Year 2024-2025, Watsonville's federal funding included receipt of $334,660
in DHS funding through FEMA for disaster relief, approximately $25,000 in DOJ Edward Byrne

Memorial JAG grants, $1.3 million in HUD Community Development Block Grants, $1 million in DOT infrastructure and safety grants, and $1 million in HHS grants for low-income household water assistance. The City used its DOJ funds to combat hate crimes, promote public trust between the community and criminal justice agencies, reduce violent crime, conduct community violence intervention, address COVID-19 criminal justice challenges and sustain innovations, and crime analysis and investigation.

683.     Watsonville is also relying on a $17 million FEMA grant to design, build, and install a new Main Electrical Facility within the existing Watsonville Wastewater Treatment Facility. This project is intended to increase the level of flood protection in the City to above the 500-year flood hazard event level and to increase the level of seismic protection to a 2,475-year return interval event.

684.     On June 24, 2025, the City Council approved a budget for Fiscal Year 2025-2026 based on the assumption that Watsonville will receive expected federal funding. The threatened loss of federal funds has created significant uncertainty around this process because the City depends on federal grants to maintain critical public services, including public safety and infrastructure improvements. Without the certainty of continued funding, Watsonville is unable to dependably finalize its 2025 budget. This uncertainty disrupts the City's fiscal planning, and jeopardizes jobs and vital programs. The loss of anticipated funding would result in lasting operational damage and a breakdown in the trust between the City and its diverse community.

**50.    Wilsonville**

685.     Wilsonville generally receives over $1 million annually in federal grant funds, either directly or through state pass-through funds.

686.     Wilsonville utilizes its various federal funds primarily for transit capital investments and providing meals to Wilsonville's senior residents. For example, in Fiscal Year 2024–2025, Wilsonville relied on over $1 million in DOT funds for bus preventative maintenance, software, security equipment, and operator safety materials. Wilsonville was also awarded pass-through funds of $135,320 for Fiscal Year 2024-2025, and a total award of $254,520 through Fiscal Year 2026–2027 from HHS to provide services for its senior residents.

687.     The loss of these funds would force Wilsonville to extend bus life spans beyond their

useful life, causing a significant decline in the quality and quantity of buses, decreasing the level of
service, and diminishing the value and appeal of public transit in the Wilsonville community. Loss of
funds would also force Wilsonville to no longer provide meals to some of its most vulnerable
community members—seniors—many of whom are on fixed incomes, are unable to leave their homes,
and lack resources and services. And the mere threat of loss of this funding has, as a result, injected
significant uncertainty into Wilsonville's budgeting and planning processes.

**C.    Plaintiffs Face Operational Harms in Serving Their Communities**

688.    Despite court orders and precedent foreclosing Defendants' understanding of the law,
Defendants' actions have fostered an atmosphere of fear and distrust between undocumented
immigrants and local government officials in Plaintiffs' jurisdictions. The threats of criminal and civil
prosecution leveled at local officials, combined with recent ICE activity in Plaintiffs' communities,
and compounded by the Trump Administration's statements about immigration enforcement, have also
generated a maelstrom of fear and confusion and have left local agencies unsure of whether efforts to
serve the undocumented community will be treated as grounds for prosecution.

689.    By heightening undocumented immigrants' concerns that any interaction with local
officials will lead to their information being turned over to ICE, the Executive Orders and Bondi and
Noem Directives discourage undocumented immigrants from reporting crimes, seeking public health
services, and otherwise engaging with programs and services provided by Plaintiffs. This threat harms
public safety, public health, and Plaintiffs' ability to act in what they have determined to be the best
interest of their residents, consistent with federal and state law.

690.    The Executive Orders and Bondi and Noem Directives undermine Plaintiffs' ability to
provide critical services not just to undocumented immigrants, but to all residents. When witnesses
and crime victims will not talk to the police, law enforcement suffers and the entire community is less
safe. When children are not vaccinated or the sick are not treated for communicable diseases, illness
spreads throughout the community.

691.    At the same time, the repeated threats of criminal and civil prosecution, in Executive
Order 14,159; in the Bove, Bondi, and Noem Directives; and in repeated statements from Trump

Administration officials, have left local officials fearful that complying with Plaintiffs' laws and serving undocumented residents will subject them to civil or criminal prosecution.

692.    These threats and fears fall disproportionately on public servants on the front lines of providing critical public safety and public health needs for residents of Plaintiffs' jurisdictions. For example, the Executive Orders and the Bondi Directive have already started to cause confusion and harm to Portland. Portland and its employees are required to follow both Oregon and federal law. Threats of prosecution impact front-line workers—police officers, firefighters, front desk staff at community centers—who will be required to make decisions in an interaction with immigration-enforcement officers that is consistent with all those laws. Threats of prosecution by DOJ do nothing to resolve the legal and policy disputes between local leaders and the federal government. Instead, they instill fear and uncertainty in public servants—employees simply trying to do their jobs consistent with the laws.

693.    Portland has been forced to consider ways to protect and assist such employees, promulgate additional guidance, and manage confusion surrounding the Executive Orders and the Bondi Directive.

694.    Similarly, Defendants' threats to prosecute employees of so-called "sanctuary" jurisdictions has caused considerable distress and consternation within the King County work force. King County has been forced to dedicate resources toward creating and adopting new protocols to mitigate the federal threat to frontline workers while continuing to enforce KWW and KCC 2.15. King County has expended sums placing a federal criminal defense attorney on retainer in anticipation of a federal prosecution.

695.    In Minneapolis, the federal government's threats have generated significant fear and uncertainty and affected the City's ability to deliver critical information and connections to resources and services to immigrant and refugee communities. Despite consistent City efforts to communicate City policies, including that the Minneapolis Police Department does not enforce federal immigration law, members of the Minneapolis community have expressed confusion, uncertainty, and fear about interacting with government. For example, anecdotal reports indicate that residents are afraid to appear at scheduled court hearings with City prosecutors due to fear of immigration detention at the county

courthouse in Minneapolis. The dynamic of uncertainty created by the executive orders and announcements from the federal government that cities perceived as "sanctuary" cities will face enhanced enforcement also extends to City employees. Threats from the federal government have created concern among City employees and officials that they may face legal challenge including criminal prosecution for doing their jobs, despite the fact that their conduct is lawful.

696.     These operational concerns are further exacerbated by the federal government's *Illinois*, *New York*, *Rochester*, *Colorado*, and *Los Angeles* lawsuits challenging many of the very same requirements that officials in Plaintiffs' jurisdictions are required to comply with under applicable local laws.

## CAUSES OF ACTION
## COUNT ONE
## TENTH AMENDMENT

697.     Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

698.     The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const., amend X. This provision prohibits the federal government from "commandeering" state and local officials to help enforce federal law. *See Printz*, 521 U.S. at 925 ("the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs.").

699.     Neither the Supremacy Clause, the INA, nor any federal statute displaces Plaintiffs' Tenth Amendment interest in refraining from deploying local resources to enforce federal immigration law. *United States v. California*, 921 F.3d at 890–91.

700.     As described above and in the Third Cause of Action below, Defendants violate the Tenth Amendment and seek to commandeer Plaintiffs because Executive Orders 14,159, 14,218, and 14,287, and the Bondi and Noem Directives attempt to use the spending power to coerce them into acting as arms of the federal government.

701.     Executive Order 14,159, Executive Order 14,287, and the Bondi and Noem Directives

also require Plaintiffs to enforce federal immigration law—including using local resources to hold individuals pursuant to civil immigration detainers and administrative warrants and share confidential personal information, including release dates for individuals in custody, with immigration authorities—on penalty of civil or criminal prosecution.

