# EXHIBIT B

2025 WL 3187762
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS, et al., Plaintiffs,
v.
DONALD J. TRUMP, et al., Defendants.

Case No. 25-cv-07864-RFL
|
Filed 11/14/2025

**Attorneys and Law Firms**

Amanda Christine Lynch, Barbara Jane Chisholm, Juhyung Harold Lee, Stacey M. Leyton, Connie K. Chan, Altshuler Berzon LLP, San Francisco, CA, Cynthia Liao, Orlando Economos, Pro Hac Vice, Victoria S. Nugent, Democracy Forward Foundation, Washington, DC, for Plaintiff American Association of University Professors.

Amanda Christine Lynch, Barbara Jane Chisholm, Juhyung Harold Lee, Stacey M. Leyton, Connie K. Chan, Altshuler Berzon LLP, San Francisco, CA, Cynthia Liao, Orlando Economos, Pro Hac Vice, Victoria S. Nugent, Democracy Forward Foundation, Washington, DC, for Plaintiff American Federation of Teachers.

Amanda Christine Lynch, Barbara Jane Chisholm, Juhyung Harold Lee, Stacey M. Leyton, Connie K. Chan, Altshuler Berzon LLP, San Francisco, CA, Arthur Wei-Wei Liou, Eleanor I. Morton, Hugh Lee Fowler Schlesinger, Kate Hallward, Leonard Carder, LLP, Oakland, CA, Cynthia Liao, Orlando Economos, Pro Hac Vice, Victoria S. Nugent, Democracy Forward Foundation, Washington, DC, for Plaintiff AFSCME Local 3299.

Amanda Christine Lynch, Barbara Jane Chisholm, Juhyung Harold Lee, Stacey M. Leyton, Connie K. Chan, Altshuler Berzon LLP, San Francisco, CA, Arthur Wei-Wei Liou, Eleanor I. Morton, Hugh Lee Fowler Schlesinger, Kate Hallward, Leonard Carder, LLP, Oakland, CA, Cynthia Liao, Democracy Forward Foundation, Washington, DC, for Plaintiff Berkeley Faculty Association.

Amanda Christine Lynch, Barbara Jane Chisholm, Juhyung Harold Lee, Stacey M. Leyton, Connie K. Chan, Altshuler Berzon LLP, San Francisco, CA, Cynthia Liao, Democracy Forward Foundation, Washington, DC, Nicole J. Daro,

California Nurses Association, Oakland, CA, Orlando Economos, Pro Hac Vice, Victoria S. Nugent, Democracy Forward Foundation, Washington, DC, for Plaintiff California Nurses Association/National Nurses United.

Arthur Wei-Wei Liou, Eleanor I. Morton, Hugh Lee Fowler Schlesinger, Kate Hallward, Leonard Carder, LLP, Oakland, CA, Cynthia Liao, Democracy Forward Foundation, Washington, DC, for Plaintiff Irvine Faculty Association.

Arthur Wei-Wei Liou, Eleanor I. Morton, Hugh Lee Fowler Schlesinger, Kate Hallward, Leonard Carder, LLP, Oakland, CA, Cynthia Liao, Democracy Forward Foundation, Washington, DC, for Plaintiff Riverside Faculty Association.

Arthur Wei-Wei Liou, Eleanor I. Morton, Hugh Lee Fowler Schlesinger, Kate Hallward, Leonard Carder, LLP, Oakland, CA, Cynthia Liao, Democracy Forward Foundation, Washington, DC, for Plaintiff San Diego Faculty Association.

Arthur Wei-Wei Liou, Eleanor I. Morton, Hugh Lee Fowler Schlesinger, Kate Hallward, Leonard Carder, LLP, Oakland, CA, Cynthia Liao, Democracy Forward Foundation, Washington, DC, for Plaintiff Santa Cruz Faculty Association.

Cynthia Liao, Democracy Forward Foundation, Washington, DC, Stacey M. Leyton, Connie K. Chan, Altshuler Berzon LLP, San Francisco, CA, for Plaintiff International Union, United Automobile, Aerospace and Agricultural Implement Workers of America.

Susan K. Garea, Beeson, Tayer & Bodine, APC, Oakland, CA, Cynthia Liao, Democracy Forward Foundation, Washington, DC, Connie K. Chan, Altshuler Berzon LLP, San Francisco, CA, for Plaintiff Teamsters Local 2010.

Daniel E. Curry, Margo A. Feinberg, Schwartz, Steinsapir, Dohrmann & Sommers, Los Angeles, CA, Cynthia Liao, Democracy Forward Foundation, Washington, DC, Orlando Economos, Pro Hac Vice, Victoria S. Nugent, Democracy Forward Foundation, Washington, DC, Connie K. Chan, Altshuler Berzon LLP, San Francisco, CA, for Plaintiff UAW Local 4811.

Arthur Wei-Wei Liou, Eleanor I. Morton, Hugh Lee Fowler Schlesinger, Kate Hallward, Leonard Carder, LLP, Oakland, CA, Cynthia Liao, Democracy Forward Foundation, Washington, DC, for Plaintiff UC Merced Faculty Association.

Arthur Wei-Wei Liou, Eleanor I. Morton, Hugh Lee Fowler Schlesinger, Kate Hallward, Leonard Carder, LLP, Oakland, CA, Cynthia Liao, Democracy Forward Foundation, Washington, DC, for Plaintiff UC Santa Barbara Faculty Association.

Arthur Wei-Wei Liou, Eleanor I. Morton, Hugh Lee Fowler Schlesinger, Kate Hallward, Leonard Carder, LLP, Oakland, CA, Cynthia Liao, Democracy Forward Foundation, Washington, DC, for Plaintiff University of California Los Angeles Faculty Association.

Arthur Wei-Wei Liou, Eleanor I. Morton, Hugh Lee Fowler Schlesinger, Kate Hallward, Leonard Carder, LLP, Oakland, CA, Cynthia Liao, Democracy Forward Foundation, Washington, DC, Stacey M. Leyton, Altshuler Berzon LLP, San Francisco, CA, Orlando Economos, Pro Hac Vice, Victoria S. Nugent, Democracy Forward Foundation, Washington, DC, Connie K. Chan, Altshuler Berzon LLP, San Francisco, CA, for Plaintiff University Council-American Federation of Teachers.

Arthur Wei-Wei Liou, Eleanor I. Morton, Hugh Lee Fowler Schlesinger, Kate Hallward, Leonard Carder, LLP, Oakland, CA, Cynthia Liao, Democracy Forward Foundation, Washington, DC, for Plaintiff Council of UC Faculty Associations.

Amanda Christine Lynch, Barbara Jane Chisholm, Juhyung Harold Lee, Stacey M. Leyton, Altshuler Berzon LLP, San Francisco, CA, for Plaintiff Davis Faculty Association.

Arthur Wei-Wei Liou, Eleanor I. Morton, Hugh Lee Fowler Schlesinger, Kate Hallward, Leonard Carder, LLP, Oakland, CA, Cynthia Liao, Democracy Forward Foundation, Washington, DC, for Plaintiff University Professional and Technical Employees- Communication Workers of America.

Cynthia Liao, Democracy Forward Foundation, Washington, DC, Stacey M. Leyton, Altshuler Berzon LLP, San Francisco, CA, Connie K. Chan, Altshuler Berzon LLP, San Francisco, CA, for Plaintiff COMMITTEE OF INTERNS AND RESIDENTS, SERVICE EMPLOYEES INTERNATIONAL UNION.

Arthur Wei-Wei Liou, Eleanor I. Morton, Hugh Lee Fowler Schlesinger, Kate Hallward, Leonard Carder, LLP, Oakland, CA, Cynthia Liao, Democracy Forward Foundation, Washington, DC, for Plaintiff UCSF Faculty Association.

Heidy L. Gonzalez, U.S. Department of Justice, Washington, DC, Abhishek Kambli, U.S. Department of Justice, Washington, DC, for Defendants.

## ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

RITA F. LIN United States District Judge

### I. INTRODUCTION

**\*1** Plaintiffs have submitted overwhelming evidence. Across 74 declarations and more than 700 pages of supporting documents, Plaintiffs show that the Administration and its executive agencies are engaged in a concerted campaign to purge "woke," "left," and "socialist" viewpoints from our country's leading universities. Agency officials, as well as the President and Vice President, have repeatedly and publicly announced a playbook of initiating civil rights investigations of preeminent universities to justify cutting off federal funding, with the goal of bringing universities to their knees and forcing them to change their ideological tune. Universities are then presented with agreements to restore federal funding under which they must change what they teach, restrict student anonymity in protests, and endorse the Administration's view of gender, among other things. Defendants submit nothing to refute this.

It is undisputed that this precise playbook is now being executed at the University of California. Defendant Leo Terrell, who heads the Administration's Task Force to Combat Anti-Semitism, publicly stated in a news interview that the UC had been "hijacked by the left" and vowed to begin investigations. The Department of Justice and Department of Education have opened a series of civil rights investigations into the UC. On July 29, 2025, in one of those investigations, DOJ issued a Notice of Findings to UCLA concerning its handling of antisemitism during 2024 student protests. Defendants did not engage in the required notice and hearing processes under Title VI for cutting off funds for alleged discrimination, nor did they mention the remedial steps UCLA had already taken to address the issues described. Instead, within 72 hours, the National Institutes of Health, National Science Foundation, and Department of Energy abruptly froze $584 million in research funding to UCLA, citing alleged civil rights violations. And at least one of those agencies, NSF, has acknowledged that it is under instructions not to approve any new grants to UCLA. About a week later, on August 8, 2025, DOJ proposed a settlement to

restore funding, which would require UCLA to review its DEI programs, change its handling of student protests, and adopt the Administration's views on gender, among other things. The UC has not stated whether it will agree. However, UC President James Milliken called the situation "one of the gravest threats in UC's 157-year history." The UC receives more than $17 billion per year in federal funding. Defendant Terrell has vowed to take "every single federal dollar" from the UC and similar universities, if they do not accede.

Defendants do not deny any of this. Instead, their principal argument is that the UC might not agree to the proposed conditions for restoring funding, so Plaintiffs' present case is too speculative to be heard. But Plaintiffs' harm is already very real. With every day that passes, UCLA continues to be denied the chance to win new grants, ratcheting up Defendants' pressure campaign. And numerous UC faculty and staff have submitted declarations describing how Defendants' actions have already chilled speech throughout the UC system. They describe how they have stopped teaching or researching topics they are afraid are too "left" or "woke," in order to avoid triggering further funding cancellations by Defendants. They also give examples of projects the UC has stopped due to fear of the same reprisals. These are classic, predictable First Amendment harms, and exactly what Defendants publicly said that they intended.

**\*2** The undisputed record demonstrates that Defendants have engaged in coercive and retaliatory conduct in violation of the First Amendment and Tenth Amendment. It also shows that they have flouted the requirements of Title VI and IX and cancelled funding in an arbitrary and capricious manner while ignoring required procedural safeguards. None of the jurisdictional hurdles raised by Defendants prevent the issuance of preliminary injunctive relief to stop the ongoing and imminent harms that Defendants are undisputedly causing. Plaintiffs' motion for a preliminary injunction is **GRANTED**, for these reasons and those further explained below.

### TABLE OF CONTENTS

**I. Introduction II. Background** A. Plaintiffs and the University of California B. The Task Force Policy 1. Defendants' Stated Plan to Withhold Federal Funds to Force Changes at Universities, Including the UC 2. Defendants' Application of the Task Force Policy at Other Universities C. Defendants' Opening of Investigations Into UC Schools D. Defendants' Indefinite Cancellation of Grant Funding to UCLA E. DOJ's Offer to UCLA Seeking $1.2 Billion and a Wide Range of Programmatic Changes in Exchange for Restoring Funding F. Impact of Present and Future Funding Cancellation on UC's Functioning G. Chilling Effects of the Task Force Policy and Funding Cancellations **III. Procedural History IV. Legal Standard V. Analysis** A. Plaintiffs Are Likely to Succeed on Their First Amendment Claim (Count I). 1. Plaintiffs Have Shown Likely Unlawful Coercion. 2. Plaintiffs Have Shown Likely Retaliation in Violation of the First Amendment. 3. The Court Has Jurisdiction to Address the Classic First Amendment Harms That Are the Intended Effect of the Task Force Policy and the Funding Cancellation. a. Task Force Policy b. Funding Cancellation B. Plaintiffs Are Likely to Succeed on the Merits of Their Unconstitutional Conditions Claim (Count III). C. Plaintiffs Are Likely to Succeed on the Merits of Their Tenth Amendment/Spending Clause Claim (Count IV). D. Plaintiffs Are Likely to Succeed on Their APA Claim for Failure to Comply with Title VI and Title IX (Counts VI & VII). 1. The Task Force Policy and Funding Cancellation Likely Fail to Comply with Title VI and IX. 2. Nothing Bars the Court from Reaching the Merits of the Task Force Policy's Violation of Title VI and Title IX. a. Standing and Ripeness b. Final Agency Action 3. The Court Likewise Has Jurisdiction to Adjudicate Whether the Funding Cancellation Violated Title VI and Title IX. a. Committed to Agency Discretion by Law b. Tucker Act E. Plaintiffs Are Likely to Succeed on Their APA Contrary to Law Claims for Violation of the First Amendment, Tenth Amendment and Spending Clause, and Under the Unconstitutional Conditions Doctrine (Counts IX, XI, XII) F. Plaintiffs Are Likely to Succeed on Their APA Arbitrary and Capricious Claim (Count VIII). 1. Defendants' Actions Are Likely Arbitrary and Capricious. 2. Nothing Bars the Court From Reaching the Merits of the Arbitrary and Capricious Claim a. Standing and Ripeness b. Final Agency Action c. Committed to Agency Discretion by Law d. Tucker Act G. Rule 19 Does Not Require Joinder of the UC. H. Plaintiffs Have Shown That Irreparable Harm is Likely. I. The Balance of Equities and Public Interest Favor Entry of an Injunction. **VI. Request for Bond and for a Stay VII. Scope of Injunctive Relief VIII. Conclusion 1 7** 7 10 11 13 15 17 18 19 21 **23 25 25** 25 25 29 31 32 39 45 47 52 52 56 56 57 62 62 63 64 64 64 68 68 68 69 69 69 71 72 **73 74 76**

## II. BACKGROUND

### A. Plaintiffs and the University of California

The University of California is a public research university. [1] Almost one-tenth of all U.S. academic research is conducted by UC researchers. [2] UC faculty, researchers, and programs include more than 70 Nobel Prize winners, 100 MacArthur "Genius" grant award winners, 65 National Medal of Science winners, and 40 Pulitzer Prize winners. [3] The UC also serves as an engine of economic mobility for its students. Federal financial aid grant recipients attending UC schools overwhelmingly go on to earn more than their parents. (Dkt. No. 27-107.) In addition, UC medical centers provide care to millions of Californians annually, including 10.8 million outpatient visits, 1.32 million inpatient days, and 474,000 emergency room visits, at a net community benefit of $2 billion. (Dkt. No. 27-23 at 3.) [4]

**\*3** Federal funding is undisputedly crucial to the viability of these endeavors: Across all programs, the UC receives around $17 billion in federal funding annually. (Dkt. No. 27-17 at 2.) UC researchers rely on over $5 billion in federal research grants across thousands of distinct awards, accounting for more than half of all UC research awards in fiscal year 2024. (Dkt. No. 27-89 at 2.) The record shows that in 2024, the UC received the following federal research funding by agency:

- Department of Health and Human Services ("HHS"), through subagencies including the National Institutes of Health ("NIH"), the Centers for Disease Control and Prevention ("CDC"), the Food and Drug Administration ("FDA"): over $2.5 billion.

- Department of Education ("DoE"): $27 million.

- National Science Foundation ("NSF"): $525 million.

- Department of Energy ("Energy"): $160 million.

- Department of Defense ("DoD"): $326 million.

- National Aeronautics and Space Administration ("NASA"): $104 million.

- Department of Agriculture ("USDA"): $86 million.

- Department of Commerce ("DoC"): $68 million.

- Department of the Interior ("Interior"): $39 million.

- Department of State ("State Department"): $20 million.

- Other agencies including the Environmental Protection Agency ("EPA"), [5] Department of Housing and Urban Development ("HUD"), National Endowment for the Humanities ("NEH"), Institute of Museum and Library Services ("IMLS"), Department of Transportation ("DoT"), and Americorps: $47 million.

(*Id.*) The UC also receives more than $1.7 billion in student financial aid funding annually from the DoE, including $494 million in Pell Grants, over $1 billion in federal student loans, $86 million in graduate fellowships and scholarships, $21 million in federal work-study, and more than $25 million in other undergraduate grants and scholarships. (Dkt. No. 27-23 at 2.) Finally, UC Health receives almost $5.3 billion annually from HHS via the Medicare program and nearly $4.6 billion annually from the federal portion of the federal-state Medicaid program, or $9.9 billion in total. (*Id.*) The unrebutted record shows that this funding is vital to the work of Plaintiffs' members.

Plaintiffs are associations and labor unions that together represent over 100,000 UC employees, faculty, and students. (Dkt. No. 31 at 33 n. 50.) Their members rely on federal funding to pay for their research, salaries, educational and professional development, and—on a larger scale—to fund the institutions where they work and attend school. Plaintiffs themselves generally describe their missions as protecting their members' interests and championing academic freedom, equity, and high-quality public education, healthcare and public services.

For example, the American Association of University Professors ("AAUP") is a membership association and labor union of faculty and academic professionals, whose members include more than 500 UC faculty. (Dkt. No. 29-49 ¶ 9.) AAUP states that its primary mission is to advance academic freedom and shared governance of higher education institutions. (*Id.* ¶ 7.) The American Federation of State, County, and Municipal Employees, Local 3299 ("AFSCME") is a labor organization representative of more than 40,000 UC service workers, patient care technical workers, and skilled craft workers. (Dkt. No. 29-36 ¶¶ 3–4.) AFSCME describes its mission in part as "effectively representing UC workers while fighting for social justice and economic opportunity not just for UC workers, but for the greater public." (*Id.*) The American Federation of Teachers ("AFT") is a national labor organization whose members include 400,000 higher education faculty and professional staff, including at the UC. (Dkt. No. 29-42 ¶ 5.) AFT's stated mission is to champion fairness, democracy, economic opportunity and high-quality public education, healthcare and public services for students, families, and communities. (*Id.* ¶ 4.) Plaintiffs

2025 WL 3187762

also include similar associations of nurses, healthcare workers, medical interns, residents, researchers, graduate students, and university staff, [6] and faculty associations from various UC schools. [7] (Dkt. No. 24 ¶¶ 17–34.) Each Plaintiff describes its mission along similar lines to the above. (*Id.*)

### B. The Task Force Policy
**\*4** On February 3, 2025, pursuant to an executive order, Defendant Department of Justice ("DOJ") announced the formation of "a multi-agency Task Force to Combat Anti-Semitism" ("Task Force"). The announcement cited Executive Order 14188, titled "Additional Measures to Combat Anti-Semitism," which instructs that universities be targeted for investigation and enforcement actions, under Title VI, and requires all executive departments and agencies to participate in the process. (Dkt. No. 27-47 (citing Exec. Order No. 14188, 90 Fed. Reg. 8847 (Feb. 3, 2025)); *see also* Dkt. No. 27-46.) The Task Force includes Defendants DOJ, DoE, HHS, and the General Services Administration ("GSA," together with DOJ, DoE, and HHS the "Task Force Agencies"). (Dkt. Nos. 27-47, 27-58.) DOJ stated that the Task Force's aim was to "root out anti-Semitic harassment in schools and on college campuses." (Dkt. No. 27-47.)

