UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

COUNTY OF SANTA CLARA, et al.,

Plaintiffs,

v.

KRISTI NOEM, et al.,

Defendants.

Case No. 25-cv-08330-WHO

**ORDER GRANTING PRELIMINARY INJUNCTION**

Re: Dkt. Nos. 19, 20, 66, 69, 70, 71

Plaintiffs[1], a collective of cities, counties, and municipalities, regularly receive grants from the Department of Homeland Security ("DHS") and the Federal Emergency Management Agency ("FEMA") to advance public safety, disaster preparedness, and emergency response management. To receive this funding, plaintiffs typically must agree to conditions that are attached to the grants by the agency, such as complying with federal anti-discrimination law. Plaintiffs have accepted DHS and FEMA conditional grants for years without concern.

This year is different. Shortly after taking office in January, President Trump began to issue a slew of Executive Orders ("EOs") targeting diversity, equity, and inclusion ("DEI")

[1] Plaintiffs are the County of Santa Clara ("Santa Clara"), City and County of San Francisco ("San Francisco"), City of Alameda ("Alameda"), City of Bellingham ("Bellingham"), City of Berkeley ("Berkeley"), City of Culver City ("Culver City"), City of Los Angeles ("Los Angeles"), County of Los Angeles ("Los Angeles County"), Los Angeles County Consolidated Fire Protection District ("LA County CFPD"), Martin Luther King, Jr. County ("King County"), County of Marin ("Marin County"), City of Oakland ("Oakland"), City of Palo Alto ("Palo Alto"), City of Pasadena ("Pasadena"), City of Petaluma ("Petaluma"), Pierce County, City of Sacramento ("Sacramento"), City of San Diego ("San Diego"), County of San Diego ("San Diego County"), City of San José ("San José"), County of San Mateo ("San Mateo County"), City of Santa Monica ("Santa Monica"), City of Santa Rosa ("Santa Rosa"), Snohomish County, County of Sonoma ("Sonoma County"), Sonoma County Community Development Commission ("SCCDC"), Sonoma County Water Agency ("Sonoma Water"), Sonoma Valley County Sanitation District ("SVCSD"), and the City of Tucson ("Tucson").

United States District Court
Northern District of California

initiatives, directing federal agencies to follow suit. In response, DHS and FEMA began issuing funding conditioned on grantees refusing to "advance or promote DEI," as well as promising to comply with all future EOs issued by the President.

Plaintiffs challenge these conditions as applied to nine categories of DHS and FEMA grants that they have received or would receive in the normal course (the "Questioned Grants"). They claim that these conditions violate the separation of powers, the spending powers of the United States Constitution, and the Administrative Procedure Act (the "APA"). They seek a preliminary injunction preventing defendants[2] from conditioning any grants with these allegedly unconstitutional conditions.

Defendants' arguments here have been soundly rejected by courts around the country, which have found similar agency conditional funding schemes to be unconstitutional.[3] The message to the Executive Branch in these cases is consistent: no one is above the law, and the separation of powers between the three branches must be respected. I similarly hold that plaintiffs have sufficiently shown a likelihood of success on the merits: DHS and FEMA's Discrimination and Executive Order conditions are ambiguous and violate fundamental principles of

---

[2] Defendants include Kristi Noem ("Noem"), in her official capacity as Secretary of Homeland Security; the United States Department of Homeland Security ("DHS"); David Richardson ("Richardson"), in his official capacity as Senior Official Performing the Duties of FEMA Administrator; and the Federal Emergency Management Agency ("FEMA").

[3] *S.F. Unified Sch. Dist. v. AmeriCorps*, 789 F. Supp. 3d 716 (N.D. Cal. 2025); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243 (D. Md. 2025); *Nat'l Educ. Ass'n v. United States Dep't of Educ.*, 779 F. Supp. 3d 149 (D.N.H. 2025); *Nat'l Ass'n for Advancement of Colored People v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 53 (D.D.C. 2025); *Housing Auth. of the City & Cnty. of S.F. v. Turner*, No. 25-cv-08859-JST, 2025 WL 3187761 (N.D. Cal. Nov. 14, 2025); *Martin Luther King, Jr. Cnty. v. Turner*, 785 F. Supp. 3d 863 (W.D. Wash. 2025); *City & Cnty. of S.F. v. Trump*, 783 F. Supp. 3d 1148 (N.D. Cal. 2025); *City of Fresno v. Turner*, No. 25-cv-07070-RS, 2025 WL 2721390 (N.D. Cal. Sept. 23, 2025); *Thakur v. Trump*, 148 F.4th 1096 (9th Cir. 2025); *Am. Ass'n of Univ. Profs. v. Trump*, No. 25-cv-07864-RFL, 2025 WL 3187762 (N.D. Cal. Nov. 14, 2025); *City of Seattle v. Trump*, No. 2:25-cv-01435-BJR, 2025 WL 3041905 (W.D. Wash. Oct. 31, 2025); see *also Illinois v. Fed. Emergency Mgmt. Agency*, No. 25-206 WES, 2025 WL 2716277 (D.R.I. Sept. 24, 2025) (denying summary judgment on similar questions of DHS and FEMA grant conditions); *Pres. & Fellows of Harvard College v. U.S. Dep't of Health & Human Servs.*, Civil Action Nos. 25-cv-11048-ADB, 25-cv-10910-ADB, 2025 WL 2528380 (D. Mass. Sept. 3, 2025) (granting permanent injunction on similar questions). *But see S.F. A.I.D.S. Found. v. Trump*, 786 F. Supp. 3d 1184 (N.D. Cal. 2025); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-1189 (4th Cir. Mar. 14, 2025) (Stay Order at ECF No. 29).

constitutional law.  Plaintiffs' harm absent relief—potential loss of millions in disaster and emergency funding for over thirty million residents—is significant.  The equities and public interest heavily favor issuance of a preliminary injunction.  For all the reasons set forth below, plaintiffs' motion for a preliminary injunction is GRANTED.

## BACKGROUND

The grants at stake in this litigation provide critical public safety and emergency management funding for plaintiffs.  This section describes the grants involved, the conditions with which defendants are requiring compliance, and the threatened impact on each plaintiff.

### 1. CONGRESSIONAL APPROPRIATIONS FOR DISASTER PREPAREDNESS AND MANAGEMENT

Congress is responsible for appropriating "billions of dollars" for DHS and FEMA, an agency within DHS, to distribute as "grants to state and local governments."  Complaint for Injunctive and Declaratory Relief ("Compl.") [Dkt. No. 1] ¶¶ 49, 51.  The purpose of these grants is to "support . . . disaster preparedness, mitigation, and recovery efforts throughout the Nation." *Id.* ¶ 51.  "[V]irtually every state and local government across the country[] rely on these federal grants to support their emergency-management functions."  *Id.* ¶ 52.  Government entities may receive grant funding "directly, by executing grant agreements with FEMA or other components of DHS, and indirectly, as subgrantees of funding from the States."  *Id.*

Upon distribution of a federal grant, recipients may "use the funding for a wide range of activities that directly advance the purposes for which Congress established the grant programs." *Id.* ¶ 55.  For DHS and FEMA grants, these include "emergency management training and enhancing the technology on which emergency operation centers operate, . . . building out public-alert communications systems and supporting community preparedness, [and] purchasing equipment . . . on which first responders and other emergency response operations rely."  *Id.*

At issue in this case are nine "grants or subgrants under . . . programs administered by FEMA," which plaintiffs "have received or been awarded, or anticipate receiving or being awarded."  *Id.* ¶ 65.  I summarize them below.

**A. Emergency Management Performance Grant Program ("EMPG")**

The EMPG is a grant distribution program created by FEMA in 2003 and codified by Congress under 6 U.S.C. § 762. *Id.* ¶ 69. The purpose of the EMPG program is to provide "federal funding, passed through the States, to assist state, local, tribal, and territorial emergency management agencies in implementing FEMA's National Preparedness System (a systematic process for developing national preparedness). *Id.* ¶ 67. FEMA allocates such funding to both States and local governments who are "developing or enhancing emergency management planning activities, emergency operations plans, public alerts and warning systems, emergency response coordination among agencies, mutual aid systems, shelter and evacuation preparedness, and disaster recovery." *Id.* ¶ 68. While States are the original recipients of EMPG funding, States may "allow subrecipients to apply for a share" of the funding. *Id.* ¶ 71.

EMPG grants include a "performance period" of two or more years, meaning that "an award in one fiscal year usually allows receiving [grantees] to continue to support program activities beyond the fiscal year in which the funding is awarded." *Id.* ¶ 76. In its fiscal year ("FY") 2025 Notice of Funding Opportunity ("NOFO"), FEMA notified recipients of EMPG funding that it "must comply with the DHS Standard Terms and Conditions." *Id.* ¶ 77.

**B. Homeland Security Grant Program ("HSGP")**

The HSGP is composed of "several discrete subprograms," two of which are at issue—the State Homeland Security Program ("SHSP") and the Urban Area Security Initiative ("UASI") grant programs. *Id.* ¶ 81. FEMA provides a consolidated NOFO for all programs within the HSGP. *Id.* ¶ 82. Its FY 2025 NOFO announced "a total of $1.008 billion in HSGP funding, including $373.5 million in [SHSP] funding and $553.5 million in [UASI] funding." *Id.* ¶ 83. Recipients of the HSGP funding, including its subprograms, were required upon acceptance to "comply with the DHS Standard Terms and Conditions." *Id.* ¶ 84.

**i. SHSP Grant Program**

The SHSP grant system "provide[s] federal funding to States—and, through them, to local governments—to build the necessary capacity to prevent, prepare for, protect against, and respond to acts of terrorism." *Id.* ¶ 87. SHSP funding originates with the USA PATRIOT Act in 2001; the

United States District Court
Northern District of California

program was later codified by Congress at 6 U.S.C. §§ 603, 605–09. *Id.* ¶ 88. States, and, through them, local governments, both may receive SHSP funding. *Id.* Upon receiving a SHSP grant, recipients may use their funds "for uses permitted by statute, such as enhancing homeland security, conducting training exercises, upgrading equipment, or paying salaries." *Id.* ¶ 89 (citing 6 U.S.C. § 609(a)). SHSP grants "typically remain[] open for three years," allowing grantees and subgrantees "to continue to support program activities in subsequent years." *Id.* ¶ 98.

#### ii. UASI Program

The UASI grant system is used to "ensure States—and, through them, local government entities serving high-risk urban areas—build and maintain the capacity to prevent, prepare for, protect against, and respond to acts of terrorism." *Id.* ¶ 100. UASI funding has been available to States, and, through them, local governments, since 2003; the program was later codified at 6 U.S.C. §§ 603–04, 606–09. *Id.* ¶ 101. UASI grants are distributed to States, who then are tasked with "provid[ing] . . . eligible urban area[s] in that State with at least 80% of the grant funds." *Id.* ¶ 105 (citing 6 U.S.C. § 604(d)(2)(A)). These urban areas must use the funding for "permitted purposes, including enhancing homeland security, conducting training exercises, upgrading equipment, or paying salaries." *Id.* ¶ 104 (citing 6 U.S.C. § 609(a)). Any leftover funds held by States must be "expended on items, services, or activities that benefit the high-risk urban area or areas." *Id.* ¶ 105.

### C. Hazard Mitigation Grant Program ("HMGP")

Under the Stafford Act, the federal government may contribute "up to 75 percent of the cost of hazard mitigation measures" that "substantially reduce the risk of, or increase resilience to, future damage, hardship, loss, or suffering in any area affected by a major disaster." *Id.* ¶ 119; 42 U.S.C. § 5170c(a). This has been expanded with the HMGP, which provides "federal funding to state, local, tribal, and territorial governments to develop hazard mitigation plans and rebuild their communities after a Presidential major disaster declaration." Compl. ¶ 120. Such projects may include retrofitting facilities, installing flood barriers, building shelters in disaster-prone areas, stabilizing slopes, and developing or improving warning systems. *Id.* ¶ 121.

Unlike other grant programs, HMGP funding "do[es] not necessarily operate neatly on a

United States District Court
Northern District of California

predic[t]able, fiscal-year basis"; rather, its funding "often follows the occurrence of disasters, emergencies, and other events." *Id.* ¶ 123. Upon declaration of a "major disaster," States can apply for HMGP funding. *Id.* States will typically review project applications from local jurisdictions and choose which to submit to FEMA for funding approval. *Id.* All funding requests must be submitted to FEMA within 15 months of the date of disaster declaration. *Id.*

**D. Transit Security Grant Program ("TSGP")**

The TSGP provides funding to transit agencies "to protect critical transportation infrastructure and the travelling public from terrorism, and to increase infrastructure resilience in our nation's public transportation systems." *Id.* ¶ 125; *see* 6 U.S.C. § 1135(a)(1). DHS fields applications from public transportation agencies for TSGP funding and must "select the recipients of grants based solely on risk." *Id.* ¶ 126 (quoting 6 U.S.C. § 1135(c)(2)).

**E. Staffing for Adequate Fire and Emergency Response ("SAFER") Program**

The SAFER program was established by Congress to "provide funding directly to local fire departments (among other entities) to help them increase or maintain the number of trained, front-line firefighters available to serve their communities." *Id.* ¶ 132. Specifically, SAFER seeks to "enhance local fire departments' abilities to comply with staffing, response, and operational standards established by the National Fire Protection Association, including assisting fire departments with 'attain[ing] 24-hour staffing to provide adequate protection from fire and fire-related hazards." *Id.* ¶ 133 (citing 15 U.S.C. § 2229a(a)(1)(A)). SAFER grants are awarded by FEMA "on a competitive basis through a neutral peer review process." *Id.* (citing 15 U.S.C. § 2229a(a)(1)(G)). The FY 2050 SAFER NOFO requires recipients of funding to "comply with DHS Standard Terms and Conditions in effect at the time the award is issued." *Id.* ¶ 134.

**F. Assistance to Firefighters Grant ("AFG")**

The AFG was established by Congress to "ensure that firefighters and other first responders can obtain critical equipment, training, and other resources necessary to protect the public and emergency personnel from fire and fire-related hazards." *Id.* ¶ 138. To obtain AFG funding, fire departments must consult the "chief executives of the States in which the recipients are located." *Id.* awards are granted "on a competitive basis," with the amount of funding being

United States District Court
Northern District of California

"related to population size." *Id.* (citing 15 U.S.C. § 2229(c)(1)–(2)). FEMA awards AFG funding "on a rolling basis." *Id.* ¶ 139. The FY 2024 AFG NOFO requires recipients to "comply with the DHS Standard Terms and Conditions in effect as of the date of the federal award." *Id.*

**G. Fire Prevention and Safety ("FP&S") Grant**

Congress established the FP&S Grant program, codified at 15 U.S.C. § 2229(d), to "assist[] fire prevention programs and support[] firefighter health and safety research and development." *Id.* ¶ 145. Like the AFG program, eligible fire departments may apply for funding, which is awarded on a "competitive basis." *Id.* Recipients of a FP&S grant may use the funding to "support public education campaigns, enforce fire codes, and promote compliance with fire safety standards." *Id.* (citing 15 U.S.C. § 2229(d)(3)). FP&S grants are awarded by FEMA on a rolling basis. *Id.* ¶ 146. Currently, recipients of a FP&S grant must "comply with the DHS Standard Terms and Conditions in effect as of the date of the federal award." *Id.*

**H. Port Security Grant Program ("PSGP")**

The PSGP "provides federal funding to state, local, territorial, and private-sector partners to help protect critical port infrastructure from terrorism and other emergencies, enhance maritime domain awareness, improve port-wide maritime security risk management, and maintain or reestablish maritime security mitigation protocols that enhance port recovery and resiliency capabilities." *Id.* ¶ 149. This program was originally created by the Maritime Transportation Security Act of 2002 and was later codified at 46 U.S.C. § 70107. *Id.* ¶ 150. Eligible port authorities and local governments may apply to FEMA for PSGP funding. *Id.* ¶ 151. Upon receiving PSGP funding, the recipient may use the money for "planning, operational activities, equipment and capital projects, training and awareness campaigns, and maintenance and sustainment." *Id.* The FY 2025 PSGP NOFO requires funding recipients to "comply with the DHS Standard Terms and Conditions in effect as of the date of the federal award." *Id.* ¶ 154.

**I. Securing the Cities ("STC") Grant**

Under 6 U.S.C. § 596b(a), the STC Grant program seeks to "enhance the ability of the United States to detect and prevent terrorist attacks and other high-consequence events utilizing nuclear or other radiological materials that pose a high risk to homeland security in high-risk

urban areas." *Id.* ¶ 156. The STC program supports "State, local, Tribal, and territorial governments in designing and implementing, or enhancing existing, architectures for coordinated and integrated detection and interdiction of nuclear or other radiological materials that are out of regulatory control." *Id.* ¶ 157 (citing 6 U.S.C. § 596b(b)(1)). STC was codified by Congress as part of the Countering Weapons of Mass Destruction Act of 2018. *Id.* ¶ 158.

**J. National Urban Search and Rescue ("US&R") Grant**

The US&R Response System "provides funding to ensure adequate management, training, exercise, procurement (vehicle and equipment), and storage and maintenance for the 28 national task forces staffed and equipped to assist States and local governments, tribes, and territories to conduct around-the-clock search-and-rescue operations following a Presidentially declared major disaster or emergency under the Stafford Act." *Id.* ¶ 160. FEMA provided a FY 2025 US&R NOFO in late July 2025. *Id.* ¶ 161.

**2. THE TRUMP ADMINISTRATION BEGINS TO DIRECT AGENCIES TO GRANT FUNDING WITH ANTI-DEI AND DEIA CONDITIONS.**

Since taking office in January 2025, President Trump has issued numerous executive orders that "direct[] federal agencies to participate in[] a coordinated effort to impose his political agenda on state and local governments and other grantees across the country." *Id.* ¶ 164. These orders particularly attack "diversity, equity, and inclusion" ("DEI") and "diversity, equity, inclusion, and accessibility" ("DEIA") programs and policies that many government entities have adopted. *Id.*[4] As explained further below, in his Administration's view, DEI and DEIA programs

[4] Plaintiffs point to numerous executive orders signed by President Trump that deal with DEI, DEIA, or other adjacent equity-based policies or programs. *See* Compl. ¶ 164 n.21. These include Executive Order 14332 ("Improving Oversight of Federal Grantmaking"), 90 Fed. Reg. 38,929, 38,931 (Aug. 7, 2025); Executive Order 14190 ("Ending Radical Indoctrination in K-12 Schooling"), 90 Fed. Reg. 8,853, 8,853–55 (Jan. 29, 2025); Executive Order 14173 ("Ending Illegal Discrimination and Restoring Merit-Based Opportunity"), 90 Fed. Reg. 8,633 (Jan. 21, 2025); Executive Order 14151 ("Ending Radical and Wasteful Government DEI Programs and Preferencing"), 90 Fed. Reg. 8,339, 8,340 (Jan. 20, 2025); Executive Order 14168 ("Defending Women From Gender Ideology Extremism And Restoring Biological Truth To The Federal Government"), 90 Fed. Reg. 8,615, 8,616 (Jan. 20, 2025); Executive Order 14148 ("Initial Rescission of Harmful Executive Orders and Actions"), 90 Fed. Reg. 8,237 (Jan. 20, 2025). Because not all executive orders are relevant to this case, I do not describe each in detail. Each relevant order is discussed in greater detail in Section II.B.2, *supra*.

United States District Court
Northern District of California

violate anti-discrimination laws and cannot be supported or utilized by federal, state, or local governments. *Id.* This perspective has been further supported by agencies within the Executive Branch—in the Department of Justice, for example, Attorney General Pamela Bondi ("Bondi") issued a memorandum titled "Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination" that echoed the executive orders' views of DEI and DEIA. *Id.* ¶ 165.

**A. DHS Revises its Fiscal Year 2025 Grant Terms and Conditions.**

In response to these executive orders, DHS revised the "standard terms and conditions applicable to Fiscal Year 2025 grants, cooperative agreements, fixed amount awards, and other types of federal financial assistance." *Id.* ¶ 168. One of these revisions is the "FY 2025 DHS Terms and Conditions Version 3 Dated April 18, 2025" (the "Standard DHS Terms"). *Id.* ¶ 169. The Standard DHS Terms contain three sets of conditions "that did not exist in any version of the DHS Terms and Conditions issued before January 20, 2025"—the "Discrimination Condition," the "Immigration Conditions," and the "EO Condition" (collectively, the "DHS Conditions"). *Id.* ¶ 170 (citing Standard DHS Terms ¶¶ 171–73).

