

# EXHIBIT A

1

ANDREW JANZ (SBN 287672)
Fresno City Attorney
andrew.janz@fresno.gov
CITY OF FRESNO
2600 Fresno Street
Fresno, CA 93721
Telephone: (559) 621-7500
Facsimile: (559) 457-1084

*Attorney for Plaintiff*
CITY OF FRESNO

THOMAS FAUGHNAN (SBN 155238)
Chief Deputy County Counsel
tfaughnan@counsel.lacounty.gov
MICHAEL S BUENNAGEL (SBN 259000)
Senior Deputy County Counsel
mbuennagel@counsel.lacounty.gov
OFFICE OF THE COUNTY COUNSEL
COUNTY OF LOS ANGELES
648 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California 90012-2713
Telephone: (213) 584-1473
Facsimile: (213) 617-7182

*Attorneys for Plaintiff*
THE COUNTY OF LOS ANGELES

AMBER HOLDERNESS (SBN 252363)
Chief Assistant County Counsel
aholderness@countyofsb.org
OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA BARBARA
105 E. Anapamu St., Suite 201
Santa Barbara, CA 93101
Telephone: (805) 568-2950
Facsimile: (805) 568-2982

*Attorneys for Plaintiff*
COUNTY OF SANTA BARBARA

JONATHAN V. HOLTZMAN (SBN 99795)
jholtzman@publiclawgroup.com
JAMES R. ROSS (SBN 149199)
jross@publiclawgroup.com
RYAN P. McGINLEY-STEMPEL (SBN 296182)
rmcginleystempel@publiclawgroup.com
JAKE D. FREITAS (SBN 341837)
jfreitas@publiclawgroup.com
MARIBEL LOPEZ (SBN 340907)
mlopez@publiclawgroup.com
RENNE PUBLIC LAW GROUP
350 Sansome Street, Suite 300
San Francisco, California 94104
Telephone: (415) 848-7200
Facsimile:  (415) 848-7230

*Attorneys for Plaintiffs*
CITY OF FRESNO; CITY OF SANTA CLARA;
CITY OF REDWOOD CITY; CITY OF SANTA
CRUZ; CITY OF BEAVERTON; CITY OF
CORVALLIS; CITY OF HILLSBORO; CITY OF
STOCKTON; COUNTY OF SAN DIEGO;
COUNTY OF LOS ANGELES; COUNTY OF
SANTA BARBARA

RENNE PUBLIC LAW GROUP
Attorneys at Law

# IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

CITY OF FRESNO; CITY OF SANTA CLARA; CITY OF REDWOOD CITY; CITY OF SANTA CRUZ; CITY OF BEAVERTON; CITY OF CORVALLIS; CITY OF HILLSBORO; CITY OF STOCKTON; COUNTY OF SAN DIEGO; COUNTY OF LOS ANGELES; COUNTY OF SANTA BARBARA,

     Plaintiffs,

v.

KRISTI NOEM in her official capacity as Secretary of Homeland Security; the U.S. DEPARTMENT OF HOMELAND SECURITY; KAREN EVANS in her official capacity as Acting Administrator of Federal Emergency Management Agency; the FEDERAL EMERGENCY MANAGEMENT AGENCY; DOUG BURGUM in his official capacity as Secretary of the Interior; the U.S. DEPARTMENT OF THE INTERIOR; PAMELA BONDI in her official capacity as Attorney General; the U.S. DEPARTMENT OF JUSTICE,

    Defendants.

Case No.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

RENNE PUBLIC LAW GROUP
Attorneys at Law

## I.     INTRODUCTION

Plaintiffs, like most local government entities, rely on congressionally authorized grant programs administered by the U.S. Department of Homeland Security (DHS), its component the Federal Emergency Management Agency (FEMA), the Department of Justice (DOJ), and the Department of the Interior (DOI) (collectively, the "Defendants") to deliver essential public services, including disaster mitigation and prevention, victim services and law-enforcement training, and water conservation initiatives that protect public safety, public health, and local economies.  For years, Plaintiffs have worked cooperatively with Defendants to administer these programs.  However, the lawful and predictable administration of these funds has recently been disrupted by the imposition of vague, unlawful, and unauthorized conditions by Defendants.

The Constitution vests Congress—not the Executive—with the authority to make laws and appropriate federal funds.  *See* U.S. Const. art. I, § 8; *Cunningham v. Neagle*, 135 U.S. 1, 83–84 (1890).  While the Executive Branch is charged with faithfully executing the laws enacted by Congress, that duty does not include the power to unilaterally rewrite or expand the statutory terms under which federal funds are awarded.  *City of Los Angeles v. Barr*, 941 F.3d 931, 945 (9th Cir. 2019); *City & Cnty. of San Francisco v. Barr*, 965 F.3d 753, 766 (9th Cir. 2020).

Defendants have imposed vague and unauthorized conditions on federal funds to coerce compliance with executive policy preferences.  These actions exceed Defendants' constitutional and statutory authority, erode the separation of powers, and disregard core constitutional and statutory protections, including the Spending Clause, the Fifth Amendment's void-for-vagueness doctrine, and the Administrative Procedure Act's (APA) procedural safeguards.

Accordingly, Plaintiffs bring this action to vindicate the constitutional and statutory limits on Defendants' authority and to prevent ongoing and imminent harm to their communities.  Plaintiffs seek declaratory relief establishing that the challenged funding conditions are unlawful and unconstitutional, and injunctive relief prohibiting Defendants from enforcing or conditioning the receipt of congressionally authorized funds on those requirements.  Absent judicial intervention, Plaintiffs will continue to face the untenable choice of either acquiescing in unlawful conditions or forfeiting critical federal funding necessary to carry out essential public safety, public health, and environmental programs.

-3-

RENNE PUBLIC LAW GROUP
Attorneys at Law

## II.    JURISDICTION

1.    The Court has jurisdiction under 28 U.S.C. § 1331.  This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202 et seq.

2.    Venue properly lies within the Northern District of California because this is an action against an officer or employee of the United States and an agency of the United States, Plaintiffs the City of Santa Clara, the City of Redwood City, and the City of Santa Cruz reside in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this district.  28 U.S.C. § 1391(e)(1).

3.    Divisional Assignment:  Pursuant to Civil Local Rule 3-2(d), except as provided in Civil L.R. 3-2(c), all civil actions that arise in the counties of Alameda, Contra Costa, Marin, Napa, San Francisco, San Mateo, or Sonoma shall be assigned to the San Francisco Division or the Oakland Division.  This action arises in various counties, including the counties of San Mateo, Santa Clara, and Santa Cruz.

## III.    PARTIES

4.    The City of Santa Clara is a charter city organized and existing under and by virtue of the laws of the State of California.

5.    Santa Clara receives federal funds, directly and indirectly, from DHS and FEMA, including: $60,000 in Bay Area UASI Funds for Fire CTOs Training, which reimburse personnel costs for approved trainings; $11,269,422 through a Staffing for Adequate Fire and Emergency Response (SAFER) grant funding firefighter staffing for front line operations; and approximately $250,000 in State Homeland Security Grant Program funds related to urban search and rescue training and deployment grant reimbursing personnel costs for trainings and deployments.

6.    Santa Clara participates in the DOJ's Asset Forfeiture Program, which distributes federal forfeiture proceeds in appropriate cases with cooperating state, local, and tribal law enforcement agencies through equitable sharing.

7.    Plaintiff City of Redwood City is a municipal corporation and charter city organized and existing under and by virtue of the laws of the State of California.

8.    Redwood City relies on federal funds administered by DHS through FEMA to implement

-4-

RENNE PUBLIC LAW GROUP
Attorneys at Law

essential flood-risk reduction, climate-resilience projects, and hazard mitigation throughout the city. Redwood City has received a $306,584 Pre-Disaster Mitigation grant to support the design and engineering of seismic improvements for the Easter Bowl and Glenloch water tanks, as well as several Hazard Mitigation Grant Program (HMGP) awards to support critical flood-mitigation infrastructure, including a majority of the $501,682.50 grant for the Price Storm Drainage Pump Station Improvement Project to upgrade stormwater pumping capacity and reduce street and property flooding, $809,925 for the Bradford Storm Drainage Pump Station Improvement Project to make similar improvements, and $2,000,000 for the Redwood Shores Sea Level Rise Protection project, which will protect homes, schools, businesses, and critical infrastructure by addressing flood risk identified by FEMA and projected future sea level rise. The project will also integrate opportunities for nature-based solutions where conditions allow along a raised and strengthened Redwood Shores levee, while enhancing recreational amenities for the community.  Redwood City has also received approximately $856,904 through FEMA's Flood Mitigation Assistance Grant Program for its Redwood Creek Watershed and Wetland Capacity Project.

9.      Redwood City has also received FEMA funding to support its firefighters through a $1,320,578 Assistance to Firefighter Grant (AFG) and a $3,630,607 Staffing for Adequate Fire and Emergency Response (SAFER) grant.

10.      Redwood City participates in the DOJ's Asset Forfeiture Program, which distributes federal forfeiture proceeds in appropriate cases with cooperating state, local, and tribal law enforcement agencies through equitable sharing.

11.      Plaintiff the City of Santa Cruz is a charter city organized and existing under and by virtue of the laws of the State of California.

12.      Santa Cruz relies on DHS and FEMA funding to support efforts to mitigate potential disasters.  The City relies on receiving approximately $97,178 in FEMA Hazard Mitigation funding to update the City's local hazard mitigation plan and to mitigate future disaster losses in the community. The City's Department of Parks and Recreation relies on receiving approximately $360,994 in FEMA Disaster Relief Grant funding to conduct storm damage repair.  The City's Department of Public Works relies on receiving approximately $11,514,632 in FEMA funding for Public Works projects, including

-5-

RENNE PUBLIC LAW GROUP
Attorneys at Law

drainage system assessment, road work, and erosion repair. The City's Water Department has been approved for approximately $2,123,000 in FEMA Disaster Relief Grant funding to conduct storm damage repair. The City's Economic Development office intends to apply for approximately $200,000 in HSGP-UASI funding as soon as the next round of applications begins.

13. Santa Cruz's Police Department relies on receiving approximately $19,020 in Bulletproof Vest Partnership Grant funding from DOJ.

14. Santa Cruz's Water Department intends to apply for DOI funding through the Bureau of Reclamation for new water supply projects through the WaterSMART Grant programs as soon as funding becomes available.

15. Plaintiff City of Fresno is a municipal corporation and charter city organized and existing under and by virtue of the laws of the State of California.

16. Fresno utilizes DOJ grants to support community safety efforts. In FY 2024, Fresno was awarded a $297,935, Justice Assistance Grant (JAG). The City is using those JAG funds to provide critical funding to support a range of program areas including law enforcement, prosecution, indigent defense, courts, crime prevention and education, corrections and community corrections. Fresno declined to apply for certain DOJ grants in FY 2025, including the Office of Community Oriented Policing (COPS) Community Policing Development Microgrant and the Law Enforcement Mental Health and Wellness Act Program grant because the application required the submittal of DEI and immigration-related certifications.

17. Fresno also utilizes DOI grant programs. Fresno currently has two active WaterSMART grants administered by the Bureau of Reclamation: a $734,452 BOR WaterSMART Drought Resiliency Program grant being used to install an on-site wellhead treatment system to remove naturally occurring contaminants from existing municipal potable water supply and a $379,390 WaterSMART Water and Energy Efficiency grant being used to purchase, install, and program 1,500 smart irrigation timers for its residential customers.

18. Fresno also relies on federal funds administered by DHS through FEMA to support its Fire Department. The Fresno Fire Department relies on a $702,727.27 Assistance to Firefighter Grant (AFG) to protect the health and safety of the public and its firefighting personnel against fire and fire-

RENNE PUBLIC LAW GROUP
Attorneys at Law

related hazards and a $7,347,000 Staffing for Adequate Fire and Emergency Response (SAFER) grant to help increase the number of firefighters to meet industry minimum standards and attain 24-hour staffing to provide adequate protection from fire and fire-related hazards, and to fulfill traditional missions of the fire department.

19. Plaintiff County of San Diego is a political subdivision of the State of California and a governmental entity that serves the San Diego County geographic region.  It is the second-most populous county in California.

20. The County of San Diego utilizes DOJ grants to support community safety efforts.  The County plans to respond to multiple FY25 Office for Victims of Crime (OVC) Notices of Funding Opportunity released in December 2025 related to human trafficking, including OVC FY25 Enhanced Collaborative Model (ECM) Task Force to Combat Human Trafficking funds, OVC FY25 Housing Assistance for Victims of Human Trafficking funds, OVC FY25 Integrated Services for Minor Victims of Human Trafficking funds, OVC FY25 Preventing Trafficking of Girls funds, and OVC FY25 Services for Victims of Human Trafficking funds.  Across these OVC funding opportunities, award ceilings range from approximately $497,000 to $1.2 million per award, depending on the specific NOFO and category, with grant periods generally spanning 36 months beginning July 1, 2026.  Application deadlines fall between February 24, 2026, and March 18, 2026.

21. The County of San Diego is seeking this funding administered by the DOJ to support a range of services for victims of sex and labor trafficking, including prevention and early intervention, victim identification, housing stability, integrated and trauma-informed services for adults and minors, and improved coordination among law enforcement, service providers, and community partners.

22. Plaintiff the City of Beaverton is a charter city and municipal corporation organized and existing under the constitution and laws of the State of Oregon and the Beaverton City Charter.

23. Beaverton relies on DOJ funding for its Municipal Court and police department.  The Beaverton Municipal Court received a DOJ Bureau of Justice Assistance (BJA) grant of $724,000 for its Beaverton Sobriety Opportunity for Beginning Recovery (B-SOBR) treatment court that assists repeat DUII offenders in recovering from alcohol and drug addictions.  B-SOBR participants agree to strict supervision while remaining out of jail, including court check-ins, communication with a case manager,

-7-

RENNE PUBLIC LAW GROUP
Attorneys at Law

sobriety and urine tests, wearing an alcohol monitoring bracelet, and random check-ins from Beaverton police officers. The Beaverton municipal court also has a $500,000 BJA Byrne Discretionary Community Project Funding/Byrne Discretionary Grants Program grant for its Behavioral Health Court, which employes a probation diversion model in which participants check in twice per month with the judge all while enrolling in treatment services and following their treatment plan.

24. The Beaverton Police Department also has a number of BJA and other DOJ grants. The department has received BJA Byrne Memorial Justice Assistance Grants in excess of $50,000 for use in, without limitation, purchasing communication devices and officer training. The Beaverton Police Department has also received Patrick Leahy Bulletproof Vest Partnership Program grants that pay 50 percent of the cost of the bulletproof vests needed by the department. Beaverton has participated in this program for many years and currently has applied for a grant of approximately $20,000.

25. The City of Corvallis is a charter city and municipal corporation organized and existing under the constitution and laws of the State of Oregon and the Corvallis City Charter.

26. Corvallis received funding as a subrecipient of the State of Oregon from the DOI's Land and Water Conservation Fund Grant Program for FY 2024. This grant will support Capital improvements at Dr. Martin Luther King, Jr. Park in Corvallis, a project which includes the construction of a children's play area, restroom facility, outdoor fitness area, and basketball court. Corvallis also received over ten-thousand dollars from DOJ for bulletproof vests in FY2025 as a subrecipient of the State of Oregon as part of the Patrick Leahy Bulletproof Vest Partnership, and has received millions of dollars from DHS as a vendor for the State of Oregon, acting by and through its Oregon Health Authority, to support ambulance operations as part of the Ground Emergency Medical Transportation grant program.

27. The City of Hillsboro is a charter city and municipal corporation organized and existing under the constitution and laws of the State of Oregon and the Hillsboro City Charter.

28. Hillsboro received approximately $410,000 in funding from the DOI's Land and Water Conservation Fund Grant Program through the State of Oregon Parks and Recreation Department. This grant will support capital improvements for the development of futsal courts at Dairy Creek Park in Hillsboro.

RENNE PUBLIC LAW GROUP
Attorneys at Law

29.     Hillsboro has also received or manages approximately $940,000 in federal funds from DHS and FEMA, through the Oregon Emergency Management Department, from the Homeland Security Grant Program – State Homeland Security Program for vulnerable facility security enhancements and FEMA's Hazard Mitigation Grant Program.

30.     Hillsboro also relies on DOJ funding.  Hillsboro has been awarded several grants either directly from DOJ or indirectly as a subrecipient through the State of Oregon.  These grants include approximately $400,000 from the Stop Violence Against Women grant program, approximately $92,000 via various awards under the Edward Byrne Memorial Justice Assistance Grant (JAG), and approximately $224,000 from the Community Oriented Policing Services Grant Program.

31.     The City of Stockton is a charter city organized and existing under and by virtue of the laws of the State of California.

32.     Stockton will  receive approximately $500,000 in funding through the DOJ-COPS Office Safer Outcomes: Enhancing Deescalation and Crisis Response Training for Law Enforcement Safer Outcomes program.  This award funds specialized training for law enforcement agencies to promote safe outcomes during police encounters with persons in crisis, including training for law enforcement officers, support personnel, campus public safety officers, and mental health professionals.