702.    By restricting funding and directing enforcement against Plaintiffs for limiting cooperation with federal immigration authorities, Defendants seek to commandeer Plaintiffs in furtherance of a federal regulatory program in violation of the Tenth Amendment to the United States Constitution.

<div align="center">

**COUNT TWO**

**SEPARATION OF POWERS**

</div>

703.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

704.    The Constitution vests Congress with legislative powers, *see* U.S. Const. art. 1, § 1, the spending power, *see* U.S. Const. art. 1, § 8, cl. 1, and the appropriation power, *see* U.S. Const. art. 1, § 9, cl. 7. Absent a statutory provision or an express delegation, only Congress is entitled to attach conditions to federal funds.

705.    "The Framers viewed the legislative power as a special threat to individual liberty, so they divided that power to ensure that 'differences of opinion' and the 'jarrings of parties' would 'promote deliberation and circumspection' and 'check excesses in the majority.'" *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 223 (2020) (quoting The Federalist No. 70, at 475 (A. Hamilton) and citing *id.*, No. 51, at 350).

706.    "As Chief Justice Marshall put it, this means that 'important subjects . . . must be entirely regulated by the legislature itself,' even if Congress may leave the Executive 'to act under such general provisions to fill up the details.'" *West Virginia v. EPA*, 597 U.S. 697, 737 (2022) (Gorsuch, J., concurring) (quoting *Wayman v. Southard*, 10 Wheat. 1, 42–43, 6 L.Ed. 253 (1825)).

707.    The separation of powers doctrine thus represents perhaps the central tenet of our constitution, *see, e.g.*, *Trump v. United States*, 603 U.S. 593, 637–38 (2024); *West Virginia v. EPA*, 597 U.S. at 723–24, *Seila Law LLC*, 591 U.S. at 227, and consistent with these principles, the

executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the express or implied will of Congress. *Youngstown Sheet & Tube Co.*, 343 U.S. at 637 (Jackson, J., concurring).

708.    Pursuant to the separation of powers doctrine, the Executive Branch may not "claim[] for itself Congress's exclusive spending power, . . . [or] coopt Congress's power to legislate." *City & Cnty. of S.F.*, 897 F.3d at 1234.

709.    Congress has not conditioned the provision of federal funding on compliance with Defendants' immigration enforcement policies and requests.

710.    Congress has not delegated to Defendants the authority to impose immigration-enforcement conditions on federal funds.

711.    Through Executive Orders 14,159, 14,218, and 14,287 and the Bondi and Noem Directives, Defendants are unilaterally imposing new conditions on federal funding without authorization from Congress.

712.    In addition, through these actions, Defendants are legislating new sanctions for failure to comply with immigration enforcement authorities that are unsupported by any act of Congress, including under the INA, or by the Constitution.

713.    For these reasons, Defendants' conditioning of federal funding on local governments' cooperation with immigration enforcement violates principles of separation of powers.

<div align="center">

**COUNT THREE**

**SPENDING CLAUSE**

</div>

714.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

715.    The Spending Clause of the U.S. Constitution provides that "Congress"—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . . ." U.S. Const. art. I,§ 8, cl. 1.

716.    As described above, Defendants violate separation of powers principles because the funding restrictions in Executive Orders 14,159, 14,218, and 14,287 and the Bondi and Noem

Directives are not authorized by Congress, expressly or impliedly, and therefore violate the Spending

Clause as well.

717.    Even if Congress had delegated its authority to impose conditions on federal funds, the

funding restrictions in Executive Orders 14,159, 14,218, and 14,287 and the Bondi and Noem

Directives would violate the Spending Clause by:

a.    imposing conditions that are ambiguous, *see Pennhurst*, 451 U.S. at 17 ("The

legitimacy of Congress' power to legislate under the spending power…rests on whether

the State voluntarily and knowingly accepts [Congress' conditions]…  There can, of

course, be no knowing acceptance if a State is unaware of the conditions or is unable to

ascertain what is expected of it…[I]f Congress intends to impose a condition on the

grant of federal moneys, it must do so unambiguously.");

b.    imposing conditions that are not germane to the stated purpose of the [program name]

funds, *see Dole*, 483 U.S. at 207 ("[C]onditions on federal grants might be illegitimate

if they are unrelated 'to the federal interest in particular national projects or

programs.'");

c.    imposing conditions that are so severe as to coerce Plaintiffs, *see Sebelius*, 567 U.S. at

579 (opinion of Roberts, C.J.) (Congress may not impose conditions so severe that they

"cross[] the line distinguishing encouragement from coercion."); and

d.    imposing conditions that would require Plaintiffs to act unconstitutionally by detaining

individuals based on civil detainers without a finding of probable cause, *Dole*, 483 U.S.

at 210 (Congress's spending power "may not be used to induce the States to engage in

activities that would themselves be unconstitutional.").

### COUNT FOUR

### FIFTH AMENDMENT DUE PROCESS: VOID FOR VAGUENESS

718.    Under the Fifth Amendment to the United States Constitution, a federal law is

unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is

prohibited, or is so standardless that it authorizes or encourages seriously discriminatory

enforcement." *Williams*, 553 U.S. at 304.

719.    The constitutional vagueness standard applies with full force to executive orders. *See United States v. Soussi*, 316 F.3d 1095, 1101 (10th Cir. 2002). When an executive order contains terms that are not "susceptible of a clear meaning," nor "mitigate the vagueness of the term by supplying any definition," then the provision "lends itself to subjective interpretation" and is unconstitutional. *Humanitarian Law Project v. U.S. Dep't of Treasury*, 463 F. Supp. 2d 1049, 1070 (C.D. Cal. 2006).

720.    Section 17 of Executive Order 14,159, which refers to "sanctuary jurisdictions," fails to meaningfully define key terms, such as "sanctuary jurisdictions," "Federal funds," or "practices that interfere with the lawful exercise of Federal law." 90 Fed. Reg. at 8446. Nonetheless, having such a "practice" subjects a jurisdiction to "criminal or civil" actions, which could be draconian in nature. *Id.* What such a practice might be is left undefined, and subject to the Executive Branch's unbridled discretion.

721.    Section 2(a)(ii) of Executive Order 14,218, which refers to "sanctuary" policies, fails to meaningfully define key terms, such as "sanctuary policies" or "Federal payments," or what constitutes "seek[ing] to shield illegal aliens from deportation" or "abet[ting] sanctuary policies," instead leaving these terms subject to the Executive Branch's unbridled discretion.

722.    While court orders and precedent clearly define the limits of what the federal government can demand, the Executive Branch has already demonstrated its eagerness to exercise this unbridled discretion to reach into states and local jurisdictions to interfere with their ordinances, operations, and processes. Such a vast, standardless, and overbroad power invites arbitrary, subjective, and discriminatory enforcement.

723.    Executive Order 14,159 and Executive Order 14,287 purport to grant the Attorney General and the Secretary of Homeland Security unfettered discretion to decide which states or local governments are "sanctuary jurisdictions" that are now subject to criminal or civil action, and will have their funding paused, terminated, and/or clawed back.

724.    Other portions of Executive Order 14,159 are equally vague. Section 8, for example, requires assessment of "fines and penalties" against "aliens unlawfully present in the United States" but also anyone who "facilitate[s] such aliens' presence in the United States." 90 Fed. Reg. at 8445. It is unclear what Defendants understand "facilitate" to mean in this context, and the Order could be read

to apply to employees of Plaintiffs who provide undocumented persons with basic, safety-net services, or landlords, employers, friends, family, churches or non-profit organizations that assist undocumented persons. Not only does this standardless provision exceed the President's authority by legislating through executive order, but it also encourages and sanctions arbitrary, subjective, and discriminatory enforcement.