Rooting out antisemitism is undisputedly a laudable and important goal. However, the unrebutted evidence shows that the Task Force Agencies and the Funding Agencies have gone well beyond that stated purpose. The record shows that Defendants engaged in a concerted policy to use allegations of antisemitism to justify funding cancellations, when their intent is to coerce universities into purging disfavored "left" and "woke" viewpoints from their campuses and replace them with views that the Administration favors. This "Task Force Policy" proceeds using a three-stage playbook, further detailed below. At stage one, a Task Force Agency announces investigations or planned enforcement actions related to alleged civil rights violations at a school. At stage two, Funding Agencies cancel the school's federal grants *en masse* without following Title VI and IX procedural requirements or limiting the scope of the terminations to non-compliant programs. At stage three, DOJ demands the payment of millions or billions of dollars—a penalty that Title VI and IX do not authorize—and requires a wide range of policy changes as a condition for restoring funding and avoiding further funding disruptions.

### 1. Defendants' Stated Plan to Withhold Federal Funds to Force Changes at Universities, Including the UC

In March 2025, Defendant Leo Terrell, the head of the Task Force, was interviewed on Fox News. Terrell began the interview by laying out the Task Force's plans:

> We're going to eliminate anti-Semitism. It's rampant[ ]. It is horrendous. .... we are suing every one of these universities guilty of antisemitism. Under Title VI, we're taking away their money[ ]. We're going to bankrupt these universities. We're going to take away every single federal dollar. That is why we are targeting these universities and we filed a notice of investigation to investigate the entire UC system in California.

(Dkt. No. 27-36 at 3–4.) Next, Terrell addressed UCLA, stating that the Task Force's goal was to shut down certain practices at UCLA, specifically, that "the academic system in this country has been hijacked by the left, has been hijacked by the Marxists.... They have controlled the mindset of our young people... we have to put an end to it. We have to seek injunctive relief. We have to stop these practices." (*Id.* at 4.) As described by Terrell, the investigations and funding cuts at the UC were aimed not only to "eliminate anti-Semitism," but also to eliminate the "left" and "Marxist" viewpoints at the UC. (*Id.*)

Other high-ranking officials at Task Force Agencies have expressed similar views. On May 23, 2025, Defendant Secretary of Education Linda McMahon—who heads Task Force Agency DoE—posted to X, "Every student deserves an education free from ideological agendas that undermine equal opportunity." (Dkt. No. 27-37.) On September 14, 2025, in the wake of Charlie Kirk's assassination, Representative Laura Loomer posted on X, "It's time to defund American universities." (Dkt. Nos. 27-50, 27-51.) In response, Harmeet K. Dhillon, the Assistant Attorney General for Civil Rights at DOJ, posted, "I'm on it. And all the other haters at our American [ ] funded schools." (*Id.*)

**\*5** Terell, McMahon, and Dhillon's statements mirror those made by Defendant President Donald Trump and Vice President J.D. Vance. In a 2023 interview, prior to taking office, President Trump stated that "colleges [have] become dominated by Marxist Maniacs and lunatics" who were "obsessed with indoctrinating America's youth." (Dkt. No. 27-25 at 3.) President Trump described his plan to "pursue federal civil rights cases," and "seize[ ] funds" from the schools. (*Id.* at 4.) The President's campaign website stated that universities were "turning our students into Communists and terrorists," and pledged that, if elected, he would "take the billions and billions of dollars that we will collect by taxing, fining, and suing excessively large private university endowments, [and] use that money to endow a new institution" that would not permit "wokeness or jihadism." (Dkt. No. 27-26 at 3.) On March 4, 2025, the President posted on Truth Social, "All Federal Funding will STOP for any College, School, or University that allows illegal protests." (Dkt. No. 27-57.) In an October 12, 2025 post, the President described his "Administration['s] ... Great Reform Agenda in Higher Education," meant to address the "corrupting [of] our Youth and Society with WOKE, SOCIALIST, and ANTI-AMERICAN Ideology..." (Dkt. No. 67-3 at 2.) Pursuant to the "Agenda," the President stated: "we will continue our current efforts to swiftly and forcefully enforce Federal Law." (*Id.*)

In October 2021, before taking office, the Vice President stated, "we have got to cut off the flow of funding to the universities that are indoctrinating our children ... If we're going to spend money on these universities, they should have to teach things that are consistent with our values and our worldview." (Dkt. No. 27-28 at 4.) In that same period, in a podcast interview on September 17, 2021, the Vice President vowed to mount a campaign to change the ideological tenor of higher education using the threat of cutting off federal funds:

> [W]hat do you do at the Department of Education? Well, you do what Victor Orban has done in Hungary, ... say, you're not allowed to teach critical race theory anymore. You're not allowed to teach critical gender theory anymore.... You're not allowed to do those things and get a dollar of federal money...

(Dkt. No. 27-31 at 5; *see also* Dkt. No. 27-33 at 9 (making similar statements in 2024).) Since taking office, the Vice President continues to publicly encourage the use of federal funds to control the speech of university professors. On September 17, 2025, on Fox News, the Vice President stated, "If you're a university professor who benefits from American tax dollars, you should not be celebrating Charlie Kirk's death. And if you are, maybe.... your university should face a loss of funding." (Dkt. No. 27-48 at 3.)

### 2. Defendants' Application of the Task Force Policy at Other Universities

*Columbia.* On March 3, 2025, Defendants HHS, DoE, and GSA announced a "comprehensive review of Columbia's federal contracts and grants" in light of "*potential* violations of Title VI" regarding antisemitism. (Dkt. No. 27-56 at 2 (emphasis added).) GSA indicated that it was reviewing grants "across the Federal Government." (*Id.*) Four days later, DOJ, HHS, DoE, and GSA announced the "immediate cancellation of approximately \$400 million in federal grants and contracts to Columbia," with "additional cancellations [ ] expected to follow." (Dkt. No. 27-58 at 2.) GSA stated that it was assisting "all agencies in issuing stop work orders." (*Id.* at 3.) On March 13, 2025, HHS, DoE, and GSA issued a demand letter, requiring broad changes including for Columbia to restructure its student disciplinary, admissions, and international recruiting process, institute a "mask ban," and place a disfavored department into receivership. (Dkt. No. 27-59.) After several rounds of negotiations, during which additional funds were cancelled, on July 25, 2025, Columbia entered into a settlement agreement requiring it to pay \$200 million to the United States and to make demanded changes to its curriculum, admissions, and international student programs. (Dkt. No. 27-63.) As a result of the agreement, Columbia was once again "eligible for further grants, contracts, and awards in the ordinary course, without disfavored treatment" and the ongoing civil rights investigations were closed. (*Id.* ¶ 8.) After the announcement, Defendant McMahon posted on X that "elite campuses have been overrun by anti-western teachings and a leftist groupthink" and "Columbia's reforms are a roadmap for elite universities that wish to regain the confidence of the American public." (Dkt. No. 27-64.)

**\*6** *Brown.* On March 10, 2025, Brown received a letter from DoE, warning that it was under investigation and subject

to potential Title VI enforcement actions related to alleged antisemitism at the school. (Dkt. No. 27-13 at 2–3.) In April 2025, NIH stopped reimbursing Brown for expenses incurred on existing grants and terminated other grants. (Dkt. No. 27-69 at 5.) On July 30, 2025, Brown entered into a settlement agreement requiring it to pay $50 million to certain state workforce development organizations; adopt a proscribed definition of "male," "female," and "sex"; refuse to provide gender-affirming care to transgender minors; and prohibit "DEI" initiatives and the use of any "proxy" for race in admissions, including personal statements. (Dkt. No. 27-70.) That same day, Defendant McMahon posted, "The Trump Administration is successfully reversing the decades-long woke-capture of our nation's higher education institutions." (Dkt. No. 27-71.) In another post, McMahon stated, "The Trump Administration is dismantling decades of woke control over America's universities. Major wins at Brown, Columbia, and UPenn are restoring higher education as a place to learn—not to indoctrinate." (Dkt. No. 27-76.) President Trump posted, "Woke is officially DEAD at Brown." (Dkt. No. 27-72.)

*Harvard*. On March 31, 2025, the Task Force announced "a comprehensive review of federal contracts and grants at Harvard" as "part of the ongoing efforts of the Joint Task Force to Combat Anti-Semitism," and criticized Harvard for "promoting divisive ideologies over free inquiry." (Dkt. No. 27-77.) On April 3, 2025, Harvard received a demand letter from HHS, GSA, and DoE requiring a broad set of changes to Harvard's admissions, hiring, student discipline, and instructing Harvard to "shutter" all "DEI programs." (Dkt. No. 27-78.) A similar letter was received on April 11, 2025. (Dkt. No. 27-79.) Harvard rejected the terms on April 14, 2025, resulting in the immediate freezing of $2.2 billion in grants to Harvard. (Dkt. No. 27-80.) President Trump explained on social media that Harvard was "pushing political, ideological, and terrorist inspired/ supporting 'Sickness[ ]' " and that Harvard "should no longer receive Federal Funds" because it was "hiring almost all woke, Radical Left" faculty and "teaching Hate and Stupidity." (Dkt. Nos. 27-81 to 27-82.) Plaintiff AAUP and Harvard challenged the withholding of federal funds in court. *See President & Fellows of Harvard Coll. v. United States Dep't of Health & Hum. Servs.*, No. 25-cv-10910, 2025 WL 2528380 (D. Mass. Sept. 3, 2025) ("*Harvard Coll.*"). In response, President Trump told reporters "every time [Harvard] fight[s], they lose another $250 million." (Dkt. No. 27-86 at 3.)

In a recent decision on cross motions for summary judgment, a district court determined that "a review of the administrative record makes it difficult to conclude anything other than that Defendants used antisemitism as a smokescreen for a targeted, ideologically-motivated assault on this country's premier universities, and did so in a way that runs afoul of the APA, the First Amendment and Title VI." *Harvard Coll.*, 2025 WL 2528380, at *36.

## C. Defendants' Opening of Investigations Into UC Schools

In keeping with the first stage of the Task Force Policy described above, the Task Force Agencies have opened a variety of investigations into UC schools. On February 3, 2025, DoE's Office of Civil Rights ("DoE OCR"), opened an investigation under Title VI against UC Berkeley regarding allegations of antisemitism. (Dkt. No. 27-11 at 2.) On March 5, 2025, the Task Force announced that DOJ had opened an investigation into the UC under Title VII of the Civil Rights Act of 1964, regarding alleged antisemitism against professors, staff and other employees. (Dkt. No. 27-14 at 2.) On March 10, 2025, DoE OCR sent a letter "warn[ing] of potential enforcement actions" to UC Davis, UC San Diego, UC Santa Barbara, and UC Berkeley, along with 56 other universities because they were "under investigation for Title VI violations relating to antisemitic harassment and discrimination." (Dkt. No. 27-13.) On March 14, 2025, DoE OCR announced it was opening Title VI investigations into UC Berkeley, along with dozens of other universities, regarding the use of "race-exclusionary practices in their graduate programs." (Dkt. No. 27-12.) On March 27, 2025, DOJ was directed "to begin compliance review investigations into admissions policies" at UC Berkeley, UCLA, and UC Irvine. (Dkt. No. 27-15 at 2.) On May 9, 2025, DOJ notified the UC "that it had opened an investigation into the University of California System's ... response to incidents of antisemitic discrimination, harassment, abuse, and retaliation against students." (Dkt. No. 27-1 at 2.) On June 26, 2025, DOJ notified the UC that it was opening a new Title VII investigation into the UC, to determine whether the UC's "UC 2030 Capacity Plan" caused a pattern or practice of unlawful race-or sex-based employment discrimination. (Dkt. No. 27-16 at 2.) Plaintiffs state that each of these investigations remains pending, which Defendants do not dispute. (Dkt. No. 31 at 16; Dkt. No. 61.)

**\*7** Task Force head, Defendant Terrell, was clear on the anticipated playbook for the UC in a May 27, 2025 interview: "[E]xpect massive lawsuits against UC systems ... [E]xpect

hate crime charges filed by the federal government. Expect Title VII lawsuits ... We're going to go after them where it hurts them financially, and there's numerous ways. I hope you can read between the lines. There's numerous ways to hurt them financially.” (Dkt. No. 27-108 at 3; *see also* Dkt. No. 27-60 (“we basically g[i]ve them notice[ ], and we stop[ ] providing the funding”).)

Two months later, the Task Force Policy proceeded to the next stage as to UCLA. On July 29, 2025, DOJ issued a “Notice of Findings Regarding the University of California, Los Angeles” (“Notice of Findings”), which concluded that UCLA had “violated its obligations under the Equal Protection Clause of the Fourteenth Amendment and Title VI[.]” (Dkt. No. 27-1 at 2.) The findings relate solely to “UCLA's response to the protest encampment on its campus in the spring of 2024” (“2024 Encampment”). (*Id.*) The findings described, in detail, the testimony of several students who lodged troubling discrimination complaints between April 25 and May 1, 2024, when the encampment was forcefully disbanded by law enforcement. For example, several students reported being excluded from campus buildings by members of the encampment who perceived them to be Jewish, several others reported being intimidated, and one student reported seeing an individual beaten by members of the encampment. (*Id.* at 6.) The findings also catalog UCLA's response to the encampment between April 25, 2024, and May 1, 2024. (*Id.* at 4–7.)

The Notice of Findings is silent on what actions UCLA took to address the issues within the scope of the investigation in the nearly fifteen months between UCLA's response in May 2024 and when the Findings were issued in July 2025. The undisputed record, however, is that the UC and UCLA had already taken ameliorative steps not discussed in the Notice of Findings. In December 2024, the UC entered into a voluntary agreement with DoE OCR to resolve, among other things, allegations of discrimination based on Jewish and Muslim ancestry at UCLA. (Dkt. No. 27-100.) That agreement required updates to systemwide anti-discrimination policies and procedures, and established a reporting and review framework under which the UC would have at least 30 days to address any concerns raised by DoE OCR. (*Id.*) In addition, on July 28, 2025, the UC entered into a settlement agreement in *Frankel v. Regents of the University of California*, 24-cv-04702 (C.D. Cal. June 5, 2024), filed by three UCLA students and a UCLA professor alleging anti-Jewish discrimination and a hostile environment in violation of Title VI. (Dkt. Nos. 27-101, 27-102, 24 at 65 n. 162.)

Under the terms of the settlement, the UC agreed to contribute $2.33 million to eight organizations that combat antisemitism and support the UCLA Jewish community, and $320,000 to UCLA's Initiative to Combat Antisemitism, which had been announced in March 2025. (Dkt. No. 27-103.) Under the agreement, UCLA is also prohibited from offering any programs, activities, or campus areas that are not fully and equally accessible. (Dkt. No. 27-102.) The Notice of Findings does not address the adequacy of these new measures or mention them in any way. Instead, it invited the UC to contact it to “resolv[e] this matter” by “enter[ing] into a voluntary resolution,” regarding Title VI violations. (Dkt. No. 27-1 at 10.)

### D. Defendants' Indefinite Cancellation of Grant Funding to UCLA

**\*8** Over the next several days—on July 30, July 31, and August 1—the NIH, NSF, and Energy suspended a combined $584 million in research funds from UCLA. (Dkt. Nos. 27-3 (NSF), 27-6 (NSF), 27-7 (Energy), 27-8 (NIH) (collectively, “Suspension Letters”); *see also* Dkt. No. 27-2.) NSF and Energy's letters each described their decisions as a “final agency decision and not subject to appeal” (Dkt. No. 27-3 at 2; Dkt. No. 27-7 at 3), and the agencies instructed UCLA to immediately cease all activities and discontinue drawing down funds. NIH, NSF, and Energy stated that they had immediately and indefinitely suspended the grants to UCLA because of its alleged failure to combat antisemitism —specifically during the 2024 Encampment—as well as UCLA's alleged discriminatory admissions practices and that UCLA allegedly allowed men in women's sports and private women-only spaces. (Dkt. Nos. 27-6 to 27-8.) None of the letters addressed UCLA's actions between May 2024 and July 2025, discussed above in Section II.D. The letters stated that the agencies were willing to “work with UCLA to identify corrective action,” but did not state what those corrective actions might be. (*Id.*)

Simultaneously, NSF stopped funding any new grants to UCLA, including for projects that it had previously recommended for funding and have received continual federal funding for almost half a century. (Dkt. No. 40-2 ¶¶ 12–13, 16, 18; Dkt. No. 40-3 ¶ 15.) NSF's Acting Chief Science Officer stated in an internal email, “[W]e have been instructed to suspend all active awards to UCLA ... and to not make further awards to [UCLA] until” DOJ's Title VI investigation into UCLA “has been resolved.” (Dkt. No. 40-3 at 8; *see also id.* ¶¶ 9–13.) NSF did not announce this decision, but Plaintiffs instead became aware of it after one of their

members was forwarded this internal correspondence. (*Id.*) The record was silent as to whether similar instructions are in place at NIH and Energy. However, as discussed below, the DOJ has informed UCLA that it will become "eligible for further grants[ ] and awards in the ordinary course," if it agrees to a series of demands. The reasonable inference is that DOJ has instructed at least some of the Funding Agencies on a blanket basis not to approve any new grants to UCLA.

### E. DOJ's Offer to UCLA Seeking $1.2 Billion and a Wide Range of Programmatic Changes in Exchange for Restoring Funding

About a week later, on August 8, 2025, DOJ sent the UC a proposal demanding that UCLA pay $1.2 billion as part of a settlement in order to restore the $584 million in lost funds and so that the Funding Agencies would treat UCLA as eligible for new funding. (Dkt. No. 67-1 ("August 8 Offer"); *see also* Dkt. No. 27-9; Dkt. No. 67-2 at 4.) Much of the language mirrors the settlements reached with Columbia and Brown universities. (*Compare* Dkt. No. 67-1, *with* Dkt. Nos. 27-63, 27-70.) The letter would require, among other things, that UCLA designate an administrator to supervise "reforms to ... scholarship ... and campus climate" (Dkt. No. 67-1 ¶ 6); "conduct a thorough review of UCLA's ... programs related to ... diversity, equity, and inclusion," including "reviewing the process for approving curricular changes" (*id.* ¶ 7.a); ban personal statements discussing a job applicant's racial identity (*id.* ¶¶ 7.c, 7.d); and make recommendations regarding necessary "academic restructuring" to "ensure academic excellence and complementarity across all programs" (*id.* ¶ 7.f).