**1. The Discrimination Condition[5]**

Section C.XVII of the Standard DHS Terms sets out the "Discrimination Condition" attached to recipients of federal grant funding. *Id.* ¶ 171. Specifically, the Discrimination Condition states:

> Recipients must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of 31 U.S.C. § 372(b)(4).
> (1) Definitions. As used in this clause –
> (a) DEI means "diversity, equity, and inclusion."
> (b) DEIA means "diversity, equity, inclusion, and accessibility."
> (c) Discriminatory equity ideology has the meaning set forth in Section 2(b) of Executive Order 14190 of January 29, 2025.
> (d) Federal anti-discrimination laws mean Federal civil rights law that protect individual Americans from discrimination on the basis of race, color, sex, religion, and national origin.
> (e) Illegal immigrant means any alien, as defined in 8 U.S.C. §

[5] Defendants maintain that the "Discrimination Condition" should really be called the "Anti-Discrimination Condition," as its "express purpose is to end any types of discrimination to the maximum extent allowed by law." Oppo. at 3. Because the "Discrimination Condition" properly encapsulates both discrimination and anti-discrimination, I choose to retain plaintiffs' original language.

1101(a)(3), who has no lawful immigration status in the United States.

(2) Grant award certification.

(a) By accepting the grant award, recipients are certifying that:

(i) They do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws; and

(ii) They do not engage in and will not during the term of this award engage in, a discriminatory prohibited boycott.

(iii) [*Provision omitted and included within Immigration Conditions, supra.*]

(3) DHS reserves the right to suspend payments in whole or in part and/or terminate financial assistance awards if the Secretary of Homeland Security or her designee determines that the recipient has violated any provision of subsection (2).

(4) Upon suspension or termination under subsection (3), all funds received by the recipient shall be deemed to be in excess of the amount that the recipient is determined to be entitled to under the Federal award for purposes of 2 C.F.R. § 200.346. As such, all amounts received will constitute a debt to the Federal Government that may be pursued to the maximum extent permitted by law.

**2. The Immigration Conditions**

Section C.IX and Subsection C.XVII(2)(a)(iii) of the Standard DHS Terms set out what plaintiffs describe as the "Immigration Conditions." *Id.* ¶ 172. Plaintiffs summarize the Immigration Conditions as follows:

a. *The Information Sharing Condition* (§ C.IX.1.a): Grant recipients and subrecipients "must comply with the requirements of 8 U.S.C. §§ 1373 and 1644," which "prohibit restrictions on information sharing by state and local government entities with DHS regarding the citizenship or immigration status, lawful or unlawful, of any individual."

b. *The Compliance Condition* (§ C.IX.1.b): Grant recipients and subrecipients "must comply with other relevant laws related to immigration, including prohibitions on encouraging or inducing an alien to come to, enter, or reside in the United States in violation of law, 8 U.S.C. § 1324(a)(1)(A)(iv), prohibitions on transporting or moving illegal aliens, 8 U.S.C. § 1324(a)(1)(A)(ii), prohibitions on harboring, concealing, or shielding from detection illegal aliens, 8 U.S.C. § 1324(a)(1)(A)(iii), and any applicable conspiracy, aiding or abetting, or attempt liability regarding these statutes."

c. *The Cooperation Condition* (§ C.IX.1.c): Grant recipients and subrecipients must "honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer."

d. *The Access Condition* (§ C.IX.1.d): Grant recipients and subrecipients must "provide access to detainees, such as when an immigration officer seeks to interview a person who might be a removable alien."

e. *The Publicization Condition* (§ C.IX.1.e): Grant recipients and subrecipients must "not leak or otherwise publicize the existence of an immigration enforcement operation."

f. *The Certification Condition* (§ C.IX.2): Grant recipients "must certify under penalty of perjury pursuant to 28 U.S.C. § 1746 and using a form that is acceptable to DHS, that [they] will comply with the requirements of this term," meaning all of Section C.IX, and must also "require any subrecipients or contractors to certify in the same manner that they will comply with this term prior to providing them with any funding under this award."

g. *The Materiality Condition* (§ C.IX.3): Grant recipients must "agree[] that compliance with this term is material to the Government's decision to make or continue with this award and that the Department of [H]omeland Security may terminate this grant, or take any other allowable enforcement action, if the recipient fails to comply with this term."

h. *The Non-Incentivizing Condition* (§ C.XVII(2)(a)(iii)): "By accepting the grant award, recipients are certifying that: . . . They do not, and will not during the term of this award, operate any program that benefits illegal immigrants or incentivizes illegal immigration," and agree that DHS has the "right to suspend payments in whole or in part and/or terminate financial assistance awards if the Secretary of Homeland Security or her designee determines that the recipient has violated" this certification.

*Id.*[6]

**3. The EO Condition**

Section C.XXXI of the Standard DHS Terms sets out what plaintiffs refer to as the "EO Condition." *Id.* ¶ 173. The EO Condition mandates that "[r]ecipients [of funding] must comply with the requirements of Presidential Executive Orders related to grants (also known as federal assistance and financial assistance), the full text of which are incorporated by reference." *Id.* (citing Compl. Ex. A FY 2025 DHS Standard Terms and Conditions [Dkt. No. 1-1]).

6 Plaintiffs do not move at this time for relief from the Immigration Conditions, as they were found arbitrary and capricious in *Illinois v. Federal Emergency Management Agency*, C.A. No. 25-206 WES, 2025 WL 2716277 (D.R.I. Sept. 24, 2025). I also prohibited defendants from applying civil immigration conditions to DHS grants in *City & County of San Francisco v. Trump*, 783 F. Supp. 3d 1148 (N.D. Cal. 2025). I include the condition here to indicate the broad scope of change implemented by the Challenged DHS Conditions.

**4. The Civil Rights Conditions**

In addition to the Challenged DHS Conditions, plaintiffs cite "several [other] provisions that require recipients of grant funding to comply with certain specified civil rights and antidiscrimination laws," which "have appeared in prior years' terms and conditions." *Id.* ¶ 174. These conditions (collectively, the "Civil Rights Conditions") are summarized by plaintiffs as follows:

> i. Section C.III, entitled "Age Discrimination Act of 1975," requires recipients to "comply with the requirements of the Age Discrimination Act of 1975, Pub. L. No. 94-135 (codified as amended at Title 42, U.S. Code § 6101 *et seq.*)."
>
> ii. Section C.IV, entitled "Americans with Disabilities Act of 1990," states that "Recipients must comply with the requirements of Titles I, II, and III of the Americans with Disabilities Act, Pub. L. No. 101-336 (1990) (codified as amended at 42 U.S.C. §§ 12101– 12213)."
>
> iii. Section C.VII, entitled "Civil Rights Act of 1964 – Title VI," requires recipients to "comply with the requirements of Title VI of the Civil Rights Act of 1964, Pub. L. No. 88-352 (codified as amended at 42 U.S.C. § 2000d *et seq.*)," including "DHS implementing regulations for the Act [that] are found at 6 C.F.R. Part 21" and, as applicable, "FEMA's implementing regulations at 44 C.F.R. Part 7."
>
> iv. Section C.VIII, entitled "Civil Rights Act of 1968," requires recipients to "comply with Title VIII of the Civil Rights Act of 1968, Pub. L. No. 90284 (codified as amended at 42 U.S.C. § 3601 *et seq.*), . . . as implemented by the U.S. Department of Housing and Urban Development at 24 C.F.R. Part 100," including with respect to "new multifamily housing with four or more dwelling units" as described in "24 C.F.R. Part 100, Subpart D."
>
> v. Section C.XIV, entitled "Education Amendments of 1972 (Equal Opportunity in Education Act) – Title IX," requires recipients to "comply with the requirements of Title IX of the Education Amendments of 1972, Pub. L. No. 92-318 (codified as amended at 20 U.S.C. § 1681 *et seq.*)," including "DHS implementing regulations [that] are codified at 6 C.F.R. Part 17" and, as applicable, "FEMA's implementing regulations at 44 C.F.R. Part 19."
>
> vi. Section C.XVI, entitled "Equal Treatment of Faith-Based Organizations," states: "It is DHS policy to ensure the equal treatment of faith-based organizations in social service programs administered or supported by DHS or its component agencies, enabling those organizations to participate in providing important social services to beneficiaries. Recipients must comply with the equal treatment policies and requirements contained in 6 C.F.R. Part 19 and other

applicable statutes, regulations, and guidance governing the participations of faith-based organizations in individual DHS programs."

vii. Section C.XXIV, entitled "Limited English Proficiency (Civil Rights Act of 1964, Title VI)," states: "Recipients must comply with Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq.*) prohibition against discrimination on the basis of national origin, which requires that recipients of federal financial assistance take reasonable steps to provide meaningful access to persons with limited English proficiency (LEP) to their programs and services. For additional assistance and information regarding language access obligations, please refer to the DHS Recipient Guidance: https://www.dhs.gov/guidance-published-help-department-supportedorganizations-provide-meaningful-access-people-limited and additional resources on http://www.lep.gov."

viii. Section C.XXXIII, entitled "Rehabilitation Act of 1973," states: "Recipients must comply with the requirements of Section 504 of the Rehabilitation Act of 1973, Pub. L. No. 93-112 (codified as amended at 29 U.S.C. § 794)."

*Id.*

**B. Defendants Adopt the Challenged DHS Conditions.**

Around August 20, 2025, defendants "adopted and published the FEMA Preparedness Grants Manual, FM-207-23-001 (the "Grants Manual")." *Id.* ¶ 176. The Grants Manual recognized that much of its content was "new or refreshed . . . for Fiscal Year (FY) 2025, mainly to align with updated standard language." *Id.* ¶ 177. Specifically, the Grants Manual demands that recipients "comply with the DHS Standard Terms and Conditions in effect as of the date of the federal award," and reiterates the EO condition "verbatim." *Id.* ¶ 178. Accordingly, defendants began attaching the Discrimination and EO Conditions to "all of their grant awards, thereby conditioning disbursement of grant funding to all direct grantees and subgrantees on their agreement to those conditions." *Id.* ¶ 181. These conditions are now attached to "all of FEMA's Preparedness Grants, including HSGP-SHSP, HSGP-UASI, TSGP, PSGP, and EMPG." *Id.* ¶ 182.

**3. PLAINTIFFS ALL RECEIVE OR EXPECT TO RECEIVE GRANTS THAT INCLUDE THE DISCRIMINATION AND EO CONDITIONS.**

Plaintiffs are a collective of cities, counties, municipalities, and local agencies that are "collectively responsible for the safety and well-being of tens of millions of residents." *Id.* ¶ 50. The grant programs described above form the basis of their claims. Each plaintiff has submitted

United States District Court
Northern District of California

declarations describing how their policies and practices are at odds with the Discrimination Condition and EO Condition attached to their federal grants. I summarize them below.

**A. Alameda**

The City of Alameda is located in the San Francisco Bay Area and is home to over 75,000 residents. Declaration of Jeniffer Ott ("Ott Decl.") [Dkt. No. 19-11] ¶ 3. Because Alameda is located on an island, the city faces unique threats from rising sea levels, increased flooding, and soft-story buildings prone to damage during earthquakes. *Id.* ¶¶ 6–7. Alameda also contains "a significant amount of critical infrastructure," including four fire stations, a police station, Oakland International Airport, the Port of Oakland, the United States Coast Guard Base Alameda, and underwater tunnels connecting the city to Oakland. *Id.* ¶ 4.

In the past year, Alameda applied for or has been awarded grants by FEMA. On August 6, 2024, Alameda was awarded a AFG program grant in the amount of $876,633.45 to "help firefighters and other first responders obtain critically needed resources necessary for protecting the public and emergency personnel from fire and related hazards." *Id.* ¶ 8. The AFG is currently funding eight members of the City to attend medic school. *Id.* Further, Alameda applied for, and expects to receive, a SAFER grant in the amount of $1,861,336.65 "to fund four firefighter positions over a three-year period." *Id.* ¶ 9. This SAFER grant is conditioned on the DHS Conditions. *See id.* Alameda is also a subrecipient to a US&R grant issued to Oakland in the amount of $1,378,311 on September 26, 2025. *Id.* ¶ 11. The US&R grant, like the SAFER grant, contains the DHS Conditions at issue in this case. *Id.* Alameda similarly applied for $7,237,014.75 in HMGP funding in August 2023; this funding is still under review by FEMA but would likely contain the DHS Conditions if approved. *Id.* ¶¶ 13–15. Finally, Alameda applied for $50,000,000 from the Building Resilient Infrastructure and Communities ("BRIC") program, which was dissolved in April 2025. *Id.* ¶¶ 16–17. Should the program be reactivated, any grant to Alameda would likely contain the DHS Conditions. *Id.* ¶ 18.

Alameda contends that the DHS Conditions will cause irreparable harm by forcing it to either "accept those conditions or lose access to approximately $61,043,170.00 in DHS/FEMA funding." *Id.* ¶ 19. This would result in "slower response times for both fires and medical

United States District Court
Northern District of California

United States District Court
Northern District of California

emergencies," "[s]taffing reductions," an inability to retrofit buildings for earthquakes, and potential "loss of Airport function" due to flooding. *Id.* ¶¶ 20–22.

**B. Bellingham**

The City of Bellingham is a city in coastal Washington that is home to approximately 100,000 resident. Declaration of William Hewett ("Hewett Decl.") [Dkt. No. 19-12] ¶ 5. Bellingham is "prone to extreme weather events such as severe flooding, wildfires, earthquakes, and tsunamis." *Id*. The Bellingham Fire Department Office of Emergency Management ("OEM") is responsible for coordinating the county-wide Natural Hazards Mitigation Plan. *Id.* The OEM also creates training and exercises relating to natural disasters and terrorism events. *Id.* Similarly, the Bellingham Fire Department covers eight fire stations within the city and provides fire and emergency services. *Id.*

This year, Bellingham Fire Department received $58,000 in annual EMPG funds "to support the[ir] emergency management program," as well as $810,000 in AFG funding to support fire and emergency services operations. *Id.* ¶ 6. These programs helped Bellingham replace personal protective equipment during the COVID-19 pandemic as well as replacing all Self-Contained Breathing Apparatuses to help firefighters "breathe clean air while entering burning buildings." *Id*. Additionally, Bellingham is the recipient of a FEMA Public Assistance Grant, covering 90% of a $4.5 million project to replace a bridge destroyed by flooding in 2021. *Id.* ¶ 7. For the upcoming fiscal year, Bellingham has applied for (or will apply for) a $44,661 EMPG grant, a $133,000 AFG grant, and a $2,000,000 SAFER grant. *Id.* ¶¶ 8–12. Each grant is expected to include the DHS Conditions. *See id.*

Bellingham maintains that attaching the DHS Conditions to these grants would irreparably harm the City. *See id.* ¶¶ 13–14. The City heavily relies on EMPG funds to sustain their emergency operations, as they constitute 10% of the OEM's budget. *Id.* ¶ 13. Without this funding, the Bellingham Fire Department would "likely need to shut down the[ir] joint City-County Emergency Operations Facility, which would lead to less coordination during a disaster." *Id.* Bellingham is also experiencing a budget deficit of roughly $4.5 million dollars and does not have any "extra funding available to replace critically needed equipment" and services. *Id.* ¶ 14.

**C. Berkeley**

The City of Berkeley is located in Alameda County, California and has a population of over 125,000 residents. Declaration of Paul Buddenhagen ("Buddenhagen Decl.") [Dkt. No. 19-13] ¶ 4. Berkeley is located in an "earthquake-prone area on the San Andreas Fault System with a history of earthquakes that have caused significant structural damage." *Id.* It is also highly susceptible to wildfires. *Id.*

Berkeley currently is receiving approximately $12.5 million in DHS and FEMA funding to support its fire and seismic safety programs. *Id.* ¶ 6. This includes a $4.7 million HMGP grant, used to "retrofit seismically vulnerable buildings" in the City, and $800,000 in AFG funding to "hire two full-time experts in behavioral health and nutrition to support firefighter training and wellbeing." *Id.* ¶¶ 7–8. Berkeley has applied to renew these programs, seeking $3.75 million and $800,000 in additional funding, respectively. *Id.* ¶¶ 9–10. The City has also applied for $6.4 million in HMGP funding to "establish a home hardening and defensible space program" to mitigate wildfire damage, and $16.5 million in HMGP funding to seismically retrofit "two historic and critical buildings." *Id.* ¶¶ 11–12. Berkeley anticipates that these new grants will all contain the DHS Conditions. *Id.* ¶ 13.

Berkeley contends that it would be forced to either accept the DHS Conditions or lose approximately $27 million in pending grant applications. *Id.* ¶ 14. Loss of such funding would "impede the City's ability to mitigate serious threats . . . posed by earthquakes and wildfires," as well as result in a loss of many critical programs. *Id.* ¶¶ 15–16. Because the City is facing an approximately $27 million structural budget deficit, Berkeley concludes that the loss of FEMA funds "may force [the City] to reduce staffing levels," which would "impact the City for years to come." *Id.* ¶¶ 16–17.

**D. Culver City**

The City of Culver City is located in Los Angeles County. Declaration of John Nachbar ("Nachbar Decl.") [Dkt. No. 19-14] ¶ 3. Culver City contains a "full-service [fire] department that is responsible for providing professional fire protection and life safety services to [the City]." *Id.* ¶ 4. This year, Culver City, through the fire department, received $32,273 in UASI funding,

$2,375 in SHSP funding, and $6,876 in EMPG funding. *See id.* ¶ 5. These grants are meant to provide "professional fire protection and life safety services to Culver City." *Id.* ¶ 3. Culver City also applied for an AFG grant but has not heard back from FEMA. *Id.* ¶ 4. The City also anticipate receiving $3,000 in SHSP and UASI grants during the 2025 Fiscal Year, which they expect will contain the DHS Conditions. *Id.* ¶ 5.

Culver City maintains that it would be forced to either accept the DHS Conditions or lose at least $3,000 in DHS and FEMA funding, "and possibly more in future fiscal years." *Id.* ¶ 7. This will impact the City's "ability to prepare for emergencies" and "provide adequate staffing," as the City is currently facing a structural deficit. *Id.*

**E. King County**

King County is located in Washington State and is home to approximately 2.3 million residents. Declaration of Brendan McCluskey ("McCluskey Decl.") [Dkt. No. 19-15] ¶ 3. Due to its geography and weather, King County is particularly "vulnerable to events such as major storms, landslides, flooding, wildland-urban fires, and other emergencies that may critically impact residents." *Id.* In addition, King County is designated a "high threat" jurisdiction for terrorist activity by the DHS, requiring additional emergency preparation. *Id.* ¶ 4. Because of these threats, the King County OEM relies on EMPG and HSGP funding to support its public safety efforts. *Id.* ¶ 8. OEM expects to receive approximately $163,342 and $1.4 million in EMPG and HSGP grants during the 2025 Fiscal Year, respectively. *Id.* ¶¶ 10, 14. King County also serves as the core member of the UASI Urban Area Working Group, represented by the King County OEM. *Id.* ¶ 15. As the core member, the OEM oversees grant funding for projects "to benefit the entire UASI region," which includes Pierce County, Snohomish County, as well as the cities of Seattle and Bellevue, Washington (both located in King County). *See id.*

King County maintains that it would be forced to either accept the DHS Conditions or lose access to over $1.6 million in DHS and FEMA funding "slated for projects that enhance . . . [infrastructure], election security plans and procedures, . . . cybersecurity . . . [and] other anti-terrorism planning, preparedness, and operational work." *Id.* ¶ 16. King County also points out that it is hosting the upcoming FIFA World Cup in 2026, which will attract "750,000 unique

visitors" to the region, demonstrating the need for funding to coordinate public safety. *Id.* ¶ 21.

**F. Los Angeles**

Los Angeles is the second most populated city in the United States, home to an estimated 3.8 million residents. Declaration of Yolanda Chavez ("Chavez Decl.") [Dkt. No. 19-17] ¶ 3. The city is particularly vulnerable to "wildfires, flooding, mudslides, earthquakes, and extreme heat." *Id.* Additionally, with its large population, critical infrastructure, and high-profile international events (such as the 2026 World Cup and 2028 Summer Olympics), Los Angeles is a target for terrorist activity. *Id.*

Los Angeles expects to receive at least $56,600,000 in DHS funding during the 2025 Fiscal Year. *Id.* ¶ 4. First, the City has already been awarded $6,677,557.35 in carry-forward funding through the STC program. *Id.* ¶¶ 5–6. This award supports "radiation and nuclear detection equipment, training, and drills/exercises for regional partners in law enforcement, fire service, and public health." *Id.* ¶ 7. Additionally, the Los Angeles Fire Department (the "LAFD") has received $1,393,311 in funding through the US&R program for the 2025 Fiscal Year. *Id.* ¶ 8. This US&R grant covers salaries, training, supplies, and equipment for four employees to assist in search and rescue efforts during catastrophic disasters. *Id.* ¶ 9. The LAFD has also received a $4,204,414.04 SAFER grant, which provides "urgent staffing (12 firefighters)" in an area found to be a "gap in fire security." *Id.* ¶ 10. The Los Angeles Police Department (the "LAPD") similarly has received $277,500 in PSGP funding, meant for the maintenance and repair of equipment. The City has also applied for EMPG, UASI, and SHSP funding from FEMA, and expects to receive $450,000-500,000, $38,664,255, and $257,000, respectively. *Id.* ¶¶ 15–20. Each of these grants are expected to contain the DHS Conditions at issue in this case.