33.     Stockton also utilizes DOI grant programs.  For FY 2024, the city applied for and received a grant through the Bureau of Reclamation's WaterSMART Water and Energy Efficiency Grant program for $4,273,925.  This funding will support a project to replace and retrofit the City's outdated metering system, improving water meters with advanced metering infrastructure for residential, commercial, and irrigation customers.  The project will promote efficiency and preserve water resources to achieve a more reliable water supply for economically challenged communities in Stockton.

34.     The County of Los Angeles is a charter County organized and existing under and by virtue of the laws of the State of California.  It is the most populous county in California.

35.     Los Angeles County relies on DOJ grant programs.  The County's Department of Medical Examiner (DME) currently receives the Strengthening the Medical Examiner-Coroner Systems grant, which allows DME to secure paid fellows for the Forensic Pathologist Medical program with the hopes of attracting and retaining these fellows full-time.  The DME has applied for this grant and anticipates

-9-

RENNE PUBLIC LAW GROUP
Attorneys at Law

being awarded either $150,000 for one fellow or $300,000 for two fellows. The DME also receives The Paul Coverdell Forensic Science Improvement Grant Program as a subrecipient of the California Governor's Office of Emergency Service. These funds provide financial support for staff, including deputy medical examiners, investigators, and criminalists, to attend classes, conferences, and seminars for continuing education. The County's District Attorney's Office (DA) has applied for a DOJ Office for Victims of Crime (OVC), FY 2025 Services for Victims of Crime grant in the amount of $500,000 to implement the Services to Victims of Gang Violence Program that is intended to strengthen and expand services to help victims rebuild their lives after gang violence. Unfortunately, the DA was forced to not apply for a DOJ BJA FY25 National Sexual Assault Kit Initiative (SAKI) for $2.5 million to work through the County's backlog of unsubmitted and partially tested sexual assault kits and to enhance victim services and support for past and current victims of sexual assault because the application required the submittal of DEI and immigration-related certifications, and also included immigration-related priorities and DEI and immigration-related unallowable uses.

36. Los Angeles County is also a recipient of significant DOI grant funding. Los Angeles County Department of Parks and Recreation, through the State of California Natural Resources Agency, has applied for, and been conditionally awarded, a DOI, National Parks Service Land and Water Conservation Fund (LWCF) grant in the amount of approximately $15 million for the development of a section of the 40-acre Western Deck of the former Puente Hills Landfill Park, including a 5-acre bike skills course, a children's nature play area, a picnic area, an amphitheater, dog run, open grassland and ceremonial space.

37. The County of Santa Barbara is a general law County organized and existing under and by virtue of the laws of the State of California.

38. Santa Barbara County utilizes DOJ grants to support community safety efforts, both directly and as a subrecipient of the California Governor's Office of Emergency Services (Cal OES). For FY2025 and FY2026, Santa Barbara County received over $1 million in funding as a subrecipient of DOJ OVC grant funding. These grants enable Santa Barbara County to provide services ranging from advocacy for victims of human trafficking and outreach and support for victims of crime. Santa Barbara County is also a direct recipient of a $385,000 BJA Smart Prosecution Innovative Prosecution Solutions

-10-

RENNE PUBLIC LAW GROUP
Attorneys at Law

grant, which funds the Santa Barbara District Attorney's efforts to implement a Digital Evidence Management System to enhance the investigation and prosecution of violent crime in the community.

39.     Santa Barbara County is also a recipient of over $5 million in DHS and FEMA funding, including a $200,919 Emergency Management Performance Grant (EMPG) to support staffing to enhance emergency management capabilities.  Other FEMA grants include $448,412 from the Homeland Security Grant Program (HSGP) to support training and equipment that will strengthen the County's capacity to prevent, prepare for, protect against, and respond to acts of terrorism or other catastrophic events.  Santa Barbara County also receives over $3.8 million in grants from the Hazard Mitigation Grant Program (HMGP), including a $1,384,040 grant to be used for the San Marcos Grade Stabilization Project, designed to implement slope stabilization along Old San Marcos Road.  Other HMGP-funded projects include the Cold Springs Debris Basin Capacity Improvement Project, the Buena Vista Creek Debris Basin Project, and the San Ysidro Debris Basin Capacity Improvement Project, each of which will build and improve infrastructure to better withstand severe weather events.

40.     Santa Barbara County has also received funding from DOI via the Bureau of Reclamation's WaterSmart program.  This grant provides $436,667 in federal funding to maintain the Water-Wise Landscape Rebate Program.  The Program is a collaboration between seven of the County's water purveyors and the Santa Barbara County Water Agency and helps fund lawn-replacement rebates, irrigation upgrades, and planting water-wise plants.  Each purveyor has its own rebate program, and the Water Agency provides administrative support.

41.     Defendant Kristi Noem is the Secretary of DHS, the highest-ranking official in DHS, and is responsible for the decisions of DHS.  She is sued in her official capacity.

42.     Defendant DHS is an executive department of the United States federal government.  6 U.S.C. § 111(a).  DHS is an "agency" within the meaning of the APA.  5 U.S.C. § 551(1).

43.     Defendant Karen Evans is the Acting Administrator of FEMA, the highest-ranking official in FEMA, and is responsible for the decisions of FEMA.  She is sued in her official capacity.

44.     FEMA is a federal agency within DHS.  6 U.S.C. § 313.  FEMA is an "agency" within the meaning of the APA.  5 U.S.C. § 551(1).

45.     Defendant Doug Burgum is the Secretary of DOI, the highest-ranking official in DOI, and

-11-

RENNE PUBLIC LAW GROUP
Attorneys at Law

is responsible for the decisions of DOI.  He is sued in his official capacity.

46.     Defendant DOI is an executive department of the United States federal government.  43 U.S.C. § 1451.  DOI is an "agency" within the meaning of the APA.  5 U.S.C. § 551(1).

47.     Defendant Pamela Bondi is the Attorney General of the United States and the head of the DOJ, the highest-ranking official in DOJ, and is responsible for the decisions of DOJ.  She is sued in her official capacity.

48.     Defendant DOJ is an executive department of the United States federal government.  28 U.S.C. § 501.  DOJ is an "agency" within the meaning of the APA.  5 U.S.C. § 551(1).

## IV.     FACTUAL ALLEGATIONS

### A.     DHS Grant Programs

49.     Congress established DHS in 2002 in the aftermath of the September 11, 2001 attacks with the goal of protecting the United States against terrorism.  *See* Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2142.  DHS administers both competitive and entitlement grant programs.  The Secretary of Homeland Security is responsible for the overall direction, supervision, and coordination of the Department of Homeland Security, including oversight of its component agencies, the administration of grants and other financial assistance programs, and ensuring compliance with statutory and executive mandates.  *See* 6 U.S.C. § 112(a)(1).

50.     DHS often acts through its component agencies, including FEMA.  Congress established FEMA in 1979 to consolidate all federal support for emergency preparedness, mitigation, and response activities under one agency's purview.  In 2006, Congress passed legislation entitled Preserving the Federal Emergency Management Agency, which requires FEMA to "be maintained as a distinct entity" within DHS.  *See* 6 U.S.C. §§ 313(a); 316(a).  By law, the DHS Secretary is responsible for all actions taken by the Department's component agencies.  The administrator of FEMA reports directly to the DHS Secretary.

### 1.     Homeland Security Grant Program

51.     FEMA's Homeland Security Grant Program (HSGP) comprises several discrete subprograms, including the State Homeland Security Program (SHSP) and the Urban Area Security Initiative (UASI) grant program.

RENNE PUBLIC LAW GROUP
Attorneys at Law

-12-

### a. State Homeland Security Program

52.     Congress authorized the creation of the Homeland Security Grant Program – State Homeland Security Program to provide federal funding to States to build the necessary capacity to prevent, prepare for, protect against, and respond to acts of terrorism.  SHSP funds have been available to States since the program was created under the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT Act) in 2001.  *See* 6 U.S.C. §§ 603, 605-09.

53.     Congress has directed FEMA to allocate SHSP funds pursuant to a risk assessment, which determines the relative threat, vulnerability, and consequences to each State from acts of terrorism, considering factors such as population density and history of threats.  *Id*. § 608(a)(1).  Recipients may then use SHSP funds for uses permitted by statute, such as enhancing homeland security, conducting training exercises, upgrading equipment, or paying salaries.  *Id*. § 609(a).

54.     Because SHSP funds are formula grants based on a statutory risk formula, not competitive funds, each State is entitled to a minimum and specific allocation based on the risk assessment whenever a notice of funding opportunity is posted.  Congress has directed that the FEMA Administrator "shall ensure" that each State receives no less than an amount equal to 0.35 percent of the total funds Congress appropriated for the SHSP.  *Id*. § 605(e)(1)(A)(v).

### b. Urban Areas Security Initiative

55.     Urban Areas Security Initiative (UASI) funds serve a similar purpose to SHSP funds.  They are used to ensure States—and, through them, local government entities serving high-risk urban areas—build and maintain the capacity to prevent, prepare for, protect against, and respond to acts of terrorism.  UASI funds have been available to States—and, through them, local government entities serving high-risk urban areas—since the program was created by appropriations statute in 2003.  *See* Pub. L. No. 108-90, 117 Stats. 1137, 1146.  The program is codified at 6 U.S.C. §§ 603-04, 606-09.

56.     Each year, FEMA must conduct a risk assessment based on a list of factors specified by statute to determine the relative threat, vulnerability, and consequences "eligible metropolitan areas"— meaning the top one hundred most populous metropolitan statistical areas in the United States—would face from an act of terrorism.  *Id*. §§ 601(5), 604(b)(2)(A)(i), 608(a)(1).  Based on that risk assessment,

-13-

RENNE PUBLIC LAW GROUP
Attorneys at Law

FEMA must designate a list of high-risk urban areas that may submit applications for UASI funds.  *Id*. § 604(b)(3).  FEMA must also rely on the same set of factors—including but not limited to population density and whether the given metropolitan area was targeted by a past act of terrorism—to allocate funding to the States and high-risk urban areas that apply for grants.  *Id*. § 608(a).

57.    UASI grants are based on a risk assessment formula that Congress has directed FEMA to refine, establish, and use to allocate UASI funding.  Each State is entitled to a specific allocation based on FEMA's risk assessment and tied to the FEMA-designated high-risk urban area or areas in that State.

58.    Recipients of UASI funds must use the funds for purposes permitted by statute, including enhancing homeland security, conducting training exercises, upgrading equipment, or paying salaries. *Id*. § 609(a).  States that receive UASI funds must provide the eligible urban area or areas in that State with at least 80% of the grant funds.  *Id*. § 604(d)(2)(A).

59.    States collectively receive hundreds of millions of dollars per year in UASI funds, passing most of these funds along to the high-risk urban areas.  States and the local government entities they pass these funds to use UASI funds for myriad counterterrorism and emergency response purposes, including support for urban fusion centers (hubs for sharing threat-related information across government and private sector partners), SWAT teams, canine units, and bomb squads.

60.    Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on HSGP grants related to a prohibition on all kinds of DEI, exclusion of transgender people, cooperation with federal immigration enforcement, or adherence to executive orders unrelated to the purpose of the funds.

**2.  Hazard Mitigation Grant Program**

61.    Section 324 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, as amended (Stafford Act) authorizes FEMA to provide funding under the Hazard Mitigation Grant Program (HMGP) for management costs incurred in the administration of HMGP.  The Stafford Act provides that the federal government may contribute "up to 75 percent of the cost of hazard mitigation measures" that "substantially reduce the risk of, or increase resilience to, future damage, hardship, loss, or suffering in any area affected by a major disaster."  42 U.S.C. § 5170c(a).

62.    The Hazard Mitigation Grant Program provides federal funding to state, local, tribal, and

-14-

territorial governments to develop hazard mitigation plans and rebuild their communities after a Presidential major disaster declaration in ways that reduce or mitigate future disaster losses.

63.     Eligible risk reduction projects include, but are not limited to, retrofitting facilities to make them more resistant to floods, earthquakes, wind, wildfires, and other natural disasters; installing permanent barriers to prevent floodwater from entering homes or businesses; building safe rooms for communities in hurricane- or tornado-prone areas; stabilizing slopes to prevent structural losses; and developing or improving warning systems. *See* 42 U.S.C. § 5170c(f)–(g)

64.     HMGP funding and funding applications do not necessarily operate on a predictable, fiscal-year basis. HMGP funding often follows the occurrence of disasters, emergencies, and other events. The amount of HMGP funds available to a State in connection with a declared disaster is a function of the level of disaster assistance provided. The State also administers a process to identify and select local project plans for FEMA approval and funding. In this process, local jurisdictions submit their applications to the State, which selects projects to submit to FEMA for approval within 15 months of the disaster declaration date. *See generally* 44 C.F.R. §§ 206.430-440. Some approved mitigation projects can span several years since many contain structural renovation components.

65.     Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on HMGP funds related to a prohibition on all kinds of DEI, exclusion of transgender people, cooperation with federal immigration enforcement, or adherence to executive orders unrelated to the purpose of the funds.

### 3. Flood Mitigation Assistance

66.     The Flood Mitigation Assistance (FMA) Program is a federal grant program administered by FEMA to reduce or eliminate the risk of repetitive flood damage to structures insured under the National Flood Insurance Program (NFIP) and to enhance community flood resilience within NFIP-participating communities.

67.     Congress authorized the FMA program in Section 1366 of the National Flood Insurance Act of 1968, which directs FEMA to provide assistance for mitigation activities that reduce future flood losses to NFIP-insured properties. *See* 42 U.S.C. § 4104c. Congress has further expanded and supported the FMA program through Division J, Title V of the Infrastructure Investment and Jobs Act, which

RENNE PUBLIC LAW GROUP
Attorneys at Law

provides additional funding and directives for flood mitigation and resilience activities.  Pub. L. No. 117-58, 135 Stat. 1387–1388 (2021).

68.    Congress established specific statutory requirements governing the award of FMA funds. Eligible applicants must be NFIP-participating States, local governments, Tribes, or territories, and funded projects must reduce or eliminate flood risk to structures insured under the National Flood Insurance Program.  42 U.S.C. § 4104c(a)–(b).  Congress directed FEMA to prioritize mitigation projects benefiting repetitive loss and severe repetitive loss properties and to evaluate applications based on cost-effectiveness, technical feasibility, and consistency with FEMA-approved hazard mitigation plans.  *Id*. § 4104c(c)–(d).  The statute establishes a default federal cost share of up to 75 percent, while authorizing enhanced federal cost shares, including up to 100 percent, for qualifying projects addressing severe repetitive loss properties.  *Id*. § 4104c(d).

69.    Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on FMA grants related to a prohibition on all kinds of DEI, exclusion of transgender people, cooperation with federal immigration enforcement, or adherence to executive orders unrelated to the purpose of the funds.

### 4.  United States Fire Administration Grant Programs

70.    The U.S. Fire Administration (USFA) is a component of FEMA established by Congress under the Federal Fire Prevention and Control Act of 1974 to provide national leadership in fire prevention, training, research, and data collection.  *See* 15 U.S.C. § 2204.  The USFA's purpose is to advance fire prevention and control efforts, improve firefighter and public safety, promote public education and awareness, conduct fire-related research, and support professional development through training and technical assistance.  Consistent with these statutory responsibilities, Congress has authorized USFA, acting through FEMA, to administer national fire grant programs, including the Staffing for Adequate Fire and Emergency Response (SAFER) Grant Program and the Assistance to Firefighters Grant (AFG) Program in accordance with the eligibility criteria, priorities, and conditions established by statute.

### a.  Staffing for Adequate Fire and Emergency Response

71.    Congress established the SAFER program to provide funding directly to local fire

-16-

RENNE PUBLIC LAW GROUP
Attorneys at Law

departments (among other entities) to help them increase or maintain the number of trained, front-line firefighters available to serve their communities.

72. The goal of SAFER funds is to enhance local fire departments' abilities to comply with staffing, response, and operational standards established by the National Fire Protection Association, including assisting fire departments with "attain[ing] 24-hour staffing to provide adequate protection from fire and fire-related hazards." 15 U.S.C. § 2229a(a)(1)(A). SAFER grants are "awarded on a competitive basis through a neutral peer review process." *Id*. § 2229a(a)(1)(G).

73. The NOFO for the SAFER program, which is from FY 2024 but which governs awards that FEMA will make through September 30, 2025 based on applications received by July 3, 2025, states that "[g]rant funds are obligated upon [FEMA's issuance of] the offer of grant award in the FEMA GO system," and that recipients of SAFER funds must "comply with DHS Standard Terms and Conditions in effect at the time the award is issued." *See* FEMA, Notice of Funding Opportunity (NOFO): FY 24 Staffing for Adequate Fire and Emergency Response (SAFER) Grant Program, https://www.fema.gov /sites/default/files/documents/fema_gpd_safer-nofo_fy24.pdf (last visited February 4, 2026).

### b. Assistance Firefighter Grant

74. Congress's stated goal in creating the Assistance to Firefighters Grant (AFG) is to ensure that firefighters and other first responders can obtain critical equipment, training, and other resources necessary to protect the public and emergency personnel from fire and fire-related hazards. 15 U.S.C. § 2229(c). Eligible fire departments may apply for AFG funding, which is awarded on a competitive basis, in consultation with the chief executives of the States in which the recipients are located, with the amount of funding capped by statutory standards based on population size. *Id*. § 2229(c)(1)–(2), (e).