725.    Executive Order 14,218 is likewise vague and leaves it to the Executive Branch's discretion to determine what constitutes a "sanctuary" policy, what "federal payments" may be withheld, and what it means for a federal payment to "abet" sanctuary policies.

726.    Executive Order 14,287 is also vague and imposes no meaningful limits on what "Federal funds" are "appropriate" to suspend or terminate, instead defining this category broadly to include grants and contracts from *all* federal agencies.

727.    The DOJ and DHS memos are equally vague and lean into the unfettered discretion purportedly granted to them by the Executive Order. The Bove Directive directs "the newly established Sanctuary Cities Enforcement Working Group … to identify state and local laws, policies, and activities that are inconsistent with Executive Branch immigration initiatives," but does not define what would be encompassed within the expansive phrase "inconsistent with Executive Branch immigration initiatives."

728.    The Bondi Directive purports to define "[s]o-called 'sanctuary jurisdictions'" to "include state or local jurisdictions that refuse to comply with 8 U.S.C. § 1373, refuse to certify compliance with § 1373, or willfully fail to comply with other applicable federal immigration laws." Similarly, the Noem Directive purports to define "sanctuary jurisdictions" to "include" [j]urisdictions that decline to "comply with the information sharing requirements of 8 U.S.C. §§ 1373 and 1644," that decline to "honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of alien pursuant to a valid detainer," or that do not "provide access to detainees" in local custody. But these definitions are circular and fail to provide any more "fair notice of what is prohibited" than Executive Order 14,159 does. *Williams*, 553 U.S. at 304. Crucially, the Directives "do[] not make clear what conduct might subject a state or local jurisdiction to defunding or enforcement action, making it impossible for jurisdictions to determine how to modify

their conduct, if at all, to avoid . . . penalties." *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d at 535.

Furthermore, use of the word "include" suggests that even a jurisdiction that does comply with Section

1373 could still be considered a "sanctuary jurisdiction" subject to defunding and prosecution under

Executive Order 14,159 and the Bondi and Noem Directives.

729.     The lack of notice or procedure for how a local government is to be designated a

"sanctuary jurisdiction" is particularly problematic when DOJ appears to have very recently taken on

an expansive reinterpretation of 8 U.S.C. § 1373 that is likely contrary to how courts have interpreted

the law. In other words, DOJ is now prosecuting jurisdictions for their ordinances and policies, when

courts have previously held similar ordinances to be lawful and *not* in conflict with federal

immigration enforcement laws. *See United States v. State of Illinois*, No. 1:25-cv-1285 (N.D. Ill. filed

Feb. 6, 2025); *United States v. New York*, No. 1:25-cv-00205 (N.D.N.Y. filed Feb. 12, 2025); *compare*

*Barr*, 965 F.3d at 764 ("Plaintiffs' respective sanctuary laws comply with 8 U.S.C. § 1373."); *Steinle*

*v. City & Cnty. of S.F.*, 919 F.3d 1154, 1164 (9th Cir. 2019) (local policy not to share release date

information of an inmate who is also an alien not preempted under the plain language of 8 U.S.C. §

1373); *United States v. California*, 921 F.3d at 891 (state law restricting information sharing with

federal immigration enforcement officials did not conflict with 8 U.S.C. § 1373); *see also Garland*, 42

F.4th at 1085–86 (Oregon's laws conserving use of state resources from being used to enforce federal

immigration laws did not conflict with 8 U.S.C. § 1373). DHS's issuance, then rapid removal, of a list

of supposed sanctuary jurisdictions—with no explanation of the import of the removal, or indication of

whether the list may be reissued—further compounds the problem, especially when paired with its

statement regarding expanded enforcement and targeting actions. With the publication of the list, DHS

"demand[ed]" that any jurisdictions on the list "immediately review and revise their policies to align

with federal immigration laws and renew their obligation to protect American citizens, not dangerous

illegal aliens." These vague commands, devoid of a legal basis but framed in mandatory language,

create unacceptable uncertainty for Plaintiffs and jurisdictions with similar policies.

730.     The reversal of prior policy that is effectuated by the Bondi and Noem Directives,

without explanation, and without heed to the fact that it is *not* the province of the Executive Branch to

say what the law is, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 388–89 (2024), also violates fair

notice requirements of the Fifth Amendment. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 254 (2012).

## COUNT FIVE

### FIFTH AMENDMENT DUE PROCESS: PROCEDURAL DUE PROCESS

731.    Under the Fifth Amendment to the United States Constitution, the federal government may not deprive Plaintiffs of money or property without "due process of law."

732.    Plaintiffs each have a constitutionally protectable property interest in the federal funds they rely on to provide essential services to their residents. Plaintiffs' property interest in those federal funds is established and governed by rules and mutually explicit understandings with the federal government.

733.    Section 17 of Executive Order 14,159 and the Bondi Directive deprive the Plaintiffs of their procedural due process rights under the Fifth Amendment because they grant the Attorney General, DOJ, and the DHS Secretary unfettered discretion to "ensure that" so-called "'sanctuary jurisdictions'" "do not receive access to Federal funds from the Department."

734.    The Noem Directive deprives the Plaintiffs of their procedural due process rights under the Fifth Amendment because it appears to grant DHS unfettered discretion to "cease providing federal funding to sanctuary jurisdictions."

735.    Section 2(a)(ii) of Executive Order 14,218 deprives the Plaintiffs of their procedural due process rights under the Fifth Amendment because it appears to grant Executive Branch agencies unfettered discretion to condition or withhold "Federal payments" that they deem to "abet" "sanctuary" policies.

736.    Section 3(a) of Executive Order 14,287 deprives the Plaintiffs of their procedural due process rights under the Fifth Amendment because it appears to grant Executive Branch agencies unfettered discretion to "identify appropriate Federal funds to sanctuary jurisdictions, including grants and contracts, for suspension or termination."

737.    The Bondi Directive's thin reference that DOJ, when terminating or clawing back funds from awardees it has deemed to be sanctuary jurisdictions, "shall comply with any notice and procedural requirements in the award, agreement, or other instrument" does not insulate the

Directive's defunding threats from a Fifth Amendment challenge. Notwithstanding any notice or procedures pursuant to terms of awarded funding that this sentence refers to, local jurisdictions have no way to know if or when they have been designated by DOJ a "sanctuary jurisdiction" in the first place, or have an opportunity to be heard to dispute that designation prior to initiation of proceedings against a jurisdiction's funding or against the jurisdiction itself. *See Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d at 536.

738.    Moreover, the Bondi Directive's directive to "[a]ll litigating components of the Department of Justice and each U.S. Attorneys' Office" to take action against local governments, as well as the Noem Directive's directive to "[a]ll components" of DHS to "make appropriate criminal referrals to the Department of Justice," appear designed to chill lawful ordinances and policies that limit the use of local resources to assist with federal immigration enforcement, and to coerce jurisdictions into abandoning those policies. The Bondi and Noem Directives provide no mechanism by which a state or local government may review, challenge, or even obtain notice that it has been designated a "sanctuary jurisdiction."