UCLA would also be required to revise its policies regarding "demonstrations, protests, displays, and other expressive activities" by increasing restrictions and discipline, and prohibiting anonymous protest. (*Id.* ¶ 11.) UCLA would be required to ban admission of "foreign students likely to engage in anti-Western, anti-American, or antisemitic disruptions or harassment" and "socialize" international students to campus "norms." (*Id.* ¶ 25.) The agreement also would require UCLA to "issue a public statement to the UCLA community" adopting the definition of "sex" and related terms consistent with Executive Order 14168 concerning "Gender Ideology"; "post this statement in a prominent location on its main website"; and remove any contrary "statements, links, or documents" from "all of its internal and public-facing websites." (*Id.* ¶¶ 32, 34.) UCLA would also be required to "cease performing hormonal interventions and 'transgender' surgeries on minors" in its

School of Medicine and its affiliated hospitals. (*Id.* ¶ 39.) Further, UCLA would pay for and submit to the supervision of a DOJ-approved "Resolution Monitor" to "assess and report on UCLA's compliance" and recommend "actions necessary to ensure ... effective compliance." (*Id.* ¶¶ 53–65 (allowing DOJ to select the Resolution Monitor unilaterally if the parties cannot agree).)

**\*9** In exchange, as "consideration" for the agreement, the United States would (1) restore terminated grants, (2) "enable the withdrawal of overdue payments on the specified Non-Terminated Grants," (3) "[t]reat UCLA as eligible for further grants, contracts, and awards in the ordinary course," and (4) "[c]lose pending [i]nvestigations or compliance reviews under [Title VI, Title IX, and other federal statutes]." (*Id.* ¶ 44.) To date, UCLA has not agreed to a settlement. (Dkt. No. 67-4.)

### F. Impact of Present and Future Funding Cancellation on UC's Functioning

The UC undisputedly views the cancellation of federal funding, and the threat to terminate more funds, as an existential threat. UC President James Milliken called Defendants' threats to the UC's funding "one of the gravest threats to the [UC] in our 157-year history. Losses of significant research and other federal funding would devastate UC and inflict real, long-term harm on our students, our faculty and staff, our patients, and all Californians." (Dkt. No. 27-18 at 2.) He wrote that "[c]lasses and student services would be reduced, patients would be turned away, tens of thousands of jobs would be lost, and we would see UC's world-renowned researchers leaving our state for other more seemingly stable opportunities in the US or abroad. It is hard to conceive of a more damaging consequence[.]" (Dkt. No. 27-27 at 2.) In sum, Milliken warned, "[a] substantial loss of federal funding would devastate our university." (*Id.*)

Milliken has indicated his belief that the Task Force Policy, and similar settlement demands as those made to UCLA, will soon be extended to the entire UC, precisely as Defendant Terrell had vowed in the May 27, 2025 interview quoted earlier. On September 3, 2025, Milliken wrote to California state legislators that "[r]ecent actions by the federal government, with the distinct possibility of more to come, place the entire [UC] system at risk[.]" (Dkt. No. 27-17.) On September 15, Milliken confirmed "the federal government is also pursuing investigations and actions in various stages against all 10 UC campuses" and that the UC was "consider[ing] the implications of expanded federal

action." (Dkt. No. 27-18 at 2.) Milliken clarified that "what's at stake" is "more than $17 billion each year in federal support" for the entire UC system. (*Id.*)

The record supports Milliken's warnings about the devastating effects of a complete federal funding cancellation. Students would lose financial aid and be forced to withdraw from their educational programs, hospitals would be unable to care for their most vulnerable patients, critical research would grind to a halt, and millions of dollars of federal funding that has already been spent on unfinished programs and projects would be wasted.

When Defendants suspended $584 million in research grants to UCLA in July and August, for example, the unrebutted record shows that researchers experienced immediate and irreparable harm that could not be, and has not been, undone. For example, Local 4811 John Doe is a graduate student researcher at UCLA who researched sex differences in lung cancer prevention. (Dkt. No. 29-10 ¶¶ 2–3.) When his grant funding was terminated in August of 2025, he was forced to halt his *in vivo* experiments, and he completed his Ph.D. program with a much more limited-scope project than the one he had designed. (*Id.* ¶¶ 8–10.) The disruption has irreparably harmed his career development, and he states that "knowledge that could improve human health has been lost." (*Id.* ¶¶ 11–12.) Similarly, Alexander Huk is a neuroscientist at UCLA and a member of UCLA-FA and CUCFA. (Dkt. No. 29-22 ¶ 2.) Huk researches memory, and his research involves colonies of marmosets that his team breeds, raises, and trains to perform memory-related tasks. (*Id.* ¶ 4.) Marmosets live for approximately ten years, but it is only between the ages of 18 months and 5–6 years that they can be used in the experiments. (*Id.* ¶¶ 4, 10.) Huk's research funding was terminated in August of 2025, forcing him to "scale down [the] marmoset colonies, significantly slowing down [his team's] ability to collect necessary data for our research projects." (*Id.* ¶¶ 6, 11.) Many other researchers have described similar setbacks and wasted resources. (*See, e.g.*, Dkt. No. 30-09 ¶ 9 (describing loss of stem cell lines, requiring team to "start from square one"); Dkt. No. 29-16 ¶ 18 (describing how experiment was suspended mid-stream, before research results were obtained).)

### G. Chilling Effects of the Task Force Policy and Funding Cancellations

**\*10** The unrebutted record further reflects that Defendants' actions have already resulted in significant chilling effect on freedom of speech. Plaintiffs' members express fear that researching, teaching, and speaking on disfavored topics will trigger further retaliatory funding cancellations against the UC, and that they will be blamed for the retaliation. They also describe fears that the UC will retaliate against them to avoid further funding cuts, or in order to comply with the proposed settlement agreement. UCLA professor and UCLA-FA member Amander Clark studies "germline and ovarian development." (Dkt. No. 29-7 ¶¶ 1–3, 6.) She explains that she teaches courses that discuss the "hormone use during gender transitions for transgender people," and has historically talked about how her research could benefit the LGBTQ community. (*Id.* ¶ 12.) In recent months, as a direct result of Defendants' actions, Clark has modified her research, teaching, and the way she talks about the same. (*Id.* ¶ 14.) Clark states that she is "afraid" to "speak freely" because she does not want to be the reason that the UC loses "millions or potentially billions in federal funding." (*Id.* ¶¶ 15–16.) Leigh Kimberg, who teaches at the San Francisco General Hospital at UCSF and sits on the UCSF FA board, describes the chilling effect of Defendants' action on research and teaching by UCSF FA members. (Dkt. No. 29-24 ¶¶ 1, 5.) Kimberg described one member's decision to potentially remove studies on racism in pain management from the curriculum. (*Id.* ¶ 31.) She states that many members feared being reported to the UCSF administration and/or the federal government. (*Id.* ¶ 38.)

The UC has already begun withdrawing support for "risky" speech as a direct result of the Task Force Policy. In the wake of Defendants opening civil rights investigations into the UC, the UC Irvine administration instructed a faculty member not to teach a course on campus politics because "it was risky and would make UCI a target." (Dkt. No. 29-29 ¶ 54.) In another example, UCLA professor and UCLA-FA member Graemen Blair explains that he is part of a team that submitted a proposal in 2024 for a project concerning academic freedom in the context of pro-Palestinian speech. (Dkt. No. 29-4 ¶¶ 1, 5, 41.) UCLA committed $140,000 in matching funds to the project, with the rest to be covered by a private funder. (*Id.*) However, after receiving the August 8 Offer, UCLA informed Blair's team on August 20, 2025, that they could no longer endorse the project. (*Id.* ¶¶ 41–43.) Without university funding, the project has been scrapped. (*Id.*) Similarly, UCLA undergraduate associations have submitted an *amicus curiae* brief describing how UCLA administration has recently required changes to words used in the naming, outreach, and advertisement for the Latinx and Philipinx Graduation events, which have run at UCLA for decades. (Dkt. No. 65-1 at 18.)

Declarants also describe how they have limited their participation in public discourse due to Defendants' conduct. Yogita Goyal, a UCLA professor and member of AAUP, the UCLA-FA, and CUCFA, studies "race and postcolonialism, with a special emphasis on African American and African literature." (Dkt. No. 29-18 ¶¶ 3, 5.) Goyal states that, due to fear of being targeted by Defendants or costing the UC millions of dollars:

> For an upcoming conference on UCLA's campus, I decided not to invite a certain scholar that I otherwise would have invited and not to include certain scholarship that I otherwise would have included. Additionally, I am considering not holding the annual Association of Postcolonial Thought conference, which I organize, and which was scheduled to be held at UCLA in 2026.

(*Id.* ¶¶ 17–19.) Darlene Lee—who is the director of the Ethnic Studies Certificate Program ("ESCP") at UCLA and a member of AFT—states that she changed the content of her "presentation at one professional conference and fully withdr[e]w from another professional conference" to avoid backlash to the ESCP. (Dkt. No. 29-26 ¶¶ 1, 6, 23.)

Moreover, Plaintiffs' members describe how their teaching has been affected by the proposed settlement's requirement to ban foreign students likely to engage in anti-Western or anti-American disruptions, and to socialize foreign students to certain norms. For example, UC Berkeley law school professor and BFA member Christopher Kutz stopped covering the Israel-Palestine conflict in his class, so that his international students would not be required to write or speak on that topic and thus face consequences if their speech was reported as anti-American. (Dkt. No. 29-25 ¶¶ 1, 7, 31–33.) UC Irvine professor and IFA and CUCFA member Sanghyuk Shin has censored his teaching on Palestine and structural racism, and has stopped promoting his students' scholarship on Palestine to protect them from being targeted. (Dkt. No. 29-44 ¶¶ 1, 9, 16–17.)

**\*11** Finally, Plaintiffs' members describe fear that they will be retaliated against for exercising their right to protest. One UPTE member at UCLA previously participated in several

protests and demonstrations—wearing a mask for health and safety reasons—but fears that doing so in the future will draw retaliation by Defendants or by UCLA in its effort to comply with Defendants' demands. (Dkt. No. 29-12 ¶¶ 8–9.) Shin, the UCLA professor, was asked by another faculty member to stop protesting because his speech "might upset the Trump administration and result in funding cuts for UC." (Dkt. No. 29-44 ¶ 18.) Another witness, who teaches at a UC school and is a CUCFA member, states that although she used to attend student-led protests and labor union rallies, she now is "hesitant to attend protests on campus or speak publicly about current events" for fear of triggering retaliation. (Dkt. No. 30-11 ¶ 1, 5, 20.)

### III. PROCEDURAL HISTORY

Plaintiffs, on behalf of their 100,000 UC employees, faculty, and student members, filed this lawsuit on September 16, 2025. They assert constitutional claims for violation of their First Amendment freedom of speech, violation of the Tenth Amendment and Spending Clause, violation of the Separation of Powers doctrine, unconstitutional conditions, and violation of the Fifth Amendment Due Process Clause. (Dkt. No. 24.) They assert claims under the Administrative Procedures Act ("APA"), based on alleged procedural violations of Title VI and IX, and on the theory that Defendants' actions are arbitrary and capricious. (*Id.*) Plaintiffs also assert APA claims based on the alleged constitutional violations.

Plaintiffs allege that Defendants want to stamp out faculty, staff, and student "woke," "left," "anti-American," "anti-Western," and "Marxist" speech at federally funded universities, including the UC. To do so, Defendants are alleged to be acting together to implement a multi-step policy, as described above, where (1) one or more Task Force Agencies open civil rights investigations into a university; (2) before the investigations have concluded, Funding Agencies cancel large amounts of federal funding to the university, at the Task Force's direction and without complying with the procedure laid out in Title VI and IX; and (3) DOJ offers to settle with the university to resolve the investigations and restore funding, in exchange for further burdening faculty, staff, and student speech. The three-step process is referred to in this Order as the "Task Force Policy." The mass suspension of $584 million in grants to UCLA in July and August 2025, and the blanket refusal to approve further grants to UCLA pending resolution of DOJ's Notice of Findings, are referred to as the "Funding Cancellation."

On October 9, 2025, Plaintiffs filed a Motion for Preliminary Injunction, moving on all claims except their Fifth Amendment claim. (Dkt. Nos. 26, 31.) Plaintiffs seek to enjoin the Task Force Policy and Funding Cancellation. They argue that there is irreparable harm to their members, whose speech has been chilled by fear of the effects of the Task Force Policy. They also argue that the Funding Cancellation is causing irreparable harm to members at UCLA, who have had to curtail research, lay off staff, and lose valuable work and opportunities for career advancement. Plaintiffs argue that the UC at large is at risk of similar imminent harm.

## IV. LEGAL STANDARD

"[I]njunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). In order to obtain a preliminary injunction, Plaintiffs must establish that they are likely to succeed on the merits, that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that an injunction is in the public interest. *Id.* at 20. When the nonmoving party is the government, the final two factors merge. *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

## V. ANALYSIS

### A. Plaintiffs Are Likely to Succeed on Their First Amendment Claim (Count I).

**\*12** The undisputed record demonstrates that Defendants have almost certainly engaged in unlawful coercion and retaliation, through both the Funding Cancellation and the Task Force Policy. Plaintiffs present overwhelming evidence that these acts have already had a predictably chilling effect throughout the UC system, in keeping with their intended purpose. Defendants offer no rebuttal. Contrary to Defendants' assertions, the Court has jurisdiction to address these classic, predictable First Amendment harms.

### 1. Plaintiffs Have Shown Likely Unlawful Coercion.

"[A] government official cannot do indirectly what she is barred from doing directly: A government official cannot coerce a [third] party to punish or suppress disfavored speech on her behalf." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024). Therefore, "a government entity's 'threat of invoking legal sanctions and other means of

coercion' against a third party 'to achieve the suppression' of disfavored speech violates the First Amendment." *Id.* at 180 (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)). To identify impermissible government coercion, the Ninth Circuit considers four non-exhaustive factors: (1) "the government official's word choice and tone" and "the tenor of the overall interaction"; (2) whether "the official has regulatory authority over the conduct at issue"; (3) "whether the recipient perceived the message as a threat"; and (4) "whether the communication refers to any adverse consequences if the recipient refuses to comply." *Kennedy v. Warren*, 66 F.4th 1199, 1207–09 (9th Cir. 2023) (citing *Nat'l Rifle Ass'n of Am. v. Vullo*, 49 F.4th 700, 715 (2d Cir. 2022), *vacated and remanded on other grounds*, 602 U.S. 175 (2024)). Applying this test, the unrebutted record in this case shows that Defendants have used the threat of investigations and economic sanctions to impermissibly coerce the UC to stamp out faculty, staff, and student "woke," "left," "anti-American," "anti-Western," and "Marxist" speech.

First, the "tenor of the overall interaction" indicates an effort to coerce rather than persuade the UC to suppress protected speech. In March of 2025, Task Force head Terrell described the environment at UCLA by saying "[t]he academic system in this country has been hijacked by the left, has been hijacked by the Marxists. *We have to stop these practices.*" (Dkt. No. 27-36 at 4 (emphasis added).) He promised to "bankrupt" the UC and other schools using civil rights investigations. (*Id.* at 3.) Defendants have followed through on the threat. They have opened a series of civil rights investigations—creating a looming threat of enforcement actions. They have suspended half a billion dollars in research funding to UCLA and refuse to approve new grants. They have conditioned restoration of existing and future "ordinary course" funding on a $1.2 billion dollar payment and additional terms requiring further suppression of speech. Defendants have vowed not to stop with UCLA and to take "every single federal dollar" from the UC system, if it does not accede. (*Id.* at 3.) Even then, Defendants make no promises as to future investigations or funding terminations if they remain unhappy with the UC, which is undisputedly dependent on federal funds for a large portion of its budget. Finally, Defendants' plan to "bankrupt" the UC is happening against the backdrop of nearly identical actions against other prominent schools—Brown, Columbia, and Harvard. Defendant McMahon described these efforts as "dismantling decades of woke control over America's universities" and a "roadmap" for future coercion. (Dkt. Nos. 27-76, 27-64.) Defendant Trump posted, "Woke is officially DEAD at Brown." (Dkt. No. 27-72.) DOJ AAG Dhillon

promised to go after "all the other haters at our American [ ] funded schools" in response to criticism of a UCLA faculty member's response to the Charlie Kirk assassination. (Dkt. Nos. 27-50, 27-51.) Defendants' actions and statements send a clear message that they have used and will continue to "use [their] authority to turn the government's coercive power against [the UC] if it does not change its ways" and police disfavored speech. *Kennedy*, 66 F.4th at 1209.

**\*13** Second, the speakers have direct "regulatory authority" over the UC. First, DOJ—which sent the August 8 Offer and on whose behalf Terrell spoke—has regulatory authority to bring enforcement actions under Titles VI, VII, and IX. *See* 28 C.F.R. § 42.107 (Title VI); 42 U.S.C. § 2000e-6 (Title VII); 28 C.F.R. § 54.605 (Title IX). The Attorney General has regulatory authority to oversee and coordinate enforcement of Titles VI and IX among federal agencies. *See generally* Exec. Order No. 12250, 45 Fed. Reg. 72995 (Nov. 2, 1980). Additionally, the Task Force Agencies and Funding Agencies have statutory authority to terminate federal funding for violations of Title VI and Title IX. 42 U.S.C. § 2000d-1 (Title VI); 20 U.S.C. § 1682 (Title IX). Finally, the President, as the head of the executive branch, has authority to direct the Agency Defendants, meaning that he also has regulatory authority.

Third, the Task Force Policy has been reasonably perceived to be a threat, both by the UC and by Plaintiffs' members. UC president Milliken wrote to California state legislators describing the Policy as a risk to the entire UC, and "one of the gravest threats in UC's 157-year history." (Dkt. No. 27-17.) He warned that "[a] substantial loss of federal funding would devastate our university and cause enormous harm to our students, our patients, and all Californians." (*Id.*) Similarly, dozens of Plaintiffs' members have expressed fear that the UC will have no choice but to suppress their speech, and that they have stopped teaching and researching disfavored topics to avoid the anticipated professional and personal consequences.

Finally, as discussed above, Defendants have explicitly laid out the "adverse consequences" to the UC if it fails to comply. *See Kennedy*, 66 F.4th at 1211 ("The most obvious cases of coercion occur when an official explicitly refers to adverse consequences" "that will follow if the recipient does not accede to the request."). In the short-term, UCLA faces the loss of over half a billion dollars in research funding, and at least one Funding Agency is withholding ordinary course grant approvals. Furthermore, Defendants' statements—and

Milliken's public warning—indicate that the entirety of the UC's federal funding is at risk of similar actions.

In defense of the Task Force Policy, Defendants argue that their actions are targeting discrimination and harassment, not protected First Amendment speech. The overwhelming evidence, however, establishes that Defendants' goal is to purge disfavored viewpoints from universities, and specifically from the UC, as they have repeatedly and publicly proclaimed. Defendants offer no contrary evidence. Moreover, Defendants' actions to date appear to further confirm that motivation. Not only did Defendants rely on complaints about a 2024 student encampment that had undisputedly already been addressed, but in order to restore funding and end the investigations, Defendants proposed a slew of conditions that had nothing to do with antisemitism but instead targeted the UC's views on DEI and gender. They have also failed to follow longstanding, legally-required process that is intended to safeguard against coercive or retaliatory government actions under Title VI and IX, as discussed in further detail below in Section V.D.1. "By not following [their] own [congressionally mandated] procedures, the [Defendants] undermine[ ] the legitimacy of [their] own investigation" raising the inferences that it is coercive and retaliatory, "rather than any legitimate investigative activity." *See Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105, 161 (D.D.C. 2025).