Los Angeles maintains that the City is forced to either accept the DHS Conditions or lose access to tens of millions of dollars in funding to secure public safety. *Id.* ¶ 22. Loss of funding would not only impact its emergency programs in Los Angeles, it contends, but also coordinated efforts between other municipalities in the greater Southern California region. *Id.* ¶ 23.

**G. Los Angeles County**

The County of Los Angeles is the nation's largest county, home to over 10 million

residents. Declaration of Mason Matthews ("Matthews Decl.") [Dkt. No. 19-18] ¶ 3. The Los Angeles County Consolidated Fire Protection District ("LA County Fire") is a special fund within the County's budget and provides 24-hour emergency services to over four million residents. *Id.* ¶¶ 2, 4. Los Angeles County, along with LA County Fire, receive over $5.33 billion in federal grants each year to assist with emergency management and public safety. *Id.* ¶ 5. Such funding was particularly important this year due to the Palisades Fire, Eaton Fire, Hurst Fire, Kenneth Fire, and other fires (collectively, the "January 2025 Fires") that devastated the region. *Id.* ¶ 6.

Los Angeles County and LA County Fire collectively have over $500 million in pending DHS and FEMA grants that "strengthen its capacity to prevent, prepare for, protect against, respond to, and recover from, acts of terrorism and other catastrophic events." *Id.* ¶ 7. First, Los Angeles County has approximately $482 million in pending grants as a result of the January 2025 Fires and the County's recovery efforts. *Id.* ¶ 13. These grants have not yet been awarded, and the County is concerned that the DHS Conditions may be attached to the granting should they be distributed soon. *Id.* Los Angeles County also anticipates being a subrecipient of $3.3 million in SHSP grant funding from California, as well as $10,950,530 in UASI funding. *Id.* ¶¶ 9–10. It also expects $1,802,009 in EMPG funding, which will enhance the County's emergency management capabilities. *Id.* ¶ 11. Other anticipated grants include $2,887,500 in HSGP Regional Threat Assessment Center funding, $751,276.32 in PSGP funds, $2,886,186.60 in AFG funds, and $1,488,311 in US&R funds. *Id.* ¶¶ 12–20. Each of these grants are meant to support critical infrastructure and programs within the County and are expected to contain the DHS Conditions at issue in this case. *See id.*

Los Angeles County maintains that it will be forced to either accept the DHS Conditions or lose at least $500 million in DHS and FEMA funding. *Id.* ¶ 21. This would result in the loss of critical infrastructure and dozens of jobs. *Id.* ¶¶ 23–25. This harm will be particularly salient due to the January 2025 Fires, as the County's resources are currently "depleted." *Id.* ¶ 22.

**H. Marin County**

The County of Marin is located in the San Francisco Bay Area, directly north of San Francisco. Declaration of Steven Torrence ("Torrence Decl.") [Dkt. No. 19-19] ¶ 3. Its

United States District Court
Northern District of California

geography—including "rugged, hilly terrain . . . wetlands, streams, and heavily wooded areas"—makes it "extremely prone to natural disasters, including flooding, severe storms, wildfires, and extreme heat events." *Id.* Marin County experiences "at least one federally declared emergency each year with average damage costs valued between $3 and $5 million." *Id.*

Marin County "generally receives between $175,000 to $200,000 in EMPG pass-through funding from [California] each year," which supports the County's emergency operations center, alert and warning enhancements, and staff training. *Id.* ¶ 6. Additionally, Marin County typically receives SHSP funding; in 2024, the County received a $288,000 grant. *Id.* While the County is still waiting to receive the total amount of EMPG and SHSP funding for FY 2025, it has already received approximately $550,000 in HMGP funding to "re-write all of the hazard mitigation plans for the school districts and special districts within the County." *Id.* Marin County is also a member of the North Hub for the Bay Area's UASI program and has historically received funding as a subrecipient. *Id.* ¶ 7. Finally, the County is waiting for approval on a $22 million HMGP grant to support flood control within an unincorporated area of the County. *Id.* ¶ 8.

Marin County maintains that it will be forced to either accept the DHS Conditions or lose at least $15 million in DHS and FEMA funding. *Id.* ¶ 10. Loss of funding would "jeopardize critical emergency operations infrastructure," including maintaining the county's alert and warning system, "regional staff training[,] field exercises and essential equipment for first responders." *Id.* It would also result in "significant economic hardship in the event of a declared emergency," as the County typically incurs "between $3 to $5 million" a year in costs for "disaster response expenses." *Id.* ¶ 12. For example, should Marin County not receive its Hazard Mitigation Grant funding this year, over 4,000 residents "will remain at risk of flooding, jeopardizing the[ir] health, safety, and welfare." *Id.* ¶ 11.

**I. Oakland**

The City of Oakland is located in the San Francisco Bay Area and is home to almost 450,000 individuals. *See* Declaration of Jestin D. Johnson ("Johnson Decl.") [Dkt. No. 19-20] ¶ 4. The geography of Oakland presents numerous potential threats for the city, including wildfires, floods, and earthquakes. *Id.* ¶¶ 5–10. Over 13% of the population of Oakland live in "high or

very high wildlife severity zones," and roughly 35% of all critical facilities in Oakland are located in "wildlife risk areas." *Id.* ¶ 7. These risks are further accentuated by the infrastructure in the city, including Oakland International Airport, which is classified by FEMA as being an extremely high risk "Special Flood Hazard Area." *Id.* ¶ 9.

Oakland currently has over $30 million in active grants with DHS and FEMA; these include $27 million in SAFER funding, $2.5 million in US&R grants, $206,370 in Local Hazard Mitigation Program ("LHMP") grants, $520,000 in PSGP funding, $52,000 as a subrecipient to California's UASI and HSPG grants, and an AFP grant. *Id.* ¶ 11. It also has applied for, and expects to receive, roughly $21 million in funding this year from various DHS and FEMA grants. *Id.* ¶ 13. The Oakland Fire Department ("OFD") has applied for roughly $19 million in SAFER funding this year to "hire 20 additional firefighters" to "address persistent staffing shortages." *Id.* ¶ 14. OFD has also been awarded roughly $1.4 million in US&R funding to assist with "search and rescue, disaster response, and disaster preparedness efforts" in both Oakland and other impacted areas. *Id.* ¶ 15–20. Additionally, OFD has applied for and received a $1.2 million UASI grant to fund five staff members who will be tasked with maintaining public safety and mitigating the risk of terrorist attacks. *Id.* ¶¶ 21–26. Finally, OFD applied for $18,000 in PSGP funds for the FY 2025, to be used to hire a contractor to facilitate training of twelve individuals to operate Fireboats. *Id.* ¶¶ 27–31.

Oakland maintains that it will be forced to either accept the DHS Conditions or lose at least $21 million in DHS and FEMA funding. *Id.* ¶ 37. Because the city is facing "significant financial strain," Oakland asserts it is "not in a position to absorb the loss of federal funding streams without serious impacts to services." *Id.* ¶ 38. For example, should Oakland not receive its $19 million SAFER grant, OFD will not be able to increase staffing, despite already being understaffed, resulting in "slower response times to emergencies" and "fewer personnel [at] each incident." *"Id.* ¶ 39. Loss of the US&R, UASI, and PSGP funding will similarly place Oakland in a "more vulnerable [position] to emergencies." *Id.* ¶¶ 40–44.

**J.  Palo Alto**

The City of Palo Alto is a chartered municipal corporation located in Santa Clara County,

United States District Court
Northern District of California

California. Declaration of Edward Shikada ("Shikada Decl.") [Dkt. No. 19-21] ¶ 3. Palo Alto is "vulnerable to a range of emergencies[,] including wildfires, earthquakes, severe storms, and homeland security threats." *Id.* It also provides fire and emergency response services to Stanford University, which is located in the city. *Id.*

Palo Alto currently has multiple pending grant applications for FY 2025 funding. *Id.* ¶ 5. First, the City has applied for $406,306.50 in HMGP funding to help "remove about 110 invasive eucalyptus trees that increase the flammability and spread of wildfires and provide an increased level of protection to more than 2400 residential homes and critical infrastructure sites." *Id.* Additionally, it seeks $3,009,055.93 in HMGP funding to retrofit two potable water storage tasks to reduce the risk of damage from earthquakes. *Id.* ¶ 6. It also has applied for $139,688.82 in AFG funding to purchase "automated chest compressors" to improve emergency medical responses. *Id.* ¶ 7. Similarly, it has requested $3,911,327.35 in SAFER funding to help fund seven firefighter positions. *Id.* ¶ 10. Finally, Palo Alto has been awarded $862,681.57 in Public Assistance funding to reimburse costs incurred due to "severe winter storm damage." *Id.* ¶ 10.

Palo Alto maintains that it will be forced to either accept the DHS Conditions or lose at least $12 million in DHS and FEMA funding. *Id.* ¶ 13. Without such support, Palo Alto may be forced to cancel these programs, "leaving the community more vulnerable to earthquakes and wildfires." *Id.* ¶ 15. It would also be "forced to divert scarce resources from other essential services, delay projects, or cancel them entirely." *Id.*

**K. Pasadena**

The City of Pasadena is a charter city located in Los Angeles County, California, and is home to approximately 138,000 individuals. Declaration of Matthew E. Hawkesworth ("Hawkesworth Decl.") [Dkt. No. 19-22] ¶ 4. Pasadena is located at the base of the San Gabriel Mountains, which presents a "significant risk[] of wildfire"; in fact, the northern and western portions of Pasadena are classified as "Very High Fire Hazard Severity Zones" by the California Department of Forestry and Fire Protection. *Id.* ¶ 5. Unfortunately, the consequence of wildfires have been seen as recently as this January 2025, when the Eaton Fire burned thousands of acres of land, residential neighborhoods, and resulted in civilian fatalities. *Id.* ¶ 6. The fire "destroyed

and, in other cases, severely damaged critical infrastructure within and outside Pasadena's jurisdictional borders including its parklands, water facilities, and energy systems." *Id.*

Pasadena currently receives almost $3 million in grants from DHS and FEMA, including an AFG grant in the amount of $319,380, to "assist Pasadena's fire department with funding its firefighting and emergency response activities"; $1.4 million in HMGP funding to "fund seismic upgrades of a city building"; $18,800 in SHSP funding to implement "homeland security strategies against terrorism and catastrophic risks"; and $791,685 in UASI funding to improve the City's "capabilities to prevent, prepare for, protect against, and respond to acts of terrorism." *Id.* ¶¶ 8–12. It also has applied for, and expects to receive, over $9 million in pending AFG, HMGP, SHSP, and UASI grant applications and agreements. *Id.* ¶ 8. Finally, Pasadena has applied for over $36 million in Public Assistance funding for its "remediation efforts relating to the Eaton Fire." *Id.* ¶ 13. It assumes that each pending grant will likely incorporate the DHS Conditions. *Id.* ¶ 14.

Pasadena maintains that it will be forced to either accept the DHS Conditions or lose "millions" in DHS and FEMA funding. *Id.* ¶ 15. A lack of funding would result in the Pasadena Fire Department "devot[ing] a substantial amount of its operating budget funds toward these grant projects, leading to less money to fund vital Fire Department programs and activities." *Id.* ¶ 16. This would "weaken[] its ability to respond to active incidents . . . thereby increasing the risk of harm to the city's residents." *Id.*

**L. Petaluma**

The City of Petaluma is located in Sonoma County, California, and is home to approximately 60,000 residents. Declaration of Brian Cochran ("Cochran Decl.") [Dkt. No. 19-23] ¶ 3. Sonoma County has experienced numerous wildfires over the past decade; Petaluma has "provided important resources for directly-affected jurisdictions," which have been reimbursed by FEMA pursuant to the California's coordinated emergency response system. *Id.*

Petaluma currently receives $659,695 in DHS and FEMA funding from two grants. *Id.* ¶ 4. First, Petaluma was awarded $637,195 from FEMA's Emergency Operations Center Grant Program to fund the construction of the City's combined police, fire, and emergency operations

center facilities.  *Id.* ¶ 5.  Second, Petaluma anticipates receiving $22,500 in pass-through funding from a Sonoma County HSGP grant, which will be used to "provide funds for disaster preparedness for seniors to help ensure the City's readiness to assist the City's senior populations during emergencies."  *Id.* ¶ 6.  It is expected that the HSGP grant will contain the DHS Conditions.  *Id.* ¶ 7.

Petaluma maintains that it will be forced to either accept the DHS Conditions or lose "critical" DHS and FEMA funding.  *Id.* ¶ 9.  Lack of Lack of funding would not only impact Petaluma residents through the loss of the new emergency operations facility, but also the greater Sonoma County region, as Petaluma provides "critical . . . mutual aid and evacuee support in regional emergencies."  *Id.*

**M. Pierce County**

Pierce County is the second largest county in the state of Washington, with a population of nearly one million residents.  Declaration of Arel Solie ("Solie Decl.") [Dkt. No. 19-24] ¶ 4. Given its unique geography, Pierce County is home to "diverse hazards including floods, wildfires, earthquakes, hazardous materials, extreme weather, and volcanic activity from Mount Rainier that could result in a major lahar mud flow."  *Id.*  Pierce County is also part of the greater Seattle Metropolitan Area, which is ranked highly for national terrorism risk, given its "many soft targets including stadiums, fairgrounds . . . ferry transportation system[,] [and] a significant number of essential bridges."  *Id.*

Pierce County currently receives $19,516,544 in FEMA and DHS grants.  which represents "over 50% of [their] emergency management funding."  *Id.* ¶ 5.  These include $6,522,506 in US&R funding; $1,165,115 in SHSP grants to "lead exercises, mass care, reunification, incident command, active shooter drills . . . and Community Emergency Response Team training"; $671,299 in UASI grants to support "two emergency management staff who lead regional planning efforts" for terrorism and law enforcement needs; $281,957 in EMPG grants to fund "staff [who] support . . . emergency operations"; and $7,477,553 in HMGP grants to support the creation and implementation of the County's Hazard Mitigation Plan.  *Id.* ¶¶ 6–11.  Additionally, Pierce County expects to receive $49,673 in HMGP funding for "wildlife scoping," $1.2 million in

United States District Court
Northern District of California

US&R grants, $473,054 in SHSP grant funding, $2,403,876 in HSGP funding, $308,000 in HMGP funding, and $246,817 in EMPG grant funding. *Id.* ¶¶ 11, 13, 18. The County expects that each of these grants will incorporate the DHS Conditions. *Id.* ¶¶ 19–22.

Pierce County maintains that it will be forced to either accept the DHS Conditions or lose at least $6 million in DHS and FEMA funding. *Id.* ¶ 23. "Pierce County's economic forecast combined with the potential loss of federal funding in several service areas across the country . . . will create significant strain on the county budget if federal funding is not accessible." *Id.* ¶ 24. Additionally, Pierce County "does not have alternate funding options to support" these programs, which "impact those most vulnerable" within the region. *Id.* Rather, Pierce County will face "the loss of funding for critical projects and personnel." *Id.*

**N. Sacramento**

The City of Sacramento is home to 524,943 residents and is the capital of the state of California. Declaration of Leyne Milstein ("Milstein Decl.") [Dkt. No. 19-27] ¶ 5. Sacramento has been awarded, and has yet to accept, $1.4 million in DHS and FEMA grants, as well as has requested $10 million in DHS and FEMA grants. *Id.* ¶ 6. These include approximately $3 million in UASI grants, to prevent and prepare for "acts of terrorism and other catastrophic events"; and approximately $1.5 million in US&R grants to "fund[] five main administrative roles (two logistics coordinators, an analyst, an administrative technician, and a training manager), in addition to approximately 207 US&R members." *Id.* ¶¶ 7–21. Additionally, Sacramento is waiting for approval of $7,381,313.41 in AFG funding to "provide essential health and wellness services for [Sacramento] firefighters that are either not covered in the City's budget or exceed allocated funding." *Id.* ¶¶ 23–26. Sacramento maintains that any loss of funding would "devastat[e] the City, as it "does not have the budget to absorb the loss of these funds." *Id.* ¶ 30.

**O. San Diego**

The City of San Diego is home to over 1.4 million residents. Declaration of Gabriel Rubi ("Rubi Decl.") [Dkt. No. 19-28] ¶ 3. "As a coastal city in Southern California with a port, harbor, and border with Mexico, San Diego uniquely faces increased border and national security threats and wildlife risks." *Id.* ¶ 4. San Diego receives funding from numerous DHS and FEMA grant

United States District Court
Northern District of California

programs, including roughly $13.5 million in active grants. *Id.* ¶¶ 5–6. These include PSGP, AFG, and US&R grants. *Id.* ¶ 5. Additionally, San Diego has applied, or has been awarded but not issued, various other grants during the FY 2025. *Id.* These include $995,011.50 in PSGP funding to "purchase [a] Radiological Nuclear Detection Capable All-Hazards Response Vessel to expand and update their fleet"; approximately $1 million in AFG funding to "outfit two wildland firefighting faller teams and replace equipment that no longer meet current standards"; and $1,378,311 in US&R funding to "cover the salaries of two administrative managers, pay for a series of specialized training sessions and FEMA refresher drills, and fund travel expenses to attend trainings." *Id.* ¶¶ 10, 17, 22.

San Diego contends that it does "not have alternate funding to redirect to" these programs should it lose the DHS and FEMA grants. *Id.* ¶ 23. This would result in the loss of "crucial public safety services that are relied on by the entire San Diego community," as well as "negatively impact[] short- and long-term financial planning." *Id.* at ¶¶ 23–24. Ultimately, the residents of San Diego would bear these costs, as the City would lose its "overall ability to respond to emergencies, risking the lives of San Diegans." *Id.* ¶ 24; *see also* Declaration of Christopher Heiser ("Heiser Decl.") [Dkt. No. 19-29] (outlining the $45 million in DHS and FEMA funding the San Diego Office of Emergency Services receives).

**P. San Diego County**

The County of San Diego is located in Southern California and is a "hub for military operations, international commerce, and tourism, increasing both its strategic importance and its exposure to potential threats." Declaration of Julie Jeakle ("Jeakle Decl.") [Dkt. No 19-30] ¶ 4. The County also faces "significant disaster risks due to its diverse geography, large population, . . . proximity to international borders . . . catastrophic wildfires, earthquakes, flooding, and severe storms." *Id.*

Because of these threats, San Diego County has relied on federal funding to "prepare for, protect against, respond to, and recover from catastrophic disasters." *Id.* ¶ 5. Last year, the County received over $3.9 million in SHSP, EMPG, and UASI grant funds, which constituted roughly one-third of their OES budget. *Id.* ¶ 7. Specifically, the County received $2.8 million in

SHSP funding to "support salaries and training for emergency response personnel . . . perform[ing] vital preparedness, response, and recovery work." *Id.* ¶¶ 11–13. The County also received $692,978 in EMPG grant funds, which similarly provides salary funding for emergency personnel. *Id.* ¶¶ 17–21. Finally, the County received $396,863 in UASI grant funds, to be used to "procure equipment necessary to respond to hazardous materials incidents," "obtain mass casualty response training and equipment for response teams," and "acquire critical emergency evacuation map books." *Id.* ¶¶ 27–28. This year, San Diego County anticipates receiving, or has already received, $3.1 million in SHSP grant funds, $690,432 in EMPG grant funds, and $933,436 in UASI grant funds. *Id.* ¶¶ 11, 19, 27.

San Diego County maintains that it will be forced to either accept the DHS Conditions or lose at least $4.77 million in DHS and FEMA funding. *Id.* ¶ 33. This loss of grant funding would "significantly hinder [their] ability to implement critical emergency preparedness and response initiatives," which are "essential to advancing . . . capabilities necessary to safeguard life, property, and the region's resilience against evolving threats." *Id.* ¶¶ 33–34. It would also result in "reductions in staffing, equipment, and training that are essential to operational readiness," such as "around-the-clock emergency readiness" to handle emergencies. *Id.* ¶ 35. Additionally, "regional partners who rely on pass-through allocations from the County . . . would also see cuts to essential programs and capabilities, impacting the region's entire emergency response network." *Id.* ¶ 36. This "ripple effect[]" would be especially felt in light of the County's "constrained financial conditions," which could not "absorb the loss of these grant funds within its existing operating budget." *Id.* ¶¶ 36–37.