75. FEMA awards AFG grants on a rolling basis. The NOFO for the AFG program, which is from FY 2024 but which governs awards that FEMA will make through September 30, 2025, states that recipients of AFG funds must "comply with the DHS Standard Terms and Conditions in effect as of the date of the federal award." *See* FEMA, Notice of Funding Opportunity (NOFO): FY 24 Assistance to Firefighters Grant Program, https://files.simpler.grants.gov/opportunities/ab253b7e-83d1-40b5-9d92- f550ee51ba74/attachments/d04af45f-2c82-492c-a791-cf3fce90ab1d/FY_2024_AFG_NOFO.pdf (last visited February 4, 2026).

Renne Public Law Group
Attorneys at Law

-17-

76.     Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on grant funds administered by the USFA related to a prohibition on all kinds of DEI, exclusion of transgender people, cooperation with federal immigration enforcement, or adherence to executive orders unrelated to the purpose of the funds.

### 5.  Other DHS Grant Programs

77.     DHS and its operating divisions and agencies administer a range of other grant programs that Plaintiffs have previously received, currently receive, or are otherwise eligible to receive.  Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on any DHS grants related to a prohibition on all kinds of DEI, exclusion of transgender people, cooperation with federal immigration enforcement, or adherence to executive orders unrelated to the purpose of the funds.

78.     Congress annually appropriates funding for DHS grant programs.  In the annual appropriations legislation, Congress sets forth priorities and directives to the Administrator of DHS with respect to funding.  Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on DHS grants related to a prohibition on DEI, exclusion of transgender people, cooperation with federal immigration enforcement, or adherence to executive orders unrelated to the purpose of the funds.  *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1448-1477; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 312-348; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 4725–4760; Consolidated Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 593-628.

79.     Plaintiffs City of Santa Clara, City of Santa Cruz, City of Redwood City, City of Fresno, City of Corvallis, City of Hillsboro, and the County of Santa Barbara (collectively, the "DHS Plaintiffs"), have previously received, currently receive, or are otherwise eligible to receive federal funding from DHS.  DHS Plaintiffs rely on millions of dollars in appropriated federal funds from DHS's direct or pass-through grant programs for projects undertaken for the benefit of their communities.

### B.     DOJ Grant Programs

80.     Congress established the Department of Justice in 1870.  28 U.S.C. §§ 501 et seq.  The DOJ administers competitive, formula, and block grant programs that provide funds to local governments to support public safety and justice activities in their communities.  DOJ administers grants directly and

-18-

RENNE PUBLIC LAW GROUP
Attorneys at Law

through its program offices, including but not limited to the Community Oriented Policing Services (COPS) Office and the Office of Justice Programs (OJP), which includes the Bureau of Justice Assistance (BJA), and the Office of Victims of Crime (OVC).

81.     The Attorney General is responsible for supervising and directing the administration and operation of the Department of Justice, including oversight of all departmental components, the administration of grants and other federal funding, and ensuring that the Department's actions comply with applicable statutory and executive requirements.  *See* 28 U.S.C. § 509.

### 1.  Byrne Memorial Justice Assistance Grant Program

82.     The Edward Byrne Memorial Justice Assistance Grant (JAG) program operates under a comprehensive statutory framework established by 34 U.S.C. § 10156 that mandates a precise, data-driven allocation formula for distributing federal criminal justice funding to states and localities.  The allocation methodology employs a dual-factor formula:  50% of funds are allocated based on each state's population ratio compared to the total U.S. population, and 50% based on each state's average annual Part 1 violent crimes reported to the FBI over the three most recent years compared to all states.  *Id*. § 10156(a)(1).  Local governments receive 40% of their state's allocation based on their proportional share of Part 1 violent crimes, subject to specific eligibility requirements, including three years of crime data reporting to the FBI within the preceding 10 years.  *Id*. § 10156(b)(2), (d), (e)(3).  The program includes comprehensive safeguards such as minimum allocation guarantees, expenditure caps, and detailed application requirements designed to ensure evidence-based criminal justice funding while maintaining federal oversight and constitutional compliance.  *See id*. § 10156(d), (e), (f).

83.     The statutory scheme authorizes funds to states and units of local government to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice across nine specific program categories:  law enforcement programs; prosecution and court programs; prevention and education programs; corrections and community corrections programs; drug treatment and enforcement programs; planning, evaluation, and technology improvement programs; crime victim and witness programs; mental health programs and related law enforcement and corrections programs; and implementation of state crisis intervention court proceedings and related programs or initiatives.  34 U.S.C. § 10152(a)

RENNE PUBLIC LAW GROUP
Attorneys at Law

84.     To receive JAG funding, a state or local government must submit an application within 120 days after funds are appropriated, including several mandatory certifications and assurances.  *See* 34 U.S.C.§ 10153.  These requirements include:  certification that federal funds will not supplant state or local funds but will increase available law enforcement funding; assurance of governing body review at least 30 days before application submission; assurance of public notice and comment opportunities; and assurance that applicants will maintain and report required programmatic and financial data.  *Id*.

85.     States must develop comprehensive statewide strategic plans detailing how grants will improve criminal justice administration.  These plans must be designed in consultation with local governments and representatives of all criminal justice system segments, including descriptions of funding allocation approaches, descriptions of evidence-based data gathering processes, identification of barriers to implementing evidence-based approaches, and be updated every five years with annual progress reports.  34 U.S.C. § 10153(a)(6).

86.     Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on JAG grant funds related to a prohibition on all kinds of DEI, exclusion of transgender people, cooperation with federal immigration enforcement, or adherence to executive orders unrelated to the purpose of the funds.

## 2.  Community Oriented Policing Services Grant Programs

87.     Congress authorized the COPS program through the enactment of the Public Safety Partnership and Community Policing Act of 1994, Pub. L. No. 103-322, Title I, Sept. 13, 1994, 108 Stat. 1807, with the goal of "increas[ing] the number of law enforcement officers interacting directly with members of the community" and improving "training to law enforcement officers to enhance their problem solving, service, and other skills needed in interacting with members of the community."  *See* 34 U.S.C. § 10381(b).

88.     To this end, the statute authorized the DOJ to provide funds to states and localities to "increase police presence, to expand and improve cooperative efforts between law enforcement agencies and members of the community to address crime and disorder problems, and otherwise to enhance public safety."  Pub. L. No 103-322 at § 1701, 108 Stat. at 1808.  Congress enumerated twenty-four purposes for which grants may be made, including, as relevant here, "to hire and train new, additional career law

-20-

RENNE PUBLIC LAW GROUP
Attorneys at Law

enforcement officers for deployment in community-oriented policing." 34 U.S.C. § 10381(b)(2). In 2018, Congress enacted the Law Enforcement Mental Health and Wellness Act of 2017, Pub. L. No. 115-113, Jan. 10, 2018, 131 Stat. 2276 (LEMHWA), with the goal of "provid[ing] support for law enforcement agency efforts to protect the mental health and well-being of law enforcement officers." 131 Stat. at 2276. LEMHWA amended the COPS Statute to add the following purpose for which COPS Grants may be made: "to establish peer mentoring mental health and wellness pilot programs within State, tribal, and local law enforcement agencies." 34 U.S.C. § 10381(b)(24).

89. The COPS Statute also sets out various requirements for applications for grant funding, including that applicants must "provide assurances that the applicant will, to the extent practicable, seek, recruit, and hire members of racial and ethnic minority groups and women in order to increase their ranks within the sworn positions in the law enforcement agency." 34 U.S.C. § 10382(c)(11).

90. The DOJ administers COPS Grants through the COPS Office. The COPS Office manages several types of COPS Grants each year. Plaintiffs in this case received several COPS grants, including the Safer Outcomes: Enhancing De-Escalation and Crisis Response Training for Law Enforcement, Community Policing Development Microgrant Program, and Law Enforcement Mental Health and Wellness Program Grant.

91. Congress annually appropriates funding for the COPS program. In the annual appropriations legislation, Congress sets forth priorities and directives to the DOJ Secretary with respect to COPS funding. *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1262-1263; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 130-131; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 4539-4541; Consolidated Appropriations Act, 2024, Pub. L. 118- 42, 138 Stat. 153-154.

92. Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on COPS grants prohibiting DEI and the "promot[ion]" of "gender ideology," or cooperation with federal immigration enforcement.

### 3. Paul Coverdell Forensic Science Improvement Grant

93. Congress authorized the Paul Coverdell Forensic Science Improvement Grant program (Coverdell grant) through the enactment of the Paul Coverdell National Forensic Sciences Improvement

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

RENNE PUBLIC LAW GROUP
Attorneys at Law

Act of 2000, Pub. L. No. 106-561, 114 Stat. 2788 (2000). This statute amended the Omnibus Crime Control and Safe Streets Act of 1968 to establish the Coverdell grant program in its current form. *See* Pub. L. No. 90-351. The aim of the program is to improve the quality, timeliness, and credibility of forensic science services for criminal justice purposes. *See* 34 U.S.C. § 10564(a).

94. DOJs administration of the Coverdell grant is authorized and governed by statutory directives. Congress authorized the Attorney General to award Coverdell grants to states and units of local government. 34 U.S.C. § 10561.

95. Recipients may use Coverdell grants for one or more statutorily defined purposes to improve forensic science and medicolegal death investigation services. *See* 34 U.S.C. § 10564. Eligible uses include carrying out all or a substantial part of a program to improve the quality and timeliness of forensic science or medical examiner services, including services provided by State and local government laboratories; eliminating backlogs in the analysis of forensic science evidence across a wide range of disciplines; training, assisting, and employing forensic laboratory personnel and medicolegal death investigators as necessary to eliminate such backlogs; addressing emerging forensic science issues and technologies; educating and training forensic pathologists; and funding medicolegal death investigation systems to facilitate accreditation of medical examiner and coroner offices and certification of medicolegal death investigators. *Id*. § 10564(a)(1)–(6). Grant funds awarded for programmatic improvements under 34 U.S.C. § 10564(a)(1) may be used only for expenses related to facilities, personnel, computerization, equipment, supplies, accreditation and certification, education, and training, and may not be used for general law enforcement or nonforensic investigatory functions. *Id*. § 10564(b)(1)–(2). The statute further limits the percentage of grant funds that may be used for the construction of new facilities based on the size of the grant award, *id*. § 10564(c)(1)–(2), caps administrative expenses at ten percent of the total grant amount, *id*. § 10564(d), and defines a "backlog" as forensic evidence that has been stored and not subjected to appropriate testing due to a lack of resources or personnel, *id*. § 10564(e).

96. To apply for a Coverdell grant, a State or unit of local government must submit several certifications to the Attorney General. *Id*. § 10562. The applicant must certify that it has developed a forensic science laboratory plan consistent with the program described in 34 U.S.C. § 10564(a) and must

RENNE PUBLIC LAW GROUP
Attorneys at Law

provide a specific description of how the grant funds will be used to carry out that plan.  *Id.* § 10562(1).  The applicant must also certify that any forensic science laboratory system, medical examiner's office, or coroner's office that will receive grant funds uses generally accepted laboratory practices and procedures established by recognized accrediting or certifying bodies.  *Id.* § 10562(2).  In addition, except with respect to medical examiner or coroner offices, the applicant must certify that such laboratories are accredited by an internationally recognized accrediting body, or, in the alternative, must provide a legally binding and enforceable assurance that a portion of the grant funds will be used to prepare and apply for such accreditation within two years of the grant award.  *Id.*

97.    If the proposed program includes construction of a new facility, the applicant must provide a specific description of the facility and its estimated costs and must certify that the amount of grant funds used for construction will not exceed the limitations set forth in 34 U.S.C. § 10564(c).  *Id.* § 10562(3).  The applicant must certify that a government entity exists and that an appropriate process is in place to conduct independent external investigations into allegations of serious negligence or misconduct that substantially affect the integrity of forensic results, when such allegations involve employees or contractors of any forensic laboratory system, medical examiner's office, coroner's office, law enforcement storage facility, or medical facility in the State that will receive grant funds.  *Id.* § 10562(4).

98.    The statute does not require applicants make certifications prohibiting DEI and the "promot[ion]" of "gender ideology," or cooperation with federal immigration enforcement.

99.    Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on Coverdell grants prohibiting DEI and the "promot[ion]" of "gender ideology," or cooperation with federal immigration enforcement.

100.    Funding for Coverdell grants comes from congressional appropriations.  Congress recently appropriated funds for the Coverdell program in the 2025 Full-Year Continuing Appropriations and Extensions Act, 2025.  *See* Pub. L. No. 119-4, 139 Stat. 9, 10-11.

101.    None of the 2025 Appropriations and Extensions Act's directives to DOJ or any other legislation authorizes DOJ to impose grant conditions prohibiting DEI and the "promot[ion]" of "gender ideology," or cooperation with federal immigration enforcement.

-23-

RENNE PUBLIC LAW GROUP
Attorneys at Law

### 4. Office of Victims of Crime Grants

102.    Federal grants administered by DOJ have long been instrumental in supporting programs that provide compensation and assistance to victims of crime.

103.    In December 1982, President Ronald Reagan's Task Force on Victims of Crime issued a report concluding that "[t]he neglect of crime victims is a national disgrace."  Among the report's key recommendations was to "enact legislation to provide federal funding to assist state crime victim compensation programs" and "provide federal funding, reasonably matched by local revenues, to assist in the operation of federal, state, local, and private nonprofit victim/witness assistance agencies that make comprehensive assistance available to all victims of crime."

104.    Two years later, Congress passed the Victims of Crime Act (VOCA), which created the Crime Victims Fund within the U.S. Treasury and established Office for Victims of Crime (OVC) as an office within DOJ.  Congress structured VOCA "with minimal bureaucratic 'strings attached,' for direct compensation and service programs to assist victims of crime" in order to support state and local victim assistance programs.  S. Rep. No. 497, 98th Cong., 2d Sess. at 1, 3 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3607, 3607, 1984 WL 37447.  "Unlike some past compensation bills," VOCA is "intended to keep conditions on Federal Aid to a bare minimum." *Id*. at 9.  The U.S. Attorney General at the time emphasized that the new grants would not "creat[e] an unnecessary bureaucracy to impose the Federal government's priorities on the States .... [T]he Federal government will provide money to the States to enable the States to effectively run their own programs."  130 Cong. Rec. S5252, 5352 (Mar. 13, 1984) (statement of Attorney General William French Smith).

105.    Over the years, Congress has amended VOCA to "allow a greater measure of flexibility to ... State and local victims' assistance programs" and provide "greater certainty" that VOCA funding "will not wax and wane with events .... [fund recipients] need to be able to plan and hire and have a sense of stability if these measures are to achieve their fullest potential."  S. Rep. No. 179, 104th Cong., 1st Sess. at 29 (1995), *reprinted in* 1996 U.S.C.C.A.N. 924, 941, 1995 WL 731704.

106.    VOCA directs that the U.S. government shall deposit into the Crime Victims Fund various penalties and fees recovered from individuals convicted of federal offenses.

RENNE PUBLIC LAW GROUP
Attorneys at Law

107.     VOCA further directs that the federal government shall draw on the Crime Victims Fund to issue annual grants to States for victim compensation and assistance.  34 U.S.C. §§ 20101-20111.

108.     Since VOCA's enactment, VOCA funds have been instrumental in providing critical support to millions of victims and survivors (and their families) of serious crime.  *See, e.g.*, Office for Victims of Crime, VOCA Victim Compensation Data Dashboard: Data Analyses for Fiscal Years 2021-2024, https://ovc.ojp.gov/funding/performance-measures/data-analyses/voca-victim-compensation (last visited February 4, 2026).

109.     As available amounts in the Crime Victims Fund have fluctuated over the years, Congress has taken action to make additional funds available, including by amendments to VOCA through the 2001 USA PATRIOT ACT, Pub. L. 107-56, and the VOCA Fix to Sustain the Crime Victims Fund Act of 2021, Pub. L. 117-27.  In January 2002, Congress also appropriated $68.1 million for the Crime Victims Fund to assist in providing relief to 9/11 victims.  Emergency Supplemental Appropriations for Recovery from and Response to Terrorist Attacks on the United States Act, Pub. L. 107-117.

### a.  OVC Formula Grants

110.     Congress has directed OVC to administer two formula grant programs pursuant to VOCA that support crime victim compensation and assistance:  Victim Compensation Formula Grants and Victim Assistance Formula Grants.

111.     The Victim Compensation and Victim Assistance grants are formula grants, not competitive grants.  Recipients are entitled to a specific amount of funding based on the applicable statutory formula.

112.     For FY 2025, over $178 million from the Crime Victims Fund is to be awarded to States, and their subrecipients under the Victim Compensation Formula Grant, and over $1.2 billion is to be awarded to States, and their subrecipients under the Victim Assistance Formula Grant.

### i.  Victim Compensation Formula Grants

113.     Victim Compensation Formula Grants provide funding to all qualifying crime victim compensation programs.  34 U.S.C. § 20102.