739.    The Bondi and Noem Directives' self-serving statements that the defunding and enforcement actions contemplated will be "consistent with" the law do not shield the Administration from the Fifth Amendment. *See Doe v. Harris*, 772 F.3d 563, 580–81 (9th Cir. 2014); *see also United States v. Stevens*, 559 U.S. 460, 480 (2010) ("We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly."); *City & Cty. of S.F. v. Trump*, 897 F.3d at 1240 ("If 'consistent with law' precludes a court from examining whether the Executive Order is consistent with law, judicial review is a meaningless exercise, precluding resolution of the critical legal issues."). These statements are also likely illusory, given the several actions that the Administration has taken, particularly with respect to federal funding, since January 20, 2025 that have already been held to be unconstitutional by courts across the country. *See, e.g.*, Mem. Op. & Order, ECF No. 30, *Nat'l Council of Nonprofits* (D.D.C. Feb. 3, 2025) (TRO against OMB directive); ECF No. 50, *New York* (D.R.I. filed Jan. 28, 2025) (same); Preliminary Injunction, ECF No. 114, *State of Washington v. Trump*, No. 25-cv-00127 (W.D. Wash. Feb. 6, 2025) (granting preliminary injunction against Executive Order ending birthright citizenship for children born to certain noncitizen parents).

740.   Because the Executive Orders and the Bondi and Noem Directives deprive the Plaintiffs of a cognizable property interest while providing no notice, no pre-deprivation opportunity to be heard, and no post-deprivation opportunity to be heard, they violate the Fifth Amendment's due process clause.

### COUNT SIX

### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)

### (ARBITRARY AND CAPRICIOUS)

741.   Plaintiffs repeat and incorporate by reference each of the allegations of the prior paragraphs as if fully set forth herein.

742.   Defendants DOJ and DHS are "agencies" as defined in the APA, 5 U.S.C. § 551(1), and the Bondi and Noem Directives are agency actions subject to review under the APA.

743.   Final agency actions (1) "mark the 'consummation' of the agency's decision-making process" and (2) are ones "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

744.   The Bondi and Noem Directives are final agency actions because they announce a final decision to condition or withhold federal funding and thus mark the consummation of DOJ's and DHS's decision-making processes.

745.   Further, the Bondi and Noem Directives are actions determining rights or obligations or from which legal consequences will flow because they exercise a purported authority held by DOJ and DHS to stop funding directed by Congress that would otherwise be provided, and add conditions that Congress has not authorized.

746.   Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

747.   "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between

the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). "[A]n agency cannot simply ignore 'an important aspect of the problem'" addressed by its action. *Id.* at 293.

748.    As described above, the Bondi and Noem Directives provide no reasoned explanation for the extreme breadth of the withholding or conditioning of funding to Plaintiffs.

749.    The Bondi and Noem Directives provide no reasoned basis for withholding or conditioning funds Congress appropriated for disbursement, including via formula grants, except to the extent they make clear that the Executive Order enacts the President's policy desires in place of Congress's intent.

750.    The Bondi and Noem Directives also ignore essential aspects of the "problem" it purports to address, including the lack of statutory authority or basis for withholding already appropriated funds, Plaintiffs' inevitable reliance on DOJ and DHS funds for critical public safety and emergency preparedness activities, and the need for clarity by local governments about funding streams to provide day-to-day services relied on by their residents.

751.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that the Bondi and Noem Directives violate the APA because they are arbitrary and capricious; vacate the Bondi and Noem Directives under 5 U.S.C. § 706; provide preliminary relief under 5 U.S.C. § 705; and preliminary and permanently enjoin Defendants from implementing or enforcing the Bondi and Noem Directives.

## COUNT SEVEN

## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)

### (CONTRARY TO CONSTITUTION)

752.    Plaintiffs repeat and incorporate by reference each of the allegations of the prior paragraphs as if fully set forth herein.

753.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

754.    As described above, the Bondi and Noem Directives violate bedrock constitutional provisions and principles, including the separation of powers between the President and Congress, the Spending Clause, the Take Care Clause, the Presentment Clause, the Appropriations Clause, and the Tenth Amendment.

755.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that the Bondi and Noem Directives violate the APA because they are contrary to constitutional rights, powers, privileges, or immunities; vacate the Bondi and Noem Directives under 5 U.S.C. § 706; provide preliminary relief under 5 U.S.C. § 705; and preliminary and permanently enjoin Defendants from implementing or enforcing the Bondi and Noem Directives.

## COUNT EIGHT

## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(C)

### (IN EXCESS OF STATUTORY AUTHORITY)

756.    Plaintiffs repeat and incorporate by reference each of the allegations of the prior paragraphs as if fully set forth herein.

757.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

758.    Defendants may exercise only authority granted to them by statute.

759.    No law or provision of the Constitution authorizes DOJ to withdraw properly obligated federal funds or to impose extra-statutory conditions not authorized by Congress. Defendants exceed the statutory authority of several laws which do concern federal payments.

760.    First, "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law," 31 U.S.C. § 1301(a). Federal agencies necessarily lack the authority to freeze funds immediately, categorically, and indefinitely, particularly where the stated purpose of that freeze is to pause, cancel, or reallocate funding to sources which do not align with the purpose for which those funds were appropriated by Congress.

761.    No appropriations act authorizes Defendants to unilaterally pause, withhold, or conditions federal payments without congressional authorization. *See, e.g.*, Inflation Reduction Act of

2022, Public Law 117-169; Infrastructure Investment and Jobs Act, Public Law 117-58; Consolidated Appropriations and Extensions Act of 2024, Public Law 118-42; Consolidated Appropriations and Extensions Act of 2025, Public Law 118-83.

762.    Second, the Impoundment Control Act of 1974 requires the President to notify and request authority from Congress to rescind or defer funds *before* acting to withhold or pause federal payments. 2 U.S.C. §§ 681 *et seq*. The President has not done so.

763.    Defendants have no authority to withhold funding from Plaintiffs without considering the statutes, regulations, and terms governing each source of funding. The blanket freeze of DOJ funding is blatantly illegal.

764.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that the Bondi and Noem Directives violate the APA because they are in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; vacate the Bondi and Noem Directives under 5 U.S.C. § 706; provide preliminary relief under 5 U.S.C. § 705; and preliminary and permanently enjoin Defendants from implementing or enforcing the Bondi and Noem Directives.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray that the Court grant the following relief:

1.    A declaration that Section 17 of Executive Order 14,159 is unconstitutional and invalid on its face;

2.    A declaration that Section 17 of Executive Order 14,159 is unconstitutional and invalid as applied to the local laws and policies identified in this complaint;

3.    A declaration that the portion of Section 2(a)(ii) of Executive Order 14,218 relating to "sanctuary" policies is unconstitutional and invalid on its face;

4.    A declaration that the portion of Section 2(a)(ii) of Executive Order 14,218 relating to "sanctuary" policies is unconstitutional and invalid as applied to the local laws and policies identified in this complaint;

5.    A declaration that Section 3(a) of Executive Order 14,287 is unconstitutional and invalid on its face;

6.    A declaration that Section 3(a) of Executive Order 14,287 is unconstitutional and invalid as applied to the local laws and policies identified in this complaint;

7.    A declaration that local laws and policies that limit (1) the honoring of civil immigration detainer requests; (2) cooperation with administrative warrants for purposes of immigration enforcement; (3) sharing of information with federal immigration authorities other than immigration or citizenship status; (4) the use of local law enforcement to arrest or detain individuals solely for civil immigration violations; or (5) the use of local resources to assist with immigration enforcement activities, do not violate federal law, including 8 U.S.C. § 1373 and 8 U.S.C. § 1324;

8.    A preliminary and permanent injunction enjoining Defendants from enforcing Section 17 of Executive Order 14,159, or taking any other action in furtherance of any pausing, freezing, terminating, withholding, or conditioning of federal funds based on Section 17 of Executive Order 14,159 or taking enforcement actions against Plaintiffs based on the laws and policies identified in this complaint;

9.    A preliminary and permanent injunction enjoining Defendants from enforcing the portion of Section 2(a)(ii) of Executive Order 14,218 relating to "sanctuary" policies, or taking any other action in furtherance of any pausing, freezing, terminating, withholding, or conditioning of federal payments based on that portion of Section 2(a)(ii) of Executive Order 14,218;