Moreover, even if Defendants were not trying to purge disfavored viewpoints from universities and solely motivated by stamping out antisemitic harassment, Defendants may not accomplish that goal by coercing the UC into adopting practices with widespread chilling effects on constitutionally protected speech. *See Bantam Books*, 372 U.S. at 69; *see also Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703, 710 (9th Cir. 2010) ("Harassment law generally targets conduct, and it sweeps in speech as harassment only when consistent with the First Amendment."). Unlike the established Title VI processes for terminating funds based on civil rights violations, government coercion to induce a third party to censor the offending speech allows the government to bypass having to prove the alleged violations. As such, it "provides no safeguards whatever against the suppression of [permissible], and therefore constitutionally protected, matter" and "creates hazards to protected freedoms markedly greater than those that attend reliance upon the [established legal process]." *Bantam Books*, 372 U.S. at 69. That is why the government "is not permitted to employ threats to squelch the free speech of private citizens." *Backpage.com, LLC v.*

*Dart*, 807 F.3d 229, 235 (7th Cir. 2015). Here, Plaintiffs shown a likelihood of success on the merits of their claim that Defendants, pursuant to the Task Force Policy, aim to do just that.

**2. Plaintiffs Have Shown Likely Retaliation
in Violation of the First Amendment.**

 **\*14** The government is entitled to its viewpoint. "But a State's failure to persuade does not allow it to hamstring the opposition. The State may not burden the speech of others in order to tilt public debate in a preferred direction." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 578–79 (2011). "To bring a First Amendment retaliation claim, the plaintiff must allege that (1) it engaged in constitutionally protected activity; (2) the defendant's actions would 'chill a person of ordinary firmness' from continuing to engage in the protected activity; and (3) the protected activity was a substantial motivating factor in the defendant's conduct—*i.e.*, that there was a nexus between the defendant's actions and an intent to chill speech." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016).

First, the unrebutted record shows that Plaintiffs have engaged in constitutionally protected activity, including teaching, research, and public speaking on disfavored topics, and participating in protests. Second, the Task Force Policy and accompanying statements by Defendants, already discussed in detail above, would chill a person of ordinary firmness from continuing to engage in those activities. If the UC refuses the settlement, Defendants have vowed to take away billions of dollars in additional funding in retaliation for disfavored speech, and if the UC accepts the settlement, the UC would be paying $1.2 billion in retaliation for prior disfavored speech and would be required to take further restrictive measures. Third, there is a nexus between Defendants' actions and an intent to chill speech. Defendants argue that "Plaintiffs have not put forward evidence that the viewpoints expressed by UC faculty, students, academic employees, and staff played a substantial role in any grant suspensions." (Dkt. No. 61 at 42.) But even though Defendants' public statements—aside from Dhillon's—did not call out any specific individual's speech, the record amply establishes that the Task Force Policy and Funding Cancellation are designed and implemented by Defendants broadly to suppress speech on disfavored left-wing topics at universities, specifically including the UC.

The evidence in the record in this case mirrors the allegations in *ASA*, where the Ninth Circuit found that the Arizona Students Association ("ASA") had plausibly pled retaliation. ASA had advocated for a proposition that Arizona Board of Regents ("ABOR") opposed. *ASA*, 824 F.3d at 863. In retaliation, ABOR voted to suspend collection of ASA's student-funded fee to "punish the ASA for participating in core political speech and, further, to attempt to bankrupt the ASA to prevent it from exercising its free-speech rights in the future." *Id.* at 869. ASA sued under the First Amendment. The Ninth Circuit explaining that "[g]iven the inherent power asymmetry ... , as well as the severe impact of ABOR's actions on the ASA, it is highly likely that the ... retaliation would chill and discourage a student or student organization of similar fortitude and conviction from exercising its free-speech rights." *Id.* Here as well, Defendants have reacted to disfavored speech by explicitly stating that they will "bankrupt the [UC] to prevent [Plaintiffs' members] from exercising [their] free-speech rights in the future." *Id.*

Defendants' principal response is to argue that the Court should find that the UC is a contractor, and thus that a more permissive balancing test applies under *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty.*, 391 U.S. 563 (1968). The Court declines to adopt the view that any university that accepts funds from the federal government becomes a "government contractor" for First Amendment purposes, whose speech the federal government can regulate just as it would an at-will employee. Defendants cite no authority for that proposition, let alone for applying such a doctrine to the free speech rights of Plaintiffs' members, who are non-parties to the contracts to which Defendants refer. And even if *Pickering* applied, Defendants have not established that they "would have taken the same action even in the absence of the protected conduct" or that legitimate government interests outweigh Plaintiffs' academic freedom and free speech interests, as the *Pickering* test requires. *See Bd. of Cnty. Commissioners, Wabaunsee Cnty., Kansas v. Umbehr*, 518 U.S. 668, 675–76 (1996). To the contrary, the evidence is overwhelming that Defendants' motivation is their desire to penalize disfavored viewpoints.

 **\*15** Defendants also argue that even if the Task Force Policy and Funding Cancellation are motivated by retaliation, "[f]uture funding decisions ... are not subject to traditional First Amendment scrutiny," and therefore, their decisions about whether or not to award a benefit (*i.e.* a grant) are insulated from judicial review. (Dkt. No. 61 at 42.) That is not accurate. Even if Defendants are otherwise entitled to

withhold a benefit or impose conditions on it, they may not do so as a means of retaliating to deter disfavored speech. In *Perry v. Sindermann*, 408 U.S. 593 (1972), a school's board of regents declined to offer a new contract to a non-tenured professor who had publicly disagreed with their policies, and the board issued a press statement describing the professor's "insubordination." *Id.* at 595. The Supreme Court held that the teacher's "lack of a contractual or tenure right to re-employment," was "immaterial" to the First Amendment analysis. *Id.* at 597–98. The board of regents could not deny him the benefit of a contract renewal on a "basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Id.* Similarly, in *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998) the Supreme Court explained that the government may generally elect to subsidize some speakers over others, but "even in the provision of subsidies, the Government may not 'ai[m] at the suppression of dangerous ideas.' " *Id.* at 587. Because Plaintiffs have shown that the Task Force Policy is likely motived by a desire to suppress and retaliate against disfavored speech, they have a likelihood of success on a retaliation theory.

### 3. The Court Has Jurisdiction to Address the Classic First Amendment Harms That Are the Intended Effect of the Task Force Policy and the Funding Cancellation.

Defendants offer no evidence to rebut the coercive and retaliatory nature of the Task Force Policy and Funding Cancellation. Instead, they assert that the Court lacks jurisdiction to hear Plaintiffs' First Amendment claims. Because Defendants raise separate jurisdictional challenges to the Task Force Policy and Funding Cancellation (as those terms are defined above in Section III), this order considers each in turn.

### a. Task Force Policy

### i. Standing and Ripeness

The Constitution gives the judiciary power to hear "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. A plaintiff's standing to sue is "part of the common understanding of what it takes to make a justiciable case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). Article III standing requires that three conditions be

satisfied: (1) Plaintiff has suffered an "injury in fact," (2) that injury is "fairly traceable" to Defendants' conduct, (3) and; (3) the "requested relief will redress the alleged injury." *Id.* at 103. An injury-in-fact must be "concrete, particularized, and imminent," not "dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.' " *Trump v. New York*, 592 U.S. 125, 131 (2020) (quotation omitted); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) ("*SBAL*") (where plaintiff had adequately alleged an Article III injury, any remaining ripeness considerations were "prudential"). [8]

"In the First Amendment context, 'the injury-in-fact element is commonly satisfied by a sufficient showing of self-censorship, which occurs when a claimant is chilled from exercising his right to free expression.' " *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1174 (9th Cir. 2022) (quoting *Edgar v. Haines*, 2 F.4th 298, 310 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 2737 (2022)). To demonstrate injury in fact based on the chilling of speech, the chilling effect must be objective, not subjective or speculative. *Id.* But, as the Supreme Court has explained, standing requirements are somewhat relaxed in First Amendment cases:

> **\*16**  Even where a First Amendment challenge could be brought by one actually engaged in protected activity, there is a possibility that, rather than risk punishment for his conduct in challenging the statute, he will refrain from engaging further in the protected activity. Society as a whole then would be the loser. Thus, when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the [conduct or] statute challenged.

*Sec. of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984).

Plaintiffs have shown that they have standing to challenge the Task Force Policy on First Amendment grounds. First, the record shows that Plaintiffs are experiencing an ongoing injury. Plaintiffs' members have submitted numerous

declarations describing how their speech was chilled after the UC was targeted by the Task Force, due to fear of triggering retaliation by Defendants or the UC. They have excised disfavored speech from their curriculum and research, in some cases by cutting entire topics. They have avoided publicly speaking or promoting student work on disfavored topics. They have refrained from participating in protests. Others have detailed how the UC withdrew support for their research on disfavored topics, resulting in them being unable to pursue that work. In sum, the record shows that Plaintiffs' members are suffering present and ongoing injuries at heart of what the First Amendment protects. *First Nat. Bank v. Bellotti*, 435 U.S. 765, 776 (1978) (holding that speech on matters of public concern lies "at the heart of the First Amendment's protection").

Traceability and redressability of current and future harm is also met. The unrebutted record shows that the chilling of Plaintiffs' members' speech is attributable to the Task Force Policy. Plaintiffs' members reasonably fear that, if they do not continue to censor their speech, Defendants will retaliate by cutting off millions or billions of additional dollars from the UC, and that they will be blamed. They also reasonably fear, based on specific examples, that the UC will discontinue support for their research if they study disfavored topics. These reasonable fears chill their speech regardless of whether the UC ultimately accepts or rejects the August 8 Offer. Moreover, if the UC accedes to a settlement agreement following the Task Force Policy's "roadmap" of Columbia and Brown, Plaintiffs' members reasonably fear that the UC will further restrict their speech, and as a result are deterred from speaking on disfavored topics. *See infra* Section V.B. Accordingly, regardless of whether the UC enters a settlement, a non-speculative First Amendment injury exists. That injury is redressable: enjoining Defendants from threatening to cancel federal funding in order to stop disfavored speech removes the principal tool of retaliation.

At oral argument, Defendants argued that under *Murthy v. Missouri*, 603 U.S. 43 (2024), Plaintiffs lack standing to bring their First Amendment claims because their current injuries are not traceable to Defendants' conduct, and because any future injury is speculative. *Murthy* provides an instructive contrast to this case. In *Murthy*, states and social media users alleged that the federal government pressured social-media platforms into censoring certain content, in violation of the First Amendment. *Id.* at 54. The record showed that, although the agencies had issued guidance, flagged posts, and encouraged platforms to change content moderation policies,

"the platforms moderated similar content long before any of the Government defendants engaged in the challenged conduct." *Id.* at 53–54, 60. Many takedowns at issue had occurred *before* any discussion between government defendants and the platforms. *Id.* at 63, 68. Absent evidence of ongoing government pressure, the risk of future, government-caused censorship was too speculative to support standing. *Id.*

**\*17** Here, by contrast, the undisputed record shows the chilling effects on Plaintiffs' members' speech to be directly traceable to Defendants' conduct. Unlike the social media companies, there is no evidence that the UC previously censored the disfavored topics. To the contrary, Defendants are targeting the UC because it has historically *permitted* its faculty, students, and staff to teach, research, write, and speak on disfavored topics. The chilling effects are thus attributable to the Task Force Policy, not the UC's preexisting practices. (*See, e.g.*, Dkt. No. 29-44 ¶ 18 ("I am afraid that we will be blamed for Trump's attacks, and nobody wants to be blamed for costing the University $1 billion.").) And although Defendants argued at the hearing on Plaintiffs' motion that other events, unrelated to this litigation, might also be chilling Plaintiffs' members' speech, "if a court decision can provide a 'small incremental step' to reduce the risk of harm to the plaintiffs 'to some extent,' that is enough to show causation as well as redressability." *Matsumoto v. Labrador*, 122 F.4th 787, 801 (9th Cir. 2024) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 524–26 (2007)).

Moreover, the record here shows Defendants are exerting continued pressure. First, not only have NSF, NIH, and Energy terminated grant funding to UCLA, but the record also shows that at least NSF has been instructed not to approve new grants to UCLA until it resolves settlement negotiations with the DOJ. That is a significant loss. NSF awarded the UC system as a whole $525 million in 2024, and the Funding Cancellation a few months ago terminated $179 million in grants to UCLA. (Dkt. No. 27-4 at 2; Dkt. No. 27-89 at 2.) With every passing day, the pressure created by the Task Force Policy grows, as UCLA loses out on more and more funding. And the ongoing pressure is not isolated to UCLA. There are currently seven ongoing investigations into the UC, and Defendants have consistently stated their intention to extend the Task Force Policy to the entire UC. *See supra* Sections II.B–C. The record supports that the Funding Cancellation directed at UCLA will not be the end of the grant terminations directed at the UC. Rather, if the UC chooses to "fight," like Harvard, it will lose millions or billions more in funding. (*See* Dkt. No. 27-86 at 3 (The President stated to reporters

that "[e]very time [Harvard] fight[s], they lose another $250 million.".) This evidence is exactly what the Supreme Court emphasized was lacking in *Murthy.*

Defendants also contend that future injuries are speculative because the UC has not accepted the August 8 Offer, so it is not yet known what the impact on "campus life, teaching, medical services, and grants" will be. (Dkt. No. 61 at 22.) But as already discussed, the record shows that the options available to the UC will injure Plaintiffs' members, regardless of what path it chooses. The UC can comply with Defendants' demands to curb Plaintiffs' members' First Amendment rights, or it can experience retaliation through crippling funding cuts. The predictable effect is that Plaintiffs' members have curbed their disfavored speech in order to avoid either further termination of federal funds (if the UC does not accede to the government's demands) or censorship by the UC (if the UC does accede). Indeed, that result is exactly what Defendants repeatedly said that they intended.

That is sufficient for causation and redressability. As the Supreme Court recently held, "[c]ourts must distinguish the 'predictable' from the 'speculative' effects of government action or judicial relief on third parties." *Diamond Alternative Energy, LLC v. Env't Prot. Agency,* 606 U.S. 100, 112 (2025). "With respect to causation (and redressability), a court must conclude that third parties will likely react to the government [action] (or judicial relief) in predictable ways that will likely cause (or redress) the plaintiff's injury." *Id.* (quotation omitted). Thus, in *Diamond Alternative Energy,* fuel producers had standing to challenge a regulation requiring automakers to make fewer gas-powered vehicles, even though consumers might still buy just as many gas-powered cars anyway, because "commonsense inferences" indicated that reduced sales were a likely and predictable effect. *Id.* at 116–17. Where the chain of events is predictable, a plaintiff need not show that the defendant's actions are "the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 169 (1997). Here, whether the UC agrees to the proposed terms or not, the commonsense, predictable effect is that Plaintiffs' members will be deterred by Defendants' conduct from engaging in protected speech, just as Defendants hoped.

**\*18** Indeed, to adopt Defendants' extreme position would eviscerate the courts' ability to redress government conduct that deliberately sought to chill speech by pressuring third parties. At oral argument, for example, Defendants' counsel was asked about a hypothetical scenario in which a future president publicly vowed to take away funding from universities whose faculty continued to criticize the administration, and then did so at two universities, which agreed to fire the offending faculty to restore funding. Defendants' counsel insisted that the faculty at a third university whose funding had been taken away, and who stopped criticizing the administration out of fear of reprisals, would not have standing to bring a First Amendment challenge. Nothing in the standing and ripeness doctrines requires the Court to set the bar at such an impossibly high level merely because the government has chosen to violate the First Amendment through conduct directed at a third party. *See, e.g., Vullo,* 602 U.S. at 193 (hearing and finding plausible a First Amendment claim brought by NRA against a government actor even though any harm to the NRA was contingent on agreements with and acts of intermediate third parties). [9]

At oral argument, Defendants also argued that Plaintiffs had failed to show standing as to each Defendant they sought to enjoin. But the record sufficiently establishes individualized standing for purposes of preliminary injunctive relief. Each of the Funding Agencies has issued funding to Plaintiffs' members. (*See, e.g.*, Dkt. No. 29-23 ¶ 4; Dkt. No. 72 ¶ 7; *see also* Dkt. No. 29-22 ¶ 6; Dkt. No. 29-35 ¶ 4; Dkt. No. 40-3 ¶ 5.) Moreover, the unrebutted evidence supports a strong inference that the Task Force Policy applies across all Funding Agencies. The Task Force Policy is undisputedly a coordinated effort, and agencies do not voluntarily choose whether to participate. Executive Order No. 14188, pursuant to which the Task Force was formed, required *every* agency, not just Task Force members, to submit a report describing all "civil and criminal authorities or actions ... that might be used to curb or combat anti-Semitism" and listing any known recent complaints of "campus anti-Semitism." 90 Fed. Reg. at 8847.

Defendants have also described all federal agencies as being part of the coordinated efforts to halt funds under the Task Force Policy. *See* Fed. R. Civ. P. 65(d)(2)(C) (injunctive relief binds all "persons who are in active concert or participation" with the parties with respect to the enjoined conduct). When Task Force head Leo Terrell described the UC system as being "hijacked by the left" and vowed to use antisemitism investigations to "stop it immediately," he was clear that "[i]f these universities do not play ball, lawyer up because the federal government is coming after you." (Dkt. No. 27-36 at 4–5.) When the interviewer Mark Levin asked which agencies would be involved in the Task

Force Policy, Terrell said, "I can honestly tell ... these universities. President Trump is going after you in *every aspect*. You asked me about the Ed Department. The answer is yes. This task force, Mark, *every agency's involved*. Every agency, Homeland Security's involved. The FBI's involved. HHS, the Ed Department, and the Treasury Department." (*Id.* at 5–6 (emphasis added).) Terrell described the goal as going after "every single federal dollar" to universities, and specifically to the UC, which would necessarily involve the whole panoply of Funding Agencies. (*Id.* at 3–4.) Consistent with that, NSF's Acting Chief Science Officer stated in an internal email, "[W]e have been instructed to suspend all active awards to UCLA." (Dkt. No. 40-3 at 8). Additionally, the record establishes that nearly all of the Funding Agencies participated in a coordinated effort to take away funding from Harvard pursuant to the Task Force Policy. *Harvard*, 2025 WL 2528380 at *2, 5, 7–8 & n. 3 (finding coordinated funding termination efforts by NIH, NSF, USDA, DoE, Energy, DoD, NASA, and DoC); (*see also* Dkt. No. 27-85 at 3 (the "Trump Administration's multi-agency move to cut funding to Harvard, demonstrate[s] the entire Administration's commitment to eradicating discrimination on Harvard's campus")). Indeed, no Defendant has submitted any evidence rebutting its participation in the Task Force Policy.