**Q. San Francisco**

The City and County of San Francisco is located in Northern California and is one of the nation's largest and most diverse urban centers. Declaration of Kim Bowman ("Bowman Decl.") [Dkt. No. 19-32] ¶ 4. San Francisco is "at risk for multiple disasters and emergencies, including but not limited to earthquakes, tsunamis, fire, severe storms, urban flooding, extreme heat, cold weather, hazardous air quality conditions, or acts of terrorism targeting critical infrastructure." *Id.*

Many critical players reduce the risk of these disasters; each receive significant funding

from DHS and FEMA. First, the San Francisco Department of Emergency Management ("DEM") helps plan, prepare, communicate, respond to, and recover from "daily emergencies, large scale citywide events, and major disasters." *Id.* ¶ 2. One of DEM's main roles is to oversee San Francisco's 911 dispatch center and large-scale emergency operations. *Id.* To this end, DEM receives SHSP and EMPG pass-through funding each year from FEMA, which helps the Department prepare and respond to threats. *Id.* ¶¶ 5–6. Last year, DEM received $775,892 in SHSP funding, as well as $269,472 in EMPG funding. *Id.* ¶¶ 6–7. Both awards help fund DEM positions, upgrading technology, creating disaster and emergency preparation programs, and community outreach. *Id.* DEM intends to apply for an additional $267,970 in EMPG funding and $853,526 in SHSP funds this year. *Id.* ¶¶ 9–10. Without this funding, DEM would be forced to "lay off workers and reduce services," as San Francisco is experiencing significant financial strain. *Id.* ¶¶ 11–12. This possibility is "more than hypothetical," as DEM has "already been discussing whether layoffs will be necessary in light of diminishing federal assistance." *Id.* ¶ 12.

Additionally, the San Francisco Police Department ("SFPD") plays an active role in emergency and disaster response initiatives. Declaration of Kimmie Wu ("Wu Decl.") [Dkt. No. 19-33] ¶ 2. SFPD is responsible for overseeing over sixty-four square miles of waterways, which contains commercial ships, tour boats, passenger ferries, and cruise ships. *Id.* ¶ 7. To support these coverage efforts, SFPD typically receives PSGP and Boating Safety & Enforcement Equipment Grants. *Id.* ¶ 5. This year, for example, SFPD was awarded $24,000 in PSGP funding to "replace an inflatable vessel that was procured in 1988 and is no longer seaworthy." *Id.* ¶ 6. The PSGP grant contains the DHS Conditions at question in this case. *Id.* ¶ 8. Because San Francisco is operating under "severe financial strain," the SFPD is "operating under tremendous budgetary pressure." *Id.* ¶ 9. SFPD is currently "critically understaffed and incurs considerable overtime expenses to respond to increased public safety requests and demands." *Id.* ¶ 10. As a result, SFPD maintains it will not be able to "fund the replacement of critical, expired, damaged, or defective equipment" without DHS and FEMA funding. *Id.* ¶ 11.

The Port of San Francisco is responsible for "implement[ing] physical security measures to protect measures and facilities" in the San Francisco Bay, including two major bridges, the local

subway system, and the City's ferry network. Declaration of Kyle Thomas ("Thomas Decl.") [Dkt. No. 19-35] ¶¶ 3–4. The Port is currently in a "multi-year effort to improve [port] security through infrastructure improvements, target hardening, and training programs." *Id.* ¶ 5. These improvements have been funded primarily by PSGP funding from FEMA. *Id.* This year, the Port has received $73,372.50 in PSGP funding to replace CCTV cameras throughout the area to increase security and law enforcement agencies. *Id.* ¶¶ 6–7. This PSGP award includes the DHS Conditions in question. *Id.* ¶ 7. Without FEMA funding, the Port maintains "there is no guarantee [they] will be able to replace its surveillance system," leaving a "patchwork of vulnerabilities" in the region's security. *Id.* ¶ 8.

The San Francisco Municipal Transportation Agency ("SFMTA") is "responsible for safety and security" for the City's mass transit lines. Declaration of Kimberly M. Burrus ("Burrus Decl.") [Dkt. No. 19-31] ¶ 1. Unlike other transit agencies, the SFMTA does not have its own police force, and relies entirely on the SFPD. *Id.* at 3. To address this lack of transit law enforcement, SFMTA regularly receives DHS funding to cover "hiring for additional police for special events and 'surge overtime.'" *Id.* ¶ 4. This year, SFMTA has received a $3,066,376 in TSGP funding to continue this initiative. *See id.* ¶ 8; Declaration of David Louk ("Louk Decl.") [Dkt. No 19-3] Ex. 5 ("SF TSGP Award"). This grant contains the DHS Conditions. *See* SF TSGP Award. Without this funding, SFMTA maintains that it "cannot allocate a contingency group large enough to manage transit specific needs." Burrus Decl. ¶ 11. This is particularly true considering SFPD is already operating at below-minimum staffing levels, and the SFMTA is facing a 5 to 7% operating budget cut this upcoming year. *Id.* ¶¶ 6, 11.

Finally, San Francisco is part of the Urban Areas Security Initiative ("Bay Area UASI"), a regional agency that "administers federal emergency management grants dedicated to preventing, protecting against, responding to, and recovering from terrorist incidents and catastrophic events for its members—the three major Bay Area cities and its 12 counties." Declaration of Mikyng Kim ("Kim Decl.") [Dkt. No. 19-34] ¶ 3. San Francisco acts as the fiscal agent for Bay Area UASI and receives significant funding and support as a member. *Id.* ¶ 6. Bay Area UASI currently receives three DHS pass-through grants: STC, Regional Catastrophic Preparedness Grant

Program, and UASI. *Id.* ¶ 7. This year, the State of California received $93,473,801 in UASI funds, and Bay Area UASI expects to receive approximately one-third of these funds. *Id.* ¶¶ 12–13. Because Bay Area UASI passes most of this money to its members, San Francisco expects to receive roughly $2.5 million in UASI funding. *Id.* ¶¶ 15–16. The City plans to use this grant to purchase an X-Ray screening system and Portable Camera Kit for law enforcement, fund the salaries of two emergency services planners, and purchase other equipment to assist with portable water distribution, search and rescue operations, and terrorist attack recovery efforts. *Id.* ¶ 16. Without federal funding, San Francisco maintain it will not be able to financially support these initiatives. *Id.* ¶ 17.

**R. San José**

The City of San José is the third largest city in California and is home to approximately 980,000 individuals. Declaration of Raymond Riordan ("Riordan Decl.") [Dkt. No. 19-36] ¶ 4. San José is situated in a "region of very high seismic activity" and an area with a "history of flooding due to heavy rain and inadequate storm drains and flood protection conveyance systems." *Id.* Additionally, the City faces "significant wildlife concerns across multiple Fire Hazard Severity Zones." *Id.*

San José currently receives $6,050,857 in grants from the DHS and FEMA. *Id.* ¶ 5. These include: $85,000 in AFG funding for "equipment for firefighters"; $39,648 in EMPG funding "for training and to purchase technology and equipment for the [city's] Emergency Operation Center"; $6,544,138 in HMGP funding to "implement a soft-story seismic retrofit program"; $252,132 and $267,796 in SHSP funding for "training programs" and an "inspection robot to access and inspect areas too small or dangerous for humans"; and $4,771,151 in UASI funding to "prepare for various emergencies including to fund three staff positions." *Id.* ¶ 6. San José has also applied, or intends to apply, for an additional $587,098 in AFG funding, $22,600 in EMPG funding, $18,060,082 in HMGP funding, $1,253,153 in SHSP funding, and $1,570,000 in UASI funding. *Id.*

San José maintains that it will be forced to either accept the DHS Conditions or lose at least $20 million in DHS and FEMA funding. *Id.* ¶¶ 7–8. With an ongoing budget shortfall, the

United States District Court
Northern District of California

DHS and FEMA grants allow the city to maintain "necessary law enforcement and fire and rescue equipment" and personnel. *Id.* ¶ 9. Were San José to lose this funding, it would "face the difficult decision to cut costs while still maintaining essential services to [its] residents." *Id.* This could lead to "layoffs and the elimination of programs that serve [the City's] most vulnerable residents," even if on a temporary basis. *Id.*; *see also id.* ¶ 10 (outlining the specific consequences of loss of funding for the OEM, San José Police Department, and San José Fire Department).

**S. San Mateo County**

San Mateo County is located in the San Francisco Bay Area and has a population of over 700,000 residents. Declaration of Michael P. Callagy ("Callagy Decl.") [Dkt. No. 19-37] ¶¶ 3–4. The County is "uniquely vulnerable to a wide spectrum of threats and hazards," including "sea-level rise, coastal flooding, . . . tsunamis[,] a high probability of major earthquakes, [and] wildfires." *Id.* ¶¶ 3–5. It also contains critical infrastructure for the San Francisco Bay Area, including San Francisco International Airport. *Id.* ¶ 6. Because of this "unique risk-profile," San Mateo County is part of the Bay Area UASI region and the Northern California Regional Intelligence Center ("NCRIC"), a joint initiative between twenty-six Northern California counties to assist with the "collection, analysis, and dissemination of terrorism and organized crime threat intelligence." *Id.* ¶¶ 7–9.

San Mateo County currently receives approximately $3 million in DHS and FEMA funding. *Id.* ¶ 13. These include active HSGP, UASI, EMPG, Pre-Disaster Mitigation ("PDM"), and HMGP funding. *Id.* ¶ 14. Such grants provide support to county's "emergency response and preparedness capacity," "ongoing wildfire fuel-reduction efforts," "prevention, response, and recovery [efforts] across jurisdictions," and "large-scale emergenc[y]" response initiatives. *Id.* ¶¶ 14–16. Additionally, San Mateo County manages grants for NCRIC, which receives almost $2.5 million and $7 million in HSGP and UASI funding, respectively. *Id.* ¶ 23. The County also anticipates applying for an additional $2.5 million in HSGP funding and $7.5 million in UASI funding for NCRIC. *Id.*

San Mateo County maintains that it will be forced to either accept the DHS Conditions or lose millions in DHS and FEMA funding. *Id.* ¶ 27. NCRIC has "no alternative source of

funding"; without these grants, it would be forced to close, "eliminating regional and national coordination against crime, terrorism and transnational narcotics networks." *Id.* ¶ 28. This would impact critical services, such as "tsunami sirens and countywide alert infrastructure," "putting lives at risk during emergencies." *Id.* Loss of funding would also stall wildfire mitigation efforts and impair emergency preparation for other natural disasters. *Id.* ¶¶ 29–30. These risks would "leave the County and its residents, as well as Northern California more broadly, dangerously exposed, undermine all prior investments, and erode both short-term response capability and long-term community resilience." *Id.* ¶ 31.

**T. Santa Clara County**

The County of Santa Clara is a charter county in California home to approximately 1.9 million residents. Declaration of Dana C. Reed ("Reed Decl.") [Dkt. No. 19-38] ¶ 4. OEM acts as the "lead emergency management agency for the entire Santa Clara County Operational Area," and is "heavily supported by FEMA funding streams." *Id.* ¶¶ 8–9. OEM receives federal grants from four different grant programs: SHSP, EMPG, UASI, and HMGP. *Id.* ¶¶ 11, 25.

Last year, Santa Clara County received $1,664,434 in SHSP grants to fund five critical staff positions in OEM focused on counterterrorism and emergency planning, as well as purchasing critical equipment. *Id.* ¶¶ 14–15. This year, they seek $1,852,295 to fund the same positions and increase equipment and training programs. *Id.* ¶ 16. Similarly, with respect to EMPG funding, Santa Clara County received $452,624 in 2024 to fund "full-time Emergency Operational Area Council Liaison" and "Voluntary Organizations Active in Disaster Liaison" staff positions, as well as "training, technology, public outreach, and critical emergency supplies." *Id.* ¶¶ 19. The County was allocated $451,385 this year for "substantially the same" uses. *Id.* ¶ 20. Santa Clara County also received $573,585 in 2024 in UASI funding, which was used to purchase an armored vehicle for the Sheriff's Emergency Response team; this year, the County received $573,585 to help purchase a "multi-passenger transit van and a decontamination trailer, evacuation devices, and patient-transport devices for Santa Clara's public health and hospital system." *Id.* ¶¶ 23–24. Finally, Santa Clara County anticipates $750,000 in pass-through HMGP funding this year, which will be used to purchase wildfire detection equipment. *Id.* ¶¶ 25–26.

United States District Court
Northern District of California

Santa Clara County maintains that it will be forced to either accept the DHS Conditions or lose at least $3.6 million in DHS and FEMA funding. *Id.* ¶ 27. This will be particularly impactful on the County's OEM, as FEMA funding comprises 43% of their FY 2025 budget. *Id.* Without DHS and FEMA funding, Santa Clara County will be forced to abandon, among other things, "coordinated community-wide planning" for natural disasters and upcoming events in the County, such as Super Bowl LX and the FIFA World Cup. *Id.* ¶¶ 29–33.

**U. Santa Monica**

The City of Santa Monica is located in Los Angeles County and is home to approximately 93,000 residents. Declaration of Oliver Chi ("Chi Decl.") [Dkt. No. 19-39] ¶ 4. The City is a popular tourist destination, attracting over 6 million tourists each year. *Id.* It is also adjacent to Pacific Palisades, which was devastated by the January 2025 Fires. *Id.* ¶ 5. Santa Monica is also subject to fire risk, with almost 3,100 housing units and 237 businesses being reclassified into fire hazard zones by the California Department of Forestry and Fire Protection. *Id.* ¶ 6. The City is also at risk for earthquakes—FEMA research "estimates $3.4 billion in total economic loss for Santa Monica after a major earthquake on the Santa Monica Fault." *Id.* ¶ 7.

Santa Monica receives approximately $4 million in FEMA grants each year. *Id.* ¶ 8. These grants include $2 million in combined UASI and SHSP funds to "coordinate regional trainings for fire department personnel, . . . training and equipment, and for cybersecurity improvements"; $135,000 in HMGP funds to provide "robust community outreach materials to educate Santa Monica residents about local hazards and potential risks of unmitigated disaster events"; and a $1,930,860 HMGP grant for "seismic retrofit work." *Id.* ¶¶ 8–15. The City anticipates receiving an additional $4.8 million in HMGP funds to finish their seismic retrofitting programs, $1.33 million in Public Assistance Grant Program funds to support recovery efforts from the January 2025 Fires, and $119,056 in AFG funding to support a firefighter wellness and fitness program. *Id.* ¶¶ 16–19. Santa Monica believes these future grants will contain (or, in the case of the AFG funding, already contains), the DHS Conditions. *Id.* ¶ 20.

Santa Monica maintains that it will be forced to either accept the DHS Conditions or lose at least $5.9 million in DHS and FEMA funding. *Id.* ¶ 23. Without this funding, Santa Monica

United States District Court
Northern District of California

contends it will lose the ability to fund their Regional Training Officer contractor position in the Santa Monica Fire Department, which to train approximately 9,000 firefighters across twenty-nine fire agencies. *Id.* ¶ 25. Additionally, as the greater Los Angeles region prepares for three major upcoming events—the FIFA World Cup in 2026, the Super Bowl in 2027, and the Olympics in 2028—Santa Monica fears that losing these grants would result in critical incident preparedness trainings would be discontinued. *Id.* ¶ 28. Finally, hundreds of residents may lose the ability to retrofit their buildings without this funding. *Id.* ¶ 29. Santa Monica cannot fund these programs without FEMA grants, as the City has declared a financial emergency. *Id.* ¶ 30.

**V. Santa Rosa**

The City of Santa Rosa is a municipal corporation and charter city located in Sonoma County, California. Declaration of Jason Nutt ("Nutt Decl.") [Dkt. No. 19-41] ¶¶ 2, 6. Santa Rosa is particularly vulnerable to wildfires: between 2017 and 2020, the City was significantly impacted by five major wildfires, destroying thousands of homes and burning hundreds of thousands of acres. *Id.* ¶ 7.

Santa Rosa receives roughly $47 million in grants from DHS and FEMA. *Id.* ¶ 8. Currently, the Santa Rosa Fire Department receives $2.36 million in SAFER grants to pay for the salaries of twelve firefighter paramedic positions, which the City cannot pay for itself. *Id.* ¶ 9. Additionally, Santa Rosa has been approved for, but has not yet received, $14.2 million in HMGP funding to update a wastewater facility to protect 230,000 individuals from "flood events." *Id.* ¶ 10. The Santa Rosa Fire Department ("SRFD") expects disbursement of approximately $3.6 million in HMGP funding to be used for "vegetation removal and fuel reduction projects along City evacuation routes, vegetation management education, and vegetation management compliance." *Id.* ¶ 11. The SRFD is also in the process of applying for a $200,000 AFG grant, which would allow for the purchase of "critical specialized firefighting and emergency medical equipment the City would otherwise lack the resources to acquire." *Id.* ¶ 12.

Santa Rosa anticipated receiving these DHS and FEMA grants when approving its FY 2025 budget; losing this funding would put the City "in limbo." *Id.* ¶ 13. It contends that "[l]oss of any significant portion of these grant funds will [also] result in increased risk of infrastructure

failure due to deferred maintenance and lack of preparedness for future disasters, accelerating the

City's need to use critical emergency reserves in fiscal year 2025-26, reserves that have been set

aside to support community health, safety, and governmental operations during potential future

disasters." *Id.* "Simply put, Santa Rosa would not be able to cover such a shortfall." *Id.*

**W. Snohomish County**

Snohomish County is located in the greater Seattle area Washington State. Declaration of

Lucia Schmit ("Schmit Decl.") [Dkt. No. 19-42] ¶ 3. Snohomish County has a unique topography,

including "numerous valleys, lowlands, forestlands and waterfront." *Id.* ¶ 4. This, in combination

with the County's dense population, makes the area "prone to hazardous weather events and

flooding[,] an increasing risk of wildfire[,] [and] earth movement events including earthquakes,

landslides and volcanoes." *Id.* The Snohomish County Department of Emergency Management

("DEM") provides emergency management services for the County. *Id.* ¶ 3. The DEM is also a

member of the Seattle Metropolitan UASI. *Id.*

Snohomish County currently receives $670,474 in EMPG funds, $885,203 in SHSP funds,

and $1,676,743 in UASI funds. *Id.* ¶ 5. It also anticipates receiving $425,000 in Flood Mitigation

Assistance funds. *Id.* The DEM also has pending awards in the following amounts: $303,237 in

EMPG funds; $368,325 in SHSP funds; and $1,009,251 in UASI funds. *Id.* The DHS also plans

to apply for three new grant awards: $540,000 in SHSP funds, $370,000 in EMPG funds, and

$750,000 in UASI funds. *Id.* These grants support roughly "one third of the core emergency

management staff at DEMA." *Id.*

Snohomish County maintains that it will be forced to either accept the DHS Conditions or

lose at least $2.1 million in DHS and FEMA funding. *Id.* ¶ 14. This loss of funding would create

"long term challenges, particularly in efforts to prepare for infrequent but major disasters." *Id.*

Instead, the County would be forced to divert resources from emergency management programs,

which would result in "fewer investments in preparedness and mitigation, which will only increase

the need for response in the future, in a continuing vicious cycle." *Id.* Snohomish County points

to potential cuts to its training programs (despite it providing approximately 40% of all emergency

management training in the state of Washington) as well as planning and outreaching initiatives.

*Id.* at ¶ 15.

**X. Sonoma County**

The County of Sonoma is located in Northern California and is home to approximately 500,000 residents. Declaration of Johannes Hoevertsz ("Hoevertsz Decl.") [Dkt. No. 19-43] ¶ 3. This region is "impacted by a variety of hazards, natural and man-made, including wildfires, earthquakes, and floods." *Id.* The most frequent hazard is flooding, with "major flooding events occurring every one to two years." *Id.* ¶ 4. The County has an "extensive history of flooding and weather storm events": since 1980, $130 million in flood claims have been paid in the County, the highest flood damage cost of any county on the West Coast. *Id.* FEMA's National Risk Index places the County at the 99.17% percentile for flood hazard risk. *Id.* The "expected annual loss from flooding alone is $23 million." *Id.*

The County of Sonoma's Public Infrastructure Department ("SPI") oversees the County's FEMA grant awards. *Id.* ¶ 5. SPI currently oversees $968,550 in HMGP funding to "design . . . long-stabilization and engineering solutions to [a] critical County roadway" subject to erosion, flooding, and bank stabilization issues. *Id.* ¶¶ 6, 9. Additionally, SPI expects to receive $155,666.25 in HMGP funding to "install solar-powered flood monitoring cameras and automated, high-water warning systems at high-risk intersections." *Id.* ¶¶ 10–11. It anticipates these new grants to contain the DHS Conditions. *Id.* ¶ 13.