114.     The purpose of these grants is to provide compensation to eligible crime victims for costs resulting from crime, including for medical care, lost wages, mental health counseling, funeral expenses,

-25-

RENNE PUBLIC LAW GROUP
Attorneys at Law

and crime scene clean-up.  The grants are designed to supplement state and territory efforts to provide

financial compensation to crime victims.  *See id.*

115.    VOCA provides that the OVC Director "shall make an annual grant" to eligible victim

compensation programs based on a fixed statutory formula.  34 U.S.C. § 20102(a).

116.    VOCA delineates a precise set of requirements that a state victim compensation program

must satisfy to be eligible for a grant, requiring, for example, that States pay for certain victim expenses,

treat federal and state crimes and residents and non-residents the same, and do not deny compensation

based on a victim's familial relationship with an offender.  *Id.* § 20102(b)(1)–(9).  The recipients must

also certify that grant funds will "not be used to supplant State funds otherwise available to provide crime

victim compensation."  *See id.* § 20102(b)(3).  None of the statutory eligibility or certification

requirements relate to prohibitions on DEI, promotion of gender ideology, or immigration enforcement.

117.    Victim Compensation Formula Grants are distributed among eligible recipients based on a

statutory formula that accounts for the amount of money each state crime victim compensation program

distributed to victims in the preceding fiscal year.  Specifically, the OVC "Director shall make an annual

grant from the Fund to an eligible crime victim compensation program of 75 percent of the amounts

awarded" by the state compensation program "during the preceding fiscal year, other than amounts

awarded for property damage."  *Id.* § 20102(a)(1).

118.    The statute recognizes only one exception to this statutory formula.  If the Crime Victims

Fund is "insufficient" to provide 75 percent of the amount distributed by each State in the preceding

fiscal year, "the [OVC] Director shall make, from the sums available, a grant to each eligible crime

victim compensation program so that all such programs receive the same percentage of the amounts

awarded by such program during the preceding fiscal year, other than amounts awarded for property

damage."  *Id.* § 20102(a)(2).

119.    The statutory formula makes no reference to prohibitions on DEI, promotion of gender

ideology, or immigration policy.

120.    Plaintiffs are not aware of Congress ever imposing or authorizing directives for or

conditions on Victim Compensation Formula grants prohibiting DEI and the "promot[ion]" of "gender

ideology," or cooperation with federal immigration enforcement.

RENNE PUBLIC LAW GROUP
Attorneys at Law

### ii. Victim Assistance Formula Grants

121.     Victim Assistance Formula Grants provide financial support for eligible crime victim assistance programs.  34 U.S.C. § 20103(a).

122.     The purpose of Victim Assistance Formula Grants is to improve the treatment of victims of crime by providing them with the assistance, support, and services necessary to aid their restoration and healing after a criminal act.  These grants are intended to enable States to provide subgrants to local community-based organizations and public agencies that provide services directly to crime victims, including but not limited to victim and witness advocacy services; crisis counseling; telephone and onsite information and referrals; criminal justice support and advocacy; emergency shelter; therapy; and consistent communication about significant events in their case.  *Id*.  These services are to be administered without regard to a victim's immigration status.  *See, e.g.*, 28 C.F.R. § 94.103(a).

123.     VOCA provides that the OVC Director "shall make an annual grant" to the chief executive of each State to provide financial support to eligible victim assistance programs.  34 U.S.C. § 20103(a).  Each State subgrants such funds out to community-based organizations and public agencies that provide services directly to crime victims.  *Id*. § 20103(b)–(c).

124.     Congress has specified the criteria for determining the eligibility of a victim assistance program to receive Victim Assistance grant funds.  *Id*. § 20103(b).  A program is eligible under these statutory criteria if, among other things, it is run by a public agency or nonprofit organization, has a demonstrated record of providing effective services to crime victims, assists victims in seeking compensation benefits, and does not discriminate against victims because they disagree with how a case is prosecuted.  *Id*.  Congress has also specified which certifications are required of a State's chief executive, including that "funds awarded to eligible crime victim assistance programs will not be used to supplant State and local funds otherwise available for crime victim assistance."  *Id*. § 20103(a)(2).  None of the eligibility criteria or required certifications specified in the statute relate to prohibitions of DEI, promotion of gender ideology, or immigration enforcement.

125.     Victim Assistance Formula Grants are distributed among the States based on a fixed statutory formula.  Under that formula, each State is entitled to a base amount of $500,000 and an additional share of the remaining available money in the Crime Victims Fund based on "each State's

RENNE PUBLIC LAW GROUP
Attorneys at Law

population in relation to the population of all States." *Id.* § 20103(a)(3).

126.    The statutory formula makes no reference to DEI, gender ideology, or immigration enforcement.

127.    Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on Victims Assistance Formula grants prohibiting DEI and the "promot[ion]" of "gender ideology," or cooperation with federal immigration enforcement.

### b.  OVC Competitive Grants

### i.    VOCA Competitive Grant Programs

128.    OVC administers many competitive grant programs authorized by VOCA, including: Services for Victims of Crime; Emergency and Transitional Pet Shelter and Housing Assistance for Victims of Domestic Violence Program; Technology to Support Services for Victims of Crime; Services for Victims of Technology-Facilitated Abuse; Sexual Assault Nurse Examiner Program Development and Operation Guide; National Crime Victim Crisis Hotlines; and Increasing Availability of Medical Forensic Examinations for Victims of Sexual Assault.

129.    Awards under these programs support a range of initiatives designed to expand and strengthen services for crime victims, including funding specialized assistance for children, elders, and victims of technology-facilitated abuse; providing housing assistance for victims; expanding victims' access to specialized medical forensic professionals and examinations; and development of statewide technology programs to improve the quality and reach of victim services.  Collectively, they enhance the quality and accessibility of services for victims of crime nationwide.

130.    VOCA's competitive grants are generally governed by 34 U.S.C. § 20103(c), which specifies the purpose of competitive grants.  VOCA provides that the OVC Director "shall make grants" for "victim services, demonstration projects, program evaluation, compliance efforts, and training and technical assistance services to eligible crime victim assistance programs" and "for the financial support of services to victims of Federal crime by eligible crime victim assistance programs." *Id.* § 20103(c)(1)(A)–(B).  The OVC Director "shall … use funds made available" for these grants "pursuant to rules or guidelines that generally establish a publicly-announced, competitive process." *Id.* § 20103(c)(3)(E).  The statutory purposes of VOCA competitive grant funds do not relate in any way to

-28-

RENNE PUBLIC LAW GROUP
Attorneys at Law

prohibitions of DEI, gender ideology, or immigration enforcement.

131.    Congress has also specified certain criteria for creating and awarding these competitive grant funds under VOCA.  The only relevant restriction that Congress has placed on the use of these funds is that not more than 50 percent of available funds shall be used for support of victims of Federal crime.  *See id.* § 20103(c)(2)(A)–(B).

132.    Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on VOCA Competitive grants prohibiting DEI and the "promot[ion]" of "gender ideology," or cooperation with federal immigration enforcement.

### ii.    OVC Human Trafficking Programs

133.    OVC also administers several competitive grant programs focused specifically on combating human trafficking and providing comprehensive services to victims, including Housing Assistance for Victims of Human Trafficking; Integrated Services for Minor Victims of Human Trafficking; Enhanced Collaborative Model (ECM) Task Force to Combat Human Trafficking; and Services for Victims of Human Trafficking.

134.    Awards under these programs support a broad range of initiatives intended to identify victims of human trafficking and provide trauma-informed, victim-centered services.  These initiatives include emergency, transitional, and long-term housing assistance; coordinated service delivery for minor victims; multidisciplinary task force efforts involving law enforcement, service providers, and prosecutors; and comprehensive services addressing victims' medical, mental health, legal, and social service needs.  Collectively, these programs are designed to improve victim safety, stability, and access to justice, and to strengthen coordinated community responses to human trafficking.

135.    The Human Trafficking Program grants are authorized under 22 U.S.C. § 7105(b), part of the Trafficking Victims Protection Act.  This authorizing statute proscribes specific requirements and priorities for the Human Trafficking Program funds.  22 U.S.C.A. 7105(b)(2)(D) provides that "[i]n selecting recipients of grants under this paragraph that are only available for law enforcement operations or task forces, the Attorney General may give priority to any applicant that files an attestation with the Attorney General stating that the grant funds awarded under this paragraph…"

a.    "will be used to assist in the prevention of severe forms of trafficking in person"

RENNE PUBLIC LAW GROUP
Attorneys at Law

b. "will be used to strengthen efforts to investigate and prosecute those who knowingly benefit financially from participation in a venture that has engaged in any act of human trafficking"

c. "will be used to take affirmative measures to avoid arresting, charging, or prosecuting victims of human trafficking for any offense that is the direct result of their victimization; and"

d. "will not be used to require a victim of human trafficking to collaborate with law enforcement officers as a condition of access to any shelter or restorative services;

136.    Additionally, 22 U.S.C.A.  7105(b)(1)(A) provides "Notwithstanding title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, an alien who is a victim of a severe form of trafficking in persons, or an alien classified as a nonimmigrant under section 1101(a)(15)(T)(ii) of Title 8, shall be eligible for benefits and services under any Federal or State program or activity funded or administered by any official or agency described in subparagraph (B) to the same extent as an alien who is admitted to the United States as a refugee under section 1157 of Title 8."

137.    Furthermore, 22 U.S.C.A.  7105(b)(1)(B(i) provides, "…Federal agencies shall expand benefits and services to victims of severe forms of trafficking in persons in the United States, and aliens classified as a nonimmigrant under section 1101(a)(15)(T)(ii) of Title 8, without regard to the immigration status of such victims. "

138.    Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on OVC Human Trafficking Program grants prohibiting DEI and the "promot[ion]" of "gender ideology," or cooperation with federal immigration enforcement.

### 5.  Other DOJ Grant Programs

139.    DOJ and its operating divisions and agencies administer a range of other grant programs, such as the Preventing Trafficking of Girls grants program, that Plaintiffs have previously received, currently receive, or are otherwise eligible to receive.  Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on these other DOJ grants related to a prohibition on all kinds of DEI, exclusion of transgender people, cooperation with federal immigration enforcement, or

-30-

RENNE PUBLIC LAW GROUP
Attorneys at Law

adherence to executive orders unrelated to the purpose of the funds.

140.    Congress annually appropriates funding for DOJ grant programs.  In the annual appropriations legislation, Congress sets forth priorities and directives to the Administrator of DOJ with respect to funding.  Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on DOJ grants related to a prohibition on DEI, exclusion of transgender people, cooperation with federal immigration enforcement, or adherence to executive orders unrelated to the purpose of the funds.  *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1245-1266; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 113-134; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 4521-4544; Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 133-156.

141.    Plaintiffs the City of Santa Clara, City of Santa Cruz, City of Redwood City, City of Fresno, City of Beaverton, City of Corvallis, City of Hillsboro, City of Stockton, County of San Diego, County of Los Angeles, and County of Santa Barbara (collectively, the "DOJ Plaintiffs"), have previously received, currently receive, or are otherwise eligible to receive federal funding from the DOJ. DOJ Plaintiffs rely on millions of dollars in appropriated federal funds from DOJ's programs for the benefit of their communities.

### C.    DOI Grant Programs

142.    Congress established the Department of the Interior in 1849 to administer the rapidly expanding land holdings acquired by the Federal Government in the first half of the nineteenth century. Act of Mar. 3, 1849, ch. 108, § 11, 9 Stat. at 396.  Today, the DOI manages 420 million acres of federal lands, nearly 55 million acres of tribal lands, more than 700 million acres of subsurface minerals, and about 2.5 billion acres of the outer continental shelf.  The DOI Secretary is responsible for all actions taken by the Department and its component offices, which include the Bureau of Indian Affairs (BIA), Bureau of Indian Education (BIE), Bureau of Land Management (BLM), Bureau of Ocean Energy Management (BOEM), Bureau of Reclamation, Bureau of Safety and Environmental Enforcement (BSEE), National Park Service (NPS), Office of Surface Mining Reclamation and Enforcement (OSMRE), U.S. Fish and Wildlife Service (FWS), and U.S. Geological Survey (USGS).

143.    The Secretary of the Interior is charged with the supervision and management of the

-31-

Department of the Interior and its bureaus, including the administration of federal programs and grants, management of public lands and resources, and ensuring that departmental actions are carried out in accordance with governing statutes and executive directives.  *See* 43 U.S.C. §§ 1457; 1458.

### 1.  Land and Water Conservation Fund Grant Program (LWCF)

144.    Congress established the Land and Water Conservation Fund Grant Program through the enactment of the Land and Water Conservation Fund Act of 1965.  Pub. L. 88-578, 54 U.S.C. § 200301 et seq., as amended.  The purpose of the Act is to assist the states and agencies to meet the "present and future outdoor recreation demands and needs of the American people."  Pub. L. 88-578.  LWCFA appropriates federal funds to states for outdoor recreation planning, acquisition, and facilities development.

145.    DOI's administration of the LWCF is authorized and governed by statutory directives.  Congress has specified what activities are eligible for funding under the LWCF, the formula DOI must apply in allocating funds, and program requirements DOI may require recipients agree to as conditions for receiving funds.  *See* 54 U.S.C. § 200305.

146.    The Land and Water Conservation Act, 54 U.S.C. § 200305, contains Congress's overarching authorization for DOI to allocate LCWF grants.  The statute authorizes the DOI Secretary to make payments to the states for outdoor recreation.  Subsection (b) of 54 U.S.C. § 200305 provides for the DOI Secretary to establish a formula to determine funding amounts and sets forth eligibility criteria the DOI Secretary shall consider to determine awards.

147.    Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on LWCF grant funds related to a prohibition on all kinds of DEI, exclusion of transgender people, cooperation with federal immigration enforcement, or adherence to executive orders unrelated to the purpose of the funds.

### 2.  WaterSMART Grant Program

148.    DOI established the WaterSMART (Sustain and Manage American Resources for Tomorrow) program in 2010 under DOI Secretarial Order 3297, with the goal to "pursue a sustainable water supply for the Nation by establishing a framework to provide federal leadership and assistance on the efficient use of water, integrating water and energy policies to support the sustainable use of all

-32-

RENNE PUBLIC LAW GROUP
Attorneys at Law

natural resources, and coordinating the water conservation activities of the various Interior bureaus and office." *See* Secretarial Order No. 3297, Department of the Interior WaterSMART Program - Sustain and Manage America's Resources for Tomorrow, U.S. Dep't of the Interior (Feb. 22, 2010), https://www.doi.gov/document-library/secretary-order/3297-department-interior-watersmart-program-sustain-and-manage (last visited February 4, 2026).  The program was codified under the Omnibus Public Land Management Act of 2009, Pub. L. 111-11, as amended 42 U.S.C. § 10364.

149.    The WaterSmart program authorizes the DOI Secretary to provide cost-shared funding in four grant categories on a competitive basis:  water and energy efficiency, small-scale water efficiency, water strategy grants, and environmental water resources projects.  *See* 42 U.S.C. § 10364(a)(1).  To be eligible for funding, applicants must meet certain criteria; they must be located in Alaska, Arizona, California, Colorado, Hawaii, Idaho, Kansas, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oklahoma, Oregon, South Dakota, Texas, Utah, Washington, Wyoming, American Samoa, Guam, the Northern Mariana Islands, and the Virgin Islands, and must submit a proposal of the improvement the grant is intended to fund.  *See* 42 U.S.C. § 10364(a)(2).  Applicants must also agree to cost sharing requirements of fifty percent or more of the total project cost, among other considerations.  *See* 42 U.S.C. § 10364(a)(3)(e).

150.    Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on WaterSMART grants prohibiting DEI and the "promot[ion]" of "gender ideology," or cooperation with federal immigration enforcement.

151.    Congress annually appropriates funding for the WaterSMART grant program.  In the annual appropriations legislation, Congress sets forth priorities and directives to the DOI Secretary with respect to WaterSMART funding.  *See*, e.g., Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1363; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 221; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 4631; Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 194, Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, 139 Stat. 24.

152.    Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on WaterSMART grants prohibiting DEI and the "promot[ion]" of "gender ideology," or

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

RENNE PUBLIC LAW GROUP
Attorneys at Law

cooperation with federal immigration enforcement.

### 3.  Other DOI Grants

153.    DOI and its operating divisions and agencies administer a range of other grant programs that Plaintiffs have previously received, currently receive, or are otherwise eligible to receive.  Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on any DOI grants related to a prohibition on all kinds of DEI, exclusion of transgender people, cooperation with federal immigration enforcement, or adherence to executive orders unrelated to the purpose of the funds.

154.    Congress annually appropriates funding for DOI grant programs, including the programs identified above.  In the annual appropriations legislation, Congress sets forth priorities and directives to the DOI Secretary with respect to transportation funding.  Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on DOI grants prohibiting DEI and the "promot[ion]" of "gender ideology," or cooperation with federal immigration enforcement.  *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1544; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 417; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 4828 Consolidated Appropriations Act, 2024, Pub. L. 118- 42, 138 Stat. 291.

155.    Plaintiffs the City of Fresno, City of Santa Cruz, City of Corvallis, City of Hillsboro, City of Stockton, County of Los Angeles, and County of Santa Barbara (collectively, the "DOI Plaintiffs") have previously received, currently receive, or are otherwise eligible to receive federal funding from the DOI.  These Plaintiffs rely on millions of dollars in appropriated federal funds from DOI direct or pass-through grant programs for transportation-related projects undertaken for the benefit of their communities.