10.    A preliminary and permanent injunction enjoining Defendants from enforcing Section 3(a) of Executive Order 14,287, or taking any other action in furtherance of any pausing, freezing, terminating, withholding, or conditioning of federal funds based on Section 3(a);

11.    A preliminary and permanent injunction enjoining Defendants from implementing the funding pause or the unlawful funding conditions directed by the Bondi Directive, the Noem Directive, and materially similar agency actions, or taking enforcement action against Plaintiffs based on the laws and policies identified in this complaint;

12.    Issue all necessary and appropriate process to postpone the effective date of the Bondi Directive, the Noem Directive, and materially similar agency actions, or to preserve the status and rights of Plaintiffs pending conclusion of the review proceedings, pursuant to 5 U.S.C. § 705;

13.     An order holding unlawful and setting aside the Bondi Directive, the Noem Directive, and materially similar agency actions pursuant to 5 U.S.C. § 706;

14.     Award Plaintiffs reasonable costs and attorneys' fees; and

15.     Grant any other further relief that the Court deems fit and proper.


Dated:  August 7, 2025                          DAVID CHIU
                                                City Attorney
                                                YVONNE R. MERÉ
                                                Chief Deputy City Attorney
                                                MOLLIE M. LEE
                                                Chief of Strategic Advocacy
                                                SARA J. EISENBERG
                                                Chief of Complex and Affirmative Litigation
                                                NANCY E. HARRIS
                                                KARUN A. TILAK
                                                Deputy City Attorneys

                                        By:  /s/ David Chiu
                                             DAVID CHIU
                                             City Attorney

                                             Attorneys for Plaintiff
                                             CITY AND COUNTY OF SAN FRANCISCO


                                                TONY LOPRESTI
                                                County Counsel
                                                KAVITA NARAYAN
                                                Chief Assistant County Counsel
                                                MEREDITH A. JOHNSON
                                                Lead Deputy County Counsel
                                                STEFANIE L. WILSON
                                                RAJIV NARAYAN
                                                Deputy County Counsels
                                                BILL NGUYEN
                                                Litigation Fellow

                                        By:  /s/ Tony LoPresti
                                             TONY LOPRESTI
                                             County Counsel

                                             Attorneys for Plaintiff
                                             COUNTY OF SANTA CLARA

ROBERT TAYLOR
Portland City Attorney

By: /s/ Naomi Sheffield
     NAOMI SHEFFIELD*
     Chief Deputy City Attorney
     1221 SW Fourth Avenue, Room 430
     Portland, OR 97204
     Tel: (503) 823-4047
     Fax: (503) 823-3089
     Naomi.Sheffield@portlandoregon.gov

     *Admitted pro hac vice

     Attorneys for Plaintiff
     CITY OF PORTLAND


SHANNON BRADDOCK
King County Executive

By: /s/ David J. Hackett
     DAVID J. HACKETT*
     General Counsel to King County
     Executive
     Chinook Building
     401 5th Avenue, Suite 800
     Seattle, Washington, 98104
     (206) 477-9483
     David.hackett@kingcounty.gov
     PAUL J. LAWRENCE*
     Pacifica Law Group
     1191 2nd Avenue, Suite 2000
     Seattle, WA 98101-3404
     (206) 245-1708
     Paul.Lawrence@pacificalawgroup.com

     *Admitted pro hac vice

     Attorneys for Plaintiff
     MARTIN LUTHER KING, JR. COUNTY

PATRICIA KING
New Haven Corporation Counsel

By: /s/ Patricia King
PATRICIA KING*
Office of the Corporation Counsel
City of New Haven
165 Church Street-4th Floor
New Haven, CT 06510
Tel:   203-946-7951
Cell: 203-668-9282
Fax:  203-946-7942
pking@newhavenct.gov

*Admitted pro hac vice

Attorney for Plaintiff
CITY OF NEW HAVEN


RYAN RICHARDSON
Oakland City Attorney

By: /s/ Ryan Richardson
RYAN RICHARDSON
City Attorney
MARIA BEE
Chief Assistant City Attorney
JAMIE HULING DELAYE
Supervising City Attorney
H. LUKE EDWARDS
Deputy City Attorney
One Frank H. Ogawa Plaza, 6th Floor
Oakland, CA 94612
Tel: (510) 238-6629
Fax: (510) 238-6500
Email: RRichardson@OaklandCityAttorney.org

Attorneys for Plaintiff
CITY OF OAKLAND

JOHN I. KENNEDY
City Attorney

By: /s/ John I. Kennedy
JOHN I. KENNEDY, City Attorney
1333 Park Ave, Emeryville, CA 94608-3517
Phone: 510-596-4381
Fax: 510-596-3724
Email: John.Kennedy@emeryville.org

Attorney for Plaintiff
CITY OF EMERYVILLE


NORA FRIMANN
City Attorney

By: /s/ Nora Frimann
NORA FRIMANN, City Attorney
ELISA TOLENTINO, Chief Deputy City Attorney
200 E Santa Clara St
San José, CA 95113-1905
Tel: 408-535-1900
Fax: 408-998-3131
cao.main@sanjoseca.gov

Attorneys for Plaintiff
CITY OF SAN JOSÉ


HEATHER FERBERT
City Attorney

By: /s/ Mark Ankcorn
MARK ANKCORN, Senior Chief Deputy City Attorney
JULIE RAU, Deputy City Attorney
1200 Third Avenue, Suite 1100
San Diego, California 92101-4100
Tel: (619) 533-5800

Attorneys for Plaintiff
CITY OF SAN DIEGO

SUSANA ALCALA WOOD
City Attorney

By: */s/ Andrea Velasquez*
ANDREA VELASQUEZ, Supervising Deputy City
Attorney
915 I St Fl 4, Sacramento, CA 95814-2621
Tel: 916-808-5346
Fax: 916-808-7455
Email: AVelasquez@cityofsacramento.org

Attorneys for Plaintiff
CITY OF SACRAMENTO


By: */s/ Anthony P. Condotti*
Anthony P. Condotti, City Attorney
Catherine M. Bronson, Assistant City Attorney
Claire Hard, Deputy City Attorney
PO Box 481
Santa Cruz, CA 95061
Tel: 831-423-8383
Email: tcondotti@abc-law.com
chard@abc-law.com
cbronson@abc-law.com

Attorneys for Plaintiff
CITY OF SANTA CRUZ


SUSAN K. BLITCH
County Counsel

By: */s/ Susan K. Blitch*
SUSAN K. BLITCH, County Counsel
HENRY BLUESTONE SMITH, Deputy County Counsel
168 W Alisal St Fl 3rd
Salinas, CA 93901-2439
Tel: 831-755-5045
Fax: 831-755-5283
Email: SmithHB@countyofmonterey.gov

Attorneys for Plaintiff
COUNTY OF MONTEREY

ANN DAVISON
Seattle City Attorney

By: */s/ Kerala Cowart*
    Kerala Cowart, Assistant City Attorney*
    Ann Davison, Seattle City Attorney*
    Dallas LePierre, Assistant City Attorney*
    Rebecca Widen, Assistant City Attorney*
    Seattle City Attorney's Office
    701 Fifth Avenue, Suite 2050
    Seattle, WA 98104
    Tel: (206) 684-8200
    E-mail: Kerala.Cowart@seattle.gov