**\*19** Finally, Defendants ask the Court to decline to hear Plaintiffs' First Amendment claims on prudential ripeness grounds: "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." (Dkt. No. 61 at 25–26 (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (citation omitted)).) The Supreme Court has questioned the "continuing vitality of the prudential ripeness doctrine" in light of federal court's "virtually unflagging" obligation " 'to hear and decide' cases within [their] jurisdiction." *SBAL*, 573 U.S. at 167. Regardless, for the reasons already discussed, the issues here are fit for judicial review. Furthermore, as explained below in Sections V.H–I, if the Court were to decline to hear this case, the hardship on Plaintiffs would be significant, greatly outweighing any harm to Defendants. In sum, Plaintiffs have sufficiently shown that they have representational standing. [10]

Defendants' remaining jurisdictional challenges do not pertain to Plaintiffs' First Amendment claim concerning the Task Force Policy. As Defendants concede, Plaintiffs' challenge to the Task Force Policy is not "committed to the Court of Federal Claims" pursuant to the Tucker Act. (Dkt.

No. 61 at 31 n. 4.); *see also National Institutes of Health v. American Public Health Association*, 145 S. Ct. 2658, 2661 (2025) ("*APHA*") (Barrett, J., concurring) (that agency guidance is "related to grants does not transform a challenge to that guidance into a claim 'founded ... upon' contract"). Nor do Plaintiffs need to demonstrate that the Task Force Policy constitutes a final agency action because this is not an APA claim. *See Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 523–26 (9th Cir. 1989); *Sierra Club v. Trump*, 929 F.3d 670, 699 (9th Cir. 2019).

### b. Funding Cancellation

### i. Standing

Plaintiffs have established an injury for purposes of standing. Though Defendants concede that claims concerning the Funding Cancellation are ripe, they argue that Plaintiffs lack standing to enjoin the Funding Cancellation "because Plaintiffs' members already secured re-instatement of the specific NSF and NIH grants identified" through preliminary injunctions in *Thakur et al. v. Trump et al.*, 25-cv-04737-RFL (filed June 4, 2025) ("*Thakur*"). (Dkt. No. 61 at 21, 26.)

*Thakur* was brought by a class of UC researchers who alleged that their federal research funding had been terminated pursuant to specific executive orders. Most of the grant terminations at issue occurred in the spring of 2025, but the *Thakur* plaintiffs later amended their complaint to encompass some of the grant suspensions that occurred at UCLA in July and August 2025. *Thakur v. Trump*, No. 25-cv-04737-RFL, 2025 WL 2696424, at *7 (N.D. Cal. Sept. 22, 2025) ("*Thakur III*"). Four classes were provisionally certified, and two preliminary injunctions issued, that together (i) prohibit the EPA, NEH, NSF, DoT, DoD, and HHS-NIH from "giving effect to any grant termination" that is "communicated by means of a form termination notice" that lacks a reasoned explanation, and (ii) prohibit the EPA, NEH, NSF, and DoT from "giving effect to any grant termination" made pursuant to Executive Orders 14151 or 14173, which bar funding of research on certain DEI-related topics (the "Equity Termination Orders"). *Thakur I*, 787 F. Supp. 3d at 1006; *Thakur III*, 2025 WL 2696424, at *19.

The *Thakur* injunctions cover a narrower set of conduct than Plaintiffs seek to enjoin in this case. The *Thakur* injunctions apply only to the agencies listed above. They also apply only to terminations that fail to include a reasoned explanation

or were based on the Equity Termination Orders. The July and August grant suspensions to UCLA were enjoined for failure to include a reasoned explanation concerning reliance interests. Although the *Thakur* Plaintiffs requested that those suspensions be preliminarily enjoined on First Amendment grounds, that request was denied because those grants were not suspended pursuant to the Equity Termination Orders and the complaint in that case did not plead any other First Amendment theories. *Thakur III*, 2025 WL 2696424, at *7, 14; *see also Thakur v. Trump*, No. 25-cv-04737-RFL, 2025 WL 2325390, at *5 (N.D. Cal. Aug. 12, 2025).

**\*20** Furthermore, the *Thakur* injunctions do not bar retaliatory denial of new grants to UCLA. NSF has already admitted that it is refusing to issue awards across the board to UCLA, including for longstanding projects that have been repeatedly renewed for decades and for research it had previously recommended for funding. (Dkt. No. 40-2 ¶¶ 12–13, 16, 18; Dkt. No. 40-3 ¶ 15; Dkt. No. 71 ¶¶ 10–13). Other Funding Agencies may well have received the same instructions. And part of the "consideration" for the August 8 Offer is to render UCLA "eligible for further grants[ ] and awards in the ordinary course." (Dkt. No. 67-1 ¶ 43–44.) Of course, such "consideration" would not be valuable if funding were still being approved in the ordinary course.

The record shows Plaintiffs' members are suffering current harms from NSF's blanket denial of new grants to UCLA. UCLA professor and UCLA-FA member Dimitri Y. Shlyakhtenko, explains that he is the director of the Institute for Pure & Applied Mathematics ("IPAM") at UCLA. (Dkt. No. 40-3 ¶¶ 1–2.) On July 29, 2025, Shlyakhtenko received an embargoed copy of an announcement that NSF was awarding IPAM and six other institutes over $91 million in grant funding. (*Id.* ¶ 8.) However, the following day, he was forwarded an email from NSF stating that NSF would "not make further awards" to UCLA pending DOJ investigation. (*Id.* ¶ 9.) On August 1, he received an email from NSF informing him that, despite being funded continuously since 2000, IPAM had been removed from the funding announcement, and IPAM has not received any of its expected funding. (*Id.* ¶¶ 4–5, 14–15.) UCLA professor and UCLA-FA member Kendall Houk was also told by NSF in July of 2025 that the primary grant funding her research group had been "recommended for funding" and would be approved to start on August 1, 2025. (Dkt. No. 40-2 ¶¶ 1, 13.) The funds have never been disbursed, with his NSF contact stating in an email that the ability to release the funds was "beyond my control." (*Id.* ¶¶ 14–17; *see also id.* at 10.) Houk anticipates

that his funds will run out by the end of the year, and he will then need to lay off staff and interrupt his research. (*Id.* ¶ 19.) Another declarant described a nearly identical experience with NSF. (Dkt. No. 78 ¶¶ 10–20.) As a result of NSF's refusal to grant his previously recommended grant, he has lost graduate student researchers, and undergraduate students will lose out on educational experiences. (*Id.* ¶¶ 24–25.)

In addition, the *Thakur* injunctions are only on a preliminary, not a permanent, basis, and the government's appeal of that preliminary relief remains pending. Though the Ninth Circuit denied the government's request to stay the *Thakur* injunctions pending that appeal, the government has also sought *en banc* review of the stay denial. Plaintiffs have submitted unrebutted evidence that the researchers at issue continue to be affected by the resulting uncertainty, and that injunctive relief tailored to the separate claims in this case, which are based on different facts and a different legal theory, would reduce that uncertainty. *See Matsumoto*, 122 F.4th at 801 ("[p]artial amelioration of a harm ... suffices for redressability"). For example, UCLA scientist and UAW Local 4811 member Cole Peters describes the disruption of his T-cell-based cancer immunotherapy research this year. (Dkt. No. 29-37 ¶¶ 3–5.) The suspension of his NIH grant in August of 2025 caused immediate harm: he was unable to "produce the new data necessary to publish articles, and without publications, it is difficult for [him] to advance [his] career." (*Id.* ¶ 15.) Although his funding has been temporarily restored pursuant to the *Thakur* injunctions, the uncertainty about the continuation of funding has caused him to scale back projects and required him to prepare to end his research prematurely. (*Id.*) Plaintiffs have established standing as to their claims based on the Funding Cancellation.[11]

### ii. Tucker Act

**\*21** Nothing requires Plaintiffs' First Amendment challenge to the Funding Cancellation to be routed to the Court of Federal Claims ("CFC"), which lacks the power to issue injunctive relief to halt a First Amendment violation or to stop its chilling effects. Defendants rely on the Tucker Act, which commits to the exclusive jurisdiction of the CFC all actions "founded ... upon any express or implied contract with the United States" exceeding $10,000. 28 U.S.C. § 1491(a)(1).[12] The determinative jurisdictional question with respect to the Tucker Act is whether the "action is a 'disguised' breach-of-contract claim." *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (quoting *Megapulse, Inc.*

*v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). In making this determination, the Court "looks to (1) the source of the rights upon which the plaintiff bases its claims and (2) the type of relief sought (or appropriate)." *Id.* (quotation omitted).

The basis for Plaintiffs' claim is indisputably the First Amendment. The issue before the Court is whether federal agencies may hold a university's funding hostage to pressure it into censoring speech or to retaliate against disfavored speech. Therefore, Plaintiffs' claim, at its core, is "about speech and whether the federal government is improperly infringing on [ ] free speech rights of an academic institution and its employees. The resolution of these claims might result in money changing hands, but what is fundamentally at issue is a bedrock constitutional principle rather than the interpretation of contract terms." *Harvard*, 2025 WL 2528380, at *14. Such a claim cannot be heard in the Court of Federal Claims. The Federal Circuit has expressly held that "the [CFC] lacks jurisdiction over claims arising under the First Amendment ... as they are not money-mandating." *Stephens v. United States*, 165 Fed. Cl. 341, 348 (2023) (citing *Cooper v. United States*, 771 F. App'x 997, 1000–01 (Fed. Cir. 2019)).

The type of relief sought also precludes application of the Tucker Act. Plaintiffs are seeking injunctive relief to stop federal agencies from further chilling their members' speech through coercion and retaliation, not specific performance under a contract. Plaintiffs seek to have the Federal Agencies restore the status quo for funding in the ordinary course and not engage in future unlawful funding cancellations. Indeed, as to the blanket denial of future funding, there is no contract in place as to which specific performance could be ordered. Only the district courts can grant the relief that Plaintiffs seek, as the CFC cannot grant injunctive relief. *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (per curiam) ("[A] district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds.").

The Tucker Act is inapplicable for the additional reason that Plaintiffs cannot bring a breach of contract claim as non-parties to the grant agreements at issue. [13] As the Ninth Circuit recently explained in an order denying rehearing *en banc*, "[u]nder the Tucker Act, the Court of Federal Claims has jurisdiction only if there is privity of contract between plaintiffs and the government." *See Cmty. Legal Servs. in E. Palo Alto v. United States Dep't of Health & Hum. Servs.*, No. 25-2808, 2025 WL 2884805, at *7 (9th Cir.

Oct. 10, 2025) ("*CLSEPA II*") (quoting *Park Props. Assocs., L.P. v. United States*, 916 F.3d 998, 1002 (Fed. Cir. 2019)). Where "[n]o such privity exists ... between Plaintiffs and the Government ... the Court of Federal Claims's jurisdiction does not cover th[e] dispute." *Id.* (quotations omitted).

**\*22** Defendants ask the Court to reach the opposite result, relying on the Supreme Court's emergency docket ruling in *National Institutes of Health v. American Public Health Association* 145 S. Ct. 2658 (2025) ("*APHA*"). But *APHA* did not involve First Amendment claims. Nor did *APHA* address the issue that there would be no forum that could hear the plaintiffs' claims, as would be the case here. Furthermore, *APHA* does not apply where "Plaintiffs have no contractual relationship with the Government." *CLSEPA II*, 2025 WL 2884805, at *4. In cases like this one, "Plaintiffs' claims have no business before the [Court of Federal] Claims." *Id.* at *2 (quotation omitted). "The result requested by the Government would mean that no court has jurisdiction to hear plaintiffs' claims. Not only is this result contrary to common sense, but it also conflicts with the 'strong presumption favoring judicial review of administrative action' " that is embodied in the APA. *See Cmty. Legal Servs. in E. Palo Alto v. United States Dep't of Health & Hum. Servs.*, 137 F.4th 932, 943 (9th Cir. 2025) ("*CLSEPA I*") (citation omitted). [14] The Court is bound by the Ninth Circuit's decisions, and cannot decline jurisdiction over Plaintiffs' claims pursuant to the Tucker Act.

The above analysis applies with even more force because Plaintiffs assert their constitutional claims against the heads of the Defendant Agencies as an *ultra vires* claim. (Dkt. No. 24 at 105.) As Defendants concede, an *ultra vires* "claim of unconstitutional action, asserted against an officer, defeats sovereign immunity." (Dkt. No. 61 at 50.) Therefore, the claim does not rely on any further waiver of sovereign immunity from the APA or any other source, and the Tucker Act's limitation on the APA's sovereign immunity waiver is irrelevant. Though Defendants argue that the Tucker Act impliedly limits the availability of *ultra vires* constitutional claims, "to foreclose a remedy for a constitutional violation, Congress must demonstrate its intent by 'clear and convincing evidence.' " *See Sierra Club*, 929 F.3d at 697 (quoting *Weinberger v. Salfi*, 422 U.S. 749, 762 (1975)). Defendants have pointed to no evidence that Congress intended the Tucker Act to deprive parties of recourse for First Amendment claims that cannot be heard in the Court of Federal Claims. *See, e.g., Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991) (refusing to find congressional intent to leave a party

with no "meaningful and adequate opportunity for judicial review"). [15]

Therefore, the Court has jurisdiction over Plaintiffs' First Amendment claims.

### B. Plaintiffs Are Likely to Succeed on the Merits of Their Unconstitutional Conditions Claim (Count III).

Plaintiffs have also shown a substantial likelihood of success as to their unconditional conditions claim. The unrebutted record shows that Defendants have impermissibly conditioned aid in a way that burdens First Amendment rights. Under the doctrine of unconstitutional conditions, the government "may not deny a benefit to a person on a basis that infringes [their] constitutionally protected interests —especially, [their] interest in freedom of speech." *Perry*, 408 U.S. at 597. In the context of the First Amendment, the Supreme Court has instructed that the government may "define the limits of [a] government spending program," but cannot impose "conditions that seek to leverage funding to regulate speech outside the contours of the program." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013) ("*AID*").

**\*23** Plaintiffs have shown a likelihood of success on the merits of this claim. Plaintiffs have shown that the Task Force Policy and Funding Cancellation are an effort to force the UC to suppress Plaintiffs' members' right to engage in disfavored speech, in exchange for the benefit of continued federal funding, as described above. Defendants accurately observe that they have the right to preferentially and conditionally fund speech that advances the Administration's preferred agenda. But the unconstitutional conditions doctrine prohibits the government from placing "a condition on the *recipient* of the subsidy rather than on a particular *program* or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program." *Rust v. Sullivan*, 500 U.S. 173, 196 (1991) (emphasis added). Thus, for example, in *Rust*, the federal government could "require that the grantee keep [abortion related speech] separate and distinct from Title X activities," so long as the government did not "not force the Title X grantee to give up abortion-related speech" altogether. *Id.* at 196–97.

That is precisely the line of which Defendants have run afoul here. The August 8 Offer proposes recipient-wide reforms that apply across all of UCLA's various activities, and is not limited to any particular federally funded program. The conditions do not have any apparent connection to research goals or priorities that a particular Funding Agency seeks to advance with respect to a specific program, nor do Defendants attempt to identify any. For example, the August 8 Offer conditions federal funding on the UC's blanket, public adoption of Defendants' preferred definition of "male," "female," and "sex," and commitment to censor all contrary statements from the school's websites, thereby limiting Plaintiffs' members' own speech on the issue. (*See, e.g.*, Dkt. No. 29-51 ¶¶ 3, 15, 18 (UC Davis professor fears ability to teach and speak about gender studies and trans studies will be suppressed).) This does not appear to be limited to any particular UC program, nor does it appear to be limited to UC programs funded by federal monies. "By demanding that funding recipients adopt—as their own— the Government's view on an issue of public concern, the condition by its very nature affects 'protected conduct outside the scope of the federally funded program.' " *AID*, 570 U.S. at 218; *see also FCC v. League of Women Voters of California*, 468 U.S. 364, 399–401 (1984) (striking down a condition on federal financial assistance to noncommercial broadcast television and radio stations that prohibited all editorializing, including with private funds).

Defendants note the August 8 Offer has not been accepted, and discussions between the UC and DOJ remain ongoing. They argue that Plaintiffs have no claim unless the unconstitutional conditions have been "consummated," relying on *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 608 (2013). (Dkt. No. 61 at 46–47.) That is not the law. Rather, the portion of *Koontz* cited by Defendants addresses what *remedy* may be available to a plaintiff in a "unconstitutional conditions cases in which someone refuses to cede a constitutional right in the face of coercive pressure." 570 U.S. at 607–09. *Koontz* states squarely that even where a "condition is never imposed," there may be an unlawful "*burden*[ on] a constitutional right." *Id.* at 608 (emphasis in original). In other words, to determine whether the government imposed an unconstitutional condition, courts examine the government's conduct, not whether the alleged victim of the government's illegal requirements has acceded to it yet.

In sum, Plaintiffs have shown a likelihood of success on the merits of their claim that the Task Force Policy and Funding Cancellation have unconstitutionally conditioned benefits on the giving up of First Amendment rights. [16]

**C. Plaintiffs Are Likely to Succeed on the Merits of Their Tenth Amendment/Spending Clause Claim (Count IV).**

**\*24** The federal government has "only limited powers," and "the States and the people retain the remainder." *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 533–34 (2012) ("*NFIB*") (opinion of Roberts, C.J.). As relevant here, "[t]he Spending Clause of the Federal Constitution ... provides Congress broad discretion to tax and spend for the 'general Welfare,' including by funding particular state or private programs or activities." *AID*, 570 U.S. at 213. Beyond that, the Tenth Amendment prohibits the federal government from exercising powers "*not* delegated to the United States." *Printz v. United States*, 521 U.S. 898, 923 (1997) (emphasis in original). Conditions attached to federal spending are "much in the nature of a contract," and States must be able to "voluntarily and knowingly accept[ ] the terms" without undue "coercion" from the federal government in their adoption or enforcement. *NFIB*, 567 U.S. at 577, 579; *see also New York v. U.S. Dep't of Health & Human Servs.*, 414 F. Supp. 3d 475, 566–71 (S.D.N.Y. 2019) (HHS regulation that amounted to surprise retroactive conditions violated the Spending Clause). Plaintiffs argue that the Task Force Policy and Funding Cancellation exceed Defendants' constitutional authority by using the threat of cancelling a major portion, if not all, of universities' federal funding on their agreement to new programs unrelated to the originally funded programs, as the August 8 Offer does.

In *NFIB*, the Supreme Court held the Congress exceeded its authority under the Spending Clause, and thus violated the Tenth Amendment, when it conditioned the States' access to existing and future federal Medicaid funds on the States' agreement to expand Medicaid to cover additional categories of individuals. 567 U.S. at 580–83. In a controlling plurality opinion, [17] Chief Justice Roberts explained that when "conditions take the form of threats to terminate other significant independent grants, the conditions are properly viewed as a means of pressuring the States to accept policy changes." *Id.* at 580. And where the threatened funding represented "over 10 percent of a State's overall budget," it amounted to an unconstitutional "gun to the head" and a state's acceptance of the terms could not be viewed as voluntary. *Id.* at 581–82.