Additionally, the Sonoma County DEM oversees all pass-through grant funding awarded to the State of California by DHS and FEMA. Declaration of Samuel Wallis ("Wallis Decl.") [Dkt. No. 19-44] ¶ 10. Currently, DEM oversees $2,288,116 in pass-through funding from HSGP, EMPG, and HMGP grants. *Id.* ¶¶ 11, 14. DEM also anticipates applying for approximately $500,000 in HSGP and UASI funding as a subgrantee. *Id.* ¶¶ 11, 16.

Sonoma County maintains that it will be forced to either accept the DHS Conditions or lose $1,124,216 in direct grant funding, as well as $500,000 in pass-through funding. *Id.* ¶ 20; Hoevertsz Decl. ¶ 14. Such loss of funding would result in critical infrastructure remaining "vulnerable to washouts and closures," as well as "increased life-safety threats due to stuck and submerged vehicles and high-risk water rescues of stranded drivers." Hoevertsz Decl. ¶¶ 15–16.

The County does not have "adequate local or other funding alternative[s]" for the grants.  *Id.* ¶ 16.

**Y.  Sonoma Water**

The Sonoma County Water Agency is a special district created by the California Legislature in 1949 to "provide flood protection and water supply services."  Declaration of James L. Spaulding ("Spaulding Water Decl.") [Dkt. No. 19-45] ¶¶ 3–4.  Sonoma Water helps manage a "water transmission system that supplies roughly 90% of pressurized water to nine cities and water agencies . . . serving over 600,000 residents throughout Sonoma and northern Marin Counties."  *Id.* ¶ 4. In 1995, the California Legislature "added the treatment of disposal of wastewater to Sonoma Water's responsibilities."  *Id.*  This service provides wastewater collection and recycled water distribution/disposal services for roughly 22,000 residences and businesses.  *Id.*  Sonoma Water is additionally tasked with providing flood protection for the County.  *Id.*

Sonoma Water plays an integral role in Sonoma County's flooding and wildfire prevention efforts.  *Id.* ¶ 5.  Since 2008, Sonoma Water has received $16 million in pass-through funding from DHS and FEMA for "targeted mitigation projects that have improved the resiliency of Sonoma Water's facilities and infrastructure to withstand the effects of natural hazard events."  *Id.* ¶ 6.  Active funding includes a $2,956,867 HMGP grant to "develop hazard mitigation plans and implement long-term hazard reduction projects"; $86,697 in HSGP funding to "purchase and install[] a video surveillance/alarm monitoring system to enhance the protection of Sonoma County's primary water supply"; and $250,000 in Local Cybersecurity Grant Program funding to upgrade cybersecurity intrusion systems.  *Id.* ¶ 8.  Sonoma Water has also applied for $487,500 in additional HMGP funding, as well as $6,143,525 in Presidential Major Disaster Declaration ("PMDD") funding to "support the seismic retrofitting of . . . water transmission pipelines" to withstand a 7.0 magnitude earthquake.  *Id.* ¶ 9.

Sonoma Water maintains that it will be forced to either accept the DHS Conditions or lose $9,437,892 in FEMA funding.  *Id.* ¶ 11.  Because the pending HMGP funding is meant to support ongoing projects, Sonoma Water will be forced to "complete the project without HMGP funding," resulting in significant financial hardship.  *Id.* ¶ 12.  Additionally, loss of PMDD funding would "effectively shelve the project and leave contractors and their customers vulnerable to aqueduct

United States District Court
Northern District of California

failure in a significant seismic event." *Id.*

**Z. Sonoma Valley County Sanitation District**

Sonoma Valley County Sanitation District ("SVCSD") is a special district in Sonoma County created in 1953. Declaration of James Spaulding ("Spaulding SVCSD Decl.") [Dkt. No. 19-46] ¶ 4. SVCSD is a separate legal entity from Sonoma Water, with a separate Board tasked with overseeing the assets of the district. *Id.* Currently, SVCSD serves 17,927 single family homes with an estimated population of 42,000 individuals. *Id.* It is the "sole entity providing public wastewater collection and treatment for the City of Sonoma and numerous unincorporated communities within Sonoma Valley." *Id.*

SVCSD currently receives $5,299,998 in pass-through HMGP funding to assist with seismic retrofitting of secondary clarifies at its wastewater treatment plant. *Id.* ¶ 5. It also has a pending application for HMGP funding in the amount of $1,596,750 to "support a bank stabilization project along Sonoma Creek and Kohler Creek to reduce risk to public health and the environment posed by erosion." *Id.* ¶¶ 5–6. Further, SVCSD intends to apply for $2 to $6 million in additional funding should it become available through a new PMDD. *Id.* ¶ 7.

Sonoma Water maintains that it will be forced to either accept the DHS Conditions or lose access to funding that provides essential services to the 42,000 residents it serves. *Id.* ¶ 8. Loss of this funding would "delay and impact the construction needed to protect its vital infrastructure to avoid damage, failures, disruption in service, loss of property, and repair costs while avoiding risks to public health and the environment." *Id.* ¶ 9.

**AA. Sonoma County Community Development Commission**

The Sonoma County Community Development Commission ("SCCDC") is a public body exercising governmental functions pursuant to California Health and Safety Code Section 34110 *et seq.* Declaration of Michelle Whitman ("Whitman Decl.") [Dkt. No. 19-47] ¶ 4. It is charged with overseeing "rental assistance, affordable housing and community infrastructure projects," as well as supporting non-profit organizations supporting low-income communities in Sonoma County. *Id.* It also implements the County of Sonoma Flood Elevation Program, which was created in response to widespread flooding in the 1980s and 1990s. *Id.* ¶ 6.

SCCDC is the body responsible for applying for pass-through funding from the California Office of Emergency Services. *Id.* ¶ 7. Once funding is received, the County of Sonoma becomes the subrecipient of the grant, while the SCCDC administers the grant. *Id.* Sonoma County currently has two active awards: $916,171.13 in FMA funding, and $1,424,319.75 in HMGP funding. *Id.* It also has a pending application for $2,790,340.00 in FMA funding. *Id.* These grants help fund programs that "elevate flood prone residential homes located in the [County's] Special Flood Hazard Area." *Id.* ¶ 8.

SCCDC maintains that Sonoma County will be forced to either accept the DHS Conditions or lose access to $5,130,830.88 in DHS and FEMA funding. *Id.* ¶ 9. Loss of funding would result in "multiple homes and occupants [remaining] unprotected from the imminent threat of damage, destruction, injury, or death" caused by local flooding hazards. *Id.* This, in turn, would place a greater strain on local resources, "increasing the costs of those services and . . . adding to the dangerous workload of 'boots on the ground' emergency service workers." *Id.* SCCDC, Sonoma County, or homeowners would also be forced to brunt any lost costs, which would "cause significant financial hardship." *Id.* ¶ 10.

**BB. Tucson**

The City of Tucson is located in Pima County, Arizona, and is home to over 500,000 residents. Declaration of Sharon McDonough ("McDonough Decl.") [Dkt. No. 19-48] ¶ 3. Given the "extremely hot, dry climate" of the region, Tucson faces a constant concern of wildfires. *Id.* ¶ 4. The arid climate also makes it prone to flash floods when it rains in the region. *Id.*

To respond to these threats, the Tucson Fire Department ("TFD") relies on substantial grants from FEMA, which account for up to 4% of the Department's annual budget. *Id.* ¶¶ 4–5. TFD currently receives $1,844,916 in direct FEMA grants, as well as $312,000 in HSGP pass-through funding. *Id.* ¶ 5. It has also applied for over $5.7 million in SAFER and AFG funding, as well as approximately $1 million in additional SHSP pass-through grants. *Id.* These new grants will cover purchasing "tethered drone systems to enhance the department's ability to respond to all hazards events"; "equipment and training" for the Arizona Regional/Border Hazmat Response Team; upgrading necessary search and rescue equipment; conducting training courses and supplies

United States District Court
Northern District of California

United States District Court
Northern District of California

for technical rescue technicians; and hiring additional firefighters. *Id.* ¶¶ 12, 14. Each of the FY 2024 and FY 2025 awards received by Tucson contain the DHS Conditions. *Id.* ¶ 15.

Tucson maintains that it will be forced to either accept the DHS Conditions or lose access to millions in DHS and FEMA funding. *Id.* ¶ 17. The City faces "mounting economic pressures," which has "constrained [its] ability to invest in critical frontline services, especially fire and emergency response," without this funding. *Id.* ¶ 18. In its view, federal funding is "not merely beneficial but essential." *Id.* ¶ 19. FEMA grants are a "life-saving resource that equip[] TFD to fulfill its mission without compromising financial integrity or operational effectiveness." *Id.* Without this funding, Tucson will be forced to reduce its efforts to "coordinate and enhance emergency response efforts on a regional basis." *Id.* ¶ 20.

4. **PROCEDURAL HISTORY**

On September 30, 2025, plaintiffs filed a complaint in the Northern District of California, seeking declaratory and injunctive relief that the DHS Conditions are unconstitutional. *See* Compl. They then filed a motion for preliminary injunction on October 1, 2025, seeking to "prohibit[] Defendants from imposing or enforcing the Unlawful DHS Conditions on Plaintiffs, withholding funding on the basis of those unlawful conditions, or imposing any materially similar conditions on Plaintiffs." Mot. at 25.[7] Because some plaintiffs faced an October 24, 2025, deadline to accept funding with the DHS Conditions, plaintiffs also moved to establish an expedited briefing schedule. *See* Plaintiffs' Motion to Shorten Time [Dkt. No. 21]. While I granted plaintiffs' motion to expedite on October 7, 2025, *see* Order Granting Motion [Dkt. No.

---

[7] That same day, plaintiffs filed a request for judicial notice of various FEMA manuals, grant NOFOs, and the Bondi Discrimination Guidance Memo. *See* Plaintiffs' Request for Judicial Notice ("RJN") [Dkt. No. 20]. Plaintiffs' request for judicial notice is GRANTED. Under Federal Rule of Evidence 201, courts may take judicial notice of any fact "not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b), (c)(2). "Courts may take judicial notice of some public records, including the 'records and reports of administrative bodies.'" *United States v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003) (quoting *Interstate Nat. Gas. Co. v. S. Cal. Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1953)). Each of the exhibits in the RJN are public records or reports issued by FEMA, DHS, or the Department of Justice. These materials fit squarely within the type of facts I may take judicial notice of.

United States District Court
Northern District of California

54], due to the federal government shutdown, the parties stipulated to push back the briefing and hearing schedule in exchange for pausing any pending deadlines. *See* Stipulation with Proposed Order [Dkt. No. 61]. I granted their proposed order on October 10, 2025, with the understanding that the earliest deadline plaintiffs would face was Monday, November 24, 2025, at 11:59 p.m. Pacific Time. *See* Order Granting Stipulated Request [Dkt. No. 63].

On October 24, 2025, defendants filed their response. *See* Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction ("Oppo.") [Dkt. No. 66]. Plaintiffs responded on November 4, 2025. *See* Plaintiffs' Reply in Support of Motion for Preliminary Injunction ("Repl.") [Dkt. No. 69].[8] I heard oral argument on November 19, 2025.

**LEGAL STANDARD**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). This has been interpreted as a four-part conjunctive test, not a four-factor balancing test. However, the Ninth Circuit has adopted a sliding scale approach, where a plaintiff may obtain an injunction so long as he has demonstrated "serious questions going to the merits," that the balance of hardships "tips sharply" in his favor, that he is likely to suffer irreparable harm, and that an injunction is in the public interest. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–35 (9th Cir. 2011).

**DISCUSSION**

**I. JUSTICIABILITY**

Defendants first challenge the justiciability of plaintiffs' claims. *See* Oppo. at 5–10. They claim plaintiffs lack an injury-in-fact to establish standing in federal court, as many have yet to receive the grants central to this dispute. *See id.* at 8–10. They also argue the Tucker Act bars

[8] Plaintiffs also filed an additional request for judicial notice with their reply. *See* Plaintiffs' Supplemental Request for Judicial Notice ("Supp. RJN") [Dkt. No. 70]. Specifically, plaintiffs seek judicial notice of an additional DHS/FEMA NOFO and a memorandum from FEMA's Acting Deputy Administrator for Resilience discussing the 2026 FIFA World Cup. *Id.* at 2. For the same reasons as the RJN, plaintiffs' request is GRANTED.

United States District Court
Northern District of California

federal district courts from hearing this dispute. *See id.* at 5–8. Neither contention has merit.

**A. Standing**

A plaintiff has standing under Article III of the United States Constitution if (1) they have suffered an injury-in-fact or face an imminent injury; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable decision would likely redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

**1. Injury-in-Fact**

An injury-in-fact must be concrete, particularized, and imminent. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). An injury is concrete when it has a "close relationship" to a harm "traditionally" recognized as providing a basis for suit. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021). An injury is particularized if it affects the plaintiff in a "personal and individual way." *Spokeo*, 578 U.S. at 339 (internal citation omitted). And an injury is actual or imminent if it has already occurred or there is a substantial risk that it will occur. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105–06 (1983). Plaintiffs typically must make a separate showing for each form of relief requested. *Id.* at 111.

Defendants argue that plaintiffs have not properly shown they have suffered (or will suffer) injury for five grant programs—HMGP, SAFER, FP&S, EMPG, and HSGP. Oppo. at 8–9.[9] With respect to the HMGP, SAFER, and FP&S grants, defendants maintain that none of the plaintiffs "currently receive or have yet been offered" these funds. *See id.* at 9. Because plaintiffs must make a separate showing for "each claim that they press against each defendant," defendants conclude plaintiffs lack standing on these three claims. *See id.* at 8 (citing *Murthy v. Missouri*, 603 U.S. 43, 61 (2024)). Additionally, defendants contend that plaintiffs are mere "subrecipients of the [EMPG and HSGP funds]" and therefore have "no control over whether the funds are accepted." *Id.* at 9. Because they cannot "make any decision regarding whether to accept those funds and any decisions about whether those funds are ultimately passed down," defendants similarly conclude that standing cannot be established for these grants. *Id.*

[9] As plaintiffs recognize in their reply, defendants do not challenge plaintiffs' standing for their AFG, TSGP, US&R, PSGP, and STC grant claims. *See* Repl. at 1.

Defendants misunderstand the theory of this case.  Plaintiffs are "challenging the *policy* of applying the Standard DHS Terms to all of Defendants' grants," which is enough to establish standing.  *See* Repl. at 2 (emphasis in original).  *Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012), is on point.  There, the Ninth Circuit explained that there are "two ways in which a plaintiff can demonstrate that [an] injury is likely to recur."  695 F.3d at 997–98 (citing *Mayfield v. United States*, 599 F.3d 964, 970 (9th Cir. 2010), *cert. denied*, 562 U.S. 1002 (2010)).  "First, a plaintiff may show that the defendant had, at the time of the injury, a written policy, and that the injury 'stems from' that policy."  *Id.* at 998 (quoting *Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir. 2001), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499 (2005)).  "Second, the plaintiff may demonstrate that the harm is part of a 'pattern of officially sanctioned . . . behavior, violative of the plaintiffs' [federal] rights.'"  *Id.*  As plaintiffs correctly argue to satisfy the first prong, "Defendants adopted the written Standard DHS Terms as an official policy and are categorically imposing the Unlawful DHS Conditions on all of Defendants' grants."  Repl. at 2.  Because plaintiffs are "harmed by this policy because they have received awards that contain the conditions," that "is enough to show standing."  *Id.*

*Melendres* controls this case.  Defendants do not contest that the DHS Conditions are being "categorically impos[ed]" on plaintiffs' current and future DHS and FEMA grants.  Repl. at 2.  And, as explained in detail below, plaintiffs show that their alleged injury—choosing to accept a potentially unconstitutional condition or forfeit millions in critical funding—is an "injury [that] 'stems from' [DHS and FEMA's] policy."  *Melendres*, 695 F.3d at 998.  That is enough to establish an injury-in-fact for the grant programs under *Melendres*.  *See id.*

Moreover, plaintiffs have also established an injury-in-fact for each of the questioned grant programs.  A "material risk of future harm can satisfy the [injury-in-fact] requirement," should the "risk of harm [be] sufficiently imminent and substantial."  *TransUnion*, 594 U.S. at 415, 435.  That standard is met here.  Plaintiffs have sufficiently identified parties who have already received HMGP and SAFER grants with the DHS Conditions.  For example, the Los Angeles Fire Department received a $4,204,414.04 SAFER grant in 2024, which "incorporate[ed] . . . all conditions set forth in the . . . 2025 DHS Standard Terms and Conditions."  *See* Chavez Decl. ¶¶

10–11. Similarly, the City of Santa Rosa has received approval for two HMGP grants totaling $17.8 million, though the grant agreement has not yet been provided. *See* Nutt Decl. ¶¶ 10–11.[10]

Further, plaintiffs' HSGP and EMPG claims sufficiently identify an injury-in-fact, even as subrecipients to the grants. Although plaintiffs do not receive these grants directly from DHS or FEMA, the allegedly unlawful DHS Conditions "flow through the states to subrecipients." Repl. at 3. As shown in their motion and corresponding declarations, plaintiffs "reasonably expect to receive millions pursuant to these programs from their states based on predetermined allocations in the notices of funding opportunities ("NOFO"), statutory entitlement, and long-standing practice." *Id*. at 2; *see, e.g.*, Kim Decl. ¶¶ 8–14; Bowman Decl. ¶¶ 5–10; Reed Decl. ¶¶ 16–24. Therefore, plaintiffs reasonably anticipate being forced to either accept the DHS Conditions, despite their potential unconstitutionality, or forfeit millions in disaster and emergency preparedness funding. This is a classic dilemma that establishes an injury-in-fact. *See Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1137 ("A plaintiff suffers a 'constitutionally cognizable injury' whenever the government succeeds in pressuring the plaintiff into forfeiting a constitutional right in exchange for a benefit or the government withholds a benefit based on the plaintiff's refusal to surrender a constitutional right.") (citation omitted).

Plaintiffs have sufficiently identified an injury-in-fact to establish standing.

2. **Traceability and Redressability**

In addition to an injury-in-fact, the two remaining standing elements are also satisfied, which defendants do not dispute. The harm asserted by plaintiffs is traceable to the defendants' conduct because plaintiffs are forced to either accept DHS and FEMA's allegedly discriminatory conditions or forego millions in crucial emergency and disaster-related funding. And the remedy they seek—a permanent injunction to prevent defendants from enforcing these conditions—would redress their harms should I grant an injunction in their favor.

**B. The Tucker Act**

Defendants also contest the statutory jurisdiction of plaintiffs' claims by arguing that the

[10] While defendants assert that no plaintiff shows that they have received a FP&S grant containing the DHS Conditions, that is immaterial because *Melendres* controls this case.

Tucker Act precludes district courts from hearing this case. The crux of their argument is this: plaintiffs bring contract claims disguised as constitutional and statutory claims, and the only forum that can hear federal contract disputes is the Court of Federal Claims (the "CFC"). *See* Oppo. at 5–8. Conversely, plaintiffs argue that (1) their claims *are* constitutional and statutory, and (2) their complaint seeks equitable relief, which cannot be provided by the CFC. Repl. at 3–4. Plaintiffs' assertions are accurate, and this court has jurisdiction.

Under 28 U.S.C. § 1491, the Tucker Act provides:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). Further, 28 U.S.C. § 1346 provides:

> The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of . . . [a]ny other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort, **except that the district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States or for liquidated or unliquidated damages in cases not sounding in tort** which are subject to sections 7104(b)(1) and 7107(a)(1) of title 41.

28 U.S.C. § 1346(a) (emphasis added).

Defendants presume that the Tucker Act "extends to claims founded on grants . . . implemented through 'contracts to set the terms of and receive commitments from recipients.'" Oppo. at 6 (quoting *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021)). Although they acknowledge that plaintiffs seek an injunction, a form of equitable relief, defendants contend that the specific relief sought—"uninterrupted grant funding pursuant to their federal grant agreements"—is actually contractual in nature. *Id.* at 7.