### D.    Following President Trump's Inauguration, Defendants Unilaterally Impose New Conditions on Federal Grants.

#### 1.    President Trump Issues Executive Orders Directing Federal Agencies to Impose New Conditions on Federal Grants

156.    Since taking office, President Trump has issued numerous executive orders directing the heads of executive agencies to impose conditions on federal funding that bear little or no connection to the purposes of the grant programs Congress established, lack statutory authorization, conflict with the

-34-

law as interpreted by the courts, and are even at odds with the purposes of the grants they purport to amend. Instead, the conditions appear to require federal grant recipients to agree to promote the political agenda President Trump campaigned on during his run for office and has continued espousing since, including prohibiting all kinds of DEI, facilitating enforcement of federal immigration, or prohibiting the "promot[ion]" of "gender ideology." Plaintiffs cannot comply with Defendants' vague, ambiguous, and unauthorized conditions without exposing themselves to substantial legal liability or forgo critical federal funding.

157. The "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" executive order directs each federal agency head to include "in every contract or grant award" a term that the contractor or grant recipient "certify that it does not operate any programs promoting DEI" that would violate federal antidiscrimination laws. Exec. Order 14173 § 3(b)(iv)(B), 90 Fed. Reg. 8633 (Jan. 21, 2025) (the "DEI Order"). The certification is not limited to programs funded with federal grants. *Id.* § 3(b)(iv).

158. The DEI Order also directs each agency head to include a term requiring the contractor or grant recipient to agree that its compliance "in all respects" with all applicable federal nondiscrimination laws is "material to the government's payment decisions" for purposes of the False Claims Act (FCA), 31 U.S.C. §§ 3729 et seq. *Id.* § 3(b)(iv)(A). The FCA imposes liability on "any person" who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). For FCA liability to attach, the alleged misrepresentation must be "material to the Government's payment decision"—an element the U.S. Supreme Court has called "demanding." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192, 194 (2016). Each violation of the FCA is punishable by a civil penalty of up to $27,894, plus mandatory treble damages sustained by the federal government because of that violation. 31 U.S.C. § 3729(a); 28 C.F.R. § 85.5(a). Given the demands of proving materiality and the severity of penalties imposed by the FCA, the certification term represents another effort to coerce compliance with the President's policies by effectively forcing grant recipients to concede an essential element of an FCA claim.

159. The DEI Order does not define the term "DEI." As explained below, subsequent executive agency memoranda and letters make clear that the Trump Administration's conception of what

-35-

RENNE PUBLIC LAW GROUP
Attorneys at Law

federal antidiscrimination law requires, including what constitutes a purportedly "illegal" DEI program, is inconsistent with the requirements of federal nondiscrimination statutes as interpreted by the courts.

160.     The "Ending Taxpayer Subsidization of Open Borders" executive order directs all agency heads to ensure "that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation."  Executive Order 14218 § 2(ii), 90 Fed. Reg. 10581 (Feb. 19, 2025) (the "Immigration Order").

161.     The Immigration Order also purports to implement the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA), pursuant to which certain federal benefits are limited to individuals with qualifying immigration status.  *See* 8 U.S.C. § 1611(a).  In particular, the Immigration Order directs all agency heads to "identify all federally funded programs administered by the agency that currently permit illegal aliens to obtain any cash or non-cash public benefit" and "take all appropriate actions to align such programs with the purposes of this order and the requirements of applicable Federal law, including … PRWORA."  *Id*. § 2(i).

162.     On April 28, 2025, President Trump issued additional executive orders related to immigration and law enforcement.  The "Protecting American Communities from Criminal Aliens" executive order states that "some State and local officials … continue to use their authority to violate, obstruct, and defy the enforcement of Federal immigration laws" and directs the Attorney General in coordination with the Secretary of Homeland Security to identify "sanctuary jurisdictions," take steps to withhold federal funding from such places, and develop "mechanisms to ensure appropriate eligibility verification is conducted for individuals receiving Federal public benefits … from private entities in a sanctuary jurisdiction, whether such verification is conducted by the private entity or by a governmental entity on its behalf."  https://www.whitehouse.gov/presidential-actions/2025/04/protecting-american-communities-from-criminal-aliens/ (last visited February 4, 2026).  The "Strengthening and Unleashing America's Law Enforcement to Pursue Criminals and Protect Innocent Citizens" executive order directs the Attorney General to, among other things, "prioritize prosecution of any applicable violations of Federal criminal law with respect to State and local jurisdictions" whose officials "willfully and unlawfully direct the obstruction of criminal law, including by directly and unlawfully prohibiting law

-36-

enforcement officers from carrying out duties necessary for public safety and law enforcement" or "unlawfully engage in discrimination or civil-rights violations under the guise of "diversity, equity, and inclusion" initiatives that restrict law enforcement activity or endanger citizens." https://www. whitehouse.gov/presidential-actions/2025/04/strengthening-and-unleashing-americas-law-enforcement-to-pursue-criminals-and-protect-innocent-citizens/ (last visited February 4, 2026).

163.     The "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" executive order directs agency heads to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology" and "assess grant conditions and grantee preferences" to "ensure grant funds do not promote gender ideology." Exec. Order No. 14168 § 3(e), (g), 90 Fed. Reg. 8615 (Jan. 20, 2025) (the "Gender Ideology Order"). The Gender Ideology Order states that "'[g]ender ideology' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true." *Id*. § 2(f). It goes on to state that "[g]ender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex" and is therefore "internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body." *Id*.

164.     On August 7, 2025 President Trump issued another executive order titled, Improving Oversight of Federal Grantmaking that requires that discretionary grant awards "demonstrably advance the President's policy priorities" and "shall not be used to fund, promote, encourage, subsidize, or facilitate" "racial preferences or other forms of racial discrimination by the grant recipient," "denial by the grant recipient of the sex binary in humans or the notion that sex is a chosen or mutable characteristic," or "any other initiatives that compromise public safety or promote anti-American values." Exec. Order No. 14332, 90 Fed. Reg. 38929 (Aug. 7, 2025) (the "Grantmaking Oversight Order").

## 2.   DHS Attaches New Conditions to DHS Grants

165.     DHS and its operating divisions and agencies have implemented President Trump's Executive Orders by imposing new and unlawful conditions (collectively, the "DHS Grant Conditions") across the expansive portfolio of DHS grants established by Congress and demanding grant recipients'

RENNE PUBLIC LAW GROUP
Attorneys at Law

-37-

agreement to those new conditions.

166.    For example, on or around April 18, 2025, DHS issued new sets of "Standard Terms and Conditions" applicable to all federal awards.  *See* U.S. Dep't of Homeland Security, Notice of Funding Opportunity for FY 2025 Standard Terms and Conditions (Apr. 18, 2025), https://www.dhs.gov/sites/default/files/2025-08/2025_0418_fy2025_dhs_terms_and_conditions_version_3.pdf (last visited February 4, 2026) ("DHS Standard Terms and Conditions").

167.    Section XI of the Standard Terms and Conditions require entities receiving federal funds through DHS to "comply with" conditions "related to coordination and cooperation" with federal immigration officials, including six specific conditions related to immigration:

      a.    The Information Sharing Condition (Sec. IX(1)(a)): Grant recipients "must comply with the requirements of 8 U.S.C. §§ 1373 and 1644, [which] prohibit state restrictions on sharing information with DHS concerning the citizenship or immigration status, lawful or unlawful, of any individual ...."

      b.    The Compliance Condition (Sec. IX(1)(b)): Grant recipients "must comply" with various criminal laws, including 8 U.S.C. § 1324, that prohibit, among other things, "encouraging or inducing" noncitizens to unlawfully enter the United States.

      c.    The Cooperation Condition (Sec IX(1)(c)): Grant recipients must "honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer. A jurisdiction does not fail to comply with this requirement merely because it lacks the necessary resources to assist in a particular instance."

      d.    The Access Condition (Sec. IX(1)(d)): Grant recipients must provide federal immigration agents "access to detainees" in correctional facilities to inquire as to such individuals' right to be or remain in the United States.

      e.    The Publicization Condition (Sec. IX(1)(e)): Grant recipients must not "leak or otherwise publicize the existence of" any federal immigration enforcement operations.

-38-

RENNE PUBLIC LAW GROUP
Attorneys at Law

f. The Certification and Monitoring Condition (Sec. IX(2)): Grant recipients must certify compliance with the above conditions and require subgrant recipients to do the same.

168. Section XVII(2)(iii) of the Standard Terms and Conditions also includes the requirement recipients certify that "[t]hey do not, and will not during the term of this award, operate any program that benefits illegal immigrants or incentivizes illegal immigration."

169. Collectively these conditions will hereto be referred to as the "DHS Immigration Enforcement Conditions."

170. Section XVII(2)((i-ii) of the Standard Terms and Conditions includes the requirement recipients certify that "[t]hey do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws" and that "[t]hey do not engage in and will not during the term of this award engage in, a discriminatory prohibited boycott,"  (the "DHS DEI Condition").

171. Subdivision XVII(3) further provides that "DHS reserves the right to suspend payments in whole or in part and/or terminate financial assistance awards if the Secretary of Homeland Security or her designee determines that the recipient has violated any provision of subsection (2)."

172. Subdivision XVII(4) provides "Upon suspension or termination under subsection (3), all funds received by the recipient shall be deemed to be in excess of the amount that the recipient is determined to be entitled to under the Federal award for purposes of 2 C.F.R. § 200.346. As such, all amounts received will constitute a debt to the Federal Government that may be pursued to the maximum extent permitted by law."

173. Additionally, the DHS Standard Terms and Conditions state in Section XXXI, that "Recipients must comply with the requirements of Presidential Executive Orders related to grants (also known as federal assistance and financial assistance), the full text of which are incorporated by reference."   This term will hereto be referred to as the "DHS EO Condition."

174. Neither the statutory provisions creating the DHS grant programs, the relevant appropriations acts, nor any other Congressional legislation authorizes the DHS to condition grant funds on the recipient's certification that it does not "promote DEI" or its agreement to not operate a program

-39-

RENNE PUBLIC LAW GROUP
Attorneys at Law

that "benefits illegal immigrants or incentivizes illegal immigration."  Federal grant recipients are required to comply with nondiscrimination and other applicable federal laws.  But executive orders and letters from agency heads cannot change what these laws require under existing court decisions.

175.     FEMA is an operating component of DHS, *see* 6 U.S.C. § 313(a), and FEMA-administered grant programs are DHS grants subject to DHS-wide policies and conditions.  As a result, the DHS Standard Terms and Conditions described above apply equally to all FEMA grant programs.  Accordingly, the DHS DEI Condition, the DHS Immigration Condition, and the DHS EO Condition are imposed on FEMA grant recipients and subrecipients as conditions of receiving the DHS financial assistance.

176.     DHS and FEMA incorporate the DHS Standard Terms and Conditions into individual grant programs through Notices of Funding Opportunity ("NOFOs") issued for specific fiscal years and programs.  For example, the Fiscal Year 2025 Homeland Security Grant Program NOFO expressly incorporates the DHS Standard Terms and Conditions by reference and states that all awards made under the NOFO are subject to those Terms and Conditions as a condition of acceptance.  *See* Fiscal Year 2025 Homeland Security Grant Program NOFO, https://www.fema.gov/sites/default/files/documents/fema_gpd_homeland-security-grant-program-nofo_fy2025.pdf (last visited February 4, 2026).

177.     The Homeland Security Grant Program NOFO further requires funding recipients to report whether "subrecipient's work or mission involves supporting aliens, regardless of whether FEMA funds support such activities,"  "[w]hether the payment request includes an activity involving support to aliens," and "[w]hether the subrecipient has any DEI practices."

178.     The Homeland Security Grant Program NOFO also contains a condition requiring "Recipients must comply with the requirements of Presidential Executive Orders related to grants (also known as federal assistance and financial assistance), the full text of which are incorporated by reference," which is identical to the DHS EO Condition in the DHS Standard Terms and Conditions discussed above.

179.     These requirements, outlined in the DHS Standard Terms and Conditions and incorporated into the NOFOs for DHS and FEMA grant programs, are unlawful, as explained further

RENNE PUBLIC LAW GROUP
Attorneys at Law

-40-

below, because the requirements violate the Separation of Powers, the Spending Clause, the Fifth

Amendment's void-for-vagueness doctrine, and the APA.

### 3. DOJ Attaches New Conditions to DOJ Grants

180.    DOJ and its operating divisions and agencies have implemented President Trump's

Executive Orders by attaching new and unlawful conditions (collectively, the "DOJ Grant Conditions")

across the expansive portfolio of DOJ grants established by Congress and demanding grant recipients'

agreement to those new conditions.

181.    For example, on or around May 12, 2025, the DOJ's Office of Justice Programs, the part

of the DOJ that manages, awards, and oversees most federal criminal justice and victim services grant

funding, published "General Conditions" for OJP Awards in FY 2025.  *See* Dep't of Justice, "General

Conditions" for OJP Awards in FY 2025,

https://www.ojp.gov/funding/explore/legaloverview2025/mandatorytermsconditions (last visited

February 4, 2026).  The General Conditions included a term that provides:

> The recipient agrees that its compliance with all applicable Federal civil
> rights and nondiscrimination laws is material to the government's decision
> to make this award and any payment thereunder, including for purposes of
> the False Claims Act (31 U.S.C. 3729-3730 and 3801-3812), and, by
> accepting this award, certifies that it does not operate any programs
> (including any such programs having components relating to diversity,
> equity, and inclusion) that violate any applicable Federal civil rights or
> nondiscrimination laws.

(the "OJP DEI Condition").

182.    Additionally, the NOFO for FY25 COPS Community Policing Development Microgrants

that warns applicants that funding may not be used to "promote gender ideology" (the "COPS Gender

Ideology Condition") or "for projects that provide or advance diversity, equity, inclusion, and

accessibility, or environmental justice programs, services, or activities," (the "COPS DEI Condition").

*See* Dep't of Justice., NOFO FY25 COPS Community Policing Development Microgrants,

https://cops.usdoj.gov/pdf/2025ProgramDocs/cpdmicrogrants/nofo.pdf (last visited February 4, 2026).

The NOFO for FY25 COPS Community Policing Development Microgrants also provides that "the

COPS Office will provide priority consideration to state or local law enforcement applicants that respond

affirmatively to the application question related to cooperation with federal immigration officials," (the

-41-

RENNE PUBLIC LAW GROUP
Attorneys at Law

"COPS Immigration Priority Conditions").

183.   The NOFO for FY25 COPS Safer Outcomes: Enhancing De-Escalation and Crisis Response Training for Law Enforcement program contains the same COPS Gender Ideology, COPS DEI, and COPS Immigration Priority conditions.  *See* Dep't of Justice., NOFO FY25 COPS Safer Outcomes: Enhancing De-Escalation and Crisis Response Training for Law Enforcement, https://cops.usdoj.gov/pdf/2025ProgramDocs/saferoutcomes/support_nofo.pdf (last visited February 4, 2026).

184.   The NOFO for FY25 COPS Law Enforcement Mental Health and Wellness Act (LEMHWA) Implementation Projects includes similar conditions.  *See* Dep't of Justice, Notice of Funding Opportunity for FY25 Law Enforcement Mental Health and Wellness Act (LEMHWA) Implementation Projects, https://cops.usdoj.gov/pdf/2025ProgramDocs/lemhwa/nofo.pdf (last visited February 4, 2026.

185.   Significantly, the COPS DIE Condition is not limited to programs that violate applicable federal law.  It prohibits COPS funding from being used to "provide or advance" any diversity, equity, inclusion, and accessibility services or activities.  Regardless of whether they comply with federal law.

186.   In or around August 2025, the DOJ published the 2025 COPS Office Law Enforcement Mental Health and Wellness Act (LEMHWA) Program Award Owner's Manual.  *See* Dep't of Justice, 2025 COPS Office LEMHWA Program Award Owner's Manual, https://cops.usdoj.gov/pdf/2025AwardDocs/lemhwa/aom.pdf (last visited February 4, 2026).  The Manual provides that "[c]ompliance with this Award Owner's Manual is a condition of your award, and this manual is binding guidance."  "

187.   The LEMHWA Manual includes the a provision requiring recipients to certify "that it does not operate any programs (including any such programs having components relating to diversity, equity, and inclusion) that violate any applicable Federal civil rights or nondiscrimination laws" similar to the OJP DEI Conditions.  Furthermore, the 2025 LEMHWA requires that "the recipient agrees that its compliance with all applicable Federal civil rights and nondiscrimination laws is material to the government's decision to make this award and any payment thereunder, including for purposes of the False Claims Act (31 U.S.C. 3729-3730 and 3801-3812)), and, by accepting this award, certifies that it

RENNE PUBLIC LAW GROUP
Attorneys at Law

-42-

does not operate any programs (including any such programs having components relating to diversity, equity, and inclusion) that violate any applicable Federal civil rights or nondiscrimination laws," (the "LEMHWA Owner's Manual DEI Condition")

188.   The LEMHWA Manual also requires that recipients "must comply with all applicable federal laws and Presidential Memoranda and all Executive Orders by the President," (the "LEMHWA EO Condition").