    *Admitted *pro hac vice*

    Attorneys for Plaintiff
    CITY OF SEATTLE


KRISTYN ANDERSON
City Attorney

By: */s/ Kristyn Anderson*
    KRISTYN ANDERSON (MN Lic. 0267752)*
    SARA J. LATHROP, Assistant City Attorney (MN Lic. 0310232)*
    SHARDA ENSLIN, Assistant City Attorney (MN Lic. 0389370)*
    350 South Fifth Street
    Minneapolis, MN 55415
    Tel: 612-673-3000
    Email: kristyn.anderson@minneapolismn.gov
    sara.lathrop@minneapolismn.gov
    sharda.enslin@minneapolismn.gov

    *Admitted *pro hac vice*

    Attorneys for Plaintiff
    CITY OF MINNEAPOLIS

LYNDSEY OLSON
City Attorney

By: /s/ Lyndsey Olson
LYNDSEY OLSON, City Attorney (MN Lic. #
0332288)*
ANTHONY G. EDWARDS, Assistant City Attorney
(MN Lic. # 0342555)*
400 City Hall and Courthouse
15 Kellogg Boulevard West
Saint Paul, Minnesota 55102
Tel: 651-266-8710
Fax: 651-298-5619
Email: Anthony.Edwards@ci.stpaul.mn.us

*Admitted pro hac vice

Attorneys for Plaintiff
CITY OF ST. PAUL


ERIN K. McSHERRY
City Attorney

By: /s/ Erin K. McSherry
ERIN K. McSHERRY, City Attorney*
200 Lincoln Avenue
Post Office Box 909
Santa Fe, NM 87504-0909
(505) 955-6967
Email: mdmartinez@santafenm.gov

*Admitted pro hac vice

Attorney for Plaintiff
CITY OF SANTA FE

By: /s/ Erin Monju
ERIN MONJU*
KATHERINE COURTNEY (CA Bar No. 341165)
NAOMI TSU**
JILL HABIG (CA Bar No. 268770)
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
Tel: (510) 738-6788
erin@publicrightsproject.org
katiec@publicrightsproject.org
jill@publicrightsproject.org
naomi@publicrightsproject.org

* Admitted pro hac vice; practicing under supervision of
D.C. Bar member pursuant to Local Rule 49(c)(8) while
application to the D.C. Bar is pending
** Admitted *pro hac vice*

Attorneys for Plaintiffs
CITIES OF MINNEAPOLIS, NEW HAVEN,
PORTLAND, ST. PAUL, SANTA FE, SEATTLE,
ALBANY, ALBUQUERQUE, BEND, BOSTON,
CAMBRIDGE, CHICAGO, COLUMBUS, CULVER
CITY, DENVER, ROCHESTER, and WILSONVILLE
and COUNTIES OF ALLEGHENY, DANE,
HENNEPIN, MULTNOMAH, and PIERCE


DONNA R. ZIEGLER
County Counsel, County of Alameda

By: /s/ Jason M. Allen
K. SCOTT DICKEY
Assistant County Counsel
JASON M. ALLEN
Senior Deputy County Counsel
1221 Oak Street, Suite 450
Oakland, California 94612
Telephone: (510) 272-6700
E-mails: scott.dickey@acgov.org
            jason.allen@acgov.org

Attorneys for Plaintiff
COUNTY OF ALAMEDA

ROBERT MAGEE*
Corporation Counsel

By: /s/ Robert Magee
City Hall, Room 106
24 Eagle St
Albany, NY 12207
Tel: 518-434-5050
Email: rmagee@albanyny.gov

*Admitted *pro hac vice*

Attorney for Plaintiff
CITY OF ALBANY


By: /s/ Lauren Keefe
LAUREN KEEFE, City Attorney (NM Lic. 14664)*
DEVON P. KING, Deputy City Attorney (NM Lic. 148108)*
One Civic Plaza NW
PO Box 2248
Albuquerque, NM 87103
Telephone: 505-768-4500
lkeefe@cabq.gov
dking@cabq.gov

*Application for admission *pro hac vice* forthcoming

Attorneys for Plaintiff
CITY OF ALBUQUERQUE


EBONY M. THOMPSON
Baltimore City Solicitor

By: /s/ Christopher Sousa
Christopher Sousa (264874)
Baltimore City Department of Law
100 N. Holliday Street
Baltimore, Maryland 21202
410.396.3947
christopher.sousa@baltimorecity.gov

Attorneys for Plaintiff
CITY OF BALTIMORE

OFFICE OF THE CITY ATTORNEY FOR
THE CITY OF BEND

By: /s/ Ian M. Leitheiser
Ian M. Leitheiser (OSB #993106)*
*City Attorney*
Elizabeth Oshel (OSB #104705)*
*Senior Assistant City Attorney*
Michael J. Gaffney (OSB #251680)*
*Senior Assistant City Attorney*
City of Bend
PO Box 431
Bend, OR 97709
(541) 693-2128
ileitheiser@bendoregon.gov
eoshel@bendoregon.gov
mgaffney@bendoregon.gov

*Application for admission *pro hac vice* forthcoming

Attorneys for Plaintiff
CITY OF BEND

By: /s/ Benjamin L. Stock
Benjamin L. Stock (SBN 208774)
Stephen A. McEwen (SBN 186512)
Eileen L. Ollivier (SBN 345880)
BURKE, WILLIAMS & SORENSEN, LLP
1999 Harrison Street, Suite 1650
Oakland, California 94612-3520
Tel:  510.273.8780    Fax:  510.839.9104
bstock@bwslaw.com
smcewen@bwslaw.com
eollivier@bwslaw.com

Attorneys for Plaintiff
CITY OF BENICIA

By: /s/ Farimah F. Brown
    Farimah F. Brown, City Attorney, SBN 201227
    Katrina L. Eiland, Deputy City Attorney, SBN 275701
    Laura Iris Mattes, Deputy City Attorney, SBN 310594
    Stephen A. Hylas, Deputy City Attorney, SBN 319833
    BERKELEY CITY ATTORNEY'S OFFICE
    2180 Milvia Street, Fourth Floor
    Berkeley, CA 94704
    Telephone: (510) 981-6998
    Facsimile: (510) 981-6960
    keiland@berkeleyca.gov
    lmattes@berkeleyca.gov
    shylas@berkeleyca.gov

    Attorneys for Plaintiff
    CITY OF BERKELEY


    ADAM CEDERBAUM
    Corporation Counsel

By: /s/ Samuel Dinning
    SAMUEL DINNING (MA BBO# 704304)*
    Chief of Staff & Policy
    KATHERINE AUBUCHON-JONES (MA BBO# 705490)*
    Senior Assistant Corporation Counsel
    City of Boston Law Department
    1 City Hall Plaza, Room 615
    Boston, MA 02201
    Telephone: 617-635-4034
    samuel.dinning@boston.gov
    katherine.jones@boston.gov

    *Application for admission *pro hac vice* forthcoming

    Attorneys for Plaintiff
    CITY OF BOSTON

CITY OF CAMBRIDGE, LAW DEPARTMENT
MEGAN B. BAYER, CITY SOLICITOR

By: */s/ Megan B. Bayer*
 Megan B. Bayer (MA BBO No. 669494)*
 *City Solicitor*
 Sean M. McKendry (MA BBO No. 678844)*
 *Assistant City Solicitor*
 Sydney M. Wright (MA BBO No. 698565)**
 *Assistant City Solicitor*
 Cambridge City Hall, 3rd Floor
 795 Massachusetts Avenue
 Cambridge, MA 02139
 (617) 349-4121
 mbayer@cambridgema.gov
 smckendry@cambridgema.gov
 swright@cambridgema.gov