Here, the Task Force Policy and Funding Cancellation bear many of the same characteristics as the provision at issue in *NFIB*. First, federal funds account for more than half

of the UC's research funding and nearly one-third of its operating budget. (Dkt. Nos. 27-23, 27-24.) Defendants have threatened to withhold potentially all federal funding from the UC unless it accepts Defendants' demands to institute wide-ranging policy changes and pay for additional programs such as an external auditor. (*See* Dkt. 27-36, at 3–4 (vowing "to take away every single federal dollar" to "put an end to" how the UC system has been "hijacked by the left"). The funds that are at risk cover many existing programs, such as ongoing research contracts, student financial aid, and Medicaid/Medicare funding. Furthermore, there is no apparent nexus between the terms in the August 8 Offer and the existing research programs that have been defunded by the Suspension Letters. Rather, Defendants' public statements indicate that the canceled funds—with threats of more to come—are simply collateral that is being used to pressure the UC to accept policy changes favored by the administration in unrelated areas. This is precisely what the Supreme Court found to be unlawfully coercive in *NFIB*.

Defendants argue that this case differs from *NFIB* because the terms in the August 8 Offer are not an entirely "new program" that the UC could not have foreseen, and instead simply require compliance with federal law. (Dkt. No. 61 at 45–46 (citing *Miss. Comm'n on Env't Quality*, 790 F.3d at 179).) But, the UC could not have predicted that it would be required to pay a $1.2 billion civil penalty in order to retain UCLA's ordinary course federal funding. Plaintiffs further respond that the "UC could not have foreseen that the federal government would condition research funding for stem cells and space exploration on compliance with brand-new—and likely incorrect—interpretations of civil rights laws." (Dkt. No. 75 at 34.) Indeed, the August 8 Offer appears to prohibit the UCLA from considering a student's discussion of their racial identity in a personal statement. (Dkt. No. 67-1 ¶ 19.) But the Supreme Court's most recent opinion addressing the use of race in admissions stated that "nothing in this opinion should be construed as prohibiting universities from considering an applicant's discussion of how race affected his or her life, be it through discrimination, inspiration, or otherwise." *See SFFA*, 600 U.S. at 230. Similarly, UCLA would be required to publicly state that it "will comply with Title IX" by providing "locker rooms and bathrooms strictly separated on the basis of sex." (Dkt. No. 67-1 ¶ 32.c.) But the Ninth Circuit has held that "just because Title IX authorizes sex-segregated [locker and bathroom] facilities does not mean that they are required, let alone that they must be segregated based only on biological sex and cannot accommodate gender identity." *Parents for Priv. v. Barr*, 949 F.3d 1210, 1227 (9th

Cir. 2020). Requiring UCLA to adopt novel interpretations of the law, favored by Defendants but not yet imposed by Congress or the courts, would have been unforeseeable as a condition to accepting federal assistance for the UC's existing programs.

**\*25** Even assuming *NFIB* would permit imposition of an unforeseeable civil penalty and wide-ranging new "compliance" requirements, the August 8 Offer also imposes substantial new obligations that require more than just "compliance with federal law." For example, it requires UCLA to retain a DOJ-approved and UCLA-funded monitor to oversee compliance with the agreement; install an administrator to conduct an overhaul of UCLA's curriculum, academic structure, policies around admissions and hiring; pay for a third-party survey of campus climate; and "develop training materials to socialize international students," among several other costly terms. (Dkt. No. 67-1.) In other words, if UCLA wants to restore "ordinary course" federal funding for its existing programs, it must agree to undertake significant new programs favored by Defendants but not required by current law or any existing legal obligation. This is the type of coercion that *NFIB* prohibits.

Finally, many of the conditions have no apparent relationship to compliance with civil rights laws whatsoever, like banning foreign students likely to engage in disruptions considered "anti-Western" (Dkt. No. 67-1 ¶ 25) or requiring "cooperation agreements" with local law enforcement (*id.* ¶ 12). These obligations are new and unforeseeable, and tying the availability of continued funding to the UC's acceptance of these terms appears to be an attempt to secure their acceptance through pressure.

Defendants also argue that a "non-binding initial [settlement] offer ... can hardly be characterized as a threat" in violation of the Tenth Amendment. (Dkt. No. 61 at 45.) This argument ignores the undisputed coercive context in which the August 8 Offer was made. First, Defendants have targeted several universities with the Task Force Policy, with the stated intention of "bankrupting" them. When Harvard failed to agree to Defendants' demands, Defendants terminated billions of dollars of federal funding. Second, the August 8 Offer was extended only eight days after Defendants took away over half a billion dollars in federal funding from UCLA. The Offer indicates that it will resolve pending civil rights investigations and restore "ordinary course" federal funding, indicating that failure to accept the terms could result in enormous legal and financial consequences for the UC.

Of course, this is not to say that the commonplace practice of negotiating voluntary agreements in the Title VI context runs afoul of the Tenth Amendment. As Catherine E. Lhamon, Assistant Secretary for DoE OCR from 2013–2017 and 2021–2025 describes, DoE regularly enters into "resolutions involv[ing] agreements to combat allegations of antisemitism." (Dkt. No. 28 ¶¶ 2, 19.) Investigations typically involve months of careful inquiry, and the DoE may seek to enter into voluntary agreements during that process. (*Id.* ¶¶ 11, 16, 23–24, 28.) But under Title VI, DoE cannot—and historically has not—moved to immediately terminate funds or threatened to do so at the outset. (*Id.* ¶ 16; *see also infra* Section V.D.1.) By contrast, the August 8 Offer goes hand in hand with preemptive funding terminations—without any process or opportunity to be heard, a blanket refusal by at least one Funding Agency to approve future grants, and threats of further process-less terminations. In sum, while an ordinary settlement offer, standing alone, would not run afoul of the Tenth Amendment, Plaintiffs have shown a likelihood that the August 8 Offer, when viewed as a part of the larger Task Force Policy, amounts to impermissible coercion.

Finally, Defendants argue that "discretion allows the [government] to impose a penalty that is proportionate to the breach," and such a penalty is not coercive. (Dkt. No. 61 at 46 (quoting *West Virginia v. HHS*, 289 F.3d 281, 292–93 (4th Cir. 2002).) However, Defendants have not introduced any evidence of what breach they are referencing, aside from the Notice of Violation. And the threat to withhold up to $17 billion in federal funds in response to one event on one UC campus, which that university has undisputedly taken significant steps to address, is facially disproportionate.

**\*26** Defendants' jurisdictional challenges fail for the same reasons articulated as to the First Amendment claims. Plaintiffs have standing and have asserted a ripe claim because, as in the First Amendment coercion claim, the coercive act was complete regardless of whether the UC ultimately accepts the August 8 Offer. Furthermore, Plaintiffs have asserted a concrete injury because the coercive pressure is ongoing, and because the UC will either accept some or all of the terms of the August 8 Offer and censor their speech, or will refuse, in which case additional funding —including funding for Plaintiffs' members' projects—will likely be terminated to bring the school to heel. Plaintiffs have shown a likelihood of success on their Tenth Amendment claim.

**D. Plaintiffs Are Likely to Succeed on Their APA Claim for Failure to Comply with Title VI and Title IX (Counts VI & VII).**

**1. The Task Force Policy and Funding Cancellation Likely Fail to Comply with Title VI and IX.**

Defendants concede that they did not follow the process described in Title VI and Title IX for cancelling funding based on civil rights violations. Title VI prohibits discrimination on the basis of race, color, or national origin in "any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Title IX prohibits discrimination on the basis of sex in "any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681. Before "terminating, or refusing to grant or continue, assistance" based on a failure to comply with a requirement adopted pursuant to Title VI or Title IX, Congress requires an agency to follow specific procedures. 42 U.S.C. § 2000d-1. [18] "[N]o such action shall be taken until the department or agency concerned" (1) "has advised the appropriate person or persons of the failure to comply with [Title VI]," (2) "has determined that compliance cannot be secured by voluntary means"; (3) has given the recipient an "opportunity for hearing" consistent with 5 U.S.C. §§ 554–557 and the relevant agency regulations; (4) if supported by the record, has made an "express finding on the record ... of a failure to comply" with Title VI; (5) has filed a "full written report of the circumstances and the grounds for such action" with the relevant congressional committees; and then (6) has waited 30 days before cancelling funds. *Id.*

Congress has also limited the permissible remedies for a violation. Funding cancellations must be "limited to the particular political entity, or part thereof, or other recipient as to whom such a finding [of noncompliance] has been made," and "limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found." *Id.*; *see also Bd. of Pub. Instruction of Taylor Cnty., Fla. v. Finch*, 414 F.2d 1068, 1076–77 (5th Cir. 1969) (Defendants bear burden of showing nexus between misconduct and scope of funding termination); *Maine v. USDA*, 778 F. Supp. 3d 200, 230 (D. Me. 2025) (where student athletics programs allegedly violated Title IX, USDA could only restrict funding to that "particular program, or part thereof," and not to food assistance programs). Title VI and IX do not provide authority for the imposition of civil penalties or fines. *See* 42 U.S.C. § 2000d-1 ("[c]ompliance with any requirement adopted pursuant to this section may be effected ... by the

termination of or refusal to grant or to continue assistance," or "any other means authorized by law"); 20 U.S.C. § 1682 (same). [19]

**\*27** The congressional record reflects the concern that Title VI might be used in a "vindictive" or "punitive" manner with respect to the "cut off" of federal funds, and that Congress took pains to avoid this possibility. (Dkt. No. 27-97 at 3.) When Senator Pastore, a proponent of the bill that became Title VI, was asked during the debate on the bill whether "safeguards have been built [ ] to protect an individual or a jurisdiction" before funding was terminated, Pastore responded, "Frankly, I do not see how we could have gone any further." (*Id.* at 3.) The "procedures spelled out in considerable detail" in 42 U.S.C. § 2000d-1 place "an emphasis on safeguards against precipitous action," create a written record for judicial review, and incentivize voluntary compliance. (*Id.* at 4.)

It is undisputed that, despite Title VI and IX's directive that "no such action shall be taken" before following their procedural requirements, NSF, NIH, and Energy issued the Suspension Letters without complying with those requirements. UCLA was not given the opportunity to voluntarily remedy the alleged violations, there was no hearing, and no written report was delivered to Congress. There is also no evidence in the record that the Suspension Letters limited the scope of the funding suspensions to noncompliant entities, parts, or programs. Furthermore, the August 8 Offer appears to be an effort to impose an enormous fine on UCLA for alleged Title VI and IX violations, but Defendants cite no authority for the ability to impose such a fine. Instead, the unrebutted record is that, as implemented at other universities, the Suspension Letters and August 8 Offer are part of a standard playbook of suspending and terminating funding without complying with the statutory requirements.

Furthermore, the record reflects that this is the *modus operandi* of the Task Force Policy. Defendants conceded at oral argument that, of the billions of dollars of federal university funding suspended across numerous agencies in recent months, not a single agency has followed the procedures required by Title VI and IX. As Terrell explained days after Columbia's funding was summarily suspended by Defendants, "Title VI is the mechanism to defund Columbia of $400 million." (Dkt. No. 27-60 at 3.) But rather than follow procedural requirements, Terrell explained "so what we did was we basically gave them notice[ ], and [then] we stopped providing the funding." (*Id.*) Terrell issued a

warning to Harvard, UCLA, NYU, and Michigan, that the "same thing's happening to them." (*Id.*) In another interview, Terrell warned Columbia, Harvard, Michigan, UCLA, and USC: "We're going to take away your funding. We're going to sue you under Title VII. We're going to sue you under Title VI." (Dkt. No. 27-35 at 4.)

Defendants do not deny that they failed to comply with the enforcement provisions of Title VI and IX. Instead, they argue that the provisions do not "apply to any of the grant suspensions or terminations (past or future) in this case, which were not based on violations of such provisions." (Dkt. No. 61 at 38.) But this argument is at odds with the unrebutted record in this case. First, Defendants initiated a variety of investigations into the UC expressly under Title VI and IX. Second, the Task Force issued a Notice of Findings to UCLA under Title VI. In the next 72 hours, NSF, NIH, and Energy terminated half a billion dollars in federal funding. While the Suspension Letters do not expressly cite Title VI or IX, they discuss the very same incident addressed in DOJ's Notice of Findings, and assert that the suspensions are to remedy discrimination in violation of federal law. NSF's Acting Chief Science Officer stated that refusal to award any new grants to UCLA was pursuant to "the Justice Department finding yesterday," linking to the DOJ's Notice of Findings under Title VI, and instructed that no further awards would be made "until the issue has been resolved." (Dkt. No. 40-3 at 8.) Nothing in the record suggests that the Funding Agencies were enforcing any other federal law or agency priorities, and Defendants do not identify or introduce evidence of any other findings that served as the basis of the Funding Cancellation. One week later, DOJ made the August 8 Offer, which would restore the very funds that the Suspension Letters cancelled, and release claims under Title VI and Title IX, if the UC agreed to its terms.

**\*28** The reasonable inference from this undisputed sequence of events is that the suspension of funds, and the blanket refusal to continue or issue new grants, was based on Defendants' assertion of Title VI and IX violations. Therefore, Plaintiffs have shown that they are likely to succeed on the merits of their claim that the Task Force Policy violated the process and scope requirements of Title VI and IX. *See Harvard*, 2025 WL 2528380, at *28 (termination of federal funds without following Title VI procedures is unlawful); *Am. Fed'n of Tchrs. v. Dep't of Educ.*, No. 25-cv-628, 2025 WL 2374697, at *20 (D. Md. Aug. 14, 2025) ("[T]he government's briefing in this case ... borders on flippant in its

repeated insistence that it did not need to employ any process to tell schools to comply with Title VI.").

Though Defendants assert that the Suspension Letters' citation to 2 C.F.R. § 200.339 [20] and 2 C.F.R. § 200.340 provides a separate basis for suspending the funds, those regulations do not give Defendants a blank check to ignore the Title VI and IX processes and limits. Such an interpretation would nullify the safeguards imposed by 42 U.S.C. § 2000d-1. Agencies would never need to go through the onerous process of terminating funds under Title VI and IX if they could take the very same actions simply by citing 2 C.F.R. §§ 200.339–40. Nothing permits an agency to "regulate away" the statutory commands imposed by Congress in Title VI and IX in that manner. *See Nat'l Treasury Emps. Union v. Cornelius*, 617 F. Supp. 365, 371 (D.D.C. 1985).

Even if Defendants could regulate away Title VI and IX's statutory requirements, the regulations at issue do not provide authority for the Funding Cancellation. The regulations allow termination when a grantee "fails to comply with [federal law]" and "noncompliance cannot be remedied," 2 C.F.R. § 200.339, or otherwise "to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). But the record in this case does not contain any instances of noncompliance, or of agency goals or priorities other than the allegations of race and sex discrimination and desire to remedy the same, as described in the Suspension Letters. Therefore, Defendants have not shown any unremedied failure to comply with federal law at UCLA, or any other legal authority or goals and priorities, that were furthered by the Funding Cancellation.

Plaintiffs have shown a likelihood of success on the merits of their claim that the contrary to law claim. Defendants nonetheless argue that the Court cannot reach the merits of this claim due to various jurisdictional barriers. Because these barriers differ based on whether the challenge is to the Task Force Policy or the Funding Cancellation, this order considers each of those in turn below.

### 2. Nothing Bars the Court from Reaching the Merits of the Task Force Policy's Violation of Title VI and Title IX.

### a. Standing and Ripeness

Plaintiffs have standing to bring claims challenging the Task Force Policy's violations of Title VI and IX. Plaintiffs' members have already suffered a concrete injury from the Task Force Policy. The grants funding their research in July and August 2025 were frozen, and new grants are not being issued. These injuries are directly traceable to Defendants' actions. *See supra* Section V.A.3.b.i (detailing the injuries and explaining that the *Thakur* Injunctions do not fully address them).

Moreover, the record shows that Plaintiffs' members are continuing to suffer further present injuries from the promise to cancel more funds without required safeguards under Task Force Policy. Defendant Terrell threatened to "investigate the entire UC system in California" to "take away every single federal dollar." (Dkt. No. 27-36, at 3–4.) Plaintiffs' members have thus stopped teaching about the Israeli-Palestinian conflict, ceased research related to those topics, and have stopped attending campus protests, all out of a fear that their conduct will draw more unfounded funding cancellations across the UC system and more demands for payments not authorized by statute. *See supra* Section V.A. There is a direct line between Defendants' threat to act without regard to these safeguards and the resulting chilling effects. And these claims are ripe, for the reasons outlined above. The likely illegal suspensions have already happened, and Defendants have threatened that more are coming, pursuant to the Task Force Policy.

### b. Final Agency Action

**\*29** The APA provides for judicial review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Defendants do not dispute that the Suspension Letters themselves are reviewable as final agency actions under Section 704. (Dkt. No. 61 at 35 (conceding that "discrete grant suspensions or terminations ... may represent a final agency action")). Nor do Defendants present any argument against treating as a final agency action the blanket refusal to award new grants to UCLA. However, Defendants argue that the Task Force Policy's directive to withdraw funds without following the required Title VI and IX process, and to offer settlements requiring the payment of a civil penalty not authorized under the statutes, is not a final agency action.

The record supports the conclusion that this directive is both an "agency action" and "final," and is therefore reviewable under the APA.

An " 'agency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). "This definition 'is meant to cover comprehensively every manner in which an agency may exercise its power.' " *San Francisco Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 576 (9th Cir. 2019) (quoting *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 478 (2001)). Plaintiffs have adduced overwhelming evidence that, through the Task Force Policy, the agencies adopted a concerted playbook of suspending and terminating funds without following the requirements of Title VI and IX and demanding fines not authorized under those statutes. The decision to proceed in that manner, though unwritten, constitutes an agency action, as applied to the UC. *See R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) (collecting cases finding that "[a]gency action ... need not be in writing to be final and judicially reviewable"). *San Francisco Herring Ass'n v. Dep't of the Interior*, provides a helpful example of why:

> In a series of formal written notices to herring fishermen, the Park Service announced that it had authority over commercial herring fishing in the waters at issue, that such fishing was prohibited under federal law, and that the Park Service would enforce the prohibition, a violation of which could lead to civil penalties and up to six months in jail. In oral communications and meetings with the Association around this time, the Park Service reiterated its position and refused to change it. Then, in January 2013... uniformed Park Service rangers and California wildlife wardens allegedly operating at the Park Service's direction confronted Association members fishing in the waters of the Recreation Area and ordered them to stop fishing there. The fishermen complied, knowing that

2025 WL 3187762

continuing to fish risked criminal sanction.

946 F.3d at 567–68. The Court found that Plaintiffs could challenge, as an agency action, the "*application and enforcement*" of "clearly-stated commercial fishing prohibition against individual fishermen." *Id.* at 575–77.

The same logic applies here. Defendants have made numerous public statements describing this *modus operandi*, as described above. The record also shows that they have implemented the Task Force Policy at three other universities, through a strikingly similar pattern: (1) opening new civil rights investigations, (2) withholding federal funds prior to the conclusion of the civil rights investigations and without following the procedural requirements and scope limitations of Title VI and IX, and (3) demanding that the university agree to similar policy changes and pay a large fine in order to resolve the open investigations and restore funding. In fact, counsel for Defendants acknowledged at oral argument that no Defendant has followed the applicable statutory procedures when implementing the Task Force Policy.