Defendants cite two recent Supreme Court stay rulings dealing with the jurisdictional constraints of the Tucker Act to support their argument. *See id.* at 7–8. First, in *Department of Education v. California*, the Court issued an emergency stay on a temporary restraining order that

required the federal government to "pay out past-due [education] grant obligations and to continue

paying obligations as they accrue." 604 U.S. 650, 650 (2025). In a four-paragraph order, the

Court recognized that the APA's limited waiver of sovereign immunity does not provide

jurisdiction to district courts to "enforce a contractual obligation to pay money." *Id.* at 651

(quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212). Rather, the Tucker

Act confers the CFC jurisdiction over any suit based on an "express or implied contract with the

United States." *Id.* (quoting 28 U.S.C. § 1491(a)(1)). That said, the Court noted that jurisdiction

in a district court is "not barred by the possibility that an order setting aside an agency's action

may result in the disbursement of funds." *Id.* (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 910

(1988) (internal quotations omitted)).

Defendants also rely on *National Institutes of Health v. American Public Health

Association* ("*NIH*"). 145 S. Ct. 2658 (2025). There, plaintiffs brought APA, constitutional, and

ultra vires challenges to the federal government's termination of various grants. *Id.* at 2569. The

district court granted a partial injunction on the plaintiffs' APA claims, prohibiting the

government from implementing the challenged policies and grants. *Am. Pub. Health Ass'n v.

Nat'l Insts. of Health*, 791 F. Supp. 3d 119 (D. Mass. 2025). On appeal, the First Circuit affirmed

the order vacating the challenged policies. *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 145

F.4th 39, 50 (1st Cir. 2025). The Supreme Court disagreed with the lower courts with respect to

vacating the grant termination programs and stayed the district court's order. 145 S. Ct. at 2660.

The plurality reaffirmed that the APA does not confer jurisdiction to district courts "to order relief

designed to enforce any 'obligation to pay money' pursuant to . . . grants." *Id.* Justice Barrett's

concurrence also noted that the district court "likely lacked jurisdiction to hear challenges to the

grant terminations, which belong in the Court of Federal Claims." *Id.* at 2661 (Barrett, J.,

concurring).

Plaintiffs' claims are factually distinct from both *California* and *NIH*. Those cases

involved the *termination* of grant funding; here, however, plaintiffs' claims do not revolve on any

terminations of DHS and FEMA funding. As plaintiffs aptly note in their reply, they "do not

challenge any grant terminations, do not advance any claim for breach of a preexisting grant

agreement, and do not seek to enforce any obligation to pay funds pursuant to federal grant agreements." Repl. at 3. Rather, plaintiffs' claims "challenge Defendants' use of an unlawful agency policy to impose unlawful grant conditions, and [they] seek equitable relief to prevent Defendants from imposing unlawful conditions and to set aside those provisions of the Standard DHS Terms." *Id.* These claims are rooted not in contract law, but rather in the "Constitution, laws, or treaties of the United States." *Id.*; 28 U.S.C. § 1331. Claims "rooted in statutory and constitutional authorities and that are *independent* of . . . grant agreements" preclude the Tucker Act from applying. *See Washington. v. U.S. Dep't of Health & Human Servs.*, No. 6:25-cv-01748-AA, 2025 WL 3002366, *6 (D. Or. Oct. 27, 2025) (emphasis in original).

Defendants' arguments are also unconvincing in light of Ninth Circuit precedent. Defendants repeatedly point to plaintiffs' complaint, which requests that the court prevent defendants from "reducing the amount of a grant award," as evidence that their argument "hinge[s] on contractual" agreements. Oppo. at 7 (citing Compl. ¶ 76). However, as noted in *California*, "a district court's jurisdiction 'is not barred by the possibility' that an order . . . may result in the disbursement of funds." 604 U.S. at 651 (citation omitted). Rather, jurisdiction is conferred to the CFC by the Tucker Act if an action is "'at its essence' a contract action." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). To determine if plaintiffs are really asserting a contractual claim, the Ninth Circuit requires district courts to consider (1) "the source of the rights upon which the plaintiff bases its claims," and (2) "the type of relief sought (or appropriate)." *United Aeronautical Corp. v U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (quoting *Megapulse*, 672 F.2d at 968)).

As discussed in detail in Section II.A.1, *supra*, plaintiffs' claims are constitutional in nature and cannot be adequately remedied in the CFC, which focuses exclusively on monetary damages for contract actions. Additionally, plaintiffs seek an injunction preventing the application of the DHS Conditions to any federal DHS or FEMA funding, a remedy that cannot be conferred by the CFC. District courts "have found with near or total uniformity that [they] have jurisdiction over claims such as these." *Housing Auth. of City & Cnty. of S.F. et al. v. Turner et al.*, No. 25-cv-08859-JST, 2025 WL 3187761, *9 (N.D. Cal. Nov. 14, 2025) (Tigar, J.) (citing *S.F. Unified*

*Sch. Dist. v. AmeriCorps*, 784 F. Supp. 3d 1280, 1291–97 (N.D. Cal. 2025)); *see Martin Luther King, Jr. Cnty. v. Turner*, 785 F. Supp. 3d 863, 877–82 (W.D. Wash. 2025); *City of Fresno et al. v. Turner et al.*, No. 3:25-cv-07070-RS, 2025 WL 2721390, *5–*6 (N.D. Cal. Sept. 23, 2025) (Seeborg, C.J.); *City & Cnty. of S.F. v. Trump*, 783 F. Supp. 3d 1148, 1201 n.12 (N.D. Cal. 2025) (Orrick, J.); *Illinois v. Fed. Emergency Mgmt. Agency*, C.A. No. 25-206 WES, 2025 WL 2716277, *9 (D.R.I. Sept. 24, 2025); *President & Fellows of Harvard College v. U.S. Dep't of Health & Human Servs.*, Nos. 25-cv-11048-ADB, 25-cv-10910-ADB, 2025 WL 2528380, *10–*14 (D. Mass. Sept. 3, 2025); *Thakur v. Trump*, 148 F.4th 1096, 1103–04 (9th Cir. 2025). I do not accept defendants' rehashed argument in light of this wall of authority. The Tucker Act does not bar this case from moving forward in district court.

## II. LIKELIHOOD OF SUCCESS ON THE MERITS

Having found there to be constitutional and statutory jurisdiction over plaintiffs' claims, I now turn to the merits of their motion. Plaintiffs claim that the DHS Conditions violate (1) the separation of powers, (2) spending power constraints, and (3) the APA. I agree.

### A. Separation of Powers

#### 1. Plaintiffs' Claims Are Constitutional

"In many cases, the plaintiff's right to seek judicial intervention arises from a statute." *League of United Latin Am. Citizens v. Exec. Office of the Pres. et al.*, Civ. Action Nos. 25-0946 (CKK), 25-0952 (CKK), 25-0955 (CKK), 2025 WL 3042704, at *23 (D.D.C. Oct. 31, 2025). "Often, in cases challenging action by the Executive Branch, that statute is the Administrative Procedure Act." *Id.* But "because 'the President is not an agency within the meaning of' the APA, the issuance of an executive order is not a final agency action that is reviewable within the APA framework." *Id.* (citing *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)).

Since the APA affords no statutory right to direct judicial relief, plaintiffs must point to either statutory authority or "resort to equity" to find relief in this case. *Id.* (quoting *Nat'l Treasury Emps. Union v. Vought (NTEU)*, 149 F.4th 762, 790 (D.C. Cir. 2025)). "The availability of such implied equitable relief substantially depends on whether the plaintiff claims a statutory or constitutional violation." *Id.* "If a plaintiff is alleging a violation of a federal statute, the

United States District Court
Northern District of California

availability of equitable relief to enforce compliance with the statute—often called *ultra vires* review—is 'extremely limited.'" *Id.* (quoting *NTEU*, 149 F.4th at 791)). However, "broader latitude [is afforded] to a plaintiff seeking equitable relief from a *constitutional* violation, rather than a statutory one." *Id.* at *24 (emphasis in original).

The parties dispute whether plaintiffs' claims are constitutional or statutory in nature, and, therefore, the amount of equitable relief to which they may be entitled. Plaintiffs maintain their arguments about the DHS Conditions are constitutional in nature. They raise a separation of powers argument, noting that "Congress exclusively holds the power of the purse . . . [and] authority must be given to the executive by the legislature to impose conditions on the use [of] funds"—authority seemingly not provided by Congress in this case. Mot. at 8; *see City of Los Angeles v. Barr*, 941 F.3d 931, 945 (9th Cir. 2019); *City of Arlington v. F.C.C.*, 569 U.S. 290, 297 (2013). In their view, "Congress has not authorized Defendants to impose grant conditions even *remotely* similar to the Unlawful DHS Conditions, which effectively prohibit any activity that the Administration would consider to be 'DEIA,' purport to rewrite anti-discrimination law as it has long been understood, and force compliance with all executive orders." Mot. at 9. Additionally, the "sprawling and hopelessly ambiguous Unlawful DHS Conditions are contrary to longstanding limits on the spending power in our constitutional structure." *Id.* at 8.

Defendants note that plaintiffs invoke "several *statutory* doctrines for [their separation of powers] proposition, all without elaborating which one applies." Oppo. at 12–13 (emphasis in original). Because plaintiffs cite to "non-constitutional cases relating to whether agencies had statutory . . . authority to perform certain actions," the "major questions doctrine," and statutory authority, defendants conclude that plaintiffs' claims are statutory and should be afforded less equitable relief. *Id.* at 13.

Defendants rely on *Dalton v. Specter*, 511 U.S. 462 (1994), to conclude that plaintiffs "foreclose[d] their ability to raise statutory arguments with constitutional dressing." *Id.* In *Dalton*, the plaintiffs "sought to enjoin the Secretary of Defense . . . from carrying out a decision by the President to close the Philadelphia Naval Shipyard," pursuant to the Defense Base Closure and Realignment Act ("DBCRA") of 1990. 511 U.S. at 474. The plaintiffs sought relief under the

APA, alleging that the Secretary "violated substantive and procedural requirements of the 1990 Act in recommending closure of the . . . [s]hipyard." *Id.* at 466. The Third Circuit recognized under *Franklin v. Massachusetts*, 505 U.S. 788 (1992), that the President's actions were not reviewable under the ADA, since the President is not an agency. *Id.* at 468. However, the court concluded that the claims may still be judicially reviewed, as the "President's actions may still be reviewed for constitutionality." *Id.* at 469 (quoting *Franklin*, 505 U.S. at 801).

The Supreme Court reversed, finding that the claims were statutory, not constitutional, in nature. *Id.* at 477–78. The Court noted that not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* at 472. Rather, "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review." *Id.* at 473. Because the procedural requirements at issue were outlined to the DBCRA, which granted "to the discretion of the President" the ability to close certain military bases, the Court concluded that judicial review was "not available." *Id.* at 469–72, 474.

Unlike in *Dalton*, plaintiffs' claims are not rooted solely in a statutory analysis. As plaintiffs contend, "Nothing in the Constitution or congressional authorizations bearing on the DHS programs at issue gives Defendants the power to impose conditions on Plaintiffs' awards remotely approaching those at issue here." Mot. at 8. The crux of plaintiffs' motion is that "Congress has not authorized Defendants to impose grant conditions even *remotely* similar to the Unlawful DHS Conditions"—an argument rooted in constitutional separation of power concerns. *See id.*

That plaintiffs also invoke "statutory doctrines for this proposition" is immaterial. *See* Oppo. at 12. In *Murphy Co. v. Biden*, the Ninth Circuit addressed whether the President had the authority under the Antiquities Act to expand a national monument in southwestern Oregon. 65 F.4th 1122, 1124 (9th Cir. 2023). The opinion recognizes that the Ninth Circuit "tak[es] an expansive view of the constitutional category of claims highlighted in *Dalton*." *Id.* at 1130. "[A] challenge to presidential action will be considered constitutional, and therefore justiciable under *Franklin*, so long as a plaintiff claims that the President has violated . . . constitutional separation

of powers principles because the President's action lacked both statutory authority and background constitutional authority." *Id.* (citing *Franklin*, 929 F.3d 670, 696–97) (cleaned up)). Additionally, "[w]hile an action taken by the President in excess of his statutory authority does not necessarily violate the Constitution, specific allegations regarding separation of powers may suffice." *Id.* at 1130 (cleaned up). As described above, plaintiffs contend that the "absence of any constitutional or statutory authority to impose conditions on the grants is dispositive and highlights the problems with [sic] the Unlawful DHS Conditions." Mot. at 8. Because plaintiffs argue that the President "lacked both statutory authority and background constitutional authority," their claims may properly be considered as constitutional under *Murphy Co. See id.*; 65 F.4th at 1130.

**2. The DHS Conditions Conflict with Congress's Intent in Creating the Questioned Grants.**

The separation of powers doctrine recognizes that the "United States Constitution exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). "The [Appropriations] Clause has a 'fundamental and comprehensive purpose . . . to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents.'" *United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016) (quoting *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427–28 (1990)). "Aside from the power of veto, the President is without authority to thwart congressional will by canceling appropriations passed by Congress." *City & Cnty. of S.F.*, 897 F.3d at 1232. Rather, executive agencies "literally ha[ve] no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986). "Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *City & Cnty. of S.F.*, 897 F.3d at 1235.

As plaintiffs assert, "Congress has not authorized Defendants to impose grant conditions even *remotely* similar to the Unlawful DHS Conditions, which effectively prohibit any activity that the Administration would consider to be 'DEIA,' rewrite anti-discrimination law as it has long been understood, and force compliance with all executive orders." Mot. at 8. The Questioned

United States District Court
Northern District of California

Grants do not confer such authority upon DHS or FEMA.

**i. Infrastructure Security Grants**

Plaintiffs first argue that the DHS Conditions contravene Congress's stated purposes in creating the Port Security Grant Program ("PSGP") and Transit Security Grant Program ("TSGP"). Mot. at 8–10. Congress established the PSGP to be used for "port security services and to train public safety personnel[.]" 46 U.S.C. § 70107. Similarly, under 6 U.S.C. § 1135(a)(1), Congress created the TSGP to "establish a program for making grants to eligible public transportation agencies for security improvements." Plaintiffs contend that neither program "include[s] vague prohibitions on DEIA or require compliance with any and all executive orders." Mot. at 9. In fact, the President's interpretation of DEIA *conflicts* with the infrastructure security grants, as Congress designated "transit security grant funds to support 'security response training' for transit employees, specifically including training in procedures to support 'individuals with disabilities and the elderly.'" *Id.* (citing 6 U.S.C. §§ 1135(b)(1)(L), (c)(5)).

The DHS Conditions attached to their grants prohibit the operation of "any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws." Mot. at 5; *see* Louk Decl. Ex. B at 17. While plaintiffs do not contest that they "regularly agreed to comply with federal antidiscrimination laws as a condition of federal funding in the past," they claim that the federal government has "called the meaning of those laws in question by purporting to interpret them far differently than previously understood by Congress, the executive, or the courts." Mot. at 13. As further explained in Section II.B.1, *supra*, the President's executive orders regarding DEIA initiatives appear to conflict with many of plaintiffs' grant programs, including the TSGP's security response training funding to support those with disabilities and the elderly. *See id.* at 9. Accordingly, plaintiffs have a strong claim that the DHS Conditions violate the separation of powers with respect to the infrastructure security grants by contravening Congress's clear intent in passing the relevant programs.

**ii. Fire Related Grants**

Plaintiffs also claim that the DHS Conditions would violate Congress's intent in establishing the Assistance to Firefighters ("AFG") and Staffing for Adequate Fire and Emergency

Response ("SAFER") grant programs. Mot. at 10–11. The AFG program is laid out in 15 U.S.C. § 2229, which provides funding to "protect[] the health and safety of the public and firefighting personnel . . . against fire, fire-related, and other hazards." 15 U.S.C. § 2229(c)(1)(A). SAFER is authorized by the same enactment, but is codified in a related provision, 15 U.S.C. § 2229a. SAFER requires the Administrator of FEMA to "make grants directly . . . for the purpose of increasing the number of firefighters to help communities meet industry minimum standards and attain 24-hour staffing to provide adequate protection from fire and fire-related hazards." *Id.* § 2229a(a)(1)(A).

Like the infrastructure security grants, the fire related grants do not authorize the DHS Conditions and in fact plainly contradict the programs. Plaintiffs cite another statute affecting both programs, 15 U.S.C. § 2205, which requires the Administrator of FEMA to "take such steps as [they] consider[] appropriate to educate the public and overcome public indifference as to fire, fire prevention, and individual preparedness." These "public education efforts *shall* include programs to provide specialized information for those groups of individuals who are particularly vulnerable to fire hazards, such as the young and the elderly." *Id.* (emphasis added). The President's ongoing executive orders targeting DEIA programs seemingly conflict with the purpose set out by Congress in the AFG and SAFER programs, as it contravenes the grants' goal in educating "particularly vulnerable" populations about fire safety. *See id.*; Mot. at 10–11.

**iii. Homeland Security Grants**

Three grant programs "designed to prepare for and prevent terrorist attacks"—the Homeland Security Grant Program ("HSGP"), the Urban Area Security Initiative ("UASI") and State Homeland Security Grant Program ("SHSP")—also are adversely affected by the DHS Conditions. Mot. at 11. UASI and SHSP program funds are meant to "help[] either high risk urban areas or local governments with 'preventing, preparing for, protecting against, and responding to acts of terrorism.'" *Id.* (citing 6 U.S.C. § 604(a); 6 U.S.C. § 605(a)). Plaintiffs claim that, "[c]onsistent with the previous grants identified, nothing in the statutes authorized the Unlawful DHS Conditions." *Id.*

Defendants' arguments in response to the HSGP funding are unconvincing. They say that

because plaintiffs "are subrecipients of [HSGP] funds only and have no control over whether the funds are accepted," they have "no power to make any decision regarding whether to accept those funds and any decisions about whether those funds are ultimately passed down to Plaintiffs." Oppo. at 9. But as subrecipients, plaintiffs "reasonably expect to receive millions pursuant to these programs from their states based on predetermined allocations in the notices of funding opportunities ("NOFO"), statutory entitlement, and long-standing practice." Repl. at 2; *see, e.g.*, Kim Decl. ¶¶ 8–14; Bowman Decl. ¶¶ 5–10; Reed Decl. ¶¶ 16–24; RJN Ex. 5 at 54–55; RJN Ex. 6 at 65. While the amount of funding each state will receive is "not yet fixed," *see* Repl. at 3 n.3, these funds will inevitably "flow through the states to subrecipients" with the same DHS Conditions. Repl. at 3. That is sufficient to establish that plaintiffs will be adversely affected by the seemingly contradictory policies. *See id.*

**iv. Other Preparedness and Non-Disaster Grants**

Plaintiffs finally point to three grant programs—the Emergency Management Performance Grant ("EMPG"), Urban Search & Rescue ("US&R"), and the Hazard Mitigation Grant Program ("HMGP")—that they expect to receive with the DHS Conditions. Mot. at 11–12. EMPG is codified at 6 U.S.C. § 762, and directs FEMA to make grants "for all hazards" and to "provide an orderly and continuing means of assistance . . . to State and local governments in carrying out their responsibilities to alleviate the suffering and damage[.]" *See* 42 U.S.C. § 5121(b). Similarly, under 42 U.S.C. § 5165f, US&R provides funding for "cooperative agreements for training and exercises, the acquisition and maintenance of equipment, and certain medical monitoring, amongst other things." Mot. at 11. Finally, HMGP awards were established by Congress to "substantially reduce the risk of, or increase resilience to, future damage, hardship, loss, or suffering in any area affected by a major disaster." 42 U.S.C. § 5170c(a).

As with the other programs, in these three grants defendants are "conditioning [plaintiffs'] receipt of appropriated funds on compliance with the President's political agenda, even though Congress has not authorized Defendants to leverage federal funding for that agenda," to "usurp Congress's 'power of the purse' and violate bedrock separation of powers principles." *Id.* (quoting *City & Cnty. of S.F.*, 897 F.3d at 1231). Plaintiffs are likely to succeed on the merits in

United States District Court
Northern District of California

showing that the separation of powers are violated by the DHS and EO Conditions.

**3. Title VI Does Not Absolve the Discrimination Condition of Violating the Separation of Powers.**

Defendants contend that the Discrimination Condition does not violate the separation of powers because it is permissible under Title VI of the Civil Rights Act of 1964, in which agencies are "authorized and directed to effectuate . . . rules, regulations, or orders of general applicability" that comply with 42 U.S.C. § 2000d. 42 U.S.C. § 2000d-1. Section 2000d, in turn, states that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Defendants maintain that this authority requires DHS and FEMA to "ensure that all grants comply with federal law," including federal anti-discrimination law. Oppo. at 19. In their view, the Discrimination Condition in DHS and FEMA grants is "not novel," as "[e]very application for Federal financial assistance must, 'as a *condition* to its approval and the extension of any Federal financial assistance,' contain assurances that the program will comply with Title VI *and* with all requirements imposed pursuant to the executive regulations issued under Title VI." Oppo. at 11 (citing *Guardians Ass'n v. Civ. Serv. Comm'n of City of New York*, 463 U.S. 582, 629–30 (1983) (Marshall, J., dissenting)).