189.   The 2025 COPS Office Safer Outcomes Program Award Owner's Manual contains the same conditions as the LEMHWA Program Award Owner's Manual.  *See* Dep't of Justice, 2025 COPS Office Safer Outcomes Program Award Owner's Manual, https://cops.usdoj.gov/pdf/2025AwardDocs/saferoutcomes/AOM.pdf (last visited February 4, 2026).

190.   The NOFOs issued by the OVC also contain new unlawful conditions implementing the President's Executive Orders.  *See e.g.*, U.S. Dep't of Justice, Office of Justice Programs, OVC FY25 Victims of Crime Act (VOCA) Victim Assistance Formula Grant NOFO, https://www.ojp.gov/funding/docs/ovc-2025-172428.pdf (last visited February 4, 2026); U.S. Dep't of Justice, Office of Justice Programs, OVC FY25 Victims of Crime Act (VOCA) Victim Compensation Formula Grant NOFO, https://www.ojp.gov/funding/docs/ovc-2025-172429.pdf (last visited February 4, 2026); U.S. Dep't of Justice, Office of Justice Programs, OVC FY25 Services for Victims of Crime NOFO, https://www.ojp.gov/funding/docs/ovc-2025-172427.pdf (last visited February 4, 2026); U.S. Dep't of Justice, Office of Justice Programs, OVC FY25 Enhanced Collaborative Model (ECM) Task Force to Combat Human Trafficking NOFO, https://www.ojp.gov/funding/docs/ovc-2025-172524.pdf (last visited February 4, 2026); U.S. Dep't of Justice, Office of Justice Programs, OVC FY25 Services for Victims of Human Trafficking NOFO, https://www.ojp.gov/funding/docs/ovc-2025-172520.pdf (last visited February 4, 2026); U.S. Dep't of Justice, Office of Justice Programs, OVC FY25 Integrated Services for Minor Victims of Human Trafficking NOFO, https://www.ojp.gov/funding/docs/ovc-2025-172521.pdf (last visited February 4, 2026); U.S. Dep't of Justice, Office of Justice Programs, OVC FY25 Preventing Trafficking of Girls NOFO, https://www.ojp.gov/funding/docs/ovc-2025-172480.pdf (last visited February 4, 2026); U.S. Dep't of Justice, Office of Justice Programs, OVC FY25 Housing Assistance for Victims of Human Trafficking, https://www.ojp.gov/funding/docs/o-ovc-2025-172519.pdf

RENNE PUBLIC LAW GROUP
Attorneys at Law

(last visited February 4, 2026).

191.    All of the above-mentioned OVC NOFOs list as an "unallowable use," "[a]ny program or activity that, directly or indirectly, violates (or promotes or facilitates the violation of) federal immigration law (including 8 U.S.C. § 1373) or impedes or hinders the enforcement of federal immigration law—including by failing to comply with 8 U.S.C. § 1373, give access to DHS agents, or honor DHS requests and provide requested notice to DHS agents" and is "out of the program scope and will not be funded" (the "OVC Immigration Enforcement Condition").

192.    Although styled as a restriction on the "unallowable use of funds," or "out of program scope," this language functions as an eligibility requirement.  The NOFOs impose these requirements on all FY 2025 OVC grant awards.

193.    Many OVC NOFOs also provide that  "OJP will provide priority consideration to applicants that propose (as applicable within the scope of this funding opportunity) projects…[d]irectly supporting law enforcement operations (including immigration law enforcement operations)," (the "OVC Immigration Priority Condition").

194.    Additionally, all of the above-mentioned OVC NOFOs include a condition that provides: "Compliance with Federal civil rights and nondiscrimination laws is material to the government's decision to make any award and payment under this program, including for purposes of the False Claims Act, and each recipient will be required to certify (in its acceptance of the conditions of the award) that it does not operate any programs (including any such programs having components relating to diversity, equity, and inclusion) that violate any applicable Federal civil rights or nondiscrimination laws," (the "OVC DEI Condition").

195.    OVC FY25 Victims of Crime Act (VOCA) Victim Compensation Formula Grant NOFO also lists as lists as an "unallowable use" "[a]ny program or activity that, directly or indirectly, violates (or promotes or facilitates the violation of) any applicable Federal civil rights or nondiscrimination law (e.g., by unlawfully favoring or disfavoring individuals in any race or group on the basis that it is (or is not) a majority or minority (or privileged or unprivileged) race or group in a given area or population or sector), including in any program or activity having any component relating to diversity, equity, or inclusion,"  (the "OVC DEI Condition II").

RENNE PUBLIC LAW GROUP
Attorneys at Law

196.     The rest of the above-cited OVC NOFOs contain a similar condition that excludes the last clause explicitly referencing DEI (the "OVC DEI Condition III").

197.     The Bureau of Justice Assistance (BJA) FY25 Paul Coverdell Forensic Science Improvement – Competitive Grants Program NOFO also incorporates the unlawful conditions implementing President Trump's executive orders.  *See* U.S. Dep't of Justice, Office of Justice Programs, BJA FY25 Paul Coverdell Forensic Science Improvement – Competitive Grants Program NOFO, https://www.ojp.gov/funding/docs/bja-2025-172472.pdf (last visited February 4, 2026).

198.     The FY25 Paul Coverdell Forensic Science Improvement – Competitive Grants Program NOFO includes a DEI condition identical to the OVC DEI condition discussed above, (the "BJA DEI Condition").

199.     The FY25 Paul Coverdell Forensic Science Improvement – Competitive Grants Program NOFO also lists as an "unallowable costs and certain activities that are out of the program scope" "any program or activity, at any tier that, directly or indirectly, violates (or promotes or facilitates the violation of) federal immigration law (including 8 U.S.C. § 1373) or impedes or hinders the enforcement of federal immigration law—including by failing to comply with 8 U.S.C. § 1373, give access to DHS agents, or honor DHS requests and provide requested notice to DHS agents" (the "BJA Immigration Enforcement Condition").

200.     The DOJ has also issued statements confirming this administration's overbroad interpretation of "DEI" that conflicts with current law.  In a February 5, 2025, letter to DOJ Attorney General Pam Bondi stated that DOJ's Civil Rights Division will "penalize" and "eliminate" "illegal DEI and DEIA" activities, characterizing such programs as discriminatory if they "divide individuals based on race or sex."  The letter suggests this may include race- or gender-based affinity groups or even teaching about racial history.  *See* Letter from Pam Bondi, Attorney General, to all DOJ Employees (Feb. 5, 2025) https://www.justice.gov/ag/media/1388501/dl?inline (last visited February 4, 2026).

201.     A second letter from Attorney General Bondi to grant recipients, issued on July 29, 2025, purports to clarify the application of federal antidiscrimination laws to DEI programs for entities receiving federal funds.  However, contrary to established legal precedent, the letter states that entities that promote DEI training programs that include discussions of inherent bias, white privilege, or toxic

-45-

RENNE PUBLIC LAW GROUP
Attorneys at Law

masculinity violate federal law.  The letter instructs entities to "[m]onitor their parties that receive federal funds to ensure ongoing compliance, including reviewing program materials."  Letter from Pam Bondi, Attorney General, to all Federal Agencies (Jul. 29, 2025) https://www.justice.gov/ag/media/1409486/dl (last visited February 4, 2026).  If this requirement, to condition federal funding on the content of program materials, were enforced, it would be a violation of the First Amendment.  *See Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 831 (1995).

202.    Additionally, in May 2025, the Deputy Attorney General issued a letter indicating that the DOJ will invoke the FCA to pursue funding recipients engaged in what it characterizes as "civil rights fraud"—including DEI initiatives.  Along with starting an initiative to "utilize the [FCA] to investigate and, as appropriate, pursue claims against any recipient of federal funds," the letter states that DOJ "strongly encourages" private FCA lawsuits against funding recipients.  Letter from Todd Blanche, Deputy Attorney General, to DOJ Offices, 19 Divisions, and U.S. Attorneys (May 19, 2025) https://www.justice.gov/dag/media/1400826/dl?inline (last visited February 4, 2026).

203.    Neither the statutory provisions creating the DOJ grants described in this Complaint, the relevant appropriations acts, nor any other legislation authorizes DOJ, itself or through its operating divisions and agencies, to condition these funds on the recipient's certification that it does not "promote" DEI or gender ideology or its admission that its compliance with these prohibitions is material for purposes of the FCA.  Nor are Plaintiffs aware of any statute authorizing DOJ, itself or through its operating divisions and agencies, to impose conditions requiring cooperation with immigration enforcement or the prohibitions on "indirectly" promoting or facilitating a violation of the immigration laws on any other DOJ grants that Plaintiffs have previously received, currently receive, or are otherwise eligible to receive.  Federal grant recipients must comply with nondiscrimination and other federal laws. But executive orders and statements from agency heads cannot change what these laws require under existing court decisions.

204.    The DOJ Grant Conditions described above are unlawful, as explained further below, because the requirements violate the Separation of Powers, the Spending Clause, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

RENNE PUBLIC LAW GROUP
Attorneys at Law

#### 4. DOI Attaches New Conditions to DOI Grants

205. DOI and its operating divisions and agencies have implemented President Trump's Executive Orders by attaching new and unlawful conditions (collectively, the "DOI Grant Conditions") across the expansive portfolio of DOI grants established by Congress and demanding grant recipients' agreement to those new conditions.

206. For example, on or around July 30, 2025, the DOI's Office of Grants Management issued General Award Terms and Conditions. *See* U.S. Dep't of the Interior, Office of Grants Management, General Award Terms and Conditions, https://www.doi.gov/sites/default/files/documents/2025-07/doi-general-terms-and-conditions-v6.pdf (last visited February 4, 2026). These conditions include a provision that states: "In accepting this award the grant recipient agrees to operating in compliance in all respects with all applicable Federal anti-discrimination laws, and certify that it does not operate any programs promoting diversity, equity and inclusion programs that violate any applicable Federal antidiscrimination laws." (the "DOI DEI Condition").

207. Neither the statutory provisions creating the DOI grants described in this Complaint, the relevant appropriations acts, nor any other legislation authorizes DOI, itself or through its operating divisions and agencies, to condition these funds on the recipient's certification that it does not operate or "promote" DEI or its admission that its compliance with these prohibitions is material for purposes of the FCA. Nor are Plaintiffs aware of any statute authorizing DOI, itself or through its operating divisions and agencies, to impose such conditions on any other DOI grants that Plaintiffs have previously received, currently receive, or are otherwise eligible to receive.

208. This certification is unlawful, as explained further below, because the anti-DEI certification violates the Separation of Powers, the Spending Clause, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

### E. The New Grant Conditions Implementing and Incorporating the Executive Orders Are Unlawful

209. The conditions discussed above purport to incorporate executive orders as governing the use of federal funds. These orders in many ways attempt to adopt new laws by presidential fiat, amend existing laws, and overturn court precedent interpreting laws. In so doing, the new grant conditions seek

-47-

RENNE PUBLIC LAW GROUP
Attorneys at Law

to usurp Congress's prerogative to legislate and its power of the purse, as well as the judiciary's power to say what the law means.  Without Congress passing his ideological agenda, President Trump has granted himself unchecked Article II powers to legislate by executive order and impose his decrees on state and local governments seeking grant funding.  This not only conflicts with the Constitution, but it also violates the APA.

### 1.  The EO Conditions Are Unlawful

210.   Executive orders are formal directives issued by the President to federal agencies and executive branch officials.  As implemented through the challenged grant conditions and applied to grant recipients, these orders are vague, unintelligible, and incapable of consistent or lawful enforcement.

211.   None of the Executive Orders at issue directly impose requirements on grant recipients; rather, they direct the heads of executive agencies to impose conditions on federal funding.  It is nonsensical to require Plaintiffs, all local government entities, to "comply with the requirements of Presidential Executive Orders" and unclear what requirements they purport to impose.

212.   This uncertainty renders the EO Conditions unconstitutionally vague and ambiguous under both the Due Process Clause and the Spending Clause.  A condition that simply directs compliance with "Presidential Executive Orders related to grants" provides no meaningful guidance as to what conduct is expected, tolerated, or prohibited.  Executive orders vary in scope and subject matter, are subject to change at any time, and are addressed exclusively to executive branch actors.  Local government entities are left guessing whether, and how, a particular executive order applies to their conduct and risk loss of critical federal funding and FCA liability if they guess incorrectly.

213.   Additionally, the vagueness of the EO Condition invites arbitrary and discriminatory enforcement.  By incorporating executive orders in sweeping, undefined terms, the EO Conditions vest federal officials with unfettered discretion to determine whether a recipient is "in compliance" without reference to any objective standards.  This discretion enables the administration to wield grant funding as a tool of coercion, selectively enforcing vague obligations against disfavored recipients while overlooking the same conduct by others.  The ambiguity of the EO Conditions thus makes them ripe for use as a mechanism of retaliation against entities that express viewpoints or pursue policies disfavored by the current administration.  The absence of clear guidelines transforms the grant process, authorized by

-48-

RENNE PUBLIC LAW GROUP
Attorneys at Law

Congress to provide critical funding to protect public safety, public health, and local economies, into a tool of political leverage that the Executive is using to force local governments to conform to its ideological agenda.

214. Additionally, the Spending Clause requires that conditions attached to federal funds be stated "unambiguously" so that state and local governments may exercise their choice knowingly and voluntarily. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *San Francisco Unified Sch. Dist. v. AmeriCorps*, 789 F. Supp. 3d 716, 745–50 (N.D. Cal. 2025). The EO Conditions fail this standard. Plaintiffs cannot knowingly agree to comply with all "Presidential Executive Orders related to grants" because that phrase does not inform them of what specific obligations they are undertaking, much less what obligations might be imposed in the future. A condition that operates as a moving target—changing with each new executive order—cannot satisfy the Spending Clause's prohibition of ambiguous conditions.

215. Accordingly, conditions that purport to incorporate all Presidential executive orders by reference, such as the DHS EO Condition discussed above, are unlawful and in violation of the Constitution and the APA.

### 2. The DEI Conditions Are Unlawful

216. Although the various DEI-related grant conditions differ slightly in wording, they all stem from and implement the same directive in President Trump's DEI Order. Section 3(b)(iv)(B) of the DEI Order expressly instructs each federal agency head to include "in every contract or grant award" a term requiring the contractor or grant recipient to "certify that it does not operate any programs promoting DEI" that would violate federal antidiscrimination laws. The challenged conditions mirror that mandate in substance and function. Each condition imposes a certification requirement, funding restriction, or programmatic prohibition targeting DEI-related activities, not as a neutral restatement of existing civil rights law, but as an additional condition of federal funding imposed pursuant to the DEI Order.

217. Some agencies, such as the COPS Office and the LEMHWA program, implemented the DEI Order in an unqualified and categorical manner, prohibiting the use of federal funds for any projects that "provide or advance diversity, equity, inclusion, and accessibility, or environmental justice programs, services, or activities," regardless of whether such activities comply with federal civil rights

-49-

RENNE PUBLIC LAW GROUP
Attorneys at Law

laws.  Other agencies purportedly limit the prohibition to DEI-related activities "that violate any applicable Federal civil rights or nondiscrimination laws."  That variation in phrasing, however, does not alter the unlawfulness of the conditions.

218.     All of the conditions, including those containing a purported qualifier, are unlawful because they do not merely require compliance with existing federal antidiscrimination statutes, which is already mandated. Instead, they impose a novel certification regime and funding condition specifically targeting programs with components relating to diversity, equity, and inclusion, and elevate that certification to a material condition of payment, often expressly invoking the False Claims Act.  In doing so, the agencies transform ordinary compliance obligations into a vague funding condition that chills lawful, protected, and congressionally authorized activities based on an executive order, not Congressional statute.

219.     While Plaintiffs have routinely certified compliance with federal nondiscrimination laws as a condition of federal funding in the past, the current administration's communications to federal grant recipients make clear that the agencies seek compliance with a novel, incorrect, and unsupported interpretation of federal nondiscrimination law contrary to actual nondiscrimination statutes and inconsistent with what any court has endorsed when interpreting them.

220.     The challenged DEI Conditions, although vague, clearly implicate a broader range of conduct than covered by applicable federal law.  *See Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 278 (D. Md.), *opinion clarified*, 769 F. Supp. 3d 465 (D. Md. 2025) ("'equity' is a concept that transcends issues of diversity, inclusion, and accessibility.  It also extends beyond areas addressed by anti-discrimination efforts and civil rights laws").  Simply placing a savings clause, such as "with applicable laws," at the end of a condition cannot cure an otherwise vague, unauthorized, or unlawful condition, nor shield it from judicial review.  *See City & Cnty. of San Francisco v. Trump* , 897 F.3d 1225, 1239–1240 (9th Cir. 2018); *Washington v. Trump*, 768 F. Supp. 3d 1239, 1278–79 (W.D. Wash. 2025).