 *Admitted *pro hac vice*
 **Application for admission *pro hac vice* forthcoming

 Attorneys for Plaintiff
 CITY OF CAMBRIDGE


By: */s/ Stephen A. McEwen*
 Stephen A. McEwen (SBN 186512)
 Eileen L. Ollivier (SBN 345880)
 BURKE, WILLIAMS & SORENSEN, LLP
 1770 Iowa Avenue, Suite 240
 Riverside, CA 92507-2479
 Tel: 951.788.0100 Fax: 951.788.5785
 smcewen@bwslaw.com
 eollivier@bwslaw.com

 Attorneys for Plaintiff
 CITY OF CATHEDRAL CITY

MARY B. RICHARDSON-LOWRY
Corporation Counsel of the City of Chicago

By:  */s/ Rebecca Hirsch*
Rebecca Hirsch (rebecca.hirsch2@cityofchicago.org)
City of Chicago Department of Law
121 North LaSalle Street, Room 600
Chicago, Illinois 60602
Tel: (313) 744-8143

Attorneys for Plaintiff
CITY OF CHICAGO


CITY OF COLUMBUS, DEPARTMENT OF LAW
ZACH KLEIN, CITY ATTORNEY

By:  */s/ Richard N. Coglianese*
Richard N. Coglianese (0066830)
Assistant City Attorney
77 N. Front Street, 4th Floor
Columbus, Ohio 43215
(614) 645-0818 Phone
(614) 645-6949 Fax
rncoglianese@columbus.gov

Attorneys for Plaintiff
CITY OF COLUMBUS

OFFICE OF THE CORPORATION COUNSEL FOR
DANE COUNTY

By: _/s/ Carlos A. Pabellon_
    Carlos A. Pabellon (WSB # 1046945)*
    _Corporation Counsel_
    David R. Gault (WSB # 1016374)*
    _Deputy Corporation Counsel_
    County of Dane
    City-County Building, Room 419
    210 Martin Luther King, Jr. Blvd.
    Madison, WI 53703
    (608) 266-4355
    pabellon.carlos@danecounty.gov
    gault@danecounty.gov

    *Admitted _pro hac vice_

    Attorneys for Plaintiff
    COUNTY OF DANE


    ASHLEY M. KELLIHER
    Assistant City Attorney

By: _/s/ Ashley M. Kelliher_
    Ashley M. Kelliher (CO Bar No. 40220)*
    Assistant City Attorney
    Denver City Attorney's Office
    201 West Colfax Avenue Denver, Colorado 80202
    720-913-3137 (phone)
    720-913-3190 (fax)
    ashley.kelliher@denvergov.org

    *Application for admission _pro hac vice_ forthcoming

    Attorney for Plaintiff
    CITY AND COUNTY OF DENVER

By: /s/ Samantha W. Zutler
Samantha W. Zutler (SBN 238514)
Eileen L. Ollivier (SBN 345880)
BURKE, WILLIAMS & SORENSEN, LLP
1 California Street, Suite 3050
San Francisco, CA 94111-5432
Tel:  415.655.8100    Fax:  415.655.8099
szutler@bwslaw.com
eollivier@bwslaw.com

Attorneys for Plaintiffs
CITIES OF HEALDSBURG and WATSONVILLE


MARY F. MORIARTY
Hennepin County Attorney

By: /s/ Rebecca Holschuh
Rebecca L.S. Holschuh (MN Lic. #0392251)*
Brittany K. McCormick (MN Lic. #0395175)*
Assistant County Attorneys
300 South Sixth Street
Minneapolis, MN 55487
Tel: 612-673-3000
Rebecca.Holschuh@hennepin.us
Brittany.McCormick@hennepin.us

*Admitted pro hac vice

Attorneys for Plaintiff
COUNTY OF HENNEPIN


HYDEE FELDSTEIN SOTO
City Attorney of the City of Los Angeles

By: /s/ Michael J. Dundas
Michael J. Dundas (CA Bar No. 226930)
Joshua M. Templet (CA Bar No. 267098)
Office of the Los Angeles City Attorney
200 North Main Street, Room 800
Los Angeles, California 90012
Tel: (213) 978-8100
mike.dundas@lacity.org
joshua.templet@lacity.org

Attorneys for Plaintiff
CITY OF LOS ANGELES

BRIAN E. WASHINGTON
County Counsel

By: /s/ Edward F. Sears
Kate K. Stanford, Deputy County Counsel
Edward F. Sears, Deputy County Counsel
3501 Civic Center Drive, Suite 275
San Rafael, CA 94903
Tel: (415) 473-6117
kate.stanford@marincounty.gov
ned.sears@marincounty.gov

Attorneys for Plaintiff
COUNTY OF MARIN


By: /s/ Nira F. Doherty
Nira F. Doherty (SBN 254523)
Stephen A. McEwen (SBN 186512)
Eileen L. Ollivier (SBN 345880)
BURKE, WILLIAMS & SORENSEN, LLP
1999 Harrison Street, Suite 1650
Oakland, California 94612-3520
Tel: 510.273.8780    Fax: 510.839.9104
ndoherty@bwslaw.com
smcewen@bwslaw.com
eollivier@bwslaw.com

Attorneys for Plaintiff
CITY OF MENLO PARK


By: /s/ B. Andrew Jones
B. Andrew Jones*
Deputy County Attorney, Oregon State Bar No. 091786
Multnomah County Attorneys Office
501 SE Hawthorne Blvd, Suite 500
Portland, OR, 97214
Phone: (503)-988-3138
Mobile: (971)-678-7526
Fax: (503)-988-3377
Email: andy.jones@multco.us

*Application for admission *pro hac vice* forthcoming

Attorney for Plaintiff
MULTNOMAH COUNTY

By: /s/ Michelle Marchetta Kenyon
Michelle Marchetta Kenyon (SBN 127969), City
Attorney
Stephen A. McEwen (SBN 186512)
Eileen L. Ollivier (SBN 345880)
BURKE, WILLIAMS & SORENSEN, LLP
1999 Harrison Street, Suite 1650
Oakland, California 94612-3520
Tel:  510.273.8780     Fax:  510.839.9104
mkenyon@bwslaw.com
smcewen@bwslaw.com
eollivier@bwslaw.com

Attorneys for Plaintiffs
CITIES OF PACIFICA and ROHNERT PARK


By: /s/ Molly S. Stump
Molly S. Stump, City Attorney SBN 177165
Caio A. Arellano, Chief Assistant City Attorney SBN
262168
Mark J. Vanni, Assistant City Attorney SBN 267892
City Of Palo Alto
250 Hamilton Ave., 8th Floor
Palo Alto, CA 94301
Telephone: (650) 329-2171
Facsimile: (650) 320-2646
Email: Molly.Stump@PaloAlto.gov
Caio.Arellano@PaloAlto.gov
Mark.Vanni@PaloAlto.gov

Attorneys for Plaintiff
CITY OF PALO ALTO


By: /s/ Eric Danly
Eric Danly
City Attorney
City of Petaluma
11 English St, Petaluma, CA 94952-2610
Telephone: 707-778-4402
E-Mail: EDanly@cityofpetaluma.org

Attorney for Plaintiff
CITY OF PETALUMA

MARY E. ROBNETT
Pierce County Prosecuting Attorney

By: /s/ Kristal M. Cowger
     KRISTAL M. COWGER, WSBA # 43079*
     JONATHAN R. SALAMAS, WSBA # 39781*
     Deputy Prosecuting Attorneys / Civil
     930 Tacoma Avenue South, Suite 946
     Tacoma, WA  98402-2102
     Ph: 253-798-7400 / Fax: 253-798-6713
     kristal.cowger@piercecountywa.gov
     jonathan.salamas@piercecountywa.gov