Therefore, the directive to cancel funds and demand payment of fines without the Title VI and IX safeguards is sufficiently "clearly stated" to allow Plaintiffs to challenge its application and enforcement as an agency action. *See, e.g., AAUP v. Rubio*, No. 25-cv-10685, 2025 WL 2777659, at *52 (D. Mass. Sept. 30, 2025) (finding "discrete enforcement initiative that targeted speech in an unprecedented way, making new use of the invoked statutes to dramatic legal effect" was final agency action; rejecting "insistence that this was a mere matter of shifting enforcement priorities, not a final agency action"); *New York v. Trump*, 133 F.4th 51, 67–68 (1st Cir. 2025) (declining to stay a preliminary injunction, and explaining that plaintiffs had identified a final agency action in various agency's collective "broad, categorical freezes on obligated funds" pursuant to rescinded OMB guidance).

**\*30** Moreover, the undisputed record shows that this directive is a "final" agency action. For an agency action to be final, "[a]s a general matter, two conditions must be satisfied": "First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Bennett*, 520 U.S. at 177–78 (citing *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)). "And second, the action must be one by which 'rights or obligations

have been determined,' or from which 'legal consequences will flow.' " *Id.* at 178 (quoting *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). A court may, under the APA, "intervene in the administration of the laws only when, and to the extent that, a specific 'final agency action' has an actual or immediately threatened effect." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990). But where a final agency action is identified, a court is authorized to grant relief sufficient to remedy the harm, even if it would affect an entire "program." *Id.* at 890 n.2; *id.* at 894 ("Such an intervention may ultimately have the effect of requiring a regulation, a series of regulations, or even a whole 'program' to be revised by the agency in order to avoid the unlawful result that the court discerns."). [21]

The first prong of *Bennett* is met. Defendants have already withheld over half a billion dollars in federal grant funding without following the required processes. Defendants have further made it clear that they will not turn back from their view that they are not required to follow Title VI and Title IX in suspending funds. Like the government agency in *San Francisco Herring*, they "repeatedly declared [their] authority" to unilaterally suspend funding without complying with those requirements; "refused to change [their] position when pressed" despite being ordered to follow those statutory requirements by another district court in the *Harvard* litigation; and repeatedly "enforced" their policy by suspending hundreds of millions in loans to the UC and other universities. *See* 946 F.3d at 575. They have made up their minds.

Second, even the UC has not yet accepted the August 8 Offer, that does not make *Defendants'* directive to withdraw funding and demand payment of civil penalties without following the safeguards of Title VI and IX interlocutory. For example, when Department of Airforce applied for a waste disposal permit, the act constituted a final agency action even if the permit had not yet been approved. *See Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*, 128 F.4th 1089, 1110 (9th Cir. 2025). The agency had made its decision, and had requested a permit—whether the request was ultimately denied or modified by the permit office was irrelevant. *Id.* As the Ninth Circuit explained "[t]he final agency action requirement is meant to prevent premature intrusion by courts into the agency's deliberations, not to insist that parties keep knocking at the agency's door when the agency has already made its position clear." *Id.* (quotation omitted). Likewise, here, it is Defendants' directive that matters, not the UC's reaction to it. The Task Force Policy directed agencies to

2025 WL 3187762

withdraw $584 million in funding, cut off future funds, and request a $1.2 billion civil penalty, without complying with Title VI and IX. Whether the UC agrees to pay that amount or not, that directive is a final agency action.[22]

**\*31**  The Task Force Policy's disregard of Title VI and IX safeguards also satisfies *Bennett* prong two, because it is an action from which legal consequences flow. This is the case even if the full effect of the Task Force Policy has not yet been felt. For example, in *Gill v. United States Dep't of Just.*, 913 F.3d 1179 (9th Cir. 2019), plaintiffs challenged the "Functional Standards" promulgated pursuant to the Nationwide Suspicious Activity Reporting Initiative ("NSI"). *Id.* at 1183–84. The Functional Standard defined suspicious activity and governed how information about it was acquired and shared, but "participation in the NSI [and adoption of the Functional Standard] remain[ed] within the agencies' discretion." *Id.* Even though the impact of the Functional Standard was dependent on agencies' participation, it was a "final agency action" because "once an agency decides to participate," the Department of Justice could immediately revoke "membership for violating various policies, including the Functional Standard." *Id.* Like the NSI, the Task Force Policy presents a playbook that Defendant agencies have committed to implement in order to take "every single dollar" from the UC and other universities, and have already implemented to the tune of hundreds of millions of dollars.

As the Ninth Circuit explained in *San Francisco Herring Ass'n*, the Park Service could not be permitted to bring Plaintiffs "to the precipice of punishment through in-water enforcement orders, only to later claim there is nothing conclusive here for the fishermen to even challenge." 946 F.3d at 575. "The APA's judicial review provisions," the Ninth Circuit explained, "prevent precisely this 'heads I win, tails you lose' approach." *Id.* Plaintiffs, who are already experiencing harms from the Task Force Policy's directive to cancel funds without safeguards, have already been brought to the precipice and beyond. *See AAUP*, 2025 WL 2777659, at \*52 (finding coordinated campaign across multiple agencies of misusing agency authority to suppress speech constituted final agency action).

In sum, nothing prevents the Court from reaching the merits of Plaintiffs' claims that the Task Force Policy violates Title VI and IX's requirements.[23]

### 3. The Court Likewise Has Jurisdiction to Adjudicate Whether the Funding Cancellation Violated Title VI and Title IX.

#### a. Committed to Agency Discretion by Law

Nothing bars the Court from adjudicating the merits of whether the Funding Cancellation was lawful under Title VI and IX either. Contrary to Defendants' assertions, Congress did not give them the discretion to violate Title VI and IX in suspending or denying grants without being held accountable in the courts. There is a "narrow[ ]" class of agency actions that are unreviewable in federal court under Section 701(a)(2) of the APA. *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (citation omitted); 5 U.S.C. § 701(a)(2) (exempting from judicial review agency action "committed to agency discretion by law"). In assessing whether this exception to judicial review applies, courts begin "with the strong presumption that Congress intends judicial review of administrative action." *Bowen v. Michigan Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986). Therefore, to overcome the presumption, an agency must ultimately make "a showing of clear and convincing evidence of a contrary legislative intent [to] restrict access to judicial review." *Dunlop v. Bachowski*, 421 U.S. 560, 567 (1975) (cleaned up).

The opposite of such legislative intent exists here. Title VI and Title IX contain a jurisdiction-granting provision, providing that any aggrieved person "may obtain judicial review ... in accordance with [the APA]" of any action "terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any requirement" based on a purported Title VI violation, and "such action shall not be deemed committed to unreviewable agency discretion." *See* 42 U.S.C. § 2000d-2 (Title VI) (emphasis added); 20 U.S.C. § 1683 (Title IX) (same); *see also* 5 U.S.C. §§ 702, 704 (authorizing judicial review of "[a]gency action made reviewable by statute"). There is no basis to conclude that Congress stripped the courts of authority to review the failures to comply with those requirements, when Congress expressly preserved judicial review over those decisions.

#### b. Tucker Act

**\*32**  Nor does the Tucker Act apply to the claim that the suspensions violated the requirements of Title VI and IX.

Title VI and IX, expressly authorize "judicial review ... in accordance with [the APA]" of any action "terminating or refusing to grant or to continue financial assistance" based on a purported Title VI or IX violation. *See* 42 U.S.C. § 2000d-2 (Title VI); 20 U.S.C. § 1683 (Title IX); *see also Harvard,* 2025 WL 2528380, at *13. Because Defendants concede that the CFC cannot hear Plaintiffs' Title VI and IX claim for the myriad reasons discussed above in Section V.A.3.b.ii, [24] the "judicial review" that the statutes authorize cannot be the CFC's, and this Court is statutorily required to provide it.

Defendants' position is that by authorizing the CFC to exercise jurisdiction over certain contract claims, Congress impliedly precluded parties from bringing other claims that relate to a government contract in the district courts. *See supra* n. 12. With respect to Plaintiffs, who are not parties to any relevant contract, Defendants' view is that Congress impliedly precluded them from bringing their APA claims anywhere. But implied preclusion cannot be found where Congress expressly granted judicial review, as it did in Title VI and IX. *See Sierra Club,* 929 F.3d at 697–98. Plaintiffs' claim that NSF is refusing to award any new grants to UCLA because of alleged violations of the civil rights statutes provides a particularly striking example. This claim has nothing to do with an existing contract, and the CFC undoubtedly could not provide the requested injunctive relief. Therefore, the CFC would not have jurisdiction to hear this claim. But when an agency "refuses to grant or to continue financial assistance" based on a purported Title VI or IX violation, the statutes authorize judicial review. The doctrine of implied preclusion cannot trump this express grant of judicial review.

Because the Court finds that Plaintiffs have shown a likelihood of success on the merits of their APA contrary to law claim, this order does not reach Plaintiffs' claim that canceling funds without following required statutory processes was *ultra vires* and in violation of the Separation of Powers doctrine (Counts II & X).

**E. Plaintiffs Are Likely to Succeed on Their APA Contrary to Law Claims for Violation of the First Amendment, Tenth Amendment and Spending Clause, and Under the Unconstitutional Conditions Doctrine (Counts IX, XI, XII).**

Plaintiffs are likely to succeed on the merits of these APA claims for constitutional violations for the same reasons described above in Sections V.A–C. And nothing bars the Court from hearing those APA claims on the merits, for the

same reasons already described in those Sections and Sections V.D.2–3.

**F. Plaintiffs Are Likely to Succeed on Their APA Arbitrary and Capricious Claim (Count VIII).**

**1. Defendants' Actions Are Likely Arbitrary and Capricious.**

Plaintiffs have shown that they are likely to succeed on their APA arbitrary and capricious claim on two independent theories. First, Defendants' termination and refusal to grant ordinary course funding via the Suspension Letters was done without considering important factors such as Plaintiffs' members' reliance interests. Second, Defendants have not provided a reasoned explanation for the Funding Cancellation or for requiring UCLA to accept the terms of the August 8 Offer, and have instead offered pretextual reasons.

**\*33** Under the APA, an agency action must be set aside and held unlawful if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency decision is unlawfully arbitrary and capricious:

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). Conversely, agency action is lawful if the agency "has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87, 105 (1983). Where an agency changes its position, it must "provide a reasoned explanation for the change [and] display awareness that [it has a] changing position." *FDA v. Wages & White Lion Invs., L.L.C.,* 604 U.S. 542, 568 (2025) (cleaned up). When an

agency rescinds a "longstanding" position, it must consider any "serious reliance interests" it may have engendered, "determine whether they [are] significant, and weigh [them] against competing policy concerns." *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30, 33 (2020) (cleaned up); *see also FDA*, 604 U.S. at 569–70. An agency may not depart from its prior position *sub silentio*. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

First, Plaintiffs are likely to succeed on the merits of their claim because the Funding Cancellation was implemented without considering important factors such as Plaintiffs' members' serious reliance interests, waste of taxpayer resources, and the public's loss of important research and services. While NSF and Energy's Suspension Letters state that "UCLA's reliance interests" were considered (Dkt. No. 27-6 at 3; Dkt. No. 27-7 at 3 (stating that Energy considered "reliance interests" generally), Defendants do not argue—and nothing in the record indicates—that NSF, NIH, and Energy considered the reliance interests of the researchers whose funding they terminated mid-stream, or whose research has been disrupted by the failure to approve grants to UCLA.

Defendants argue that no analysis is required because it is "exceedingly unlikely" that any reliance interests exist in funding that can be unilaterally terminated. (Dkt. No. 61 at 41.) This position ignores that some of Plaintiffs' members' projects have received continuous federal funding for half a century. (*See, e.g.*, Dkt. No. 40-2 ¶¶ 12–13.) It also ignores the nature of research grant funding. The undisputed record is that Plaintiffs' members hired graduate students, raised live animals, grew cultures, arranged for laboratory time, and made numerous other preparations that relied upon the continued availability of funds, and that such reliance was reasonable in light of the laborious merit-based process to award grants in the first place. Defendants cannot escape these facts by pointing to boilerplate disclaimers, as the Supreme Court explained in *DHS v. Regents of University of California*. There, the government argued that DACA recipients had no "legitimate reliance" interests because "the DACA Memorandum stated that the program 'conferred no substantive rights' and provided benefits only in two-year increments." 591 U.S. at 31 (quoting the government's reply brief). The Court found that while such disclaimers might go to "strength of [the] reliance interests," the agency was still obligated under the APA to undertake the consideration. *Id.* at 31. The same is true here.

**\*34** Similarly, NSF, NIH, and Energy have not introduced any evidence indicating that they considered other important factors, including the waste that would result from projects halted before completion, or the loss to the public of critical research that will go unpublished. *See Thakur v. Trump*, 148 F.4th 1096, 1106–07 (9th Cir. 2025) ("*Thakur II*"). As just one example, Local 4811 John Doe, who researches lung cancer prevention, was forced to halt his experiments when his funding was terminated, and "insights that could help inform approaches to treating and preventing cancer were lost." (Dkt. No. 29-10 ¶¶ 8–10, 12.) The disruption has also caused an enormous waste in resources, as teams are forced to "scale down" colonies of live animals, lose stem cell lines, and end experiments before obtaining results. (Dkt. No. 29-22 ¶ 11; Dkt. No. 30-09 ¶ 9; Dkt. No. 29-16 ¶ 18.) Defendants were required to—but apparently did not—consider the loss of this research that it had previously agreed to fund prior to conducting *en masse* grant cancellations. *See Nw. Env't. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 687 (9th Cir. 2007) (explaining that while an agency may change its "view of what is in the public interest," it must do so in accordance with the law and "must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored" (quotation omitted)). Defendants' failure to consider these important factors was likely arbitrary and capricious.

Second, Plaintiffs have shown that the three reasons for suspending funding and denying future funding described in the "Notice of Findings and Suspension Letters were not a "reasoned explanation," and were likely pretextual. As described above in Sections II.D & V.D.1, the only "findings" in the Notice of Findings and the first reason given in the Suspension Letters was UCLA's alleged failure to mitigate incidents of antisemitism during the 2024 Encampment. However, there is no evidence that Defendants considered UCLA's subsequent efforts to address this issue in 2024 and 2025. That UCLA has taken steps to address the alleged civil rights violations is indisputably an "important factor" that Defendants should have considered before sanctioning UCLA. Its failure to consider this important factor, as the unrebutted record shows, was likely arbitrary and capricious. *See Harvard*, 2025 WL 2528380, at *31–32 (cancelling grants to Harvard was arbitrary and capricious where there was "no evidence that Defendants considered any of the steps Harvard had taken to research or address antisemitism on campus before declaring that funding would be frozen").

The Suspension Letters mention two additional reasons for terminating funding: alleged race-based discrimination in admissions, and that UCLA's policy regarding transgender people created an unsafe environment for women. However, there are "no findings and no analysis [ ] to justify the choice made." *Nw. Env't. Def. Ctr.*, 477 F.3d at 690 (quotation omitted). With respect to discrimination in admissions, the Suspension Letters cite only UCLA's "holistic" admissions process, but do not explain their conclusory statement that the process is discriminatory. (Dkt. Nos. 27-6 to 27-8.) And with respect to women's safety, the agencies make the conclusory statement that UCLA lacks "safe and secure bathrooms, and extracurricular activities" for women, but do not offer any factual findings or explain how they reached this conclusion. (*Id.*) Nor have Defendants introduced into the record any other findings or analysis to justify the Funding Cancellation.

However, the justifications in the Notice of Findings and Suspension Letters are not the only "explanation" in the record for the Funding Cancellation or the Task Force Policy more broadly. Rather, as discussed above in Section II, Defendants have repeatedly given another reason for terminating funds to prominent universities: to stamp out certain viewpoints and speech at "woke" universities. This alternate reason explains why the "remedial" conditions that Defendants seek to impose via the August 8 Letter are largely mismatched from any alleged findings of discrimination, as already discussed above in Section V.C. Instead, the terms are closely tied to Defendants' effort to target disfavored speech. Where the official "explanation for agency action [ ] is incongruent with what the record reveals about the agency's priorities and decisionmaking process" and there is a "disconnect between the decision made and the explanation given," an agency action is likely arbitrary and capricious. *See Dep't of Com. v. New York*, 588 U.S. 752, 783–85 (2019) (affirming determination that agency action was arbitrary and capricious where agency's proffered explanation was contrived). Plaintiffs have shown a likelihood of success on the merits of their arbitrary and capricious claim.

### 2. Nothing Bars the Court From Reaching the Merits of the Arbitrary and Capricious Claim

#### a. Standing and Ripeness

**\*35**  Plaintiffs have shown that they have standing to assert their APA arbitrary and capricious claim for much the same reasons as their APA contrary to law claim. Many of Plaintiffs'

members have already been injured by NIH, NSF, and Energy's suspension of their funding between July and August 2025—and at least one Funding Agency's ongoing refusal to approve new grants—without a reasoned explanation or considering their reliance interests. Furthermore, Defendants' deployment of the Task Force Policy at other universities, Defendants' statements to the media, and Milliken's public statements are sufficient to show a likelihood that further unreasoned grant suspensions and terminations are imminent. Therefore, Plaintiffs have standing to bring their APA arbitrary and capricious claim.

#### b. Final Agency Action

The Task Force Policy's directive to suspend funding, *en masse*, without making findings of fact or considering reliance interests, and to condition restoration of funding on acceptance of conditions unrelated to the supposed bases for termination, is a final agency action for the same reasons discussed above in Section V.D.2.b. Defendants' numerous public statements on the issue and pattern of implementing the Task Force Policy at other universities makes the directive sufficiently clear to show consummated decision-making. Furthermore, as discussed above, it is a decision from which concrete legal consequences flow.

#### c. Committed to Agency Discretion by Law

As already discussed above, in Section V.D.3.a, whether the Funding Cancellation was arbitrary and capricious is reviewable under the standards described in Title VI and IX.[25] However, even if that were not the case, 2 C.F.R. § 200.340—which Defendants argue is the authority for the Funding Cancellation—provides a meaningful standard for the Court to apply. As the Ninth Circuit recently explained:

> Sections 200.340, 200.341, 200.343, and 200.345 outline the requirements for termination, the notification requirements when grants are terminated, and the effects of suspension and termination of grants. These regulations provide a meaningful standard by which courts

2025 WL 3187762

may review the agencies' exercise of discretion.

*Thakur II*, 148 F.4th at 1105–06. Therefore, the Court must "reject [Defendants'] argument that the terminations are not reviewable and consider whether the [Funding Cancellation] w[as] arbitrary and capricious." *Id.* at 1106 (citing 5 U.S.C. § 706(2)(A)). Plaintiffs' arbitrary and capricious claims are reviewable.

### d. Tucker Act

This Court, and not the CFC, has jurisdiction over Plaintiffs' arbitrary and capricious claims for the same reasons it has jurisdiction over Plaintiffs' contrary to law claims. *See supra* Section V.D.3.b.