At oral argument, counsel for defendants reiterated this position, asserting that the Discrimination Condition only forbids "illegal DEI" practices, and that the burden is on plaintiffs to show their programs comply with current understandings of federal anti-discrimination law to receive funding. To this point, defendants cite *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181 (2023) ("*SFFA*"), where the Supreme Court considered "whether a university may make admissions decisions that turn on an applicant's race." *Id.* at 208. The Court found that Harvard University's race-based admissions programs were unconstitutional, as the purported educational benefits cited for the programs failed to meet strict scrutiny. *See id.* at 209–18. However, the Court noted that certain race-based admissions systems, including military academies, may have "potentially distinct interests" and were left unaddressed by the

United States District Court
Northern District of California

decision. *See id.* at 213 n.4.

Relying on *SFFA* and Title VI, defendants conclude that the Discrimination Condition is permissible in that it prevents "illegal" DEI programs from being implemented by plaintiffs. This argument falls flat. For one thing, Title VI squarely conflicts with various provisions of the Discrimination Condition. Section (3) of the Discrimination Condition notes that "DHS reserves the right to suspend payments in whole or in part and/or terminate financial assistance awards if the Secretary of Homeland Security or her designee determines that the recipient has violated any provision of [the Condition]." Standard DHS Terms, Section C.XVII(3). Title VI, however, sets out strict procedural requirements for agencies who decide to terminate grant funding:

> [N]o such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report.

42 U.S.C. § 2000d-1. The Discrimination Condition fails to provide grantees with notice and the ability to cure potential issues, despite Title VI mandating all agencies to provide such due process. *See id.*

The Hon. Rita Lin recently addressed the use of Title VI to cudgel anti-DEI policies in *American Association of University Professors et al. v. Trump et al.*, No. 25-cv-07864-RFL, 2025 WL 3187762 (N.D. Cal. Nov. 14, 2025) ("*AAUP*"). Judge Lin examined the legislative history behind Title VI, which showed that some members of Congress were concerned Title VI "might be used in a 'vindicative' or 'punitive' manner with respect to the 'cut off' of federal funds." *Id.* at *27. As a result, "Congress took pains to avoid this possibility" by adding the "procedural . . . safeguards against precipitous action." *Id.* The procedural posture of that case is slightly different, as the grantees had received notice of suspension letters without adhering to Title VI's procedural requirements. But given the Administration's Executive Orders and other guidance, it

United States District Court
Northern District of California

seems likely that defendants may use the Discrimination Condition's "right to suspend payments . . . if the Secretary of Homeland Security . . . determines that the recipient" has "advance[d] or promote[d] DEI, DEIA, or discriminatory equity ideology" to circumvent the clear procedural due process requirements afforded grant recipients under Title VI. Standard DHS Terms, Sections C.XVII(2)(a)(i), (3). Defendants have not provided any support suggesting DHS and FEMA would act otherwise.

Moreover, defendants dramatically overread the Court's holding in *SFFA.* It did not abrogate all constitutional or statutory precedent developed over the past seventy years to protect Americans from discrimination, which is the inference from their argument. The current Administration's vision of what anti-discrimination means, and the protections that must be afforded to *all* the people in this country, are somewhat at odds with that precedent, as discussed later. The DHS Conditions conflict with the purposes of the grants and are, at best, ambiguous.

**B. Spending Powers**

**1. The Spending Power Constraints Apply to this Case.**

The Spending Clause of the Constitution provides Congress with "broad power . . . to set the terms on which it disburses federal funds." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022). As a threshold matter, the parties dispute whether the Spending Clause applies to the Executive Branch as well as to Congress. Defendants contend that the Spending Clause does not apply in this case because it "limits Congress' power to legislate only and has no application to Executive Branch decisions about how to expend appropriated funds [by] Congress." Oppo. at 14. Plaintiffs, conversely, argue that the DHS Conditions are unlawful because they "exceed constitutional limits on the spending power." Mot. at 12.

Defendants rely on *Board of Education for the Silver Consolidated Schools v. McMahon*, 791 F. Supp. 3d 1272 (D.N.M. 2025), to support their framing of the Spending Clause. In *McMahon*, the court found that the "Spending Clause is only implicated 'when Congress imposes a spending or funding condition,'" not agency or executive decisions. *Id.* at 1288 (quoting *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, 784 F. Supp. 3d 127, 162 (D.D.C. 2025)). I disagree. "[T]he Spending Clause applies not only to Congress, but the

United States District Court
Northern District of California

agencies implementing spending legislation." *S.F. Unified Sch. Dist. v. AmeriCorps*, 789 F. Supp. 3d 716, 744 (N.D. Cal. 2025) (Chen, J.). "An agency may not confer power upon itself," and has "no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n*, 476 U.S. at 374. The Ninth Circuit has concluded that the Spending Clause "appl[ies] to agency-drawn conditions on grants to states and localities just as they do to conditions Congress directly places on grants." *Barr*, 929 F.3d at 1175 n.6. There is "no reason why the addition of an agency middleman either expands or contracts Congress's power to 'provide for the . . . general Welfare.'" *Id.* (quoting U.S. Const. art. I, § 8, cl. 1). Judges within the Northern District of California have applied this reasoning in similar cases involving grant conditions involving DEIA. *See S.F. Unified Sch. Dist.*, 789 F. Supp. 3d at 744. Plaintiffs are well within their authority to raise a claim under the Spending Clause.

**2. Ambiguity**

The spending power is "subject to several general restrictions." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). First, the spending power "must be in pursuit of 'the general welfare,'" and courts should "defer substantially to the judgment of Congress." *Id.* (quoting *Helvering v. Davis*, 301 U.S. 619, 640–41). Second, "if Congress desires to condition the States' receipt of federal funds, it 'must do so unambiguously.'" *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). Third, "conditions on federal grants might be illegitimate if they are unrelated 'to the federal interest in particular national projects or programs.'" *Id.* (citing *Massachusetts v. United States*, 435 U.S. 444, 461 (1978)). The DHS Conditions violate the second and third principles— they are ambiguous and do not relate to the content of the grants in question.

Plaintiffs have agreed to comply with federal antidiscrimination laws as a condition to their funding in the past. But they assert that "the federal government has now called the meaning of those laws in question by purporting to interpret them far differently than previously understood by Congress, the executive, or the courts—leaving it unclear what is expected under the terms." Mot. at 13. They point to at least five executive orders or directives that seem to create ambiguity.

First, on January 20, 2025, President Trump issued Executive Order 14168, entitled

"Defending Women From Gender Ideology Extremism And Restoring Biological Truth To The Federal Government." 90 Fed. Reg. 8,615. This order established a "policy of the United States to recognize two sexes, male and female," and prohibited an expansive understanding of gender identity. *Id.* Sec. 1; Sec. 2(f). It also prohibited federal funds from "be[ing] used to promote gender ideology," and required each agency to "assess grant conditions and grantee performances [to] ensure grant funds do not promote gender ideology." *Id.* Sec. 3(g).

That same day, President Trump issued Executive Order 14151, entitled "Ending Radical and Wasteful Government DEI Programs and Preferencing." 90 Fed. Reg. 8,339. This order targeted "illegal and immoral discrimination programs, going by the name 'diversity, equity, and inclusion' (DEI), into virtually all aspects of the Federal Government." *Id.* Sec. 1. The Director of the Office of Management and Budget, along with the Attorney General and the Director of the Office of Personnel Management, were directed to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear." *Id.* Sec. 2(a). And each agency was required to "terminate . . . [all] 'equity-related' grants or contracts." *Id.* Sec. 2(b)(i).

On January 21, 2025, President Trump signed Executive Order 14173, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity." 90 Fed. Reg. 8,633. This order claims that "critical and influential institutions of American society, including the Federal Government . . . have adopted and actively use dangerous, demeaning, and immoral race- and sex-based preferences under the guise of so-called 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA) that can violate the civil-rights laws of this Nation." *Id.* Sec. 1. Agencies were ordered to "include in every contract or grant award" a term requiring recipients to "certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." *Id.* Sec. 3(b)(iv)(B).

Later, on August 7, 2025, President Trump issued Executive Order 14332, "Improving Oversight of Federal Grantmaking." 90 Fed. Reg. 38929. The order criticized federal grants funding "diversity, equity, and inclusion and other far-left initiatives . . . [such as] Marxism, class

warfare propaganda, and other anti-American ideologies." *Id.* Sec. 1. Accordingly, the order requires discretionary grant awards to "demonstrably advance the President's policy priorities" and "not be used to fund, promote, encourage, subsidize, or facilitate" "racial preferences or other forms of racial discrimination by the grant recipient," "denial by the grant recipient of the sex binary in humans or the notion that sex is a chosen or mutable characteristic," "illegal immigration," or other "anti-American values." *Id.* Sec. 4(b)(i); 4(b)(ii)(A)–(D).

Attorney General Pamela Bondi ("Bondi") attempted to clarify these executive orders in a Department of Justice memorandum issued on July 29, 2025, titled "Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination." *See* RJN Ex. 4 [Dkt. No. 20-4] ("Discrimination Guidance Memo"). The purpose of this memorandum was to establish "best practices" "to help entities comply with federal antidiscrimination laws and avoid legal pitfalls," although the document did not impose "mandatory requirements." *Id.* at 1. The memorandum provides a "non-exhaustive list of unlawful practices that could result in revocation of grant funding," as well as potential "liab[ility] for discrimination" for funding recipients if they "knowingly fund the unlawful practices of contractors, grantees, and other third parties." *Id.* at 4. Such unlawful practices include "[f]acially neutral criteria (e.g., 'cultural competence,' 'lived experience,' geographic targeting) that function as proxies for protected characteristics . . . if designed or applied with the intention of advantaging or disadvantaging individuals based on protected characteristics." *Id.* at 2.

i. **Discrimination Condition**

Plaintiffs argue that the Discrimination Condition, in light of the executive orders, "raise[] serious questions about what meaning and scope Defendants intend the Discrimination Condition[s] to carry" when accepting a grant. Mot. at 14. They point to numerous inconsistencies between federal law and the Discrimination Condition. For instance, plaintiffs contend that the use of "[f]acially neutral criteria . . . that functions as proxies for protected characteristics" does not actually violate federal anti-discrimination law as Attorney General Bondi suggests. *Id.*; Discrimination Guidance Memo at 2. Rather, the Supreme Court has "consistently declined to find constitutionally suspect" the adoption of race-neutral criteria, "even

where the decision-maker was 'well aware' the race-neutral criteria 'correlated with race.'" Mot. at 14 (citing *Coal. For TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 885–86 (4th Cir. 2023) (cleaned up) (citing, *inter alia*, *Tex. Dep't of Hous. & Cnty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 545 (2015)).

Similarly, plaintiffs argue the Executive Orders do not comply with established anti-discrimination law. Plaintiffs point out that Executive Order 14168, targeting "gender ideology extremism," is "out of step with governing law extending critical sex-based protection to trans[gender] people." Mot. at 14; *see Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 662, 670 (2020) (recognizing "Title VII prohibits all forms of discrimination because of sex, however they may manifest themselves or whatever other labels might attach to them."). These contradictions are particularly harmful considering crucial terms in the orders and DHS Conditions are left ambiguous or undefined and thus provide plaintiffs with no guidance on how to adhere to the conditions. Mot. at 15–16.

Defendants contend that the Discrimination Condition is not ambiguous and is supported by Ninth Circuit and Supreme Court precedent. Oppo. at 15–16. They first cite *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1 (1981), which they claim stands for the proposition that "Congress must only make clear that acceptance of federal funds obligates States to comply with a condition" to satisfy the Spending Clause. *Id.* at 15. But this reading belies both *Pennhurst* and the facts of this case. In *Pennhurst*, the Court recognized that Congress must "express *clearly* its intent to impose conditions on the grant of federal funds so that the States can knowingly decide whether or not to accept those funds." 451 U.S. at 24 (emphasis added). "Knowing acceptance requires awareness of the conditions or an ability to 'ascertain what is expected of it.'" *S.F. Unified Sch. Dist.*, 789 F. Supp. 3d at 745 (quoting *Pennhurst*, 451 U.S. at 17). "By insisting that Congress speak with a clear voice, [States are enabled] to exercise their choice knowingly, cognizant of the consequences of their participation." *Pennhurst,* 451 U.S. at 17. But when a State's "potential obligations . . . are largely indeterminate," a grant may be ambiguous. *Id.* at 24.

Here, plaintiffs sufficiently demonstrate that the Discrimination Condition is ambiguous. The Condition provides, in relevant part, that grantees will "not . . . operate any programs that

United States District Court
Northern District of California

advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws." Standard DHS Terms, Section C.XVII. It then vaguely defines DEI as "diversity, equity, and inclusion," and DEIA to mean "diversity, equity, inclusion, and accessibility," without providing more detail or examples. *Id.* § C.XVII.1.a–b. Unlike DEI and DEIA, the definition of "discriminatory equity ideology" is incorporated by reference to Section 2(b) of Executive Order 14190 ("Ending Radical Indoctrination in K-12 Schooling"), which provides, in part:

> (b) [A]n ideology that treats individuals as members of preferred or disfavored groups, rather than as individuals, and minimizes agency, merit, and capability in favor of immoral generalizations, including that:
>
> (i) Members of one race, color, sex, or national origin are morally or inherently superior to members of another race, color, sex, or national origin;
>
> (ii) An individual, by virtue of the individual's race, color, sex, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;
>
> (iii) An individual's moral character or status as privileged, oppressing, or oppressed is primarily determined by the individual's race, color, sex, or national origin;
>
> (iv) Members of one race, color, sex, or national origin cannot and should not attempt to treat others without respect to their race, color, sex, or national origin;
>
> (v) An individual, by virtue of the individual's race, color, sex, or national origin, bears responsibility for, should feel guilt, anguish, or other forms of psychological distress because of, should be discriminated against, blamed, or stereotyped for, or should receive adverse treatment because of actions committed in the past by other members of the same race, color, sex, or national origin, in which the individual played no part;
>
> (vi) An individual, by virtue of the individual's race, color, sex, or national origin, should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion;
>
> (vii) Virtues such as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist or were created by members of a particular race, color, sex, or national origin to oppress members of another race, color, sex, or national origin; or

(viii) the United States is fundamentally racist, sexist, or otherwise discriminatory.

*Id.*

Read as a whole, the Discrimination Condition requires that plaintiffs refrain from "advanc[ing] or promot[ing]" DEI, DEIA, or discriminatory equity ideology in violation of federal anti-discrimination law. But the DHS does not explain how grantees could "advance or promote" these ideologies, nor does it explain how these terms fit into current understandings of anti-discrimination law. *See, e.g.*, *Bostock*, 590 U.S. at 662, 670 (recognizing "Title VII prohibits all forms of discrimination because of sex, however they may manifest themselves or whatever other labels might attach to them."); *Lam v. University of Hawai'i*, 40 F.3d 1551, 1562 (9th Cir. 1994) (recognizing that "the attempt to bisect a person's identity at the intersection of race and gender often distorts or ignores the particular nature of their [lived] experiences"); *Thakur v. Trump*, 148 F.4th 1096, 1107–08 (finding that "DEI [and] DEIA . . . are not merely neutral topics" and "convey the viewpoint that the exclusion of historically disadvantaged groups is undesirable," in violation of the "bedrock principle" that the government cannot "leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints"); *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 95–96 (1973) (finding Title VII protects non-citizens, despite defendants defining "Federal anti-discrimination laws" as those that "protect individual Americans from discrimination.").[11] Nor does it define key terms within the Condition, as explained above.

That the Discrimination Condition is "rife with vagueness and ambiguity, leaving grantees

[11] Defendants also cite to *SFFA*, 600 U.S. 181, which they contend "recently reinforced longstanding precedent that stereotyping and discrimination against other races for the benefit of certain races are illegal." Oppo. at 16; 600 U.S. at 211–12. In their view, *SFFA*, along with Title VI, provide enough clarity about the scope of the DHS Conditions to make them unambiguous. But *SFFA* is not the smoking gun defendants claim it is. *SFFA* dealt with a unique issue—race-based admissions in higher education—and the Supreme Court never claimed for it to be a brightline rule. 600 U.S. at 213 n.4. Nowhere in *SFFA* does the Court prohibit all programs rooted in promoting diversity; rather, the Court "described these goals as 'commendable' and 'worthy' (though insufficient to justify race-based admissions)." *City of Seattle*, 2025 WL 3041905, at *7 (citing 600 U.S. at 214–15, 230). Nor does *SFFA* cover the entire scope of the Discrimination Condition, which targets *all* forms of "DEI, DEIA, or discriminatory ideology." Standard DHS Terms, Section C.XVII(3). While I understand defendants to cite *SFFA* as evidence of the current Supreme Court explaining the scope of federal anti-discrimination law, it is unpersuasive authority in light of the terms of the DHS Conditions that seemingly violate other well-settled anti-discrimination laws like *Bostock*, *Lam*, *Thakur*, and *Espinoza*.

United States District Court
Northern District of California

to speculate what is proscribed and what is permitted" is particularly concerning in light of the False Claims Act (the "FCA"), which is invoked by defendants in the DHS Conditions. *S.F. Unified Sch. Dist.*, 789 F. Supp. 3d at 746. The FCA imposes liability on "any person" who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). Plaintiffs who violate the FCA may be subject to civil penalties and mandatory treble damages. 31 U.S.C. § 3729(a)(2); 28 C.F.R. § 85.5(a). The lack of clear definitions, coupled with the well-founded fear that the Department of Justice may use the FCA as a "weapon" against grant recipients, lends credence to plaintiffs' arguments that the Discrimination Condition is ambiguous. *See* RJN Ex. 12 ("Civil Rights Fraud Initiative Memo") [Dkt. No. 20-12] at 1–2. Plaintiffs are accordingly likely to show that the Discrimination Condition is ambiguous in violation of the Spending Clause.

**ii. Executive Order Condition**

Next, plaintiffs argue that the EO Condition is impermissibly ambiguous because it provides "little detail on what 'compliance' with the . . . Condition would require." Mot. at 6. Specifically, they claim that grantees "cannot possibly ascertain what it means to comply with all executive orders 'related to grants' that this Administration has issued *or might issue in the future*." *Id.* at 16 (emphasis in original). This is particularly true considering *Pennhurst*, plaintiffs claim, which found that the spending power does not allow for "post acceptance or 'retroactive' conditions" on funding. 451 U.S. at 25.

Defendants respond by asserting that plaintiffs "point to no Executive Orders related to grants that they are unsure apply," and instead "facially challenge the EO Conditions without explaining what possible hypothetical ambiguities exist." Oppo. at 19. Such compliance is "commonplace for recipients, who are regularly required to ensure their programs comply with all federal law, even as it shifts when Congress passes laws or the Supreme Court interprets laws differently." *Id.*

Even accepting defendants' argument as true, the EO Condition is, at best, ambiguous. Consider the following hypothetical: Berkeley, a plaintiff to this case, is approved for its $6.4 million and $16.5 million HMGP grants, which contain the EO Condition. Buddenhagen Decl. ¶¶

11–12. Berkeley accepts the grants with the attached EO Condition. Months after accepting the funding, President Trump issues an Executive Order that requires grantees to no longer follow the Supreme Court's decision in *Bostock*. "For purposes of all federal grants," the Order states, "discrimination 'because of sex' should be understood in reference to sex assigned at birth, not to sexual orientation or gender identity. Parties who recognize or promote a correlation between sex and sexual orientation are subject to termination of their grants." After receiving the grants, but before this hypothetical Executive Order, Berkeley's City Council adopts a policy interpreting any law preventing discrimination "based on . . . sex" to also include sexual orientation. In defendants' view, it would be appropriate for Berkeley to immediately lose their grant funding, as they accepted the grant on an "unambiguous" condition that they adhere to all future Executive Orders, even if those Orders contradict the Constitution, settled case law, or their local policies.

Such an outcome would be unjust. "When determining the ambiguity of conditions on federal grants, courts evaluate 'whether [a recipient] . . . would clearly understand . . . the obligations of the [conditions].'" *City of Fresno*, 2025 WL 2469330, at *6 (quoting *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006)). Here, it is not clear what compliance with the EO Condition would entail, as it fails to articulate to what extent plaintiffs would be expected to adhere to President Trump's Executive Orders. The EO Condition simply notes that grantees must comply with "requirements of Presidential Executive Orders related to grants." Standard DHS Terms, Section C.XXXI. Must plaintiffs comply with only those Executive Orders that focus exclusively on grants? Could the President "attach" a sentence at the end of every Executive Order discussing grant funding, thus requiring plaintiffs to adhere to every Order? What if the Executive Orders directly contradict Congress's intent in passing a grant program? Or contain conditions enjoined as unconstitutional? Such questions, even if they do not appear on the face of the EO Condition, raise concerns that render it impermissibly ambiguous.