221.     Defendants' expansive reinterpretation of nondiscrimination law is evident when compared to the prior, long-standing interpretation reflected in their regulations.  For instance, the February 5, 2025 letter from Attorney General Pam Bondi to DOJ employees states that DOJ's Civil

RENNE PUBLIC LAW GROUP
Attorneys at Law

Rights Division will "penalize" and "eliminate" "illegal DEI and DEIA" activities and asserts that such activities include any program that "divide[s] individuals based on race or sex"—potentially reaching affinity groups or teaching about racial history.  Letter from Pam Bondi, Attorney General, to all DOJ Employees (Feb. 5, 2025), https://www.justice.gov/ag/media/1388501/dl?inline (last visited February 4, 2026).

222.    Neither the text of Title VI nor any other statute enacted by Congress prohibits recipients of federal funding from considering issues of diversity, equity, or inclusion.  In fact, the opposite is true.  There are many federal laws and regulations that require recipients of federal funds to consider issues of diversity and equity.

223.    The Supreme Court has never interpreted Title VI to prohibit diversity, equity, and inclusion programs.  Indeed, existing case law rejects this administration's expansive views on nondiscrimination law with respect to DEI.  The President has no authority to declare, let alone change, federal nondiscrimination law by executive fiat.  Yet, the DEI Order seeks to impose his views on DEI as if they were the law by implementing funding conditions and the threat of FCA enforcement to direct and coerce recipients of federal funds into acquiescing to his administration's unorthodox legal interpretation of nondiscrimination law.

224.    Accepting these conditions would permit Defendants to threaten Plaintiffs with burdensome and costly enforcement action, backed by the FCA's steep penalties, if they refuse to align their activities with this administration's ideological agenda.  This threat is intensified by the conditions that purport to have recipients concede the DEI certification's "materiality"—an otherwise "demanding" element of an FCA claim.  Further, even short of bringing a suit, the FCA authorizes the Attorney General to serve civil investigative demands on anyone reasonably believed to have information related to a false claim—a power that could be abused to target grant recipients with DEI initiatives the Trump Administration disapproves of.  *See* 31 U.S.C. § 3733.

225.    The FCA is intended to discourage and remedy fraud perpetrated against the United States—not to serve as a tool for the Executive to impose unilateral changes to nondiscrimination law, which is instead within the province of Congress in adopting the laws and the Judiciary in interpreting them.  Requiring recipients to certify that compliance "with all applicable Federal civil rights and

nondiscrimination laws " is always "material" for purposes of FCA imposes an impermissibly vague standard that is broader than the statute allows.

226.    The DEI Conditions also constitute arbitrary and capricious agency action in violation of the APA.  Defendant agencies implementing the DEI Order failed to engage in reasoned decision making, failed to consider the limits of their statutory authority, and failed to adequately explain how the challenged conditions are consistent with governing civil rights statutes, longstanding agency interpretations, or the purposes of the underlying grant programs.

227.    Accordingly, the DEI Conditions discussed above, are unlawful and in violation of the Constitution and the APA.

### 3.   The Gender Ideology Conditions Are Unlawful

228.    The Gender Ideology Conditions improperly seek to force federal grant recipients to no longer recognize transgender, gender diverse, and intersex people by restricting funding that promotes "gender ideology."  These conditions facially discriminate based on transgender status, contravening antidiscrimination laws and Defendants' own regulations that prohibit discrimination based on sex.

229.    Both the U.S. Supreme Court and the 9th Circuit have interpreted the term "sex" in discrimination contexts to encompass gender identity and transgender status.  The Supreme Court's decision in *Bostock v. Clayton County, Georgia*, 590 U.S. 644 (2020) definitively established that Title VII's prohibition on sex discrimination includes discrimination against transgender individuals, holding that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."  *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 660 (2020).  The 9th Circuit has similarly held that "sex" and "gender" are interchangeable terms under federal law and that discrimination based on gender non-conformity violates federal anti-discrimination protections.  *See Schwenk v. Hartford*, 204 F.3d 1187, 1202 (9th Cir. 2000).

230.    Several statutes and regulations are in conflict with the Gender Ideology Conditions. Federal statute requires that regulations necessary for the guidance of personnel carrying out Federal assistance functions at the site of a major disaster or emergency "shall include provisions for insuring that the distribution of supplies, the processing of applications, and other relief and assistance activities shall be accomplished in an equitable and impartial manner, without discrimination on the grounds of

-52-

RENNE PUBLIC LAW GROUP
Attorneys at Law

race, color, religion, nationality, sex, age, disability, English proficiency, or economic status." 42 U.S.C. § 5151(a).

231.     Additional regulations applicable to DHS require that "[a]ll personnel carrying out Federal major disaster or emergency assistance functions, including the distribution of supplies, the processing of the applications, and other relief and assistance activities, shall perform their work in an equitable and impartial manner, without discrimination on the grounds of race, color, religion, nationality, sex, age, or economic status." 44 C.F.R. § 206.11(b).

232.     The Justice System Improvement Act provides, "[n]o person in any State shall on the ground of race, color, religion, national origin, or sex be excluded from participation in, be denied the benefits of, or be subjected to discrimination under or denied employment in connection with any programs or activity funded in whole or in part with funds made available under this chapter" 34 U.S.C. § 10228(c)(1).  This provision applies to all grants administered by the DOJ's Office of Justice Programs.

233.     Title IX of the Education Amendments of 1972 applies to grants that fund educational programs or activities, including grants administered by Defendants.  Under 20 U.S.C. § 1681(a), "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C.A. § 1681.  The DOJ has implemented Title IX through comprehensive regulations at 28 C.F.R. Part 54, "which is designed to eliminate (with certain exceptions) discrimination on the basis of sex in any education program or activity receiving Federal financial assistance, whether or not such program or activity is offered or sponsored by an educational institution as defined in these Title IX regulations." 28 C.F.R. § 54.100.

234.     The Gender Ideology Condition is also vague.  The definition of "gender ideology" provided in the Gender Ideology Order is not only demeaning but also idiosyncratic and unscientific. Further, given the expansive meaning of "promote," federal agencies have free rein to punish recipients who for a broad and subjective range of activities that could be seen as promoting gender ideology, such as simply complying with existing federal nondiscrimination requirements, providing services in accordance with an individual's gender identity, or using inclusive language in policies, training materials, or public communications.

-53-

235.    On February 28, 2025, Judge Lauren King of the United States District Court for the Western District of Washington enjoined enforcement of the Gender Ideology Order in part (including parts the Gender Ideology Condition incorporates by references), holding that the plaintiffs had shown a likelihood of success on their claims that the Order violates the Fifth Amendment's guarantee of equal protection and the separation of powers.  See *Washington v. Trump*, 768 F. Supp. 3d 1239, 1261-77 (W.D. Wash. 2025).

236.    Particularly relevant here, the Court ruled that the plaintiffs were likely to succeed in showing that "[b]y attaching conditions to federal funding that were . . . unauthorized by Congress," subsections 3(e) and (g) of the Gender Ideology Order "usurp Congress's spending, appropriation, and legislative powers."  *Id*. at 1261.  The Court explained that the Gender Ideology Order "reflects a 'bare desire to harm a politically unpopular group'" by "deny[ing] and denigrat[ing] the very existence of transgender people."  *Id*. at 1277 (citation omitted).

237.    The Gender Ideology Condition likewise constitutes arbitrary and capricious agency action in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Agencies imposing the Gender Ideology Condition failed to engage in reasoned decision making, failed to identify any statutory authority permitting them to condition federal funding on adherence to an executive branch definition of "gender ideology," and failed to explain how the condition is consistent with governing civil rights statutes, longstanding agency interpretations, or the purposes of the underlying grant programs.  Instead, Defendants imposed a novel, ideologically driven funding restriction untethered from congressional authorization and unsupported by factual findings, rendering the condition arbitrary, capricious, and not in accordance with law.

238.    Accordingly, the Gender Ideology Conditions discussed above are unlawful and in violation of the Constitution and the APA.

### 4.  The Immigration Enforcement Condition is Unlawful

239.    Congress has not delegated to Defendants the authority to condition federal funding on a recipient's agreement to "comply with" conditions "related to coordination and cooperation" with federal immigration officials or to certify that they do not "operate any program that benefits illegal immigrants or incentivizes illegal immigration."  It is also unclear what type of conduct this might encompass,

-54-

RENNE PUBLIC LAW GROUP
Attorneys at Law

1  leaving recipients of federal funds without fair notice of what activities would violate the prohibition and

2  giving federal agencies free rein to arbitrarily enforce it.

3       240.    Nor, or does labeling the requirement as an "agency priority" cure these defects or alter its

4  substance or legal effect.  Regardless of how Defendants characterize it, the requirement operates in

5  practice as a binding condition on the receipt of federal funds, backed by the threat of grant denial,

6  termination, or enforcement action.  Conditioning funding on adherence to an agency-defined "priority"

7  related to cooperation with federal immigration enforcement has the same coercive force and legal

8  consequences as an express funding condition, yet remains unsupported by congressional authorization,

9  impermissibly vague, and susceptible to arbitrary and discriminatory enforcement.

10       241.    Multiple federal courts have already adjudicated the DHS Immigration Enforcement

11  Conditions and other materially similar conditions implemented by the Department of Transportation

12  (DOT) unlawful under the Constitution and the APA.

13       242.    In *Illinois v. Fed. Emergency Mgmt. Agency*, 801 F. Supp. 3d 75 (D.R.I. 2025), the United

14  States District Court for the District of Rhode Island held that DHS's decision to attach the Immigration

15  Enforcement Conditions to DHS-administered grants was arbitrary and capricious under the APA and

16  unconstitutional under the Spending Clause, concluding that the conditions were not reasonably related

17  to the purposes of the grants to which they were attached, were impermissibly coercive given the

18  magnitude and indispensability of the funding at stake, and were unlawfully ambiguous, depriving states

19  of clear notice of what compliance required.  The court vacated the conditions and permanently enjoined

20  federal officials from enforcing them.  Defendant DHS has appealed against that decision, which is

21  pending in the First Circuit.

22       243.    In *California v. United States Department of Transportation*, --- F. Supp. 3d ----, 2025

23  WL 3072541 (D.R.I. Nov. 4, 2025), the United States District Court for the District of Rhode Island

24  invalidated an analogous immigration enforcement conditions imposed by DOT across federal

25  transportation grants.  The court held the conditions ultra vires under the APA because no statute

26  authorized DOT to impose sweeping immigration-cooperation mandates unrelated to transportation

27  programs.  It further held the condition arbitrary and capricious for relying on factors Congress did not

28  intend DOT to consider, failing to account for state reliance interests, and imposing vague obligations.

RENNE PUBLIC LAW GROUP
Attorneys at Law

-55-

The court also held the immigration conditions violated the Spending Clause because it was not reasonably related to the federal interest in transportation programs, impermissibly coercive given the scale and indispensability of the funds, and impermissibly ambiguous because they failed to provide States meaningful notice of what cooperation entailed.  The court declared the conditions unlawful, vacated them from all DOT grant agreements, and permanently enjoined DOT from implementing or enforcing them.  2025 WL 3072541, at *11–13.  Initially, the DOT appealed this decision, however, on January 13, 2026, the DOT filed a motion to dismiss its appeal, conceding that these immigration conditions, as implemented by DOT, violate both the APA and the Constitution.

244.    The Immigration Enforcement Condition is particularly unlawful as applied to certain grant programs, including the Office for Victims of Crime ("OVC") Human Trafficking Programs, because it directly conflicts with express statutory directives in the Trafficking Victims Protection Act ("TVPA"), 22 U.S.C. § 7105(b).  Congress carefully prescribed the permissible priorities and conditions for Human Trafficking Program grants, authorizing the Attorney General to give priority only to applicants that attest grant funds will be used for enumerated anti-trafficking purposes and expressly prohibiting the use of funds to require trafficking victims to collaborate with law enforcement as a condition of access to services.  22 U.S.C. § 7105(b)(2)(D).  Congress further mandated that victims of severe forms of trafficking are eligible for federal benefits and services "without regard to the immigration status of such victims," and required federal agencies to expand such benefits notwithstanding otherwise applicable immigration-related restrictions.  22 U.S.C. § 7105(b)(1)(A), (B).  Conditioning OVC Human Trafficking funds on cooperation with federal immigration enforcement or on certifications concerning programs that may "benefit" undocumented individuals not only exceeds Defendants' authority but also affirmatively undermines Congress's express determination that immigration status must not be used to limit access to trafficking victim services.

245.    Accordingly, the Immigration Enforcement Conditions and Immigration Priority Conditions challenged here are unlawful and in violation of the Constitution and the APA.

**F.    Plaintiffs Face an Impossible Choice of Accepting Illegal Conditions, or Forgoing Federal Grant Funding for Critical Programs and Services**

246.    The grant conditions that Defendants seek to impose leave Plaintiffs with the Hobson's

-56-

choice of accepting illegal conditions that are unauthorized by Congress, violate the Constitution, and accompanied by poison pill provisions that increase the risk of FCA claims, or forgoing the grant funds—funds paid (at least partly) through local federal taxes—that are essential for vital local services. The uncertainty caused by these illegal conditions has impeded Plaintiffs' ability to budget and plan for services covered by the grants.

247.    The heightened FCA risk is not merely speculative.  A May 19, 2025, letter from Deputy Attorney General Todd Blanche to certain DOJ divisions and offices and all U.S. Attorneys states that DOJ is setting up a "Civil Rights Fraud Initiative"—co-led by DOJ's Civil Fraud Section and Civil Rights Division—that will "utilize the [FCA] to investigate and, as appropriate, pursue claims against any recipient of federal funds that knowingly violates civil rights laws."  The letter asserts the FCA "is implicated whenever federal-funding recipients or contractors certify compliance with civil rights laws while knowingly engaging in racist preferences, mandates, policies, programs, and activities, including through diversity, equity, and inclusion (DEI) programs that assign benefits or burdens on race, ethnicity, or national origin."  It further states that the Civil Fraud Section and Civil Rights Division will "engage with the Criminal Division, as well as with other federal agencies that enforce civil rights requirements for federal funding recipients" and "will also establish partnerships with state attorneys general and local law enforcement to share information and coordinate enforcement actions."  Finally, the letter states that DOJ "strongly encourages" private lawsuits under the FCA and "encourages anyone with knowledge of discrimination by federal-funding recipients to report that information to the appropriate federal authorities so that [DOJ] may consider the information and take any appropriate action."  Letter from Todd Blanche, Deputy Attorney General, to DOJ Offices, 19 Divisions, and U.S. Attorneys (May 19, 2025), https://www.justice.gov/dag/media/1400826/dl?inline (last visited February 4, 2026).

248.    The prospective loss of these federal funds would be so catastrophic to Plaintiffs' finances that the essential services they provide—including disaster preparedness, mitigation, and emergency response; wildfire and flood resilience projects; victim services; de-escalation and crisis-response training for law enforcement; community-oriented policing initiatives; and the conservation and rehabilitation of parks, open space, and water resources—would be effectively halted.  Plaintiffs cannot replace these funds with local revenue without drastically cutting other critical services or abandoning

RENNE PUBLIC LAW GROUP
Attorneys at Law

other critical programs.  Yet agreeing to the vague, unauthorized, and contradictory grant conditions—even if Plaintiffs were to make a good faith effort to revise their policies to comply—would expose them to significant liability.  Certifying compliance with these conditions carries an intolerable risk of enforcement under the False Claims Act, and constitutional and statutory challenges from stakeholders who could assert that Plaintiffs have adopted discriminatory or otherwise unlawful policies in violation of their rights.  Plaintiffs thus face an impossible dilemma: either accept legal jeopardy by complying with the conditions or forfeit funding that is essential to the health, safety, and well-being of their residents.

> 1. **Plaintiffs, as Recipients of Pass-Through Funds, have a Reasonable Concern that the Challenged Conditions Apply to those Pass-Through Funds**

249.    Local government entities that receive federal grant funds may receive the funds directly from a federal agency (as a direct recipient) or indirectly from a pass-through entity (as a sub-recipient). Where a pass-through entity (for example, a state) provides federal funds to a sub- recipient (for example, a city or county within the state), the pass-through entity is responsible for ensuring the sub-recipient complies with applicable federal requirements.  *See* 2 C.F.R. § 200.332(b)(2) (pass-through entity must provide to the sub-recipient information regarding "[a]ll requirements of the subaward, including requirements imposed by Federal statutes, regulations, and the terms and conditions of the Federal award"), 200.332(e) (pass-through entity must "[m]onitor the activities of a subrecipient as necessary to ensure that the subrecipient complies with Federal statutes, regulations, and the terms and conditions of the subaward"); 2 C.F.R. § 2800.101 (incorporating 2 C.F.R. Part 200 requirements with respect to federal awards made by DOJ); 2 C.F.R. § 1402.103 (same for DOI).

250.    Consistent with 2 CFR § 200.332, the grant agreements and terms and conditions received by Plaintiffs incorporate applicable federal requirements against sub-recipients.

## V.    CAUSES OF ACTION

### Count 1: Separation of Powers
*(All Grant Conditions)*

251.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

RENNE PUBLIC LAW GROUP
Attorneys at Law

252.    The Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).  This power is "directly linked to [Congress's] power to legislate," and "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Id.* (second alteration in original) (quoting *Clinton v. City of New York*, 524 U.S. 417, 438 (1998)).