     *Admitted pro hac vice

     Attorneys for Plaintiff
     PIERCE COUNTY


DAVID ALESHIRE
City Attorney

By: /s/ Kimberly Y. Chin
     SHANNON MOORE, Chief Assistant City Attorney
     KIMBERLY Y. CHIN, Senior Assistant City Attorney
     450 Civic Center Plaza
     Richmond, CA  94804-1630
     Tel: 510-620-6509
     Fax: 510-620-6518
     Email: Shannon_Moore@ci.richmond.ca.us
     Email: Kimberly_Chin@ci.richmond.ca.us

     Attorneys for Plaintiff
     CITY OF RICHMOND

By: /s/ John D. Nibbelin
    JOHN D. NIBBELIN, County Counsel (SBN 184603)
    Rebecca M. Archer, Chief Deputy Counsel (SBN 202743)
    Lauren F. Carroll, Deputy County Counsel (SNB 333446)
    500 County Center, 4th Floor
    Redwood City, CA 94063
    Telephone: 650-363-4757
    jnibbelin@smcgov.org
    rmarcher@smcgov.org
    lcarroll@smcgov.org

    Attorneys for Plaintiff
    COUNTY OF SAN MATEO


By: /s/ Teresa L. Stricker
    TERESA L. STRICKER, City Attorney (CA Lic. 160601)
    AUTUMN LUNA, Chief Assistant City Attorney (CA Lic. 288506)
    ADAM S. ABEL, Assistant City Attorney (CA Lic. 148210)
    HANNAH E. FORD-STILLE, Deputy City Attorney (CA Lic. 335113)
    100 Santa Rosa Ave, Room 8
    Santa Rosa, CA 95404
    Telephone: (707) 543-3040
    tstricker@srcity.org
    aluna@srcity.org
    aabel@srcity.org
    hfordstille@srcity.org

    Attorneys for Plaintiff
    CITY OF SANTA ROSA


By: /s/ Joshua A. Myers
    Robert H. Pittman, County Counsel (SBN 172154)
    Joshua A. Meyers, Chief Deputy County Counsel (SBN 250988)
    575 Administration Drive, Room 105A
    Santa Rosa, California 95403
    Telephone: (707) 565-2421
    Joshua.Myers@sonoma-county.org

    Attorneys for Plaintiff
    COUNTY OF SONOMA

1

By: /s/ Amanda Guile-Hinman
Amanda R. Guile-Hinman, OSB #093706*
29799 SW Town Center Loop E
Wilsonville, OR 97070
guile@wilsonvilleoregon.gov
(503) 570-1509

*Admitted *pro hac vice*

Attorney for Plaintiff
CITY OF WILSONVILLE

**FILER'S ATTESTATION**

I, DAVID CHIU, am the ECF user whose identification and password are being used to file this SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF. Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that the other above-named signatories concur in this filing.

TONY LOPRESTI, SBN 289269
County Counsel
KAVITA NARAYAN, SBN 264191
Chief Assistant County Counsel
MEREDITH A. JOHNSON, SBN 291018
Lead Deputy County Counsel
RAPHAEL N. RAJENDRA, SBN 255096
HANNAH M. GODBEY, SBN 334475
Deputy County Counsels
70 W. Hedding Street, East Wing, Ninth Floor
San José, California 95110-1770
Telephone: (408) 299-5900
E-Mail:     Raphael.Rajendra@cco.sccgov.org
            Hannah.Godbey@cco.sccgov.org

DAVID CHIU, SBN 189542
City Attorney
YVONNE R. MERÉ, SBN 175394
Chief Deputy City Attorney
MOLLIE M. LEE, SBN 251404
Chief of Strategic Advocacy
SARA J. EISENBERG, SBN 269303
Chief of Complex and Affirmative Litigation
DAVID S. LOUK, SBN 304654
STEVEN A. MILLS, SBN 328016
Deputy City Attorneys
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, California 94102-5408
Telephone: (415) 355-3308
E-Mail:     David.Louk@sfcityatty.org
            Steven.Mills@sfcityatty.org

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

Attorneys for Plaintiff
CITY AND COUNTY OF SAN
FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CITY AND COUNTY OF SAN FRANCISCO, COUNTY OF SANTA CLARA, CITY OF PORTLAND, MARTIN LUTHER KING, JR. COUNTY, CITY OF NEW HAVEN, CITY OF OAKLAND, CITY OF EMERYVILLE, CITY OF SAN JOSÉ, CITY OF SAN DIEGO, CITY OF SACRAMENTO, CITY OF SANTA CRUZ, COUNTY OF MONTEREY, CITY OF SEATTLE, CITY OF MINNEAPOLIS, CITY OF ST. PAUL, CITY OF SANTA FE, COUNTY OF ALAMEDA, CITY OF ALBANY, CITY OF ALBUQUERQUE, COUNTY OF ALLEGHENY, CITY OF BALTIMORE, CITY OF BEND, CITY OF BENICIA, CITY OF BERKELEY, CITY OF BOSTON, CITY OF CAMBRIDGE, CITY OF CATHEDRAL CITY, CITY OF CHICAGO, CITY OF COLUMBUS, CITY OF CULVER CITY, COUNTY OF DANE, CITY AND COUNTY OF DENVER, CITY OF HEALDSBURG, COUNTY OF HENNEPIN, CITY OF LOS ANGELES, COUNTY OF MARIN, CITY OF MENLO PARK, MULTNOMAH COUNTY, CITY OF PACIFICA, CITY OF PALO ALTO, CITY OF PETALUMA, PIERCE COUNTY, CITY OF RICHMOND, CITY OF ROCHESTER, CITY OF ROHNERT PARK, COUNTY OF SAN

Case No. 3:25-cv-01350-WHO

**[PROPOSED] ORDER GRANTING ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED**

1  MATEO, CITY OF SANTA ROSA, COUNTY
   OF SONOMA, CITY OF WATSONVILLE,
2  CITY OF WILSONVILLE,

3          Plaintiffs,

4  v.

5  DONALD J. TRUMP, President of the United
   States, UNITED STATES OF AMERICA,
6  PAMELA BONDI, Attorney General of the
   United States, EMIL BOVE, Acting Deputy
7  Attorney General, UNITED STATES
   DEPARTMENT OF JUSTICE, KRISTI NOEM,
8  Secretary of United States Department of
   Homeland Security, UNITED STATES
9  DEPARTMENT OF HOMELAND SECURITY,
   RUSSELL VOUGHT, Director of United States
10 Office of Management and Budget, UNITED
   STATES OFFICE OF MANAGEMENT AND
11 BUDGET, DOES 1-100,

12          Defendants.

13         On October 1, 2025, the plaintiffs to the action *County of Santa Clara, et al. v. Noem, et al.*,

14 No. 3:25-cv-08330 (N.D. Cal.) ("*Santa Clara v. Noem*"), moved to relate their case to the above-

15 captioned case, *City and County of San Francisco, et al. v. Trump, et al.*, No. 3:25-cv-01350-WHO

16 (N.D. Cal.).  The Court finds that *Santa Clara v. Noem* is related to the above-captioned case and shall

17 be reassigned to the undersigned judge.  The parties are instructed that all future filings in the

18 reassigned case are to bear the initials of the newly assigned judge immediately after the case number.

19 Any case management conference in the reassigned case will be rescheduled by the Court.  Unless

20 otherwise ordered, any dates for hearing noticed motions are vacated and must be re-noticed by the

21 moving party before the newly assigned judge.  Any deadlines set by the ADR Local Rules remain in

22 effect, and any deadlines established in a case management order continue to govern, except dates for

23 appearance in court, which will be rescheduled by the newly assigned judge.

24 **IT IS SO ORDERED.**

25

26 Dated: _____

27                                           _____
                                            THE HONORABLE WILLIAM H. ORRICK III
28                                          UNITED STATES DISTRICT JUDGE