### G. Rule 19 Does Not Require Joinder of the UC.

Plaintiffs do not seek injunctive relief that would require any action from the UC or impair any existing UC contract. Nonetheless, Defendants argue that the requested injunction cannot issue because UC is an indispensable party that has not been joined in this litigation. (Dkt. No. 61 at 31–34.) A party is "necessary" if either: (1) the court cannot accord "complete relief among existing parties" in the party's absence, or (2) the absent party "claims an interest relating to the subject of the action," and proceeding with the suit in its absence will "impair or impede" the party's ability to protect that interest, or leave an existing party at "substantial risk" of multiple or inconsistent obligations." Fed. R. Civ. P. 19(a)(1)(A)–(B). A necessary party should be joined. *Id.* at (a)(2). If joinder is impossible, the Court must determine if the non-joined party is "indispensable," and the case should be dismissed as a matter of "equity and good conscience." *Id.* at (b). The inquiry is fact-specific, and the party seeking dismissal bears the burden of persuasion. *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990).

**\*36** The UC is not a necessary party. First, Defendants do not explain why the Court cannot afford "complete relief." Plaintiffs seek an order enjoining Defendants from violating their constitutional rights, and directing Defendants to follow statutory requirements, with respect to the cancellation of federal funding. The Court can afford that relief without enjoining the UC or entering any orders against it. Second, Defendants identify no legally protected interest of the UC

that will be impaired or impeded if this suit proceeds without joinder. Plaintiffs do not seek to set aside or invalidate any grant agreement to which the UC is a party. Nor would enjoining Defendants from unlawfully suspending, terminating, or threatening to terminate grant agreements affect the UC's rights to continue (or not continue) with those agreements. *See Cachil Dehe Band of Wintun Indians of the Colusa Indian Cmty. v. California*, 547 F.3d 962, 970 (9th Cir. 2008) (joinder not required unless the party's absence would "as a practical matter impair or impede their ability to *protect the interest*") (cleaned up, emphasis in original)).

Defendants suggest that enjoining the Task Force Policy could affect the UC's "prospective contractual relationships"—*i.e.* its ability to "accept [ ] the government's terms as part of ongoing settlement negotiation." (Dkt. No. 61 at 32, 34.) But, for purposes of Rule 19, a future contract is not a legal interest, absent some pre-existing right entitling the party to that benefit. *Compare Disabled Rts. Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 881 (9th Cir. 2004) (option to extend contract is not a legal interest for Rule 19), *with Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1020–23 (9th Cir. 2002) (contractual right to automatic renewal of gaming compact would be compromised by court order requiring automatic termination instead). Moreover, even if the UC had a legally protected interest in entering a future settlement, Plaintiffs do not request to enjoin the UC from accepting any particular terms. Rather, they seek to stop Defendants from holding funding hostage as a tactic to force the UC to the bargaining table. That does not impair the UC's rights.

Defendants have not carried their burden of showing that the UC is a necessary party. Therefore, this Order does not reach the question of whether the UC is an indispensable party.

### H. Plaintiffs Have Shown That Irreparable Harm is Likely.

A plaintiff seeking a preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). As discussed in the analysis on the merits, Plaintiffs have demonstrated that the Task Force Policy and Funding Cancellation likely violate the First and Tenth Amendment, and that their members are experiencing an ongoing chilling effect as a direct result of these actions. That means Plaintiffs have made a sufficient showing of irreparable harm, as it is "well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir.

2017) (internal citation omitted). This is particularly true when the First Amendment is implicated, because the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (citing *New York Times Co. v. United States*, 403 U.S. 713 (1971)).

The record contains detailed and unrebutted evidence of the irreparable harm that Plaintiffs are already experiencing, including a significant, ongoing chilling effect of Defendants' actions. Plaintiffs' members have changed the way they teach, research, and engage in public discourse, and have limited their participation in protest. They have also shown irreparable harm in layoffs of team members, interruption of graduate programs, and the potential complete loss of research projects, all of which will harm Plaintiffs' members' professional reputations. Injury to reputation "is not easily measured or fully compensable in damages" so "often held to be irreparable." *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996) (collecting cases). Furthermore, when Plaintiffs' members' multi-year projects rely heavily on federal funding, "[a] total loss of federal funding would be catastrophic, and [Plaintiffs'] need for certainty renders damages inadequate." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018). Plaintiffs have shown that irreparable harm to them is likely.

### I. The Balance of Equities and Public Interest Favor Entry of an Injunction.

**\*37**  Finally, both the balance of equities and the public interest strongly favor the entry of a preliminary injunction. These two factors merge when the federal government is a party. *Nken*, 556 U.S. at 435. As the D.C. Circuit has explained, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). To the contrary, an injunction serves the interests of the general public where it ensures that federal agency actions comply with federal law and the Constitution. *Id.*; *Hernandez*, 872 F.3d at 996.

Defendants argue that the "public interest is harmed when the United States is forced to pay out funds that it may not be able to recover." (Dkt. No. 61 at 53 (*citing Department of Education*, 604 U.S. at 652).) But in *Department of Education*, Defendants submitted evidence of the difficulties inherent in recovering disbursed funds under the specific grant agreements in that case. *See* 604 U.S. at 652 (citing App. To Application To Vacate Order 15a, 17a.). No such

evidence has been presented by Defendants here. The grantee on the funds is the University of California, an arm of the State of California. Defendants present no evidence that the UC could not repay disbursed funds. Absent any showing from Defendants, the Court cannot conclude that the balance of equities or public interest tips in their favor. *See CLESPA I*, 137 F.4th at 943.

Defendants also argue that "any injunction interfering with the President's priorities is itself a substantial injury." (Dkt. No. 61 at 53.) But if courts were to adopt Defendants' argument that an injunction should not issue because the requested relief would pause the President's ability to effectuate his agenda, then "no act of the executive branch asserted to be inconsistent with a legislative enactment could be the subject of a preliminary injunction. That cannot be so." *Doe #1 v. Trump*, 957 F.3d 1050, 1059 (9th Cir. 2020).

The balance of equities and public interest favor granting a preliminary injunction.

### VI. REQUEST FOR BOND AND FOR A STAY

Defendants request an administrative stay for seven days "to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized." (Dkt. No. 61 at 54.) They also seek to have the Court impose a bond under Fed. R. Civ. P. 65(c). (*Id.*) In granting relief under Rule 65, "[t]he court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review." *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985). As result of Defendants' actions, Plaintiffs' members in many instances have been unable to continue their research, or to pay themselves, their staff, and graduate students, and are laying some of them off. Based on this record, the Court finds that requiring a bond would stifle Plaintiffs' enforcement of their rights as described above. Because this litigation is brought to protect the public interest and ensure compliance with federal law, Plaintiffs shall be required to pay a nominal bond of $100.

Defendants' request for a stay pending appeal, or for seven days pending a motion to the court of appeals for a stay, is also denied. A stay is not appropriate because Plaintiffs are likely to succeed on the merits of their First Amendment, Tenth Amendment, and APA claims. *See Manrique v. Kolc*, 65 F.4th 1037, 1040 (9th Cir. 2023) (providing that one of the primary factors considered for whether a stay should be issued is

whether the applicant for the stay has "made a strong showing that he is likely to succeed on the merits") (quoting *Nken*, 556 U.S. at 434); *see also Washington v. Trump*, No. 25-807, 2025 WL 553485, at *3 (9th Cir. Feb. 19, 2025) (Forrest, J., concurring). Moreover, Defendants have not carried their burden of showing that they are likely to face "irreparable injury ... during the period before the appeal is decided." *See Doe #1 v. Trump*, 957 F.3d 1050, 1058–59 (9th Cir. 2020).

## VII. SCOPE OF INJUNCTIVE RELIEF

**\*38**   A separate order will issue with the terms of the preliminary relief. The following discussion provides the Court's reasoning for the scope of the relief ordered.

When an agency is in violation of the APA, the court "shall ... hold unlawful and set aside [the] agency action." 5 U.S.C. § 706(2). Agency Defendants' grant terminations and refusal to authorize new grant funding to UCLA pursuant to the Funding Cancellation will therefore be set aside and vacated.

Plaintiffs also request injunctive relief. In light of the findings of this Order, the Court will order preliminary injunctive relief to address Plaintiffs' irreparable harm and to restore the *status quo*. Defendants do not contest the scope of that relief other than to argue that only members of the Plaintiff organizations should be covered by any injunction. (Dkt. No. 61 at 52.) But Plaintiffs have shown that Defendants are coercing the UC as a whole, through the Task Force Policy and Funding Cancellation, in order to stamp out their members' disfavored speech. Therefore, to afford Plaintiffs complete relief, the entirety of the coercive practice must be enjoined, not just the suspensions that impact Plaintiffs' members. [26]

The order does narrow the scope of requested relief pertaining to the unconstitutional conditions claim. Plaintiffs seek to enjoin "conditioning the grant or continuance of federal funding on the UC's agreement to any measures that would violate the rights of Plaintiffs or their members under the First Amendment *or any federal constitutional provision or statute*." (Dkt. No. 26-1 ¶ 4 (emphasis added).) Plaintiffs submit ample evidence that, through the August 8 Offer and the Task Force Policy, Defendants have sought to impose conditions on continued federal funding that impermissibly burden their First Amendment rights. However, Plaintiffs have not submitted evidence of other unconstitutional conditions that extend beyond (a) coercive demands in violation of the First and Tenth Amendments, and (b) demands that violate the process and scope limits of Title

VI and IX, both of which are already separately enjoined in other provisions of the requested relief. Therefore, the italicized catchall provision that Plaintiffs propose sweeps more broadly than is supported by the record and beyond what is necessary to afford relief as to the claims at issue.

To be clear, examples of conditions on the grant or continuance of federal funding that would violate the First Amendment rights of Plaintiffs' members would include, but are not limited to:

- Requiring the UC to make hiring, firing, or funding decisions on the basis of Plaintiffs' members' protected speech or freedom of assembly.

- Requiring the UC to restrict its curriculum, scholarship, or research based on the Defendants' preferred viewpoints.

- **\*39**  • Requiring the UC to screen international students based on "anti-Western" or "anti-American" views and/or "socialize" international students to favored "norms."

- Requiring the UC to institute reporting requirements concerning Plaintiffs' protected speech or freedom of assembly.

- Requiring the UC to adopt specific definitions of "sex," "male," and "female," or adopt Defendants' favored views as to gender or gender affirming care and disallowing inconsistent speech by its faculty, staff, or students.

- Restricting how the UC decides scholarship awards, hiring, or admissions, beyond what current constitutional or statutory law requires.

The Court acknowledges that other events, not covered by the claims in this lawsuit, may also chill certain aspects of Plaintiffs' members' speech. But, as discussed above in Section V.A, Plaintiffs have shown that Defendants' actions are chilling their members' speech in specific ways, entitling them to injunctive relief. The fact that the Court cannot remedy every harm that Plaintiffs' members are experiencing is not a reason to withhold equitable relief.

## VIII. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction is **GRANTED**. A separate order for APA vacatur and preliminary injunctive relief will issue.

2025 WL 3187762

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2025 WL 3187762

---

### Footnotes

1    The UC has ten campuses (UC Berkeley, UC Davis, UC Irvine, UCLA, UC Merced, UC Riverside, UC San Diego, UC San Francisco, UC Santa Barbara, and UC Santa Cruz), three affiliate national laboratories (Lawrence Berkeley National Laboratory, Lawrence Livermore National Laboratory, and Los Alamos National Laboratory), six academic health centers systems (UC Davis Health, UC San Diego Health, UCI Health, UCLA Health, UCR Health, and UCSF Health), and numerous institutes, centers, and research laboratories across the state.

2    https://accountability.universityofcalifornia.edu/2021/chapters/chapter-9.html (last visited Nov. 12, 2025).

3    https://www.ucop.edu/operating-budget/_files/rbudget/2025-26-budget-detail.pdf, at p. 12 (last visited Nov. 12, 2025).

4    All citations to page numbers refer to ECF pagination.

5    HHS and its listed subagencies, DoE, NSF, Energy, DoD, NASA, USDA, DoC, Interior, State Department, and EPA are identified in this order as the "Funding Agencies."

6    California Nurses Association/National Nurses United ("CNA/NNU"); Teamsters Local 2010; Committee of Interns and Residents, Service Employees International Union ("CIR"); University Professional and Technical Employees–Communication Workers of America ("UPTE"); International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"); UAW Local 4811 ("Local 4811").

7    Berkeley Faculty Association ("BFA"); Council of UC Faculty Associations ("CUCFA"); Davis Faculty Association ("DFA"); Irvine Faculty Association ("IFA"); Riverside Faculty Association ("RFA"); San Diego Faculty Association ("SDFA"); Santa Cruz Faculty Association ("SCFA"); UC Merced Faculty Association ("UCMFA"); UC Santa Barbara Faculty Association ("SBFA"); UCSF Faculty Association ("UCSF FA"); University of California Los Angeles Faculty Association ("UCLA-FA"); University Council–American Federation of Teachers ("UC-AFT").

8    When an organization sues as the representative of its members, it must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions, Inc. v. Presidents & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) ("*SFFA*"). Defendants do not challenge the second and third requirements, and the Court finds that they are met. Therefore, the foregoing analysis addresses only the first requirement.

9    In a footnote, Defendants also argue that Plaintiffs lack standing to enforce payment of contracts to which they are nonparties. (Dkt. No. 61 at 21 n. 3.) This argument is rejected for the reasons explained in *Thakur I*, 787 F. Supp. 3d at 992–95.

10   Because this order finds that Plaintiffs have representational standing, the Court does not reach the question of whether any Plaintiffs have suffered an injury in their own right.

2025 WL 3187762

11    Defendants also challenge Plaintiffs' claims under the claim-splitting doctrine, which arises out of district courts' "broad discretion to control their dockets." *Adams v. California Dep't of Health Servs.*, 487 F.3d 684, 688 (9th Cir. 2007). The Court declines to exercise its discretion to dismiss claims. *Thakur* primarily concerns an earlier round of grant terminations, pursuant to different executive orders, and does not relate to the Task Force Policy. Therefore, each case has a different nucleus of facts. Furthermore, Plaintiffs here assert causes of action not present in *Thakur*, including First Amendment coercion and retaliation claims, a Tenth Amendment Claim, and Title VI and IX claims. Judicial economy is best served by allowing the case to proceed as filed.

12    The APA waives broadly waives the United States' sovereign immunity in "all actions seeking relief from official misconduct except for money damages." *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1171 (9th Cir. 2017). But the waiver does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. Defendants' position is that the Tucker Act "impliedly forbids" Plaintiffs' claims because they are disguised contract claims seeking money damages.

13    "Defendants maintain that Plaintiffs' members" are "non-parties" and are not intended "third-party beneficiaries." (Dkt. No. 61 at 21–22 n. 3.) It is doubtful that Plaintiffs' members could qualify as intended third-party beneficiaries, a category that is restrictively defined in the government funding context. *See Thakur III*, 2025 WL 2696424, at *10.

14    Defendants note that *CLESPA* cites additional reasons for the inapplicability of the Tucker Act. But that does not change the binding nature of *CLESPA*'s holding regarding nonparties. *See In re Sedona Cultural Park, Inc.*, No. 05-cv-00558, 2007 WL 7540968, at *7 (B.A.P. 9th Cir. Apr. 13, 2007) (where a court relies on multiple grounds "no single one ... is dictum").

15    Defendants further argue that *ultra vires* claims are not available for speculative relief regarding "future actions." (Dkt. No. 61 at 50.) There is no basis to apply a heightened standard of standing or ripeness to *ultra vires* claims alleging constitutional violations, and Defendants cite none. And the Court has already found that Plaintiffs' claims meet the regular standing and ripeness requirements, as explained above.

16    Defendants' jurisdictional challenges fail for the same reasons articulated as to the First Amendment claims.

17    "The *NFIB* plurality found a Spending Clause violation on narrower grounds than did the joint opinion of Justices Scalia, Kennedy, Thomas, and Alito." *Mississippi Comm'n on Env't Quality v. E.P.A.*, 790 F.3d 138, 176 n.22 (D.C. Cir. 2015) (citing *NFIB*, 132 S.Ct. at 2656–69). It therefore controls here. *Marks v. United States*, 430 U.S. 188, 193 (1977) (the controlling plurality is that which explains the "position taken by those Members who concurred in the judgments on the narrowest grounds" (quotation omitted)).

18    The parties agree that Title VI and Title IX's enforcement provisions are materially the same. *Compare* 42 U.S.C. § 2000d-1 *with* 20 U.S.C. § 1682. For simplicity, this Order cites only the enforcement provision of Title VI. Title VII does not authorize agencies to terminate federal funding for noncompliance. Instead, "Title VII creates an administrative process that requires *claimants* [follow certain steps] ... before filing a complaint in a federal court." *Joseph v. Bd of Regents of the Univ. Sys. of Ga.*, 121 F.4th 855, 868 (11th Cir. 2024).

19    Nor does Title VII's enforcement provision authorize civil monetary penalties or fines. *See* 42 U.S.C. § 2000e-5.

20    HHS/NIH's letter cites 45 C.F.R. § 75.371 (Dkt. No. 27-8), which closely mirrors 2 C.F.R. § 200.339. For simplicity, this Order refers only to the later.

21    The APA's sovereign immunity waiver is not limited to "final agency actions." *See Navajo Nation*, 876 F.3d at 1171–72 ("[T]he second sentence of § 702 waives sovereign immunity broadly for all causes of action that

2025 WL 3187762

meet its terms, while § 704's 'final agency action' limitation applies only to APA claims."). Section "702 waives whatever sovereign immunity the United States enjoyed from prospective relief with respect to any action for injunctive relief." *Id.* (citation omitted). Therefore, the forgoing analysis is not relevant to Plaintiffs' *ultra vires* constitutional causes of action (Counts I-IV).

22    The termination of funding and the August 8 Offer make this case materially different from a simple investigation, which is "quintessentially non-final as a form of agency action." *Ass'n of Am. Med. Colleges v. United States*, 217 F.3d 770, 781 (9th Cir. 2000).

23    Defendants do not attempt to make any showing that the Task Force Policy is committed to agency discretion by law, as they limit their arguments to "grant suspensions" and "grant decisions." (Dkt. No. 61 at 37.) *See Dunlop*, 421 U.S. at 567 (defendants are required to make "a showing" of "legislative intent [to] restrict access to judicial review"). Nor do Defendants contend that the Tucker Act applies to Plaintiffs' challenges to the Task Force Policy, as noted above.

24    In short, (1) Plaintiffs do not bring breach of contract claims, they challenge Defendants' failure to engage in a statutorily required process in terminating existing and withholding future funding. (2) Plaintiffs seek exclusively injunctive and declaratory relief, which the CFC cannot grant. Specifically, Plaintiffs seek to require Defendants to abide by the procedural and scope limitations of Title VI and IX before freezing funding to the UC. (3) It is undisputed that Plaintiffs are not parties to any contracts at issue, and would not be able to bring their claims in the CFC.

25    Defendants do not claim that the question of whether the Task Force Policy is arbitrary and capricious is committed to agency discretion by law.

26    Defendants also ask that Plaintiffs be required to provide a list of impacted "entity names within UC and their 'Unique Entity Identifier.' " (Dkt. No. 61 at 52.) Because it appears that such information is more readily available to Defendants, the Court declines to do so. The parties should work together to identify any information needed to effectuate the preliminary injunction entered in this case.

---

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.