In short, the EO Condition, as it is currently written and applied to the DHS Conditions, is ambiguous. To find otherwise would defy the power of Congress to confer upon agencies the authority to grant funding in the first place.

**3. Relatedness**

For a grant to adhere to the spending powers, its conditions must be "reasonably related to the purpose of the expenditure." *New York v. United States*, 505 U.S. 144, 172 (1992) (citation omitted); *Dole*, 483 U.S. at 207, 209 (Conditions on federal grants must be "reasonably calculated to address th[e] particular . . . purpose . . . for which the funds are expended"). Without a relationship between the conditions and the "purpose of the federal spending," "the spending power could render academic the Constitution's other grants and limits of federal authority." *New York*, 505 U.S. at 167.

The Discrimination and EO Conditions are not sufficiently related to the purpose of the DHS and FEMA grant programs. Defendants claim that the "reasonable relation" requirement is a "low-threshold" and "not demanding." Oppo. at 17 (citing *State ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1034 (N.D. Cal. 2018); *Barr*, 929 F.3d at 1175). Because the Supreme Court has "never struck down a condition on federal grants based on th[e] relatedness prong," defendants conclude that there is "no need . . . to break new ground." *Id.* (citing *Barr*, 929 F.3d at 1175). But *New York* recognized that conditions still need to "bear *some relationship* to the purpose of the federal spending." 505 U.S. at 144 (emphasis added). And here, as described above, the Discrimination and EO Conditions are not only unrelated to, but are inconsistent with, many of the grant programs in question. Such contradictions include:

- Hazard Mitigation Grant Program ("HMGP"): Requires the Administrator of FEMA to implement a grant program as authorized by the Robert T. Stafford Disaster Relief and Emergency Assistance Act, which encourages issuance of grants to state and local governments who "identify[] and improv[e] the climate and natural hazard resilience **of vulnerable communities**." 6 U.S.C. § 762(a); 42 U.S.C. § 5121(b)(7).
- Fire Prevention and Control (applying to SAFER and AFG grants): The Administrator of the United States Fire Administration, within FEMA, "shall [create] programs to provide **specialized information for those groups of individuals who are particularly vulnerable to fire hazards, such as the young**

**and the elderly**." 15 U.S.C. § 2205.

- Assistance to Firefighters Grant ("AFG"): Allows for grantees to "establish wellness and fitness programs for firefighting personnel to ensure that [they] are able to carry out their duties as firefighters, **including programs dedicated to raising awareness of, and prevention of, job-related mental health issues**," as well as providing resources to train firefighters and others on "how to properly intervene with individuals with mental illness." 15 U.S.C. §§ 2229(c)(3)(E), (N).
- Transit Security Grant Program ("TSGP"): Requires Secretary of Transportation to "issue guidelines to ensure that, to the extent that recipients of grants under this section use contractors or subcontractors, **such recipients shall use small, minority, women-owned, or disadvantaged business concerns as contractors or subcontractors to the extent practicable**." 6 U.S.C. § 1135(h).

It is hard to imagine that the Discrimination and EO Conditions are "related" to these grants, as they squarely conflict with many of their statutory authorization provisions. *See S.F. Unified Sch. Dist.*, 789 F. Supp. 3d at 750 (finding that anti-DEI grant conditions likely did not "bear [any] relationship" to grants whose "statutory objectives . . . conflict[ed]" with the conditions).

Defendants' argument that non-discrimination conditions have *always* been attached to federal grant funding is unpersuasive. Even though previous DHS Terms and Conditions included provisions requiring grantees to follow "relevant Executive guidance," it does not appear that any other President has attempted to comprehensively override understanding of federal anti-discrimination law in the way this Administration seeks to through Executive Orders. Critical to any funding scheme is 42 U.S.C. § 2000d-1, which only authorizes agencies to issue "rules, regulations, or orders . . . consistent with achievement of the objectives of the statute authorizing the financial assistance." As shown above, these conditions are not consistent with Congress's goals in establishing these grants. The grant programs are unrelated to the Discrimination and EO Conditions attached to them.

**C. APA**

Finally, plaintiffs claim that defendants' DHS and EO Conditions violate the APA.

Plaintiffs are likely to succeed on these claims.

**1. Final Agency Action**

"[T]wo conditions must be satisfied for agency action to be 'final'" and subject to judicial review: "First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (citing *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948); *Post of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). Finality "must be interpreted in a pragmatic and flexible manner." *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (cleaned up).

Plaintiffs' claims clearly meet the first prong of *Bennett*. "Where an agency establishes conditions on grant eligibility, the agency has taken action that 'mark[s] the 'consummation' of the agency's decisionmaking process.'" *S.F. Unified Sch. Dist.*, 789 F. Supp. 3d at 740 (citing *Bennett*, 520 U.S. at 177–78); *see also City & Cnty. of S.F. v. Trump*, 783 F. Supp. 3d 1148, 1198–99 (N.D. Cal. 2025) (finding "the Bondi Directive's instruction to freeze the distribution of all DOJ funds to implement President Trump's directive to defund 'sanctuary' jurisdictions . . . clearly 'mark[s] the consummation of' the DOJ's 'decision-making process' that so-called 'sanctuary' jurisdictions are ineligible for federal funding"). Plaintiffs' complaint and motion for preliminary injunction both establish that the grants in question require adherence to the DHS Condition and the EO Condition to receive funding, indicating a consummation of the DHS and FEMA's decision-making process. Mot. at 19–20.

Similarly, "legal consequences will flow" from the DHS and EO Conditions because FEMA and DHS can deny or terminate grants should plaintiffs fail to adhere to their DEI-related requirements. *S.F. Unified Sch. Dist.*, 789 F. Supp. 3d at 740. Defendants candidly recognize that the DHS and EO Conditions "require[] the Plaintiffs to comply with Executive Orders," and that failure to do so may result in termination or rejection of a grant award. *See* Oppo. at 18. It is hard to imagine any scenario where the grant conditions would not be characterized as a "legal

consequence[]" of the DHS and EO Conditions. *See S.F. Unified Sch. Dist.*, 789 F. Supp. 3d at 740.

Defendants argue in response that seven of plaintiffs' grants—namely, the HMGP, SAFER, AFG, FP&S, TSGP, PSGP, and STC grants—should not be considered final agency action because "they are discretionary" and are not subject to judicial review. Oppo. at 19–21. "[F]or discretionary grants," they assert, "agencies are free to reject applications in what is a competitive process." *Id.* at 20. Additionally, defendants claim that 5 U.S.C. § 701(a) "precludes review under the APA if the challenged agency action is 'committed to agency discretion by law.'" *Id.* (quoting *Heckler v. Chaney*, 470 U.S. 821, 828 (1985)). Because each of the seven grants provide "limited guidance for how [they] should be distributed," and "[n]one limit FEMA's discretion to issue funding, much less . . . prevent requiring compliance with federal anti-discrimination law or Executive Branch policy directives," defendants conclude that the grants are "presumptively unreviewable." Oppo. at 21.

Not so. "[T]he § 701(a)(2) exception for action committed to agency discretion [is read] 'quite narrowly, restricting it to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.''" *Dept. of Com. v. New York*, 588 U.S. 752, 772 (2019) (quoting *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018)). The Ninth Circuit has made clear that the "fact that a statute contains discretionary language does not make agency action unreviewable." *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1068 (9th Cir. 2015) (quoting *Beno v. Shalala*, 30 F.3d 1057, 1066 (9th Cir. 1994)). Contrary to defendants' assertions, plaintiffs seek to challenge DHS and FEMA's decision to "adopt the new Unlawful DHS Conditions . . . to Plaintiffs' awards," which is "at odds with the statutory schemes that authorize the grants at issue." Repl. at 11. In similar circumstances, district courts and the Ninth Circuit have consistently found there to be final agency action. *See S.F. Unified Sch. Dist.*, 789 F. Supp. 3d at 741–42; *ASSN Int'l, Inc.*, 803 F.3d at 1068; *Martin Luther King Jr. Cnty. v. Turner*, 785 F. Supp. 3d at 882–84; *City of Fresno*, 2025 WL 2721390, at *6; *Housing Auth. of the City & Cnty. of S.F.*, 2025 WL 3187761, at *16–*17; *Am. Assn. of Univ. Profs. v. Trump*, No. 25-cv-07864-RFL, 2025 WL 3187762, *29–*31 (N.D.

Cal. Nov. 14, 2025). There is no reason to depart from this authority. Plaintiffs have sufficiently shown that nothing prevents me from reaching the merits of their claims.

**2. APA Violation**

Section 706 of the APA provides, in part:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall –
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D) without observance of procedure required by law;

5 U.S.C. § 706. Plaintiffs claim that the DHS and EO Conditions violate the APA because they (1) exceed DHS and FEMA's statutory authority; (2) are contrary to a constitutional power; and (3) are arbitrary and capricious.

**i. Statutory Authority and Contrary to Constitutional Powers**

Plaintiffs contend that the defendants' "adoption, imposition, attachment, and enforcement of the Unlawful DHS Conditions are 'not in accordance with law,' 'contrary to constitutional right power, privilege, or immunity' and 'in excess of statutory . . . authority' within the meaning of the APA." Mot. at 20 (quoting 5 U.S.C. § 706(2)(A)–(C)). As explained in Sections II.A.2 and II.B.2–3 above, plaintiffs have sufficiently demonstrated that their separation of powers and spending clause claims will prevail on the merits because the DHS Conditions infringe upon the grants' statutory authority and Congress's intent in creating such grant programs. Because their APA claim reiterates the same legal theories, plaintiffs are likely to succeed in showing that the DHS Conditions infringe Congress's constitutional powers and are in "excess of [the DHS and FEMA's] statutory . . . authority." 5 U.S.C. § 706(2)(B)–(C).

**ii. Arbitrary and Capricious**

Next, plaintiffs argue that the DHS Conditions are arbitrary and capricious in violation of the APA. Under the APA, an agency decision is unlawfully arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). While agencies have the discretion to change their policies, they must "provide a reasoned explanation for the change [and] display awareness that [it has a] changing position." *F.D.A. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 568 (2025) (cleaned up). "When an agency rescinds a 'longstanding' position, it must consider any 'serious reliance interests' it may have engendered, 'determine whether they [are] significant, and weigh [them] against competing policy concerns.'" *Am. Assn. of Univ. Profs.*, 2025 WL 3187762, at *33 (quoting *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30, 33 (2020)).

The crux of plaintiffs' argument is this: defendants adopted the DHS Conditions "without any authorization to do so on a grant-by-grant and statute-by-statute basis," and failed to provide an explanation for their stark departure from previous understandings of federal anti-discrimination law. *See* Mot. at 21–22. Further, that the DHS Conditions are imposed in a "systematic" fashion underscores that defendants "failed to consider the many statutory terms that actually *require* DHS to 'ensure that the civil rights and civil liberties of persons are not diminished by efforts, activities, and programs aimed at securing the homeland,' 6 U.S.C. § 11(b)(1)(G), as well as certain statutory terms authorizing actions readily described as 'DEI' or 'DEIA.'" Mot. at 21.

Defendants respond that district courts, in reviewing agency decisions, "may not substitute its own policy judgment for that of the agency," and that all it should consider is whether the agency "acted within a zone of reasonableness." Oppo. at 22; *F.C.C. v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). They contend that the DHS and FEMA's decisions were completely reasonable as neither the Discrimination Condition nor the EO Condition is "new."

Oppo. at 22. Rather, the DHS has "long required recipients to comply with all anti-discrimination laws," and the FY 2025 version of the conditions are only "worded differently." *Id.* Even if the policy *were* new, defendants argue that plaintiffs do not explain "what reliance interests they had in the prior policy." *Id.* at 22–23.

Defendants' characterization of the Conditions is misleading. That the current DHS Conditions are merely"worded differently" ignores that their *interpretation* has starkly changed. As explained above, the Trump Administration's Executive Orders, the Discrimination Guidance Memo, and the DHS Conditions all depart from both federal anti-discrimination law and the statutory purposes of many grant programs without real explanation. This departure violates 2 C.F.R. § 3002.10, which requires federal agencies to "ensur[e] that specific Federal award conditions . . . are consistent with the [statutory] program design," and to explain "why the specific condition(s) is being imposed . . . [p]rior to imposing [such] conditions." 2 C.F.R. § 200.208(a); 2 C.F.R. § 200.208(d)(2). Given the lack of a "reasoned explanation" for such changes, plaintiffs have demonstrated that the DHS Conditions are likely arbitrary and capricious in violation of the APA. *See Wages & White Lion Invs., L.L.C.*, 604 U.S. at 568; *see also City of Fresno*, 2025 WL 2721390, at *9 (finding DEI conditional grants to be arbitrary and capricious in similar circumstances); *Illinois v. Fed. Emergency Mgmt. Agency*, 2025 WL 2716277, at *11–*12 (finding the Immigration Condition to be arbitrary and capricious as applied to FEMA grants).

## III. IRREPARABLE HARM

"[S]imply showing some 'possibility of irreparable injury' fails to satisfy" the irreparable harm factor. *Nken*, 556 U.S. at 434–35 (citing *Abbassi v. INS*, 143 F.3d 513, 514 (9th Cir. 1998), *abrogated on other grounds*, *Singh v. Holder*, 658 F.3d 879 (9th Cir. 2011)). Rather, plaintiffs must provide sufficient evidence showing that they will be "irreparably injured absent" a preliminary injunction. *Id.* at 426.

Plaintiffs assert that some of them must decide by November 24, 2025, to "either accept unlawful conditions or lose federal funding earmarked for vital public safety and security services." Mot. at 23. They contend that any loss in funds would have an "immediate, irreparable, and reverberating harm[]" to the plaintiffs' communities. *Id.* "Even a temporary interruption in

funding [would] disrupt[] procurement and management of programs that help prevent the loss of life and property during natural disasters and man-made threats." *Id.* (citing Wallis Decl. ¶ 22). Additionally, this "Hobson's choice" creates uncertainty that "undermines Plaintiffs' ability to do long-term planning," as they "cannot responsibly commit to multi-year projects, leaving them ultimately less prepared to address both current and emerging threats." *Id.* at 23–24. Because of these both temporary and permanent harms, plaintiffs conclude that an injunction is necessary. *Id.* at 24.

Defendants claim that plaintiffs' irreparable harm argument is unsuccessful because "fundamentally, the harms they assert are economic." Oppo. at 23. Economic harms do not by themselves warrant granting a preliminary injunction, as such funds can typically be recovered at a later date. *See L.A. Memorial Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980). But defendants fundamentally misread plaintiffs' arguments. While true that a party who "objects to a condition on the receipt of federal funding . . . [may simply] decline the funds," this ignores the reality that these plaintiffs face. *See* Oppo. at 24 (citing *Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013)). The DHS and FEMA grants in question fund critical public safety and emergency management programs for over thirty million individuals. *See* Mot. at 23–24. Should plaintiffs choose to decline the funds, they place the "safety of their residents, communities, and first responders on the line," ironically contradicting Congress's decision to "appropriate[] billions of dollars to *support* local disaster preparedness and emergency response to prevent and mitigate [such] harms in the first place." Repl. at 14. Should plaintiffs choose to accept the funds, however, they are placed "at risk of arbitrary enforcement and legal liability under the FCA." *Id.* at 13.

I have previously found this Catch-22 to constitute irreparable harm, and I will do so again here. *See City & Cnty. of S.F.*, 779 F. Supp. 3d at 1082 (finding "irreparable injury in the form of budgetary uncertainty, deprivation of constitutional rights, and undermining trust between the Cities and Counties and the communities they serve"). Plaintiffs are likely to suffer both short- and long-term consequences, regardless of their decision, should I not grant a preliminary injunction in their favor.

**IV. BALANCE OF EQUITIES AND PUBLIC INTEREST**

In cases where the federal government is the opposing party, the balance of the equities and public interest factors merge. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). These two factors often turn on whether the district court finds a likelihood of success on the merits of the underlying claim. *See Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014); *see also Melendres*, 695 F.3d at 1002 (concluding it is "always in the public interest to prevent the violation of a party's constitutional rights") (cleaned up).

Plaintiffs' interest in ensuring their communities receive funding for critical infrastructure, public safety, and emergency response programs far exceeds defendants' interests. As indicated above, plaintiffs represent over thirty million individuals, and their DHS and FEMA grants provide funding to support these disaster and public safety initiatives. Mot. at 25. Many of the plaintiffs would be unable to otherwise fund these programs without the grants. *See* Schmit Decl. ¶¶ 14–15; Buddenhagen Decl. ¶¶ 17–18; Nachbar Decl. ¶ 7; Hawkesworth Decl. ¶ 16; Hewett Decl. ¶ 13; Bowman Decl. ¶¶ 11–13; Kim Decl. ¶ 17; Thomas Decl. ¶¶ 8–9; Heiser Decl. ¶¶ 25–26; Reed Decl. ¶ 27. Should plaintiffs be forced to decline the DHS and FEMA grants on account of the DHS Conditions, they would also lose millions of dollars that they would not be able to recoup in either the short- or long-term. Mot. at 25. They have a compelling interest in a preliminary injunction.

So too does the general public. The public is interested in seeing its communities receive funding for critical infrastructure and public safety initiatives—funding that is paid for by their federal tax dollars. And it is also interested in seeing regulations passed by Congress be properly implemented; should relief not be granted, many grant programs will be contradicted or overridden by the President's Executive Orders. These interests also strongly weigh in favor of granting a preliminary injunction.

Defendants' interests hold little weight. They contend that granting an injunction would "significantly disrupt DHS's ongoing consideration of grant applications for the upcoming year." Oppo. at 24. I do not doubt that being constrained by the Constitution and laws of the United States is more burdensome than ignoring their strictures. This does not outweigh the significant

United States District Court
Northern District of California

United States District Court
Northern District of California

concern that plaintiffs will face should they be forced to either accept the DHS Conditions or forego federal funding altogether. That the government "may never recover" any lost funding from the injunction is also unconvincing, as Congress has already appropriated these funds via the statutory schemes described above. The balance of the equities and public interest favor granting plaintiffs' request for injunctive relief.

## V. ISSUANCE OF A BOND

Finding all four *Winter* factors favor granting a preliminary injunction, defendants ask that the injunction "be accompanied by a bond" under Federal Rule of Civil Procedure 65(c). Oppo. at 25. To support their request, defendants cite to authority from the D.C. Circuit stating that "injunction bonds are generally required." *Id.* (citing *Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025) (per curiam)).

As defendants acknowledge, whether to require a security bond is within the court's discretion. *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999). "It is within [a] district court's discretion to waive [the] bond requirement entirely if [there is] 'no evidence the party will suffer damages from the injunction,' or if there is a 'high probability of success that equity compels waiving the bond, the balance of equities overwhelmingly favors the movant . . . or the requirement of a bond would negatively impact the movant's constitutional rights." *City & Cnty. of S.F.*, 783 F. Supp. 3d at 1203 (citing *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878 (9th Cir. 2003); *Gilmore v. Wells Fargo Bank, N.A.*, No. C 14-2389-CW, 2014 WL 3749984, at *6 (N.D. Cal. July 29, 2014); *East Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 868 (N.D. Cal. 2018).

Defendants have not shown why a security bond is required in this case. They do not explain how the DHS and FEMA grants during the pendency of the order would result in damages for the government later. As in *City and County of San Francisco*, the balance of equities tips strongly in plaintiffs' favor, since "imposing a bond would negatively impact their access to the courts and their ability to assert their constitutional rights." *Id.* Defendants' request for the issuance of a bond is DENIED.

United States District Court
Northern District of California

**CONCLUSION**

Plaintiffs' motion for a preliminary injunction is GRANTED.

It is ORDERED that:

1. Defendants and their officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with them ARE RESTRAINED AND ENJOINED from directly or indirectly taking any action to withhold, freeze, or condition funds from the plaintiffs based on (1) Section C.XVII of the Standard DHS Terms (the "Discrimination Condition"); and (2) Section C.XXXI of the Standard DHS Terms (the "EO Condition").

2. This Order shall apply to the maximum extent provided for by Federal Rule of Civil Procedure 65(d)(2) and 5 U.S.C. §§ 705 and 706.

**IT IS SO ORDERED.**

Dated: November 21, 2025

William H. Orrick
United States District Judge