253.    The Constitution vests Congress—not the Executive—with legislative powers, *see* U.S. Const. art. 1, § 1, the spending power, *see* U.S. Const. art. 1, § 8, cl. 1, and the appropriations power, *see* U.S. Const. art. 1, § 9, cl. 7.  Absent an express delegation, only Congress is entitled to attach conditions to federal funds.

254.    "The Framers viewed the legislative power as a special threat to individual liberty, so they divided that power to ensure that 'differences of opinion' and the 'jarrings of parties' would 'promote deliberation and circumspection' and 'check excesses in the majority.'"  *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 223 (2020) (quoting The Federalist No. 70, at 475 (A. Hamilton) and citing *id.*, No. 51, at 350).

255.    "As Chief Justice Marshall put it, this means that 'important subjects … must be entirely regulated by the legislature itself,' even if Congress may leave the Executive 'to act under such general provisions to fill up the details.'"  *West Virginia v. EPA*, 597 U.S. 697, 737 (2022) (Gorsuch, J., concurring) (quoting *Wayman v. Southard*, 10 Wheat. 1, 42–43, 6 L. Ed. 253 (1825)).

256.    The separation of powers doctrine thus represents perhaps the central tenet of our Constitution.  *See, e.g.*, *Trump v. United States*, 603 U.S. 593, 637–38 (2024); *West Virginia v. EPA*, 597 U.S. at 723–24; *Seila Law LLC*, 591 U.S. at 227; *see also Clinton v. City of New York*, 524 U.S. 417, 450 (1998) ("Liberty is always at stake when one or more of the branches seek to transgress the separation of powers" (Kennedy, J., concurring)).  Consistent with these principles, the executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the express or implied will of Congress.  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

257.    Pursuant to the separation of powers doctrine, the Executive Branch may not "claim[] for itself Congress's exclusive spending power, . . . [or] coopt Congress's power to legislate." *City*

RENNE PUBLIC LAW GROUP
Attorneys at Law

& *Cnty. of S.F.*, 897 F.3d at 1234.  Indeed, the Impoundment Control Act of 1974 requires the President to notify and request authority from Congress to rescind or defer the expenditure of funds before acting to withhold or pause federal payments.  2 U.S.C. §§ 681 et seq.  The President has not done so.

258.    Congress has not conditioned the provision of Defendants' grants on compliance with the prohibiting DEI and the "promot[ion]" of "gender ideology," or cooperation with federal immigration enforcement.  Nor has Congress delegated to Defendants the authority to attach the challenged conditions unilaterally.

259.    By imposing the challenged conditions on recipients of federal funds, Defendants are unilaterally attaching new conditions to federal funding without authorization from Congress.

260.    Further, the "[t]he interpretation of the meaning of statutes, as applied to justiciable controversies," is "exclusively a judicial function."  *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 411–13 (2024) (internal quotations omitted).

261.    Here, Defendants seek to impose conditions that purport to require compliance with the law interpreted and envisioned by the Executive, contrary to Congress's authority to legislate and the Judiciary's interpretation of the law's meaning.

262.    For these reasons, Defendants' conditioning of federal funds on compliance with challenged conditions violates the separation of powers doctrine.

### Count 2: Spending Clause
#### *(All Grant Conditions)*

263.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

264.    The Spending Clause of the U.S. Constitution provides that "Congress"—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States …"  U.S. Const. art. I, § 8, cl. 1.

265.    As described above, Defendants violate the separation of powers because the challenged conditions are neither expressly nor impliedly authorized by Congress.  For the same reasons, Defendants

-60-

RENNE PUBLIC LAW GROUP
Attorneys at Law

violate the Spending Clause.

266.    The Spending Clause also requires States to have fair notice of conditions that apply to federal funds disbursed to them. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981). The grant conditions must be set forth "unambiguously." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

267.    Moreover, funding restrictions may only impose conditions that are reasonably related to the federal interest in the project and the project's objectives. *S. Dakota v. Dole*, 483 U.S. 203, 207, 208 (1987).

268.    Finally, federal funds "may not be used to induce the States to engage in activities that would themselves be unconstitutional." *Id*. at 210.

269.    Even if Congress had delegated authority to the Executive and DHS, FEMA, DOI or DOJ to condition grant funding on terms prohibiting DEI and the "promot[ion]" of "gender ideology," or cooperation with federal immigration enforcement, the challenged conditions would violate the Spending Clause by:

    a.    imposing conditions that are ambiguous, *see Pennhurst*, 451 U.S. at 17;

    b.    imposing conditions that are so severe as to be coercive;

    c.    imposing conditions that are not germane to the stated purpose of grant program funds, *see Dole*, 483 U.S. at 207 ("[C]onditions on federal grants might be illegitimate if they are unrelated 'to the federal interest in particular national projects or programs.'"); and

    d.    with respect to the prohibition on promotion of "gender ideology," imposing a condition that purports to require grant recipients to act unconstitutionally by discriminating on the basis of gender identity and sex, *see id*. at 210.

## Count 3: Tenth Amendment
### *(All Grant Conditions)*

270.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

271.    The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the

-61-

RENNE PUBLIC LAW GROUP
Attorneys at Law

1    people." U.S. Const. amend X.

2        272.    Legislation that "coerces a State to adopt a federal regulatory system as its own" "runs

3    contrary to our system of federalism." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577–78

4    (2012).  States must have a "legitimate choice whether to accept the federal conditions in exchange for

5    federal funds." *Id*. at 578.

6        273.    Even if Congress had delegated authority to the Executive or Defendants to condition

7    grant funds on any policy that "promotes" the Administration's conception of an "illegal" DEI program

8    or on participation in the Administration's enforcement of federal immigration laws, the challenged

9    conditions violate the Tenth Amendment by imposing conditions so severe as to coerce recipients of such

10   funds to adopt the Administration's reinterpretation of the law.  *See id*. at 579 (Congress may not impose

11   conditions so severe that they "cross[] the line distinguishing encouragement from coercion.").

### Count 4: Fifth Amendment Due Process – Vagueness
*(All Grant Conditions)*

14       274.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully

15   set forth herein.

16       275.    Under the Due Process Clause of the Fifth Amendment, a governmental enactment, like

17   an executive order, is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair

18   notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory

19   enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

20       276.    The challenged conditions are unconstitutionally vague.

21       277.    The EO Condition is vague in purporting to incorporate all executive orders.  Executive

22   orders are the President's directives to federal agencies and do not apply to federal grant recipients.  The

23   purported incorporation of all executive orders into the recipient or sponsor's use of grant funds renders

24   the other new grant conditions vague.

25       278.    The DEI Conditions fails to clearly define what conduct is prohibited and fails to specify

26   clear standards for enforcement.  This uncertainty is amplified by agency letters and statements, that

27   conflict with federal statutes and case law.

28       279.    The Immigration Enforcement Conditions fails to define the terms it uses, including

-62-

RENNE PUBLIC LAW GROUP
Attorneys at Law

"cooperate," "cooperating," "impeding," "incentivize" and "enforcement" with respect to "Federal immigration law," leaving federal grant recipients without fair notice of what would violate the prohibition.

280.    The definition of "gender ideology" adopted in the Gender Ideology Condition is so vague as to require people of ordinary intelligence to guess as to what is prohibited.  By the same token, the Gender Ideology Condition affords unfettered discretion to Defendants to determine, based on their subjective interpretation, whether a federal grant is used to "promote gender ideology."

281.    Thus, the challenged conditions are unconstitutionally vague in violation of the Fifth Amendment's Due Process Clause.

## Count 5: Administrative Procedure Act, 5 U.S.C. § 706(2) –

### Arbitrary and Capricious
*(All Grant Conditions)*

282.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

283.    Defendants DHS, FEMA, DOI, and DOJ are all "agenc[ies]" as defined in the APA, 5 U.S.C. § 551(1).  the inclusion of the challenged conditions in the various policies and NOFOs, including but not limited to, the DHS's Standard Terms and Conditions, the FY25 Homeland Security Grant Program NOFO, the General Conditions for OJP Awards in FY2025, the FY25 Community Policing Development Microgrants NOFO, the FY25 Safer Outcomes Enhancing De-Escalation NOFO, the FY25 Law Enforcement Mental Health and Wellness Act (LEMHWA) Implementation Projects NOFO, the COPS Office LEMHWA Program Award Owner's Manual, the Safer Outcomes Program Award Owner's Manual, the FY25 Victims of Crime Act (VOCA) Victim Assistance Formula Grant NOFO, the FY25 Victims of Crime Act (VOCA) Victim Compensation Formula Grant NOFO, FY25 Services for Victims of Crime NOFO, the FY25 Paul Coverdell Forensic Science Improvement NOFO, the OVC FY25 Housing Assistance for Victims of Human Trafficking NOFO, OVC FY25 Integrated Services for Minor Victims of Human Trafficking NOFO, OVC FY25 Enhanced Collaborative Model (ECM) Task Force to Combat Human Trafficking NOFO, the OVC FY25 Services for Victims of Human Trafficking NOFO, the OVC FY25 Preventing Trafficking of Girls NOFO, and the DOI Office of Grants

-63-

RENNE PUBLIC LAW GROUP
Attorneys at Law

Management, General Award Terms and Conditions are all final agency actions subject to review under the APA.

284.    Final agency actions (1) "mark the 'consummation' of the agency's decision making process" and (2) are ones "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

285.    These actions determine rights and obligations and produce legal consequences because they exercise purported authority to create new conditions on already awarded funds that would obligate recipients to comply with the Executive's policy priorities.

286.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

287.    "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'"  *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).  A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'"  *Id.* (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)).  "[A]n agency cannot simply ignore 'an important aspect of the problem'" addressed by its action.  *Id.* at 293.

288.    Defendants have provided no reasoned explanation for their decision to impose conditions prohibiting DEI and the "promot[ion]" of "gender ideology," or cooperation with federal immigration enforcement on federal funds.

289.    Defendants also ignore essential aspects of the problems they purport to address via the various grant programs, including the Plaintiff's reasonable and inevitable reliance on now at-risk funds, the expectation of reimbursement from already appropriated funds, and the delaying or halting disaster mitigation projects that reduce loss of life and property, disrupting victim services that provide emergency shelter, counseling, and legal assistance to survivors of violence and exploitation, and impeding water restoration efforts necessary to protect drinking water supplies, prevent environmental contamination.

-64-

RENNE PUBLIC LAW GROUP
Attorneys at Law

290.     Furthermore, in many instances, the challenged conditions contravene the nondiscrimination laws and authorizing statutes they purport to implement.

291.     Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that Defendants imposing the challenged conditions violates the APA because it is arbitrary and capricious; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from imposing those Conditions without complying with the APA.

### Count 6: Administrative Procedure Act, 5 U.S.C. § 706(2) –
### Contrary to the Constitution
*(All Grant Conditions)*

292.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

293.     Under the APA, a "court shall … hold unlawful and set aside agency actions, findings, and conclusions found to be … contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

294.     As described above, Defendants' imposition of the challenged conditions violates bedrock constitutional provisions and principles, including the separation of powers between the President and Congress, the Spending Clause, the Tenth Amendment, and the Fifth Amendment.

295.     Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that Defendants imposing the challenged conditions violates the APA because it is contrary to constitutional rights, powers, privileges, or immunities; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from imposing those Conditions without complying with the APA.

### Count 7: Administrative Procedure Act, 5 U.S.C. § 706(2) –
### In Excess of Statutory Authority
*(All Grant Conditions)*

296.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

297.     Under the APA, a "court shall … hold unlawful and set aside agency actions, findings,

and conclusions found to be … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

298.    Defendants may exercise only authority granted to them by statute or the Constitution.

299.    No law or provision of the Constitution authorizes Defendants to impose extra-statutory conditions not authorized by Congress on congressionally-appropriated funds.

300.    No legislation authorizes Defendants to impose conditions on federal funding prohibiting DEI and the "promot[ion]" of "gender ideology," or cooperation with federal immigration enforcement.

301.    Indeed, by threatening to unilaterally withhold funds on the basis of unauthorized agency-imposed grant conditions, Defendants attempt to circumvent the process established in the Impoundment Control Act of 1974, which requires the President to notify and request authority from Congress to rescind or defer the expenditure of funds before acting to withhold or pause federal payments.  2 U.S.C. §§ 681 et seq.

302.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that Defendants imposing the challenged conditions violates the APA because it is in excess of Defendants' statutory jurisdiction, authority, or limitations, or short of statutory right; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from imposing those Conditions without complying with the APA.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request the following relief:

A.    A declaration that the DHS Grant Conditions are unconstitutional, are not authorized by statute, violate the APA, and are otherwise unlawful;

B.    A declaration that Defendants' attachment or incorporation of the DHS Grant Conditions to Plaintiffs' funding is unconstitutional, is not authorized by statute, violates the APA, and is otherwise unlawful;

C.    A preliminary and permanent injunction enjoining DHS Defendants from imposing or enforcing the DHS Grant Conditions or any materially similar terms or conditions to any DHS funds received by or awarded to Plaintiffs, directly or indirectly;

D.    A declaration that the FEMA Grant Conditions are unconstitutional, are not authorized by

-66-

RENNE PUBLIC LAW GROUP
Attorneys at Law

statute, violate the APA, and are otherwise unlawful;

E.    A declaration that Defendants' attachment or incorporation of the FEMA Grant Conditions to Plaintiffs' funding is unconstitutional, is not authorized by statute, violates the APA, and is otherwise unlawful;

F.    A preliminary and permanent injunction enjoining FEMA Defendants from imposing or enforcing the DHS Grant Conditions or any materially similar terms or conditions to any DHS funds received by or awarded to Plaintiffs, directly or indirectly;

G.    A declaration that the DOI Grant Conditions are unconstitutional, are not authorized by statute, violate the APA, and are otherwise unlawful;

H.    A declaration that Defendants' attachment or incorporation of the DOI Grant Conditions to Plaintiffs' funding is unconstitutional, is not authorized by statute, violates the APA, and is otherwise unlawful;

I.    A preliminary and permanent injunction enjoining DOI from imposing or enforcing the DOI Grant Conditions or any materially similar terms or conditions to any DOI funds received by or awarded to Plaintiffs, directly or indirectly;

J.    A declaration that the DOJ Grant Conditions are unconstitutional, are not authorized by statute, violate the APA, and are otherwise unlawful;

K.    A declaration that Defendants' attachment or incorporation of the DOJ Grant Conditions to Plaintiffs' funding is unconstitutional, is not authorized by statute, violates the APA, and is otherwise unlawful;

L.    A preliminary and permanent injunction enjoining DOJ from imposing or enforcing the DOJ Grant Conditions or any materially similar terms or conditions to any DOJ funds received by or awarded to Plaintiffs, directly or indirectly;

M.    An order pursuant to 5 U.S.C. § 705 that postpones the effective date or any action by any Defendants to adopt, issue, or enforce the challenged Grant Conditions pending conclusion of this litigation; declares the challenged Grant Conditions void and unenforceable with respect to any application, award, agreement or other document executed by Plaintiffs; and declares that the DEI Conditions require compliance with the statutes cited therein as those statutes have been enacted by

Congress and interpreted by the judiciary.

N.     An order under 5 U.S.C. § 706 holding unlawful, setting aside, and vacating all actions taken by Defendants to:  adopt, issue, or implement the challenged Grant Conditions; require, attach, incorporate, implement, or enforce the challenged Grant Conditions at any stage of the grant process, including but not limited to any grant application or grant agreement or subagreement; construe the DEI Conditions to require anything other than compliance with the statutes cited in the DEI Conditions as they have been enacted by Congress and interpreted by the judiciary.

O.     Orders preliminarily and permanently enjoining Defendants from retaliating against any Plaintiff for participating in this lawsuit or taking any adverse action based on any Plaintiffs' participation in this lawsuit, including but not limited to reducing the amount of a grant award to that Plaintiff or to any state agency through which Plaintiff may receive grant funding; refusing to issue, process, sign, or approve grant applications, grant agreements, or subgrant agreements; and refusing to issue, process, sign, or approve any notice or request for payment, or reducing the amount of such approval or payment;

P.     Award Plaintiffs their reasonable costs and attorneys' fees; and

Q.     Grant any other further relief that the Court deems fit and proper.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

RENNE PUBLIC LAW GROUP
Attorneys at Law

Dated:  February 20, 2026

RENNE PUBLIC LAW GROUP

By: _____ */s/ Ryan P. McGinley-Stempel* _____
      RYAN P. McGINLEY-STEMPEL

Attorneys for Plaintiffs
City of Fresno; City of Redwood City; City of
Santa Clara; City of Santa Cruz; City of
Beaverton; City of Corvallis; City of Hillsboro;
City of Stockton; County of San Diego; County
of Los Angeles; County of Santa Barbara

Dated:  February 20, 2026

FRESNO CITY ATTORNEY'S OFFICE

By: _____ */s/ Andrew Janz* _____
      ANDREW JANZ

Attorney for Plaintiff
City of Fresno

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**ECF ATTESTATION**

I, RYAN P. McGINLEY-STEMPEL, am the ECF user whose identification and password are being used to file this COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF.  Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that the other above-named signatories concur in this filing.

Dated:  February 20, 2026

RENNE PUBLIC LAW GROUP

By: _____*/s/ Ryan P. McGinley-Stempel*_____
RYAN P. McGINLEY-STEMPEL

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF